040372/19344/MHW/JFM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARL HEMPHILL, <br><br> Plaintiff, <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INC.; SALEH OBAISI; ANN HUNDLY DAVIS; LATONYA WILLIAMS; LOUIS SHICKER; MICHAEL LEMKE; DORRETTA O'BRIEN; and KEVIN HALLORAN, <br><br> Defendants. | Case Number 15-cv-4968 <br><br> Judge Sharon Johnson Coleman |

### LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS BY THE WEXFORD DEFENDANTS

NOW COME the Defendants, WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, P.A., and ANN DAVIS, M.D., by and through their attorneys, Matthew H. Weller and James F. Maruna, of CASSIDAY SCHADE LLP, and for their L.R. 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, state as follows:

### Jurisdiction and Venue

1. The Court has jurisdiction over this case because the Plaintiff raises claims under 42 U.S.C. § 1983. *See* Second Amended Complaint, [Dkt. # 33]. Venue is proper for this litigation in the Northern District of Illinois because the events alleged occurred at Stateville Correctional Center which is located in this District. [Dkt. # 33].

**The Parties**

2.⠀⠀⠀⠀Plaintiff, CARL HEMPHILL, is a forty-one (41) year old inmate serving a thirty-nine (39) year sentence for a variety of crimes including murder and kidnapping. *See* Deposition of Carl Hemphill, attached as ***Exhibit A***, 12:1-10-16; 13:11-14. Plaintiff has been incarcerated at IDOC prisons continuously since March 20, 2003. (Ex.A at 12:1-10).

3.⠀⠀⠀⠀Deceased Defendant, SALEH OBAISI, M.D., was Stateville's Medical Director. *See* Deposition of Saleh Obaisi, M.D., attached as ***Exhibit B***, 5:8-10. Dr. Obaisi attended medical school in 1968; followed by a four (4) year general surgery residency at The Ohio State University and a burn fellowship at Cook County Hospital. (Ex.B at 9:11-10). Following completion of his surgical training, Dr. Obaisi operated as a private practice general surgeon for several decades until joining Wexford in 2002. (Ex.B at 9:11-13). Dr. Obaisi came to Stateville on August 2, 2012, where he served as its medical director until his death in 2017. (Ex.B at 5:8-10).

4.⠀⠀⠀⠀Defendant, Ann Davis, M.D., was a staff physician at Stateville from April 2013 to April 2014. *See* Deposition of Ann Davis, M.D., attached as ***Exhibit C***, 6:7-17. Dr. Davis obtained a degree in biomedical engineering from Duke University and then attended medical school, graduating in 2008. (Ex.C at 12:2-5). Following medical school, Dr. Davis completed a residency in family medicine. (Ex.C at 12:16-21). She currently is licensed to practice medicine in two states. (Ex.C at 80:10-16).

5.⠀⠀⠀⠀Defendant, LATANYA WILLIAMS, P.A., is the physician's assistant at Stateville. *See* Deposition of Latanya Williams, P.A., 10:20-22; 7:13-14, attached as ***Exhibit D***. PA Williams obtained a master's in physician's assistant studies from the University of Nebraska in 2000 and has been working at Stateville since 2002. (Ex.D at 7:1-2; 13-14). As a PA, she can

2

write prescriptions and order labs, but she cannot recommend or evaluate patients for surgery or MRIs. (Ex.D at 15:3-14; 20:14-19).

6. Defendant, WEXFORD HEALTH SOURCES, INC., is a private company that has contracted with the State of Illinois to provide certain medical services to IDOC inmates pursuant to a contract. *See* Deposition of Arthur Funk, M.D., attached as ***Exhibit E***, 10:10-16.

### Other Testimony

7. Dr. Arthur Funk, Wexford's Regional Medical Director for Northern Illinois provided testimony was Wexford's 30(b)(6) designee. (Ex.E at 8:1-3). Dr. Funk is a licensed medical doctor in the State of Illinois and also holds a Certified Correctional Health Care Provider designation. (Ex.E at 7:2-10). He has worked in correctional medicine for approximately the last twenty-two (22) years. (Ex.E at 7:13-14).

8. Dr. Louis Shicker, is the retired, former agency medical director of the entire IDOC. *See* Deposition of Louis Shicker, M.D., attached as ***Exhibit F***, 6:13-16. Dr. Shicker graduated from medical school in 1986 and then completed a residency in internal medicine at Rush Presbyterian St. Luke's Medical Center. (Ex.F at 8:2-13).

### Plaintiff's Expert

9. Plaintiff's expert witness is David Hellerstein, M.D. *See* Deposition of David Hellerstein, M.D., attached as ***Exhibit G***, 22:13-15. Dr. Hellerstein is board-certified in internal medicine - he is not a surgeon. (Ex.G at 22:13-15). Dr. Hellerstein is currently a retired annuitant for the California Department of Corrections and a part-time expert witness. (Ex.G at 30:18-31:14). Previously, he was a medical director for the California Department of Corrections; however, he retired in 2006, and testified that he has not treated an incarcerated patient in fourteen (14) years. (Ex.G at 32:9-12). Interestingly, Dr. Hellerstein was previously

retained as an expert witness by Wexford to review a case. (Ex.G at 42:23-43:230. He prepared a report, testified in a deposition, and actually testified in Court on Wexford's behalf. (Ex.G at 41:13-15). During his deposition in this case, when pressed by counsel on what his previous work with Wexford involved, Dr. Hellerstein was forced to concede that he spoke with Wexford's attorneys more than five (5) times, and also was provided and reviewed confidential internal Wexford documents. (Ex.G at 42:23-43:23). He also met with Wexford's attorney and participated in preparation sessions prior to giving both his deposition and trial testimony. (Ex.G at 42:23-43:6).

## **Wexford's Experts**

10. Wexford disclosed Dr. Kennon Tubbs as its correctional medicine expert witness. *See* Deposition of Kennon Tubbs, M.D., attached as ***Exhibit H***, 8:24-9:7. Dr. Tubbs obtained his bachelor's of science at Colorado State and his medical degree at Georgetown University School of Medicine. (Ex.H at 8:24-9:7). He then completed a family practice residency. (Ex.H at 8:24-9:7). Dr. Tubbs is licensed to practice medicine in multiple states and board-certified in family practice. (Ex.H at 9:8-10; 10:8-6). Dr. Tubbs also holds a Certified Correctional Health Care Provider designation. (Ex.H at 10:8-16). He started working in correctional medicine in 1990, and is currently the medical director of multiple jails in the Mountain states. (Ex.H at 16:9-13; 20:5-25:3). Dr. Tubbs currently spends more than fifty (50) hours per week treating inmates in clinic in a jail, and sees approximately 100 inmates each week for medical services. (Ex.H at 148:23-25; 25:1-3). Additionally, Dr. Tubbs has drafted the medical policies for numerous correctional facilities. (Ex.H at 165:25-166:2).

11. Wexford disclosed Dr. Chad Prodromos as its orthopedic surgeon expert witness. *See* Deposition of Chadwick Prodromos, M.D., attached as ***Exhibit I***, 8:4-11. Dr. Prodromos

obtained his bachelor's degree from Princeton University, and then attended Johns Hopkins for medical school. (Ex.I at 8:4-11). After obtaining his medical degree, Dr. Prodromos completed a surgical internship at the University of Chicago, followed by an orthopedic residency at Rush Presbyterian St. Luke's Medical Center; and then a surgical fellowship at Harvard University. (Ex.I at 8:4-11). Dr. Prodromos is a board certified orthopedic surgeon. (Ex.I at 8:23-9:1). He has worked as a private orthopedic surgeon since 1986 and also taught as an associate professor of surgery at Rush for twenty-five (25) years. (Ex.I at 16:22-17:7; 14:16-15:7).

## Background on Medical Care at Stateville

12. Stateville Correctional Center has approximately 1,600 inmates. (Ex.E at 18:18-18:2).

13. The IDOC retained Wexford as a vendor to provide certain medical services to inmates housed at IDOC prisons, such as Stateville. (Ex.E 10:10-16).

14. Stateville contains a health care unit consisting of 1 medical director; 1 staff physician; 1 physician's assistant; and about 30 nurses. (Ex.E at 15:21-16:30; 16:14-17:2; 17:7-10).

15. Inmates secure medical services at Stateville via a process called sick call. (Ex.E at 29:19-30:17). An inmate completes a sick call form and submits it to the Health Care Unit with an explanation. (Ex.E at 29:19-30:17). A medical technician ("CMT"), a position below a nurse, picks up the sick call requests from the inmates. (Ex.D at 32:13-18). Then, a designated nurse reviews the sick call request and routs it to the specific department, based on his or her medical judgment. (Ex.E at 29:19-30:17; (Ex.B at 15:9-18). The nurse can provide treatment or route the patient to a higher-level clinician, such as the M.D. or P.A., depending on what the request is, and whether or not the inmate has complied with the State of Illinois' co-pay

requirement. (Ex.E at 29:19-30:17). The triaging nurse reports to the Director of Nursing, not to the Medical Director, Dr. Obaisi. (Ex.B at 15:9-18).

16. Medical treatment options available to inmates housed at Stateville run the gamut of treatment options available in the local community. (Ex.E at 49:5-10).

17. While most medical needs can be addressed on-site, from time-to-time, an inmate may benefit from offsite medical services, such as a consultation with a medical specialist. (Ex.E at 13:4-7). In such instances, the on-site medical director may request a Wexford collegial review discussion. (Ex.E at 65:8-24).

18. During a Wexford collegial review, the on-site medical director and a group of physicians will discuss the request for off-site treatment, and, if the physicians are in agreement, the request will be approved and an authorization for medical services will be sent to the offsite facility - typically the University of Illinois-Chicago ("UIC") for inmates at Stateville. (Ex.E at 65:8-24).

19. After approval, the on-site clinicians, such as Dr. Obaisi, have no role in scheduling with UIC; rather, scheduling is handled by a secretary in the IDOC's medical records department who coordinates with UIC and IDOC security. (Ex.B at 108:13-109:6).

20. As medical providers, Wexford does not actually transport the inmate to the offsite facility; rather, that is handled by IDOC security staff. (Ex.E at 66:15-67:2).

21. While Wexford does have some internal medical guidelines, clinicians practicing at IDOC prisons are required to follow treatment protocols developed by the IDOC. (Ex.E at 41:5-15); (Ex.C at 19:24-20:10).

6

22. In any event, Wexford's treatment guidelines outline only common problems and common solutions, they are not a step-by-step manuals and the clinician's independent medical judgment always controls. (Ex.B at 18:18-19:3); (Ex.E at 48;11-22); (Ex.C at 75:1-7).

23. Wexford's clinicians are required to practice medicine according to the community standard of care. (Ex.E at 48:11-22); (Ex.D at 15:3-14); (Ex.C at 91:3-9).

### Explanation of Impingement Syndrome

24. The Plaintiff is complaining of two issues related to his shoulder - impingement syndrome and mild degenerative joint disease. (Ex.E at 102:15-20). Impingement syndrome is inflammation of the rotator cuff within the rotator cuff supraspinatus - essentially, the rotator cuff swells and causes pain. (Ex.I at 30:24-42:9). The second condition, mild degenerative joint disease, is osteoarthritis. (Ex.E at 59:14-16).

25. The majority of patients with impingement syndrome receive conservative treatment, improve, and do not require surgery or further treatment. (Ex.H at 69:7-15).

26. Critically, impingement syndrome does not cause "around the clock" pain; rather, impingement syndrome only causes pain if you perform certain movements - namely, lifting your arm over your head . (Ex.I at 145:20-147:1); (Ex.B at 45:18-46:5); (Ex.E at 105:5-17).

27. Impingement syndrome cannot disturb sleep because an arm at rest generates no pain. (Ex.B at 45:18-46:5).

28. Per Dr. Prodromos, the only orthopedic surgeon deposed in this case, if a patient is reporting pain with impingement syndrome it is "always" because the patient is forcing his shoulder to perform an activity that it cannot tolerate - thus, in every case of impingement syndrome, if the patient simply stops the movement, the pain goes away:

    Q: Is that always the case, Doctor that --

> A: It's always the case.
>
> Q: -- the pain goes away?
>
> A: Always the case. Let me say it again, always the case. Physical structures do not hurt if they're not stressed…[Plaintiff has] demonstrated by the fact that he responded to treatment that was given…that he has impingement syndrome or rotator cuff tendonitis or bursitis. It is a physical structure, it is a tendon. Those structures simply do not hurt ever. Did I say ever? Ever. Unless they're stressed. If you don't stress them, they don't hurt. Period. (Ex.I at 95:21-96:12).

29. Treatment for complaints of impingement syndrome follow a logical progression of care beginning with conservative treatment. (Ex.I at 60:15-21). The first level of treatment is treatment with anti-inflammatory pain medications; ice; and/or therapy. (Ex.H at 69:16-19).

30. When conservative treatment is not working, you can move to a more invasive form of treatment consisting of steroid injections. (Ex.H at 70:5-12). A needle is inserted into the shoulder and two medications are injected into the space. (Ex.E at 53:14-20). The first medication, cortisone, a steroid, provides therapeutic treatment because it reduces inflammation in the shoulder. (Ex.E at 53:14-20); (Ex.I at 131:13-133:7). The second medication, lidocaine, provides diagnostic therapy in that if the pain goes away after lidocaine is injected then it confirms that the clinician has identified the correct pathology of the pain. (Ex.I at 131:13-133:7).

31. Eventually, if the patient still reports pain after all of these treatment options, surgery can be considered. (Ex.H at 71:7-14). However, surgery is not a universal "cure all" for impingement syndrome and some patients who receive surgery for this condition, still report pain after having surgery. (Ex.H at 71:7-14).

8

**The Comprehensive Medical Treatment Provided by the Defendants to This Plaintiff**

32. Per the Plaintiff, he had no shoulder pain, whatsoever, prior to January 1, 2013. (Ex.A at 34:9-11).

33. However, as Dr. Funk explained, given that the Plaintiff had impingement syndrome, it is simply not possible that the Plaintiff's pain started on January 1, 2013. (Ex.E at 75:11-76:16). Rather, the Plaintiff's pain had to have started many years prior, even, possibly, decades prior, and as Dr. Funk testified, "…as a clinician. I could say [that] with a very high degree of medical certainty." (Ex.E at 75:11-76:16).

34. On February 1, 2013, Plaintiff claimed that he made his second request to be seen by a doctor for a complaint of shoulder pain. (Ex.A at 46:18-25). He was given a prescription for Tylenol 325 mg and placed on the schedule to see a clinician. (Ex.A at 47:14-17).

35. On February 15, 2013, Plaintiff saw PA Williams in clinic. (Ex.A at 47:22-48:23). PA Williams performed a comprehensive physical examination of the Plaintiff's shoulder and found that he provided "poor effort" when she went to test the range of motion in his shoulder. (Ex.A at 47:22-48:23).

36. Per PA Williams, "poor effort" meant that the patient did not put very much effort into participating in her range of motion assessment. (Ex.A at 37:10-15). Nevertheless, despite Plaintiff's non-cooperation, she still increased the Plaintiff's pain medication prescription from 325 mg to 650 mg, and added a prescription for analgesic balm. (Ex.A at 47:22-48:23).

37. On April 11, 2013, Dr. Davis saw the Plaintiff in clinic following his self-report that he was lifting weights in the yard (despite, allegedly, having severe shoulder pain at this time), and dropped a weight on his hand. (Ex.A at 49:5-24). Dr. Davis provided treatment for his hand. (*Id.*). As Dr. Prodromos, the board-certified orthopedic surgeon explained, a patient

9

with shoulder pain should not lift weights because "lifting is probably the most effective way to make it--to make rotator cuff tendonitis hurt." (Ex.I at 145:20-147:1).

38. On April 19, 2013, Dr. Davis saw the Plaintiff in clinic and he complained of continuing shoulder pain for two (2) months. (Ex.A at 50:5-22). Dr. Davis switched the Plaintiff's medication from Tylenol to Naproxen. (Ex.A at 50:5-22).

39. On June 6, 2013, the Plaintiff received an x-ray. (Ex.A at 52:23-53:10). He saw Dr. Obaisi in clinic on June 26, 2013, and told Dr. Obaisi that the Naproxen was not helping. (Ex.A at 53:15-54:6). Based on the Plaintiff's self-report, Dr. Obaisi switched the Plaintiff from Naproxen to Mobic. (Ex.A at 53:15-54:6).

40. On July 18, 2013, the Plaintiff told a nurse that his medications were not helping. (Ex.A at 54:13-55:6). The nurse performed an examination and found that the Plaintiff had no signs or symptoms consistent with distress. (Ex.A at 54:13-55:6).

41. On July 31, 2013, based on the Plaintiff's continued reports of pain, Dr. Obaisi elevated the Plaintiff's treatment to a more invasive level of therapy by providing a corticosteroid injection into the Plaintiff's shoulder. (Ex.A at 55:7-56:1).

42. On September 11, 2013, the Plaintiff told a nurse that "Orange Crush" (the IDOC's tactical team) did a security sweep and took his pain medications. (Ex.A at 56:17-57:1). He asked for a refill. (*Id.*) The nurse discussed this with Dr. Davis who authorized a refill of the prescription medications. (Ex.A at 57:2-12). Dr. Davis also set the Plaintiff to see Dr. Obaisi for consultation of another steroid injection on September 24, 2012, but the appointment was rescheduled due to the facility going on security lockdown. (Ex.A at 58:8-16).

43. The Plaintiff saw Dr. Obaisi on October 22, 2013, and he agreed with Dr. Davis's recommendation of a steroid injection, and scheduled the Plaintiff for the injection in one (1)

weeks' time. (Ex.A at 58:17-59:2). On October 30, 2013, Dr. Obaisi provided a second corticosteroid injection to the Plaintiff. (Ex.A at 59:3-8).

44. The same day, Dr. Obaisi provided the Plaintiff with a medical permit asking the IDOC to assign him to a low bunk in the cell house, and also to cuff the Plaintiff at the waist rather than behind his back. (Ex.A at 60:4-15).

45. On February 8, 2014, the Plaintiff "no showed" for a scheduled sick call appointment. (Ex.A at 60:24-61:6).

46. On February 13, 2014, he told a nurse that the pain medications helped "a little" and that the injections were providing relief for approximately two (2) months. (Ex.A at 61:12-62:11).

47. In the interim, despite getting relief from the treatment provided by the on-site clinicians, the Plaintiff authored a letter to the State of Illinois demanding an MRI and surgery. (Ex.A at 63:10-18). The letter was routed to the IDOC's Agency Medical Director, Dr. Louis Shicker. (*Id.*)

48. Dr. Shicker reviewed the Plaintiff's case and wrote a letter to the Plaintiff indicating that the decision for an MRI is a clinical decision, depending on functional needs, and Dr. Obaisi was following and treating the Plaintiff symptomatically for his complaints. (*Id.*)

49. On May 1, 2014, the Plaintiff presented to sick call and asked for another steroid injection telling the nurse that the pain had only returned "in the last few weeks." (Ex.A at 64:3-5).

50. On May 12, 2014, Dr. Obaisi provided the Plaintiff with a third steroid injection, which Plaintiff testified provided about forty (40) days of relief. (Ex.A at 65:10-14; 66:6-7).

11

51. On November 12, 2014, Dr. Obaisi saw the Plaintiff in clinic and diagnosed him with chronic tendonitis, ordered an x-ray, and issued a prescription for Naproxen 500 mg which the Plaintiff admitted provided him with some relief at this deposition. (Ex.A at 66:20-67:9). That same day, Dr. Obaisi also renewed the Plaintiff's low bunk permit and issued a front cuffing permit instead of a waist chain permit. (Ex.A at 68:9-25).

52. Per Plaintiff, Dr. Obaisi told him during this appointment that the security staff complained to the warden about their safety around inmates cuffed with waist chains, so Dr. Obaisi changed the Plaintiff from a waist chain permit to a front cuffing permit, to maintain security but also try and provide some relief. (Ex.A at 68:21-69:2).

53. On November 14, 2014, the x-ray returned negative findings. (Ex.A at 67:12-68:3).

54. On March 14, 2015, the Plaintiff reported to the staff physician that his right shoulder pain had returned and that the pain was "on and off." (Ex.A at 72:8-73:1). The Plaintiff received a prescription for Naproxen for ninety (90) days. (Ex.A at 73:5-7).

55. On June 4, 2015, the Plaintiff told Dr. Obaisi that his shoulder pain was "on and off for two years." (Ex.A at 73:1-16). Dr. Obaisi advised that he would make a referral for an offsite consultation with UIC's orthopedic service. (Ex.A at 74:13-23). Plaintiff complained about having a common cold, so Dr. Obaisi provided him with cold medication treatment. (Ex.A at 74:5-8).

56. In June of 2015, Dr. Obaisi participated in a collegial review discussion with other Wexford physicians, and Wexford approved Dr. Obaisi's recommendation to send the Plaintiff offsite for a consultation with UIC's orthopedic service. (Ex.A at 74:20-23).

57. On September 16, 2015, the Plaintiff reported to the HCU for treatment of a cut to his hand that he sustained while working his prison job in Stateville's prison. (Ex.A at 76:6-23). Plaintiff advised that during the same time that he was complaining of, allegedly, severe shoulder pain, he was working in Stateville's kitchen performing multiple jobs. (Ex.A at 76:6-23).

58. On November 24, 2015, the Plaintiff presented to Dr. Obaisi requesting renewal of his low bunk permit. (Ex.A at 78:3-17). Dr. Obaisi noted that the Plaintiff's x-rays were "WNL" (a medical acronym for "within normal limits"); his physical examination was normal; and he demonstrated full range of motion of his shoulder. (Ex.A at 78:3-17). Dr. Obaisi informed the Plaintiff that the Plaintiff was not eligible for a low bunk permit, and the Plaintiff left the room angry. (Ex.A at 78:3-17).

59. On January 19, 2016, the Plaintiff presented to PA Williams, and asked for another shoulder x-ray due to pain. (Ex.A at 79:19-80:19). PA Williams ordered another shoulder x-ray and provided the Plaintiff with pain medications an analgesic balm. (*Id.*) The Plaintiff received the shoulder x-ray on January 21, 2016, and it was negative for any findings. (Ex.A at 81:21-82:2). The Plaintiff also asked for physical therapy, and PA Williams told the Plaintiff that he was on the waiting list. (Ex.A at 81:9-15).

60. On March 10, 2016, the physical therapist reviewed the Plaintiff's file and scheduled him for an evaluation. (Ex.A at 82:9-14).

61. On March 18, 2016, the Plaintiff presented to PA Williams complaining about heartburn. (Ex.A at 83:1-18). He made no complaints of shoulder pain. (Ex.A at 83:1-18).

**The Plaintiff Transfers from Stateville Correctional Center to Hill Correctional Center**

62. On March 22, 2016, the Plaintiff transferred from Stateville Correctional Center to Henry Hill Correctional Center in Western Illinois. (Ex.A at 84:15-19). His medical transfer

form indicated that the Plaintiff had no active complaints, such as pain, at the time of his transfer. (Ex.A at 84:15-19).

63. When a patient leaves Stateville to transfer to a new prison, the medical treatment and medical decision making is handed off entirely to the team of physicians at the receiving facility. (Ex.B at 129:3-15); (Ex.D at 123:8-12).

64. On April 15, 2016, the provider at Hill Correctional Center noted that the Plaintiff had a UIC orthopedic appointment scheduled, but the appointment was missed because the inmate transferred across the State to Hill Correctional Center and too late of notice was given to arrange transportation back to UIC. (Ex.A at 85:2-8). A plan was approved to complete the orthopedic provider consultation in the Galesburg, IL area now that the Plaintiff resided at Hill Correctional Center. (Ex.A at 85:23-86:1). The following day, the Plaintiff refused the nurse's offer of ibuprofen pain medication. (Ex.A at 87:15-17).

65. On April 26, 2016, the Plaintiff saw a local orthopedic surgeon in Galesburg who recommended an MRI. (Ex.A at 87:23-88:18). On May 6, 2016, the Plaintiff received the MRI which showed a partial tear of the Plaintiff's rotator cuff. (Ex.A at 88:25-89:5).

66. On May 25, 2016, Wexford approved the orthopedic surgeon's recommendation for an acromioplasty/mumford surgery, and the Plaintiff received the surgery in June of 2016. (Ex.A at 89:15-90:2; 90:8-10).

67. Despite having surgery, the Plaintiff, at the time of his deposition, still reported that his pain was "4 out of 10." (Ex.A at 90:17-22).

68. Given that some patients always will have lifelong pain with this condition, Plaintiff was asked at his deposition whether he would ever accept a medical provider's

14

statement that he would always have some level of pain going forward, and the Plaintiff advised that he would not accept anything less than zero pain. (Ex.A at 96:10-16).

69. Plaintiff admitted that Wexford provided treatment; he just disagrees with the treatment Wexford provided. *See* (Ex.A at 95:20-25) ("Q: But we just reviewed a lot of treatment that was provided to you, so what I'm trying to understand is are you saying that they didn't treat it [the condition] period, or are you saying you don't agree with the treatment they provided? A: I don't agree with the treatment.") (Ex.A at 95:20-25).

## Unchallenged Medical Opinions

70. Dr. Obaisi, Dr. Davis, and PA Williams never intended to cause harm to the Plaintiff and only desired the best possible medical outcome. (Ex.B at 152:8-15); (Ex.C at 79:23-25; 80:1-4); (Ex.D at 88:3-8).

71. The medical treatment of the Plaintiff provided by Dr. Obaisi; Dr. Davis, and PA Williams complied with the applicable community standard of medical care. (Ex.B at 152:23-153:1); (Ex.C at 80:17-19); (Ex.D at 88:15-17); (Ex.E at 100:15-101:2).

72. As Dr. Tubbs, a Certified Correctional Health Care Provider with decades of experience in correctional medicine, who has drafted numerous medical policies for correctional facilities, explained, to a reasonable degree of medical certainty, the standard of care was met with respect to medical services provided to the Plaintiff by Dr. Obaisi, Dr. Davis, and PA Williams. (Ex.H at 41:15-19).

73. In fact, as a practicing correctional medical provider, who sees approximately 100 inmates a week in jail, Dr. Tubbs stood by and supported the medical care provided by Dr. Obaisi; Dr. Davis, and PA Williams to this Plaintiff. (Ex.H at 165:9-11).

74. Moreover, as to Wexford, Dr. Tubbs, a Certified Correctional Health Care Provider with decades of experience in correctional medicine, who has drafted numerous medical policies for correctional facilities, testified that Wexford and Wexford's medical policies and procedures did not prevent or obstruct the quality or quantity of medical care provided to Plaintiff. (Ex.H at 166:6-10).

75. Dr. Prodromos, the only orthopedic surgeon deposed in this case, opined that to a reasonable degree of medical certainty, the standard of care was met in this case. (Ex.I at 36:24-37:4).

76. In fact, as Dr. Prodromos opined, if the Plaintiff had presented to him for orthopedic consultation, Dr. Prodromos would have recommended only conservative treatment, "quite similar" to what the Wexford Defendants provided in this case: pain medication, activity modification, and injections. (Ex.I at 148:15-149:1).

77. **Specifically, Dr. Prodromos opined that if the Plaintiff had presented to him for orthopedic consultation, he would not have recommended surgery for this patient nor even recommended an MRI.** (Ex.I at 148:15-149:1). Thus, any claim by Plaintiff that orthopedic consultation or an MRI was delayed is false because orthopedic consultation and medical imaging beyond the x-rays (such as an MRI) were never medically indicated for this patient. (Ex.I at 149:20-24).

78. Dr. Prodromos, a board-certified orthopedic surgeon who has treated this type of injury for the better part of thirty (30) years, opined that to a reasonable degree of medical certainty, he supports the medical care of Dr. Obaisi; Dr. Davis; and PA Williams. (Ex.I at 150:1-21).

79. In fact, Dr. Prodromos wrote in his report that the doctors were compassionate in their medical care because, as a practicing physician, he did not like Plaintiff's tenor in calling the doctors callous; rather Dr. Prodromos opined that the doctors did everything that they could to help this patient. (Ex.I at 99:15-100:10).

Respectfully submitted,

WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, P.A., and ANN DAVIS, M.D.

By: /s/ James F. Maruna
Matthew H. Weller / ARDC No. 6278685
James F. Maruna / ARDC No. 6313433
CASSIDAY SCHADE, LLP
222 W Adams Street, # 2900
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 - Fax
mweller@cassiday.com
jmaruna@cassiday.com

*Counsel for Defendants,* WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, P.A., and ANN DAVIS, M.D.

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2019, I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ James F. Maruna

9079846 JMARUNA