UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

CARL HEMPHILL,

PLAINTIFF

VS.          CASE NO. 15-CV4968

WEXFORD HEALTH SOURCES, INC.;
SALEH OBAISI; ANN HUNDLY DAVIS;
LATONYA WILLIAMS; LOUIS SHICKER;
MICHAEL LEMKE; DORRETA O'BRIEN;
and KEVIN HALLORAN

DEFENDANTS

DEPOSITION OF CARL HEMPHILL
TAKEN ON BEHALF OF THE DEFENDANTS
SEPTEMBER 18, 2017

---

**Page 3**

```
 1        UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
 2
 3   CARL HEMPHILL,
 4        PLAINTIFF,
 5   vs.            No. 15-CV-4968
 6   WEXFORD HEALTH SOURCES, INC.;
     SALEH OBAISI; ANN HUNDLY DAVIS;
 7   LATONYA WILLIAMS; LOUIS SHICKER;
     MICHAEL LEMKE; DORRETTA O'BRIEN;
 8   and KEVIN HALLORAN
 9
          DEFENDANTS.
10
11
12     Deposition of CARL HEMPHILL, produced, sworn,
     and examined on the 18th day of September, 2017,
13   between the hours of 8:00 o'clock in the forenoon
     and 5:00 o'clock in the afternoon, at the offices of
14   Hill Correctional Center, 600 South Linwood Road, in
     Galesburg, Illinois, before Pamela K. Needham, CCR,
15   CSR (MO, IL), in a certain cause now pending UNITED
     STATES DISTRICT COURT, NORTHERN DISTRICT OF
16   ILLINOIS, wherein CARL HEMPHILL is the Plaintiff,
     and WEXFORD HEALTH SOURCES, INC.; et al., are the
17   Defendants.
18
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1               INDEX
 2   EXAMINATION                    PAGE
 3
 4   QUESTIONS BY MR. MARUNA          5
 5   QUESTIONS BY MR. STEPHENSON     97
 6   QUESTIONS BY MR. BRITT         145
 7          INDEX OF EXHIBITS
 8   NUMBER  DESCRIPTION            PAGE
 9   For the Defendants:
10   Exhibit 1  Photo               10
11   Exhibit 2  Responses to Interrogatories  31
12   Exhibit 3  Second Amended Complaint   33
13   Exhibit 4  Medical Records      46
14   Exhibit 5  Grievance M758      124
15   Exhibit 6  Grievance Response Report  128
16   Exhibit 7  Grievance M897      130
17   Exhibit 8  Grievance Response Report   132
18   Exhibit 9  ARB Response        133
19   Exhibit 10 Grievance 2866      135
20   Exhibit 11 Grievance Officer's Report   137
21   Exhibit 12 ARB Return of Grievance     138
22
23
24   (Exhibits attached to original transcript.)
25
```

---

**Page 4**

```
 1   APPEARANCES:
 2
     FOR THE PLAINTIFF:
 3
     Mr. Jason Britt
 4   Foley & Lardner, LLP
     321 North Clark Street, Suite 2800
 5   Chicago, IL  60654
     (312) 832-4371
 6   jbritt@foley.com
 7
     FOR THE DEFENDANT WEXFORD HEALTH
 8     SOURCES, INC., ET AL.:
 9
     Mr. James F. Maruna
10   Cassiday, Schade, LLP(Chicago)
     20 North Wacker, Suite 1000
11   Chicago, IL  60606
     (312) 641-3100
12   jmaruna@cassiday.com
13
     FOR THE DEFENDANTS LOUIS SHICKER, MICHAEL
14     LEMKE and DORRETTA O'BRIEN:
15   Mr. Michael Stephenson
     Illinois Attorney General's Office
16   100 West Randolph, 13th Floor
     Chicago, IL  60601
17   (312) 814-5163
     nstephenson@atg.state.il.us
18
19
20
21   The Court Reporter:
22   Pamela K. Needham, RPR, IL CSR, MO CCR
     Veritext Legal Solutions
23   515 Olive Street, Suite 300
     St. Louis, MO  63101
24   314-203-2987
25
```

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Exhibit A

Page 5

1　IT IS HEREBY STIPULATED AND AGREED, by and between
2　counsel for the Plaintiffs and counsel for the
3　Defendants, that the deposition of CARL HEMPHILL may
4　be taken in shorthand by Pamela K. Needham,
5　Certified Court Reporter (IL 084-002247 and MO 505),
6　and afterwards transcribed into typewriting; and the
7　signature of the witness is reserved.
8　　　　　* * * * *
9　　　(On the record at 11:56 a.m.)
10　　　　CARL HEMPHILL,
11　of lawful age, produced, sworn, and examined on
12　behalf of the Defendants deposes and says:
13　　　　EXAMINATION
14　QUESTIONS BY MR. MARUNA
15　　Q.　Would you go ahead and state your name
16　and spell it for the record?
17　　A.　Carl Hemphill.  C-A-R-L,
18　H-E-M-P-H-I-L-L.
19　　Q.　Let the record reflect that this is the
20　deposition of Carl Hemphill taken pursuant to notice
21　continued to today's date by agreement of the
22　parties.  This deposition is taken pursuant to the
23　Federal Rules of Civil Procedure, the local rules of
24　the Northern District of Illinois, and all other
25　applicable rules.

Page 6

1　　　Mr. Hemphill, have you ever given a
2　deposition before?
3　　A.　No.
4　　Q.　I'm going to go over a couple rules here
5　that will keep us on the same page.  The court
6　reporter is here today to take down everything we
7　say, she's going to create a line by line report of
8　it.  There's a couple things that we can do to make
9　her job lot easier.  The first and most important is
10　that we can try to keep our voices up, it's not a
11　big room, but I ask that, because she's over on the
12　side here, just try to keep your voice up.  If we
13　could avoid talking over each other, so I know it's
14　human nature you may see where I am going with a
15　question and want to interject, just let me go ahead
16　and get my whole question out, I'll pause, let you
17　get your entire answer out, okay?
18　　　The next thing is that the court
19　reporter can only take down verbal cues, so "yes,"
20　"no;" "uh-huhs," "uh-huhs," nods of the head, they
21　don't come across on the page, so try to give a
22　verbal answer to the questions.
23　　　If you don't understand a question that
24　I've asked, let me know, and I'll rephrase it and we
25　can do that until you understand the question.  If

Page 7

1　you don't tell me that, Mr. Hemphill, I'm going to
2　assume that you understood the question as I've
3　asked it; is that fair?
4　　A.　Mm-hmm.  Yes.
5　　Q.　And the last rule is that if you need a
6　break at any time, let us know, I just ask that you
7　answer any question pending, okay?
8　　A.　Yes.
9　　Q.　Are you here today represented by
10　counsel?
11　　A.　Yes.
12　　Q.　And is counsel in the room seated next
13　to you?
14　　A.　Yes.
15　　Q.　Are you on any drugs, medication, that
16　could otherwise impact your ability to give truthful
17　and accurate testimony today?
18　　A.　No.
19　　Q.　Did you do anything to prepare for
20　today's deposition?
21　　A.　No.
22　　Q.　Did you meet with anyone to prepare for
23　today's deposition?
24　　A.　Yes.
25　　Q.　Who did you meet with?

Page 8

1　　A.　My attorney.
2　　Q.　And I don't want to know what you and
3　your attorney talked about, but how long did you
4　meet with your attorney -- well, how many times did
5　you meet with your attorney?
6　　A.　Twice.
7　　Q.　About how long the first time?
8　　A.　I don't recall.
9　　Q.　When was that?
10　　A.　Last week.
11　　Q.　And did you meet with your attorney
12　again this morning before the deposition?
13　　A.　Yes.
14　　Q.　And about how long did you meet with
15　your attorney this morning before the deposition?
16　　A.　Don't recall.
17　　Q.　Was it more or less than a half hour?
18　　A.　Yes.
19　　Q.　Was it around a half hour?
20　　A.　Yes.
21　　　MR. BRITT:  And I just want to state for
22　the record, we're in a room without a clock and
23　there's no watches or anything back here.
24　　Q　(By Mr. Maruna) It's like a casino, so
25　yeah, we understand, I'm not holding you to it.

Page 9

1        **Besides meeting with your attorney, did**
2  **you speak with anyone else about today's deposition?**
3        A.  No.
4        Q.  **Did you review any documents to prepare**
5  **for today's deposition?**
6        A.  No.
7        Q.  **Did you review your medical records?**
8        A.  No.
9        Q.  **Did you review your complaint?**
10        A.  No.
11        Q.  **Did you review your discovery responses?**
12        A.  No.
13        Q.  **You said that you've never given a**
14  **deposition before.  Have you ever given trial**
15  **testimony before?**
16        A.  Yes.
17        Q.  **Was that in a criminal case, or was that**
18  **in a civil case?**
19        A.  Criminal.
20        Q.  **Have you ever given trial testimony in a**
21  **civil case?**
22        A.  No.
23        Q.  **Have you ever had any prior civil**
24  **lawsuits?  And if you don't understand what a civil**
25  **lawsuit is, let me know and I can explain it**

Page 10

1  **further.**
2        A.  Okay.
3        Q.  **Sure.  Not a criminal matter, but you're**
4  **suing someone seeking money or some other sort of**
5  **damage.  Do you have any of those types of lawsuits?**
6        A.  No.
7        Q.  **Just this one, correct?**
8        A.  Yes.
9        Q.  **And you understand that you're here**
10  **today giving testimony in a lawsuit that you filed**
11  **against my clients related to medical care, as well**
12  **as some state defendants related to medical care and**
13  **some other issues; do you understand that?**
14        A.  Yes.
15        Q.  **Besides your attorneys, have you spoken**
16  **with anyone else about this lawsuit?**
17        A.  No.
18        Q.  **Have you told your cell mate about it?**
19        A.  No.
20        Q.  **Have you told any family members about**
21  **it?**
22        A.  No.
23        MR. MARUNA:  Let's go ahead and mark
24  this as 1.
25        (Deposition Exhibit Number 1 marked for

Page 11

1  identification.)
2        Q  **(By Mr. Maruna) All right, Mr. Hemphill,**
3  **I'm showing you what we've marked as Exhibit 1.**
4  **Take a second, it's a two-page exhibit, it's front**
5  **and back.  Have you ever seen this document before**
6  **or something like this document?**
7        THE WITNESS:  Yes.
8        Q.  **All right.  What do you recognize this**
9  **as?**
10        A.  It's a picture of me.
11        Q.  **All right.  And I see here it's titled**
12  **Illinois Department of Corrections Internet Inmate**
13  **Status as of Saturday, September 16, 2017, is that**
14  **correct?**
15        A.  Yes.
16        Q.  **And is that your picture below there?**
17        A.  Yes.
18        Q.  **And is that your name and your inmate**
19  **number, R19689, correct?**
20        A.  Yes.
21        Q.  **All right, I'm just going to go through**
22  **a couple questions on this document very fast.  Do**
23  **you see that your date of birth is January 1st,**
24  **1978, is that correct?**
25        A.  Yes.

Page 12

1        Q.  **I see that your admission date to the**
2  **Illinois Department of Corrections is March 10th,**
3  **2003, is that correct?**
4        A.  Yes.
5        Q.  **You have a projected parole date of**
6  **March 30, 2039, is that correct?**
7        A.  Yes.
8        Q.  **And then a projected discharge date of**
9  **March 30, 2042, is that correct?**
10        A.  Yes.
11        Q.  **I see that there's a couple of criminal**
12  **charges listed there, the first one is a Class X**
13  **felony for aggravated kidnapping with a ten-year**
14  **sentence, and a custody date of March 30, 1999, is**
15  **that correct?**
16        A.  Yes.
17        Q.  **And that was in Cook County, sir?**
18        A.  Yes.
19        Q.  **Have you been incarcerated continuously**
20  **since 1999?**
21        A.  (No response.)
22        Q.  **Sure.  So I see that the custody date**
23  **listed on the 1999 charge is March 30, 1999, and you**
24  **didn't enter the DOC until 2003.  For those four**
25  **years in between were you at Cook County Jail, for**

Page 13

1  example?
2      A.  Yes.
3      Q.  Have you been I guess outside of a
4  prison or jail since March -- since March 30, 1999?
5      A.  No.
6      Q.  And then I see there's another sentence
7  below that, also a Class X felony, for armed
8  robbery, and that's got the same custody date as
9  March 30, 1999, correct?
10     A.  Yes.
11     Q.  I see there's a Class M for murder,
12  intent to kill, backslash, injure, also with the
13  same custody date, correct?
14     A.  Yes.
15     Q.  And then armed robbery with the same
16  custody date, as well, correct?
17     A.  Yes.
18     Q.  Besides the criminal charges we've just
19  discussed, sir, have you had any other criminal
20  charges in your life?
21     A.  Yes.
22     Q.  What other criminal charges have you
23  had?
24     A.  Possession, criminal trespassing, and
25  what was -- I forgot what it was.  Something like

Page 14

1  with a... with a knife.
2      Q.  Let's talk about the possession charge.
3  What year was that?
4      A.  '96.
5      Q.  Did you -- were you convicted of a
6  crime, or did you plead guilty, or were you
7  acquitted?
8      A.  They... I... they sent me to a drug
9  rehab.
10     Q.  Mm-hmm.  What county was that in?
11     A.  Cook.
12     Q.  Did you enter an IDOC prison --
13     A.  No.
14     Q.  -- as a result of that one?
15     A.  No.
16     Q.  What about the criminal trespass charge,
17  what year was that?
18     A.  '97.
19     Q.  And same question, were you convicted,
20  acquitted, charged?
21     A.  Probation.
22     Q.  Did you enter prison or jail as a result
23  of that?
24     A.  No.
25     Q.  And the knife charge, what year was

Page 15

1  that?
2      A.  The knife was like, like 90 -- between
3  '97, '98.
4      Q.  And what county, sir?
5      A.  Cook County.
6      Q.  Did you enter a prison as a result of
7  that?
8      A.  No.
9      Q.  Was that a conviction or a --
10     A.  It was dismissed.
11     Q.  Dismissed?  Besides the charges listed
12  on Exhibit 1 and the three we just discussed, are
13  there any other criminal charges in your background?
14     A.  No.
15     Q.  Besides Cook County Jail, have you ever
16  been in any other county jail?
17     A.  No.
18     Q.  Have you ever been charged with a crime
19  involving fraud or dishonesty?
20     A.  No.
21     Q.  Besides those that we've discussed?
22     A.  No.
23     Q.  Ever been in the Armed Forces?
24     A.  No.
25     Q.  Ever receive any medical training in

Page 16

1  your life, sir?
2      A.  No.
3      Q.  We've talked about your prior
4  incarcerations, so we discussed that you've been in
5  Cook County Jail a couple times, correct?
6      A.  (Nods affirmatively.)
7      Q.  And then let's talk about the charges
8  beginning in 1999.  I assume after your arrest you
9  entered Cook County Jail, correct?
10     A.  Yes.
11     Q.  And you were in Cook County Jail on or
12  about 2 -- until 2003, correct?
13     A.  Yes.
14     Q.  When you came to the DOC in 2003, what
15  was the first prison you went to?
16     A.  Of IDOC?
17     Q.  Correct.
18     A.  Stateville Correctional Center.
19     Q.  Was that the Joliet Reception Center, or
20  was that Stateville, itself?
21     A.  Stateville.
22     Q.  How long were you in Stateville for?
23     A.  Fifteen years.
24     Q.  After Stateville, where did you transfer
25  to?

Page 17

1    A. Henry Hill Correctional Center.
2    Q. Have you transferred anywhere else?
3    A. No.
4    Q. So your entire incarceration history
5  consists of Stateville, and then Henry Hill,
6  correct?
7    A. Yes.
8    Q. And you've never been in what was called
9  the Joliet Receiving Center or one of the Northern
10 Correction Receiving Center?
11   A. I mean I came through receiving.
12   Q. Sure.
13   A. Yeah.
14   Q. So in 2003, was that at Stateville, or
15 was that still at Joliet?
16   A. Stateville. Because Joliet is a
17 receiving, so I just go there, get processed, and
18 then go to Stateville.
19   Q. Sure, and so my question as actually
20 exactly about that. Did you go to Joliet Receiving
21 first for processing before you went to Stateville?
22   A. Oh, yes.
23   Q. Okay. So the actual IDOC, if I was to
24 make a list of every prison you've been at, would be
25 Joliet Receiving Center, Stateville Correctional

Page 18

1  Center, and Henry Hill Correctional Center, correct?
2    A. Yes.
3    Q. How long were you with the Joliet
4  Receiving Center for?
5    A. One day.
6    Q. Usually it's a couple days, so you got
7  out of there pretty fast.
8       Okay, when I say your current
9  incarceration going forward in the deposition,
10 Mr. Hemphill, I'm going to refer to 2003 to present,
11 do you understand that?
12   A. Yes.
13   Q. When you first arrived for your current
14 incarceration, did you undergo any sort of inmate
15 orientation?
16   A. Yes.
17   Q. What did that consist of?
18   A. Dentist... dentist, they drew blood, and
19 a physical.
20   Q. Did they tell you how policies and
21 procedures work inside of a DOC prison?
22   A. No.
23   Q. Well, you've been here for a number of
24 years, sir, so how, how did you learn that
25 information over time?

Page 19

1    A. They gave me a rule manual.
2    Q. A rule manual?
3    A. Yeah.
4    Q. Is that sometimes called an orientation
5  manual?
6    A. Yes.
7    Q. And did you receive one of those when
8  you went to the DOC?
9    A. Yes.
10   Q. Do you still have it in your possession?
11   A. No.
12   Q. Where did it go?
13   A. Orange Crush took it.
14   Q. When did Orange Crush take it?
15   A. In Stateville like six months after I
16 got there.
17   Q. But you've been in prison since 2003, so
18 are you fairly familiar with the way things run
19 inside a prison if you need?
20      MR. BRITT: Object to the form.
21      MR. MARUNA: Sure.
22   Q (By Mr. Maruna) If you need certain
23 services, do you understand how to secure those
24 services in a prison?
25      THE WITNESS: Yes.

Page 20

1    Q. Are you familiar with a procedure called
2  sick call?
3    A. Yes.
4    Q. What is sick call?
5    A. You write a request slip stating the
6  issue of your medical problem.
7    Q. And was that the procedure in
8  Stateville?
9    A. Yes.
10   Q. And it's the same procedure that exists
11 at Henry Hill?
12   A. Yes.
13   Q. What if you have a medical emergency, do
14 you know how to get treatment in that situation?
15   A. Yes.
16   Q. And how does that work?
17   A. You tell the officer.
18   Q. Okay. And was that the procedure at
19 Stateville?
20   A. No.
21   Q. What was the procedure at Stateville,
22 Mr. Hemphill?
23   A. Medical slip.
24   Q. And what about at Henry Hill, is the
25 procedure you tell an officer if there's a medical

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

Page 21

1  emergency?
2      A.  Yes.
3      Q.  Have you ever seen a doctor or medical
4  professional at an IDOC prison?
5      A.  Can you say that again?
6      Q.  Sure.  Since 2003, have you seen a
7  doctor or a medical professional for medical
8  treatment in an IDOC prison?
9      A.  Yes, in the prison.
10     Q.  Now when seeing doctors or medical
11  professionals, have they ever asked you what's wrong
12  with you?  Why you're coming to see them?
13     A.  Yes.
14     Q.  And do you tell them what's wrong with
15  you?
16     A.  Yes.
17     Q.  And why do you do that?
18     A.  So they can get some type of
19  understanding what's wrong with you.
20     Q.  Is there ever a situation you can think
21  of, Mr. Hemphill, where something was medically
22  wrong with you, but you wouldn't tell it to a
23  medical provider?
24     A.  No.
25     Q.  And that wouldn't make any sense, would

Page 22

1  it?
2      MR. BRITT:  Object to form.
3      Q  (By Mr. Maruna) Has that been the
4  situation since you entered the DOC in 2003?
5      THE WITNESS:  Yes.
6      Q.  Have you ever refused medical treatment
7  during your current incarceration?
8      A.  No.
9      Q.  Have you ever refused medication during
10  your current incarceration?
11     A.  No.
12     Q.  So I want to understand a bit about --
13  well, have you received medicine inside of a DOC
14  prison since you've been here since 2003?
15     A.  Yes.
16     Q.  Okay.  How do you receive medicine in a
17  prison?  Tell me how that works.
18     A.  The doctors prescribe it to you.
19     Q.  And how do you get it?  Is there a med
20  line?  Do they give it to you in your cell?  There's
21  certainly not a Walgreen's you go to, I just want to
22  understand how you get it.
23     A.  It's a med line.
24     Q.  How does med line work?
25     A.  The officer comes to your cell and let

Page 23

1  you out.
2      Q.  And so the officer lets you out of your
3  cell, and someone gives it to you?
4      A.  Yes.
5      Q.  Do you know if the person that gives you
6  the medication is an employee of Wexford, or a state
7  employee?
8      MR. STEPHENSON:  Objection, foundation.
9      Q  (By Mr. Maruna) You can answer.
10     THE WITNESS:  I don't know.
11     Q.  The people that are handing out the
12  medication in the cell, are those the medical
13  doctors, like the medical director?
14     A.  Nurses.
15     Q.  I want to talk about your typical day
16  now at Henry Hill, okay?  What cell house are you
17  currently in, Mr. Hemphill?
18     A.  4 House.
19     Q.  How long have you been there?
20     A.  About eight months.
21     Q.  All right, let's talk about your day.
22  What time do you get up in the morning?
23     A.  6:00.
24     Q.  And what do you in your cell when you
25  get up?

Page 24

1      A.  Brush my teeth, take care of my hygiene.
2      Q.  And what time do you leave your cell in
3  the morning?
4      A.  8:00.
5      Q.  Where do you go?
6      A.  To work.
7      Q.  Where do you work?
8      A.  Clothing room.
9      Q.  What does work in the clothing room
10  involve?
11     A.  Folding of clothes.
12     Q.  How long have you been on that work
13  detail?
14     A.  Four months.
15     Q.  Have you ever been on any other work
16  details?
17     A.  Yes.
18     Q.  What prior work details were you on?
19     A.  LTS.
20     Q.  What does that mean?
21     A.  It's the yard, the gym.
22     Q.  And what do you do as that sort of work?
23     A.  I take equipment to the yard.
24     Q.  And how long were you on that work
25  detail?

Page 25

```
 1      A.  Six months.
 2      Q.  And when were you on that work detail?
 3      A.  Oh, eight months ago.
 4      Q.  And you said it was called LTS?
 5      A.  Yes.
 6      Q.  Before LTS, were you on any other work
 7  details?
 8      A.  No.
 9      Q.  Had you asked to be put on any other
10  work details?
11      A.  Yes.
12      Q.  When did you ask to be put on a work --
13  when did you first ask to be put on a work detail?
14      A.  When I first entered Henry Hill
15  Correctional Center.
16      Q.  And when was that again, sir, two years
17  ago?
18      A.  A year and a half ago.
19      Q.  And was your request approved, denied,
20  do you know?
21      A.  It was approved.
22      Q.  Was there a work detail available?
23      A.  No.
24      Q.  What about at Stateville, were you on
25  any work details?
```

Page 26

```
 1      A.  Yes.
 2      Q.  What work details were you on at
 3  Stateville?
 4      A.  Inside rounds.
 5      Q.  What does that mean?
 6      A.  You clean up inside the institution.
 7      Q.  And how long were you on inside round
 8  work detail at Stateville?
 9      A.  Like a year.
10      Q.  Do you know what year that was?
11      A.  Don't recall.
12      Q.  More or less than five years ago?
13      A.  Four.
14      Q.  Besides the inside rounds, were you on
15  any other work details at Stateville Correctional
16  Center?
17      A.  Dietary.
18      Q.  And how long were you on dietary?
19      A.  A year and a half.
20      Q.  And when was that?
21      A.  2015.
22      Q.  What did dietary involve?
23      A.  Cooking.
24      Q.  And besides the two that we just
25  discussed, the inside rounds and dietary, were you
```

Page 27

```
 1  on any other work details at Stateville?
 2      A.  No.
 3      Q.  Had you asked to be put on any other
 4  work details at Stateville besides the two we've
 5  just discussed?
 6      A.  No.
 7      Q.  All right, going back to your current
 8  day at Henry Hill, how long does your work detail
 9  take each day?
10      A.  (Indicates.)
11      Q.  Yeah, here.
12      A.  Six months.
13      Q.  So each day do you go to your work
14  detail?  I'm confused?
15      A.  No.  How long do I work?
16      Q.  Yeah, each day.
17      A.  Oh.  7 to 3.
18      Q.  And after your work detail is complete
19  at around 3, what, what do you do then, do you go
20  back to your cell?
21      A.  Yes.
22      Q.  And how long are you in your cell then?
23      A.  For -- depends on what day room is.
24      Q.  What does that mean?
25      A.  By -- day room goes 5:30 to 6:30,
```

Page 28

```
 1  to 7:30, 7:30 to 8:30, 8:30 to 9:30.
 2      Q.  What time is lights out at the prison?
 3      A.  9:30.
 4      Q.  Do you ever go to yard time?
 5      A.  Yes.
 6      Q.  What is yard time?  Help me understand
 7  that.
 8      A.  Recreation.
 9      Q.  What do you do on the yard?
10      A.  Walk around.
11      Q.  Are you on any sports teams?
12      A.  No.
13      Q.  Is there a commissary here at Henry
14  Hill?
15      A.  Yes.
16      Q.  Have you ever purchased goods from the
17  commissary?
18      A.  Yes.
19      Q.  Do you know if pain medication is sold
20  at the commissary?
21      A.  No.
22      Q.  No, you don't know, or no, it's not?
23      A.  No, I don't know.
24      Q.  What about at Stateville, did you
25  purchase goods from the commissary there?
```

Page 29

1      A.  Yes.
2      Q.  And do you know if pain medication was
3  available for sale at the Stateville commissary?
4      A.  I don't know.
5      Q.  Are you familiar with the term I've
6  heard called lockdown?
7      A.  Yes.
8      Q.  What is a lockdown, sir?
9      A.  No movement.
10     Q.  Can you see a doctor on lockdown?
11     A.  No.
12     Q.  Do you know who controls lockdown?
13         MR. STEPHENSON:  Objection, foundation.
14         THE WITNESS:  Staff.
15     Q  (By Mr. Maruna) What does staff mean?
16     A.  Administration.
17     Q.  Of the prison?
18     A.  Yes.
19     Q.  Do you know if the medical directors
20  control lockdown?
21     A.  No.
22         MR. STEPHENSON:  Objection, foundation.
23     Q  (By Mr. Maruna) No, you don't know, or
24  no, they don't?
25         THE WITNESS:  No, they don't.

Page 30

1      Q.  Have you heard the term medical permit?
2      A.  Yes.
3      Q.  What is a medical permit?
4      A.  It's when you're allowed to have a
5  bottom bunk permit, front, front cuffs free of
6  shackles.
7      Q.  So is my understanding that a medical
8  permit gives you, the inmate, special privileges
9  that aren't available to the general population of
10  inmates?
11         MR. BRITT:  Object to form.
12     Q  (By Mr. Maruna) Is that a correct
13  statement, sir?
14         THE WITNESS:  I don't understand the
15  question.
16     Q  (By Mr. Maruna) Sure.  You said it gives
17  you a bottom bunk, for example, correct?
18     A.  Yeah.
19     Q.  Does every inmate have the right to a
20  bottom bunk?
21     A.  No.
22     Q.  So would the medical permit be something
23  that gives you a right to a bottom bunk, correct?
24     A.  Yes.
25     Q.  So would a medical permit be something

Page 31

1  that gives you a right that's not available to the
2  other inmates in general?
3      A.  Yes.
4      Q.  All right.
5         (Deposition Exhibit Number 2 marked for
6  identification.)
7      Q  (By Mr. Maruna) Sir, I'm showing you what
8  we've marked as 2, and if you want to thumb through
9  this, sir, and just take a quick look at it, it's
10  entitled Plaintiff's Responses and Objections To
11  Defendant's First Set of Interrogatories.  Do you
12  recognize this document?
13         THE WITNESS:  Yes.
14     Q.  What is this document, sir?
15     A.  It's a response of, well, objections to
16  defendant's first set of interrogatories.
17     Q.  And if you turn to Page 2, sir, question
18  1, it asks to state your full name, and in the
19  answer we see Carl Hemphill is noted, correct?
20     A.  You say on Page 2?
21     Q.  Yeah, on Page 2, question 1.
22     A.  Okay.
23     Q.  The question was:  State your full name;
24  and you see the answer was:  Carl Hemphill?
25     A.  Yes.

Page 32

1      Q.  It's on the next page.  So did you
2  answer these interrogatories, sir?
3      A.  Yes.
4      Q.  Did you have assistance from your
5  attorney in preparing these interrogatories?
6      A.  No.
7      Q.  Did you type them up yourself?
8      A.  No.
9      Q.  Okay.  So did your attorney type them up
10  then?
11     A.  Oh, yes.
12     Q.  So I'm going to ask you, I didn't see a
13  signature page from you on these interrogatories;
14  did you ever sign something after you fulfilled --
15  or completed writing these?  Do you recall?
16     A.  No.
17     Q.  But these are your words, correct?
18     A.  (No response.)
19     Q.  Are these your -- these are your answers
20  to the interrogatories, correct?
21     A.  Yes.
22     Q.  Okay, and you filled these out, correct?
23     A.  Yes.
24     Q.  You can put Exhibit 2 away, sir.
25         (Deposition Exhibit Number 3 marked for

Page 33

1    identification.)
2        Q   (By Mr. Maruna) Sir, showing you what
3    we've marked as 3, this is a docket number entry
4    331, and I show it's -- I'm sorry, not 331, it's 33,
5    and Second Amended Complaint is the title. Do you
6    recognize this document?
7        THE WITNESS: Yes.
8        Q. All right. And did you draft this with
9    your attorney, sir?
10       A. No.
11       Q. Okay. Did your attorneys consult you on
12   this document?
13       A. Consult like how?
14       Q. Did they ask you questions? Did they
15   give you a draft of this? I just want to know -- I
16   don't want to know what you told them, I just want
17   to know were you involved in drafting this at all?
18       A. No.
19       Q. All right, let's turn to Page 5, and
20   I'll ask you just a couple questions I want
21   clarification on. So what I think the easiest way
22   to do here is I'll direct you to a page number and
23   then a paragraph number, okay?
24       A. All right.
25       Q. First paragraph is going to be 19.

Page 34

1        A. 19, okay.
2        Q. And it says that: On or about January
3    1st, 2013, upon waking up one morning, you had
4    severe excruciating pain in your right shoulder;
5    correct?
6        A. Yes.
7        Q. Is that accurate?
8        A. Yes.
9        Q. Okay. You had no pain in your shoulder
10   prior to January 1st, 2013, is that correct?
11       A. No.
12       Q. When did the pain in your shoulder
13   begin?
14       A. January 1st, 2013.
15       Q. Sure. Prior to that day, did you have
16   any pain in your shoulder?
17       A. No.
18       Q. Did you have any injuries to your
19   shoulder?
20       A. No.
21       Q. In your life up until January 1st, 2013,
22   have you ever had any shoulder injuries?
23       A. No.
24       Q. Have you ever sought medical treatment
25   in your life up until January 1st, 2013, for any

Page 35

1    shoulder injuries?
2        A. No.
3        Q. Did you have any injuries a couple days
4    beforehand?
5        A. No.
6        Q. Sprains, strains, injuries lifting
7    weights, anything like that?
8        A. No.
9        Q. Let's turn to Page 6, and I want to
10   direct your attention to paragraph 25.
11       A. Mm-hmm.
12       Q. That's the very top of the page.
13   Paragraph 25 states: On April 10th, 2013,
14   Mr. Hemphill was lifting weights in the exercise
15   yard when his right shoulder failed, causing him to
16   drop a weight onto his right hand.
17           Is that correct, sir?
18       A. Yes.
19       Q. So you were lifting weights on April 10,
20   2013, correct?
21       A. Yes.
22       Q. And was your shoulder still in pain on
23   April 10, 2013?
24       A. Yes.
25       Q. Why were you lifting weights on April

Page 36

1    10, 2013, if you were having shoulder pain?
2        A. Because Ms. Williams informed me that
3    the Tylenol that she prescribed me would help with
4    the pain in my shoulder.
5        Q. Did the Tylenol help with your pain?
6        A. A little.
7        Q. So the Tylenol that Ms. Williams
8    prescribed reduced your pain to a level that you
9    felt it was safe to lift weights on April 10, 2013,
10   correct?
11       MR. BRITT: Object to form.
12       THE WITNESS: Yes.
13       Q   (By Mr. Maruna) Okay. Let's turn to Page
14   8, and I'll direct your attention to paragraph 39.
15       A. 39.
16       Q. Very top of the page: On July 31st,
17   2013, almost, more than six months after he filed
18   his first request for medical services, and after
19   many cancelled appointments with Dr. Obaisi, Mr.
20   Hemphill was finally given a Cortisone shot by Dr.
21   Obaisi to relieve his shoulder pain.
22           Is that what's on the page, sir?
23       A. Yes.
24       Q. Is July 31st, 2013, the first time that
25   you saw Dr. Obaisi?

Page 37

1    A.  No.
2    Q.  When was the first time you saw Dr.
3  Obaisi?  And let me clarify, for your shoulder pain
4  I'm asking.
5    A.  Okay.
6    Q.  But was July 31st, 2013, the first time
7  you saw Dr. Obaisi for your shoulder pain?
8    A.  No.
9    Q.  When was the first time you saw Dr.
10  Obaisi for your shoulder pain?
11    A.  October 22nd.
12    Q.  2013?
13    A.  Yes.
14    Q.  But by July 31st, 2013, you had seen
15  other medical providers for your shoulder pain,
16  correct?
17    A.  Yes.
18    Q.  We discussed that you saw Ms. Williams,
19  who prescribed you some Tylenol that you felt
20  relieved your pain to the level that you were able
21  to lift weights in April, correct?
22    A.  Yes.
23    Q.  Had you seen any other medical providers
24  for your shoulder pain by that day, July 31st?
25    A.  Dr. Davis.

Page 38

1    Q.  Dr. Davis is a medical doctor?
2    A.  Yes.
3    Q.  So you'd seen both the physician's
4  assistant and the medical doctor, correct?
5    A.  Yes.
6    Q.  I want to direct your attention later on
7  in that page to paragraph 41:  By June, 2013, a
8  Wexford medical professional told Mr. Hemphill that
9  an MRI was needed in order to diagnose the problems
10  and figure out a proper treatment plan; correct?
11    A.  Yes.
12    Q.  Who told you that?
13    A.  Nurse Heather.
14    Q.  Nurse Heather.  Would you be so kind as
15  to describe Nurse Heather to me?  What does she look
16  like?
17    A.  White lady, heavy set.
18    Q.  Further description, sir?  Hair, eyes?
19    A.  Like longish red hair.
20    Q.  And you said that was a nurse, correct?
21    A.  Yes.
22    Q.  That wasn't a medical doctor, correct?
23    A.  No.
24    Q.  That wasn't a physician's assistant,
25  correct?

Page 39

1    A.  No.
2    Q.  Was that a nurse or a correctional
3  medical tech; do you know the difference?
4    A.  Nurse.
5    Q.  And how do you know it was a nurse?
6    A.  She said she was a nurse.  A registered
7  nurse.
8    Q.  Let's turn to paragraph 43.  And
9  paragraph 43, sir, is continuing with the line of 41
10  that you needed an MRI.  Paragraph 43 says:  Dr.
11  Obaisi was told this, but despite such knowledge,
12  and despite knowing that you were suffering from
13  uncontrollable pain, Dr. Obaisi refused to order an
14  MRI.
15    Is that what's on the page, sir?
16    A.  Yes.
17    Q.  Is that statement accurate, sir?
18    A.  Yes.
19    Q.  And I want to know what your basis is.
20  How do you know that Dr. Obaisi obtained that
21  knowledge?
22    A.  Because it was a referral sheet done
23  asking for physical therapy and an MRI for my right
24  shoulder.
25    Q.  And who made it, who filled out that

Page 40

1  referral sheet?
2    A.  Registered Nurse Heather.
3    Q.  And do you know that Dr. Obaisi reviewed
4  that?
5    A.  No, I don't know.
6    Q.  Let's turn to Page 8 -- or we're still
7  on Page 8, I want to go to paragraph 44 at the
8  bottom of the page.
9    A.  Mm-hmm.
10    Q.  You write:  Tylenol, Motrin and Naproxen
11  are all simple over-the-counter... pan medications,
12  I think you meant pain, though, correct?
13    A.  Yes.
14    Q.  Do you know in a prison if all of those
15  are considered over-the-counter or prescription
16  medications?
17    A.  That's what I was informed of.
18    Q.  Mm-hmm.  Do you know one way or the
19  other whether those are prescription or
20  over-the-counter medicines in a prison?
21    A.  I know two is over-the-counter.  Tylenol
22  and Motrin are over-the-counter.
23    Q.  Can they be written as prescription
24  medications based on the dosage, though?
25    MR. BRITT:  Object to form.

Page 41

```
 1          THE WITNESS:  That I don't know.
 2          Q  (By Mr. Maruna) Let's turn to Page 11,
 3  I'm going to direct you to paragraph 64.  Paragraph
 4  11 -- or Page 11, paragraph 64, discusses that:  A
 5  Cortisone shot provided relief, but it wore off in
 6  December.
 7          Do you recall getting a Cortisone shot
 8  in, around or about October, 2013?
 9          A.  October -- what's the date?
10          Q.  Well, I think in the paragraph above
11  you're discussing October 30, 2013, is when you
12  received, per your allegation, a second Cortisone
13  shot?
14          A.  Yes.
15          Q.  And I'm asking, it says here in 64 that
16  it provided relief, more relief, in fact, correct?
17          A.  No.
18          Q.  So you disagree with your allegation in
19  paragraph 64?
20          A.  Okay, no, in 63, 30 to 60 days, that's
21  how long that the Cortisone shot lasted.
22          Q.  Mm-hmm.  But it says here -- well, let's
23  just look at it.  63 it says you got a second
24  Cortisone shot in October, 2013, is that accurate?
25          A.  October 30th, that's when I received my
```

Page 42

```
 1  second Cortisone shot.
 2          Q.  And in paragraph 64 you say, quote:  The
 3  Cortisone shot did provide more relief, closed
 4  quote.
 5          Is that statement correct?
 6          A.  Yes.
 7          Q.  Okay.  And it wore off after December,
 8  correct?
 9          A.  Actually, it wore off after October
10  30th.
11          Q.  So your statement today in your
12  deposition under oath is that paragraphs 63 and 64
13  are incorrect when they state that the relief lasted
14  30 to 60 days and it provided more relief.
15          MR. BRITT:  Object to form,
16  mischaracterizes his testimony.
17          MR. MARUNA:  He can answer the question.
18          THE WITNESS:  Yes.
19          Q  (By Mr. Maruna) Yes what?
20          A.  The shot only lasted 30 to 60 days.
21          Q.  Let's turn to Page 12, I want to direct
22  you to paragraph 70 at the top.  You were discussing
23  a February 11, 2014, appointment where a nurse
24  believed that you should be referred for an MRI.
25  What nurse was that?
```

Page 43

```
 1          A.  Nurse Heather.
 2          Q.  It was Nurse Heather again, correct?
 3  Nurse Heather was the nurse you told us about
 4  earlier.
 5          A.  Yes.
 6          Q.  So this is again Nurse Heather's opinion
 7  that we're discussing in paragraph 70, is that
 8  correct?
 9          A.  Yes.  And actually, I saw Nurse Heather
10  February 13, 2014.
11          Q.  Mm-hmm.  Let's turn to the bottom of the
12  page there in paragraph 77.  Paragraph 77 states:
13  On July 28th, 2013, Mr. Hemphill filed his first
14  offender's grievance.
15          Was July 28th, 2013, the first time you
16  filed a grievance, sir?
17          A.  Yes.
18          Q.  And your testimony is that the pain
19  began January 1st, 2013, your birthday, correct?
20          A.  Yes.
21          Q.  Why did you wait seven months to file a
22  grievance?
23          A.  Because the medical staff informed me
24  that the medication that they was prescribing would
25  help with my shoulder pain.
```

Page 44

```
 1          Q.  Well, you started receiving treatment in
 2  February, based on the allegations in your medical
 3  records, right?  We know you saw medical providers
 4  in February I believe you just said, right?
 5          A.  February 1st is when I received my first
 6  treatment of some medication, which was Tylenol.
 7          Q.  So it took five months from the time you
 8  first started getting treatment for you to file a
 9  grievance then?
10          A.  Yeah.
11          Q.  When did you decide that the medication
12  wasn't working to relieve your pain?
13          A.  When my shoulder got worser.
14          Q.  So you received the medication in
15  February, correct?
16          A.  Yes.
17          Q.  When did you decide it wasn't working to
18  relieve your pain?
19          A.  When I couldn't get the help that I
20  needed.
21          Q.  When -- what date was that?
22          A.  From the time I received my medication?
23          Q.  Correct, sir.
24          A.  I would say like four or five months.
25          Q.  So shortly before this grievance was
```

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 45

1  filed then?
2      A. Yes.
3      Q. So let's turn to Page 15, and paragraph
4  92, you state that none of Wexford's medical
5  professionals or IDOC has considered surgery on your
6  shoulder.
7          I will submit to you, sir, this document
8  was filed March 20, 2016. Have you since received
9  surgery?
10     A. What?
11     Q. Have you received surgical approval
12 since this document was filed?
13     A. Yes.
14     Q. Okay, so in '92 when you say: None of
15 Wexford's medical professionals have considered or
16 has considered surgery; the time, based on the fact
17 that you have received surgical approval, indicates
18 that they have considered surgery, correct?
19     A. Yeah, after I filed a lawsuit.
20     Q. Sure, but they have considered it,
21 because it's approved, I'm just trying to clarify,
22 because this was filed some time ago, sir. Is that
23 correct, that they have considered surgery now?
24     A. Yes.
25     Q. Okay. All right. You can put away

Page 46

1  Exhibit 3. Let's do 4.
2          (Deposition Exhibit Number 4 marked for
3  identification.)
4      Q (By Mr. Maruna) Sir, I'm showing you what
5  is marked as 4, and these are pages that we've
6  pulled from your medical records that we received
7  pursuant to discovery requests. At the very bottom
8  you're going to see Bates numbers they're called,
9  beginning IDOC, the first one is 000063?
10     A. Mm-hmm.
11     Q. And you'll see them in the bottom
12 right-hand corner. We've rearranged these
13 chronologically, so they're not going to go
14 sequentially on the bottom, but I will direct you to
15 the Bates number before we begin discussing the
16 record; is that fair?
17     A. Yes.
18     Q. All right. The first record I want to
19 direct you to is on Bates 63, I see a date of
20 February 1st, 2013; is that correct, sir?
21     A. February 1st, 2013? Yes.
22     Q. And it looks like you're requesting to
23 be seen in M.D. sick call for complaint of right
24 shoulder pain, correct?
25     A. Yes.

Page 47

1      Q. Was this the first request that you made
2  for shoulder pain treatment?
3      A. My second request that I made.
4      Q. Where was the first request?
5      A. January 1st, 2013.
6      Q. And was that contained in your medical
7  records, do you know?
8      A. Was that contained in my medical
9  records?
10     Q. Sure, your medical progress chart.
11         MR. BRITT: Object to form.
12         THE WITNESS: I don't know, they, they
13 lose paperwork at Stateville.
14     Q (By Mr. Maruna) Okay. And we see on
15 February 1st, 2013, you are prescribed some Tylenol,
16 325 milligrams, correct?
17     A. Yes.
18     Q. And it looks like you're scheduled to be
19 seen on February 15th, 2013, based on the Plan
20 section, is that correct?
21     A. Yes.
22     Q. All right. And then if we look at the
23 bottom of the page, sir, we'll see another note
24 dated February 15, 2013, correct?
25     A. Yes.

Page 48

1      Q. And do you know who this appointment was
2  with on February 15, 2013?
3      A. The Physician Assistant Williams.
4      Q. I see, I want to direct you to the
5  fourth line from the bottom in the sentence
6  beginning EXT, and I see she records poor effort for
7  ROM, which I will tell you is an acronym for range
8  of motion. Do you recall giving poor effort on your
9  range of motion test on February 15, 2013, during
10 your examination with PA Williams?
11     A. I don't recall.
12     Q. Do you dispute that you gave poor effort
13 during your range of motion exam?
14         MR. BRITT: Object to form.
15         THE WITNESS: I don't recall.
16     Q (By Mr. Maruna) And then if we look over
17 on the Plan section, it looks like PA Williams has
18 increased your pending Tylenol prescription to 650
19 milligrams from 325, is that correct?
20     A. Yes.
21     Q. And then it looks like she gives you
22 some ice and an analgesic balm, correct?
23     A. Yes.
24     Q. Do you recall receiving all that?
25     A. Yes.

Page 49

1    Q.  And then it looks like the plan is:
2  Return to clinic in six weeks for follow-up,
3  correct?
4    A.  Yes.
5    Q.  Now on 64, the next page, sir, we're
6  going to talk about a note on April 11, 2013, and I
7  see that's captioned:  M.D. note?
8    A.  April 11, 2013.
9    Q.  Is that a medical doctor note, an M.D.
10  note at the top, do you see that?
11    A.  Yes.
12    Q.  And do you know who this appointment was
13  with?
14    A.  It was with Dr. Davis.
15    Q.  And was this for that injury we
16  discussed earlier where you dropped the weight on
17  your hand while lifting weights?
18    A.  Yes.
19    Q.  I see that you didn't make any shoulder
20  related complaints during this visit with Dr. Davis,
21  is that correct?
22    A.  No, I explained to her, the reason
23  why I dropped the weight on my hand, because my
24  right shoulder had gave out.
25    Q.  Mm-hmm.  Do you see any shoulder

Page 50

1  recorded complaints, or shoulder complaints recorded
2  in this note?
3    A.  No.
4    Q.  All right, let's turn to 67.
5    A.  Mm-hmm.
6    Q.  And we see here a note on April 19th,
7  2013, is this note by Dr. Davis, sir?
8    A.  I can't see the name.
9    Q.  Okay.  It's a medical doctor note, an
10  M.D. note, correct?
11    A.  Okay, I see it, yes, scheduled
12  Dr. Davis.
13    Q.  And it looks like you are presenting for
14  two months of left shoulder pain, correct?
15    A.  Yes.
16    Q.  And it looks like the medication during
17  this examination has changed to Naproxen 500
18  milligrams, correct?
19    A.  Yes.
20    Q.  Okay.  That's a different medication
21  than the Tylenol that you were previously on?
22    A.  Yes.
23    Q.  And it looks like the plan here is to
24  schedule you with Dr. Davis or Obaisi, correct?
25    A.  Yes.

Page 51

1    Q.  Let's turn to Page 68.
2    A.  60 who?
3    Q.  68, the next one sequentially.
4    A.  (Witness complies.)
5    Q.  Let me direct your attention to the
6  number 6613, sir, and that's an M.D. note, and
7  you'll see at the bottom there's an O signature
8  beginning there, a squiggle?
9    A.  An O.
10    Q.  Yeah, at the very bottom of the page.
11  Yep.  Do you recognize this as -- well, I'll just
12  tell you this is Dr. Obaisi's note.  Is this the
13  first time you saw Dr. Obaisi for your shoulder, on
14  June 6, 2013?
15    A.  June 6.  I didn't see him on June 6.
16    Q.  Well, you agree with me there's an M.D.
17  note, right, and there's a date of 6-6-13?
18    A.  Yes.
19    Q.  Do you agree with me there's an OB, if
20  you look at the signature right there on the bottom;
21  are you saying that's not Dr. Obaisi that you saw on
22  June 6th, 2013?
23    A.  I didn't see him.  I did not see him on
24  June 6.
25    Q.  Who did you see June 6, 2013?

Page 52

1    A.  I saw -- let me see.  I was, actually
2  put a request slip in to see him about my right
3  shoulder pain by Dr. Davis, because I received a,
4  she scheduled me to go out for an X-ray, and I was
5  supposed to see him after my X-ray, and I did not
6  see him.
7    Q.  So you see in the M.D. note of June 6,
8  2013, where there's an objective finding on your
9  examination; your testimony today is that there was
10  no medical appointment with the doctor on June 6,
11  2013?
12    A.  It was scheduled; I didn't see him,
13  though.
14    Q.  Did you see a medical doctor that
15  performed an examination of you on June 6, 2013?
16    A.  I just had, I just went out and got an
17  X-ray.
18    Q.  You didn't see Obaisi this day.
19    A.  No.
20    Q.  Did you see any medical provider that
21  day?
22    A.  I went out for an X-ray.
23    Q.  Let's turn to 222, the next page.  And
24  we do see there was an X-ray that day, correct?
25    A.  Yes.

Page 53

1    Q.  And we see the ordering physician's
2  signature again is that OB signature that was on the
3  previous page?
4    A.  Mm-hmm.
5    Q.  And we see the results of that X-ray of
6  the right shoulder are negative, correct?
7    A.  Yep.
8    Q.  Now let's turn to Page 69.  I want to
9  direct you to June 26, 2013.
10   A.  Mm-hmm.
11   Q.  And we see here another M.D. note, and
12  that same OB signature that we've seen twice before,
13  is that correct?
14   A.  Yes.
15   Q.  Now did you see Dr. Obaisi on June 26,
16  2013?
17   A.  Yes, I did.
18   Q.  Is this the first time you saw Dr.
19  Obaisi, or had you seen him previously for your
20  shoulder.
21   A.  This would be the first time I saw Dr.
22  Obaisi.  Because he prescribed me some medication.
23   Q.  And you just anticipated where I'm going
24  with this.  It looks like you're complaining that
25  the Naproxen didn't help, is that correct?

Page 54

1    A.  Yes.
2    Q.  And then he's changing your medication
3  to a medication called Mobic --
4    A.  Yes.
5    Q.  -- M-O-B-I-C, is that correct?
6    A.  Yes.
7    Q.  Can you just let me get my question out?
8  It just --
9    A.  I'm sorry.
10   Q.  -- makes her job easier.  Mobic's a
11  different pain medication than Naproxen, correct?
12   A.  Yes.
13   Q.  All right, let's turn to Page 70.  Do
14  you see a note on July 18th, 2013, it's an R.N. sick
15  call note.
16   A.  Yes.
17   Q.  And it looks like you are complaining
18  that the pain meds are not helping, correct?
19   A.  Yes.
20   Q.  No signs or symptoms of distress are
21  noted in her objective findings, correct?
22     MR. BRITT:  Object to form.
23   Q  (By Mr. Maruna) "No S backslash S of
24  distress noted;" is that the last sentence in the
25  objective portion of her medical note?

Page 55

1      THE WITNESS:  I don't know where you're
2  at.
3    Q.  Yeah.  Right here beginning with:  "No S
4  backslash S."  Does that say:  No S backslash S of
5  distress noted?
6    A.  I can't really tell what that is.
7    Q.  Mm-hmm.  And it looks like there was a
8  plan to schedule you for a steroid injection with
9  the medical director on July 31st, 2013, correct?
10   A.  Yes.
11   Q.  And then we go to the bottom of that
12  page, Mr. Hemphill, and we see on July 31st, 2013,
13  there's another M.D. note with that same OB
14  signature we've seen a few times, is that correct?
15   A.  Yes.
16   Q.  Is that Dr. Obaisi?
17   A.  Yes.
18   Q.  And it looks like you were getting pain
19  medication in -- and I can't read the actual name of
20  it, but something with lidocaine, right, and it's
21  injected into your right shoulder, is that correct?
22   A.  Yes.
23   Q.  Do you recall getting a pain injection
24  on July 31st, 2013, performed by Dr. Obaisi?
25   A.  That was my first steroid -- I mean

Page 56

1  Cortisone shot that I received.
2    Q.  Did that provide any relief?
3    A.  No.
4    Q.  When did you decide that it didn't
5  provide any relief?
6    A.  (No response.)
7    Q.  When did you make the determination it
8  didn't provide any relief?  What day?
9    A.  Oh.  That same day.
10   Q.  Mm-hmm.  So it didn't get better at all.
11   A.  No, it got worser.
12   Q.  So the pain injection medication
13  actually made your shoulder worse is your testimony?
14   A.  Yes, at 5:00 in the morning.
15   Q.  Why don't we turn to Page 74.
16   A.  (Witness complies.)
17   Q.  And I think you've alluded to this name
18  before, I just want to get it clear for the record.
19  We see on that September 11, 2013, note that it's
20  complained that:  Orange Crush took my pain
21  medication.  Is that correct?
22   A.  Yes.
23   Q.  What is Orange Crush.
24   A.  Tactical unit.
25   Q.  So that's a security team?

14 (Pages 53 to 56)

Page 57

1    A.  Yes.
2    Q.  And it looks like you are requesting to
3  get your pain medications renewed, correct?
4    A.  Yes.
5    Q.  And it says in the note:  Discussed with
6  Dr. Davis and okay to renew; correct?
7    A.  Yes.
8    Q.  So after Dr. Davis learned that your
9  pain medications were taken, did she prescribe you
10  new pain medications?
11    A.  She just renewed the medication that I
12  had.
13    Q.  Sure; but you were currently out -- you
14  told her you didn't have access to your pain
15  medications, correct?
16    A.  No, I informed her Orange Crush took my
17  medication.
18    Q.  Sure.  So if Orange Crush took them, did
19  you have access to your pain medication?
20    A.  Yes.
21    Q.  You did have access to them if Orange
22  Crush took them?
23    A.  No, I did not have them.
24    Q.  Correct.  So Orange Crush took your pain
25  meds, and you didn't have access to them, is that a

Page 58

1  correct statement?
2    A.  Yes.
3    Q.  You notified the medical personnel, and
4  Dr. Davis gave you I guess a renewal of your
5  existing prescription so you could go get the pain
6  medications back, is that correct?
7    A.  Yes.
8    Q.  Now we see here that it looks like a
9  plan of steroid injection was planned for 9-24-13,
10  correct?  On the right-hand side of the Plan column?
11    A.  Yes.
12    Q.  And then we see on 9-24-13 there's a
13  note that the lockdown resulted in the rescheduling
14  of your appointment until October 22nd, 2013,
15  correct?
16    A.  Yes.
17    Q.  And then it looks, if we go to the very
18  bottom of that page, we see October 22nd, 2013,
19  looks like you receive another steroid injection,
20  correct?
21    A.  No, I asked for a steroid injection.
22    Q.  Okay, so it looks like you're asking for
23  it, and then it's scheduled in five days, is that
24  correct?
25    A.  I was, I was informed by Dr. Obaisi to,

Page 59

1  that I was going to be rescheduled to return in five
2  days for my Cortisone shot.
3    Q.  And if we flip over to Page 75, on
4  10-30-13, that's another Dr. Obaisi note?
5    A.  Yes.
6    Q.  Did you receive a pain injection on that
7  day?
8    A.  Yes.
9    Q.  So you got your, another pain injection
10  on October 30, 2013, correct?
11    A.  Yes.
12    Q.  Let's flip the page to 228, sir.
13    A.  228.
14    Q.  All right.  I see a document at Bates
15  228 titled Illinois Department of Corrections
16  Medical Permit, and I see your name, correct?
17    A.  Yes.
18    Q.  And we discussed earlier medical
19  permits, would this be a document evidencing the
20  medical permit?
21    A.  Yes.
22    Q.  Okay.  And we see it's authorized by
23  M.D., and it's got that same OB signature, is that
24  correct?
25    A.  Yes.

Page 60

1    Q.  All right.  And I see there's two items
2  checked here, the first is low bunk, correct?
3    A.  Yes.
4    Q.  What is a low bunk permit?
5    A.  It's when -- I don't have to climb on
6  the top bunk, I have an access just for the bottom
7  bunk.
8    Q.  And then the second one I see checked is
9  a waist chain, is that correct?
10    A.  Yes.
11    Q.  What is a waist chain?
12    A.  It's where that, instead of me
13  having handcuffs on, I just have a waist chain
14  around my, my hips, and the handcuffs will be on my
15  armpits.
16    Q.  And were both of these prescribed to
17  alleviate your complaints of shoulder pain?
18    A.  Yes.
19    Q.  And we see there in effect beginning
20  October 30, 2013, for one year, so October 30, 2014,
21  correct?
22    A.  Yes.
23    Q.  Let's turn to Page 79.
24    A.  (Witness complies.)
25    Q.  And then we see a note here of February

Page 61

1  8th, 2014.  Let's see, it says:  IM no show for RN
2  SC?
3     A.  Inmate.
4     Q.  Inmate no show for RN sick call,
5  correct?
6     A.  Yes.
7     Q.  Why did you not show up for your nursing
8  appointment on February 8, 2014?
9     A.  The officer didn't come and get me.
10     Q.  All right.  Let's turn to Page 81.
11     A.  (Witness complies.)
12     Q.  And this is a note two days later,
13  February 13th, 2014, correct?
14     A.  Yes.
15     Q.  And it looks like this is from Nurse
16  Heather that you were referencing earlier, correct?
17     A.  Yes.
18     Q.  And it looks like you were making
19  complaints, Naproxen helps a little you said,
20  correct?
21     A.  Yes.
22     Q.  Now it says here above that:  Describe
23  the location, type and characteristic and pattern of
24  pain; and the note says:  Since February, 2013;
25  correct?

Page 62

1     A.  Where are you reading that?
2     Q.  Yeah, it's the, I guess under the S,
3  it's the third box:  Describe location, type,
4  characteristic and pattern of pain.
5     A.  Okay.
6     Q.  Did you give a report that your pain had
7  been in effect since February, 2013?
8     A.  Yes.
9     Q.  And then it looks like you say the
10  injections help about 60 days, correct?
11     A.  Yes.
12     Q.  Let's turn to Page 229.  229, sir, is a
13  letter from Louis Shicker, M.D., the agency medical
14  director for the Illinois Department of Corrections,
15  to you, and it's dated February 25th, 2014, correct?
16     A.  February 25th, 2014?
17     Q.  Is that correct, sir?
18     A.  Yes.
19     Q.  So had you written a letter to the
20  Governor's Office of Citizen?
21     A.  Yes.
22     Q.  And when did you write that letter?
23     A.  I don't recall the date that I wrote it.
24     Q.  Do you have a copy of that letter
25  in your possession still?

Page 63

1     A.  I think so.
2     Q.  Have you given that to your attorneys?
3     A.  One was provided when I filed my
4  lawsuit.
5     Q.  Mm-hmm.  And it looks like Dr. Shicker
6  here is responding to a request you had that you
7  believe was not adequately addressed, and it looks
8  like you're requesting an MRI, correct?
9     A.  Yes.
10     Q.  And Dr. Shicker for the DOC writes:  The
11  decision for an MRI is a clinical one and depends on
12  functionality, amongst other things; and Dr. Obaisi
13  has been following you and treating you
14  symptomatically, correct?
15     A.  Yes.
16     Q.  Did you do any follow-up on this letter
17  by Dr. Shicker?
18     A.  No.
19     Q.  Did you agree with Dr. Shicker's medical
20  opinion?
21     A.  No.
22     Q.  Let's turn to the next page, 83.  And we
23  see a note here of May 1st, 2014, correct?
24     A.  5-1-14?
25     Q.  Yep.  And it looks like you were coming

Page 64

1  to him on May 1st, 2014, asking for an injection?
2     A.  Yes.
3     Q.  And looks like it says:  The pain had
4  just come back in the last few weeks; correct?
5     A.  Yes.
6     Q.  So did the pain subside at some point in
7  time?
8     A.  No.
9     Q.  So why did you tell Dr. Obaisi on May
10  1st, 2014, that the pain had just come back in the
11  last few weeks?
12     A.  Because he told me that the medication
13  would help with the pain.
14     Q.  Well, I'm not understanding.  So were
15  you in pain consistently from the time of your last
16  injection till May 1st, 2014?
17     A.  Yes.
18     Q.  Okay, so then why did you give a report
19  that the pain had just come back in the, quote,
20  "last few weeks," closed quote?
21     A.  Because the pain medication that he
22  prescribed me was only giving me small relief into
23  my shoulder.
24     Q.  So it was providing relief, correct?
25     A.  Some relief.

Page 65

1  Q.  It was providing enough relief that you,
2  in fact, asked for another injection on May 1st,
3  2014.
4       A.  Yes, because he informed me that all I
5  need is a steroid injection.
6       Q.  And it looks like it's, the plan here is
7  to go ahead and give you an injection shortly
8  thereafter, correct?
9       A.  Yes.
10      Q.  And if we flip the page to 84, we see on
11 May 12th, 2014, another M.D. note by Dr. Obaisi, and
12 it looks like he's injecting medication in your
13 right shoulder again, correct?
14      A.  Yes.
15      Q.  Did that injection provide you relief,
16 Mr. Hemphill?
17      A.  No.
18      Q.  So it provided you no relief.
19      A.  No.
20      Q.  Well, you previously reported that the
21 injections were providing you about 60 days of
22 relief?
23      A.  30 to 60 days.
24      Q.  Well, in one report it was 60, so let's
25 say 30 to 60, if that's your testimony today, I want

Page 66

1  to know if this injection on May 12th, 2014,
2  provided you 30 to 60 days of relief.
3       A.  No.
4       Q.  Did it provide you any relief?
5       A.  Some.
6       Q.  And when did that relief wear off?
7       A.  Within like 40 days.
8       Q.  All right.  Well, let's turn to Page 88.
9       A.  (Witness complies.)
10      Q.  Then we see an M.D. note of September
11 16, 2014, correct?
12      A.  Yes.
13      Q.  Is that the next time you saw Dr.
14 Obaisi?
15      A.  9-16 of 2014?
16      Q.  Correct, so he injects you on May 12th,
17 2014, did you see him again before September 16,
18 2014?
19      A.  I don't recall.
20      Q.  Okay.  Let's flip the page to
21 November -- or the next page is Bates 95, it's a
22 date of 11-12-14, correct?
23      A.  Mm-hmm.
24      Q.  And that's again another M.D. note by
25 Dr. Obaisi.

Page 67

1       A.  Yes.
2       Q.  And it looks like he assesses you with
3  chronic tendonitis, and he orders an X-ray, correct?
4       A.  Yes.
5       Q.  And he gives you Naproxen or tells you
6  to continue Naproxen at 500 milligrams, correct?
7       A.  Yes.
8       Q.  Was the Naproxen providing any relief?
9       A.  Some.
10      Q.  All right, let's turn to Page 223.
11      A.  223.
12      Q.  And you see here a... let's see.
13 11-14-14 is this note, so that's November 14, 2014,
14 and this looks like the X-ray is performed on your
15 right shoulder, correct?
16      A.  11-14-14?
17      Q.  Mm-hmm.
18      A.  Yes.
19      Q.  And it looks like it's a right shoulder
20 and cervical spine X-ray specifically, correct?
21      A.  I'm assuming, yes.
22      Q.  Your neck and your shoulder, does that
23 sound familiar to you?  Do you know what cervical
24 spine is?
25      A.  No, I don't.

Page 68

1       Q.  Okay.  Both studies are listed as
2  negative, correct?
3       A.  Yes.
4       Q.  All right, and then let's flip to 231.
5       A.  Okay.
6       Q.  Is this another one of those medical
7  permits that we discussed?
8       A.  Yes.
9       Q.  And again, this is in effect from
10 11-12-14 to 11-12-15, correct?
11      A.  Yes.
12      Q.  And it's signed by Dr. Obaisi, is that
13 correct?
14      A.  Yes.
15      Q.  And I see it's a low bunk, which we
16 discussed earlier, correct?
17      A.  Yes.
18      Q.  And then "other" is checked, and it's a
19 front cuffing --
20      A.  Yes.
21      Q.  -- permit?  What is a front cuffing
22 permit?
23      A.  It's where that, because the warden had
24 told the medical staff that the officers was
25 complaining about us having waist chains, so they

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 69

1    just told us to put front cuffs on us instead of the
2    waist chain.
3        Q.  Is that different than a normal cuffing?
4    I'm confused why there's a permit noted for it.
5        A.  No, the handcuffs, that's, it's a
6    different permit.  Instead of a waist chain, instead
7    of us having the chain wrapped around our waist and
8    the cuffs on our hands where we can be like this,
9    (indicating), it's just regular handcuffs that they
10   will be handcuffing with just two regular -- well,
11   one set of handcuffs.
12       Q.  Is that different than how an inmate is
13   normally cuffed?
14       A.  Yes, because regular handcuffs you got
15   to put them behind your back.
16       Q.  Okay.  So the normal inmate, I guess I'm
17   understanding, the normal inmate gets the handcuff
18   behind the back, correct?
19       A.  Right.
20       Q.  Originally you had a waist chain permit,
21   which --
22       A.  Right.
23       Q.  -- ties your hands to the waist,
24   correct?
25       A.  Right.

Page 70

1        Q.  The security officers complained and
2    said:  Don't give the inmates waist chains anymore,
3    correct?
4        A.  Yes.
5        Q.  And then Dr. Obaisi here, because you're
6    still making complaints, he orders a different type
7    of cuffing called front cuffing, correct?
8        A.  Yes.
9        Q.  And that's where your hands are cuffed
10   in the front so that they're not pulled behind you,
11   correct?
12       A.  Yes.
13       Q.  Let's turn to Page 224.
14       A.  (Witness complies.)
15       Q.  On Page 224 we see a request from
16   December 9th, 2014, for an X-ray of your right great
17   toe and foot?
18       A.  Right great toe and foot.
19       Q.  Do you know what that's about?
20       A.  This is -- this occurred from 2011.
21       Q.  So were you having a toe injury at this
22   time?
23       A.  Actually, I had sprung my foot.
24       Q.  In 2011.
25       A.  Yes.

Page 71

1        Q.  Mm-hmm.
2        A.  April 7, 2011.
3        Q.  And so this is related to a 2011 injury,
4    this X-ray report, correct?
5        A.  Yes.
6        Q.  Was your toe injury causing you any
7    pain?
8        A.  No.
9        Q.  What about the foot injury that's noted
10   here, as well?
11       A.  No.
12       Q.  So why were you getting your toe looked
13   at in 2014 if it wasn't bothering you?
14       A.  I don't know where this come from.
15       Q.  Would it just be -- do you dispute that
16   you received an X-ray of your great toe and foot in
17   2014?  December, 2014, specifically?
18       A.  I don't even recall going and getting my
19   foot looked at in 2014.
20       Q.  Is that your name at the top, Carl
21   Hemphill?
22       A.  Yes.
23       Q.  And is that your offender number next to
24   it?
25       A.  Yes.

Page 72

1        Q.  So you have no memory of going to get an
2    X-ray in December, 2014, on your foot?
3        A.  (Shakes head no.)
4        Q.  You have to give an answer.
5        A.  Oh.  Yes.
6        Q.  Yes, you have no memory?
7        A.  Yes.
8        Q.  Let's turn to the bottom here, 3-4-15.
9    Next page, sir, it's on -- it's kind of hard to read
10   the Bates stamp.  97?
11       A.  (Witness complies.)
12       Q.  Yeah, exactly.  We see it's another M.D.
13   note, and it complains here that pain in right
14   shoulder and back on and off.  Do you recall telling
15   the medical provider on March 4th, 2015, that your
16   shoulder and back pain was, quote, on and off,
17   closed quote?
18       A.  This statement, shoulder is back, my
19   right shoulder is back.  That's I-S, is back.
20       Q.  Mm-hmm.  And it says next to that on and
21   off, correct?
22       A.  Right.
23       Q.  Do you recall telling the provider that
24   your pain in the right shoulder was, quote, on and
25   off?

Page 73

1    A.  Yes.
2    Q.  And has that been consistent since 2013,
3  that your pain in your shoulder is on and off?
4    A.  Yes.
5    Q.  And it looks like you are prescribed
6  Naproxen for 90 days that day, correct?
7    A.  Yes.
8    Q.  Let's turn to Page 103.
9    A.  (Witness complies.)
10   Q.  And we see this is an M.D. note dated
11  June 4th, 2015, correct?
12   A.  Yes.
13   Q.  And again, we're seeing in the S portion
14  of the note:  Pain right shoulder on and off for two
15  year; correct?
16   A.  Yes.
17   Q.  So is that consistent with your prior
18  testimony that the pain in the shoulder has been on
19  and off for two years?
20   A.  Yes.
21   Q.  Looks like you might have been
22  complaining about some breathing issues that day?
23   A.  Yes.
24   Q.  Do you recall having a cold or
25  something?

Page 74

1    A.  No, it wasn't a cold.
2    Q.  What was it, sir?
3    A.  My right shoulder was hurting so bad I
4  couldn't breathe.
5    Q.  And we see that Dr. Obaisi prescribed
6  several medications, looks like some Keflex and some
7  throat lozenges, correct?
8    A.  Yes.
9    Q.  And then let's turn to Page... you know,
10  104 is actually connected to the next page, so let's
11  skip to 1.  Do you see that?  Page 1?
12   A.  (Witness indicates.)
13   Q.  Yeah, the typed note.  So it looks like
14  here Dr. Obaisi is putting in a request to get you
15  an orthopedic evaluation at UIC, correct?
16     MR. BRITT:  Object to form.
17   Q  (By Mr. Maruna) Is that what the note
18  says, sir?
19     THE WITNESS:  Yes.
20   Q.  Do you recall getting told you were
21  approved for orthopedic evaluation at UIC in June of
22  2015?
23   A.  No.
24   Q.  Okay.  And it looks like pain in --
25  chronic right shoulder pain, onsite steroid

Page 75

1  injections ineffective, correct?
2    A.  Yes.
3    Q.  All right, let's turn to Page 112.
4    A.  (Witness complies.)
5    Q.  And we see here on September 16, 2015,
6  you see the medical provider, looks like that same
7  Obaisi signature, correct?
8    A.  Yes.
9    Q.  And it looks like you're requesting a
10  cuffing permit that day, and it says:  Informed he
11  is not eligible; correct?
12   A.  Yes.
13   Q.  What did Dr. Obaisi tell you that day
14  about your cuffing permit?
15   A.  He said that he wasn't -- the warden had
16  informed him that I could not get a front cuff
17  permit anymore.
18   Q.  Did he give a basis for the warden's
19  opinion of that?
20   A.  He said because we have to go to an
21  outside provider first.
22   Q.  So the testimony, your testimony today
23  is that Dr. Obaisi told you the warden informed him
24  that you need to go to an outside medical provider
25  first before a front cuffing permit is approved,

Page 76

1  correct?
2    A.  Yes.
3    Q.  Let's turn to Page 116, and it's,
4  continues on to 117?
5    A.  (Witness complies.)
6    Q.  And it looks like this is a note from
7  October 20, 2015, correct?
8    A.  Yes.
9    Q.  At the top, and it looks like the
10  initial complaint is that you were trying to open a
11  container can in the kitchen, and you accidentally
12  cut your finger, correct?
13   A.  Yes.
14   Q.  So were you working in the kitchen?
15   A.  Yes.
16   Q.  And that was part of the work duty that
17  we discussed?
18   A.  Yes.
19   Q.  And that's when you were doing the
20  cooking and everything?
21   A.  Yes.
22   Q.  And you cut your hand, correct?
23   A.  Yes.
24   Q.  Looks like the next day, October 21st,
25  2015, you were seen by a medical provider, correct?

19 (Pages 73 to 76)

Page 77

1      A.  Yes.
2      Q.  Do you know what medical provider you
3  saw that day?
4      A.  It was a nurse.
5      Q.  Do you know if that was LaTonya Williams
6  by chance?
7      A.  I don't recall.
8      Q.  Well, if we flip the page to 117,
9  correct?
10     A.  Mm-hmm.
11     Q.  At the very top you'll see it says:
12  10-21-15, PA note continued; correct?
13     A.  Yes.
14     Q.  Would that help refresh your memory that
15  you may have seen LaTonya Williams?
16     A.  Yes.
17     Q.  So did you see LaTonya Williams on
18  October 21st, 2015?
19     A.  Yes.
20     Q.  And it looks like she treats your cut in
21  the hand, correct?
22     A.  Yes.
23     Q.  Let's turn to November -- next page,
24  121.  And that's November 24th, 2015, correct?
25     A.  Yes.

Page 78

1      Q.  And it's an M.D. note, correct?
2      A.  Yes.
3      Q.  Now it says, you're requesting low bunk
4  because of pain in the right shoulder, and he notes
5  that:  X-ray WNL, exam WNL, full range of motion,
6  and offender informed he is not eligible low bunk;
7  correct?
8      A.  Yes.
9      Q.  And it says that:  Offender left room
10  angry; correct?
11     A.  Yes.
12     Q.  Okay.  Do you recall this appointment?
13     A.  Yes.
14     Q.  What happened?
15     A.  He informed me that he does not give
16  people that's in their 20's and 30's bottom bunk
17  permits.
18     Q.  Did he explain to you that the results
19  of his examination found that you were within normal
20  limits?
21     A.  No.
22     Q.  Mm-hmm.  And do you recall leaving the
23  room angry?
24     A.  Yes.
25     Q.  Did you say anything?

Page 79

1      A.  No.
2      Q.  Did you stomp out?
3      A.  No.
4      Q.  So how would Dr. Obaisi know you were
5  angry?
6      A.  Because of our conversation.
7      Q.  What did you say?
8      A.  I asked him for a bottom, to renew my
9  bottom bunk permit, and he told me he doesn't give
10  out bottom bunk permits for people that's 20 or 30
11  years of age.
12     Q.  And you said you were angry, correct?
13     A.  I didn't say anything.
14     Q.  Well, do you disagree that you left the
15  room angry?
16     A.  I was angry, I just got up and left.
17     Q.  Let's turn to Page 225.
18     A.  (Witness complies.)
19     Q.  No, no, let's talk -- I'm sorry, I
20  skipped one, we're on 126.  Do you see that?
21  January 19, 2016?
22     A.  Yes.
23     Q.  All right, and we see here you're seen
24  on M.D. sick call, correct?
25     A.  Yes.

Page 80

1      Q.  Do you recall if this appointment was
2  with LaTonya Williams, though?  The PA?
3      A.  I don't recall.
4      Q.  And it looks like you're complaining of
5  painful right shoulder, and you ask if you can get
6  another X-ray, correct?
7      A.  Yes.
8      Q.  Do you recall asking for another X-ray?
9      A.  Yes.
10     Q.  And if you just look over in the Plan
11  section, we see that this provider, LaTonya
12  Williams, ordered you another X-ray, correct?
13     A.  (No response.)
14     Q.  X-ray right shoulder and check under the
15  Plan section, correct?
16     A.  Yes.
17     Q.  It looks like you were also given some
18  pain medication and an analgesic balm, correct?
19     A.  No, I just got some pain medication.
20     Q.  You dispute that you received analgesic
21  balm on November -- or January 19, 2016?
22     A.  I never received it.  Only time I
23  received that, that cream was in 2013.
24     Q.  Do you dispute that it was ordered for
25  you on January 19th, 2016?

Page 81

1      MR. BRITT:  Object to form.
2      Q   (By Mr. Maruna) You do dispute that was
3  ordered for you?
4      THE WITNESS:  I don't recall.
5      Q.  And then we see here that it's, there's
6  discussion about physical therapy and that you're on
7  the waiting list, correct?
8      A.  Yes.
9      Q.  So do you recall that provider told you
10  that you were going to get some physical therapy?
11     A.  I asked for physical therapy.
12     Q.  And did they agree to provide it for
13  you, based on your request?
14     A.  They just informed me it was a waiting
15  list.
16     Q.  So as far as you know, you were approved
17  for physical therapy, there was just a list, a
18  waiting list to get it, correct?
19     A.  Yeah, I was just informed of a waiting
20  list.
21     Q.  All right, let's turn to Page 225.  And
22  on 225, sir, we see an X-ray with a date of January
23  21st, 2016, correct?
24     A.  Yes.
25     Q.  And we see that that result was

Page 82

1  negative, correct?
2      A.  Yes.
3      Q.  All right.  Let's turn to 3... 3...
4  let's see, looks like it's 3-10-16, it's like the
5  fourth note on that page on 130?
6      A.  At the top?
7      Q.  Bottom.
8      A.  3-16-16?
9      Q.  It's right above that, it looks like
10  it's 3-10-16?
11     A.  Oh, okay.
12     Q.  And it says, note, it says:  PT note
13  scheduled for PT eval.
14     A.  Okay.
15     Q.  Do you recall going for a PT eval or
16  being scheduled for one?
17     A.  I -- no.
18     Q.  Did you receive physical therapy at
19  Stateville?
20     A.  No.
21     Q.  Do you recall being examined for
22  physical therapy while at Stateville?
23     A.  No.
24     Q.  Let's turn to Page 131.
25     A.  (Witness complies.)

Page 83

1      Q.  And you see here on March 18, 2016, it's
2  another PA note, correct?
3      A.  Yes.
4      Q.  Was that with LaTonya Williams?
5      A.  Yes.
6      Q.  And we see here it looks like you're
7  complaining about heartburn, correct?
8      A.  Yes.
9      Q.  When did your heartburn start?
10     A.  Probably like couple days before I saw,
11  before I saw her.
12     Q.  And it doesn't look like you made any
13  complaints of shoulder pain during this examination,
14  correct?
15     A.  No.
16     Q.  And then she prescribed some Zantac and
17  antacids, correct?
18     A.  Yes.
19     Q.  All right.  Let's turn to 133.  And 133
20  is a note on March 22nd, 2016, where it looks like
21  you're transferring from Stateville to Hill, is that
22  correct?
23     A.  Yes.
24     Q.  And is that consistent with your
25  recollection of when you transferred down here?

Page 84

1      A.  Yes.
2      Q.  At the time you're noted to be on
3  Zantac, and Tylenol 500 milligrams, and that's
4  between doses of Naproxen, correct?  Very top of the
5  page, sir, current medications?
6      A.  Yeah, yeah, I don't recall none of this.
7      Q.  You don't recall this examination on
8  your transfer screen?
9      A.  No.
10     Q.  Do you recall that on March 22nd, 2016,
11  you were on two pain medications, Tylenol and
12  Naproxen?
13     A.  Only medication I was on was Naproxen
14  when I came down here.
15     Q.  Then if we look at the bottom at Hill,
16  you have no complaints at this time on your
17  examination, correct?  Current complaint zero with a
18  slash through it?
19     A.  Yes.
20     Q.  All right, let's turn to Page 3.
21     A.  (Witness complies.)
22     Q.  Page 3, sir, is a note dated April 21st,
23  2016, and it looks like here it's noted that:
24  Patient missed his appointment at UIC ortho on
25  4-15-16, correct?

Page 85

1  A. 4-15-16.
2  Q. Yeah, it's about the fifth line from the
3  bottom: PT misses appointment at UIC Ortho on
4  4-15-16 because Hill was given too late of notice,
5  and transportation security was not feasible;
6  correct?
7  A. Yeah, I wouldn't know anything about
8  that.
9  Q. Do you know anything about, is it
10 possible that you transferred down to Hill while you
11 had a pending appointment at UIC scheduled, and they
12 had to find a local provider down here to look at
13 you, since Hill is three and a half hours from
14 Chicago?
15     MR. BRITT: Object to form.
16     MR. STEPHENSON: Object to form, I'm
17 going to join, foundation.
18 Q (By Mr. Maruna) You can answer the
19 question, sir.
20     THE WITNESS: I, I don't know.
21 Q. Did anyone tell you anything like that?
22 A. They don't inform us of that.
23 Q. And then we'll see here the plan below
24 is: Approved for orthopedic eval with a local
25 provider; correct?

Page 86

1  A. Yes.
2  Q. All right, let's turn to Page 145. And
3  that's a note of April 16, 2016, correct?
4  A. Yes.
5  Q. And it looks like you handed a nurse a
6  full card of Mobic and said that they've made you
7  sick, and you do not want them anymore, correct?
8  A. Yes.
9  Q. So when did the Mobic start making you
10 sick?
11 A. This Mobic made me sick back when I was
12 in Stateville.
13 Q. And is that -- and how long were you on
14 the Mobic?
15 A. I was on the Mobic at least like a week.
16 And it, I got dizzy, nauseated, I got bad diarrhea,
17 and I explained that to one of the nurses and I had
18 gave the medication back to her, and then they said
19 they was going to inform Dr. Obaisi about it.
20 Q. Mm-hmm. And then you said you were on
21 other medications at Stateville, correct, the
22 Naproxen and --
23 A. Yeah.
24 Q. Correct?
25 A. Yes.

Page 87

1  Q. So you were on other medications after
2  you made your complaint about Mobic, correct?
3  A. Yes.
4  Q. And then we see on this note, if we look
5  in the right-hand column, there's a checkmark next
6  to Ibuprofen, correct?
7  A. Yes.
8  Q. And you say, the nurse writes down:
9  Refused the medication, so Ibuprofen, states has
10 some Naproxen and does help, correct?
11 A. Yes.
12 Q. So is that consistent that the Naproxen
13 was helping your pain?
14 A. Yes.
15 Q. And that you refused the nurse's offer
16 to take Ibuprofen, correct?
17 A. Yes.
18 Q. All right, let's go ahead and flip.
19 A. (Witness complies.)
20 Q. The next note, sir, is a May 3rd, 2016,
21 note.
22 A. May 3rd.
23 Q. And it looks like there was a
24 recommendation here by the outside treating
25 physician at Cottage Hospital, so it looks like you

Page 88

1  saw an outside treatment physician at Cottage
2  Hospital on or about April 26, 2016, is that
3  correct?
4  A. Yes.
5  Q. And Cottage Hospital, is that a local
6  hospital in the area around, where are we,
7  Galesburg?
8  A. I guess so.
9  Q. They probably don't give you specific
10 directions, but --
11 A. Yes.
12 Q. Okay. And do you recall going to see a
13 medical provider at an outside hospital around the
14 prison around here?
15 A. Yes.
16 Q. And that provider said he wanted to get
17 an MRI, correct?
18 A. Yes.
19 Q. And do you recall that an MRI was
20 approved by Wexford shortly thereafter?
21 A. That part I don't know.
22 Q. Okay. And let's turn to Page 14. And
23 we see here another note dated May 16, 2016.
24 A. Yes.
25 Q. And it looks like you received that MRI

Page 89

1    on May 6th, 2016, correct?
2        A. Yes.
3        Q. And it showed a rotator cuff tear,
4    correct?
5        A. Yes.
6        Q. And we see Wexford's approving a
7    follow-up with Dr. Schierer, correct?
8        A. Yes.
9        Q. And Dr. Schierer is the doctor at the
10   Cottage Hospital, the outside facility here?
11       A. Yes.
12       Q. All right, let's turn to Page 18. And
13   we see a note here 5-25-16, correct?
14       A. 5-25?
15       Q. Yeah. Date and time 5-25-16. The
16   comments say 5-23-16, so if that helps clear it up.
17       A. Yes.
18       Q. And it looks like the doctor at Cottage
19   Hospital, did he recommend a surgery on your
20   shoulder?
21       A. Yes.
22       Q. And was that called an
23   acromioplasty/Mumford procedure?
24       A. I'm assuming so. He never told me.
25       Q. And we see here that Wexford approved

Page 90

1    that surgery, correct?
2        A. Yes.
3        Q. And did you end up receiving that
4    surgery?
5        A. Yes.
6        Q. When did you receive the surgery?
7        A. I don't recall the --
8        Q. June, 2016, sound familiar?
9        A. It was -- it was in the summer time. Or
10   right about --
11       Q. So about a --
12       A. -- summer.
13       Q. About a year ago?
14       A. Yes.
15       Q. Okay. And did the surgery help?
16       A. Yes.
17       Q. Do you have any pain as you sit here
18   today?
19       A. Some.
20       Q. Scale of 1 to 10 what's your pain as you
21   sit here today?
22       A. About 4.
23       Q. What was it before the surgery?
24       A. 10.
25       Q. So the surgery has helped, correct?

Page 91

1        A. Yes.
2        Q. But it has not relieved all of your
3    pain, correct?
4        A. No.
5        Q. Have you sought any additional treatment
6    for the remaining pain?
7        A. They just having me doing physical
8    therapy.
9        Q. And when did you start physical therapy?
10       A. Last year.
11       Q. And that's physical therapy inside the
12   prison?
13       A. Yes.
14       Q. And is that helping?
15       A. Some.
16       Q. How much?
17       A. I'd say about still a 4.
18       Q. Do you have any other future treatment
19   planned that you know of as you sit here today?
20       A. No, not that I know of.
21       Q. Are you able to do all of your work
22   details currently?
23       A. Yes.
24       Q. As part of your treatment, has any
25   provider given you exercises that you can do in your

Page 92

1    cell?
2        A. No.
3        Q. Have you ever heard the term home
4    exercise plan?
5        A. No.
6        Q. So you recall that no, you don't recall
7    that any provider has given you exercises that you
8    can perform on your own?
9        A. No. Just, just the physical therapy
10   that they provided.
11       Q. Mm-hmm. So as we sit here today, we've
12   reviewed a substantial amount of medical treatment,
13   sir, and I kind of want to understand a little bit
14   about your lawsuit. Are you, are you saying that
15   you haven't received treatment for your shoulder, or
16   are you saying that you dispute the treatment that
17   you did receive for your shoulder?
18       MR. BRITT: Object to form.
19       Q (By Mr. Maruna) You can answer the
20   question.
21       THE WITNESS: I'm trying to understand
22   the question.
23       Q. Sure. What is your complaint here
24   exactly? What are you suing, what is the basis for
25   your lawsuit, what are you saying Wexford or the

23 (Pages 89 to 92)

Page 93

1    medical providers did wrong? I want to understand
2    that better.
3        A. They delayed my treatment, they -- they
4    act like they didn't care about my treatment.
5        Q. We reviewed a lot of treatment that you
6    did receive, though, correct?
7        A. Yes.
8        Q. Okay. So are you just saying you
9    disagree with the type of treatment that they
10   provided you?
11       A. No, the, the lack of treatment that they
12   gave me. They act like they didn't care. Just
13   because I'm, just because I am incarcerated, provide
14   me with the proper treatment that I should have
15   coming.
16       Q. Well, they did give you surgery,
17   correct?
18       A. After I filed the lawsuit.
19       Q. But they did give you surgery, correct?
20       A. Yes.
21       Q. They've given you an MRI, correct?
22       A. Yes.
23       Q. They've given you at least four pain
24   injections that were reviewed, correct?
25       A. I only received three injections.

Page 94

1        Q. I thought it was four, but fine.
2        A. No, it's three.
3        Q. They received -- you received three,
4    correct?
5        A. Yes.
6        Q. They provided you multiple types of pain
7    medication, correct?
8            MR. BRITT: I'm just going to object
9    really quick on the whole use of "they" is
10   ambiguous.
11       Q (By Mr. Maruna) Sure. The medical
12   providers at Wexford, that's how I'll define "they"
13   going forward; do you understand?
14           THE WITNESS: No, I don't understand.
15       Q. Sure. Dr. Davis, PA Williams, Dr.
16   Obaisi, and their employer, Wexford Health Sources,
17   okay? Do you understand if I use "they," that's who
18   I'm referring to for this line of questioning?
19       A. Sure.
20       Q. Do you know who all three medical
21   providers are, correct?
22       A. Yes.
23       Q. Okay. And you know what Wexford Health
24   Sources is, correct?
25       A. I don't know anything about Wexford.

Page 95

1        Q. Well, you sued them, so what do you know
2    about them?
3        A. I don't know anything about Wexford,
4    who, who they employ.
5        Q. Okay. You agree that since you've been
6    incarcerated, let's just ask it this way.
7        A. Okay.
8        Q. Since you've been incarcerated for your
9    shoulder, you've received the treatment that we just
10   went over a few questions ago, correct?
11       A. Yes.
12       Q. You've received multiple types of pain
13   medication, correct?
14       A. Yes.
15       Q. And your testimony today is that you're
16   saying they didn't treat your condition, correct?
17   And you used "they" yourself, so I'll use it however
18   you define it. Correct?
19       A. Yes.
20       Q. But we just reviewed a lot of treatment
21   that was provided to you, so what I'm trying to
22   understand is are you saying they didn't treat it
23   period, or are you saying you don't agree with the
24   treatment they provided?
25       A. I don't agree with the treatment.

Page 96

1        Q. All right. What are you seeking out of
2    the litigation, sir?
3        A. Just to make me better.
4        Q. And if the determination was that you
5    have chronic pain condition, would you accept those
6    findings?
7            MR. BRITT: Object to form.
8            THE WITNESS: I would want to go out and
9    be treated, because I, I don't want to be in chronic
10   pain anymore.
11       Q (By Mr. Maruna) Mm-hmm. But if a medical
12   provider was to ever tell you that there will be
13   some level of pain going forward, would you accept
14   those findings?
15           MR. BRITT: Object to form.
16           THE WITNESS: No.
17           MR. MARUNA: No further questions at
18   this time, reserve my right to request the
19   witness consistent with the rules. Counsel for the
20   State is going to ask you some questions now.
21           MR. BRITT: Can we take a quick break?
22           MR. STEPHENSON: Sure, absolutely.
23   We'll go off the record.
24           (Discussion off the record.)
25           (Recess)

Page 97

```
 1              EXAMINATION
 2   QUESTIONS BY MR. STEPHENSON
 3        Q.  We'll back on the record.  Good
 4   afternoon, Mr. Hemphill, my name is Mike Stephenson,
 5   I'm representing the State defendants in this case;
 6   that's Mr. Lemke, Ms. O'Brien, and Dr. Shicker.
 7        A.  Okay.
 8        Q.  Who is Ms. O'Brien?
 9        A.  She was Assistant Warden at Stateville
10   Correctional Center.
11        Q.  Do you know which type of Assistant
12   Warden she was?
13        A.  I think Security.
14        Q.  Assistant Warden of Security?
15        A.  Yes.
16        Q.  How do you know that?
17        A.  That's what she had told -- that's what
18   she told me her title was.
19        Q.  Ms. O'Brien told you that?
20        A.  Yes.
21        Q.  You had conversations with Ms. O'Brien?
22        A.  I mean we, we asked them when they'd
23   come through the cell house, we'd ask them who they
24   are, and they'll tell us which warden that they are.
25        Q.  Did you have conversations with
```

Page 98

```
 1   Ms. O'Brien then?
 2        A.  Yeah.
 3        Q.  Do you know her first name?
 4        A.  No.
 5        Q.  How many conversations did you have with
 6   Ms. O'Brien?
 7        A.  Four.
 8        Q.  Do you recall when those conversations
 9   were?
10        A.  In 2013.
11        Q.  Do you recall when in 2013 those
12   conversations took place?
13        A.  Sometime in the summer.
14        Q.  So all four conversations with
15   Ms. O'Brien took place in the Summer of 2013?
16        A.  On different occasions.
17        Q.  Where did these conversations take
18   place?
19        A.  In X House.
20        Q.  Were you in your cell?
21        A.  Yes.
22        Q.  Did you have a cell mate at the time?
23        A.  Yes.
24        Q.  Who was that?
25        A.  His name was Pete.
```

Page 99

```
 1        Q.  Pete?
 2        A.  Yes.
 3        Q.  Did he have a last name?
 4        A.  I don't know his last name.
 5        Q.  Did he have an alias?
 6        A.  Not that I know of.  I just called him
 7   Pete.
 8        Q.  What unit was this?
 9        A.  X House.
10        Q.  What cell, though?
11        A.  4 or 5.
12        Q.  What wing in X House?
13        A.  Lower East.
14        Q.  Okay, so while you were incarcerated in
15   X House Lower East, you had four conversations in
16   your cell -- well, you were in your cell,
17   Ms. O'Brien would have been outside the cell I would
18   imagine -- you had four conversations while you were
19   in X House at that time with Ms. O'Brien?
20        A.  Yes, four different, four different
21   conversations.
22        Q.  And during those conversations she said
23   that you -- she was the Assistant Warden of
24   Security?
25        A.  Yes.
```

Page 100

```
 1        Q.  Do you know how long she was the
 2   Assistant Warden for at Stateville?
 3        A.  No.
 4        Q.  During these conversations, do you
 5   recall what you told Ms. O'Brien?
 6        A.  Yes.
 7        Q.  Okay.  What was that?
 8        A.  Two of them I was asking about an out of
 9   state transfer.
10        Q.  Now what did these out of state
11   transfers, why did you, why were you requesting
12   those?
13        A.  Because my family wanted to know if I
14   could transfer out to Colorado.
15        Q.  Okay.  What about the other two
16   conversations?
17        A.  The other two was about my shoulder.
18        Q.  What did you tell Ms. O'Brien about your
19   shoulder?
20        A.  That I was trying to get medical
21   treatment for my shoulder.
22        Q.  Anything else?
23        A.  No.
24        Q.  What did Ms. O'Brien respond?
25        A.  She would check into it.
```

Page 101

1       Q.  That's what she said, she said she'd
2   check into it?
3       A.  Yes.
4       Q.  Did she say anything else?
5       A.  No.
6       Q.  Now after these two conversations with
7   Ms. O'Brien, did you ever follow-up with her?
8       A.  No, because half the time she wasn't
9   there.
10      Q.  What do you mean she wasn't, she wasn't
11  at the facility, or she wasn't in X House?
12      A.  She wasn't at X House.
13      Q.  Did you ever write to Ms. O'Brien?
14      A.  Yes.
15      Q.  When was that?
16      A.  I don't recall what date or year the
17  letter was.
18      Q.  Was it before or after these four
19  conversations?
20      A.  After.
21      Q.  Okay.  Was the letter to follow-up on
22  the conversations that you had?
23      A.  Yes.
24      Q.  You're just not sure when you sent the
25  letter.

Page 102

1       A.  Yes.
2       Q.  How did you send the letter?
3       A.  Through the mail.
4       Q.  Describe the mail.
5       A.  I put the mail inside the bars, I write
6   on a scratch sheet of paper, fold it up, and I set
7   it inside the bars.  The officer will come past and
8   pick the mail up at the bars.
9       Q.  Now the letter, what did the letter say
10  to Ms. O'Brien?
11      A.  That I'm trying to get an answer for my
12  follow-up for my medical treatment.
13      Q.  Anything more specific than that?
14      A.  No.
15      Q.  What, did you put anything on the
16  outside of the letter that you folded up?
17      A.  To Assistant -- to Assistant Warden
18  O'Brien.
19      Q.  Now when do they pick up the
20  institutional mail at Stateville in X House?
21      A.  At between 10:30, 10:45, before they
22  leave.
23      Q.  P.m. or a.m.?
24      A.  P.m.
25      Q.  So that would be the second shift?

Page 103

1       A.  Yes.
2       Q.  Did you watch an officer pick up this
3   piece of mail?
4       A.  Not all the time, because I would be
5   asleep sometimes when they'd pick up the mail.
6       Q.  Okay, what about this mail that you sent
7   to Ms. O'Brien, did you watch one of the
8   correctional officers pick it up?
9       A.  No, I was asleep.
10      Q.  So you're not sure whether she, in fact,
11  received this letter?
12      A.  Yes.
13      Q.  Yes you're not sure?
14      A.  Yes, I'm not sure if she received it.
15      Q.  Ms. O'Brien never responded to that
16  letter, did she?
17      A.  No.
18      Q.  Did you have any other interactions with
19  Ms. O'Brien after those four conversations?
20      A.  No.
21      Q.  And the only letter that you wrote her
22  was this one letter, but you're not sure when you
23  sent it?
24      A.  Yes.
25      Q.  Are there any other communications that

Page 104

1   you had with Ms. O'Brien?
2       A.  No.
3       Q.  Do you know when she stopped working at
4   Stateville?
5       A.  No.
6       Q.  As an Assistant Warden at Stateville, do
7   you know what Ms. O'Brien's job responsibilities
8   were?
9       A.  She was in charge of security.
10      Q.  Was she in charge of anything else?
11      A.  All I know is security.
12      Q.  Just security.
13      A.  Yes.
14      Q.  Now her responsibility for security, are
15  you basing that on her job title as Assistant Warden
16  for Security, or is this something that she tell --
17  told you?
18      A.  This is something that, that we know
19  from the officers, like she's just the Warden of
20  Security, so...
21      Q.  Okay, so based on what other officers
22  told you --
23      A.  Yes.
24      Q.  -- as far as you know, Ms. O'Brien's
25  only responsibility was security?

26 (Pages 101 to 104)

1     A.  Yes.
2     Q.  All right, Mr. Hemphill, we were taking
3  a look earlier at your Second Amended Complaint,
4  which we marked as Exhibit 3. Do you have that in
5  front of you?
6     A.  Yes.
7     Q.  Take your time and please turn to Page
8  4, paragraph 18.
9     A.  18.
10     Q.  Now in this paragraph you allege that --
11  you first allege that Mr. O'Brien, did you mean
12  Ms. O'Brien?
13     A.  Yes, I -- I put Ms. O'Brien.
14     Q.  You meant to -- you understand that it's
15  a female?
16     A.  Yes.
17     Q.  Okay. So although the complaint says
18  Mr. O'Brien, you understand it to be Ms. O'Brien,
19  correct?
20     A.  Yes.
21     Q.  So in paragraph 18, with the correction
22  of Mr. to Ms., you allege that: Ms. O'Brien was
23  responsible for the custody and care of all
24  prisoners at Stateville; is that right?
25     A.  Yes.

1     Q.  And you know this based on what other
2  correctional officers have told you?
3     A.  Yes.
4     Q.  That they told you she was the Assistant
5  Warden --
6     A.  Yes.
7     Q.  -- of Security?
8     A.  Oh, yes.
9     Q.  That's okay. You further allege that
10  Ms. O'Brien was responsible for the supervision of
11  all employees at Stateville, is that right?
12     A.  Yes.
13     Q.  Now what do you mean by that allegation
14  that she was responsible for the supervision of all
15  employees at Stateville?
16     A.  I'm assuming from her title she had say
17  so of what goes on inside the institution.
18     Q.  So you're basing that allegation on her
19  title as Assistant Warden?
20     A.  Yes.
21     Q.  Is there any other basis as to why you
22  allege that?
23     A.  No.
24     Q.  So you don't know whether she, in fact,
25  supervises all the employees at Stateville?

1     A.  Yes. I'm not, I'm not aware if she
2  supervises all employees.
3     Q.  There are medical employees at
4  Stateville, correct?
5     A.  Yes.
6     Q.  There are doctors?
7     A.  Yes.
8     Q.  Nurses?
9     A.  Yes.
10     Q.  Physician's assistant?
11     A.  Yes.
12     Q.  Do you know who their employers are?
13     A.  No.
14     Q.  And you don't know whether Ms. O'Brien
15  supervises them, correct?
16     A.  I'm not -- I don't know if she, if she
17  have any say so with them or anything like that.
18     Q.  Now you further allege that Ms. O'Brien
19  was responsible for establishing, altering and
20  administering policies and procedures at Stateville;
21  do you see that allegation?
22     A.  What's that, throughout his tenure?
23     Q.  It's actually the sentence, it's
24  actually right before that.
25     A.  Right before that?

1     Q.  Mm-hmm. Yes.
2     A.  Where it says: Including Mr. Hemphill,
3  the supervision of all employees at Stateville?
4     Q.  Do you see where it says, about halfway,
5  here, I'll point it out to you.
6        Just let the record reflect that I have
7  marked Exhibit 3 by underlining paragraph 18 to
8  direct Plaintiff's attention to what I'm referring
9  to.
10        So here in paragraph 18 that I just
11  underlined in Exhibit 3, that you're alleging:
12  Ms. O'Brien has the authority to establish, alter
13  and administer policies and procedures at
14  Stateville; do you see that?
15     A.  Yes.
16     Q.  Now can you please explain what you mean
17  by that allegation?
18     A.  By, assuming by her title she has some
19  say on what her staff should be able to do.
20     Q.  Do you have any other reason to believe
21  that she has that type of authority?
22     A.  No.
23     Q.  Have you ever seen her exercise that
24  type of authority?
25     A.  I mean we barely see them any.

Page 109

1    Q.  So you're not sure whether she, in fact,
2    has the authority to establish, alter and administer
3    policies and procedures at Stateville?
4        A.  Yes.
5        Q.  Do you know who does?
6        A.  All three wardens, to my knowledge.
7        Q.  And your knowledge is, again, just based
8    on their titles?
9        A.  Yes.
10       Q.  And you have no other reason to believe
11   that that's true.
12       A.  Yes.
13       Q.  Now when you say:  "Establish, alter,
14   and administer policies and procedures," which
15   policies and procedures are you referring to?
16       A.  Medical.
17       Q.  Now in that next sentence it says:
18   "Throughout her tenure as Assistant Warden,
19   Ms. O'Brien had personal knowledge that the
20   conditions of confinement challenged in this
21   complaint were being imposed on Stateville inmates."
22           Now I first want to address what you
23   mean by conditions of confinement; do you see that
24   in there in the paragraph?
25       A.  Yes.

Page 110

1        Q.  Okay.  Can you please explain to me what
2    you mean by conditions of confinement?
3        A.  About us being locked in our cells.
4        Q.  Do you mean anything else by that
5    statement, conditions of confinement?
6        A.  No.
7        Q.  So my understanding is then, and correct
8    me if I'm wrong, the allegation that you're just
9    saying that Ms. O'Brien has personal knowledge that
10   you guys are locked in your cells?
11       A.  Yes.
12       Q.  Then further in that sentence, it
13   actually goes on to Page 5, it says that she has
14   personal knowledge, and then Mr -- Ms. O'Brien
15   implemented, enforced and condoned these conditions.
16   Now you're referring again to the fact that you're
17   confined to your cell?
18       A.  Yes.
19       Q.  And you're alleging that she
20   implemented, enforced and condoned that condition,
21   is that right?
22       A.  Yes.
23       Q.  Now how do you know that she had
24   personal knowledge that you were locked in your
25   cells?

Page 111

1        A.  Because she walked past my cell.
2        Q.  Who is Warden -- former Warden Lemke?
3        A.  He was the number one warden of
4    Stateville Correctional Center.
5        Q.  Do you know for what timeframe?
6        A.  I don't, I don't recall the timeframe.
7        Q.  Do you recall the wardens after Mr.
8    Lemke?
9        A.  I was gone after Lemke.  I left before
10   Lemke.
11       Q.  When did you leave Stateville
12   Correctional Center?
13       A.  2016.
14       Q.  Do you know who the warden was in 2016?
15       A.  No.
16       Q.  Do you know who the warden was in 2015?
17       A.  2015, the warden was, who was the
18   warden?  No, I'm going to say no, I don't recall who
19   the warden was.
20       Q.  Do you recall who the warden was in 2014
21   at Stateville?
22       A.  I'm going to say Green, Warden Green, if
23   that was his name.
24       Q.  Warden Green, can you spell the last?
25       A.  G-R-E-E-N.

Page 112

1        Q.  And then who was the warden in 2013?
2        A.  What was his name?  McCann.  McCaine.  I
3    think that was his name.  McCaine.
4        Q.  McCann or McCaine?
5        A.  McCaine.
6        Q.  Do you know how to spell that?
7        A.  C-A-I-N-E.
8        Q.  And you believe he was the warden of
9    Stateville Correctional Center in 2013?
10       A.  Yes.
11       Q.  So how do you, how do you know Mr.
12   Lemke?
13       A.  He was just the warden.  We would see
14   him walking around the institution, or the offices,
15   we'll say:  That's Lemke, Warden Lemke right there.
16       Q.  The officers would point him out for
17   you?
18       A.  Yes.
19       Q.  Did you ever have any conversations with
20   Mr. Lemke?
21       A.  No.
22       Q.  Do you recall what he looked like?
23       A.  Heavy set white guy.  I think like
24   pepper, salt and pepper hair.  And that's about it.
25       Q.  When you saw him, how far away was he?

28 (Pages 109 to 112)

Page 113

```
 1        A.  Like 10, 15 feet.
 2        Q.  And what unit did you see him in, or
 3   what cell house?
 4        A.  I saw him when I was in X House, and I
 5   saw him when I was in Delta House.
 6        Q.  But you didn't have any conversations
 7   with him?
 8        A.  No.
 9        Q.  Did you ever communicate with him at
10   all?
11        A.  Just my -- did I write him a letter?  I
12   think just the time that I wrote him the one letter
13   asking for help for my right shoulder.
14        Q.  So you, so you did write Mr. Lemke a
15   letter?
16        A.  Yes.
17        Q.  Do you recall when you sent that letter?
18        A.  His letter, I sent his letter the same
19   day I sent Mrs. O'Brien letter.
20        Q.  Now when you sent those two letters --
21   you sent them at the same time?
22        A.  Yes.
23        Q.  Do you recall which cell house you were
24   in?
25        A.  I was in X House.
```

Page 114

```
 1        Q.  Same unit as before?
 2        A.  Yes.
 3        Q.  Which was Lower East?
 4        A.  Yes.
 5        Q.  And just like Ms. O'Brien's letter, you
 6   didn't see an officer pick up Mr. Lemke's letter?
 7        A.  No.
 8        Q.  Now on the inside of Mr. Lemke's letter,
 9   was it the same as Ms. O'Brien's?
10        A.  Yes.
11        Q.  And on the outside of that letter was
12   what?
13        A.  Addressed the same way, to Warden Lemke,
14   to Laura -- to Warden Lemke from Carl Hemphill, ID
15   number, cell house, cell number.
16        Q.  Did you have any other communications
17   with Mr. Lemke other than this letter?
18        A.  No.
19        Q.  You don't know whether he, in fact,
20   received this letter, correct?
21        A.  No, I don't know if he received it.
22        Q.  Do you know what Warden Lemke's
23   responsibilities were as a warden of Stateville?
24        A.  He was the head person in charge.
25        Q.  But do you know what the
```

Page 115

```
 1   responsibilities were as a, as the warden, as the
 2   head person in charge?
 3        A.  No.
 4        Q.  Now similar to Ms. O'Brien, you allege
 5   that Mr. Lemke was responsible for the supervision
 6   of all the employees at Stateville, right?
 7        A.  Yes.
 8        Q.  And your basis for that allegation is
 9   that by virtue of being the warden, he had those
10   responsibilities?
11        A.  Yes.
12        Q.  Do you know, in fact, whether he did
13   have those responsibilities?
14        A.  He should have those responsibilities.
15        Q.  Right, but do you, but do you know as
16   you sit here today as a certainty that he did have
17   supervision over all employees at Stateville?
18        A.  Yes.
19        Q.  Yes as in you're not sure?
20        A.  Yes, I'm not sure.
21        Q.  Now again, I just want to clarify, you
22   also allege that Mr. Lemke had personal knowledge
23   that the, of the conditions of confinement
24   complaint, or excuse me, challenged in this
25   complaint; and again, when you say conditions of
```

Page 116

```
 1   confinement, you're just referring to the fact that
 2   you are held within a cell?
 3        A.  Yes.
 4        Q.  You don't know whether Mr. Lemke was, in
 5   fact, super -- in charge of supervising the medical
 6   staff at Stateville, correct?
 7        A.  Yes, I'm not sure if he was in charge.
 8        Q.  Do you know who defendant Dr. Shicker
 9   is?
10        A.  No.
11        Q.  You've never met him?
12        A.  No.
13        Q.  You never talked with him?
14        A.  No.
15        Q.  You never met him face to face?
16        A.  No.
17        Q.  You've never seen him at Stateville?
18        A.  No.
19        Q.  He's never provided you medical
20   treatment, correct?
21        A.  No.
22        Q.  And you've never written him directly,
23   correct?
24        A.  No.
25        Q.  Have you communicated with him in any
```

Page 117

1  form?
2      A.  No.
3      Q.  Do you know what position he held when
4  he was with IDOC?
5      A.  They said he was in charge of the
6  Northern District.
7      Q.  Who's they?
8      A.  The staff.
9      Q.  The prison staff at Stateville?
10     A.  Yes.
11     Q.  I'm sorry, in charge of the Northern
12  District?
13     A.  The medical district, for all, for all
14  penitentiaries in the Northern District.
15     Q.  Do you know which institutions that
16  would include?
17     A.  I just know of Stateville.
18     Q.  Do you know any of, any other of
19  Mr. Shicker's responsibilities?
20     A.  No.
21     Q.  You don't know whether Shicker had
22  management and administrative responsibilities at
23  Stateville, correct?
24         MR. BRITT:  Object to form.
25         THE WITNESS:  Can you explain that?

Page 118

1      Q   (By Mr. Stephenson) Mm-hmm.  Well,
2  actually, I'm getting this from, from your
3  allegations.  You allege that Shicker had management
4  responsibilities at Stateville, but you don't know
5  that, correct?
6      A.  Yes.
7      Q.  Correct -- yes as in you --
8      A.  Yes, I'm not aware of his duties at
9  Stateville.
10     Q.  And you're not aware of his
11  administrative responsibilities at Stateville
12  either, correct?
13     A.  Yes.
14     Q.  And you don't know whether Dr. Shicker
15  had any responsibilities at Stateville, correct?
16     A.  Correct.
17     Q.  Do you know whether Dr. Shicker was in
18  charge of IDOC policies on the provision of medical
19  care at all IDOC facilities?
20     A.  I'm not sure of that.
21     Q.  Then you're not sure whether Dr. Shicker
22  was also in charge of procedures on the provision of
23  medical -- medical care at all the IDOC facilities,
24  correct?
25     A.  I'm not sure.

Page 119

1      Q.  Now I want to go back to Ms. O'Brien.
2      A.  Mm-hmm.
3      Q.  Now you allege that Ms. O'Brien acted
4  with deliberate indifference to your serious medical
5  need, correct?
6      A.  Yes.
7      Q.  The serious medical need in this case is
8  your right shoulder.
9      A.  Yes.
10     Q.  Can you please explain to me how she
11  acted with deliberate indifference?
12     A.  Because I informed her that my right
13  shoulder was hurting, and I asked her if she could
14  get me some medical help, and then I didn't hear
15  anything else from them.
16     Q.  Now during that time, these
17  conversations with Ms. O'Brien was in the Summer of
18  2013, correct?
19     A.  Yes.
20     Q.  At that time you were receiving medical
21  treatment from the physicians at Stateville,
22  correct?
23     A.  Yes.
24     Q.  And you don't know whether Ms. O'Brien
25  was, in fact, in charge of supervising the medical

Page 120

1  staff, correct?
2      A.  Yes.
3      Q.  As far as you know, she was only in
4  charge of security, right?
5      A.  Yes.
6      Q.  Now can you please explain to me how
7  else Ms. O'Brien acted with deliberate indifference?
8      A.  Because I wrote her and explained myself
9  of my medical condition that I was having, and I
10  asked her for some help, and I never heard any
11  response back from her.
12     Q.  Now when you say you wrote her, are you
13  referring to that, that one letter that you sent
14  her?
15     A.  Yes.
16     Q.  You're not sure when you sent it,
17  though?
18     A.  Yes.
19     Q.  Do you have any copies of that letter?
20     A.  It was provided in my lawsuit.  A copy
21  of it was provided in my lawsuit.
22     Q.  Okay.  And you don't know whether she,
23  in fact, received it, though, right?
24     A.  Yes.
25     Q.  Okay.  How else did Ms. O'Brien act with

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 121

1    deliberate indifference, other than the two things
2    we just talked about?
3        A.  From her job title, she could have
4    intervened and got me sent to the hospital.  For my
5    right shoulder.
6        Q.  Was there a time that you wanted to go
7    to the Health Care Unit and you weren't allowed to?
8        A.  We not allowed to go anywhere without
9    the officers coming to get us, or anybody's approval
10   for us to go to the hospital.
11       Q.  Right, and you did that, you submitted
12   sick call requests, correct?
13       A.  Yes.
14       Q.  And you were able to see the doctor?
15       A.  Yes.
16       Q.  And you received treatment in 2013 for
17   your right shoulder pain.
18       A.  Just medication.
19       Q.  But you did receive some medical
20   treatment.
21       A.  Yes.
22       Q.  Do you know whether Ms. O'Brien is
23   involved in the inmate grievance process at
24   Stateville?
25       A.  That I don't know.

Page 122

1        Q.  Can you please explain to me the inmate
2    grievance procedure generally?
3        A.  Yes, when we -- if any inmate have any
4    issues that's going on inside the institution, we
5    are entitled to file a grievance.  Once we file our
6    grievance, we mail our grievance in, it goes to the
7    counselor, the counselor responds to our grievance,
8    the counselor then sends the grievance back to us so
9    we can see their response.  If we don't like the
10   response that we receive from the counselor, then we
11   can send it to the Grievance Office.  And from the
12   Grievance Office, if we don't like the response from
13   the Grievance Office, then we can send it up to
14   Springfield.
15       Q.  When you say send it out to Springfield,
16   are you referring to the Administrative Review
17   Board?
18       A.  Yes.
19       Q.  But before you send it to the
20   Administrative Review Board in Springfield, you
21   first had to receive a response from the grievance
22   officer, correct?
23       A.  The counselor first.
24       Q.  And the counselor first.
25       A.  Right, the counselor first, then the

Page 123

1    grievance officer.
2        Q.  Now in that grievance officer's
3    response, you also have to receive a response from
4    the Chief Administrative Officer, correct?
5        A.  Right.
6        Q.  Is the Chief Administrative Officer the
7    warden at Stateville?
8        A.  Yes.
9        Q.  Can you file a grievance whenever, or is
10   there a time line?
11       A.  The time line --
12           MR. BRITT:  Object to form.
13           THE WITNESS:  The time line is 30 days
14   from the counselor, 60 days from the grievance, from
15   the Grievance Office, and from the Administration
16   Review Board they say basically they ain't got no
17   time line for them.
18       Q  (By Mr. Stephenson) Now in those steps
19   that you just described, the inmate grievance
20   process, you don't recall Ms. O'Brien being a part
21   of that process, correct?
22       A.  No.
23       Q.  Do you recall Warden Lemke being a part
24   of that process?
25       A.  His name is attached to the response

Page 124

1    once we get our grievance back.
2        Q.  Because he's the warden?
3        A.  Yes.
4        Q.  Now in your complaint you allege that
5    you filed three grievances in relation to your right
6    shoulder, is that right?
7        A.  Yes.
8        Q.  Okay.  Now I just want to go through
9    those grievances and make sure that I have them all.
10       A.  All right.
11       Q.  Do you recall when you filed the first
12   grievance?
13       A.  I know it was the 28th, I think it's, I
14   think the first one is July 28th, 2013.
15           MR. BRITT:  Counsel, we're on 5?
16           MR. MARUNA:  Yes.
17           (Deposition Exhibit Number 5 marked for
18   identification.)
19       Q  (By Mr. Stephenson) Mr. Hemphill, I'm
20   showing you what is marked as Exhibit 5.  What is
21   Exhibit 5?
22       A.  Okay, July 28th, 2013.
23       Q.  Is this the grievance that you wrote?
24       A.  Yes.
25       Q.  On July 28th, 2013?

Page 125

1      A.  Yes.
2      Q.  That's your signature towards the middle
3  there, Carl Hemphill?
4      A.  Yes.
5      Q.  That's your ID number, R19689?
6      A.  Yes.
7      Q.  Dated July 28th, 2013?
8      A.  Yes.
9      Q.  This grievance is in relation to your
10  right shoulder pain, correct?
11      A.  Yes.
12      Q.  This is the first grievance that you
13  filed regarding your right shoulder?
14      A.  Yes.
15      Q.  Now moving towards the bottom of Exhibit
16  5, there's a paragraph titled Counselor's Response,
17  do you see that?
18      A.  Yes.
19      Q.  You received the counselor's response?
20      A.  Yes.
21      Q.  On August 16th, 2013?
22      A.  Yes.
23      Q.  Now I cannot read that, that
24  handwriting, but who was your counselor at the time?
25      A.  Counselor R. Bishop.

Page 126

1      Q.  Now before you submitted this to
2  Counselor Bishop, you filed it as an emergency
3  grievance, correct?
4      A.  Yes.
5      Q.  How does the emergency grievance process
6  work at Stateville?
7      A.  I don't recall how the process works,
8  but if you have an emergency, a real bad emergency,
9  you can file a grievance, and it will -- typically
10  it will go -- it's supposed to go straight to the
11  warden, and then the warden is supposed to answer
12  it.  But then if the warden don't answer it, they'll
13  send it back and say that we will have to send it
14  through the regular grievance.
15      Q.  So you, if you file, if you believe that
16  it's an emergency --
17      A.  Yes.
18      Q.  -- you can file it as an emergency --
19      A.  Yes.
20      Q.  -- grievance, correct?
21      A.  Yes.
22      Q.  That goes directly to the warden's
23  office?
24      A.  Yes.
25      Q.  That happened here, correct?

Page 127

1      A.  Yes.
2      Q.  It was received by Warden Lemke's
3  office?
4      A.  Yes.
5      Q.  Do you know whether that's Warden
6  Lemke's signature?
7      A.  I don't know if it's his signature.
8      Q.  You don't know whether Lem -- Warden
9  Lemke actually reviewed this grievance, correct?
10      A.  Right.
11      Q.  But nonetheless, the Warden's office
12  responded to your emergency grievance, correct?
13      A.  Yes.
14      Q.  They denied it as an emergency?
15      A.  Yes.
16      Q.  Then you resubmitted it through the
17  counselor.
18      A.  Yes.
19      Q.  After receiving the counselor's
20  response, you then continued through the grievance
21  process and sent this to the grievance officer,
22  correct?
23      A.  Yes.
24      Q.  One last question on this grievance,
25  Mr. Hemphill, on Exhibit 5.  This grievance has been

Page 128

1  marked as M758, is that correct?
2      A.  Yes.
3          (Deposition Exhibit Number 6 marked for
4  identification.)
5      Q  (By Mr. Stephenson) Mr. Hemphill, I'm
6  handing you what's marked as Exhibit 6, what is
7  Exhibit 6?
8      A.  Grievance Response Report.
9      Q.  You received this from the grievance
10  officer at Stateville, correct?
11      A.  Yes.
12      Q.  This is in response to grievance
13  numbered 578, correct?
14      A.  Okay, yes.
15      Q.  That is the grievance that you submitted
16  on July 28, 2013?
17      A.  Yes.
18      Q.  The grievance officer responded,
19  correct?
20      A.  Yes.
21      Q.  And Jill Parrish being the grievance
22  officer at the time said that no action is needed,
23  correct?
24      A.  Yes.
25      Q.  I'll rephrase, I'll read the whole

Page 129

1   thing. The counselor responded: No action as
2   grievant appears to be receiving appropriate medical
3   care at this time, correct?
4       A. Yes.
5       Q. And the next box is the, for the CAO to
6   respond, correct?
7       A. Yes.
8       Q. The Chief Administrative Officer?
9       A. Yes.
10      Q. Also known as the Warden.
11      A. Yes.
12      Q. Do you know which warden signed this
13  document?
14      A. Here it say Terry Williams.
15      Q. Do you recall whether Terry Williams was
16  a warden of Stateville?
17      A. I don't know.
18      Q. So someone, though, from the Warden's
19  office responded to this grievance, as well?
20      A. Yes.
21      Q. It appears that the CAO at the time was
22  Terry Williams?
23      A. Yes.
24      Q. That was dated October 24, 2014?
25      A. I can't really -- yes, down here, yes.

Page 130

1       Q. Then you appealed that grievance.
2       A. Yes.
3       Q. Mr. Hemphill, that's the first grievance
4   that you filed, correct?
5       A. Yes.
6       Q. And you filed a second grievance?
7       A. Yes.
8       Q. Do you recall when you filed that
9   grievance?
10      A. October 11th.
11      Q. Of what year?
12      A. 2013.
13      (Deposition Exhibit Number 7 marked for
14  identification.)
15      Q (By Mr. Stephenson) Mr. Hemphill, I'm
16  handing you what's marked as Exhibit 7. What is
17  Exhibit 7?
18      THE WITNESS: My second grievance,
19  October 11th, 2013.
20      Q. You drafted this grievance?
21      A. Yes.
22      Q. That's your signature towards the middle
23  of the paragraph?
24      A. Yes.
25      Q. That's your inmate number, R19689?

Page 131

1       A. Yes.
2       Q. You signed it on October 13th, 2013?
3       A. Yes.
4       Q. This is the second grievance in regards
5   to your right shoulder, correct?
6       A. Yes.
7       Q. This grievance you did not submit as a
8   emergency, correct?
9       A. Yes.
10      Q. You sent it directly to the counselor?
11      A. Yes.
12      Q. Mr. Bishop?
13      A. Yes.
14      Q. This grievance is marked as M897, is
15  that right?
16      A. Yes.
17      Q. You received a response from the
18  counselor?
19      A. Yes.
20      Q. On October 15th, 2013.
21      A. The date received? Yes, 10-15-13.
22      Q. I apologize, you're correct, Mr. Bishop
23  responded on October 22nd, 2013.
24      A. Yes.
25      Q. Did you then send this grievance on to

Page 132

1   the grievance officer after you received a response
2   from the counselor?
3       A. Yes.
4       (Deposition Exhibit Number 8 marked for
5   identification.)
6       Q (By Mr. Stephenson) Mr. Hemphill, I'm
7   handing you what's marked as Exhibit 8. What is
8   Exhibit 8?
9       THE WITNESS: It's a grievance officer
10  response -- report.
11      Q. This grievance officer's response is in,
12  is in response to grievance M897, correct?
13      A. Yes.
14      Q. That's the grievance that you submitted
15  on October 11, 2013?
16      A. Yes.
17      Q. In regards to your right shoulder?
18      A. Yes.
19      Q. The grievance officer at Stateville
20  responded, correct?
21      A. Yes.
22      Q. They responded that: No action as the
23  grievant appears to be receiving appropriate medical
24  care at this time; is that right?
25      A. Yes.

1    Q.  Now the CAO or Chief Administrative
2  Officer also responded, correct?
3    A.  Yes.
4    Q.  And the signature that appears in that
5  box is from Terry Williams?
6    A.  Yes.
7    Q.  But you're not sure who the warden was
8  at the time?
9    A.  No.
10    Q.  But it appears to be Terry Williams?
11    A.  Yes.
12    Q.  Someone from Terry Williams, the
13  Warden's office, responded on October 24, 2014,
14  correct?
15    A.  Yes.
16    Q.  You appealed that decision?
17    A.  Yes.
18      (Deposition Exhibit Number 9 marked for
19  identification.)
20    Q.  Mr. Hemphill, I'm handing you what's
21  been marked as Exhibit 9.  What is Exhibit 9?
22    A.  The Administration Review Board
23  response.
24    Q.  This is the response to your two, the
25  first two grievances that you submitted, correct?

1    A.  Yes.
2    Q.  In regards to your right shoulder?
3    A.  Yes.
4    Q.  It's in response to specifically
5  grievances M758, correct?
6    A.  Yes.
7    Q.  And also in response to M897, correct?
8    A.  Yes.
9    Q.  Now those two grievances were reviewed
10  by the Administrative Review Board on April 7, 2015,
11  correct?
12    A.  April 7th?
13    Q.  Or at least according to the top
14  right-hand corner?
15    A.  Okay, yes.
16    Q.  Ultimately, the Administrative Review
17  Board denied your two grievances, correct?
18    A.  Yes.
19    Q.  Now Mr. Hemphill, you mentioned earlier
20  and in your complaint that there was a third
21  grievance that you filed.
22    A.  Yes.
23    Q.  And those are the only three grievances
24  that you are, that are pertaining to these
25  allegations?

1    A.  Yes.
2    Q.  And we'll go through that one real
3  quickly.  Do you recall when you submitted that
4  third grievance?
5    A.  No, I don't recall the actual, the date
6  when I submitted it, but I know I submitted a third
7  grievance.
8    Q.  Do you remember what year or month?
9    A.  I think it was in between 2013 or 2014.
10      (Deposition Exhibit Number 10 marked for
11  identification.)
12    Q.  All right, Mr. Hemphill, I'm handing you
13  what's marked as Exhibit 10.  What is Exhibit 10?
14    A.  My third grievance that I filed June
15  19th of 2014.
16    Q.  This is in regards to your right
17  shoulder?
18    A.  Yes.
19    Q.  Now this grievance has been marked as
20  2866, do you see that?
21    A.  Yes.
22    Q.  That's your signature under, or excuse
23  me, above offender's signature?
24    A.  Yes.
25    Q.  That's your ID number, R19689?

1    A.  Yes.
2    Q.  It's dated June 19, 2014?
3    A.  Yes.
4    Q.  Now like the last one, this one is also
5  submitted as a regular grievance, correct?
6    A.  Yes.
7    Q.  So it went directly to the counselor?
8    A.  Yes.
9    Q.  You received a counselor's response?
10    A.  Yes.
11    Q.  A counselor reviewed this on what
12  appears to be January -- you know, I'm not sure what
13  date that is.
14    A.  What date she re -- they received it?
15    Q.  The date of the response.
16    A.  The date of the response is, to me it
17  look like 11-12-2014.
18    Q.  So to the best of your knowledge as you
19  sit here today, they responded to this grievance on
20  November 2nd, 2014?
21    A.  November 12th.
22    Q.  Or excuse me, November 12th, 2014?
23    A.  Yes.
24    Q.  Did you send this grievance to the
25  grievance officer at Stateville, as well?

Page 137

1      A.  Yes.
2          (Deposition Exhibit Number 11 marked for
3   identification.)
4      Q  (By Mr. Stephenson) Okay, Mr. Hemphill,
5   I'm handing you what's marked as Exhibit 11.
6      A.  11.
7      Q.  What is Exhibit 11?
8      A.  Grievance Officer's Report.
9      Q.  This is in response to grievance Number
10  2866, correct?
11     A.  Yes.
12     Q.  This is in response to the third
13  grievance regarding your right shoulder?
14     A.  Yes.
15     Q.  The grievance that you submitted on June
16  19th, 2014?
17     A.  Yes.
18     Q.  You received a response from the
19  grievance officer, correct?
20     A.  Yes.
21     Q.  They recommended no action?
22     A.  Yes.
23     Q.  Then the CAO or Chief Administrative
24  Officer responded, correct?
25     A.  Yes.

Page 138

1      Q.  That's also known as the Warden at
2   Stateville?
3      A.  Yes.
4      Q.  And it appears that the signature is
5   Terry Williams' signature?
6      A.  Yes.
7      Q.  But you're not sure who the warden was
8   at the time?
9      A.  Correct.
10     Q.  But someone from the Warden's office
11  signed it Terry Williams on October 10th, 2014?
12     A.  Correct.
13     Q.  Then you appealed this decision,
14  correct?
15     A.  Yes.
16         (Deposition Exhibit Number 12 marked for
17  identification.)
18     Q  (By Mr. Stephenson) Mr. Hemphill, I'm
19  handing you what's marked as Exhibit 12; what is
20  Exhibit 12?
21     A.  Administrative Review Board Return of
22  Grievance or correspondence.
23     Q.  This is in response to grievance marked
24  2866, correct?
25     A.  Yes.

Page 139

1      Q.  The grievance that we were just talking
2   about that you submitted on June 19th, 2014?
3      A.  Yes.
4      Q.  And the Administrative Review Board
5   responded by saying that it was not submitted in the
6   timeframe outlined in Department Rule 504, correct?
7      A.  Yes.
8      Q.  They further explained that:  Therefore,
9   this issue will not be addressed further, is that
10  right?
11     A.  Yes.
12     Q.  And that response from the
13  Administrative Review Board was sent on April 7th,
14  2015?
15     A.  Yes.
16     Q.  Now from those three grievances that we
17  just went through, you don't know whether
18  Ms. O'Brien was involved in any of those grievances,
19  correct?
20     A.  Correct.
21     Q.  You don't know whether she had reviewed
22  any of them, correct?
23     A.  Correct.
24     Q.  You don't know whether Warden Lemke is
25  involved in the pro -- in that process of reviewing

Page 140

1   those grievances, correct?
2      A.  Correct.
3      Q.  And you don't know whether he, in fact,
4   reviewed any of those grievances, is that right?
5      A.  Correct.
6      Q.  Now I want to ask you more about the
7   deliberate indifference that we were discussing
8   earlier.  Now you allege that O'Brien and Lemke
9   failed to adequately investigate or address all the
10  allegations in those grievances.  Do you recall
11  that?
12     A.  Yes.
13     Q.  Okay, so if they're not involved --
14  they're not involved in the grievance process,
15  right?
16         MR. BRITT:  Object to form,
17  mischaracterizes his testimony.
18         MR. STEPHENSON:  Correct, he testified
19  that Ms. O'Brien, to your knowledge, is not involved
20  in the grievance process, or excuse me, reviewing
21  the three grievances, correct?
22         THE WITNESS:  Yes.
23     Q  (By Mr. Stephenson) And to your
24  knowledge, you don't know whether Lemke is involved
25  in -- was involved in these three grievances,

Page 141

1  correct?
2      A.  Correct.
3      Q.  So how then did they fail to investigate
4  the allegations in those grievances?
5      A.  Because they was informed, I informed
6  them of my medical issues that I was having.
7      Q.  And -- but not through the grievances,
8  correct?
9      MR. BRITT:  Object to form.
10      THE WITNESS:  Through the grievance I
11  informed them -- I informed for me to write to them
12  in my grievance about my right shoulder, about the
13  pain that I was having and asking for some help, and
14  no one did anything about it.
15      Q  (By Mr. Stephenson) When you say no one,
16  who are you referring to?
17      A.  Warden O'Brien, Mrs. O'Brien, and
18  warden -- Mr. Lemke.
19      Q.  Now at that time you were receiving
20  medical treatment, correct?
21      A.  Yes.
22      Q.  You don't know whether Warden Lemke is
23  medically trained, correct?
24      A.  Correct.
25      Q.  And you don't know whether Ms. O'Brien

Page 142

1  has received any medical training, correct?
2      A.  Correct.
3      Q.  Now how did Louis, Dr. Louis Shicker act
4  with deliberate indifference to you?
5      A.  From his response from my letter to the
6  governor.
7      Q.  You're referring to the letter that you
8  received from Dr. Shicker on February 25th, 2014?
9      A.  Correct.
10      Q.  That's Bates numbered 000229?
11      A.  Correct.
12      Q.  Now Dr. Shicker in his letter to you
13  notes that:  Dr. Obaisi has been following you and
14  treating you symptomatically; do you recall that?
15      A.  Correct.
16      Q.  And he further said that:  Should things
17  change clinically, he may need to adjust his
18  clinical treatment plan; correct?
19      A.  Correct.
20      Q.  He's referring to Dr. Obaisi in that
21  statement?
22      A.  Correct.
23      Q.  And you never received any medical
24  treatment from Dr. Shicker, correct?
25      A.  Correct.

Page 143

1      Q.  You never met Dr. Shicker.
2      A.  Correct.
3      Q.  He was never at Stateville, to your
4  knowledge.
5      A.  Correct.
6      Q.  This is the only communication that
7  you've ever had with him?
8      A.  Correct.
9      Q.  Now Mr. Hemphill, if you'll just give me
10  a moment to look through my notes.
11      A.  (Nods affirmatively.)
12      Q.  Mr. Hemphill, you don't know whether
13  Ms. O'Brien was responsible for investigating
14  whether Wexford was providing adequate care,
15  correct?
16      A.  Can you say that again?
17      Q.  Sure.  You don't know whether
18  Ms. O'Brien was responsible for investigating
19  whether Wexford was providing adequate care,
20  correct?
21      A.  Correct.
22      Q.  You don't know whether Ms. O'Brien was
23  responsible for implementing a system in which to
24  review medical requests, correct?
25      A.  Correct.

Page 144

1      Q.  And you don't know whether Ms. O'Brien
2  was responsible for providing sufficient medical
3  staff at Stateville, correct?
4      MR. BRITT:  Object to form.
5      MR. STEPHENSON:  Let me finish the
6  question.  First can you read it back to him?
7      THE REPORTER:  Yes.
8      QUESTION:  "And you don't know whether
9  Ms. O'Brien was responsible for providing sufficient
10  medical staff at Stateville, correct?"
11      MR. BRITT:  Object to form.
12      THE WITNESS:  Are you finished?
13      Q  (By Mr. Stephenson) Yes, go ahead.
14      A.  Correct.
15      Q.  You don't know whether Warden -- excuse
16  me, you don't know whether Lemke was responsible for
17  investigating whether Wexford was providing adequate
18  care at Stateville, correct?
19      A.  Correct.
20      Q.  You also don't know whether Lemke was
21  responsible for implementing a system in which to
22  review medical requests, correct?
23      A.  Correct.
24      Q.  You also don't know whether Mr. Lemke
25  was responsible for employing sufficient medical

36 (Pages 141 to 144)

Page 145

```
1     staff at Stateville, correct?
2         MR. BRITT:  Object to form.
3         THE WITNESS:  Correct.
4         MR. STEPHENSON:  I don't have any
5     further questions at this time, Mr. Hemphill, so I'm
6     going to pass you, the witness, over to your
7     counsel, he may have questions.
8             EXAMINATION
9     QUESTIONS BY MR. BRITT:
10        Q.  Just a quick follow-up question.  We had
11    some discussion earlier today about the Second
12    Amended Complaint.  I think that's Exhibit 3?
13        A.  Yes.
14        Q.  So the Second Amended Complaint that was
15    filed in March of last year, did you see that
16    document before it was filed?
17        A.  Correct.
18        Q.  Did you have a chance to review it
19    before it was filed?
20        A.  Correct.
21        Q.  To make sure it was accurate?
22        A.  Correct.
23        Q.  Okay.  I don't have any further
24    questions.
25            MR. MARUNA:  I've got nothing further.
```

Page 146

```
1             MR. STEPHENSON:  I don't have anything
2     either, so before we conclude then, your counsel
3     will explain signature.
4             MR. BRITT:  Yeah, we will reserve that.
5             (Discussion off the record.)
6             (Signature reserved.)
7             (Off the record at 2:22 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 147

```
1             CERTIFICATE OF REPORTER
2     I, Pamela K. Needham, Certified Court Reporter
3     within and for the State of Missouri, do certify
4     that the witness whose testimony appears in the
5     foregoing deposition was duly sworn by me; the
6     testimony of said witness was taken by me to the
7     best of my ability and thereafter reduced to
8     typewriting under my direction; that I am neither
9     counsel for, related to, nor employed by any of the
10    parties to the action in which this deposition was
11    taken, and further, that I am not a relative or
12    employee of any attorney or counsel employed by the
13    parties thereto, nor financially or otherwise
14    interested in the outcome of the action.
15
16        <%Signature%>
17        Pamela K. Needham, CSR, CCR
          Illinois CSR No. 084-002247
18        Missouri CCR No. 505
19
20
21
22
23
24
25
```

Veritext Legal Solutions
1 North Franklin Street - Suite 3000
Chicago, Illinois 60606
Phone: 312-442-9087

October 4, 2017

To: Mr. Britt

Case Name: Hemphill, Carl v. Wexford Health Sources, Inc., et al.

Veritext Reference Number: 2688427

Witness:  Carl Hemphill  Deposition Date:  9/18/2017

Dear Sir/Madam:
Enclosed please find a deposition transcript.  Please have the witness
review the transcript and note any changes or corrections on the
included errata sheet, indicating the page, line number, change, and
the reason for the change.  Have the witness' signature at the bottom
of the sheet notarized and forward errata sheet back to us at the
address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

Saleh Obaisi, M.D., 11/9/17

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL HEMPHILL,                    )
                                  )
                Plaintiff,        )
                                  )
        vs.                       )      No. 1:15-cv-04968
                                  )
WEXFORD HEALTH SOURCES, INC.,     )
SALEH OBAISI; ANN HUNDLY          )
DAVIS; LATONYA WILLIAMS;          )
LOUIS SHICKER; MICHAEL LEMKE;     )
and DORRETTA O'BRIEN,             )
                                  )
                Defendants.       )


        The deposition of SALEH OBAISI, M.D., called

by the Plaintiff for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Kelly A. Siska, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Reporting

Instructor, Certified LiveNote Reporter, and Notary

Public, at Stateville Correctional Center, Joliet,

Illinois, commencing at 10:00 a.m. on November 9th,

2017.

Exhibit B

Saleh Obaisi, M.D., 11/9/17

---

## Page 2

1  APPEARANCES:
2     FOLEY & LARDNER LLP
      MR. JASON P. BRITT
3     321 North Clark Street, Suite 2800
      Chicago, Illinois 60654
4     (312) 832-4500
      jbritt@foley.com
5
         On behalf of the Plaintiff;
6
7     CASSIDAY SCHADE LLP
      MR. JAMES F. MARUNA
7     20 North Wacker Drive, Suite 1000
8     Chicago, Illinois 60606
      (312) 641-3100
9     jmaruna@cassiday.com
10       On behalf of the Defendant
         Saleh Obaisi, M.D.;
11
      ASSISTANT ATTORNEY GENERAL
12    MR. MICHAEL STEPHENSON
      100 West Randolph Street, 13th Floor
13    Chicago, Illinois 60601
      (312) 814-4752
14    mstephenson@atg.state.il.us
15       On behalf of the Defendant
         Illinois Department of Corrections.
16
17
            * * * * *
18
19
20
21
22
23
24

---

## Page 3

1            I N D E X
2  WITNESS                         PAGE
3  SALEH OBAISI, M.D.
4    DIRECT EXAMINATION BY MR. BRITT......... 4
     CROSS-EXAMINATION BY MR. MARUNA....... 151
5    REDIRECT EXAMINATION BY MR. BRITT...... 206
6
7         E X H I B I T S
8                                PAGE
9  No. 1...................................... 13
   No. 2...................................... 20
10 No. 3...................................... 46
   No. 4...................................... 59
11 No. 5...................................... 70
   No. 6...................................... 80
12 No. 7...................................... 92
   No. 8...................................... 96
13 No. 9..................................... 101
   No. 10.................................... 105
14 No. 11.................................... 115
   No. 12.................................... 118
15 No. 13.................................... 129
   No. 14.................................... 134
16 No. 15.................................... 142
   No. 16.................................... 143
17 No. 17.................................... 182
   No. 18.................................... 185
18 No. 19.................................... 193
   No. 20.................................... 194
19
   (EXHIBIT NOS. 19 AND 20 RETAINED BY COUNSEL.)
20
21
22
23
24

---

## Page 4

```
1              (Witness sworn.)
2  WHEREUPON:
3              SALEH OBAISI, M.D.,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6              DIRECT EXAMINATION
7  BY MR. BRITT:
8    Q.  Good morning.
9    A.  Good morning.
10   Q.  Can you please state your name for the
11 record.
12   A.  My first name Saleh, S-a-l-e-h.  Last name
13 Obaisi, O-b-a-i-s-i.
14   Q.  And I'm going to go ahead and assume that
15 you've been deposed before; right?
16   A.  Yes, sir.
17   Q.  So you understand that you're under oath
18 today?
19   A.  Yes, sir.
20   Q.  Please let me know if you don't understand
21 a question.  Please answer my questions audibly so
22 that the court reporter can take down the answer.  And
23 if you need a break, please just let me know.  The
24 only thing I'll ask is that if I have a question
```

---

## Page 5

```
1  pending, please answer it.  Are those ground rules
2  okay?
3    A.  Yes.
4    Q.  What is your position at Stateville?
5    A.  Medical director.
6    Q.  And how long have you had that position?
7    A.  For about five years.
8    Q.  When did you -- about when did you start as
9  medical director then?
10   A.  August the 2nd, 2012.
11   Q.  What are your responsibilities as the
12 medical director here?
13   A.  As medical director, I examine patient.  I
14 refer patient on consultations to the various
15 specialists, the one who need to be referred.  I refer
16 them in case of urgent or emergent situation to the
17 emergency room.  Then I notify Wexford.  I presented
18 the cases which are not urgent or emergent for
19 referral at a process called collegial review where I
20 talk to a physician from the -- what do you call --
21 utilization management.  And I supervise the mid-level
22 provider here, PA and physician -- staff physician.
23 We have one.  I supervise and educate the nurses.  I
24 supervise various department -- mental health, dental.
```

Pages 6 to 9

Saleh Obaisi, M.D., 11/9/17

Page 6

1  I'm in charge of the infirmary.  I supervise
2  laboratory work and X-ray, physical therapy, and other
3  things.  I attend meetings in Springfield every three
4  months for what is called the quarterly medical
5  director meetings of the IDOC.  And basically that's
6  what I do.
7      Q.   And when you say that you examine patients,
8  what are your responsibilities for clinical care at
9  Stateville?
10     A.   Yes.
11     Q.   How would you describe those
12 responsibilities as a clinician?
13     A.   Yes.  As a clinician, I see the patient.  I
14 listen to his complaint.  I do a physical examination
15 and do the objective part, I come up with a
16 preliminary diagnosis, and I proceed with the workup
17 and the treatment.
18     Q.   Have those responsibilities changed
19 substantially since August of 2012?
20     A.   No.
21     Q.   How many physicians are posted at
22 Stateville?
23     A.   Currently myself and Dr. Aguinaldo.  He's a
24 physician here full-time.  And we have the physician

Page 7

1  assistant, LaTonya Williams.
2      Q.   And how many doctors were stationed here
3  during 2013?
4      A.   I don't know.
5      Q.   What about in 2014?
6      A.   You know, we had doctors -- sometimes they
7  leave.  I remember, probably, 2013 we have Ann Davis,
8  and she was transferred maybe in 2014 or after.  She
9  was moved to Sheridan.
10     Q.   Was there anyone else here that you
11 remember from 2013?
12     A.   No, I don't remember anybody else.
13     Q.   And aside from Dr. Davis, who transferred
14 in 2014, are there any other doctors that you remember
15 from 2014?
16     A.   I think we have Dr. Martija after Davis.
17 M-a-r-t-i-j-a.  And then Martija was replaced by
18 Dr. Aguinaldo, who is still with us.
19     Q.   So is it fair to say that there's been --
20 since 2013, there's been two doctors at Stateville
21 pretty much since 2013?
22     A.   Yes, sir.
23     Q.   Were you employed at Stateville before
24 August of 2012?

Page 8

1      A.   No.
2      Q.   What was your last position before you
3  began at Stateville?
4      A.   I was a medical director at Logan
5  Correctional in Lincoln, Illinois.
6      Q.   And did you have the same responsibilities
7  as medical director at Logan that you have as medical
8  director at Stateville?
9      A.   Yes.
10     Q.   And how long were you medical director
11 there?
12     A.   I thought about seven years.
13     Q.   So you began there in about 2005?
14     A.   Somewhere like that.
15     Q.   And did you have any positions at a
16 correctional institution before then?
17     A.   Yeah.  I was at Hill in Galesburg for one
18 year.
19     Q.   And were you medical director there as
20 well?
21     A.   Yes.
22     Q.   With the same responsibilities?
23     A.   Correct.
24     Q.   And before Hill, did you have any positions

Page 9

1  with a correctional center?
2      A.   Initially they hire me in 2002, and they
3  send me to Vienna prison where I spend four or five
4  months, and they move me to Galesburg to be closer to
5  my home.  I was living in Lincoln, Illinois, at that
6  time.
7      Q.   And you had clinical duties at each of
8  those locations, just as you do with Stateville;
9  correct?
10     A.   Yes, sir.
11     Q.   What kind of medical education do you have?
12     A.   I went to medical school in Damascus,
13 Syria.  I graduated in 1968.  I worked in general
14 practitioner for year and a half, couple years.  And
15 then I came to the United States.  In 1970, I had one
16 year internship, rotating internship.  Then I had four
17 years general surgery program at Dayton, Ohio, which
18 was -- at the VA Hospital, which was part of the
19 program at Ohio State University.
20         And then I had a fellowship at Cook County
21 Hospital in Chicago in burn unit.  Then in -- then I
22 work a little bit part-time emergency room, and I went
23 to Clinton, Illinois, small town in Central Illinois.
24 They were building the Clinton Nuclear Power Plant at

Saleh Obaisi, M.D., 11/9/17

Page 10

1  the time. And they said they wanted a general
2  surgeon, and I started my practice there in the fall
3  of 1978. And I stayed there till I joined Wexford. I
4  did also some work and I was on the staff at Abraham
5  Lincoln Memorial Hospital in Lincoln, Illinois, for a
6  while.
7      Q.   And is that where you were employed before
8  2002 when you went to -- what was it? -- Vienna
9  prison?
10     A.   Yes.
11     Q.   How do inmates at Stateville request
12  medical treatment?
13     A.   Well, they have three alternatives. One,
14  the standard one, there is a slip requesting medical
15  evaluation. The inmate fill out the slip, which is
16  available in a special location in each housing unit.
17  And he deliver it -- he either drop it in a box or we
18  have a nurse who go morning and evening from cell to
19  cell asking them if any one of them has a medical
20  problem. He can deliver it to the nurse or he can
21  drop it in the box.
22          And second way, he can verbally tell the
23  nurse when she make round that he has headache or
24  certain issue. She exercise her judgment if she will

Page 11

1  give him, for an example, Tylenol when he's at his
2  cell or he may need to be evaluated. So she may have
3  him on the list to be evaluated by the M.D. or by the
4  PA or by even a nurse at what is called nurse sick
5  call.
6          Third way, if he has severe stress, he can
7  call the security officer, and the security officer
8  will pass a complaint right away to the healthcare
9  unit. And if there is something important, they will
10 move him to the healthcare unit or a nurse will go
11 there, evaluate him, and take action, whatever, to
12 meet the need of the case.
13     Q.   So for the second method that you
14 discussed, where an inmate can verbally tell a nurse
15 who's making rounds throughout the facility that he
16 needs medical attention, is there a record made of
17 those encounters?
18     MR. MARUNA:  Objection, foundation.
19     You can answer, if you know.
20 BY THE WITNESS:
21     A.   I really don't know. I will assume there's
22 something in writing. You know, any time they deliver
23 a medicine to the patient, they will make a notation
24 on the chart.

Page 12

1      Q.   And would that be kept with the inmate's
2  medical records?
3      MR. MARUNA:  Objection, foundation.
4      You can answer, Doctor.
5  BY THE WITNESS:
6      A.   I think -- yeah, most of the time, yes.
7  You know, I don't do this. That is a job of the nurse
8  and director of nursing person who will, you know,
9  address these issues and the policies. So I cannot be
10 very specific about the answer.
11     Q.   Who's the director of nursing?
12     MR. MARUNA:  Now or back in '13, '14?
13 BY MR. BRITT:
14     Q.   We can start with now and go back.
15     A.   We don't have --
16     MR. MARUNA:  Hold on. Why don't you -- I guess,
17 I don't want to disclose the name of someone if
18 they're not -- I'll just tell you the position has
19 changed.
20     MR. BRITT: Okay.
21     MR. MARUNA:  So I don't want to put a name on the
22 record of someone if they're not remotely tied to this
23 lawsuit.
24     MR. BRITT: Okay.

Page 13

1      MR. MARUNA:  So that's my only objection. That's
2  why I was trying to do that.
3  BY MR. BRITT:
4      Q.   So who was the director of nursing in 2013?
5      A.   Cindy Garcia.
6      Q.   And how long did she have that position?
7      A.   She was here when I moved here. I don't
8  know how many years.
9      Q.   So she was here in 2012 when you started?
10     A.   Yes, she was in 2012.
11     Q.   And when did she leave?
12     A.   She left about two, three months ago.
13     Q.   Now, you mentioned -- you know, going back
14 to the three ways that inmates could request medical
15 attention. You said there was a slip that they could
16 either give to a nurse or drop in a box; right?
17     A.   Correct.
18     Q.   I'll show you what I'll have marked as
19 Exhibit 1.
20          (Deposition Exhibit No. 1 was so
21          marked.)
22 BY MR. BRITT:
23     Q.   Is that a -- are these examples of the
24 slips you're talking about?

Saleh Obaisi, M.D., 11/9/17

Page 14

1      A.   Yeah.  Offender Sick Call Medical Services
2  Request.
3      Q.   And these are slips that were submitted by
4  the plaintiff in this case, Carl Hemphill; correct?
5      MR. MARUNA:  Objection, foundation as to they
6  were submitted.
7      You can answer, Doctor.
8  BY THE WITNESS:
9      A.   Well, I see his name on these forms.
10     Q.   Do you have any reason to believe that they
11 were not submitted?
12     A.   I don't know.
13     Q.   Who was responsible for reviewing these
14 medical services requests when they were submitted?
15     A.   I think there's a designated nurse.  This
16 is a position changeable.  So there was a nurse should
17 address these requests and, you know, take care of the
18 request.
19     Q.   And would these become part of an inmate's
20 medical records?
21     MR. MARUNA:  Objection, foundation.
22 BY THE WITNESS:
23     A.   Usually I don't see them in the medical
24 record.  I think they keep them somewhere.

Page 15

1      Q.   Did you -- let me back up.  Do you ever
2  refer to medical services requests when examining an
3  inmate?
4      A.   No.
5      Q.   Do you ever refer to them when trying to
6  complete a history for the inmate?
7      A.   No.  If I have the patient/inmate before
8  me, then I will take the history from him.
9      Q.   The nurse who reviews these, the designated
10 nurse, do they exercise their judgment in deciding
11 whether the inmate needs to be seen?
12     MR. MARUNA:  Objection to foundation.
13     You can answer if you know.
14 BY THE WITNESS:
15     A.   They exercise their judgment in triaging
16 who is going see the patient.  He could be seen by a
17 nurse.  He could be seen by PA.  He could be seen by
18 M.D.  He could be seen by the medical director.
19     Q.   And how does that triage process work?
20     MR. MARUNA:  Objection to foundation.
21     Again, Doctor, if you know what the nurse
22 does, you can answer.
23 BY THE WITNESS:
24     A.   Well, as I say, supposedly somebody has a

Page 16

1  little head cold.  I think he will be -- they will
2  dispense some head cold medicine to him.
3  Decongestion.  Tylenol.  Symptomatic treatment.  And
4  they will tell him to, you know, file a request if he
5  has no -- if he has still no improvement.
6      On the second time they treat him again,
7  the nurse will treat him.  On the third time, she
8  refer him to M.D.
9      If the case, for an example, somebody has
10 acute chest pain, which is a serious issue, then he
11 will be referred to the M.D.  If the patient has a
12 chronic ongoing problem, then she may refer him to
13 anybody.  Could be the PA or could be myself or who is
14 available will see the patient in shorter time.
15     Q.   So does it depend, in part, on the severity
16 of the complaint?
17     A.   Yeah.  The severity and the nature of the
18 complaint.  Is it chronic?  Is it life-threatening?  I
19 mean, heart problem, life-threatening.  Displaying
20 sign of maybe mild stroke or incoordination,
21 disequilibrium.  These cases go to the M.D.
22     Q.   The triaging nurse, who does that person
23 report to?
24     A.   Well, I believe whatever she does --

Page 17

1  director of nurses, we have supervisor.  We usually
2  have couple supervisors and -- nursing supervisors and
3  we have the DON.  And these are the one who, you know,
4  handle the nurses' activities.
5      Q.   Are there any policies or rules that apply
6  to how the nurse conducts triaging of these medical
7  services requests?
8      A.   This is not a matter of policy and rules.
9  This is a matter of judgment.  We have good nurses,
10 trained, licensed, reliable, and that's exactly like
11 when you go to a doctor.  He exercises judgment.  And
12 she does exercise the judgment.
13     Q.   And is there any supervision of that
14 process to make sure that judgment is being exercised
15 responsibly?
16     A.   That's what I said.  We have supervisors --
17 two supervisors usually, and we have the DON and we
18 have myself here.  Any problem they come to me and my
19 door open.  I'm an easy guy.  So they have any
20 concern, I always tell them to send me the patient.
21     Q.   That's what you told the nurses?
22     A.   That's my policy.  Any time there's a
23 concern, just send me the patient.
24     Q.   Did you ever see any of the medical

Saleh Obaisi, M.D., 11/9/17

Page 18

1  services requests that are contained in Exhibit 1?
2      A.   No.
3      Q.   Can you tell me what is Wexford Health
4  Sources rule in providing medical care to inmates at
5  Stateville?
6      A.   Well, Wexford Health Sources try to
7  accommodate the policy and the procedure by the IDOC.
8  So whatever they have policy, it's compatible or is
9  exactly, to a certain degree, they copy whatever the
10  IDOC does and try to live up to it.
11      Q.   So are you saying that Wexford's role is
12  simply to implement IDOC policies?
13      A.   There's coordination between both of them.
14  Wexford basically give the services, give them the
15  physicians, give them some of the nurses. All the
16  physicians are Wexford. And we just try to come up
17  with very precise, efficient medical care.
18      Q.   And aside from IDOC policies and rules,
19  does Wexford have any other standards or policies that
20  it implements on its own?
21      A.   Well, Wexford does have a booklet about
22  procedures and policies, but these are superseded by
23  the medical judgment of the medical provider. These
24  are not something, like, you are going to follow step

Page 19

1  by step. The medical judgment of the examiner is the
2  one who is going to prevail over any other
3  consideration.
4      Q.   So between IDOC policies and any
5  institutional directives and the Wexford policies and
6  procedures manual, aside from those, were there any
7  other policies that you're aware of that govern inmate
8  medical care at Stateville?
9      A.   No.
10      Q.   And this was true from 2013 through the
11  present?
12      A.   Correct.
13      Q.   Did you ever discuss Mr. Hemphill's medical
14  treatment with any IDOC personnel at Stateville?
15      A.   No.
16      Q.   Any other IDOC personnel?
17      A.   No.
18      Q.   Do you remember treating Mr. Hemphill for
19  shoulder pain?
20      A.   You know, I can't connect his face with his
21  name. The name is -- strike me like I'm familiar with
22  the name, but I don't have really recollection of
23  events.
24      Q.   And let me just ask you. You have some

Page 20

1  documents in front of you. Can you tell me what those
2  are?
3      A.   These are copies of his medical record
4  supplied to me by my attorney.
5      Q.   And have each of those been produced in
6  this case?
7      A.   (Gesturing.)
8      MR. MARUNA:   You have to answer.
9  BY THE WITNESS:
10      A.   I assume, yes.
11      Q.   Let me hand you what will be marked as
12  Exhibit 2.
13          (Deposition Exhibit No. 2 was so
14          marked.)
15  BY MR. BRITT:
16      Q.   And can you tell me what that document is?
17      A.   This is an Offender Outpatient Progress
18  Note.
19      Q.   And what does that mean?
20      A.   That mean all the medical notes regarding
21  to his care written by medical provider, whoever, will
22  write his note on these sheets. And these sheets will
23  be kept in the medical record of the patient.
24      Q.   What's the purpose of these notes?

Page 21

1      A.   It's a documentation for whoever want to
2  read them. When I see a patient, sometimes I can't
3  remember events, what I did to him the last visit, so
4  I open the medical record and go back, review my
5  previous notes, and proceed from there.
6      Q.   Do you review them each time you see an
7  inmate for medical care?
8      A.   Almost. For continuing of care, I don't
9  review from day one, but I review the previous visit
10  or couple of visits before so I be able to know what
11  we did last couple visits. Then we proceed.
12      Q.   And is -- I'm sorry. Let me just stop for
13  a moment. We can go off the record for just a second.
14          (Discussion off the record.)
15  BY MR. BRITT:
16      Q.   Is an inmate's medical history important to
17  knowing how to treat them?
18      A.   The medical history is part of the physical
19  examination. Of course. There is no physical
20  examination if you don't do a medical history.
21      Q.   And is part of that reviewing medical
22  records like those marked as Exhibit 2?
23      A.   Correct.
24      Q.   And these notes in Exhibit 2, those are

Saleh Obaisi, M.D., 11/9/17

Page 22

1    notes for Mr. Hemphill; correct?
2        A.   Yes, sir.
3        Q.   And I'll direct you to the first note
4    that's there, and that's dated February 1, 2013;
5    correct?
6        A.   Correct.
7        Q.   Can you tell me what's reflected on that
8    note?
9        A.   This is a certified medical technician,
10   Mr. Nagpal, and he did see the patient probably at
11   cell house.  Resident -- you want me to read it for
12   you or are you okay with reading it?
13       Q.   If you could read it, just to make sure I
14   get the handwriting down.
15       A.   Resident requesting to be seen in --
16   M.D. -- I don't know -- I/M -- what that is here.
17   But, M.D. sick call for chief complaint right shoulder
18   pain.  Self-reported.  Has sharp pain from right
19   shoulder to arm and is not able to extend the right
20   arm.  Denied any injury, trauma.  Assessment,
21   Self-reported right shoulder pain.
22       Q.   And in the right column where it says,
23   Plans, what's laid out there?
24       A.   I think he put him on a list, M.D. sick

Page 23

1    call 2-15-13.  Next available I/H M.D. sick call.
2    Second thing he wrote, See healthcare unit prn.  Then
3    he wrote --
4        MR. MARUNA:  Can you say what prn. means?
5    BY THE WITNESS:
6        A.   As needed.  Tylenol 325 milligram two
7    tablet by mouth four times a day and prn., as needed.
8        Q.   And that's a note made by a med tech who
9    saw Mr. Hemphill; correct?
10       A.   Yes, sir.  Mr. Nagpal.
11       Q.   And let me just ask:  Is the I/M is that
12   inmate?
13       A.   Yeah.  It looks to me like inmate.
14       Q.   And then the note beneath that, is that the
15   follow-up on February 15?
16       A.   Correct.
17       Q.   And can you tell who made that note?
18       A.   This is Ms. LaTonya Williams, who is a
19   physician assistant.
20       Q.   And based on this note, did Ms. Williams
21   see Mr. Hemphill on that day?
22       A.   Yes, sir.
23       Q.   And he's continuing to complain of right
24   shoulder pain; correct?

Page 24

1        A.   Yes, sir.
2        Q.   And reading down through the note, it
3    appears to say, Poor effort for ROM.  Do you see that?
4        A.   Yeah.
5        Q.   What does that mean?
6        A.   Poor effort for range of motion.  Because
7    he did not seem to be interested to -- I guess she was
8    not convinced he was trying his best to move his arm
9    as she asked him to do abduction, adduction, rotation,
10   retroversion, anteversion, whatever.
11       Q.   So that's your interpretation of the note
12   is that LaTonya Williams didn't think Carl Hemphill
13   was making an effort to move his shoulder?
14       A.   Correct.
15       Q.   And under plans, what did Ms. Williams note
16   for treatment of Mr. Hemphill going forward?
17       A.   One bag ice twice a day for one month
18   with analgesic balm b.i.d., twice a day.  Tylenol
19   650 milligrams twice a day.  There's a word I can't
20   read.  L-e-o-r-s.
21       MR. MARUNA:  Where are you looking?
22       THE WITNESS:  This one here (indicating).
23   BY THE WITNESS:
24       A.   Three, return to clinic.

Page 25

1        Q.   Is that what RTC means?
2        A.   Yes, sir.  Return to clinic.
3        Q.   Okay.
4        A.   Four, Patient educated, reassurance.  Five,
5    $5 co-pay.  You know, I wonder -- is that her
6    handwriting?  Ms. Williams?  LaTonya Williams.
7        Q.   I'm sorry.  Did you say that is or is not
8    her handwriting?
9        A.   Yeah.  That is her handwriting.  She wrote
10   at the top, yeah.  PA note.
11       Q.   And what is that note at the bottom right.
12   It looks like it says, Noted -- something.  Can you
13   see what that says?
14       A.   We have a nurse always with us, and the
15   nurse would read the orders and make sure they will be
16   carried out.  So she put her name that she did read
17   these orders.
18       Q.   And at the bottom of that page -- and this
19   is under the Subjective/Objective Assessment column.
20   At the very bottom, sort of beneath the grid there,
21   does that say, Probable bursitis?
22       A.   Correct.
23       Q.   What's bursitis?
24       A.   Bursitis is a small bag, very thin wall,

Saleh Obaisi, M.D., 11/9/17

Page 26

1  has small amount of fluid. And it's situated between
2  muscles -- between muscle and bone. Also, some of
3  them is like an envelope around the tendon, and the
4  tendon slide through them. So they help the muscles
5  to slide over the bone or muscle over muscle. Now, if
6  the bursa becomes inflamed -- could be by trauma,
7  could be slipped on the side -- whatever the reason,
8  the bursa is going to react by becoming inflamed.
9      The inflammation means swelling,
10  tenderness, pain, heat. And most of these bursa are
11  invisible to us, especially in the shoulder. So she
12  assumed there's bursitis. Now, the bursa could have a
13  little more fluid in it when it become inflamed. We
14  see it more in the elbow. There's a lot of these bags
15  in the elbow because in the elbow it's visible.
16  There's no muscle to cover the bursa.
17      Or the bursa -- especially if it's
18  chronic -- it becomes dry bursa. There's no fluid,
19  but the wall is thick and you don't know there's no
20  fluid until you stick a needle and aspirate or you do
21  ultrasound and then you discover no fluid. So that
22  suggests a chronic bursitis.
23      So she assumed, rightfully, I agree with
24  her diagnosis, that the most probable diagnosis is

Page 27

1  bursitis.
2      Q.  And what part of his presentation would
3  lead you to agree with the diagnosis of bursitis at
4  that point?
5      A.  Well, it's the most common pathology or
6  etiology for pain in the shoulder. There is nothing
7  to suggest the man has a tear in his tendon, nothing
8  traumatic. So sometimes bursitis and tendinitis is
9  the most common diagnosis by orthopedist and could
10  come from either one blow, acute movement -- what's
11  called a sprain -- or could come from strain by the
12  movement being repeated and repeated and repeated.
13  That would be a strain. And you end up having
14  bursitis and tendinitis where the white blood cells
15  infiltrate the area, tend to produce all kind of
16  chemical, lead to swelling and pain.
17      Q.  And the white blood cell issue leading to
18  the release of chemicals and the pain, that's the
19  tendinitis aspect; correct?
20      A.  That's correct.
21      Q.  And is that something that's typically
22  secondary to bursitis, like, you know, someone would
23  have bursitis and tendinitis?
24      A.  Tendinitis and bursitis, they go together.

Page 28

1  I would say that bursitis is one which probably
2  trigger more pain because bursa has more sensory nerve
3  endings. Tendon has less nerve sensory ending. So
4  it's -- you can't really visually -- even if you open
5  the area, you cannot tell this is tendinitis or
6  bursitis or together. So, for practicality, we call
7  it tendinitis/bursitis.
8      Q.  And so how do you treat that?
9      A.  Well, the treatment is a simple way, to
10  give them nonsteroidal anti-inflammatory agent. For
11  an example, ibuprofen, Advil, you know, naproxen,
12  Mobic. There are many of these products.
13      Q.  And those are referred to as NSAIDs?
14      A.  NSAID. Nonsteroidal anti-inflammatory
15  agent, which inhibit the lymphocyte in that area from
16  producing the chemicals or block the chemical effect
17  and produce inflammation.
18      Q.  Is there any other treatment that is
19  recommended for bursitis/tendinitis?
20      A.  Ice, as she wrote here. We tell them not
21  to move their shoulder. You know, don't do strenuous
22  exercise. He still can use the shoulder, not
23  strenuous.
24      Q.  Let me just ask: For bursitis and

Page 29

1  tendinitis, are there cases where NSAIDs, ice,
2  avoiding strenuous activity does not resolve the
3  condition?
4      A.  You will not be able to tell until you use
5  them. Then if the patient -- in this case, the only
6  thing we have for the case, with this case, which is
7  very common, is the patient has pain. This is a
8  subjective complaint. We don't really know how bad.
9  Does he really have pain or not. You can't tell, as a
10  physician or a nonphysician. And if he has pain, you
11  don't know how severe the pain is.
12      So if the patient persists that he still
13  have pain, then you have to assume these are not
14  helping, but you have to give them enough time. It is
15  not like you take the pill now and you expect the
16  patient to be cured on the following day. We are
17  using them as anti-inflammatory agent. Not as a pain
18  medication. The pain will resolve if you control the
19  inflammation.
20      Many of these patients, they don't comply
21  with the medicine. They always think we're giving
22  them pain medication. This is not for pain. This is
23  for inflammation. You take the pill twice a day. You
24  have pain, you don't have pain, I want you to go 30

Saleh Obaisi, M.D., 11/9/17

Page 30

1  days straight or one week straight or whatever I give
2  you because I want the inflammation to go down. So
3  many times the patients don't comply. We don't know
4  who comply and who does not.
5      Q.  But let's assume there is a patient who is
6  compliant and still complains of pain, say, 30 days
7  later, what is the next course of treatment after
8  rest, ice, NSAIDs that you would go to?
9      A.  Well, usually you have to realize there's
10  an acute episode, subacute episode, chronic episode.
11  Now, if this drag on for more than three months, then
12  I will label it myself as chronic. Then we -- if the
13  pain also is very severe, we don't have to go three
14  months, but if the pain is very incapacitating, then
15  we give them shot of cortisone. Steroid injection is
16  most successful for tendinitis/bursitis, and not all
17  the physicians do that usually. Even in today
18  training maybe the orthopedist does that. I'm from
19  the old school, so I give these injections, as I did
20  in my private practice. And that would be the next
21  step.
22      Q.  And, you know, let's further assume that
23  you get to a point where the steroid injection does
24  not provide lasting relief. What's the next course of

Page 31

1  action after that?
2      A.  Well, the steroid injection usually does
3  not cure if you have a pathology there. You're not
4  going to cure it. You are dealing -- in this case,
5  you have to look at your patient. Are we dealing with
6  younger patient? Older patient? This is a younger
7  patient. That means you're dealing with younger
8  tissue, younger tendon, younger bursa, younger muscle,
9  younger bone. So you are very much expecting full
10  recovery, and you expect most of this -- the reason
11  you expect it will be trauma. Even the patient
12  sometimes does not think he traumatized his shoulder.
13  He may lift something heavy, he may lift his box, his
14  personal issues, but he does not classify it as
15  trauma. And, in fact, it did affect his shoulder.
16      So, in conclusion, the second step is a
17  steroid injection. Now, the steroid injection has
18  been an issue of, for a while, debate in the medical
19  community. I give the patient cortisone, he does very
20  well. Then he come back to me in three, four months,
21  and the pain is back. How often I could inject that
22  steroid? Now, there is a consensus today if the
23  steroid work for about three, four months, it's okay.
24  You can give the patient three to four injections a

Page 32

1  year, and that will be very much acceptable if that --
2  you know, if that solve the problem.
3      Q.  And that can be a long-term course of
4  treatment?
5      A.  Yes, sir.
6      Q.  And what if relief does not last for three
7  to four months? Is there another course of treatment
8  beyond the steroid injections?
9      A.  Well, you have to be guided by the physical
10  examination you conduct on the patient. Now, if the
11  patient says, you know, I'm still dying, then you
12  check his movement, range of movement.
13      Now, if you're talking about the range of
14  movement, the patient -- let's say rotator cuff today
15  is a big issue in medicine. Always rotator
16  injury. Well, if the patient has tear in his
17  supraspinatus muscle, he will not be able to abduct
18  his arm. That's when Ms. Williams referred to the
19  examination. If the patient can lift his arm all the
20  way, you can say to a great deal of accuracy that he
21  does not have a tear in his tendon, in the rotator
22  cuff.
23      The rotator cuff is like a sleeve, and the
24  tendon going in the wall. So you assume there's no

Page 33

1  tear. However, if the patient lift his arm all the
2  way, but, Doctor, really now I feel pain when I lift
3  it, you may entertain the diagnosis of impingement
4  syndrome in that case. And if you diagnose
5  impingement syndrome in somebody like this, it's a
6  little bit touchy because impingement syndrome means
7  the tendon go through this little crack or this
8  little -- I call it -- what we call it. An attic. I
9  call it the attic. You have the clavicle up there
10  meeting with the acromion bone, and then the upper
11  edge of the scapula, between them these tendon pass.
12  They come from the shoulder blade, some of them --
13  they are four muscles. One of them in the front. Two
14  of them on the back. One of them originated from the
15  edge of the scapula. And they go through this little
16  space.
17      Now, if they go through the space, that
18  mean there should be -- and there's a pressure, there
19  should be a narrow space to squeeze all these tendons.
20  Well, you see, the narrow space mostly in patient who
21  has a little bit advanced age -- 40, 50,
22  osteoarthritis, degenerative osteoarthritis. The bone
23  become a little bit coarse, the clavicle, or the
24  acromion mostly, and the tendon squeezed. And when

Saleh Obaisi, M.D., 11/9/17

Page 34

1    the tendon is squeezed, you create inflammation. So
2    that's what you call impingement syndrome.
3            Now, in younger patients sometimes they
4    think the ligament -- there are a bunch of ligaments
5    going there, and they say, well, the ligament is a
6    little bit, you know, enlarged or sick or whatever. I
7    don't know too much about sickness of the ligament,
8    but now they are talking about. Medicine is changing.
9            And so you make a diagnosis of impingement
10   syndrome. Now, I do diagnose a lot of impingement
11   syndrome. Now, impingement syndrome, you put the
12   steroid in, the steroid inhibit the blood cells,
13   inhibit the lymphocytes, inhibit the chemical, the
14   tendon is free of the swelling and there is now again
15   movement well. Because when the space is narrow, that
16   is, number one, then the tendon, when you squeeze it,
17   the tendon swell. So when you give that steroid,
18   you're reducing the swelling of the tendon, and then
19   the tendon moving back and forth. And this is
20   impingement syndrome.
21   Q.   So in terms of treatment for
22   bursitis/tendinitis versus impingement syndrome, is it
23   the same course of treatment for either condition?
24   A.   Yes. Impingement syndrome is causing -- I

Page 35

1    mean, you have tendinitis or bursitis, you are going
2    to now -- when you have it for a long time, what
3    causing it? Impingement syndrome is one of the
4    element which you can consider in the diagnosis --
5    differential diagnosis.
6    Q.   So if you get to a point where you
7    administer the steroid injection and that is not
8    giving relief for three to four months, such that you
9    can't continue with that as a main course of
10   treatment, what's the next step after that?
11   A.   Well, I think you cannot go by three to
12   four months in somebody young, somebody healthy. You
13   have to really go for sometimes years we go for it.
14   You can go physical therapy, you can give ice, you can
15   make sure this person is not abusing the shoulder,
16   going after he leave you and play basketball and
17   bullshit and whatever.
18           And so these things are -- you know, it
19   will be a judgment call on the side of the physician
20   if he think we have to proceed with further testing or
21   not, but all the medical community now not very much
22   fascinated by rushing and doing testing, including the
23   plain X-ray. If you read the American Family Practice
24   recommendation, the American -- whatever -- Medical

Page 36

1    Society for the internal medical physician, both them
2    recommend when you see somebody with back pain, with
3    shoulder pain, don't rush and do X-ray because you are
4    going to have findings which is false, which
5    over -- there's overinterpretation, and you are going
6    to go from test to test to test.
7            So, MRI. Everybody fascinated with MRI.
8    Well, I'll tell you there is more false reading on the
9    MRI than we ever thought there would be. We thought
10   the MRI is going to solve the problem. There is a lot
11   of surgery done based on MRI, which I would say
12   unneeded. People who live long enough, like me, they
13   have a lot of cases they seen in their life.
14           So somebody young, I send my patient to
15   UIC, and I assure you UIC is going to treat this
16   patient with physical therapy. They may gave him --
17   you know, occasionally I send patient, they gave him a
18   shot, and they recommend physical therapy and NSAIDs
19   and follow-up in six months or in a year sometimes --
20   follow up in a year because they don't see this is
21   worthy of, let's say, surgery. Surgery is not a
22   benign treatment. Surgery could have complications.
23   You could end up in disaster with surgery sometimes.
24           So you have to be very careful, and you

Page 37

1    don't recommend surgery. Only when the benefit is
2    going to outweigh the disadvantage. You are not
3    really sure in case like this when you have a good
4    bone, when you have a good cartilage, you know, how
5    you are going to really, kind of, accept what causing
6    the impingement syndrome.
7    Q.   How do you know there is good bone and good
8    cartilage in this case?
9    A.   Well, the plain X-ray is going to tell you
10   if you have what -- osteoarthritis by itself. It's a
11   smooth bone that is going to have the coarse surface,
12   coarse edges.
13   Q.   And that will appear on an X-ray?
14   A.   Yes. It's going to be on a plain X-ray.
15   You don't need MRI. The plain X-ray can tell you
16   about the clavicle. The clavicle will become a little
17   bit wider, the surface uneven, the acromion will be --
18   now they make big issue now of the acromion clavicular
19   joint. Here some of the joint become a little bit
20   enlarged, and they take it as, you know, causing the
21   impingement syndrome. But his X-ray always was
22   normal.
23   Q.   Now, let me ask you. What is -- what would
24   be -- let me back up.

Saleh Obaisi, M.D., 11/9/17

Page 38

1    What are the indications for surgical
2 intervention for impingement syndrome?
3        A.    Well, I don't make the indication for
4 surgical intervention.  That would be the orthopedist
5 to make that call.  So, you know, after I treat the
6 patient for certain time and we are going nowhere,
7 then we may ask for consultation.  In this case, I did
8 ask for a referral to UIC orthopedic, which probably
9 was, you know, the end of the line.
10       But that's not a guarantee the orthopedist
11 is going to jump and operate on the guy.  I just want
12 to say, I send a lot of patients, especially the
13 shoulder.  And I go by UIC because we went -- you
14 know, we deal with sometimes community physician.  And
15 I would say UIC is very much conservative about
16 jumping and doing surgery.  And we have different
17 issue.  We have knees.  We have shoulders.  We have
18 all kinds of surgery.  And we have significant number
19 of bad outcomes.
20       Q.    So what would be -- what are the
21 indications for you to refer an apparent impingement
22 syndrome patient to an outside ortho provider?
23       A.    Well, No. 1, I don't like to do on my own
24 MRI.  The reason if you get -- I'm not doing the

Page 39

1 referral to get an MRI for the MRI.  If I have a
2 patient with pain, supposedly I get normal reading
3 MRI.  Let's say we did the MRI, come back normal.
4 What is the next step, Dr. Obaisi?  I don't know what
5 is the next step.  So what I do is -- this is my -- I
6 build it since I came here.  You know, what I do is
7 send him to the orthopedist.  And the guy says,
8 Well -- I said, you are going to wait a little bit.
9 But at least he's going to stuck with you because if
10 you get normal MRI -- you know, I'm sending you for
11 the pain.  I'm not sending you -- he is going to say
12 we need MRI, we need CAT scan, we need this.  Let him
13 do any test he want to do.  All the tests you want to
14 do.  But at least I'm not responsible.  So I refer him
15 to UIC.  Let them do whatever they want to do.
16       Q.    And I just want to make sure I'm clear.  At
17 what point would you send him out to UIC?
18       A.    Well, in prison, you know, it's a different
19 population than outside, let me say it this way.  I
20 mean, and I -- patients here always have pain.  We
21 never really going to cure the pain.  And when I
22 feel -- you know, we try.  We gave him -- if you go by
23 the rules -- for an example, you have to give the guy
24 three injection of steroid before you entertain the

Page 40

1 possibility of going beyond the steroid.  Now, for me,
2 going beyond steroid is send him to the specialist.
3       A specialist, if you give him the injection
4 three times, and if the specialist believe impingement
5 syndrome there and he think surgery is going to help,
6 that's his job.  I mean, I'm not -- this is not my
7 job.
8       So as far as this guy, I think I gave him
9 three or four injection of steroid.  He continued to
10 have pain.  And then I asked for referral.  So we have
11 patients, I give them injection maybe once a year,
12 twice a year, and that's it.  They come after six
13 months, Give me a shot, Dr. Obaisi.  My shoulder is
14 hurting me.  And I have no problem.  I don't think I'm
15 going to send this guy anywhere.  But if the guy is
16 going to jump every day and drive me crazy, I don't
17 care, and I get tired and send them out.
18       So in this case, we gave him about four
19 injection.  I think it's time to send him to see
20 orthopedist, and I requested that he go and see UIC
21 orthopedist.
22       Q.    Is that a requirement or is it your
23 personal standard that you try to give three
24 injections before doing the referral?

Page 41

1       A.    This is a standard practice in the medical
2 community, if you go to the orthopedist.  I remember
3 years ago a neurosurgeon would not operate on anybody
4 back until he get three consecutive epidural
5 injections.  It has to be three, three of them because
6 he want to report that nothing else help the patient.
7 Figuring if he get into trouble in surgery, if he get
8 complications, that -- you know, the guy went to
9 court, they'll say, Well, we tried everything and I
10 explain to the patient and the thing fail.
11       So the three injection, four injection is
12 very much, I would say, general practice anywhere we
13 go to.  You cannot say the steroid injection failed
14 based on one injection.  It has to be more than one.
15 It has to be minimum amount of three.  And then you
16 say, Well, I'm not going to give you any more steroid
17 injection.
18       Q.    Is impingement syndrome something that
19 worsens over time?
20       A.    Yes, it could.  All of it depends on the
21 etiology of the condition.  What's causing it.
22       Q.    And how do you determine the etiology?
23       A.    Well, in this case, you know, I don't know.
24 I mean, this case -- as I said, you're talking the

Saleh Obaisi, M.D., 11/9/17

---

Page 42

1    young guy. His bone is normal. He doesn't have,
2    like, you know, 50 and above degenerative
3    osteoarthritis, which is most of the cases I found
4    that needed surgery. But, as I said, in this case, we
5    send him to specialist, let him figure it out.
6         Q.   Do you make any attempt here at Stateville
7    to determine what the etiology of the condition is?
8         A.   That's it. That's the only thing in our
9    hand. We send them to specialist, and the specialist
10   will maybe order MRI. May order EMG/nerve conduction
11   study. Maybe order MRI to his neck because, you know,
12   there is a pain in the shoulder there, but I have seen
13   cases, the origin of the pain was pinched nerve in the
14   neck or something else unexpected. So the orthopedist
15   is not just going to take it in a simple way. I would
16   go to clinical orthopedist. That's the reason we go
17   to UIC. They are going to look at the whole body and
18   figure it out. And somebody young like this, probably
19   somebody academic, he is going to look around a little
20   bit before he jump and say, This is the problem.
21        Q.   And that's something that you leave to the
22   specialist to determine?
23        A.   Correct.
24        Q.   And there are some causes, some etiologies,

---

Page 43

1    of this condition that are not going to be responsive
2    to NSAIDs; correct?
3         A.   Correct. There are cases -- you know, as I
4    said, we have subjective complaints. We have, I have
5    pain. Now, as a physician, you try to find objective
6    finding to explain this pain. My objective findings
7    are limited. I don't -- as I said, I don't want to
8    start doing tests which sometimes if it come back
9    normal would leave me in the dark. So UIC for us here
10   in prison, or my own philosophy, is academic
11   institution. They have the neurologists, they have
12   the neurosurgeon, they have the orthopedist. And when
13   the orthopedist, for an example, in doubt, he is going
14   to definitely refer him to a neurologist or
15   neurosurgeon, whatever. He will have a fair workup
16   definite for sure diagnosis and then for sure is going
17   to be successful treatment.
18        Q.   And, likewise, there are some etiologies
19   and some causes of impingement syndrome that do not
20   respond to steroid injections; correct?
21        A.   Yes. Correct.
22        Q.   With either bursitis, tendinitis, or
23   impingement syndrome, that can result in pain that
24   interferes with daily living activities; correct?

---

Page 44

1         MR. MARUNA:  Are you asking is it possible in the
2    known universe or are you asking for this patient?
3    BY MR. BRITT:
4         Q.   In general, there can be cases that result
5    in that severity of pain; correct?
6         A.   Well, you have to look at -- as I said, if
7    you have a patient who you did X-ray and you find this
8    definite finding of impingement syndrome, you see the
9    Y, the clavicle, and the radiologist gives you back
10   description, then you expect probably the steroid are
11   not going to do the job. And in that patient you will
12   be more inclining to refer him to orthopedist to
13   address the issue, and I would expect in my mind
14   probably he will need to have decompression procedure.
15        Q.   Okay.
16        A.   We call it decompression.
17        Q.   So that's --
18        A.   In this case, we've normal X-ray. We have
19   normal young patient. It's not very common to see it
20   in younger patient with a normal bone. So I'm not
21   going to comment. I mean, this is the reason why I
22   refer him.
23        Q.   So I guess what I'm asking is, rather than
24   course of treatment, impingement syndrome can cause

---

Page 45

1    severe pain in people who suffer from it; correct?
2         A.   You know, I have treated so many people
3    with impingement syndrome, and the steroid injection
4    success is almost 90 percent. And if the first
5    injection doesn't work, the second injection does
6    work.
7         Q.   So I understand that is the treatment, but
8    impingement syndrome is a condition that can cause
9    severe pain; correct?
10        MR. MARUNA:  Objection, argumentative. I think
11   the doctor answered your question, and so I'm going to
12   add asked and answered.
13             But, Doctor, you can answer.
14   BY THE WITNESS:
15        A.   It's going to cause pain, but I'm not going
16   to tell severe because what is the definition of
17   severe pain?
18        Q.   Can it cause pain severe enough to
19   interfere with a patient's sleep?
20        MR. MARUNA:  Objection, form of the question.
21   BY THE WITNESS:
22        A.   No. Most the patient who has impingement
23   syndrome, they tell you, I don't lift my arm up. When
24   I lift it, it hurt me. When their arm down or just

---

Saleh Obaisi, M.D., 11/9/17

Page 46

1  lifted up horizontally, they have no pain.
2  Impingement syndrome -- this is the way you make a
3  diagnosis of impingement syndrome. Certain movement
4  could trigger the pain, but it is not constant pain at
5  rest.
6      Q. I'm going to have you take a look at what
7  I'll have marked as Exhibit 3.
8          (Deposition Exhibit No. 3 was so
9          marked.)
10 BY MR. BRITT:
11     Q. Can you tell me what that is?
12     A. This is Offender Outpatient Progress Note.
13     Q. And these are the same kinds of records
14 that we looked at in Exhibit 2; correct?
15     A. Correct.
16     Q. And these notes reflect that Mr. Hemphill
17 was seen on April 19 of 2013?
18     A. Correct.
19     Q. Who saw him on that day?
20     A. Dr. Davis.
21     Q. And who wrote these notes?
22     A. I believe that her writing.
23     Q. So you believe these are Dr. Davis's notes?
24     A. No. It seemed to be scheduled with the

Page 47

1  Dr. Davis up there and Obaisi on Tuesday. If that her
2  note, she cannot write -- I don't know how -- is that
3  her signature? I don't know. Because it says,
4  Schedule with Dr. Davis and Obaisi on Tuesday,
5  April 23rd, for injection right AC joint, shoulder
6  sling, naproxen. Could be her handwriting. I don't
7  really know because I see -- I see two signature. I
8  see here her signature and I see there's another
9  signature on the other side.
10     Q. And do you know whose signatures those are?
11     A. Well, I expect this one is Davis. I could
12 be wrong, but this is what I think.
13     Q. So the first signature is Dr. Davis, and
14 then do you know who the second signature is?
15     A. I have no idea.
16     Q. And are these notes taken on the same day
17 of the visit?
18     A. Yes, sir.
19     Q. And according to the M.D. note,
20 Mr. Hemphill is complaining of shoulder pain still;
21 correct?
22     A. Correct.
23     Q. You know, on the second line of the note,
24 there's something that looks like, No relief with

Page 48

1  motion. Am I reading that right?
2      A. I see, No relief. Then I see a little I or
3  whatever. Then there's motion. Motion worsened with
4  analgesic -- worsen with analgesic? What? It's
5  unbelievable that analgesic would make it worse.
6      Q. What do you mean it's unbelievable?
7      A. Because analgesic balm is to alleviate his
8  pain. Analgesic balm is NSAID to be sucked by the
9  skin over the area, and you don't expect it to make it
10 worse. You expect it to make it better, or at least
11 it did not improve. I think that's beyond my
12 comprehension, honestly.
13     Q. And next to the "O," does that mean
14 objective?
15     A. Yes, sir.
16     Q. And objective, is that based on the
17 clinician's examination?
18     A. Correct.
19     Q. And what are the objective findings that
20 are here?
21     A. Well, she said tenderness over the AC
22 joint, acromioclavicular joint. Right pain
23 external -- on external and internal rotation. Range
24 of motion, full, positive, active, limited by pain.

Page 49

1  Left shoulder normal.
2      Q. And what is -- you know, on the next line,
3  what is that note?
4      A. What is the next line?
5      Q. It looks like it says, R AC joint?
6      A. Right AC joint boggy.
7      Q. What does that mean?
8      A. Well, boggy, I will take it, like,
9  swelling. I don't know. I never use the word in my
10 life. I never seen it used.
11     MR. MARUNA: That's fine. You are reading
12 another provider's notes, so ...
13 BY MR. BRITT:
14     Q. So the assessment of this provider is that
15 there is right rotator cuff impingement; is that
16 right?
17     A. That what she wrote down there.
18     Q. And is there anything else that's noted
19 there under assessment?
20     A. I don't know. There's -- on the second
21 line, I can't figure what this word is. Then she
22 wrote, Treatment, shoulder sling, corticosteroid
23 injection of AC joint. Will schedule with Dr. Obaisi.
24 Will also give scheduled NSAID.

Saleh Obaisi, M.D., 11/9/17

Page 50

1    Q.   So this provider is progressing from the
2  first line treatment of NSAIDs and immobilization to
3  the second line treatment of injection of steroid;
4  correct?
5    A.   I just want to make a little note. AC
6  joint has nothing to do with the rotator cuff.
7    Q.   Okay. So is there a difference between
8  impingement syndrome and this note of right rotator
9  cuff impingement? Are those two different things?
10    A.   Well, yeah. I would say yes. There is a
11  case, you can say this is AC joint inflammation just
12  by itself.
13    Q.   So why would there be a note of rotator
14  cuff impingement, but then she would recommend steroid
15  injection of the AC joint?
16    MR. MARUNA: Objection, foundation.
17    Doctor, if you know what Dr. Davis is
18  indicating.
19  BY THE WITNESS:
20    A.   Some things she has to answer to.
21    Q.   And just to step back, it would be accurate
22  to say she would be recommending moving on from first
23  line treatment of NSAIDs, ice, immobilization to the
24  second line treatment of steroid injection; correct?

Page 51

1    A.   Yes. She is suggesting steroid injection.
2    Q.   And under plans, it says that Mr. Hemphill
3  is scheduled to see you on Tuesday, April 23rd; is
4  that correct?
5    A.   Where do you find that?
6    MR. MARUNA: (Indicating.)
7  BY THE WITNESS:
8    A.   On Tuesday, April 23rd. That's her
9  recommendation.
10    Q.   Okay.
11    A.   You know, some times could be honored or
12  could not be honored. She should talk to the nurses
13  to make sure there's a space for him to be seen.
14    Q.   So on the next page of this exhibit at the
15  very top, there's a note for April 23rd, 2013;
16  correct?
17    A.   Correct.
18    Q.   And what does that note say?
19    A.   It said, Inmate not seen today due to no
20  provider. Inmate reschedule for 4-28-13.
21    Q.   So what does it mean "due to no provider"?
22    A.   Well, the provider was probably on
23  vacation. That's what I said. She has to make sure
24  when she write the order to be seen on April 23rd --

Page 52

1  before I write that, I'll ask the nurses to see if
2  that is doable. If the doctor is here or if the
3  doctor is going to be crowded or if the doctor has
4  deposition or Lord knows what is going on. But,
5  anyway, so she make us look bad now, Inmate not seen
6  today due to no provider. Inmate reschedule for
7  4-28-13.
8    Q.   Was he seen on April 28?
9    A.   I just read it for you.
10    Q.   Okay. Well, he was rescheduled for
11  April 28; correct?
12    A.   Correct. He reschedule 4-28.
13    Q.   Was he seen on April 28?
14    A.   No idea.
15    Q.   If he was seen by a medical provider on
16  April 28, there should have been a note on this record
17  of that visit; correct?
18    A.   Yes, sir.
19    Q.   And there is no such note?
20    A.   I don't see it.
21    Q.   So he is next seen on May 31st, 2013;
22  correct?
23    A.   Yes, sir.
24    Q.   And who saw him on that day?

Page 53

1    A.   Mr. Nagpal is certified medical technician,
2  but he is an M.D. by education.
3    Q.   What do you mean by that?
4    A.   He went to medical school in India, but he
5  did not kind of correct his status here in the States.
6  Certified medical technician.
7    Q.   And this note reflects, Continuing
8  complaints of right shoulder pain; correct?
9    A.   Yes, sir.
10    Q.   And it says that he was supposed to be FU.
11  I assume that means followed up?
12    A.   Yes, sir.
13    Q.   But was not seen; is that correct?
14    A.   Yes, sir.
15    Q.   And it says that Mr. Hemphill is
16  complaining that he cannot sleep because of pain;
17  correct?
18    A.   Yes, sir.
19    Q.   Is there any reason to doubt that
20  subjective report?
21    A.   Well, you know, in prison every time they
22  intend to file a lawsuit, this is the behavior we
23  have. Always the pain never improve. Never -- you
24  don't find anything on your objective findings; but,

Saleh Obaisi, M.D., 11/9/17

Page 54

1    yet, they keep coming and complaining and filing a
2    grievance and sending letter. So they exhausted all
3    the means, so legally he can file a lawsuit. They are
4    programmed like that. It's a business.
5        Q.   So you think in May of 2013 he was planning
6    to file a lawsuit?
7        A.   I'm not saying he was planning, but I'm
8    saying about behavior. You know, knowing what I --
9    I've been in prison here for long time, and I could
10   smell it when the patient keep coming and coming and
11   coming and there is nothing to support their
12   complaint. And there's nothing -- only the pain. The
13   only thing they can tell you is pain, and that's
14   something we cannot measure.
15       Q.   Could you smell it for Mr. Hemphill?
16       MR. MARUNA: Objection; form of the question,
17   argumentative.
18   BY THE WITNESS:
19       A.   Can I what?
20       Q.   You said you could smell it with certain
21   inmates that --
22       A.   Well, I smelled that. Yeah, I could smell
23   it. He's going to file a lawsuit.
24       Q.   With Mr. Hemphill?

Page 55

1        A.   Yes, sir.
2        MR. MARUNA: Objection, foundation. The doctor
3    has -- you haven't shown the doctor a single record
4    that he's seen the patient on this date. You're
5    asking him after the fact. Strike the question.
6    Improper. Argumentative.
7            Doctor, don't give an answer to that.
8        MR. BRITT: I ask counsel again to stop with the
9    speaking objections, first of all. Second of all, I'm
10   asking the doctor based on his testimony. If he wants
11   to answer that question, he can go ahead. If he
12   doesn't know, then he can say he doesn't know.
13       MR. MARUNA: Well, let's clarify your question,
14   Counsel, because I'm confused. Are you asking him as
15   of May 31st, 2013, when he hadn't seen the patient if
16   he smelled a lawsuit, or are you asking him today as
17   he's sitting at a deposition did he smell a lawsuit
18   after reviewing the records? Could you clarify?
19   BY MR. BRITT:
20       Q.   When you were treating with Mr. Hemphill
21   and when you were reviewing his records as part of
22   that treatment, did you smell that he was likely to
23   file a lawsuit?
24       A.   Not at that time, no.

Page 56

1        Q.   So when did you have that smell about him?
2        A.   Smell about him when I review the current
3    medical record. I mean, when I reviewed recently with
4    all the things I did, I see Mr. Hemphill -- when he
5    file a complaint, he said the steroid injection did
6    not help him. The pain never recover. I was reading
7    my note. And he indicated to me the pain on some
8    occasions disappeared after the steroid injection. He
9    came back to take a second steroid injection. That's
10   total falsification about he was in constant pain. I
11   mean, I didn't know at the time he was going to file a
12   lawsuit.
13       Q.   How do you know he's falsifying the
14   constant pain?
15       A.   Because my note. I was reading my notes.
16   As we go, you are going to see my note that the
17   steroid injection did help him.
18       Q.   So do you have any indication that on
19   May 31, 2013, for this note that we are looking at,
20   that he is falsifying the subjective report of pain on
21   that day?
22       A.   I did not see this note until I went
23   through the record for this deposition. So how I
24   would assume on that day I thought he was falsifying?

Page 57

1    I did not know the note exist.
2        Q.   So let's go down to the next note on
3    June 6, 2013, and that's on that same page. Whose
4    notes are these?
5        A.   6-6-13. That's my handwriting.
6        Q.   And that's your signature in the lower
7    right?
8        A.   Yes, sir.
9        Q.   Did you see Mr. Hemphill on that day?
10       A.   Yes, sir.
11       Q.   Why did you see him?
12       A.   I saw him because of his right shoulder
13   pain.
14       Q.   Did he report shoulder pain at that time?
15       A.   Of course. Subjective. That's what he
16   told me.
17       Q.   Did you believe him?
18       MR. MARUNA: Objection, form of the question.
19   BY THE WITNESS:
20       A.   If I did not believe him, would I document
21   it?
22       Q.   Well, I mean, you can answer that question.
23   If you did not believe him, would you document his
24   report of pain?

Saleh Obaisi, M.D., 11/9/17

Page 58

1      A.   Of course.  I will document that he is
2   drug-seeking patient if I don't believe him.
3      Q.   You would document that he was drug
4   seeking?
5      A.   I would, yes, if I don't believe him.
6      Q.   So based on this note on June 6, 2013, when
7   you saw him, did you believe his report of pain on
8   that day?
9      A.   Of course.
10     Q.   And did you make any diagnosis of the cause
11  of his shoulder pain on that day?
12     A.   Yeah.  My assessment is tendinitis of the
13  right shoulder.
14     Q.   And is that consistent with the earlier
15  notes of impingement that we saw?
16     A.   Yes, sir.
17     Q.   And what course of treatment did you
18  recommend at that point?
19     A.   Well, I order for him X-ray of right
20  shoulder and follow up in one week.
21     Q.   And did that X-ray take place?
22     A.   I don't know.  I would assume, yes.
23     Q.   I'm going to go ahead and show you -- this
24  will be No. 4.

Page 59

1                (Deposition Exhibit No. 4 was so
2                marked.)
3   BY MR. BRITT:
4      Q.   Can you tell me what Exhibit 4 is?
5      A.   There is an X-ray requisition by myself.
6      Q.   So is that from that June 6 visit?
7      A.   Correct.
8      Q.   Did that X-ray take place?
9      A.   Yes, sir.
10     Q.   And what were the -- what was the outcome
11  of that X-ray?
12     A.   The report?  The findings, negative study.
13     Q.   What does that mean?
14     A.   That means normal shoulder X-ray.
15     Q.   Are there any injuries or conditions that
16  could cause impingement or tendinitis that would not
17  show up on an X-ray?
18     A.   Yes.
19     Q.   And what would some of those injuries or
20  conditions be?
21     A.   The patient could be doing a workout,
22  lifting weight, exercises, aggravating his inflamed
23  tendon.  That's one possibility.
24     Q.   So an inflamed tendon would not show up on

Page 60

1   an X-ray?
2      A.   X-ray does not see tendon.  It will see --
3   the only time it will see the tendon, it will show you
4   calcification and chronic tendinitis.  Not an acute
5   tendinitis.
6      Q.   Are there tissue conditions other than an
7   inflamed tendon that will not show up on an X-ray?
8      A.   No.  Something beyond the usual, most
9   common problem, I can't think of anything because a
10  physical examination did not support an objective
11  finding to back up the symptoms except which is just
12  the pain.
13     Q.   So does that mean you have no physical
14  findings from exam to explain the pain?
15     A.   Correct.  Except when we abducted his arm
16  on 6-6-13, he was able to abduct the arm all the way
17  with pain when you reach the end of the range of the
18  abduction.  You know, you go beyond 90 degrees and
19  above 180 degrees.  He was capable of doing it but
20  with some pain.
21     Q.   And there was nothing on the X-ray that
22  explained that pain?
23     A.   Correct.
24     Q.   And just to clarify to make sure I

Page 61

1   understand, when you say abduction, what does that
2   refer to?
3      A.   Abduction is to have the hand going far
4   away from the body and to go and circle their way to
5   lift it above the head.
6      Q.   So if I start with my arm at my side and
7   move it up like I'm trying to make a T with my body
8   and keep going up, that's abduction?
9      A.   That's abduction.
10     Q.   Would an inflamed tendon show up on an MRI?
11     A.   Not necessarily.
12     Q.   Can an MRI detect inflamed tendons?
13     A.   May.  It will be an issue of stipulation on
14  the part of the radiologist who read it.  So one
15  radiologist may read tendinitis.  The other
16  radiologist doesn't read tendinitis.
17     Q.   So it's a matter of interpretation of the
18  results?
19     A.   It's a matter interpretation of the reader.
20  So you still have to go by the clinical finding.
21     Q.   So based on your physical examination of
22  Mr. Hemphill on June 6, 2013, and then the following
23  negative X-ray study, what were your conclusions about
24  what was causing his pain?

Saleh Obaisi, M.D., 11/9/17

Page 62

1    A.   Well, I said tendinitis.
2    Q.   Let's go back to Exhibit 3, and if we can
3  turn to the following page that will have IDOC 69 as
4  the number at the bottom.
5    A.   Yes, sir.
6    Q.   And I just want to ask really quick, the
7  top note is from June 4, 2013; correct?
8    A.   Yes, sir.
9    Q.   Which is before June 6, 2013?
10    A.   Correct.
11    Q.   Do you have any idea why this note comes
12  later in the medical records than the June 6th note?
13    A.   Well, sometimes there will be some nurse
14  jump, skip one clean empty page to a second page or
15  she may pull a sheet -- she may pull a sheet, stick
16  the name on it and write the note.  Then somebody take
17  the sheet and stick it in the file.  So it came kind
18  of not in very organized way.  Come after somebody
19  wrote a note which is beyond 6-4-13.
20    Q.   Is it possible that a note would be written
21  after the day that a visit took place?
22    A.   No.  You have to go by the date.  You don't
23  go just by how the sheet was placed.  Just the date.
24  The date says 6-4-13.

Page 63

1    Q.   So that's the date of the visit and the
2  date that that note was taken?
3    A.   6-4-13, the date the person, the RN, wrote,
4  Patient reschedule to see Dr. Obaisi for shoulder pain
5  per Dr. Davis.
6    Q.   Now, looking at the next note on here, is
7  that from June 26, 2013?
8    A.   Yes, sir.
9    Q.   And whose notes are these?
10    A.   That's mine.
11    Q.   Did you see Mr. Hemphill on that day?
12    A.   Yes, sir.
13    Q.   And he reports that the naproxen is not
14  helping; correct?
15    A.   Correct.
16    Q.   And he is still experiencing pain in his
17  right shoulder; correct?
18    A.   That's what he said.
19    Q.   And what action did you take as a result of
20  that?
21    A.   We try to move him to a different NSAID.
22  We thought maybe different NSAID may do the trick for
23  us.  More advanced, Mobic, 7.5 milligrams twice a day
24  was prescribed.

Page 64

1    Q.   And what's the difference between Mobic and
2  naproxen?
3    A.   Mobic is more advanced version of the
4  NSAID.  Naproxen is one of the older NSAIDs came to be
5  used.
6    Q.   Is the mechanism of these two NSAIDs,
7  naproxen and Mobic, do they work differently in the
8  body?
9    A.   They work similarly.  Mobic probably work
10  more efficiently than naproxen.  And sometimes one
11  medicine work for one patient, doesn't work for
12  another patient.  There are two variable, the
13  medication and the human body.  So maybe
14  Mr. Hemphill's body will respond better to the Mobic.
15    Q.   And did you do a steroid injection at that
16  time?
17    A.   If I did it, I will note it.
18    Q.   So is there a note of a steroid injection
19  on this date?
20    A.   I don't see.
21    Q.   Why didn't you proceed with a steroid
22  injection on that day?
23    A.   Because I like to exert the benefit of the
24  NSAID.  Something simple, noninvasive.  Tablet he

Page 65

1  swallow in his stomach.  He can keep in the cell
2  house.  And, you know, that is the simplicity
3  practicality of the medicine.
4    Q.   Do you know why Dr. Davis wouldn't have
5  tried that first?
6    A.   Each physician has own mind, his own
7  judgment.
8    Q.   Did you have any further plans for
9  treatment other than switching him to the Mobic at
10  that point?
11    A.   Well, that's what I wrote.  That's my note.
12    Q.   Let's turn the page to the one marked
13  No. 70 at the bottom.  IDOC 70.
14    A.   I am looking at the bottom, sir.
15    Q.   And there was a visit on July 18, 2013;
16  right?
17    A.   Yes, sir.
18    Q.   Whose note is that?
19    A.   A nurse.
20    Q.   Do you know which nurse?
21    A.   She is not here anymore.
22    Q.   Do you know who that nurse is?
23    A.   Kaminski.
24    Q.   Is that who saw Mr. Hemphill on that day?

Saleh Obaisi, M.D., 11/9/17

Page 66

1    **A.  Well, that's her name.**
2    Q.  So she both wrote this note and saw
3 Mr. Hemphill on this date?
4    **A.  Yes, sir.**
5    Q.  And Mr. Hemphill is still complaining of
6 right shoulder pain on that day; correct?
7    **A.  Yes.**
8    Q.  And said the pain meds are not helping?
9    **A.  Yes, sir.**
10    Q.  And what's under plans?  What's the note
11 there?
12    **A.  It said, My shoulder is still hurting.  The**
13 **pain meds are not helping.**
14    Q.  I'm sorry.  Let me stop you.  I mean, under
15 the plans column, in the right-hand column of this
16 note?
17    **A.  The P?**
18    Q.  Yes, sir.
19    **A.  Spoke to medical director to schedule for**
20 **steroid injection.**
21    Q.  Do you remember this nurse speaking to you
22 on this day?
23    **A.  No, I don't remember.**
24    Q.  Do you remember agreeing to do the steroid

Page 67

1 injection at this time?
2    **A.  I don't remember anything.  I just read**
3 **what I have here.  I mean, you look at the objective**
4 **finding.  She wrote, Inmate alert oriented time three;**
5 **ambulatory; speech clear; no sign, no symptoms of**
6 **distress noted.**
7    Q.  What does that mean, no signs, symptoms of
8 distress noted?
9    **A.  She did not see any sign of pain in his**
10 **face.  See, that's when you look at the pain level.**
11 **After level three, if the pain really severe, you**
12 **could -- examiner has to grade it now.  Not the**
13 **patient.  And you are going to see expression of pain.**
14 **You are going to see the way he's moving his arm,**
15 **moving his shoulder, he's acting.  Then you make the**
16 **level of the pain yourself.  You grade it yourself, as**
17 **an examiner, not as patient.  So a patient who does**
18 **not display any symptoms, his pain level is a three,**
19 **for an example.  So he does not have sign to indicate**
20 **that he is pain.  That's what she intended to say.**
21    Q.  And different people react to pain in
22 different ways; right?
23    **A.  Of course.**
24    Q.  And just because someone is not exhibiting

Page 68

1 signs and symptoms of distress does not mean that they
2 are not in pain; correct?
3    MR. MARUNA:  Objection; form of the question,
4 foundation.
5    Doctor, you can answer.
6 BY THE WITNESS:
7    **A.  We are talking about the level of the pain.**
8 **We are not talking about he has pain or no pain.  We**
9 **are accepting the fact he has pain.  Otherwise, why**
10 **Dr. Obaisi is going to agree to give him steroid**
11 **injection.  If I don't believe he has pain, I'm not**
12 **going to give him steroid injection.  But it's how bad**
13 **the pain is.  And I'm commenting on the nurse**
14 **notation.**
15    Q.  Do you think that someone who is seeking a
16 steroid injection is exhibiting drug-seeking behavior?
17    **A.  He did not seek.  We propose it to him**
18 **initially.  He's coming asking for it.**
19    Q.  Because he's still in pain after taking
20 NSAIDs; right?
21    MR. MARUNA:  Objection, foundation.
22 BY THE WITNESS:
23    **A.  That's what he's saying.**
24    Q.  Let's go down to the next note.  That's on

Page 69

1 July 31, 2013; correct?
2    **A.  Correct.**
3    Q.  Whose note is that?
4    **A.  This is my note.**
5    Q.  And did you see Mr. Hemphill on that day?
6    **A.  Of course.**
7    Q.  What happened at that visit?
8    **A.  Depo-Medrol 1 cc 40 milligrams plus**
9 **lidocaine 1 percent 1 cc injected the right shoulder**
10 **subacromial space today.  Subacromial space.  Where**
11 **the rotator cuff tendon muscles pass.**
12    Q.  And so that is a steroid injection with a
13 local anesthetic; is that correct?
14    **A.  Correct.**
15    Q.  And what is in the right column?  What do
16 you have noted there?
17    **A.  In the right column we wrote, Follow up**
18 **prn., as needed.**
19    Q.  And whose signature is at the bottom of
20 that column?
21    **A.  Ms. Kaminski.**
22    Q.  Why did Kaminski sign that separately?
23    **A.  She acknowledged my order.**
24    Q.  And why is it important that she

Saleh Obaisi, M.D., 11/9/17

Page 70

1  acknowledge that?
2      **A.   That is a policy.**
3      Q.   And what is that policy for?  I just want
4  to make sure I understand why she's reviewing that.
5      **A.   I mean, supposedly we order something big**
6  **medicine.  She will sign her name that if there's a**
7  **failure and the patient never received the medicine,**
8  **we know who was the nurse to blame.**
9      Q.   So it's to make sure that follow-up plans
10 are executed properly?
11     **A.   Yes, sir.**
12     Q.   Let's it turn to what I will have marked as
13 Exhibit 5.
14         (Deposition Exhibit No. 5 was so
15 marked.)
16 BY MR. BRITT:
17     Q.   And can you tell me what that is?
18     **A.   Offender Outpatient Progress Note.**
19     Q.   And that's similar to the -- or it's the
20 same kind of record we were just looking at as
21 Exhibit 3; right?
22     **A.   Yes, sir.**
23     Q.   Mr. Hemphill was seen on August 31;
24 correct?

Page 71

1      **A.   Yes, sir.**
2      Q.   By whom?
3      **A.   Dr. Obaisi.**
4      MR. MARUNA:  Wait.  Which one are you looking at?
5  BY THE WITNESS:
6      **A.   Oh, no, not August 31.  I don't know.  Was**
7  **he seen?  Nurse sick call.  Chief complaint, pain in**
8  **right shoulder.  Offender, assessment pain in the**
9  **right shoulder.  Plan, Offender has appointment with**
10 **medical director on 9-24-13.**
11     Q.   So on August 31, 2013, Mr. Hemphill is
12 again complaining of right shoulder pain?
13     **A.   Correct.**
14     Q.   And that's a month after you administered
15 the steroid injection; correct?
16     **A.   Yes, sir.**
17     Q.   And do you know who saw him on August 31?
18     **A.   Obviously, a nurse.  I can't tell you who**
19 **is she.**
20     Q.   Is that her signature on -- it's the lower
21 right of this note, about halfway down the page.
22     **A.   Correct.**
23     Q.   And do you know whose signature that is?
24     **A.   No.**

Page 72

1      Q.   He was seen again on September 9, 2013;
2  correct?
3      **A.   Yes, sir.**
4      Q.   And who saw him on that day?
5      **A.   Kaminski.  RN.**
6      Q.   And is this Nurse Kaminski's note?
7      **A.   Yes, sir.**
8      Q.   And he is -- Mr. Hemphill is again
9  complaining of pain in his right shoulder on
10 September 9; correct?
11     **A.   Correct.**
12     Q.   And what course of action is taken as a
13 result of this?
14     **A.   Schedule medical director 9-24-13.**
15     Q.   So was he scheduled to see you on
16 September 24?
17     **A.   That's what she wrote here.**
18     Q.   Why couldn't Mr. Hemphill be seen by a
19 doctor on that day?
20     MR. MARUNA:  Objection, calls for speculation.
21 BY THE WITNESS:
22     **A.   Her judgment told her that he is not going**
23 **to lose his arm on that day.  He is not in very acute**
24 **distress.  He could wait like anybody else in his**

Page 73

1  **house.  Call his doctor, and the doctor say they will**
2  **see you in two weeks.**
3      Q.   What are you basing that on?
4      **A.   Basing that on she is a good nurse.**
5  **Remarkable nurse.**
6      Q.   How would she have evaluated his pain on
7  that day?
8      MR. MARUNA:  Objection; foundation, form of the
9  question, calls for speculation.
10         You can answer, Doctor.
11 BY MR. BRITT:
12     Q.   Let me rephrase.  If you know, how did she
13 evaluate his pain on that day?
14     **A.   Well, let me read her note first.  Can I?**
15     Q.   Certainly.
16     **A.   Nurse, I need to see the medical director.**
17 **I have to have my steroid injection.  Objective,**
18 **Inmate alert and oriented times three.  Speech clear.**
19 **Ambulatory.  Chief complaint, pain in the right**
20 **shoulder.  Inmate informed of Level 1 lockdown.  Will**
21 **be seen at scheduled appointment.**
22     Q.   So is there anything in that note that
23 tells you the severity of his pain?
24     **A.   Telling me the severity of his pain No. 3,**

Saleh Obaisi, M.D., 11/9/17

Page 74

1   maximum. Level 3, 3 over 10 maximum. Giving him the
2   benefit of the doubt.
3       Q.  And where do you see that?
4       A.  Because she said he is not displaying any
5   sign of pain. He's just verbally saying he has pain.
6   You cannot give anybody verbally saying I have pain
7   more than three.
8       Q.  And where do you see that on the
9   September 9 note? I just want to make sure I'm
10  reading it properly.
11      A.  Speech clear, alert, oriented times three,
12  ambulatory. Chief complaint, pain in the right
13  shoulder. Inmate informed of Level 1 lockdown. If
14  there is any sign of distress, the nurse is going to
15  absolutely document it. She did not see any sign of
16  distress. She does not document something she does
17  not see.
18      Q.  So what does it mean to say he's alert and
19  oriented times three?
20      A.  I don't know. My God, you are an attorney
21  with all the education behind you, and you ask me this
22  question? I mean, we are going too long now.
23          You know, he's talking. He's alert. He is
24  alert to where he is, the place and the person and the

Page 75

1   time.
2       MR. MARUNA: Just say what the three things are
3   she asks. Person, place, time. Is that correct?
4       THE WITNESS: That's it.
5   BY MR. BRITT:
6       Q.  And ambulatory just means he can walk, he's
7   on his feet; correct? I just want to make sure I
8   understand what these findings reflect.
9       A.  Yeah. I mean, he can talk. She said his
10  speech is clear. He's walking on his legs. I mean,
11  we document what is abnormal. We don't sit down and
12  document every detail. We don't have time. Then you
13  are going to have -- you have to designate one nurse
14  to each inmate.
15      Q.  Let's turn to the next page. I'm sure
16  you're ready to at this point.
17      A.  All right.
18      Q.  There's a note at the top for September 11,
19  2013; is that correct?
20      A.  Yes, sir.
21      Q.  Whose note is this?
22      A.  This is Kaminski.
23      Q.  And Kaminski notes that Mr. Hemphill is
24  complaining of pain in his right shoulder again;

Page 76

1   correct?
2       A.  Yes, sir.
3       Q.  And what action is taken by Nurse Kaminski
4   on September 11?
5       A.  She discussed the case with Dr. Davis.
6       Q.  And it looks like she renewed some pain
7   meds that had been taken by correctional officers; is
8   that correct, Doctor?
9       MR. MARUNA: Can you clarify who the "she" is.
10  There's two females in this note.
11      MR. BRITT: Okay.
12  BY MR. BRITT:
13      Q.  The nurse renewed pain medications that had
14  been taken by correctional officers; correct?
15      A.  Taken by correctional officer?
16      Q.  I'm looking at the top of the note where it
17  says, Orange Crush took my pain medication.
18      A.  Oh, the officer took his pain medication,
19  yeah. I see. I see.
20      Q.  Was any other action other than renewing
21  his pain meds taken on September 11?
22      A.  Well, she called Dr. Davis, and Dr. Davis
23  schedule him for steroid injection on 9-24-13.
24      Q.  Now, moving down the page, was Mr. Hemphill

Page 77

1   seen on September 24?
2       A.  Yes, sir. Oh, no, no. September 24? He
3   was not seen.
4       Q.  Why not?
5       A.  Lockdown.
6       Q.  What does that mean?
7       A.  When we have a lockdown, no inmate can
8   leave his cell. You know, these individuals are in
9   prison because they are lawbreakers. And they are in
10  prison. The prison is controlled by law regulation to
11  secure the safety of everybody. And when they are on
12  lockdown -- maybe at that time there was some fighting
13  and beating, and so he cannot move from his cell. On
14  lockdown, the inmate would not leave his cell, only if
15  there is some extreme circumstances.
16      Q.  How do you go about rescheduling
17  appointments that are canceled as a result of a
18  lockdown?
19      MR. MARUNA: Objection, foundation.
20          Doctor, if you know how the appointments
21  are rescheduled.
22  BY THE WITNESS:
23      A.  The nurses do that. They have the book and
24  they have the -- you know, if the days are full with

George E. Rydman & Assoc., Joliet, IL (815) 727-4363

Saleh Obaisi, M.D., 11/9/17

---

Page 78

1 patient they cannot schedule them, so they put him on
2 10-22-13.
3     Q. And when was his visit rescheduled for?
4     A. October 22, '13.
5     Q. So about a month later?
6     A. Yes, sir.
7     Q. And what happened on October 22, 2013?
8     A. This is my note, Dr. Obaisi. Asking for
9 steroid injection. Right shoulder pain came back.
10 Last injection was July 17. Objective, mild
11 tenderness right shoulder, movements okay.
12 Assessment, Impingement syndrome right shoulder.
13 Schedule steroid injection in five days.
14     Q. And whose note is that?
15     A. That's Dr. Obaisi.
16     Q. So that's your note?
17     A. Yes, sir.
18     Q. And you saw him on that day?
19     A. Yes, sir.
20     Q. Let's turn to the next page. There's a
21 note for October 30, 2013; correct?
22     A. Correct.
23     Q. Whose note is that?
24     A. Myself.

---

Page 79

1     Q. And did you see Mr. Hemphill on that day?
2     A. Yes, sir.
3     Q. What happened during that visit?
4     A. Depo-Medrol 1 cc 40 milligrams plus
5 lidocaine 1 percent 1 cc injected right subacromial
6 space right shoulder.
7     Q. And under the plans column off to the
8 right, what's noted there?
9     A. We gave him low bunk for one year and waist
10 chain.
11     Q. And why did you do the steroid injection on
12 October 30? Why did you proceed with that?
13     A. Because he asked for it. He thought the
14 steroid injection was something good for him. It was
15 helping his pain. And I'm not going to stop it if
16 that help his pain. Sure, we give it to him.
17     Q. And was there any plan for him for his
18 treatment going forward at that point?
19     A. You can't make any treatment. You give him
20 injection.
21     MR. MARUNA: Can you read your plan section?
22 BY THE WITNESS:
23     A. The plan, Low bunk we gave him for one year
24 and waist chain for one year he would be going with

---

Page 80

1 that.
2     Q. So there was no other follow-up plan set at
3 that point; correct?
4     A. Correct.
5     MR. MARUNA: Since we're switching over to 2-13,
6 I would imagine now is a good time for a break. We've
7 been going about two hours.
8     MR. BRITT: Works for me.
9     MR. MARUNA: Let's take five.
10         (A short break was had.)
11 BY MR. BRITT:
12     Q. Let's turn to what I'll have marked as
13 Exhibit 6.
14         (Deposition Exhibit No. 6 was so
15         marked.)
16 BY MR. BRITT:
17     Q. What is this document?
18     A. Offender Outpatient Progress Note.
19     Q. So this is like the same kind of document
20 that we looked at before? Exhibits 2, 3, and 5?
21     A. Correct.
22     Q. And let's turn to the third page of this
23 document. It will have IDOC 81 as the number at the
24 bottom.

---

Page 81

1     A. Yes, sir.
2     Q. What is this document?
3     A. This is nurse protocol. Muscle strain,
4 joint pain.
5     Q. So is this, like, a special form that they
6 would use for taking down notes for evaluating joint
7 pain?
8     A. Correct.
9     Q. And when is this dated?
10     A. It's dated 2-13-14.
11     Q. And who took these notes?
12     A. A nurse. Heather somebody. I can't tell
13 you. It was Heather somebody.
14     Q. Do you know who that is?
15     A. She used to be here.
16     Q. And looking next to where the date is
17 written under the subjective, objective, assessment
18 column, there's a question that says, How long has
19 pain been present; correct?
20     A. Yes.
21     Q. And what does it say?
22     A. 2-20-13.
23     Q. And next to that?
24     A. Eight -- I don't know the word here.

Saleh Obaisi, M.D., 11/9/17

Page 82

1    Constant.
2    Q.   Does that say 8 out of 10?
3    A.   Eight to 10.  Eight to 10, yeah.  He should
4    be on gurney, according to the pain-level scale.
5    Q.   Is that something that's explained when you
6    ask someone to rate their pain?
7    A.   You should not ask if he said more than
8    three.
9    MR. MARUNA:  Just answer his question.
10   THE WITNESS:  Okay.
11   MR. MARUNA:  Repeat the question.
12   BY MR. BRITT:
13   Q.   Well, let me rephrase.  How do you ask
14   someone to rate their pain?
15   A.   Well, the nurse ask him, and he told her 8
16   over 10.
17   Q.   So does the nurse just ask, Can you rate
18   your pain on a scale of 1 to 10?
19   A.   Yes.  And, of course, he is not educated.
20   She never explained to him how the pain scale is
21   measured.  She didn't know herself.
22   Q.   And he reported 8 out of 10?
23   A.   Correct.
24   Q.   And said the pain was constant?

Page 83

1    A.   Yes, sir.
2    Q.   And this is referring to his right shoulder
3    pain; correct?
4    A.   Correct.
5    Q.   And in the upper right corner of this form,
6    do you see where an MRI is noted?
7    A.   Yeah, I see the word MRI.  I see PT, and I
8    see MRI.
9    Q.   What does that note mean, just so I
10   understand?
11   A.   Refer to M.D., PT/MRI.
12   Q.   And is that a referral to you?
13   A.   Who was referring to me?  The nurse?
14   Q.   I'm looking at the line above that.  I'm
15   sorry.  There's a note that I think is your --
16   A.   Referring to Dr. Obaisi; correct.
17   Q.   And then below that it says, Question
18   PT/MRI.
19   A.   Yes.
20   Q.   How do you interpret that note?
21   A.   That's her opinion that -- she exceeding
22   her limitation and her duty.  That's not her job.  She
23   refer him to me.  I make this decision.
24   Q.   So is she referring to you to see if PT or

Page 84

1    an MRI is appropriate?
2    A.   Yeah, probably the inmate might have asked
3    her for MRI, as all of them ask.
4    Q.   Why does everyone ask for an MRI?
5    MR. MARUNA:  Objection, foundation.
6    Doctor, if you know.
7    BY THE WITNESS:
8    A.   Lack of education.  Each one of them is a
9    patient and the doctor, too.  They come to us, they
10   teach us how to treat them, what tests we are to
11   order.
12   Q.   Do you know why Mr. Hemphill was asking for
13   an MRI?
14   A.   You have to ask him.  He's your client.
15   Q.   But I was wondering, do you know why he was
16   asking?
17   A.   I did not say.  I said a possibility he
18   asked the nurse.  I don't know if he did ask her or
19   not.  I'm not saying anything.
20   Q.   Would this document have been included in
21   with Mr. Hemphill's records?
22   A.   This is a copy of the medical record.
23   Q.   And this same record from February 13,
24   does this reflect that you are scheduled to see

Page 85

1    Mr. Hemphill on March 5, 2014?
2    A.   Yes, sir.
3    Q.   Now, if we turn the page, did you see
4    Mr. Hemphill on March 5, 2014?
5    A.   No.
6    Q.   Why not?
7    A.   I don't see my handwriting.
8    Q.   So you didn't write down this note;
9    correct?
10   A.   No, I did not write.
11   Q.   And does it say, No provider, on that note?
12   A.   Correct.
13   Q.   What does that mean?
14   A.   That mean the provider was not here.
15   Q.   Do you know why you weren't there on that
16   day?
17   A.   He was on the mountain.
18   MR. MARUNA:  Do you have knowledge of --
19   BY THE WITNESS:
20   A.   I do not know why I was not here.  I really
21   do not know why there was no provider.
22   Q.   And what action was taken at that time?
23   A.   Reschedule on 4-3-14.
24   Q.   And what happened on 4-3-14?

Saleh Obaisi, M.D., 11/9/17

Page 86

1    A.  I have no idea.  We are going through to
2  see.  4-3-14 I see a note.  RN note, No provider
3  available.
4    Q.  And do you know why there was no provider
5  available on that date?
6    A.  No.
7    Q.  And what action was taken at that point?
8    A.  Will reschedule, May 1st, '14.
9    Q.  And what happened on May 1st?
10    A.  May 1st, '14, I did see him.
11    Q.  And what do your notes reflect there?
12    A.  My notes said, After steroid injection last
13  October, right shoulder pain resolved.  Asking for
14  injection today because pain start to come back last
15  few weeks.  Objective, Right shoulder abduction
16  movement, and I would say -- this is a short phrase --
17  I mean short sentence, I should say.  Right shoulder
18  abduction and movement normal maybe.
19    Q.  Does it say normal?
20    A.  Doesn't say normal, but I did not complete.
21  There's a word that's missing here.
22    Q.  Okay.
23    A.  Assessment, Right shoulder impingement
24  syndrome, schedule -- on the plan, Schedule for

Page 87

1  steroid injection of right shoulder next week.
2    Q.  So it says that the pain started to come
3  back last few weeks; right?
4    A.  Correct.
5    Q.  What is that based on?
6    A.  That's what he told me.
7    Q.  But we just looked at a note from February
8  where he was complaining of shoulder pain; correct?
9    A.  Correct.
10    Q.  If there's a note from February reflecting
11  that the shoulder pain -- that he was experiencing
12  shoulder pain at that time, do you have any idea why
13  there would be a note on May 1st saying that the pain
14  had just come back in the last few weeks?
15    A.  Because that's my note when I talked to him
16  face-to-face.  That mean he's just having complaint of
17  pain all the time.  He tell the nurses something.  He
18  tell me something else.  I am very accurate when I
19  talk to them because I do not want to give him another
20  injection if it's not going to help him.  So that's
21  the history he gave me, and I said we schedule you in
22  five days to have another injection.
23    Q.  Did you refer back to the February note
24  before you saw him on May 1, 2014?

Page 88

1    A.  I don't remember.
2    Q.  Did you discuss the possibility of an MRI
3  on May 1, 2014, with Mr. Hemphill?
4    A.  No.
5    Q.  What about the possibility of an ortho
6  referral?
7    A.  No.
8    Q.  Why not?
9    A.  I did not feel he does need it at that
10  stage.
11    Q.  Had any nurse referred the question of the
12  availability of an MRI to you before the May 1, 2014,
13  appointment?
14    A.  No.
15    Q.  So is the February 2014 note incorrect?
16  Did that nurse not follow through?
17    A.  That is correct, but who make the decision,
18  the doctor or the nurse?  I mean, I'm asking you who
19  is the one that's going to make the decision.  I am
20  the physician, and I say there's no indication at this
21  stage for MRI.
22    Q.  Let's turn the page, and there's a note for
23  May 12, 2014; correct?
24    A.  Correct.

Page 89

1    Q.  What happened on that day?
2    A.  This is my note.  Depo-Medrol 40 milligrams
3  plus lidocaine 1 percent, 1 cc, injected the right
4  shoulder subacromial space today for impingement
5  syndrome.  Plan, follow up prn.
6    MR. MARUNA:  Please say what prn. means.
7  BY THE WITNESS:
8    A.  As needed.
9    Q.  And why did you proceed with the steroid
10  injection on that day?
11    A.  Because he said it help him.  He was free
12  of pain since October till a few weeks.  The pain
13  start to come back slowly, slowly.  So we gave him
14  another injection.  From October till May, that is
15  seven months.  The shot, let's say, help four months,
16  five months, so that is a good result from the steroid
17  injection.
18    Q.  If the steroid injection that he received
19  in October had provided a shorter duration of relief,
20  would you still have proceeded with the third steroid
21  injection?
22    A.  The steroid injection, when you inject it
23  inside the joint, it stay -- and you can read it in
24  the pamphlet of the medications.  They stay eight to

Saleh Obaisi, M.D., 11/9/17

Page 90

1 ten weeks inside the joint. It's a milky color. The
2 medicine is designed to dissolve slowly, slowly. So
3 the expectation that this shot is going to help the
4 pain minimum about ten weeks. Then the pain, if it
5 does come back, it will come back slowly, slowly. So
6 the inflammation come back slowly.
7     And that's what -- you know, he said he was
8 free of pain for a while. Then the pain now is coming
9 back. That mean a sign that we give him injection.
10 But if that injection does not help him more than, you
11 know, a week or two weeks, then there's no need. We
12 will not give him a second injection because already
13 the medicine is still in his joint.
14   Q. So you say that the medication is supposed
15 to continue working for eight to ten weeks; correct?
16   A. Correct.
17   Q. If you administer the steroid injection and
18 someone is complaining of pain, say, 30 days later, is
19 is that a sign that the medication is not treating the
20 injury?
21   A. Well, if it's 30 days, the medication,
22 probably he need a bigger dose. Probably -- you
23 cannot just pass judgment on one injection. You
24 really have to do two, three injections to see the

Page 91

1 trend. Then you make your conclusion at the end of
2 three injections. Do we proceed anymore or are we
3 going to call it quit?
4   Q. And that's true even if the first two
5 injections do not provide relief as long as expected?
6   A. In his case? In this case you're talking
7 about?
8   Q. Well, what I'm saying is in general, if you
9 provide two steroid injections to someone suffering
10 from impingement syndrome --
11   A. Correct.
12   Q. -- and each time that you deliver those
13 injections it only delivers, for example, 30 days of
14 relief as opposed to eight to ten weeks --
15   A. Correct.
16   Q. -- you would still proceed to give the
17 third steroid injection; is that what you're telling
18 me?
19   A. Correct.
20   Q. To see how the third time works out?
21   A. Correct. Tendon, muscle, ligament, bone,
22 pain does not dissolve fast enough. It's always drug
23 on for weeks and months, even with the injection of
24 steroid. The pain in these organs resolve slowly.

Page 92

1 Tendon don't have much blood supply. If you take a
2 tendon and if you are a surgeon, you cut it in
3 surgery, there is no blood -- hardly you see blood
4 coming out of the tendon. So the blood supply to the
5 tendon is not great, and you are relying basically on
6 the steroid to be absorbed by the bursa around it and
7 somehow by the tendon, but it's not going to be that
8 great.
9   MR. BRITT: I think we're up to seven now, if we
10 can get this marked.
11     (Deposition Exhibit No. 7 was so
12     marked.)
13 BY MR. BRITT:
14   Q. Can you tell me what that document is?
15   A. This is a -- what?
16   Q. Can you tell me what that document is?
17   A. Offender Outpatient Progress Notes.
18   Q. Is that a part of Mr. Hemphill's medical
19 records?
20   A. Yes.
21   Q. Have you ever seen this document?
22   A. I don't recall seeing it.
23   Q. Do you know if you would have seen it as
24 part of any review you undertook of his medical

Page 93

1 records?
2   A. I don't recall.
3   Q. Taking a look at this note, do you know
4 what's being noted upon here?
5   A. Somebody wrote, Offender request to have
6 MRI, surgery, on the right shoulder and consult at
7 UIC. Who wrote this thing, I don't know.
8   Q. Do you know whose signature that is on the
9 bottom?
10   A. On the bottom? I can't tell you the name,
11 no.
12   Q. Is that a nurse?
13   A. Yeah. She wrote RN by her name.
14   Q. On August 19, 2014?
15   A. Correct.
16   Q. And can you just tell me at the top, the
17 very top of this document, are those grievance numbers
18 that are reflected at the top?
19   MR. MARUNA: Objection, foundation.
20 BY MR. BRITT:
21   Q. If you know.
22   A. I don't know.
23   Q. Let's go back to the previous exhibit,
24 No. 6, and if you can turn to the page where the

Saleh Obaisi, M.D., 11/9/17

Page 94

1  number at the bottom is IDOC 88, and there should be a
2  note for September 16, 2014.
3      **A.  Correct.**
4      Q.  Whose note is that?
5      **A.  That's my handwriting.**
6      Q.  Did you see Mr. Hemphill on that day?
7      **A.  I don't know.  I have to read.**
8      Q.  Okay.
9      **A.  On 5-12-14, was given steroid injection on**
10  **right shoulder.  Never reported recurrent pain to**
11  **healthcare staff and filed grievance to be evaluated.**
12  **I mean, the patient has to be evaluated by me.**
13      **So the point is he wrote a grievance about**
14  **his pain, but he never told the nurses.  He never**
15  **complained to any of the provider he has pain.  So the**
16  **plan, Dr. Obaisi, Line in 9-26-14 was already**
17  **scheduled.  So he was scheduled to be seen on 9-26-14.**
18  **So we are going to see him on 9-26-14.**
19      Q.  And did you ever see a copy of those
20  grievances?
21      **A.  No.**
22      Q.  Were you ever told what those grievances
23  concerned?
24      **A.  Yeah, probably I was told about his**

Page 95

1  **shoulder.**
2      Q.  Anything beyond what's in this M.D. note?
3      **A.  No.**
4      Q.  Who spoke to you about those grievances?
5      **A.  I don't know if somebody talk to me.  A**
6  **nurse probably would come and talk to me about it.**
7      Q.  Let's turn to the next page.  There's a
8  note for October 9; correct?
9      **A.  Yes.**
10      Q.  And what happened on that date?
11      **A.  On that day, Inmate not seen by medical**
12  **director, Level 1 lockdown.  Reschedule 11-12-14.**
13      Q.  And what's the -- who took that note on
14  October 9?
15      **A.  An RN.**
16      Q.  Who -- did the RN see Mr. Hemphill on that
17  day?
18      MR. MARUNA:  Objection, foundation.
19      Doctor, if you know.
20  BY THE WITNESS:
21      **A.  It doesn't say he was seen by her.  She did**
22  **not say that she did see him.**
23      Q.  So she might have?  She might not have?
24      **A.  Probably.**

Page 96

1      Q.  What's the next note that's on there?
2      **A.  On 10-11-14, lockdown Level 1.  No contact**
3  **this date.  Will be rescheduled.**
4      Q.  Did any medical professional see
5  Mr. Hemphill on that date?
6      **A.  I don't know.**
7      Q.  And what is the next note that's on that
8  document?
9      **A.  10-15-14.**
10      Q.  What does that note reflect?
11      **A.  RN sick call.  Inmate opt to cx -- I don't**
12  **know what that mean -- RNC -- RN sick call and wait to**
13  **be seen by M.D. 11-12-14.**
14      Q.  So Mr. Hemphill wants to be seen by a
15  doctor?
16      **A.  Correct.**
17      MR. BRITT:  We'll get this marked No. 8.
18          (Deposition Exhibit No. 8 was so
19              marked.)
20  BY MR. BRITT:
21      Q.  If we can turn to the third page with the
22  Bates No. IDOC 95.  Should be a note for November 12,
23  2014.  Do you see that?
24      **A.  Correct.**

Page 97

1      Q.  Whose note is that?
2      **A.  Dr. Obaisi.**
3      Q.  So you wrote that note?
4      **A.  Yes.**
5      Q.  Did you see Mr. Hemphill on that day?
6      **A.  Yes.**
7      Q.  And Mr. Hemphill is, again, complaining of
8  right shoulder pain; is that correct?
9      **A.  I have to read it.**
10      Q.  Okay.
11      **A.  Pain in right shoulder no better for two**
12  **years and the left side neck.  Objective, abductor**
13  **right arm 120 degrees, then painful.  Mild tenderness,**
14  **left side trapezius muscle.  Assessment, Chronic**
15  **tendinitis.  X-ray of right shoulder, continue**
16  **Naprosyn 500 milligrams twice a day for 60 days.**
17  **X-ray right shoulder and neck.**
18      Q.  So you were putting him on naproxen; is
19  that correct?
20      **A.  Correct.**
21      Q.  And naproxen had been tried for his
22  shoulder pain before; correct?
23      **A.  They build tolerance.  And if you go back**
24  **and use again, it will do better.**

Saleh Obaisi, M.D., 11/9/17

Page 98

1    Q.   But he had previously been put on naproxen
2   for his shoulder pain; correct?
3    A.   Correct. Yeah.
4    Q.   And still complained of pain afterward;
5   correct?
6    A.   Correct. At the time he had pain because
7   he built tolerance to the medicine. Now, the
8   tolerance gone. He may do better on it.
9    Q.   How long does it take to build that
10  tolerance to naproxen?
11   A.   A few months.
12   Q.   Was there any other action taken at this
13  time for his shoulder?
14   A.   We order X-ray on his neck and his
15  shoulder.
16   Q.   And let's turn two pages, and that's
17  page 97 at the bottom, although it's kind of hard to
18  see. There's a note for December 10, 2014; correct?
19   A.   Yes, sir.
20   Q.   Can you tell me what that note reflects?
21   A.   No-show.
22   Q.   What does that mean?
23   A.   That mean he did not show up to his
24  appointment.

Page 99

1    Q.   Any idea why?
2    A.   I don't know. They said 12:00 p.m., and
3   they printed here, Security, X-ray. So I don't know
4   why the no-show, but will be rescheduled for the next
5   available appointment time.
6    Q.   And what's the next note that follows that?
7    A.   M.D. note. That's me.
8    Q.   And did you see Mr. Hemphill on March 4,
9   2015?
10   A.   Yes, sir.
11   Q.   And he's still reporting pain in his right
12  shoulder; right?
13   A.   Correct.
14   Q.   And what are your objective findings at
15  that appointment?
16   A.   Able to abduct right arm 80 degrees. Left
17  wrist and thumb movement within normal limits. Left
18  forearm -- left forearm -- exercise, I guess. I don't
19  know. Within normal limits.
20   Q.   And below that there are -- I'm sorry.
21  What is your assessment at this visit?
22   A.   Tendinitis of right shoulder improving.
23   Q.   Do you know if that says -- and I just want
24  to make sure I understand it. Does that say improving

Page 100

1   or does it say impingement syndrome?
2    A.   Improving.
3    Q.   And what action do you take as a result of
4   this visit?
5    A.   We gave him Naprosyn 500 milligrams twice
6   day for 90 days. Follow-up in three months. Advance
7   to do some -- advised to do some gentle exercise. I
8   meant the left wrist and thumb movement. Yeah, do the
9   gentle exercise. That's it.
10   Q.   So you prescribed the same medication that
11  you did the last time; correct?
12   A.   Correct.
13   Q.   Even though he was reporting pain in his
14  right shoulder again?
15   A.   As I said, he had tolerance. The tolerance
16  gone. He has to do well on it this time.
17   Q.   But it is the same medication you
18  prescribed the last time?
19   A.   It is the same medication, yes, sir.
20  Naprosyn is the safest -- the last study done two
21  years ago, Naprosyn the safest NSAID available till
22  now, in spite of all the new medications, expensive
23  medications show up on the market. Naprosyn is better
24  for the heart and for the kidney. So I'm always for

Page 101

1   Naprosyn.
2    MR. BRITT:  Let's get this marked as Exhibit 9, I
3   think we're up to.
4    (Deposition Exhibit No. 9 was so
5   marked.)
6   BY MR. BRITT:
7    Q.   And there's a note there for April 15,
8   2015; correct?
9    A.   Yes, sir.
10   Q.   Whose note is this?
11   A.   RN.
12   Q.   Do you know which RN?
13   A.   No idea.
14   Q.   And Mr. Hemphill is seen on that day;
15  correct?
16   A.   Yes, sir.
17   Q.   And he says, My shoulder hurts and it's
18  hard for me to breathe; correct?
19   A.   Yes, sir.
20   Q.   And, in fact, he's continuing to complain
21  of right shoulder pain and describes it as radiating
22  down the right side of his back; correct?
23   A.   Correct.
24   Q.   And complaining that he is -- I'm sorry.

Saleh Obaisi, M.D., 11/9/17

Page 102

1  Complaining that the pain is causing shortness of
2  breath; correct?
3      **A.   Correct.**
4      Q.   What action is taken at that time?
5      **A.   The nurse check his pulse oximetry, 98**
6  **percent.  That means he's breathing really good.  He's**
7  **sucking all the oxygen in the air very well.  His**
8  **blood pressure 123/88, respiration 20, heart rate 74,**
9  **and he was prescribed Tylenol given for pain.**
10 **Follow-up with M.D.  Rule out bursitis.**
11     Q.   And let's turn two pages, and there's a
12 note there -- yeah, there's some numbers that are
13 scratched out, but it looks like this is a note from
14 June 4, 2015; is that correct?
15     **A.   Correct.**
16     Q.   Whose note is this?
17     **A.   That's me.**
18     Q.   Did you see Mr. Hemphill on that day?
19     **A.   Yes, sir.**
20     Q.   And what happened during that visit?
21     **A.   Subjective pain of right shoulder on and**
22 **off for two years and received so far four injection**
23 **of steroid in the shoulder joint.  For two days severe**
24 **sore -- and I meant sore throat, but I forgot to write**

Page 103

1  **the throat.  And on deep breathing, right shoulder**
2  **muscles hurt.  Objective, Abduction of right arm**
3  **120 degrees.  Clear lung, normal; S1 S2, normal.**
4  **Assessment, Right shoulder pain, throat okay -- sore**
5  **throat.**
6      Q.   So he's, again, complaining of right
7  shoulder pain in June of 2015?
8      **A.   Correct.**
9      Q.   And what action do you take as a result of
10 that?
11     **A.   We treated his sore throat at the time.**
12     Q.   Any further treatment of his shoulder?
13     **A.   No.  He still, I believe, has his**
14 **medications.**
15     Q.   So even though you've prescribed
16 medication, and he is complaining of pain on June 4,
17 2015, you take no further action at that time;
18 correct?
19     **A.   We took action.  We handled the acute sore**
20 **throat, which probably make him more sensitive to the**
21 **pain.  So if you treat his first sickness, acute sore**
22 **throat, probably you are going to help the pain a**
23 **great deal in the shoulder.**
24     Q.   So you are providing treatment for the sore

Page 104

1  throat at this visit; correct?
2      **A.   Correct.**
3      Q.   But, yet, he's coming in complaining of the
4  right shoulder pain; correct?
5      **A.   Sure.**
6      Q.   So the treatment of the sore throat would
7  not have revealed shoulder pain if he walked into that
8  visit complaining of it; correct?
9      **A.   Probably he's going to reflect positively**
10 **on his pain.  It's going to improve a little bit.**
11     Q.   Let's turn to the page that's numbered 109.
12 There's a note there for September 2, 2015.  Do you
13 see that?
14     **A.   Yes, I see 109.**
15     Q.   Whose note is this?
16     **A.   RN sick call.**
17     Q.   Do you know who signed that note?
18     **A.   I don't know.**
19     Q.   Do you know if Mr. Hemphill was seen on
20 that day?
21     **A.   I would assume he did because there's**
22 **subjective, objective.**
23     Q.   And what do those notes reflect?
24     **A.   I don't know.  I can't read the handwriting**

Page 105

1  here.
2      Q.   Did you ever tell Mr. Hemphill prior to
3  September of 2015 that he would be going to an outside
4  hospital?
5      **A.   I don't recall I did.**
6      Q.   If you had gotten Mr. Hemphill scheduled to
7  visit an outside hospital, would that have been noted
8  in these medical records?
9      **A.   Well, if we're going to send him out, then**
10 **we would be receiving a letter -- confirmation letter**
11 **of approval from Wexford.  So if we had confirmation**
12 **letter, that means I put.**
13     Q.   I'll show you what will be marked as 10.
14          (Deposition Exhibit No. 10 was so
15          marked.)
16 BY MR. BRITT:
17     Q.   Exhibit 10.  Can you tell me what that
18 document is?
19     **A.   This is from utilization management.**
20 **Confirmation.**
21     Q.   And who is it addressed to?
22     **A.   This is in regard to Hemphill, Carl**
23 **Hemphill.  Site, Stateville.  Service office,**
24 **outpatient.  Based upon review of the information**

Saleh Obaisi, M.D., 11/9/17

Page 106

1    provided, service is approved, approval by Dr. Ritz in
2    collegial for Dr. Obaisi for patient with a chronic
3    right shoulder pain, on-site steroid injection
4    ineffective. Meets IQ. So he would be going to see
5    ortho for evaluation at UIC.
6        Q.   Do you remember requesting this?
7        A.   I don't remember.
8        Q.   Do you remember why you would have
9    requested this for Mr. Hemphill?
10       A.   Well, I think we give him, repeatedly,
11   steroid injection. He still has -- still complaining
12   of pain. I think it's time that we send him to see
13   the orthopedist.
14       Q.   Do you know while Mr. Hemphill was at
15   Stateville, did he ever see the outside ortho person?
16       A.   I don't remember. I don't know.
17       Q.   If this approval was received in June 2015,
18   when would you have expected him to be sent for that
19   outside referral?
20       A.   Well, it's unpredictable with UIC. We have
21   no right to tell UIC when they see our patient. The
22   arrangement between IDOC and UIC that UIC reserve the
23   right to give us a date when they see the patient.
24       Q.   Do you remember taking any steps to make

Page 107

1    this outpatient visit happen?
2        A.   I don't remember.
3        Q.   And you don't know if this visit happened
4    before Mr. Hemphill left Stateville; is that correct?
5        A.   I don't know.
6        Q.   When you get an approval to refer someone
7    to an outside specialist, how do you follow up to make
8    sure that visit takes place?
9        A.   It's automatically on the same day or the
10   following day, his name electronically would be
11   transmitted to the prospective clinic at UIC by
12   Wexford indicating we are going to pay the bill on
13   this patient if you see him, or for his services. So
14   the prospective clinic has the name already. They
15   just have to give us a date. That's something we
16   cannot get involved with. UIC would not permit us to
17   take any action about that.
18       Q.   So if UIC does not get back to you with a
19   date, do you ever follow up on that?
20       A.   We follow up if it's something very severe,
21   critical. If he has a broken bone. If he has -- if
22   he need surgery which has to be done in a short time,
23   yes, we will e-mail them and talk to them. We don't
24   even talk to the doctor, but we have somebody in

Page 108

1    between to communicate to.
2            Impingement syndrome never is an acute
3    case. There is, never will be, urgent or emergent
4    care for impingement syndrome. It's elective case.
5    Standard everywhere in every nation and every time.
6        Q.   So if you get -- if you receive this
7    approval for an outside referral and UIC never
8    followed up to schedule that, you would not take
9    further action on this approval; is that correct?
10       A.   UIC always will follow up. Always going
11   the call the patient, but it may not happen in one
12   month or two months.
13       Q.   And do you know if UIC ever tried to
14   schedule this visit?
15       A.   I don't deal with UIC. I don't work there.
16       Q.   Do you know if they ever contacted you to
17   schedule this?
18       A.   UIC would not contact me. And when I try
19   to contact physician, they would not talk to me. They
20   always refer us to Ms. Barbara Johnson. And I'm not
21   going to call for impingement syndrome. This is not
22   urgent or emergent situation.
23       Q.   Who would they contact to schedule that
24   visit?

Page 109

1        A.   They will send --
2        Q.   I'm sorry. I'm sorry. Who would UIC
3    contact at Stateville to arrange that visit?
4        A.   They sent electronically.
5        Q.   And who receives that electronically?
6        A.   Secretary down in the medical records.
7        Q.   And what does the secretary do with that
8    information?
9        A.   She will get the information, pass it to
10   the security to tell them the date and the time so
11   they make the arrangement. You know, this is a
12   prison, so they have to make arrangement. A van, two
13   security officers to be with the inmate. And the time
14   when they going to go and the time expected to come
15   back. All that they will arrange for it. I don't get
16   involved with it.
17       Q.   So do you know if the -- do you know if the
18   visit with the specialist even takes place after that?
19       A.   Oh, definitely.
20       Q.   And how do you know that?
21       A.   When they go always they are seen by the
22   specialist. Occasionally they are not seen by the
23   specialist as emergency. Let's say they go and they
24   have emergency surgery, but they reschedule the

Saleh Obaisi, M.D., 11/9/17

Page 110

1  patient, and they do it and it happen in a week to two
2  weeks. Sometimes we have incidents where the patient
3  was not seen, patient -- there's car accident, the van
4  hit something on the road. He end up in the wrong
5  hospital or -- you know, something like this. Or we
6  have a patient, we send them and he slipped at UIC,
7  broke his neck. I'm giving you, you know --
8      Q.  I mean, those are sort of the wild
9  examples --
10     A.  But, definitely, UIC does honor the time.
11 But they have to pick their own time. We just can't,
12 you know, change their policy. They are very busy
13 place, and I would wait -- if I'm a patient, and I'm
14 serious about this. If I am the patient myself, I'm
15 given the choices and I can wait for UIC, I will wait
16 for UIC because I want to see their opinion. It's
17 more important than somebody come and touch my
18 shoulder like this (indicating) anxious to get $2.
19 UIC take their time. They do all the study and they,
20 you know, zero in on the right diagnosis and the right
21 treatment, and this I justify waiting for UIC.
22     Q.  But after that visit takes place at UIC, do
23 you get a report of that visit or some other record
24 that shows that it took place?

Page 111

1      A.  Of course, we get -- we get two reports.
2  One is handwritten. It will be sent back by the
3  security officer in an envelope. And that quick, for
4  an example, they will write, MRI shoulder or MRI with
5  contrast, without contrast. All the details. I take
6  care of them immediately on the same day. I fill out
7  requisition, within two days I get approved from
8  Wexford, and we keep going. We get them approved for
9  the follow-up and the case keep rolling.
10     Q.  Did you get any sort of follow-up report
11 from UIC as a result of any visit arising from the
12 this approval in Exhibit 10?
13     A.  You mean before he go?
14     Q.  No, no, no. What I'm saying is, you know,
15 there's this outpatient visit, this referral that's
16 approved in Exhibit 10.
17     A.  Correct.
18     Q.  Did you get any sort of report back from
19 UIC after that visit took place?
20     A.  Yes. The secretary down there share with
21 them on the screen, the same page, and we know his
22 name is there because sometimes -- let's say we have
23 him approved. He come to me after two months and say,
24 UIC did not call me. So I call Amanda. Amanda, look

Page 112

1  at your screen. Tell me where we stand with this guy.
2  And Amanda will tell me, Well, we still don't have
3  date because sometimes I forget even I approve some
4  patients. So they come to me, and I say, Well, I
5  can't -- I'm not sure. I call Amanda, Amanda, did we
6  have him approved? Oh, yeah, he's approved, but no
7  date yet. And then occasionally if we have the urge,
8  if we think something has to be done a little bit
9  faster, we say, Amanda, can you e-mail Barbara
10 Johnson, and I'm going to send her another bouquet of
11 flowers if she will move that forward.
12     Q.  Do you remember that happening with
13 Mr. Hemphill at all?
14     A.  No, it never happened. I mean, I don't
15 remember what happened with him. No, don't remember.
16     Q.  And did you get any sort of follow-up
17 report from UIC --
18     A.  Remove that bouquet of flowers, please.
19     Q.  Did you get any sort of follow-up report
20 from UIC indicating that an MRI or other evaluation of
21 Mr. Hemphill took place?
22     A.  No, I did not get any report, and I don't
23 usually get the report. But I think that could be
24 verified that he was scheduled to go to UIC.

Page 113

1      Q.  Let's turn back to Exhibit 9 really quick.
2      A.  Oh, yeah. We have an appointment 4-14-16.
3      Q.  Let's turn the page that's marked IDOC 111,
4  and it's two pages from where we were. There's a
5  visit for September 9, 2015, that's noted. Do you see
6  that?
7      A.  Yeah, I see 111.
8      Q.  And who filled out this note?
9      A.  LPN.
10     Q.  Do you know who?
11     A.  LPN -- I can't tell you who is that.
12     Q.  So it's a nurse?
13     A.  Yes, sir.
14     Q.  And it says -- toward the upper left
15 corner, it reflects that, you know, there's been pain
16 for -- it's been hurting for two years; correct?
17     A.  That's what -- yeah, that's what's written
18 down there.
19     Q.  And it says, Mr. Hemphill was told he was
20 going to UIC?
21     A.  Yeah. Probably I told him, probably, you
22 know.
23     Q.  And it says in the upper right-hand corner
24 that this is an ongoing issue; correct?

Saleh Obaisi, M.D., 11/9/17

Page 114

1    A.   Correct.
2    Q.   And these notes all relate to his visit
3  with the LPN on September 9, 2015; correct?
4    A.   Yes, sir.
5    Q.   Did you ever review this note?
6    A.   Probably.
7    Q.   Let's turn to the next page.  There's a
8  note there for September 16, 2015; correct?
9    A.   Yes, sir.
10   Q.   Whose notes are those?
11   A.   Myself.
12   Q.   Did you see Mr. Hemphill on September 16,
13  2015?
14   A.   I must.
15   Q.   And he is, again, complaining of shoulder
16  pain; correct?
17   A.   Correct.
18   Q.   And what did you -- I'm sorry.  What did
19  you do as a result of this visit?
20   A.   Refer to PT.  Physical therapy.
21   Q.   And who would that PT have been?
22   A.   We have here Mr. Jose Becerra.
23   Q.   So would you have -- so this is a referral
24  to the physical therapist at Stateville?

Page 115

1    A.   Yes.  I fill out the form like exactly --
2  medical specialty referral in reporting form, and I
3  send it to Mr. Becerra.
4    Q.   Why did you take that step at that time?
5    A.   I think this is another conservative way to
6  treat and help the shoulder pain.
7    Q.   And that's true even though you had
8  previously tried NSAIDs, rest, and steroid injections?
9    A.   Correct.
10   Q.   Let's go to what will be Exhibit 11.
11        (Deposition Exhibit No. 11 was so
12        marked.)
13  BY MR. BRITT:
14   Q.   And what is this document?
15   A.   This is a Stateville Correctional Center
16  Offender Progress Note.
17   Q.   And these are like the progress notes that
18  we looked at before; right?
19   A.   Correct.
20   Q.   Let's turn to the page Bates numbered
21  IDOC 121, so it's about six, seven pages back.
22  There's a note dated November 24, 2015.  Do you see
23  that?
24   A.   Yeah.  That's my handwriting.

Page 116

1    Q.   So those are your notes?
2    A.   Yes, sir.
3    Q.   Did you see Mr. Hemphill on November 24,
4  2015?
5    A.   Yes, sir.
6    Q.   What happened at this visit?
7    A.   Requesting low bunk because of pain in
8  right shoulder.  X-ray within normal limits.
9  Examination within normal limits.  Full range of
10  motion.  Offender informed he's not eligible for low
11  bunk.  Left exam room angry.
12   Q.   Do you remember that visit?
13   A.   I don't remember it, no.
14   Q.   Do you know why he was not eligible for a
15  low bunk at that point?
16   A.   He was moving all his extremities.  He was,
17  kind of -- full range of motion.  I don't see a reason
18  that because he has some pain in his shoulder -- all
19  the inmates have pain in their shoulder, pain in their
20  wrist.  So we have limited number of low bunks.  So
21  with his age, 30-some years old, with all his
22  cardiovascular, lung, everything is normal, he's not
23  eligible for low bunk privilege.
24   Q.   And he's, again, complaining of shoulder

Page 117

1  pain during that visit; correct?
2    A.   Yes, sir.
3    Q.   And what did you do to follow up on that
4  report of pain?
5    A.   We wrote, Follow up as needed.
6    Q.   Were there any different pain medications
7  tried at that point?
8    A.   No.
9    Q.   Any further steroid injection?
10   A.   No, sir.
11   Q.   Referral for any further imaging --
12   A.   No, sir.
13   Q.   -- or diagnostics of any kind?
14   A.   No.
15   Q.   Any referral for a specialist at that time?
16   A.   No, sir.
17  MR. MARUNA:  Objection, foundation.
18  BY MR. BRITT:
19   Q.   Do you know if you saw Mr. Hemphill at any
20  point after November 24, 2015?
21   A.   I don't remember.  Everything I remember
22  what is in this record.
23   Q.   So you don't have any independent memories
24  of his treatment outside of these notes?

Pages 118 to 121

Saleh Obaisi, M.D., 11/9/17

Page 118

1    A.  No, I don't have any independent memory.
2        MR. BRITT:  We'll get this marked as Exhibit 12.
3        (Deposition Exhibit No. 12 was so
4        marked.)
5    BY MR. BRITT:
6    Q.  And what is this document?
7    A.  Progress note sheet.
8    Q.  Like the ones we've been looking at?
9    A.  Yes, sir.
10   Q.  And this is dated January 14, 2015;
11   correct?
12   A.  Correct.
13   Q.  But flipping to the next page really quick,
14   that's a note for January 19, 2016; correct?
15   A.  Correct.
16   Q.  So going back to the first page, that
17   appears to be January 14, 2016, and someone just
18   didn't get the new year correct; would you agree with
19   that?
20       MR. MARUNA:  Objection, foundation, but ...
21   BY MR. BRITT:
22   Q.  There's also the M.D. sick call noted as
23   2016 in the upper right?
24   A.  I agree with you.

Page 119

1    Q.  Who saw Mr. Hemphill on that day?
2    A.  An RN.
3    Q.  And under the subjective portion,
4    Mr. Hemphill is again complaining of right shoulder
5    pain; correct?
6    A.  Correct.
7    Q.  And says that, you know, that's been
8    present -- that pain has been present for several
9    years; correct?
10   A.  Several years now.  Several means
11   seven-like.  If you look in a dictionary, several,
12   seven to ten.
13   Q.  I'll take your word for it, but under, How
14   long has the pain been present, on this form, it says
15   several years; correct.
16   A.  That's what it says, yes.
17   Q.  And under objective findings, are there any
18   objective findings related to his shoulder?
19   A.  Cannot move it above 90 degrees.
20   Q.  And above that, it notes the shoulder is
21   tender; correct?
22   A.  Yes.  No, it doesn't say tender; does it?
23   It says, Right shoulder, limited range of motion.
24   Q.  But above that there's a question on this

Page 120

1    form -- oh, I'm sorry.  I think I see where you're
2    looking.  So I'm looking under the objective findings.
3    So on the bottom half of the page there's a question
4    for tenderness on examination; correct?
5    A.  Where is it?
6    Q.  Toward the bottom.
7    A.  Yes.
8    Q.  And it says, Shoulder is tender?
9    A.  Yes.
10   Q.  And that's an objective finding by the
11   medical professional?
12   A.  By the nurse, yes, sir.
13   Q.  And below that it says, Cannot move it
14   above 90 degrees; correct?
15   A.  Correct.  But it's not specific as to which
16   direction.
17   Q.  Do you believe that's referring to his
18   shoulder?
19   A.  Yes.
20   Q.  So would you say, you know, based on how
21   it's phrased that he is not able to abduct his arm
22   beyond 90 degrees because it says above?
23   A.  He will abduct it, but, as I said, with
24   some pain.  He cannot abduct that completely.  If the

Page 121

1    guy has a tear of tendon, he cannot abduct it, he
2    cannot maintain it, and it will drop down.  Here, he
3    abduct, but if he put a little effort, he will be able
4    to take it up to 180 degrees.
5    Q.  Is that consistent with the note that says,
6    Cannot move it above 90 degrees?
7    A.  Yes, sir.
8    Q.  Go ahead and turn to the next page, and
9    that's a note for January 19, 2016; is that correct?
10   A.  Yes, sir.
11   Q.  Whose notes are these?
12   A.  These are LaTonya Williams.
13   Q.  And did LaTonya Williams see Mr. Hemphill
14   on January 19, 2016?
15   A.  It seemed to be, yes.
16   Q.  Would LaTonya Williams have seen a patient
17   on an M.D. sick call?
18   A.  Yes, sir.
19   Q.  And on January 19, 2016, Mr. Hemphill is
20   again complaining of right shoulder pain; correct?
21   A.  Yes, sir.
22   Q.  And what is the assessment at this time?
23   A.  Shoulder pain, chronic.
24   Q.  And what action is taken as a result of

Saleh Obaisi, M.D., 11/9/17

Page 122

1 that?
2 A. Ms. Williams order X-ray for him. He asked
3 for X-ray. And confirm with PT, waiting list -- on
4 waiting list. Education, reassurance, Naprosyn
5 500 milligrams one tablet twice a day prn for three
6 weeks -- or three months. Three months. Five,
7 Balm -- analgesic balm to affected area twice a day --
8 twice to three times a day as needed for one month
9 with heat. Six, Return to clinic follow-up three
10 weeks.
11 Q. And she prescribes naproxen again; correct?
12 A. Yes.
13 Q. Which is the same medication that he has
14 been on for the last, almost, four years at this
15 point?
16 MR. MARUNA: Objection, foundation.
17 BY MR. BRITT:
18 Q. Or three years. I'm sorry.
19 A. He was not on it four years or three years.
20 Obviously, if it doesn't work, he should tell her it
21 doesn't work. It's working, so that's fine. People
22 stay on the medicine for many, many years if it's
23 working.
24 Q. Do you think based on these notes that the

Page 123

1 naproxen was working?
2 A. I think naproxen is an excellent medicine.
3 Of course it's working.
4 Q. Do you think it was working in
5 Mr. Hemphill's case?
6 A. Yes, sir.
7 Q. Based on what?
8 A. When I saw him, when I documented that we
9 did not give him in the low bunk, he was moving well
10 with the extremities. Obviously, his extremities, his
11 movement, is something he control. He can move it any
12 way he want. He can move it 10 degrees or 100 degrees
13 or no degrees. We can't force him to move it.
14 Q. Let's skip ahead two pages to the page
15 labeled 128. Whose notes are these?
16 A. Ms. Williams.
17 Q. And what date is this note from?
18 A. February 9, '16.
19 Q. And this indicates that an X-ray was taken;
20 is that correct?
21 A. For X-rays, out. Let's see if it was taken
22 or not. We don't know. Did she say it was taken?
23 Did she have the result?
24 Q. So on the second and third line of the

Page 124

1 notes, am I reading this correctly? It says, Advised
2 X-rays neg, for negative?
3 A. Excellent.
4 Q. Are you complimenting my reading skills,
5 sir?
6 A. We got to be serious. You cannot take
7 advantage of me by joking.
8 Q. Did I read that accurately?
9 A. Yes. You are right.
10 Q. And what does that mean, that the X-rays
11 were negative?
12 A. That mean that the bones, all of them,
13 intact. There is no sign of dislocation, fracture,
14 subluxation, or finding to confirm an impingement
15 syndrome.
16 Q. Is there anything else that's reflected in
17 the notes there?
18 A. I don't know. I did not read the note.
19 I'm just reading what you ask me to. My -- I don't
20 know what the word here -- my -- you want me to read
21 it or just accept it as it is? Or you read whatever,
22 and I tell you, yes, it's true.
23 Q. Well, it indicates that Mr. Hemphill, it
24 says he has a copy of records that show Wexford

Page 125

1 approved him for an MRI; correct?
2 A. That's what he said.
3 Q. And it also says that -- or a search was
4 taken of the facility's records, and they weren't able
5 to locate that record; correct?
6 A. I don't know. I mean, that's what you're
7 reading. Let's say he said that.
8 Q. If Wexford had approved an outside referral
9 for imaging or to see a specialist --
10 A. Yes.
11 Q. -- would Stateville still have a copy of
12 that approval as of February 2016?
13 MR. MARUNA: Are you asking Stateville or
14 Wexford?
15 MR. BRITT: I'm sorry. Let me clarify.
16 BY MR. BRITT:
17 Q. Would the healthcare unit have a copy of an
18 approval like the one that was marked as Exhibit 10?
19 MR. MARUNA: So that also doesn't help clarify.
20 We can go off the record for a second.
21 (Discussion off the record.)
22 BY MR. BRITT:
23 Q. So going back and looking at Exhibit 10.
24 The medical professionals who were treating

Saleh Obaisi, M.D., 11/9/17

Page 126

1  Mr. Hemphill at Stateville, would they be able to find
2  any record of an approval like the one reflected in
3  Exhibit 10?
4      **A.  Well, as you are his attorney, did he show**
5  **you a copy of that report?**
6      Q.  That's separate from what I'm asking.
7      MR. MARUNA:  So just clarify, Doctor, he's asking
8  this -- I'm sorry, Exhibit 10 is the UM note; right?
9  You're asking about Exhibit 10?
10     MR. BRITT:  Yes.
11     MR. MARUNA:  He's asking about the Wexford UM
12  note.
13  BY THE WITNESS:
14     **A.  Wexford say he's approved for orthopedic**
15  **evaluation at UIC.  That's all he was approved for.**
16     Q.  So when Mr. Hemphill comes in in February
17  of 2016 and says Wexford approved an outside referral,
18  where would a medical professional at Stateville go to
19  see if that approval had been issued?
20     MR. MARUNA:  I object to foundation.  I don't
21  think that's what the plaintiff testified based on the
22  medical record.
23         But with that objection, Doctor, you can
24  answer.

Page 127

1  BY THE WITNESS:
2      **A.  He never was approved because he cannot**
3  **approve without me.  I'm the one that was going to get**
4  **him the approval.**
5      Q.  So --
6      **A.  And I got him approved for orthopedist, so**
7  **the orthopedist can order any test they want.  So his**
8  **information is inaccurate.**
9      Q.  So what you're saying is after February of
10  2016, he may have been approved for an outside
11  referral, but not necessarily for an MRI because that
12  would be the specialist's decision?
13     **A.  Correct.**
14     Q.  Do you know if that was explained to
15  Mr. Hemphill in February 2016?
16     **A.  I don't know.**
17     Q.  Do you know if Mr. Hemphill was told in
18  February 2016 that he was going to be referred to UIC?
19     **A.  Usually after we get them approved, we have**
20  **to let them know they were approved to go to UIC.  So**
21  **if I have him approved, he will be -- I don't have to**
22  **ask for him.  They are going to bring him to me and I**
23  **will let him know that he was approved to go to UIC.**
24  **If he asks me, Am I approved for MRI, for an example,**

Page 128

1  **I would say, No, you are not approved for MRI.  You**
2  **are approved for the orthopedist, and then the**
3  **orthopedist then will ask for whatever test he feel is**
4  **needed and I will get that test approved.**
5      Q.  Do you know what action was taken as a
6  result of this February 2016 visit?
7      **A.  I don't know.**
8      Q.  Do you know what the notes reflect in terms
9  of further action?  And I'm back looking at
10  Exhibit 12, the notes from that February 2016 visit?
11     **A.  Where is that further action?**
12     Q.  Under plans.
13     MR. MARUNA:  What are the plans?
14  BY THE WITNESS:
15     **A.  Continue on medication as directed,**
16  **Tylenol 500, 2 po between doses of Naprosyn, prn.**
17  **Continue waiting list for PT as ordered.  91615**
18  **patient -- I don't know the word here.  I don't know**
19  **the word.**
20     Q.  Does that indicate further patient
21  education?
22     **A.  Yeah.  Education.**
23     Q.  So aside from Tylenol, were there any new
24  medications that were prescribed at that time?

Page 129

1      **A.  Well, he was on Naprosyn, and that Tylenol**
2  **added to the Naprosyn.**
3      Q.  And did you have any responsibility for
4  Mr. Hemphill's care after he transferred to Hill?
5      **A.  No.**
6      Q.  Did you have any -- did you ever
7  communicate with anyone at Hill about Mr. Hemphill's
8  medical care?
9      **A.  No.**
10     Q.  Did anyone at Hill ever contact you about
11  Mr. Hemphill's medical care?
12     **A.  No.**
13     Q.  I'll show you what will be marked as 13.
14         (Deposition Exhibit No. 13 was so
15         marked.)
16  BY MR. BRITT:
17     Q.  Have you seen this document before?
18     **A.  No, sir.**
19     Q.  Would you mind just taking a quick look at
20  the findings and the impression?
21     **A.  Impression, Tear of the insertion of the**
22  **supraspinatus on the greater tubercle extending**
23  **longitudinally.  Most likely the tear is partial**
24  **thickness and communicate with the bursal surface.**

Saleh Obaisi, M.D., 11/9/17

---

Page 130

1  Two, Fluid in the subacromial-subdeltoid bursa
2  consistent with bursitis. No fluid seen in the
3  glenohumeral joint. Three, severe degenerative
4  changes in the acromioclavicular joint with spurring
5  indicating or indenting on the musculotendinosis
6  junction of the supraspinatus.
7      Q. And let me back up for a moment. This says
8  this is an imaging report. Do you know what that
9  imaging report is taken from?
10     A. Well, the imaging was MRI or CT scan.
11     Q. It is not an X-ray; correct?
12     A. Correct. It's MRI looks to me. MRI. But
13  I just want to clarify to you. I was reading the part
14  of the report, and they did not see any tear in his
15  supraspinatus tendon. Like, a tear in the insertion
16  of the supraspinatus. The surgeon was there, he look
17  at it. He said there is no tear in that tendon.
18     Q. Where do you see that?
19     A. In the operative report. Read the surgeon
20  operative report. I did not have copy of this one in
21  this paper I have. But I have the surgeon operative
22  report what he did in the surgery, how he did it, and
23  his findings. And he said the supraspinatus tendon is
24  intact.

---

Page 131

1      Q. So do you think this imaging report is
2  wrong?
3      A. Many times what I'm referring to there's a
4  lot of pseudo findings. Sometimes what you are
5  looking at -- you are looking at the black and dark
6  shadows, and you may see stuff I would not see. Like,
7  I disagree with you or the three of us will have three
8  different reading. But the bottom line, he got into
9  his shoulder, he operated, there is no tear in that
10  tendon.
11     Q. So are you telling me this imaging report
12  is wrong -- the first impression here is wrong; is
13  that what you're saying?
14     A. The first one, yes. That's inaccurate.
15     MR. MARUNA: Based on what?
16  BY THE WITNESS:
17     A. Based on the operative report finding by
18  the surgeon. And you should have copy of the
19  operative report.
20     Q. Is the second impression in this report
21  correct --
22     A. Bursitis.
23     Q. -- based on your review of the operative
24  report?

---

Page 132

1      A. Subacromial -- you know, he did not
2  mention, the surgeon, so I can't tell you anything.
3      Q. About what the third impression?
4      A. The only thing I was looking at the surgeon
5  how he did surgery, what he did. Well, I don't argue
6  with that one, subacromial clavicular joint with the
7  spurring indenting on the musculotendinous junction of
8  the supraspinatus. I just don't have opinion. I
9  know -- if I want to go by -- if I have this MRI
10  myself, I will back it up with the CAT scan because
11  the CAT scan is the one who see the bone. If you're
12  really looking at my spinal cord -- if you are going
13  to look at the bone if I have a spur, if I have a
14  fracture in my vertebrae, you do a CAT scan. If you
15  are looking at the soft tissue, you do MRI. If you
16  look at my spinal cord or the cartilage, yes, MRI is
17  better. That's -- everybody agree on that. But,
18  anyhow, he had surgery. It doesn't matter.
19     Q. Do you think this third finding is
20  accurate?
21     MR. MARUNA: Object to foundation.
22  BY THE WITNESS:
23     A. I'm not saying it's accurate or inaccurate.
24  I mean, the surgeon did go down there and he did --

---

Page 133

1  you know, he did smooth -- he did smooth the bone.
2  But the plain X-ray -- the CAT scan is really a plain
3  X-ray. The CAT scan sees calcium. The plain X-ray
4  see calcium. The MRI see hydrogen. So the water has
5  a lot of hydrogen. If you're going to look at my
6  liver, my liver is soft, filled with water, so it's
7  the best MRI. If you are going to look for somewhere
8  where I have calcium, you do MRI, which is no more
9  than --
10     MR. MARUNA: Do you mean if you see calcium, you
11  do MRI, or do you mean something else?
12  BY THE WITNESS:
13     A. The calcium you look at CT scan. You do CT
14  scan. So the CT is like an X-ray, but you do it and,
15  you know, in sections.
16     Q. Slices.
17     A. The benefit, you penetrate that tissue. So
18  you do it. If you are, an example, looking for
19  somebody come unconscious to the emergency room and
20  you think he bled, CAT scan is better if you want to
21  rule out blood in the subdural hematoma, for an
22  example, because blood is rich with calcium. So the
23  thing is it's showing you just one element of whatever
24  is in the fluid. One of them looking at the hydrogen.

---

Saleh Obaisi, M.D., 11/9/17

Page 134

1    One of them looking at the calcium.
2        Q.   So the finding that's reported on
3    impression No. 3, is that something that an X-ray
4    would have revealed to you the severe degenerative
5    changes in the AC joint?
6        A.   You know, it should, really.  It should
7    make it a little mention of it.  It did not.
8        Q.   Do you know why?
9        A.   As I said, I don't have any opinion about
10   things.  I want to see what he did after surgery, how
11   he recover.  What's the outcome of surgery.  I don't
12   know.  He lived.
13       MR. BRITT:  We'll get this marked as 14.
14            (Deposition Exhibit No. 14 was so
15            marked.)
16   BY MR. BRITT:
17       Q.   Understanding that this is an excerpt, can
18   you tell me what this is excerpted from?
19       A.   This is Wexford Health Sources.
20       Q.   And what is this document from?
21       A.   It's from Wexford.
22       Q.   And what document is it?
23       A.   It's medical policies and procedures.
24       Q.   And what's the --

Page 135

1        A.   Region, Illinois.
2        Q.   What's the purpose of this document?
3        A.   It's just enlightenment for the people who
4    do medical care to, you know, review the kind of,
5    basics and medical care.
6        Q.   Do you know if this is the set of policies
7    and procedures that was in place in 2013?
8        A.   I believe so.  It may be modified a little
9    bit, but still the same.
10       Q.   And do you know if, you know, these
11   policies and procedures were in place through March
12   2016?
13       A.   Yes.
14       Q.   They were?
15       A.   Yes.
16       Q.   Can you turn to -- it will be page No. 212
17   as you flip toward the back of this document.  The
18   Bates number will be Wexford 531, and there's a
19   section that's marked "shoulder"?
20       A.   I see.
21       Q.   Tell me what this is under shoulder.  What
22   are these columns?  What does this information mean?
23       A.   A, Fracture and dislocation.  B, Acute pain
24   with no fracture or dislocation.  Should call it

Page 136

1    sprain.  D, Multiple shoulder dislocation.  Recurrent,
2    would be nicer.  More accurate.  E, AC joint
3    separation.  Very common.  We see it here.  Acute and
4    chronic.  F, Clavicle fracture, acute and chronic.  So
5    these are the most common injury seen from trauma --
6    bone trauma where placed here.
7        Q.   And when you were providing care to
8    Mr. Hemphill for his shoulder pain, would this reflect
9    Wexford's policies toward treatment of that condition?
10       MR. MARUNA:  Objection to foundation.
11           Doctor, you can answer.
12   BY THE WITNESS:
13       A.   Mr. -- what's his name?  Winfield?  Our
14   inmate case does not fall under any of these titles.
15       Q.   Why not?
16       A.   It's a tendon.  Tendinitis, and that --
17   nothing here covers tendinitis except chronic pain.
18   NSAIDs, range of motion, exercise, activity
19   modification.  Then, secondary Wexford treatment,
20   unless emergent, conduct collegial.  Of course, we
21   did.  And you do ortho evaluation as discretion of
22   provider, which is my case.  I am the provider.  I got
23   him approved to go see the orthopedist.
24       Q.   And that approval took place in June of

Page 137

1    2015; is that correct?
2        A.   Correct, sir.
3        Q.   At which point Mr. Hemphill had been
4    complaining of shoulder pain since February 2013;
5    correct?
6        A.   Correct.
7        Q.   Do you think that's a reasonable amount of
8    time to move to the secondary treatment that is
9    described here?
10       A.   You want my answer from my heart?  To be
11   honest truthful with you?
12       Q.   Please.
13       A.   If Mr. Hemphill went to UIC, I don't think
14   he's going to have surgery.  He's going to have
15   conservative treatment.
16       Q.   And what do you base that on?
17       A.   Based on my experience with UIC and the
18   number of patients I send.  And probably, if he is
19   going to have any surgical procedure, it's going to be
20   arthroscopy.  They will get the scope, stick it in his
21   shoulder, and they will look and they will see -- you
22   know, they will do the minimum things, and they are
23   very good on that.
24       Q.   And that's based on your experience with

Saleh Obaisi, M.D., 11/9/17

Page 138

1    other patients that have been sent there?
2        A.    That's exactly what he really need.
3        Q.    But, I guess, what I'm asking is it took
4    over two years to get to the point of reaching the
5    secondary treatment step.  Do you think that was
6    reasonable in Mr. Hemphill's case?
7        A.    For impingement syndrome, the answer is
8    yes.
9        Q.    And why?
10       A.    Because impingement syndrome, this is the
11   way it's created.  It's just -- nothing threatening
12   anybody life.  It's not threatening the muscle
13   strength or the joint.  You can wait and treat
14   conservatively as long as you want.  And the
15   hesitation here -- we are dealing, as I said, with an
16   inpatient who really doesn't fit the criteria for the
17   older folks who will have the impingement syndrome,
18   the real thing.  So you ask me a question, and that's
19   my answer.  I'm not an orthopedist, but my experience
20   with UIC is they don't jump.  And only they operate on
21   the very bad cases, the way I see it here.
22       Q.    And you were -- you think it is reasonable
23   to continue with conservative treatment and not move
24   to the secondary treatment options because you did not

Page 139

1    think further damage was being done to the joint; is
2    that accurate?
3        A.    You know, I mean, I know you represent him,
4    but I'll tell you exactly what I think.  If I am the
5    patient myself, I'm not going to choose surgery.  See,
6    he give different stories.  He come to me, he was
7    doing well because probably I asked him direct
8    questions.  And if I am going to take a shot, and the
9    shot is going to help me for a few months, I would
10   rather have an injection every three, four months over
11   going and having surgery I don't know what the outcome
12   of it.
13            If I have to have surgery, I'm going to go
14   to a guy who give me arthroscopy, at least diagnosis,
15   if not surgery.  They do now -- they are skilled.
16   They are doing a lot of cutting and pinching through
17   the scope.  I will go for limited surgery, maybe
18   arthroscopy, if I will have.  But I am not going to go
19   to these radical old way of chopping and cutting, you
20   know.  But that's the way it happened.
21       Q.    Let me put it this way.  Did Mr. Hemphill's
22   reporting of his own pain play a role in your decision
23   to move to secondary treatment options?
24       A.    Well, we have to give him -- you know, we

Page 140

1    have to go through the process.  He did not improve
2    three, four steroid injection, and I don't think I
3    would feel myself comfortable to keep going.  If the
4    orthopedist want to do it, I'm not going to dispute
5    it.  I think that's fine.  But I think my role as a
6    primary care physician got to end at one point and I
7    turn him over to the orthopedist, even if the
8    orthopedist would do the same thing I'm doing.  And I
9    have patients who we send them to UIC, and they came
10   back with the same thing.
11            You know, I have a patient the other day I
12   send them and they give him shot of cortisone in his
13   knee.  And the guy wrote to see him in three months.
14   We're going to give him steroid injection next visit
15   and every probably three months.  Of course, I'm
16   capable of doing it, but let him go.  He decide.
17   That's fine with me.
18       Q.    Looking back at this Exhibit No. 14, did
19   any aspect of your treatment -- let me start over.
20            Did this document influence your course of
21   treatment for Mr. Hemphill?
22       A.    You know, I did not read that document, and
23   I don't really do too much reading these documents
24   very much because I read them one time.  And they

Page 141

1    are -- they are basic.  They are really -- they are
2    right, but you are -- there's something you read it on
3    the paper and in the book so nice.  It's like legal
4    issue on the book.  It's good.  The minute you are in
5    the field -- in the field you just become like
6    soldier.  You know, there are many elements you are
7    involved in, and you are not going to run to the book
8    every time and -- you know, you may question.  For an
9    example, in the case, honestly, I looked at the
10   anatomy and I said, The guy did stuff.  And I said,
11   How does he do this?  It did not make sense to me, but
12   he's an orthopedist, and I'm not an orthopedist.
13       Q.    So let me just ask, is there any -- was
14   there any policy or direction from Wexford that played
15   a role in how you treated Mr. Hemphill?
16       A.    Wexford never ever intervene in my
17   management, and I say it honestly.  Every week I get
18   30 to 40 approval.  And they never ever told me -- you
19   know, they may question something, probably, let's do
20   the CAT scan now.  In fact, sometimes they are ahead
21   of me.  I would say, you know, Let's send this guy to
22   have the CAT scan.  Oh, no, no, no.  Send him to a
23   specialist right away.  Probably that would make sense
24   better.  As long as you -- you know, the physician and

Saleh Obaisi, M.D., 11/9/17

Page 142

1  the management -- utilization management, he see you
2  are -- you make sense in your decision and how you
3  present the case. They are hundred percent with us.
4  They don't want us to waste. They don't want us to do
5  shooting in the dark.
6      I mean, you know, they ask me -- we used to
7  order -- I mean, the guys before me used to order MRI
8  and CAT scan, and then you get -- I review it. It's
9  normal. But the patient's still coming to me, he has
10  pain. So we can say we did CAT scan, it's normal, and
11  close the case. It doesn't work that way. We send
12  the man because he has back pain or we send the man --
13  that's the reason we send him to consultant. Let the
14  consultant handle it all.
15      MR. BRITT: Let's go ahead and mark this as
16  Exhibit 15.
17          (Deposition Exhibit No. 15 was so
18          marked.)
19  BY MR. BRITT:
20      Q.  Can you tell me, have you seen this
21  document before?
22      A.  No.
23      Q.  So you've never seen this?
24      A.  I've never seen it.

Page 143

1      MR. BRITT: And I'll have this marked as
2  Exhibit 16.
3          (Deposition Exhibit No. 16 was so
4          marked.)
5  BY MR. BRITT:
6      Q.  Can you tell me what this is?
7      A.  This is an e-mail exchange between me and
8  Dr. Louis Shicker, who was the agency medical director
9  for IDOC.
10      Q.  And who does Dr. Shicker report to?
11      MR. MARUNA: Objection, foundation.
12  BY MR. BRITT:
13      Q.  I'm sorry. Let me back that up. What is
14  Dr. Shicker's role?
15      A.  Dr. Shicker was the agency medical
16  director. He was an employee of the State of
17  Illinois, and he was a medical director for IDOC. His
18  job is to monitor the function of Wexford personnel in
19  that we are living up to the contract requirement.
20      Q.  Do you know why Dr. Shicker wrote to you on
21  February 7, 2014?
22      A.  I would assume the inmate or somebody on
23  the inmate behalf file a complaint with Dr. Shicker,
24  and in that case they usually send an e-mail asking

Page 144

1  what's going on with this case.
2      Q.  And this is asking about plaintiff in this
3  case, Carl Hemphill; correct?
4      A.  Correct.
5      Q.  And you wrote back to him on February 11;
6  correct?
7      A.  Correct.
8      Q.  And you said in this e-mail that you had a
9  diagnosis of impingement syndrome?
10      A.  Correct.
11      Q.  And you say that on July 31, 2013, you
12  administered a steroid injection; correct?
13      A.  Correct.
14      Q.  And you state that that gave relief until
15  October 30, 2013?
16      A.  Correct.
17      Q.  In fact, Mr. Hemphill had actually
18  complained of shoulder pain, at least three times,
19  between July 31 and October 30, 2013; hadn't he?
20      A.  Correct. To somebody else. Not to me.
21      Q.  But that's reflected in the medical
22  records; correct?
23      A.  Correct.
24      Q.  So this e-mail is incorrect; isn't it?

Page 145

1      A.  No. This is correct.
2      Q.  How so?
3      A.  Because Mr. Hemphill was literally saying
4  he has pain to everybody. When he comes to me, he
5  said he was without pain. Who am I going to believe?
6  He's sitting talking to me face-to-face.
7      Q.  But there are medical records that indicate
8  that between July --
9      A.  That is a lie. I don't care what he tell
10  the nurses. It's what he tell me.
11      Q.  How do you know what he's telling the nurse
12  is a lie?
13      A.  Because I'm asking him. I'm asking him the
14  question. He give me the answer. I go by his answer.
15      Q.  Did you review any of his -- any of
16  Mr. Hemphill's sick call requests before sending that
17  e-mail to Dr. Shicker?
18      A.  No.
19      Q.  Did you review Mr. Hemphill's medical
20  records before sending this e-mail back to
21  Dr. Shicker?
22      A.  No. I reviewed nothing. I reviewed just
23  the medical record when we gave him the injection and
24  when we are going to give him the injection. We never

Saleh Obaisi, M.D., 11/9/17

Page 146

1  forced the patient to take the steroid injection.  He
2  comes back on his own asking for the injection.  He
3  can't say the injection doesn't help me.  We have
4  patient -- in fact, I encouraged them not to take an
5  injection.
6      Q.  So if Dr. Shicker is supposed to be
7  overseeing the treatment given to inmates -- is that
8  part of his role?
9      MR. MARUNA:  Objection to foundation.
10          If you know Dr. Shicker's role.
11  BY THE WITNESS:
12      A.  Dr. Shicker represents the State of
13  Illinois.  He has to do with the contract with
14  Wexford.  He has to do with the policy, all the
15  policies, all the ADA, whatever.  All of it, Shicker
16  is responsible for it.
17      Q.  And is part of that responsibility to make
18  sure that Wexford is delivering adequate care to
19  inmates?
20      MR. MARUNA:  Objection to foundation.
21      MR. STEPHENSON:  I join.
22  BY THE WITNESS:
23      A.  He received the complaint.  He received the
24  complaint from the inmates or from the inmate's family

Page 147

1  or the inmate go file a complaint with their senator,
2  with their preacher, with the governor office, and
3  these offices communicated to Dr. Shicker, and Shicker
4  communicated to us to see what's going on.  Shicker
5  used to come here, pull the charts, review the charts
6  himself.
7      Q.  Does Dr. Shicker rely on you at Stateville
8  to accurately relay information about inmate care?
9      MR. MARUNA:  Objection to foundation as to what
10  Shicker relies.
11          Doctor, if you know, you can answer.
12      MR. STEPHENSON:  Join.
13  BY THE WITNESS:
14      A.  Which I did.
15      Q.  You did relay accurate information?
16      A.  Accurate information.  Yes, sir.
17      Q.  But you did not look at the medical records
18  before responding to him; is that correct?
19      MR. MARUNA:  Objection, mischaracterizes the
20  prior testimony.
21          Doctor, you can explain.
22  BY THE WITNESS:
23      A.  I told you I look at the medical record.  I
24  cannot answer him without looking at the medical

Page 148

1  record to look at the date and the events.
2      Q.  But the medical records do reflect that
3  during that time period he was complaining of shoulder
4  pain, just to other professionals; correct?
5      A.  That's your opinion.  I go by what the
6  inmate tell me.  I don't look at what the inmate told
7  the nurse.  There's one question.  It has to have one
8  answer.  Which answer I'm going to tell.  What he told
9  the nurse a month ago or what he's telling me
10  face-to-face?
11      Q.  You did not tell Dr. Shicker that
12  Mr. Hemphill had complained of shoulder pain to the
13  nurses; correct?
14      A.  I did not know he complained to nurses,
15  neither I write these notes.  Neither I care about the
16  thing.  As long as you are my patient sitting before
17  my face, I take your history.  I don't call your
18  mother to take your history from your mama.
19      Q.  Did you consult with anyone else before
20  sending this e-mail to Dr. Shicker?
21      A.  I am the ultimate medical director here.
22  Consult with nobody.
23      Q.  So you answered this e-mail based on your
24  knowledge and nobody else's; correct?

Page 149

1      A.  Absolutely.
2      Q.  Did you refer at all to Mr. Hemphill's
3  grievance history before responding to this e-mail?
4      A.  No, I did not see the grievances.  The
5  grievances are a mode for Mr. Hemphill and all of them
6  to file lawsuit.  I say that at the beginning.  That's
7  the way they are -- they are in business.  I sell
8  medicine.  You sell law.  He sell pain.  I have --
9  every single inmate here have a lawsuit.  Some of them
10  have three, four, five lawsuits.  Is that something
11  reasonable?  Unreasonable.
12      Q.  Did you ever get any information about
13  Mr. Hemphill's grievances while you were at
14  Stateville?
15      A.  No.
16      Q.  Did anyone ever tell you about
17  Mr. Hemphill's grievances?
18      A.  No.
19      Q.  Were you ever asked for information about
20  any other inmate's medical grievances?
21      MR. MARUNA:  Are you talking ever in the five
22  years he's been here?
23      MR. BRITT:  In general.
24

Saleh Obaisi, M.D., 11/9/17

Page 150

```
 1   BY MR. BRITT:
 2       Q.  Have you ever been asked about any other
 3   inmate's medical grievances?
 4       A.  Sometimes I am asked.
 5       Q.  Just not about Mr. Hemphill's?
 6       A.  I don't recall that I was asked about
 7   Hemphill.
 8       Q.  Do you remember seeing Mr. Hemphill before
 9   February of 2013 for anything?
10       A.  I don't remember.
11       Q.  Do you remember there being any -- looking
12   at Exhibit 16 again, do you remember there being any
13   further follow-up communications from this?
14       A.  No.
15       Q.  Did you ever discuss this over the phone
16   with Dr. Shicker?
17       A.  I don't recall.
18       Q.  So as far as you remember, sitting here,
19   you sent this e-mail and that was the end of the
20   discussion?
21       A.  Correct.
22       Q.  Do you know if Dr. Shicker took any action
23   as a result of this e-mail?
24       A.  I don't believe he took any action.  He
```

Page 151

```
 1   probably send an e-mail to the -- or message to the
 2   inmate.
 3       Q.  And do you know whether that happened?
 4       A.  Or whoever filed the complaint.  I don't
 5   really know.  I mean, he doesn't tell me, but I know
 6   over the years that they get all kind of complaint
 7   from various people on behalf of the inmates, and they
 8   give an answer.
 9       MR. BRITT:  I have nothing further.
10       MR. MARUNA:  Why don't we take five, and then I'm
11   going to have a few.
12          (A short break was had.)
13          CROSS-EXAMINATION
14   BY MR. MARUNA:
15       Q.  Doctor, couple questions here.  Same rules
16   that we discussed earlier apply.  If you don't
17   understand what I've said, let me know.  I'm happy to
18   rephrase it; okay?
19       A.  (No verbal response.)
20       Q.  Okay?
21       A.  Yes, sir.
22       Q.  I want to go over a couple things in your
23   background that I don't think we addressed earlier.
24   Do you hold any Board certifications?
```

Page 152

```
 1       A.  Yes, sir.
 2       Q.  Where are you board-certified at?
 3       A.  Urgent care medicine.  And I'm a member of
 4   the Royal College of Surgeons in Canada.
 5       Q.  And that's an organization of surgeons; is
 6   that correct?
 7       A.  Yes, sir.
 8       Q.  Dr. Obaisi, as you reviewed the medical
 9   records today of your care and treatment of
10   Mr. Hemphill, did you ever intend to cause him any
11   harm in your treatment?
12       A.  Never.
13       Q.  Is it true, Doctor, that you only desired
14   the best possible medical outcome for this patient?
15       A.  Correct.
16       Q.  Doctor, if I use the term "standard of
17   care," are you familiar with that term?
18       A.  Yes, sir.
19       Q.  And you are a medical doctor licensed in
20   the state of Illinois to practice medicine and all of
21   its branches; is that correct?
22       A.  Yes.
23       Q.  Did you comply with the standard of care in
24   treating this patient?
```

Page 153

```
 1       A.  Correct.  I did.
 2       Q.  And we've discussed several other medical
 3   records that you would have reviewed today regarding
 4   the patient's incarceration and treatment at
 5   Stateville Correctional Center; is that fair?
 6       A.  Yes.
 7       Q.  Did the prisoner receive appropriate
 8   treatment based on your review of those records?
 9       A.  Yes.
10       Q.  And did the other medical practitioners at
11   Stateville comply with the standard of care in their
12   treatment of Mr. Hemphill?
13       A.  Yes.
14       Q.  Doctor, do you currently see inmates at
15   Stateville Correctional Center?
16       A.  Yes.
17       Q.  And do you -- when you see inmates, do you
18   make medical progress notes of your examinations of
19   those inmates?
20       A.  Yes.
21       Q.  And I'm going to use the term "custom and
22   practice," and by that I mean something that you would
23   invariably do.  Like, this morning I put on my seat
24   belt like I've done every day since I was 16.  Do you
```

Saleh Obaisi, M.D., 11/9/17

Page 154

1   understand that?
2       A.   Yes, sir.
3       Q.   Do you have a custom and practice in making
4   medical notes?
5       A.   Yes, sir.
6       Q.   If an inmate reports pain, would your
7   custom and practice be to note that in your medical
8   record?
9       A.   Yes.
10      Q.   Can I take it to mean that if your medical
11  record does not contain a notation that the inmate
12  reported pain, that he did not give you a report of
13  pain?
14      A.   Yes.
15      Q.   How many inmates are there at Stateville
16  Correctional Center?
17      A.   At the present time, we have 1,400.
18      Q.   And would that be consistent with 2013 and
19  2014?
20      A.   2013 we had 1,800.
21      Q.   What about 2014?
22      A.   1,800.
23      Q.   You obviously can't see each and every
24  inmate in this prison; correct?

Page 155

1       A.   Correct.
2       Q.   So do you have a staff?
3       A.   Yes.
4       Q.   So we discussed that there's yourself and
5   one staff physician; correct?
6       A.   Yes.
7       Q.   And there's LaTonya Williams, who's a
8   physician assistant; is that correct?
9       A.   Correct.
10      Q.   Do the three of you function as, I guess,
11  what we'll call, higher level medical providers in the
12  healthcare unit?
13      A.   Yes.
14      Q.   So that's why we can see why Ms. Williams
15  was sometimes listed under M.D. sick call; correct?
16      A.   Correct.
17      Q.   There's also nurses in the sick care
18  unit -- or the healthcare unit; correct?
19      A.   Yes.
20      Q.   And there's CMTs; correct?
21      A.   Yes.
22      Q.   Is there a dental department at Stateville?
23      A.   Yes.
24      Q.   A psychological department?

Page 156

1       A.   Yes.
2       Q.   A pharmacy?
3       A.   Yes.
4       Q.   As we discussed, you can't see each and
5   every inmate here; correct?
6       A.   Correct.
7       Q.   Do you rely on other medical providers to
8   treat inmates?
9       A.   Yes.
10      Q.   Or provide the inmates with medical
11  services such as pharmacy?
12      A.   Yes.
13      Q.   Or to dispense medication to the inmate if
14  they're in the cell; correct?
15      A.   Correct.
16      Q.   It's your expectation that each provider
17  will render medical treatment in accordance with the
18  applicable community standard of care; correct?
19      A.   Correct.
20      Q.   And that's a reasonable belief based on
21  your experience as a medical provider for 40 years;
22  correct?
23      A.   Correct.
24      Q.   And that's no different than how it worked

Page 157

1   when you were at the hospital you mentioned earlier;
2   correct?
3       A.   Yes, sir.
4       Q.   We discussed that sick call, nursing sick
5   call specifically, has a triage component in it; is
6   that accurate?
7       A.   Yes.
8       Q.   So, ultimately, a nurse has to make a
9   decision on when and how this inmate needs to be seen;
10  correct?
11      A.   Yes.
12      Q.   And that decision could be that the inmate
13  needs to be seen by a nurse; correct?
14      A.   Correct.
15      Q.   The inmate needs to be seen by a higher
16  level medical provider; correct?
17      A.   Yes.
18      Q.   You don't make that initial assessment;
19  correct?
20      A.   Yes.
21      Q.   Someone else does that; correct?
22      A.   Correct.
23      Q.   From that person's assessment, the inmate
24  would then be put on your schedule; is that correct?

Saleh Obaisi, M.D., 11/9/17

Page 158

1      A.   Yes.
2      Q.   If the inmate's not put on your schedule,
3  you wouldn't see the inmate; correct?
4      A.   Yes.
5      Q.   You don't go through the cell house and go,
6  Does anyone need medical treatment today; correct?
7      A.   Correct.
8      Q.   You rely on someone else to perform --
9  Strike that.
10          You rely on the inmates to use the
11  procedures put in place for them at the prison to
12  secure medical treatment; correct?
13      A.   Yes.
14      Q.   We discussed earlier lockdown procedure at
15  Stateville; do you recall that?
16      A.   Yes.
17      Q.   Do you have any role in putting the
18  facility on lockdown?
19      A.   No.
20      Q.   Did you develop the procedures for
21  restricting or limiting medical care during a
22  lockdown?
23      A.   No.
24      Q.   Do you know if Wexford has any role in a

Page 159

1  lockdown?
2      A.   No.
3      Q.   No, it does not have a role?
4      A.   No.
5      Q.   Did Wexford, to your knowledge, participate
6  in drafting any of the procedures we discussed
7  regarding lockdown?
8      A.   No.
9      Q.   Dr. Obaisi, have you treated rotator cuff
10  shoulder-type pain in the past?
11      A.   Yes.
12      Q.   Ballpark estimate, in your career for 40
13  years, how many cases?
14      A.   More than hundred cases.
15      Q.   More than a hundred -- hundreds or more
16  than a hundred?
17      A.   More than hundred.
18      Q.   Are you familiar with how to treat shoulder
19  pain?
20      A.   Correct.
21      Q.   Are you familiar with how to treat rotator
22  cuff complaints?
23      A.   Correct.
24      Q.   Dr. Obaisi, if an inmate's reporting pain,

Page 160

1  is pain medication a type of treatment?
2      A.   Yes.
3      Q.   We discussed that there's a medication
4  called NSAIDs; correct?
5      A.   Yes.
6      Q.   And my understanding is that they treat the
7  pain because they reduce the inflammation that's
8  causing the pain; correct?
9      A.   Correct.
10      Q.   So it has -- the NSAID actually has two
11  mechanisms of treatment for the patient.  First, pain
12  reduction.  Second, swelling reduction.  Correct?
13      A.   Correct.
14      Q.   Swelling reduction can also help increase
15  range of motion?
16      A.   Correct.
17      Q.   It can also help if a person was, say, for
18  example, having trouble performing their activities of
19  daily living, it might increase range of motion in a
20  shoulder; correct?
21      A.   Correct.
22      Q.   In addition to helping the range of motion
23  increase because the pain was reduced; correct?
24      A.   Correct.

Page 161

1      Q.   Motrin is a type of NSAID; correct?
2      A.   Yes.
3      Q.   Naproxen is a type of NSAID; correct?
4      A.   Yes.
5      Q.   Mobic is a type of NSAID; correct?
6      A.   Correct.
7      Q.   By the way, I saw the inmate a couple times
8  had Tylenol prescribed.  What is Tylenol?
9      A.   Tylenol, pain reliever.  It --
10      Q.   So that's another -- go on, Doctor.
11      A.   It works on the brain, basically.
12      Q.   So it numbs the sense of pain throughout
13  the body?
14      A.   Correct.
15      Q.   And at times we've prescribed this inmate
16  Tylenol; correct?
17      A.   Yes.
18      Q.   And, by the way, Doctor, the medication
19  doses that we reviewed in the medical records, those
20  aren't over-the-counter doses; are they?
21      A.   No.
22      Q.   That means they're prescription doses;
23  correct?
24      A.   Correct.

Saleh Obaisi, M.D., 11/9/17

Page 162

1    Q.   So this isn't something that if
2  Mr. Hemphill was in the outside world he can walk down
3  to the Walgreens and buy; correct?
4    A.   Correct.
5    Q.   Is ice a type of treatment for
6  Mr. Hemphill's injuries?
7    A.   Is what?
8    Q.   Icing a type of treatment?
9    A.   Correct.
10   Q.   What does icing do?  What's the mechanism
11 that helps?
12   A.   Icing slow down the swelling in any tissue,
13 slow down the lymphatic movement, and is used today as
14 pain inhibitor by basically the physical therapist.
15 They try now to use it now with -- the heat.  Years
16 ago the heat was number one.  So now they are using
17 ice.  Occasionally, they alternate ice and heat.
18   Q.   Pain injections are another type of
19 treatment for Mr. Hemphill's injuries; correct?
20   A.   Correct.
21   Q.   Now, counsel asked you this, and we touched
22 on it ever so briefly.  The injections we were giving
23 Mr. Hemphill contained two medications; correct?
24   A.   Yes.

Page 163

1    Q.   Tell me about the first one, the steroid.
2  What does that do?  How does that treat his symptoms?
3    A.   Steroid is anti-inflammatory medication.
4  It's more potent than a nonsteroidal.  And the
5  steroid, we give it long-acting, which is stay in the
6  injured area so you can inject it inside the knee
7  joint or shoulder joint.  When they do the epidural,
8  they inject it in the space between the sleeve of the
9  nerve root and the nerve root so it stay there
10 captured and it works for a few months like the same
11 concept we use it here when I injected in the
12 subacromial space in the shoulder.
13   Q.   So the steroid acts as a long-lasting,
14 powerful anti-inflammatory agent; correct?
15   A.   Correct.
16   Q.   The second component of that injection is a
17 local anesthetic; is that correct, Doctor?
18   A.   Correct.
19   Q.   How does the local anesthetic help respond
20 to Mr. Hemphill's medical complaints?
21   A.   Well, the local anesthetic is, No. 1,
22 alleviate the pain and alleviate the pain of the
23 injection itself.  However, when the patient --
24 usually I use it as indicator.  When I give him the

Page 164

1  injection and supposedly we are targeting certain
2  tendon, we ask him to move that finger or arm or
3  whatever.  And when he move it and he say the pain
4  gone, I tell him that I'm using the medicine also as
5  diagnostic method because I know I put the steroid in
6  the right place because the steroid take about a
7  couple of days to kick in and keep working slowly for
8  about eight to ten weeks.
9    Q.   In reviewing Mr. Hemphill's treatment, we
10 see that it progressed from nonsteroid medications to
11 injections to eventually orthopedic referral; correct?
12   A.   Correct.
13   Q.   So it would not be -- it would incorrect to
14 say we adopted a static -- Strike that.
15        It would be incorrect to say that you
16 adopted a static treatment plan for Mr. Hemphill;
17 rather, or more accurately, is it true that you
18 developed an aggressive, increasing treatment plan for
19 Mr. Hemphill?
20        MR. BRITT:  Object to form.
21 BY THE WITNESS:
22   A.   Correct.  What my intention is, like, if
23 you don't give him the steroid injection here, you
24 send him to see the specialist, and he's going to give

Page 165

1  him the steroid injection.  And you will be sending
2  the patient several times just for the specialist to
3  use a steroid three, four times and he would say it
4  doesn't work.
5        So we do it here instead of sending him
6  out.  And how much we are perfect in prison, we never
7  are going to be good on timing because circumstances
8  in prison from lockdown to movement, security.  So
9  supposedly, we're going to send him to orthopedic to
10 give him steroid injection, and he write to us follow
11 up in six weeks.  It does not never happen in six
12 weeks.  I watch these patients.  I approve them to go
13 back in six weeks.  UIC doesn't call them in six
14 weeks.  Sometimes we send them, then the visit
15 canceled.  So it will be how much we look here slow
16 inside the prison, we are still better off than to
17 send them out.
18        So when I send him for the consultation,
19 the orthopedist does not have to go back and use the
20 steroid injection from ground zero.  Now, he pass that
21 stage and he address if there is really indication for
22 surgical treatment.
23   Q.   As I'm hearing it, Doctor, it sounds like
24 there's three levels of treatment.  We can imagine

Saleh Obaisi, M.D., 11/9/17

Page 166

1 moving each level up. Level 1, NSAID medication;
2 correct?
3    **A. Correct.**
4    Q. If the patient doesn't respond to that over
5 time, we elevate to Level 2, which is steroid
6 injection; correct?
7    **A. Correct.**
8    Q. If the patient doesn't respond to that over
9 time, then let's send him out to an orthopedic
10 specialist, and that specialist will make the
11 determination; is that correct?
12    **A. That's the way.**
13    Q. And, by the way, Doctor, is that what your
14 treatment ultimately shows here in the medical
15 records?
16    **A. Exactly.**
17    Q. Now, would you ever recommend, Doctor, that
18 a patient not take one of the medications that his
19 doctor has prescribed for him?
20    **A. No.**
21    Q. And, in fact, Doctor, is it important in
22 this case, based on the medications that you
23 prescribed Mr. Hemphill, the nonsteroidal agents, that
24 he actually take each and every dose?

Page 167

1    **A. Correct.**
2    Q. And that's because it takes time to produce
3 the chemical effects in the body to reduce the
4 inflammation; correct?
5    **A. Correct.**
6    Q. So missing a dose here or there could
7 actually delay or inhibit the nonsteroidal agent from
8 reducing the inflammation?
9    **A. Correct.**
10    Q. Doctor, what are medical permits?
11    **A. Medical permit is a permission, written**
12 **paper, for the patient to have certain privilege. One**
13 **of them is a low bunk or waist chain cuffing. You**
14 **know, we can do a lot of other things, like, low**
15 **gallery, certain shoes, certain pillows, certain**
16 **mattresses, et cetera.**
17    Q. So it's a permit to give an inmate a
18 special privilege not available to all inmates in the
19 prison; correct?
20    **A. Correct.**
21    Q. And that's based upon a medical need;
22 correct?
23    **A. Correct.**
24    Q. Now, when you issue an inmate a low bunk,

Page 168

1 for example, do you physically go out there and put
2 him in the low bunk?
3    **A. No.**
4    Q. All you do is you write the permit;
5 correct?
6    **A. Correct.**
7    Q. And then the inmate presents that to the
8 state to assign him to a low bunk; correct?
9    **A. Correct.**
10    Q. And certainly, Doctor, you would never give
11 an inmate a permit if it wasn't medically indicated;
12 correct?
13    **A. Correct.**
14    Q. And, in fact, Doctor, if you had issued a
15 permit but the patient's condition changed such that
16 he no longer demonstrated a medical need for it, is it
17 incumbent upon you to revoke that permit?
18    **A. Correct.**
19    Q. And that's because, as you alluded to
20 earlier, this is a prison?
21    **A. Correct. Because you always have to have**
22 **time limitation. This is for three months, for six**
23 **months, for one year. And you give yourself chance to**
24 **reevaluate the patient again. Unfortunately, we have**

Page 169

1 **cases, and that create a problem to the prison when**
2 **the patient get one time low bunk and it become, like,**
3 **you know, his right till the day he die he's going to**
4 **be in a low bunk and that you left us with low bunk**
5 **when somebody -- no low bunk available when somebody**
6 **break his leg or really need the low bunk after**
7 **surgery and so forth. So we have to be careful and if**
8 **the patient does not deserve it, then we don't give it**
9 **to him.**
10    Q. Doctor, do you practice evidence-based
11 medicine?
12    **A. Yes, sir.**
13    Q. What is evidence-based medicine, Doctor?
14    **A. It's a medicine based on evidence through**
15 **clinical studies and through various -- by various**
16 **government offices.**
17    Q. So does that mean that you only order
18 medical treatment that is clinically indicated?
19    **A. Correct.**
20    Q. Doctor, did this inmate ever demonstrate to
21 you, from the time of his first complaint in February
22 2013 till he transferred to Hill, that he needed an
23 MRI?
24    **A. No.**

Saleh Obaisi, M.D., 11/9/17

Page 170

1    Q.   Doctor, have you worked with LaTonya
2    Williams for several years?
3       A.   Yes.
4       Q.   Do you find her a competent medical
5    practitioner?
6       A.   Yes.
7       Q.   Doctor, have you worked with Dr. Ann Davis
8    for -- well, a couple years?
9       A.   Yes.
10      Q.   Do you find Dr. Davis to be a competent
11   medical provider?
12      A.   Yes.
13      Q.   Doctor, do you have any formal role in the
14   IDOC grievance process?
15      A.   No.
16      Q.   From time to time, are you consulted if
17   there's a medical question?
18      A.   Correct.
19      Q.   But you have no memory of being consulted
20   in the case; correct?
21      A.   Correct.
22      Q.   Doctor, we discussed earlier the collegial
23   review utilization management process.  Do you recall
24   those questions?

Page 171

1       A.   Yes, sir.
2       Q.   I want to understand a bit more about the
3    scheduling.  So it's my understanding from your
4    testimony that once the inmate is approved for an
5    outside appointment, you have no further role in that
6    process of scheduling the outside appointment;
7    correct?
8       A.   Correct.
9       Q.   Someone else in the medical staff takes
10   care of that; correct?
11      A.   Correct.
12      Q.   And it's your expectation that that staff
13   follows through and schedules that appointment;
14   correct?
15      A.   Yes.
16      Q.   With UIC, in particular, though, you
17   indicated that they receive the information on the
18   patient and they determine when they want to see that
19   patient; correct?
20      A.   Yes.
21      Q.   So that's a medical decision made by the
22   orthopedic department at UIC; correct?
23      A.   Correct.
24      Q.   Doctor, when an inmate transfers to another

Page 172

1    IDOC prison, like this patient did in March of 2016,
2    you hand them off to a new doctor; correct?
3       A.   Yes.
4       Q.   And it's up to that doctor then to make
5    treatment decisions; correct?
6       A.   Correct.
7       Q.   Doctor, are you familiar with the acronym
8    SOAP, S-O-A-P?
9       A.   Yes.
10      Q.   My understanding is S is subjective;
11   correct?
12      A.   Correct.
13      Q.   That is what the patient tells you;
14   correct?
15      A.   Yes.
16      Q.   O is objective; correct?
17      A.   Correct.
18      Q.   Objective means what you as a medical
19   provider objectively are witnessing during the
20   examination; correct?
21      A.   Correct.
22      Q.   Based on the S and 0, you make an
23   assessment, the A; correct?
24      A.   Yes.

Page 173

1       Q.   And from that assessment you make a plan to
2    treat that assessment; correct?
3       A.   Correct.
4       Q.   As a medical provider, you have to use
5    objective information to verify a patient's subjective
6    complaints; correct?
7       A.   Yes.
8       Q.   We discussed earlier the 1 to 10 pain
9    scale; right?
10      A.   Yes.
11      Q.   And your testimony is that really any
12   report of pain four and above needs to be made by the
13   medical provider; correct?
14      A.   Correct.
15      Q.   In fact, you said, Doctor, if a patient was
16   a 9 or 10 out of 10 pain, they'd be lying on a gurney
17   they'd be in so much pain; correct?
18      A.   Correct.
19      Q.   Now, is one of the ways you can verify --
20   well, let me just ask this way.
21           Earlier you testified that one of the ways
22   a provider can objectively verify a patient's
23   subjective report of pain is by looking at their face
24   to see if they're grimacing; correct?

Saleh Obaisi, M.D., 11/9/17

Page 174

1    A.   Yes, sir.
2    Q.   Another way is that you check their walk,
3 their ambulation; correct?
4    A.   Correct.
5    Q.   So if a patient was in pain, they'd have
6 trouble walking or ambulating freely; correct?
7    A.   Correct.
8    Q.   Is another way you can verify whether a
9 patient's in that sort of severe pain we're talking
10 about is by looking at their vital signs?
11   A.   Correct.
12   Q.   And in a patient with subjective -- strike
13 that.
14        In a patient with objectively severe pain,
15 you would expect to see an elevated heart rate?
16   A.   Yes, sir.
17   Q.   Would you expect to see an elevated pulse?
18   A.   Yes.
19   Q.   Would you expect to see an elevated
20 respiratory rate?
21   A.   Yes.
22   Q.   What about blood pressure?
23   A.   Blood pressure.
24   Q.   Doctor, several times in the medical

Page 175

1 records the inmate's vital signs are recorded;
2 correct?
3    A.   Yes.
4    Q.   Did you ever see any objective evidence in
5 those vital signs in the records you reviewed for this
6 patient that he was in any sort of severe 9, 8 out of
7 10 pain that he's reported on a few occasions?
8    A.   No.
9    Q.   Earlier today counsel asked you in
10 Exhibit 14 about some Wexford policies and procedures.
11 Do you recall those questions?
12   A.   Yes, sir.
13   Q.   I'm going to direct you back to Exhibit 14.
14 Specifically, Doctor, I'm going to draw your attention
15 to page 2 of Exhibit 14, which is Bates-stamped
16 Wexford 321.  Do you have that in front of you?
17   A.   Yes, sir.
18   Q.   So, Doctor, is it your understanding that
19 Wexford's medical policies and procedures are general
20 treatment guidelines that you can consult in your
21 practice?
22   A.   Correct.
23   Q.   And, Doctor, is that -- ultimately the
24 medical guidelines do not replace your judgment as a

Page 176

1 licensed medical doctor; correct?
2    A.   Correct.
3    Q.   Is that reflected anywhere in the Wexford
4 policy that counsel referenced earlier?
5    A.   Clinical pathway do not replace sound
6 clinical judgment, nor are they intended to strictly
7 apply to all patients.
8    Q.   Does that sentence end with, But their
9 application --
10   A.   But their application is the decision made
11 by the practitioner in accounting for individual
12 circumstances.
13   Q.   So first off, Doctor, we discussed that
14 really only one of the orthopedic policies could
15 potentially apply to this case, and that was on
16 page --
17   A.   Chronic pain.
18   Q.   Chronic pain.  And I'll just get for the
19 record what page that was on.  That was Policy 5C on
20 page Wexford 531.  The first primary treatment is
21 NSAIDs.  Did we provide NSAIDs to this patient?
22   A.   Yes.
23   Q.   Range of motion exercises.  Did your own
24 medical note note that you gave this patient exercises

Page 177

1 to perform?
2    A.   Yes.
3    Q.   Activity modification; correct?
4    A.   Yes.
5    Q.   Would that include something like a low
6 bunk permit; correct?
7    A.   Correct.
8    Q.   Maybe a permit for different handcuffing;
9 correct?
10   A.   Correct.
11   Q.   Did we provide those to the inmate?
12   A.   Yes.
13   Q.   The secondary treatment listed is ortho
14 evaluation at discretion of provider; correct?
15   A.   Correct.
16   Q.   That means it's your decision as the
17 provider; correct?
18   A.   Correct.
19   Q.   But, ultimately, you put this inmate in for
20 an ortho evaluation; correct?
21   A.   Correct.
22   Q.   He just didn't get the appointment because
23 he transferred downstate before he was called by UIC;
24 correct?

Saleh Obaisi, M.D., 11/9/17

Page 178

1    A.   Correct.
2    Q.   And, by the way, Doctor, you also have the
3  ability to go outside of these procedures based on
4  your independent clinical judgment and assessment of
5  the patient; correct?
6    A.   Correct.
7    Q.   Doctor, do you know when an inmate's being
8  transferred to another prison?
9    A.   No.
10    Q.   So that's something the state decides;
11  correct?
12    A.   Correct.
13    Q.   So your treatment wouldn't reflect any
14  knowledge that the inmate was being transferred in
15  March downstate; correct?
16    A.   Correct.
17    Q.   Doctor, I want to direct you to your note
18  of October 30, 2013, and it's at DOC 75, which I
19  believe is in Exhibit 5.
20        Off the record.
21        (Discussion off the record.)
22  BY MR. MARUNA:
23    Q.   Doctor, we're showing you Bates-stamp
24  IDOC 75.  I show a date of October 30, 2013.  Is that

Page 179

1  your medical note and handwriting?
2    A.   Yes.
3    Q.   I see you issued a low bunk permit;
4  correct?
5    A.   Yes.
6    Q.   I see you issued a waist chain?
7    A.   Yes.
8    Q.   What is a waist chain?
9    A.   Waist chain is a handcuff attached to a
10  chain hooked to a belt around the waist and enable the
11  patient -- the chain is a little bit, has some couple
12  feet length so he can move his arm back and forth.
13  Unfortunately, it's not very secure, according to the
14  correction officer.  They mention one case an inmate
15  was able to slip his hand from the waist chain and run
16  away from the van.
17    Q.   So how are inmates normally cuffed; if you
18  know?
19    A.   Usually, normally their hands behind their
20  back.  Then we give them -- there are other ways,
21  like, the hand in the front or you give them double
22  cuffing, which they leave a distance between the hands
23  a little bit.  If you use a front cuffing, just the
24  hand will be by the hand.  The double cuffing would be

Page 180

1  separate.
2    Q.   So inmates are normally handcuffed in the
3  front; correct?
4    A.   In the back.
5    Q.   I'm sorry.  In the back.  Could that put
6  strain on a shoulder complaint of pain?
7    A.   That's what they say.
8    Q.   So the inmate was coming to you saying he
9  had shoulder pain, and you asked security at
10  Stateville to let him be chained by the sides so his
11  hands weren't pinned behind his back; correct?
12    A.   Correct.
13    Q.   So that's a lifestyle accommodation you
14  sought for this patient to help him; correct?
15    A.   Correct.
16    Q.   Now, ultimately it's up to the state to
17  decide whether they feel that's safe to allow?
18    A.   Security is over -- does override medical
19  order.
20    Q.   Now, I want to direct you to a note on
21  May 1st, 2014.  It's at DOC 83.
22        MR. BRITT:  That's Exhibit 6.
23  BY MR. MARUNA:
24    Q.   I see here -- is the inmate coming to see

Page 181

1  you to request another steroid injection?
2    A.   Yes.
3    Q.   Does he indicate what happened with his
4  pain in his shoulder?
5    A.   He said pain resolved.  Asking for
6  injection today because pain start to come back last
7  few weeks.
8    Q.   So did the inmate tell you, based on your
9  medical note, on May 1st, 2014, that the last
10  injection resolved his pain?
11    A.   Correct.
12    Q.   Now, it started to come back over time;
13  correct?
14    A.   Correct.
15    Q.   And you indicated that may happen with an
16  injection, that it loses efficacy over time as the
17  medication wears off; correct?
18    A.   Correct.
19    Q.   And you've given the inmate two injections
20  by this point; correct?
21    A.   Correct.  We gave him a total, I guess,
22  four injections.  Yeah, I wrote that last note.
23    Q.   So if the inmate said at some point that
24  the injections weren't helping him at all, would it be

Saleh Obaisi, M.D., 11/9/17

Page 182

1  expected that he'd come back and ask for a third
2  injection?
3      A.  No.
4      Q.  I want to direct your attention to -- so
5  on 11-12-14, which is at 95.  I think we glossed over
6  it.  That's that note.  11-12-14 you order an X-ray;
7  correct?
8      A.  Yes.
9      Q.  I don't think we discussed that record, so
10 I just want to go to it real quick.  It's at IDOC 223.
11     A.  Yes, sir.
12     MR. MARUNA:  I don't think that was in your
13 exhibits.  Do you want a copy of it?
14     MR. BRITT:  We can introduce it.
15     MR. MARUNA:  Let's pull that out.
16         (Deposition Exhibit No. 17 was so
17         marked.)
18 BY MR. MARUNA:
19     Q.  Doctor, so in front of you, is this an
20 X-ray requisition form?
21     A.  Yes, sir.
22     Q.  Is that your handwriting up top there?
23     A.  Yes.
24     Q.  And what are you ordering?  X-rays of the

Page 183

1  shoulder and cervical spine?
2      A.  Correct.
3      Q.  And what's the date you ordered them?
4      A.  11-12-14.
5      Q.  Which would be consistent with the medical
6  progress note we discussed; correct?
7      A.  Correct.
8      Q.  And were the X-rays performed?
9      A.  Yes.
10     Q.  And what were the results?
11     A.  Right shoulder, include AC joint, negative
12 study.  Cervical spine also negative exam.  Leif -- I
13 guess his name Jon Leif, 16 November 2014.
14     Q.  So, once again, we're seeing that there's
15 no evidence here of a bone fracture; correct?
16     A.  Correct.
17     Q.  No evidence of osteoarthritis; correct?
18     A.  Correct.
19     Q.  Nothing telling you, as a provider, that
20 this inmate needs to go right now to a specialist;
21 correct?
22     A.  Correct.
23     Q.  Let's turn to -- it's IDOC 97.
24     MR. MARUNA:  Is that in one of yours?  It's the

Page 184

1  March 4, 2015, note.
2      MR. BRITT:  Yeah, that's part of Exhibit 8.
3  BY MR. MARUNA:
4      Q.  Doctor, showing you March 4, 2015, IDOC 97.
5  Under subjective, does the patient tell you anything
6  about his pain frequency?
7      A.  Pain in right shoulder is back on and off
8  and some pain in left forearm for a couple of weeks.
9      Q.  What does the phrase "on and off" tell you
10 about how consistent his pain was?
11     A.  It was not consistent on an everyday basis.
12 The pain would go away, especially after, my
13 understanding, the injection.  Then it would come back
14 after a while.
15     Q.  And so what the inmate is telling you here
16 is this pain doesn't last all the time; correct?
17     A.  Correct.
18     MR. BRITT:  Object to form.
19 BY MR. MARUNA:
20     Q.  The inmate's telling you on March 4, 2015,
21 is that his pain goes on and off; correct?
22     A.  Correct.
23     Q.  In fact, he indicates it's only come back
24 the last few weeks; correct?

Page 185

1      A.  Correct.  And just for note, I don't know
2  any pain doesn't change every day.  Only cancer.  The
3  only pain doesn't change, improve and come back,
4  cancer pain.
5      Q.  I'm going to direct you to IDOC 103, which
6  is June 4, 2015.
7      MR. BRITT:  It's part of 9.
8  BY MR. MARUNA:
9      Q.  On this record, Doctor, counsel asked you
10 if you did anything further besides treating the
11 report of sore throat; correct?
12     A.  Yes.
13     Q.  I want to direct you to page 2 in the
14 medical records.  IDOC 2.
15     MR. MARUNA:  If you don't have it, I'll give you
16 a copy.
17     MR. BRITT:  Yeah, if you can pass me one.
18         (Deposition Exhibit No. 18 was so
19         marked.)
20 BY MR. MARUNA:
21     Q.  Doctor, showing you what we marked as
22 Exhibit 18.  You recognize this type of document?
23     A.  Yes, sir.
24     Q.  What is it?

Saleh Obaisi, M.D., 11/9/17

Page 186

1    A.   Medical Special Services Referral and
2 Report.
3    Q.   Is this you requesting to Wexford to
4 approve outside treatment with a specialist for the
5 patient?
6    A.   Yes.
7    Q.   And this was made the same day as your
8 June 4, 2015, examination; correct?
9    A.   Correct.
10   Q.   What are you requesting from Wexford
11 specifically?
12   A.   Chronic pain of right shoulder.  Referral
13 to ortho.  That's my request.
14   Q.   And below that, does it ask you to provide
15 a basis for why you're seeking to send the patient to
16 UIC?
17   A.   I wrote him a note.  Chronic pain of right
18 shoulder.  Has had four steroid intrajoint injections
19 and couple courses of PT.  Abduction painful.
20   Q.   So your understanding here, based on this
21 note, is that the patient had not responded as you had
22 hoped to the steroid injections; correct?
23   A.   Correct.
24   Q.   And based on what you testified earlier,

Page 187

1 that three-step process, you're now deciding step two
2 has been completed.  Let's move on to step three,
3 referral; correct?
4    A.   Correct.
5    Q.   And, by the way, does Wexford approve him
6 for that referral?
7    A.   Yes.
8    Q.   And we noted earlier that even though
9 Wexford approved him on June 10, 2015, if you look
10 back at IDOC 0001, it's noted on the record that the
11 appointment was not given by UIC until April 15, 2016;
12 correct?
13   A.   Correct.
14   Q.   Now, even though there's a delay of several
15 months between approval and appointment, this inmate's
16 not without treatment during that time; correct?
17   A.   Correct.
18   Q.   He's still at the prison; correct?
19   A.   Correct.
20   Q.   He still can be seen by a medical provider;
21 correct?
22   A.   Correct.
23   Q.   He can put in for sick call; correct?
24   A.   Correct.

Page 188

1    Q.   He's still getting his pain medications;
2 correct?
3    A.   Yes.
4    Q.   In fact, we're trying to get him to be seen
5 by physical therapy during that time as well; correct?
6    A.   Correct.
7    Q.   Now, you don't provide the physical
8 therapy; correct?
9    A.   No, I don't.
10   Q.   You said another gentleman does?
11   A.   Yes.
12   Q.   And he sets his own schedule; is that
13 correct?
14   A.   Correct.
15   Q.   And he makes the assessment on when to see
16 the patients; correct?
17   A.   Yes.
18   Q.   The next note I want to ask you about is --
19 let's turn to -- it's September 16, 2015, at
20 IDOC 1122.
21       MR. MARUNA:  Is that part of yours?
22       MR. BRITT:  Yeah.  It's part of Exhibit 9.
23 BY MR. MARUNA:
24   Q.   All right, Doctor, here you're seeing the

Page 189

1 patient for a complaint of shoulder pain; correct?
2    A.   Correct.
3    Q.   And what do you find objectively?
4    A.   Movement, full range.  Requesting cuffing
5 permit.
6    Q.   What does movement full range tell you?
7    A.   The movement of his right arm is at full
8 range.  That means if he has tendinitis, it's in
9 remission.
10   Q.   So you were asking him to -- are you
11 performing an arc on the shoulder then?
12   A.   Correct.  The best sign is the abduction.
13 That's what you really look at.  You hardly get
14 problem with the abduction subscapularis.
15   Q.   And then we see that he's requesting a
16 cuffing permit; correct?
17   A.   Correct.
18   Q.   Is that the type of permit that we
19 discussed earlier, the waist chain?
20   A.   Yes, sir.
21   Q.   And you inform him that he's not eligible?
22   A.   Correct.
23   Q.   What is the basis as to why he was no
24 longer eligible for that?

Saleh Obaisi, M.D., 11/9/17

---

Page 190

1      A.   Because I don't have really fracture.  I
2  don't have torn tendon.  I don't have something to
3  back up my -- if I want to give him a permit, I have
4  to answer sometimes to the wardens here.  They got a
5  little bit irritated.  There was too much easy policy
6  was followed by the previous physicians and even
7  ourselves we have been doing it.  So the security was
8  in turmoil about this.
9          And we start to -- if we don't have
10 objective evidence to back up the complaint of the
11 patient, we are not going to give for just, I have a
12 pain in my shoulder.  Every one of them.  My elbow.
13 My shoulder.  My wrist.  My finger.  20 years ago I
14 broke my bone.  That is not going to do it.
15     Q.   So the basis for why he's denied the
16 extension of the cuffing permit is that based on your
17 examination on September 16, 2015, there was no
18 objective sign that he needed the permit; correct?
19     A.   Correct.  And I went ahead and refer to PT
20 on the same day.
21     Q.   Next we're going to move to 121, which is
22 November 24th, 2015.  And, Doctor, you see the
23 inmate's coming to you and he's requesting a low bunk
24 because of the pain of his shoulder; correct?

---

Page 191

1      A.   Correct.
2      Q.   And you performed an assessment.  I see the
3  acronym WNL.  What does that stand for?
4      A.   Within normal limit.
5      Q.   So your examination, when he said, I want a
6  low bunk, you tested his shoulder; correct?
7      A.   Correct.
8      Q.   And you objectively found it was within
9  normal limits; correct?
10     A.   Correct.
11     Q.   What do you note about his range of motion?
12     A.   Correct.  That's what I wrote.
13     Q.   Well, you expressly noted --
14     A.   Full range of motion, yeah.
15     Q.   So consistent with your prior examination
16 we just discussed, full range of motion; correct?
17     A.   Correct.
18     Q.   So you inform him he's not eligible for a
19 low bunk; correct?
20     A.   Correct.
21     Q.   Then how does he leave that room, Doctor?
22     A.   He was very angry man.
23     Q.   Why?
24     A.   Because he just would like to have this

---

Page 192

1  privilege.
2      Q.   And, by the way, as of 11-24-15, we already
3  had that UIC approval out there; correct?
4      A.   Yes.
5      Q.   We were just waiting for -- Strike that.
6          You were just waiting for UIC to call the
7  patient; correct?
8      A.   Yes.
9      Q.   Doctor, is impingement syndrome ever an
10 urgent medical need?
11     A.   No.
12     Q.   So for this patient, at any time during
13 your care, did he demonstrate any urgent medical need?
14     A.   No.
15     Q.   I want to direct you to the letter, the
16 July 24th, '13 letter, which I think is --
17         MR. BRITT:  Exhibit 15.
18         MR. MARUNA:  Thank you.  Exhibit 15.
19         MR. BRITT:  This one (indicating)?
20         MR. MARUNA:  No, actually, I want -- we entered
21 the --
22         THE WITNESS:  You mean the e-mail from --
23         MR. MARUNA:  Yeah, the e-mail from Asten
24 Pacellio.  Did we enter that?

---

Page 193

1          MR. BRITT:  No.  Just the letter.
2  BY MR. MARUNA:
3      Q.   Doctor, on 15 we see a record -- a letter
4  dated -- to utilization management dated July 24,
5  2013; correct?
6      A.   Yes.
7      Q.   There's a stamp on that, Received July 29,
8  2013; correct?
9      A.   Yes.
10     Q.   And then I'm going to show you this.
11         (Deposition Exhibit No. 19 was so
12 marked.)
13 BY MR. MARUNA:
14     Q.   This is an e-mail from someone named Asten
15 Pacellio, and it's to Cindy Garcia and Dr. Arthur
16 Funk?
17     A.   Yes.
18     Q.   And someone is asking Cindy Garcia and
19 Dr. Funk to see the letter that was stamped July 29,
20 2013; correct?
21     A.   Yes.
22     Q.   By the way, Doctor, you saw this patient on
23 July 31st, 2013, and gave him a pain injection;
24 correct?

---

Saleh Obaisi, M.D., 11/9/17

Page 194

1    A.   Correct.
2    Q.   So two days later, after Wexford gets the
3 letter, he's getting a pain injection; correct?
4    A.   Yes.
5    MR. BRITT:  Can I just interrupt?  The e-mail,
6 what's the Bates number on that, just so we make sure
7 we have that?
8    MR. MARUNA:  It's Wexford 655, and it bleeds onto
9 657.
10   MR. BRITT:  Thank you.
11 BY MR. MARUNA:
12   Q.   Let's direct you to IDOC 229.
13        (Deposition Exhibit No. 20 was so
14        marked.)
15 BY MR. MARUNA:
16   Q.   Doctor, this is a letter from Louis
17 Shicker, M.D.; correct?
18   A.   Yes.
19   Q.   And I see that you're cc'd on it,
20 Dr. Obaisi, medical director; correct?
21   A.   Probably I never read it.
22   Q.   But you're cc'd on it, and it's dated
23 February 25th, 2014; correct?
24   A.   Yes.

Page 195

1    Q.   Does Dr. Shicker write that he's addressing
2 the inmate's letter to the governor's office regarding
3 his complaint for a shoulder problem that he believed
4 was not adequately addressed with an MRI; correct?
5    A.   Correct.
6    Q.   Dr. Shicker writes, quote, The decision for
7 an MRI is a clinical one and depends on functionality;
8 correct?
9    A.   Correct.
10   Q.   Dr. Obaisi's been following you and
11 treating you symptomatically; correct?
12   A.   Yes.
13   Q.   And should things change, Dr. Obaisi may
14 need to clinically adjust his treatment plan; correct?
15   A.   Yes.
16   Q.   Dr. Shicker agreed with your treatment
17 plan?
18   A.   Of course.
19   Q.   And, by the way, ultimately, you did adjust
20 your treatment plan and sent him out to UIC when he
21 stopped responding to the steroids; correct?
22   A.   Correct.
23   Q.   Counsel asked you at the beginning of the
24 deposition about verbal requests for sick call;

Page 196

1 correct?
2    A.   Yes, sir.
3    Q.   You don't perform sick call; right?
4    A.   No.
5    Q.   You have no clue whether or not sick call
6 requests are made verbally to providers?
7    A.   Correct.
8    Q.   You don't review the sick call requests; do
9 you?
10   A.   No, I don't.
11   Q.   Your expectation is that someone in the
12 chain of command does.  And if it's necessary, they
13 put them on your schedule; correct?
14   A.   Correct.
15   Q.   Counsel asked you some questions about what
16 nurses look for when completing their triage.  You
17 don't perform that triage; correct?
18   A.   No, I don't.
19   Q.   So you were just speculating on what a
20 nurse may look for; correct?
21   A.   Correct.
22   Q.   When you review medical records before
23 treating a patient, you don't review each and every
24 medical record in the patient's chart; correct?

Page 197

1    A.   Correct.
2    Q.   You review the pertinent medical records
3 that you need; correct?
4    A.   Yes.
5    Q.   And that may be one record?  It may be ten
6 records; correct?
7    A.   Correct.
8    Q.   Each situation is different; correct?
9    A.   Yes.
10   Q.   We discussed the patient's reports
11 subjectively in the medical records that he had
12 trouble sleeping; correct?
13   A.   Yes.
14   Q.   Your testimony -- and I want to understand
15 it a bit more.  You said he would only have pain if
16 his arm was located directly above his head based on
17 his claimed injury; correct?
18   A.   Correct.
19   Q.   Or if it was, I guess, extended in a T from
20 the body; right?
21   A.   Correct.
22   Q.   So you said that based on the way his pain
23 would objectively present, based on his injury, it
24 could not impact how a human being would sleep;

Saleh Obaisi, M.D., 11/9/17

Page 198

1    correct?
2        MR. BRITT:  Object to form.
3    BY THE WITNESS:
4        A.    Yes.
5        Q.    So do you find the patient's report that he
6    had difficulty sleeping because of his injury
7    inconsistent with his objectively demonstrated medical
8    symptoms?
9        A.    Correct.
10       Q.    Counsel asked you some questions about no
11   provider available, some of those notes in the record.
12   Do you recall those questions?
13       A.    Yes.
14       Q.    You don't know what that note means
15   specifically; correct?
16       A.    I don't know.
17       Q.    First off, there's multiple providers in
18   the clinic; right?
19       A.    Correct.
20       Q.    And you don't know if you were here that
21   day or not here that day or were on vacation that day;
22   correct?
23       A.    Yes.
24       Q.    And, by the way, at no time was this

Page 199

1    patient without access to medical care during his
2    incarceration at Stateville; correct?
3        A.    Correct.
4        Q.    If the nurses felt he needed something
5    urgently, they can call the on-duty medical doctor;
6    correct?
7        A.    Yes, sir.
8        Q.    By the way, during the interim, if the
9    patient felt he needed treatment, he could put in for
10   sick call and be triaged for that; correct?
11       A.    Correct.
12       Q.    Also, at all times this patient had
13   medication; correct?
14       A.    Yes.
15       Q.    So to the degree that there were any delays
16   in being seen due to no provider available, this
17   patient had access to medical treatment and pain
18   medication; correct?
19       A.    Yes.
20       Q.    Any delay, Doctor -- in your medical
21   opinion, Doctor, any delays that counsel was alluding
22   to earlier, did they worsen the patient's medical
23   conditions?
24       A.    No.

Page 200

1        Q.    Did they cause him any additional pain?
2        A.    No.
3        Q.    Directing you back to Exhibit 7, Doctor.
4    Exhibit 7 is a handwritten note by a nurse dated
5    August 19, 2014; correct?
6        A.    Yes.
7        MR. MARUNA:  It's at Bates IDOC 1019, Jason?
8        MR. BRITT:  Yes.
9    BY MR. MARUNA:
10       Q.    It says, Offender requested to have MRI,
11   surgery on right shoulder, and consult at UIC;
12   correct?
13       A.    Yes.
14       Q.    That's not a doctor saying he needs it.
15   That's the offender saying he wants all that; correct?
16       A.    Correct.
17       Q.    As far as you know, Mr. Hemphill didn't go
18   to medical school; right?
19       A.    Right.
20       Q.    But, yet, he's demanding an MRI, he's
21   demanding surgery, and specifically he wants to go to
22   UIC; correct?
23       A.    Correct.
24       Q.    And it looks like the nurse completes the

Page 201

1    review of his chart; correct?
2        A.    Yes.
3        Q.    She notes that he's been treated multiple
4    times for his right shoulder pain; correct?
5        A.    Yes.
6        Q.    And she notes that there's no pending
7    referral to UIC or MRI order; correct?
8        A.    Correct.
9        Q.    Ultimately, does this provider assess the
10   merit of Mr. Hemphill's request?
11       A.    Correct.
12       Q.    What does she find?
13       A.    No merit.
14       Q.    No merit to his request; correct?
15       A.    Yes.
16       Q.    You looked at this earlier, and you said
17   you had to eventually switch the NSAID medications for
18   the patient because they will develop a tolerance over
19   time; correct?
20       A.    Correct.
21       Q.    And so if I'm understanding what that
22   means, the tolerance will diminish the efficacy of the
23   inflammation reduction over time, unless the
24   medication is switched; correct?

Saleh Obaisi, M.D., 11/9/17

Page 202

1    A.  Yes, sir.
2    Q.  Now, certainly if the patient reports that
3  the medication is resolving his pain, there's no need
4  to switch it; correct?
5    A.  Yes.
6    Q.  However, once he reports that the pain
7  medication isn't working, you will sometimes switch to
8  another NSAID, such as Mobic; correct?
9    A.  Correct.
10    Q.  There's another opportunity that you could
11  change the dosage of the medication rather than
12  switching the medication; correct?
13    A.  Correct.
14    Q.  I'm going to direct you to Exhibit 9,
15  IDOC 101.  We see that's an April 15, 2015, progress
16  note by a nurse; correct?
17    A.  Correct.
18    Q.  The inmate's complaining that he's having
19  shortness of breath; correct?
20    A.  Yes, sir.
21    Q.  Does this nurse take a look at the inmate's
22  vital signs?
23    A.  Yes.
24    Q.  Does she record them in this note?

Page 203

1    A.  Yes.
2    Q.  Is his respiratory rate normal?
3    A.  Correct.
4    Q.  Respiratory rate means how often he's
5  breathing; right?
6    A.  Yes.
7    Q.  And O2 sat, you mentioned that earlier.
8  What is that measuring exactly?
9    A.  The oxygen in the red cells.  98 percent
10  saturation.
11    Q.  So how does oxygen get --
12    A.  That is normal.
13    Q.  We'll get there.  How does the oxygen get
14  into one's blood cells?  Do you have to breathe it in?
15    A.  Breathe it in.
16    Q.  So we see that he's breathing at a normal
17  rate; correct?
18    A.  Yes.
19    Q.  We also see that his O2 saturation is at
20  98 percent; correct?
21    A.  Correct.
22    Q.  That's a normal reading; correct?
23    A.  Yes.
24    Q.  And, by the way, you have to take a reading

Page 204

1  to write 98 percent.  You can't just examine that and
2  write it down; correct?
3    A.  Yes.
4    Q.  You have to actually use a pulse oximeter
5  machine to take that; correct?
6    A.  Correct.
7    Q.  So despite the fact that the patient's
8  telling the nurse he's got shortness of breath, we
9  have two objective medical vital signs recorded here
10  that directly contradict the patient's subjective
11  report; correct?
12    A.  Correct.
13    Q.  Finally, I want to direct you to
14  Exhibit 10, IDOC 128.  That's a February 9th, 2016,
15  medical note; correct?
16    A.  Yes, sir.
17    MR. BRITT:  Hold on.  Which exhibit are we
18  looking at?
19    MR. MARUNA:  I think it's in 10.  I wrote down
20  DOC 128.
21    MR. BRITT:  Hold on a second.  I don't think
22  that's 10.
23    MR. MARUNA:  It's actually probably 12.
24    MR. BRITT:  Yeah.  Exhibit 12.

Page 205

1  BY MR. MARUNA:
2    Q.  Exhibit 12, IDOC 128.  This is a note by
3  LaTonya Williams; correct?
4    A.  Yes.
5    Q.  And we see here that the patient is saying
6  that he has a copy of a document saying that Wexford
7  approved him for an MRI; correct?
8    A.  Yes.
9    Q.  Now, we reviewed the medical records, and
10  the only thing that Wexford approved was an orthopedic
11  referral; correct?
12    A.  Correct.
13    Q.  And that's based on the document we
14  reviewed Bates-stamped IDOC 0001, I believe; correct?
15    A.  Correct.
16    Q.  And you testified, moreover, you would
17  never in your practice refer a patient out for an MRI;
18  correct?
19    A.  Correct.
20    Q.  You refer them to the orthopedic surgeon,
21  and let that person order the MRI; correct?
22    A.  Yes.
23    Q.  And you're the only person at Stateville
24  that can make a referral for a patient; correct?

Saleh Obaisi, M.D., 11/9/17

Page 206

1     A.   Correct.
2     Q.   So when the patient says he's got a report,
3  an actual written document, saying Wexford's giving
4  him an MRI, that cannot be correct; is that correct?
5     A.   Correct.
6     MR. MARUNA:  Nothing further.
7        Michael, do you have anything?
8     MR. STEPHENSON:  I don't have any questions.
9     MR. BRITT:  One quick thing.
10         REDIRECT EXAMINATION
11 BY MR. BRITT:
12    Q.   When someone exhibits full range of motion
13 at a joint, they can still experience pain at that
14 joint; correct?
15    A.   But at the time I did not see him
16 exhibiting any sign of pain.
17    Q.   But someone can exhibit full range of
18 motion while still experiencing pain in that joint;
19 correct?
20    A.   If the patient experiencing pain, he will
21 tell me.  I can't lift it.  It's hurting me.  He will
22 lift his hand all the way and say, I have pain.  How I
23 would know he has pain or no pain if he doesn't tell
24 it.  We have no tool to measure the pain, to diagnose

Page 207

1  the pain.  We depend on the patient complaint, verbal
2  expression of pain.
3     Q.   But is it -- just a yes-or-no proposition.
4  If someone exhibits full range of motion in a joint,
5  they can still experience pain in that joint; correct?
6     A.   It could be very mild.  Very mild.
7  You can you call it discomfort.
8     Q.   But someone -- you know, yes or no -- can
9  still experience pain in the joint, even though they
10 have full range of motion?
11    A.   Yes.
12    MR. BRITT:  That's it.
13    MR. MARUNA:  Doctor, are you waiving today?
14    THE WITNESS:  Forever.
15    THE COURT REPORTER:  Are you ordering this?
16    MR. BRITT:  Yeah.  E-tran.
17    THE COURT REPORTER:  Copy?
18    MR. MARUNA:  E-tran.  Exhibits, too.
19    MR. STEPHENSON:  E-tran for the state defendants
20 as well, please.
21         (Which were all the proceedings
22          had in the above-entitled cause.)
23
24

Page 208

1  UNITED STATES OF AMERICA      )
   NORTHERN DISTRICT OF ILLINOIS )
2  EASTERN DIVISION         ) SS.
3  STATE OF ILLINOIS        )
   COUNTY OF LASALLE        )
4
5     I, KELLY A. SISKA, CSR, RPR, CRI,
6  and Notary Public, do hereby certify that
7  SALEH OBAISI, M.D., was first duly sworn by me to
8  testify the truth, that the above deposition, Page 1
9  through 208, was reported stenographically and reduced
10 to typewriting under my personal direction; and that
11 the foregoing transcript of the said deposition is a
12 true and correct transcript of the testimony given by
13 the said witness at the time and place previously
14 specified.
15    I further certify that I am not counsel for
16 nor in any way related to any of the parties to this
17 suit, nor am I in any way interested in the outcome
18 thereof.
19    IN WITNESS WHEREOF, I do hereunto set my
20 hand and affix my seal this 30th of November, 2017.
21
22
23                    _____
                      KELLY A. SISKA, CSR, RPR, CRI
24                    CSR No. 084-002761

Page 1

1            UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
              CASE NO. 15 cv 4968
3

4

5   CARL HEMPHILL,                      )
                                        )
6           Plaintiff,                  )
                                        )
7      vs.                              )
                                        )
8   WEXFORD HEALTH SOURCES, INC.,       )
    SALEH OBAISI, ANN HUNDLY DAVIS,     )
9   LATONYA WILLIAMS, LOUIS SHICKER,    )
    MICHAEL LEMKE, and DORRETTA         )
10  O'BRIEN,                            )
                                        )
11          Defendants.                 )
    -----------------------------------
12

13

14

15

16

17            DEPOSITION OF ANN DAVIS, M.D.

18                 (Taken by Plaintiff)

19

20             Thursday, December 7, 2017

21

22

23

24             Reported in Stenotype by
                   Jana F. Collins
25    Transcript produced by computer-aided transcription

Exhibit C

Page 2

```
1            APPEARANCES
2  ON BEHALF OF THE PLAINTIFF:
3     JASON P. BRITT, Esquire (Via Videoconference)
       Foley and Lardner, LLP
4      321 North Clark Street, Suite 2800
       Chicago, Illinois 60654
5      (312) 832-4390
6  ON BEHALF OF THE DEFENDANTS, WEXFORD HEALTH
       SOURCES, INC., SALEH OBAISI, ANN HUNDLY DAVIS,
7  and LATONYA WILLIAMS:
8      JAMES F. MARUNA, Esquire
       Cassiday Schade, LLP
9      20 North Wacker Drive, Suite 1000
       Chicago, Illinois 60606
10     (312) 739-3213
11 ON BEHALF OF THE DEFENDANT, MICHAEL LEMKE:
12     MICHAEL STEPHENSON, Esquire (Via Videoconference)
       Assistant Attorney General
13     Office of the Illinois Attorney General
       100 West Randolph Street, 13 Floor
14     Chicago, Illinois 60601
       (312) 814-3700
15
16
17
18
19
20        DEPOSITION OF ANN DAVIS, M.D., a witness
21 called on behalf of Plaintiff, before Jana Collins,
22 Notary Public, in and for the State of North Carolina,
23 at the Regus Offices, 615 Saint George Square Court,
24 Suite 300, Winston-Salem, North Carolina, on Thursday,
25 the 7th day of December, 2017, commencing at 1:18 p.m.
```

Page 3

```
1         INDEX OF EXAMINATIONS
2  BY MR. BRITT. . . . . . . . . . . . . . . PAGE 4
3  BY MR. MARUNA. . . . . . . . . . . . . PAGE 79
4  BY MR. BRITT. . . . . . . . . . . . . . PAGE 98
5  BY MR. STEPHENSON. . . . . . . . . . . . PAGE 99
6
7         INDEX OF EXHIBITS
8  NUMBER     DESCRIPTION          PAGE
9  Exhibit 1  IDOC Offender Outpatient    22
             Progress Notes - Stateville
10           Correctional Center - IDOC 000063
             to IDOC 000064
11
   Exhibit 2  IDOC Offender Outpatient    35
12           Progress Notes - Stateville
             Correctional Center - IDOC 000067
13           to IDOC 000072
14 Exhibit 3  IDOC Offender Outpatient    49
             Progress Notes - Stateville
15           Correctional Center - IDOC 000073
             to IDOC 000077
16
   Exhibit 4  IDOC Offender Outpatient    50
17           Progress Notes - Stateville
             Center - IDOC 000079 to
18           IDOC 000092
19 Exhibit 5  State of Illinois DOC       56
             Prescription Order - IDOC 000389
20           to IDOC 000391
21 Exhibit 6  Galesburg Cottage Hospital  69
             Imaging Report - IDOC 000220 to
22           IDOC 000221
23 Exhibit 7  Wexford Health Sources Medical  74
             Policies and Procedure -
24           WEXFORD 000319
25
```

Page 4

```
1           ANN DAVIS, M.D.
2     having first been duly sworn, was examined
3          and testified as follows:
4            EXAMINATION
5  BY MR. BRITT:
6     Q    Good afternoon, Dr. Davis. Can you please
7  state your name for the record?
8     A    Ann Davis.
9     Q    Okay. And can you just spell that for me,
10 please?
11    A    A-N-N. D-A-V-I-S.
12    Q    Okay. You've been deposed before; is that
13 correct?
14    A    Yes.
15    Q    Okay. So you understand that you're under
16 oath?
17    A    Yes.
18    Q    So just some ground rules that you're probably
19 familiar with is let me know if you don't understand a
20 question. When you, when you answer a question,
21 please do so audibly as the court reporter is taking
22 everything down and she's going to have a hard down
23 with, you know, nods and uh-huh's and things like
24 that. So when you answer, please do so audibly. If
25 you need a break, let me know. The one thing I'll ask
```

Page 5

```
1  is that you please answer any question that's pending
2  before taking that break. Do you understand those
3  ground rules?
4     A    I do.
5     Q    Okay, great. When you -- did you do anything
6  to prepare for this deposition?
7     A    I spoke with my attorney.
8     Q    Okay. Did you speak with anyone else
9  beforehand?
10    A    No.
11    Q    Did you review any documents to prepare for
12 this deposition?
13    A    Yes.
14    Q    Okay. Which documents did you review?
15    A    The medical records and also a couple of other
16 documents that my attorney showed me.
17    Q    Okay. And which medical records did you go
18 over?
19    A    The records from Stateville from the time I was
20 there regarding the inmate in question.
21    Q    Okay. And that would be Mr. Hemphill, right?
22    A    Yes.
23    Q    And you said you reviewed a few other documents
24 as well. Do you remember what those were?
25    A    The answers to interrogatories that I had
```

2 (Pages 2 - 5)

Page 6

1 signed.
2 Q   Okay.  Anything else?
3 A   I --
4      MR. MARUNA:  I'll just tell you so we can
5 speed this up, I showed her the answers to
6 production request and the complaint as well.
7 Q   Okay.  You used to work at Stateville, correct?
8 A   Yes.
9 Q   And what was your position there?
10 A   I was a staff physician.
11 Q   And when did you start working there as a staff
12 physician?
13 A   April of 2013.
14 Q   And how long were you a staff physician there?
15 A   Almost exactly a year.
16 Q   So you left in April 2014?
17 A   Yes, sir.
18 Q   What were your responsibilities as a staff
19 physician at Stateville?
20 A   My primary responsibility was that I was in
21 charge of the chronic care clinics.  So that was the
22 hypertension, diabetes, asthma, and seizure clinics.
23 I also helped with the, with the sick call and
24 assisted the medical director in the infirmary at
25 times.

Page 7

1 Q   And when you say you assisted the medical
2 director in the infirmary, what did that involve?
3 A   The medical director was in charge of the
4 infirmary but on days when he wasn't there or on --
5 sometimes I would do admissions or that kind of thing
6 if we were busy.
7 Q   Okay.  And was Dr. Obaisi the medical director?
8 A   Yes.
9 Q   And he was the medical director the whole time
10 you were there, correct?
11 A   Yes.
12 Q   What were your clinical responsibilities there?
13      MR. MARUNA:  Where?
14      MR. BRITT:  At Stateville.
15 A   I'm sorry.  Could you clarify?
16 Q   Sure.  So when you saw -- well, let me be a
17 little bit more specific.  When you saw inmates at
18 sick call at the infirmary at Stateville, how would
19 you describe your clinical responsibilities at sick
20 call?
21      MR. MARUNA:  Objection.  Foundation, form
22 of the question.  Dr. Davis, you can clarify or --
23 A   Sure.  So sick call in the infirmary were two
24 different, were two different things.  The infirmary
25 is the subacute almost like the hospital part of the

Page 8

1 prison that had to do with the people that were
2 admitted to the infirmary and people who lived there
3 long-term.  Sick call was the, was sort of like an
4 outpatient clinic rather than the inpatient part of
5 it.
6 Q   So when you saw someone at sick call, am I
7 understanding you right that that usually did not
8 happen in the infirmary; is that correct?
9 A   Correct.  That didn't happen in the infirmary.
10 The infirmary was actually a residential part of the
11 prison.  So the people had -- they were, they were
12 celled in the infirmary as opposed to sick call which
13 happened in the healthcare unit.
14 Q   Okay.  So describe what's the difference
15 between the healthcare unit and the infirmary?
16 A   The healthcare unit is like an outpatient
17 clinic.  Well, it's the part of the prison that
18 involves healthcare and so there's an outpatient part
19 of it and kind of an inpatient part of it.  And the
20 inpatient of part of it is what we would call the
21 infirmary.
22 Q   Okay.  So when you saw inmates at, at sick
23 call, what were your responsibilities as a physician
24 covering sick call visits?
25 A   It would be to respond to the concerns that the

Page 9

1 inmate had, the medical issue of the day, whatever it
2 was that they were presenting for.  And to provide or
3 to assess and do a physical exam on a patient and come
4 up with an appropriate first line treatment and
5 prescribe medications, if indicated.
6 Q   Okay.  And did that involve developing
7 treatment plans as well?
8 A   Yes.
9 Q   Did any of your responsibilities as a staff
10 physician change during the time you were stationed at
11 Stateville?
12 A   Could you be a little more specific?  I'm
13 sorry.  I don't quite understand.
14 Q   Sure.  Did any of your job responsibilities
15 change between when you started at Stateville in April
16 of 2013 and when you left in April of 2014?
17 A   Every day was different that I was there
18 because it depended on the needs of the population and
19 the needs of the facility and what was going on.  And
20 so what I did on an individual day would be different.
21 But in terms of my actual job responsibilities, I had
22 the same responsibilities over the time I was there.
23 Q   Okay.  Who assisted you with providing clinical
24 care at Stateville?  Who did you work with to provide
25 medical care?

3 (Pages 6 - 9)

1    A    Sure.  It's, it was a team-based approach.  So
2  from the correctional medical technicians which we
3  called med techs to the LPNs and nurses.  And also we
4  had physician assistants mostly LaTonya Williams
5  during the time that I was there.  And then me and
6  then also Dr. Obaisi, who's the medical director, and
7  then the nursing administration that was there as
8  well.
9    Q    And what -- did Dr. Obaisi have supervisory
10  responsibilities over you?  Did he supervise your
11  work?
12    A    Yes.
13    Q    And did you respond -- I'm sorry.  Did you
14  supervise the other members of the clinical team so
15  the physician's assistants, the nurses, the CMTs?
16    A    Not really.  I -- in terms of -- I wasn't
17  anyone's boss there is the answer to that question.
18  Medically, if they were to come to me with an issue,
19  my medical opinion and decision-making would always
20  supersede theirs.  But in terms of procedurally, I was
21  not, I did not have any direct responsibility for
22  them.
23    Q    In connection with your medical judgment, I
24  mean, did you ever review the medical decisions that
25  other members of the team were making, the nurses, the

1  PAs, the CMTs?
2        MR. MARUNA:  Objection, form.  I think it's
3    kind of a vague question.  Dr. Davis, you can
4    answer if you know or seek clarification.
5    A    I would review the chart and the relevant
6  records and look over the medical decision-making.
7  But it was never my responsibility to, like, do any
8  sort of audit or anything on anybody to make sure that
9  they were doing what they were supposed to be doing.
10  That was Obaisi's job.
11    Q    If you ever, if you disagreed with a course of
12  treatment that a nurse or a PA was putting in place,
13  could you override their medical judgment?
14        MR. MARUNA:  Objection.  Form of the
15    question, foundation as to override medical
16    judgment.  Dr. Davis, you can answer over the
17    objections.
18    A    So my job was to see the patient that was in
19  front of me.  So if I was seeing a patient and
20  evaluating him and I would come up with a plan, that
21  plan may or may not go along with a plan that had been
22  established by a different provider.  But it was my
23  job to see the person who was in front of me and come
24  up with a plan and implement it then.
25    Q    Okay.  Let me step back to, you know, a little

1  bit more background.  Before you started at, at
2  Stateville, what was the last position you had before
3  starting there in April of 2013?
4    A    I worked at Aunt Martha's Youth Service Center
5  as a family medicine doctor.
6    Q    And what kind of practice was that?  Was that a
7  private practice or --
8    A    It was a Federally qualified health center so
9  what we used to call free clinics.
10    Q    And how long were you employed there?
11    A    From December of '11 until I started to work at
12  Stateville.
13    Q    And you practiced family medicine there; is
14  that right?
15    A    Yes.
16    Q    Okay.  And before you were at that position,
17  where were you employed?
18    A    I finished residency in November of, of 2011 at
19  Hinsdale, family medicine residency.
20    Q    Okay.  And how long was that residency for?
21    A    Three years.
22    Q    And is that a family medicine residency?
23    A    Yes.
24    Q    Did you have any other residency or fellowship
25  program that you completed?

1    A    No.
2    Q    And what other medical education did you have?
3    A    I graduated from medical school in 2008.
4    Q    And where did you go to school?
5    A    Eastern Virginia Medical School.
6    Q    Aside from medical school and your residency,
7  have you had any other medical training?
8    A    I've done continuing medical education.
9    Q    Okay.  As required to maintain certification?
10    A    Yes.
11    Q    Okay.  Have you had any training with diagnosis
12  or treatment of orthopedic issues?
13    A    Yes.
14    Q    And what, what training is that?
15    A    It's part of the standard family medicine
16  residency training.
17    Q    And how would you describe that orthopedic
18  training?
19    A    It was, we had discrete rotation in orthopedics
20  and also in sports medicine.  I did sports medicine
21  and orthopedic rotations in medical school and through
22  residency.  And we had a longitudinal didactics
23  curriculum in sports medicine and orthopedics.
24    Q    And how long were those rotations when you went
25  through orthopedics and sports medicine?

4 (Pages 10 - 13)

Page 14

1    A   I don't remember.  In residency, a standard
2  rotation was 4 weeks.  In medical school, it varied.
3  It could have been 6 or 8.  I don't know.
4    Q   Okay.  And how many of those rotations did you
5  have in med school, I mean, more or less?
6    A   I don't remember.  It's part of the standard --
7  like I said, it's part of the standard curriculum for
8  family medicine.
9    Q   Okay.  And do you remember how many of those
10 rotations you had during your residency program?
11   A   No, I don't.
12   Q   Okay.  So you mentioned when you were at
13 Stateville that you had responsibilities for covering
14 sick call on occasion, right?
15   A   Yes.
16   Q   How did inmates go about setting up those sick
17 call visits?
18       MR. MARUNA:  Objection to foundation.  Dr.
19 Davis, if you know, you can answer.
20   A   It was my understanding that they put in a
21 request and then were scheduled.  I didn't have
22 anything to do with the scheduling process.
23   Q   Who did participate in that scheduling process?
24       MR. MARUNA:  Objection, foundation.  Again,
25 Dr. Davis, if you know.

Page 15

1    A   I believe it was the nurses and the, and the
2  med techs.
3    Q   Did you ever see any of those sick call
4  requests that were submitted by inmates?
5    A   No, I didn't.
6    Q   Now the sick call requests could include and
7  generally did include what an inmate was complaining
8  of, right?
9        MR. MARUNA:  Objection, foundation.  I
10 don't think the witness -- the witness just said
11 she hasn't seen those and two, I think I'm going to
12 object to foundation as to -- or form as to vague
13 on that question.  Dr. Davis, you can answer.
14   A   Well, like I said, I didn't really see the, the
15 sick call request forms.  I know that by the time they
16 came to see me on my schedule, the schedule that I was
17 given, it would say what their complaint was for the
18 day.
19   Q   Okay.  And do you know where that information
20 came from?  When you were told what they were coming
21 in for that day, where did that information come from?
22   A   Again, I was told by the nurses.  My assumption
23 is that it came from the inmates to the nurses, but I
24 don't know that for a fact.
25   Q   So did the nurses just tell you verbally when

Page 16

1  you were setting up the appointment why the inmate was
2  there?  Is that how that worked?
3        MR. MARUNA:  Objection.  Foundation that
4  Dr. Davis sets up the appointment.  Dr. Davis, over
5  the objections, you may answer.
6    A   I was given a schedule.  There was a scheduling
7  book wherein it was the schedule of patients that were
8  on for the day were listed and it said what their
9  complaint was.  So it was in writing.  I never -- that
10 wasn't a verbal communication.
11   Q   Before you saw a patient during sick call, did
12 you review their medical records?
13   A   Yes.
14   Q   Okay.  And why did you review their medical
15 records?
16   A   To have the information I needed going into an
17 encounter.
18   Q   And why do you need information from the
19 medical records to conduct the encounter?
20   A   It saves time.  Oftentimes and this is true
21 whether it's a correctional medicine setting or just
22 an outpatient medicine setting.  Very commonly a
23 patient will come in and say something like, well, he
24 gave me a pill.  Well, I'd like to be able to look at
25 the medical record and know what pill that was.  And

Page 17

1  so being able to correlate the history that the
2  patient is giving me with what medically has been done
3  again, saves time and adds clarity.
4    Q   Okay.  So that allows you to review the
5  patient's prescription record as part of that process?
6    A   I'm sorry.  I didn't hear you.
7    Q   Yeah.  So reviewing the medical record allows
8  you to review the patient's prescription record before
9  seeing them, that's part of the record you review?
10       MR. MARUNA:  Objection.  Foundation,
11 mischaracterizes the witness's testimony.  Dr.
12 Davis.
13   A   I -- not necessarily the prescription record.
14 An institutional setting is a little bit different
15 than an outpatient medical setting in that the
16 prescription record -- there's, there's a pharmacy
17 part of it and then there's also a medical part of it.
18 What I would be reviewing is the treatment plans that
19 are documented in the, in the chart and part of that
20 is medication, but there's other parts of that as
21 well.
22   Q   Okay.  You certainly have the history of the
23 inmate's visits, right?
24       MR. MARUNA:  Objection.  Form of the
25 question, vague, and on foundation.  Dr. Davis.

Page 18

1   A   I would have the history of the visits that
2 were documented in the chart, yes.
3   Q   Okay. And that would include treatment plans
4 that were made during those visits; is that correct?
5   A   They should, yes.
6   Q   As well as I would imagine the complaints that
7 the inmate had that led to those visits?
8   A   A standard progress note has a subjective,
9 objective, assessment, and plan portion. We call them
10 SOAP notes. So subjective is what the inmate says.
11 Objective is what I observe. Assessment is my medical
12 judgment and plan is what my plan is.
13   Q   Okay.
14   A   Again, that's a physician's note. Nursing
15 notes, they have slightly different documentation
16 standards.
17   Q   When you were at Stateville, who, who employed
18 you?
19   A   Wexford.
20   Q   Is that Wexford Health Sources?
21   A   Yes.
22   Q   Can you tell me what is your understanding of
23 Wexford's role in providing medical care to inmates at
24 Stateville?
25   A   It's my understanding that Wexford's job was to

Page 19

1 provide the medical care for the patients at
2 Stateville with the exception of HIV care while
3 working with the State.
4   Q   And in terms of medical care, how would you
5 describe which responsibilities fell on the State and
6 which ones fell to Wexford?
7       MR. MARUNA: Object to foundation. Dr.
8   Davis, you can answer if you know.
9       MR. STEPHENSON: Join.
10   A   I know that some of the people were employed by
11 the State and some of the people were employed by
12 Wexford. I'm not exactly sure what the relationship
13 was there. I know I was employed by Wexford. And I
14 know all the security personnel were employed by the
15 State. And some of the nurses were State and some
16 were Wexford and I'm not sure. It would have been in
17 the institutional directives.
18   Q   Okay. When you were providing medical care to
19 inmates at Stateville, were there any policies issued
20 by Wexford or by IDOC that you had to follow?
21       MR. MARUNA: Objection to the compound
22   nature of the question. Would you mind breaking
23   that up, Counsel?
24   Q   Sure. So when you were providing medical care
25 to inmates at Stateville, were there any policies

Page 20

1 issued by IDOC that you had to follow in providing
2 that care?
3   A   Absolutely. The institutional directives and
4 the administrative directives of the prison. I mean,
5 prison is about following rules. You had to follow
6 the rules. That doesn't mean that supersedes my
7 medical judgment. But if I thought that a correct
8 medical treatment was something that wasn't going to
9 work in the correctional setting, then that would have
10 been, that wouldn't have been okay in that situation.
11   Q   What do you mean by that?
12   A   An example would be -- I mean, there's certain
13 things that are safe in the outpatient setting that
14 aren't safe in the correctional setting and in terms
15 of medication, I guess. I don't know. I'm having a
16 difficult time characterizing it. What I'm trying to
17 say is that there are rules that I had to follow but
18 they didn't supersede my medical judgment.
19   Q   So if your medical judgment conflicted with an
20 ID or an AD, would your medical judgment control?
21   A   No. Because safety is still the number 1
22 priority. An example is, like, a mass casualty
23 situation. If someone is bleeding in prison, it would
24 not be my job to run over and put pressure on the
25 wound. It would be my job to wait and let a security

Page 21

1 person tell me it was okay to do that. That doesn't
2 mean that that's necessarily superseding my medical
3 judgment. It just means you have to follow the rules
4 of the situation that you're in.
5   Q   Are there any concerns other than safety that
6 would permit your medical judgment to be overruled by
7 an ID or an AD?
8       MR. MARUNA: Objection to foundation to
9   medical judgments overruled. Dr. Davis, you can
10   answer.
11   A   No matter what setting you're in as a doctor,
12 you're making decisions based on the rules of the
13 environment that are around. And so it's just that
14 it's -- I was following a different set of rules when
15 I was working in the prison. An example would be
16 marijuana. Suppose I had -- I have now moved to North
17 Carolina. I used to live in Illinois. Suppose I was
18 somebody who prescribed medical marijuana for glaucoma
19 in Illinois. I can't do that in          . Does
20 that mean the laws in          are superseding
21 my medical judgment? Not really. What that means is
22 that there's different rules for different scenarios.
23   Q   Okay. Do you remember providing medical
24 treatment to the Plaintiff in this case, Carl
25 Hemphill?

6 (Pages 18 - 21)

Page 22

1    A   No, I don't.
2        MR. MARUNA:  Actually, before we continue,
3    I think Dr. Davis had given in the answer revealed
4    that she lives in a -- what state she lives in now.
5    For security reasons, do you have a problem if I
6    redact that before this exhibit would be filed
7    anywhere, this deposition transcript?
8        MR. BRITT:  We can certainly regard that
9    portion of the transcript as confidential.
10       MR. MARUNA:  Right, yeah.  I just want to
11   blackout the state that she lives in now just for
12   security reasons, obviously.  Thank you.
13       MR. BRITT:  Yeah, that's fine.  Okay.  If
14   we can step off record for just a moment.
15       (DISCUSSION OFF THE RECORD)
16       MR. BRITT:  We can go back on.
17   Q   I'm going to have you bring up what will be
18   marked as Exhibit 1 and that's the document that
19   starts with IDOC 63.  Can you tell me what that is?
20       MR. MARUNA:  Hold on.  We've got to fish
21   through.  I've got a document beginning 63 and
22   ending 64.  Is that what you're referencing?
23       MR. BRITT:  Yes, that's correct.
24       MR. MARUNA:  Okay.  So this will be 1.
25       (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION)

Page 23

1    Q   Can you tell me what that document is once you
2    have had a moment to review?
3    A   Are you speaking to me?
4    Q   Yeah.  I was asking if you could tell me what
5    those records are?
6    A   Sure.  So this is the, this is a part of an
7    inmate's chart from Stateville, Mr. Hemphill's chart.
8    Q   Are these the kinds of medical records that we
9    were talking about a moment ago that document visits?
10   A   Yes.
11   Q   Okay.  And I think we covered this a little
12   bit, but I just want to make sure I'm clear.  Looking
13   at the, you know, toward the top of this document, I
14   see Subjective, Objective, Assessment and then off to
15   the right Plans.  Can you tell me what that means?
16       MR. MARUNA:  Objection.  Asked and
17   answered.  Dr. Davis, you can explain again.
18   A   Yes.  That's the, the way that these progress
19   notes are set up to contain the standard doctor's
20   progress notes which is what I was talking about
21   earlier.
22   Q   Okay.  And what does subjective mean?
23       MR. MARUNA:  Objection.  Asked and
24   answered.  Dr. Davis, you can explain again.
25   A   It's that which the inmate tells us or that

Page 24

1    which the patient tells us.
2    Q   And anything else that would be included with
3    that?
4        MR. MARUNA:  Objection.  Vague.
5    A   Not typically.  It depends a little bit.  Every
6    person has a different style of documentation.
7    Q   But generally speaking, the subjective is just
8    what the inmate tells you about, about their condition
9    and why they're there?
10   A   It's the subjective information.  So that isn't
11   always from the patient themselves.  Sometimes it's
12   from someone else.  It could be, in the outpatient
13   practice, it could be what a parent says about a
14   child.  In inpatient medicine, it could be what a
15   nurse says about how a patient was overnight.  In the
16   correctional setting, it could be what an officer told
17   you or what a nurse told had you.  But it's subjective
18   information coming from a source that isn't the
19   doctor, usually the patient.
20   Q   And what is the objective portion of that?
21   A   It's a physical exam.
22   Q   Is there any other source of information that
23   would be used for the objective portion of this form?
24   A   Sometimes lab work and x-rays and that kind of
25   thing could be there but not always and usually not

Page 25

1    for an initial visit.
2    Q   Any other kinds of information that would be
3    included under objective?
4    A   Not typically.  Nothing I can think of.
5    Q   And then what's the assessment portion?
6    A   That's the, it's either documentation of the
7    decision-making process or just the documentation of
8    the diagnosis depending on, depending on the person.
9    It just depends a little bit on style of
10   documentation.
11   Q   Okay.  Is there anything other than the
12   doctor's or the clinician's decision-making process or
13   diagnosis that would be included with that or is that
14   everything?
15   A   I think that's everything.
16   Q   And then plans, what gets, what gets included
17   under plans?
18   A   Sure.  A plan is a plan of treatment.  It can
19   be orders.  So as a doctor, it's what I'm telling the
20   nurses to do.  It can also be like what the -- patient
21   education, what it is that we discussed with the
22   patient, that kind of thing which is also the plan of
23   treatment.
24   Q   And do the plan notes reflect input from the
25   patient in their planned course of treatment?

7 (Pages 22 - 25)

Page 26

1  A  I don't understand.
2  Q  Sure.  When you're coming up with a plan of
3  treatment that gets reflected on these notes, does
4  that take into account, you know, any kind of
5  discussion or requests from the patient for how they
6  want their treatment to proceed?
7  A  It's a documentation plan, it's a documentation of
8  the medical treatment plan.  There's this idea of
9  shared medical decision-making where the doctor or the
10  clinician works together with the patient to come up
11  with a plan.  Some doctors use that model more than
12  others.  It just depends on the clinician.  It's
13  certainly not to do with patient requests but should
14  the patients be part of their -- it's the plan of
15  treatment that the doctor comes up with.  Is part of
16  that decision-making done with the patient?  Yes or
17  no.  It depends on the situation.  It depends on the
18  doctor.
19  Q  If the patient says that they want a certain
20  course of treatment and the doctor disagrees and says
21  that's not what we're doing, would the patient's
22  request be noted in the plan section of these records?
23  A  That's a very strange question.  No, I don't
24  think that would be in the plan.  Now that might be in
25  the assessment or in the subjective.  I'm, I'm kind of

Page 27

1  trying to think of an example that might help to
2  clarify that.  A subjective complaint might be Doctor,
3  I need labs or Doctor, I need blah, blah, blah.
4      THE WITNESS:  I'm sorry, court reporter.  I
5  don't know how to say that.
6      MR. MARUNA:  B-L-U-H.  B-L-U-H.
7  A  But the, the plan is that which is going to
8  happen or that which the doctor is implementing.  In
9  the assessment, you could document the patient thinks
10  that he needs this lab test, but here's why it's not
11  indicated.  But that wouldn't necessarily have to be
12  included.
13  Q  Okay.  So looking at this Exhibit 1 that's
14  before you, looking at this first set of
15  notes, do you know who took or -- let me backup.  This
16  reflects a visit on February 1, 2013, correct?
17      MR. MARUNA:  Objection, foundation.  Dr.
18  Davis, you can answer.
19  A  That is a note from a med tech.  I don't know
20  whether or not it documents a visit.  That might just
21  be chart review.  I don't know.  Also, that's before I
22  started at Stateville.
23  Q  Okay.  But that February 1 note does reflect a
24  complaint of shoulder pain; is that correct?
25      MR. MARUNA:  Objection to foundation.  Dr.

Page 28

1  Davis, you may answer.
2  A  Yes, it, it represents a complaint.
3  Q  Okay.  Of right shoulder pain?
4      MR. MARUNA:  Same objection.  Dr. Davis.
5  A  Yes.
6  Q  Do you know who made that note?
7  A  It's, it's a CMT.  I can't read the signature.
8  Q  Okay.  And based on this record, do you know
9  what action was taken at that time?
10      MR. MARUNA:  Objection, foundation.
11  A  It looks like the inmate was given Tylenol to
12  treat his pain and he was scheduled for a sick call.
13  Q  Okay.  And moving down the page, there's a note
14  and it looks like that's for February 15, 2013.  Do
15  you see that?
16  A  Yes, I do.
17  Q  Okay.  And is that a note from a sick call
18  encounter?
19  A  Yes.
20  Q  Okay.  And do you know whose notes those are?
21  A  That's Miss Williams, our PA.
22  Q  And would she have been the one who saw Mr.
23  Hemphill on that date?
24  A  It certainly looks like it.  Again, this is
25  before I started at Stateville.

Page 29

1  Q  Okay.  And based on the record and, you know, I
2  understand this is before you started but based on the
3  record, Mr. Hemphill is again complaining of that
4  right shoulder pain, correct?
5      MR. MARUNA:  Objection to foundation.  Dr.
6  Davis, you can read the note.
7  A  I don't know that I would say he's again
8  complaining of it.  This is the first time he's been
9  evaluated by a provider for it according to these
10  notes.
11  Q  Okay.  Based on this record, what action was
12  taken in response to his complaint of shoulder pain?
13  A  She wrote for him to have ice twice a day for a
14  month which a strong inflammatory treatment and
15  analgesic balm which again is a topical
16  anti-inflammatory.  She also gave him a higher dose of
17  Tylenol and said to come back to clinic in about 6
18  weeks.  She also says that she educated him and
19  reassured him.
20  Q  Okay.  And when you see reassurance on, you
21  know, a plan, on the plan section of a medical record
22  like this, what does that mean?
23  A  That typically means a reassurance that this is
24  not an acute condition that requires hospitalization.
25  Q  Okay.  And was there any diagnosis made at this

8 (Pages 26 - 29)

Page 30

1 time based on this record?
2     A   The -- she put alteration and comfort of right
3 shoulder and also probable bursitis.
4     Q   Okay.  You know, what does, what is bursitis?
5     A   A bursa is a sac of fluid that cushions bones
6 or joints from the skin.  Bursitis of the shoulder is
7 usually in the acromioclavicular space.  There is a
8 bursa that sits there that can get inflamed and
9 irritated and very commonly causes pain and discomfort
10 chronically.
11     Q   And what's a, you know, what's a course of
12 treatment that's typically or -- let me backup.  What
13 course of treatment would you recommend for bursitis?
14         MR. MARUNA:  Objection.  Foundation, form
15     of the question, incomplete hypothetical, and
16     assumes facts not in evidence.  Over those
17     objections, Dr. Davis, you can answer or seek
18     clarification.
19     A   Topical anti-inflammatories and patient
20 education are the number 1 things.
21     Q   And are there cases of bursitis where
22 anti-inflammatory drugs do not relieve the pain?
23         MR. MARUNA:  In the whole history of the
24     universe?
25     Q   There are cases of bursitis where

Page 31

1 anti-inflammatory drugs do not relieve the pain,
2 correct?  In some cases, anti-inflammatory drugs don't
3 relieve the pain?
4     A   In -- in general the way that we approach any
5 kind of an orthopedic complaint whether it's in prison
6 or outpatient medicine or whatever is that you treat
7 it as noninvasively as possible, as conservatively as
8 possible.  And then reassess after a certain amount of
9 time and then make the decision based on that.
10    Q   Okay.  So to apply that general approach to
11 this, you would start with anti-inflammatory drugs as a
12 noninvasive course of treatment and follow-up after a
13 certain period of time to see how that's working; is
14 that correct?
15        MR. MARUNA:  Objection.  Foundation,
16     mischaracterizes the witness's testimony.  It's an
17     incomplete hypothetical and it assumes facts that
18     are not in evidence.  Dr. Davis, over the
19     objections.
20    A   I would say anti-inflammatory measures.  That
21 wouldn't necessarily be medications.  Ice is an
22 anti-inflammatory.  Rest is an anti-inflammatory.  And
23 so it's anti-inflammatory measures, yes.  Drugs not
24 necessarily.
25    Q   Okay.  And for bursitis, if, if those

Page 32

1 anti-inflammatory measures that you just discussed are
2 not working, how long would you attempt them before
3 trying an alternative course of treatment?
4         MR. MARUNA:  Objection.  Foundation, form
5     of the question.  It's an incomplete hypothetical
6     and it assumes facts that aren't in evidence.  Dr.
7     Davis, over the objections, you can answer or seek
8     clarification.
9     A   That depends on an awful lot of things.  That
10 depends on the patient's function, how much it's
11 impairing their life.  It depends on what kind of a
12 thing that they do.  If they're a major league
13 pitcher, that's going to have a different implication
14 than if they're an office worker.  It depends on the
15 general health of the person.  There's a lot, there's
16 a lot that goes into it.
17    Q   Let me have you turn to the next page of that
18 Exhibit 1.
19        MR. MARUNA:  And that's IDOC 64, Counsel?
20        MR. BRITT:  Yes.
21        MR. MARUNA:  Thank you.
22 BY MR. BRITT:
23    Q   This is a note from April 11, 2013, correct?
24    A   Yes.
25    Q   And whose notes are these?

Page 33

1     A   Mine.
2     Q   Okay.  Does this reflect an encounter that you
3 had with Mr. Hemphill on April 11, 2013?
4     A   Yes.
5     Q   Do you know is that the first time that you
6 personally encountered Mr. Hemphill?
7     A   If this is my first note in the chart, then it
8 is.
9     Q   And did he complain of shoulder pain during
10 that encounter?
11    A   No.  So I'm sorry.  I need to clarify one of
12 the answers I gave earlier.  When I was talking about
13 MD sick call, there's actually two different kinds of
14 responsibilities that I would have.  One would be to
15 see the patients that were scheduled for MD sick call
16 that were on that schedule that we talked about in the
17 scheduling book.  The other would be to respond to
18 emergencies.  And this is a note wherein I was
19 responding to an emergency.  The patient had had an
20 injury and they were brought to me for evaluation.
21    Q   Okay.  So this is a result of an emergency
22 encounter then?
23    A   Yes.
24    Q   Okay.  And was there any complaint regarding
25 his shoulder at that time?

9 (Pages 30 - 33)

Page 34

1     A    No.
2     Q    Okay.  And let me just ask if you can review
3  the Plan section of that record?
4     A    Yes.
5     Q    Does that indicate that there's a follow-up for
6  shoulder treatment?
7     A    Yes.  What I said was that he needed to keep
8  his appointment that had already been scheduled for
9  his shoulder.
10    Q    Okay.  Do you remember if he had any further
11 complaint about his shoulder on April 11?
12         MR. MARUNA:  Objection to foundation that
13    he had any complaint of his shoulder on April 11.
14    Dr. Davis, you can answer.
15    A    So I don't remember him at all.  And as I'm
16 looking at this note, the other thing is just the way
17 that it's laid out, I have A/P written at the bottom
18 which means that I actually started my plan at the
19 bottom of that note and then continued it in the Plans
20 column.  I'm sorry if that's confusing for
21 documentation.  But under that A/P so Assessment/
22 Plan, I said right hand trauma, x-ray negative per
23 verbal report.  Continue Motrin and ice.  Return to
24 clinic for, in one week to follow-up on shoulder.  So
25 we had already looked at an x-ray.  It was normal.

Page 35

1  Continue with the ice and the Motrin and just come
2  back for your shoulder.
3     Q    Okay.  So no further treatment or really
4  assessment was provided for his shoulder at that time,
5  correct?
6     A    Correct.  Because what I was doing was
7  evaluating his hand.
8     Q    Sure.  Let's turn to what will be Exhibit 2 and
9  this will be the document that starts with IDOC 67.
10 The last page of that should be 72.
11         (EXHIBIT 2 WAS MARKED FOR IDENTIFICATION)
12    Q    And can you tell me what those records are?
13    A    Again, it's medical records from Mr. Hemphill
14 at Stateville starting on April 19th of 2013.
15    Q    And looking at that first page that has the
16 April 19 note there, whose, whose notes are those?
17    A    Mine.
18    Q    Okay.  And what was the purpose of that visit
19 on April 19?
20    A    That's the follow-up on his shoulder.
21    Q    Okay.  And what were your findings during that
22 visit?
23    A    I found that he had tenderness over his right
24 acromioclavicular joint.  Pain with external and
25 internal rotation of the shoulder.  He had a full

Page 36

1  passive range of motion and his active range of motion
2  was limited by pain and that his left shoulder was
3  normal.  Also, that his right AC joint felt boggy.
4     Q    And so let's walk through those.  When you say,
5  you know, there's a passive active range of motion,
6  what does that mean?
7     A    That means that I could move his shoulder
8  through all of its range of motion.  But when he tried
9  to do it, it hurt so he stopped.
10    Q    Okay.  Did you find his complaints of pain
11 credible?
12         MR. MARUNA:  Objection to form.  Credible
13    being a medical term.  Dr. Davis, you can answer or
14    seek clarification.
15    A    Yeah, I'm sorry.  I don't really know what you
16 mean by that.
17    Q    Yeah.  Let me rephrase.  Did you believe him
18 when he said that his shoulder hurt when he tried to
19 move it?
20    A    Absolutely.
21    Q    And is it consistent with some kind of
22 orthopedic injury for you to be able to move his arm
23 through its full range of motion, but he would not be
24 able to due to pain?
25    A    Yes.  You see that in any number of

Page 37

1  inflammatory conditions especially a tendonitis or a
2  bursitis.
3     Q    Okay.  And when you say his right AC joint felt
4  boggy, what does that mean?
5     A    It -- it means that the tissue texture felt
6  different than a normal AC joint does.  It's not a
7  very specific term.  It's not the most precise of
8  documentation.  But it, I can tell you that when I
9  would use that in a note would be that I was implying
10 inflammation without distinct joint deformity.
11    Q    So when we see boggy in your notes, you're
12 thinking inflammation?
13    A    Typically.
14    Q    And you've got a note it looks like next to the
15 letter A, that's for assessment; is that correct?
16    A    Yes.
17    Q    And what is your assessment of Mr. Hemphill
18 during this visit?
19    A    Right rotator cuff impingement and bursitis.
20    Q    And we talked a little bit about what bursitis
21 means.  What do you mean by right rotator cuff
22 impingement?
23    A    So the bursa again sits in that
24 acromioclavicular space.  And when it starts to
25 impinge the tendons, so there's a swollen sac of fluid

10 (Pages 34 - 37)

Page 38

1 there that's sitting next to the tendon. So when the
2 tendon moves, it hits that, it hits that bursa and it
3 hurts. So the bursitis means that it's swollen and
4 then the impingement means and it's poking the tendon.
5 So the tendons are poking it.
6     Q   Okay. And you know, we discussed a little bit
7 how you would typically begin treatment of bursitis.
8 Does that treatment plan change when you see right
9 rotator cuff impingement with that?
10     A   Not necessarily. It -- the treatment plan is
11 mostly different because of the time course, because
12 it's been a while now. It's not just a couple of
13 weeks of this. It's been for a couple months. So
14 it's not necessarily the tendon impingement that's the
15 issue. It's the time course and that he said that it
16 didn't get any better with Motrin.
17     Q   Okay. And so what further action did you take
18 at this point?
19     A   I prescribed a stronger anti-inflammatory
20 medicine. So rather than just the topicals that he
21 was on, I gave him a scheduled Naproxen dose which
22 means he would not just take it as he needed it, but
23 take it twice a day, scheduled. Also, I scheduled him
24 to have an injection of his right AC joint with Dr.
25 Obaisi or asked the nurses to schedule him. I didn't

Page 39

1 do Obaisi's schedule.
2     Q   And Naproxen, that's a, that's the same as
3 Aleve, correct?
4     A   It's a prescription strength. It's stronger
5 than over-the-counter Aleve.
6     Q   But it's the same active ingredient, correct?
7     A   Yes.
8     Q   Okay. And when you say you scheduled an
9 injection with Dr. Obaisi, what, what injection are
10 you referring to there?
11     A   A steroid injection.
12     Q   Okay.
13     A   Again, that would be an anti-inflammatory
14 treatment.
15     Q   Okay. So the steroid acts as a further
16 anti-inflammatory; is that correct?
17     A   Yes.
18     Q   And so is the steroid considered to be a
19 stronger or more aggressive course of treatment than
20 the Naproxen?
21     A   It's more invasive because it's a needle. So
22 any time you're, you're going -- so the least invasive
23 treatment would be a topical like the analgesic balm
24 and then you go to an oral medication which is
25 slightly more invasive. And then you would go to an

Page 40

1 injection which is more invasive than that.
2     Q   And why did you move ahead with the injection
3 at this point?
4     A   Because he had had several months of pain and
5 he said it wasn't getting better on the medicine.
6     Q   And the note is that or under Plans, it
7 reflects that he is supposed to be seen on April 23,
8 correct?
9         MR. MARUNA: Objection to foundation.
10     A   I, I wrote that. I can tell you that I didn't
11 actually have that power when I was at Stateville. It
12 wasn't my job to schedule people. I'm sure that what
13 happened -- well, I can't say that I'm sure what
14 happened but what probably happened is I verbally said
15 to the nurse schedule him for an injection. And then
16 the nurse scheduled him and then said, okay. It will
17 be on this day. I wasn't prescribing that it had to
18 happen on that day. Again, it wasn't my job to
19 schedule.
20     Q   Okay. So you think it's most likely the nurse
21 provided that date to you?
22     A   Almost certainly because again, I didn't do any
23 of Dr. Obaisi's scheduling or Dr. Obaisi might have.
24 It was either him or one of the nurses.
25     Q   Okay. And now turning to the next page of that

Page 41

1 Exhibit 2 --
2         MR. MARUNA: So we've been running for
3 about an hour here. Why don't we take a 5-minute
4 break?
5         MR. BRITT: Yeah, that's fine.
6         MR. MARUNA: All right. Let's go off the
7 record, please.
8         (RECESS TAKEN)
9         MR. BRITT: Go back on.
10     Q   All right. Dr. Davis, if I can have you turn
11 to the second page of that Exhibit 2.
12     A   Is that the one that's labeled 69 at the
13 bottom?
14     Q   I believe it's 68. That's the page I'm looking
15 at.
16     A   Okay, I've got it. Thank you.
17     Q   Great. Was Mr. Hemphill seen on April 23,
18 2013?
19         MR. MARUNA: Objection to foundation. Dr.
20 Davis, you can answer over the objection.
21     A   No, he wasn't.
22     Q   And it says due to no provider, correct?
23     A   Correct.
24     Q   What does that mean, not seen due to no
25 provider?

11 (Pages 38 - 41)

1    A   It means that for whatever reason Dr. Obaisi
2  wasn't there to see him that day.
3    Q   Okay.  Does that mean you were unavailable as
4  well?
5    A   Not necessarily especially because it was an
6  injection he was scheduled for and I didn't do
7  injections.
8    Q   So was Dr. Obaisi the only person who was
9  qualified to do that injection at Stateville?
10   A   I don't know the answer to that.  I don't know
11 whether or not Miss Williams did injections or not.  I
12 just know I didn't.
13   Q   And so looking through those notes, he was not
14 seen after that until May 31, 2013, correct?
15       MR. MARUNA:  Objection, foundation.  Dr.
16   Davis, you can answer if you know.
17   A   I can't tell whether or not he was seen that
18 day.  Again, that's one of those CMT notes that
19 doesn't necessarily indicate that he was seen, but I
20 don't see a provider note in there but that -- I
21 certainly don't remember.
22   Q   Okay.  So there's nothing in the records that
23 indicates he was seen between April 23rd and May 31st?
24       MR. MARUNA:  Based on the record that
25   you've provided the witness?

1        MR. BRITT:  Based on this record.
2    A   On this sheet of paper, there's a note on the
3  23rd and then there's a note on May 31st.  I don't
4  have record of any other visits, but I'm not looking
5  at his entire, his complete medical record either.
6    Q   Well, let me just ask you.  On this May 31
7  note, you mentioned that was a note by a CMT, correct?
8    A   Correct.
9    Q   And do you know who that is?
10   A   Looks like Nagpaul.
11   Q   I'm sorry?
12   A   Looks like Nagpaul.
13   Q   Is that someone that you know there?
14   A   Vaguely.  It's been a few years.  I remember
15 there being several CMTs.
16   Q   Okay.  And in this note, the CMT is noting that
17 Mr. Hemphill is continuing to complain of shoulder
18 pain, correct?
19   A   Yes.
20   Q   And that the pain is severe enough that Mr.
21 Hemphill is complaining he can't sleep?
22       MR. MARUNA:  Objection to foundation that
23   the pain was severe enough that he can't sleep.
24   Mischaracterizes the record.
25   A   The CMT wrote SR.  So that's self-reported.  So

1  that means that the inmate said right shoulder pain,
2  up arrow, I'm assuming that means increased, can't
3  sleep because of pain.  So what he said is that's what
4  the inmate said.
5    Q   Is there anything in this report or anything
6  else you're aware of that would cause you to
7  disbelieve that self-report?
8        MR. MARUNA:  Objection to the form of the
9    question, the term disbelieve.  Dr. Davis, you may
10   answer over the objection.
11   A   That's not really my job.  So the only time
12 that I would ever look at an inmate's chart was when
13 the inmate was in front of me and I was evaluating
14 them.  So when somebody is sitting there talking to me
15 and saying, you know, this hurts really badly or
16 whatever it is, I -- part of my assessment and plan is
17 does this person's subjective complaint mesh with the
18 objective picture that I'm seeing.  If I'm not the
19 provider that's evaluating the person right then, I
20 have no basis to make that, to make that call.
21   Q   Okay.  Well, let me just ask with, with rotator
22 cuff impingement with bursitis, is that a condition
23 that can cause enough pain that it would interfere
24 with someone's sleep?
25   A   That's a very subjective question.  Any amount

1  of pain can cause sleep impairment in some people.
2  And severe pain doesn't cause sleep impairment in
3  other people.  So that's -- one of the things that can
4  come with any degree of pain is sleep impairment.
5    Q   And what sort of plan was put in place at this
6  May 31 visit according to these records?
7        MR. MARUNA:  Again, you're just asking the
8    witness to read someone else's medical record at
9    this time?
10   Q   Sure.  And based on her reading, is there any
11 further plan that's implemented at this point?
12   A   It looks like the patient was scheduled to see
13 the doctor in the healthcare unit.
14   Q   And to continue taking the pain medicines that
15 he was already on?
16   A   Well, it says take pain meds as directed.  I
17 don't know whether or not he was taking them as
18 directed before.
19   Q   Okay.  Now let me skip down to the next page
20 and this does have IDOC 69 at the bottom.  At the top
21 of that, there's a note from June 4, 2013, correct?
22   A   Correct.
23   Q   And do you know who, whose note this is?
24   A   It's a nursing note.  I can't read the
25 signature.

Page 46

1 Q Okay. And this note indicates that the nurse,
2 whoever it was, spoke with you; is that correct?
3 A Yes.
4 Q Do you remember that, anything about that
5 conversation?
6 A No. As I said before, I don't remember
7 anything about Mr. Hemphill.
8 Q Okay. And certainly based on this note, it
9 doesn't seem any further assessment or plan was
10 developed based on your conversation with the nurse on
11 June 4, 2013; is that correct?
12 MR. MARUNA: Objection. Foundation,
13 mischaracterizes the note. You can answer, Dr.
14 Davis.
15 A The plan was for him to see Dr. Obaisi.
16 Q Okay. But no further assessment or treatment
17 was made at that time, correct?
18 MR. MARUNA: Objection to foundation.
19 Mischaracterizes the record. Dr. Davis, you may
20 answer.
21 A I didn't see the patient.
22 Q Okay. And because you didn't see the patient,
23 you didn't make any further assessment of his
24 condition, correct?
25 MR. MARUNA: Objection to the form of the

Page 47

1 question, further assessment, and foundation that
2 she saw the patient this day to make an initial
3 assessment from which there could become a further
4 assessment. But over the objections, Dr. Davis.
5 A I had already seen the patient and the plan
6 that I had recommended was an injection or to be
7 evaluated for an injection which is not something that
8 I did. And so in order to be evaluated for the
9 injection, he needed to be seen by Dr. Obaisi. So
10 what I was saying by saying rescheduled per Dr. Davis
11 probably what that was me saying this isn't an
12 emergency. He doesn't need to go to the hospital
13 right now. We need to reschedule him to see Dr.
14 Obaisi. I didn't do any -- I didn't physically
15 examine the patient at all.
16 Q Okay. Did, did you ever speak with Dr. Obaisi
17 about Mr. Hemphill?
18 A I don't remember.
19 Q Did you ever speak with anyone else in the
20 healthcare unit about Mr. Hemphill?
21 A Other than what's documented in the record, I
22 don't have any recollection of any conversations about
23 Mr. Hemphill.
24 Q Okay. And I'm assuming you don't recall any
25 conversation with anyone at IDOC about Mr. Hemphill

Page 48

1 either; is that correct?
2 A I know I didn't have any conversations with
3 IDOC about it. About -- do you mean medically? I'm
4 sorry. Could you clarify what you mean by anyone at
5 IDOC?
6 Q Sure. Well, I mean, I think we've covered the
7 healthcare unit. So outside of the healthcare unit --
8 let me just ask. Did you ever speak with anybody else
9 about Mr. Hemphill before this case was filed?
10 MR. MARUNA: Counsel, you kind of broke up
11 there in asking the question. Can you please state
12 it again so we can get a clear, I guess,
13 transmission here?
14 Q Sure. Outside of the healthcare unit and
15 before this case was filed, do you remember speaking
16 to anyone about Mr. Hemphill about anything?
17 A No. And I would remember because that would
18 have been very unusual for me to have spoken with a
19 warden or anything.
20 Q Okay. Do you remember after, you know, this
21 June 4 note, do you remember when the next time you
22 saw Mr. Hemphill was?
23 A Like I said, I don't have any recollection.
24 It's whenever it was noted in the record.
25 Q Okay. Let's mark as Exhibit 3 the documents

Page 49

1 that's Bate numbered IDOC 73 and 77 is the last page
2 of that.
3 (EXHIBIT 3 WAS MARKED FOR IDENTIFICATION)
4 Q And these are additional medical records like
5 the ones we looked at in Exhibit 1 and Exhibit 2,
6 correct?
7 A I'm sorry. Could you repeat that?
8 Q Sure. So these are medical records of the same
9 kind that we looked at in Exhibit 1 and Exhibit 2,
10 correct?
11 A Correct.
12 Q Okay. I'll have you look at the second page.
13 That will be the one labeled IDOC 74.
14 A Okay.
15 Q And at the top, there's an RN note from
16 September 11, 2013, correct?
17 A Correct.
18 Q And looking at the bottom of the note, there's
19 a phrase, Discussed with Dr. Davis, okay to renew. Do
20 you see where it says that?
21 A Yes.
22 Q And so this would be the nurse discussing with
23 you renewal of pain medicine; is that correct?
24 A Correct.
25 Q Do you remember anything about that discussion?

13 (Pages 46 - 49)

1    A   Not this specific one, but I do remember -- so
2  under Subjective on that note where it says, Orange
3  crush took my pain medication, there was a big sweep,
4  I guess, of the prison.  They called -- I don't, I
5  don't know what their technical term is but the tack
6  team, I think, the orange crush is what the inmates
7  referred to them as, swept the cells and did a major
8  security sweep and everyone's medications were taken.
9  And so we had a massive, a massive renewal of pain
10  medications, of Tylenol, and that kind of thing.
11    Q   So you think this was per that massive sweep?
12    A   I think so.
13    Q   Okay.  And do you know based on these records
14  what pain medication you were renewing at that point?
15    A   Not based on this record, no.
16    Q   Okay.  I'll go ahead.  And let's go to what I
17  will mark as Exhibit 4, that's the document that
18  begins with IDOC 79.
19        MR. MARUNA:  Yeah.  So I've got in
20  sequence, it goes 79, 80 through looks like 92.
21        MR. BRITT:  Yes, that's the one.
22        (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION)
23    Q   These are additional medical records, correct,
24  the same as Exhibits 1 through 3?
25    A   Correct.

1    Q   And if you can turn to, I think it will be the
2  third page, numbered 81 at the bottom.
3    A   Yes.
4    Q   And there's a note there from, from February
5  13, 2014; is that correct?
6    A   Yes.
7    Q   Okay.  Whose notes are these?
8    A   They're an RN sick call nurse.
9    Q   Okay.  Do you know who that RN was?
10    A   I believe that's Heather Kits, but I could be
11  wrong.
12    Q   Okay.  And is that someone you knew as a nurse
13  who was working at Stateville at the time?
14    A   Yes.
15    Q   And that reflects, if you look at the left side
16  maybe a quarter of the way down, there's a complaint
17  of constant shoulder pain since February 2013; is that
18  correct?
19    A   I'm sorry.  I'm having a very hard time reading
20  this note.  I don't see where you mean.
21    Q   Sure.  So on the left side, so on the column,
22  the top of it is the Subjective, Objective,
23  Assessment, there's a box?
24    A   I see, okay.
25    Q   There's a box initially labeled What caused the

1  pain, lifting, sports, et cetera.  Does it say right
2  shoulder?
3    A   Yes.
4    Q   Okay.  And then down in the box below that, it
5  says how long has pain been present and it says
6  2/2013; is that correct?
7    A   Yes.
8    Q   Okay.  So since February of 2013?
9    A   Yes.
10    Q   And then what's that note that's next to
11  2/2013?  Do you know what that says?
12    A   There's some kind of a number and then it says
13  constant.
14    Q   Okay.  Could that number be 8 of 10?
15    A   It could be.  Again, I'm having trouble reading
16  this note.
17    Q   Sure.  If it does say 8 of 10, how would you
18  read that or what would you take that to mean?
19        MR. MARUNA:  Objection.  Foundation, form,
20    incomplete hypothetical, and it assumes facts not
21    in evidence.  Dr. Davis, you may answer.
22    A   Nurses use a pain rating scale out of 10.
23  Doctors very rarely do.  So an 8 out of 10 pain would
24  be -- it's a nursing pain assessment.
25    Q   Okay.  And when you see a nursing pain

1  assessment, is a higher number more severe pain?
2    A   It's all subjective.  It's, it's, it means that
3  the inmate reported, the patient reported a, a pain of
4  8 out of 10.
5    Q   Okay.  Let me ask.  Did you ever make any
6  attempt to refer Mr. Hemphill for a MRI?
7    A   That wasn't in my job responsibility at
8  Stateville.  I didn't, I didn't refer anyone to
9  anything outside of the facility.  All I would do
10  would be to say that they needed to see Dr. Obaisi and
11  then he would take it from there.
12    Q   Okay.  So you lacked, I mean, correct me if I'm
13  wrong, but are you saying you lacked authority to
14  refer someone for an MRI?
15        MR. MARUNA:  Objection to the form, use of
16    the word authority.  Dr. Davis, if there's a word
17    you'd prefer.
18    A   Well, it wasn't my job to do that.  That wasn't
19  part of my job description.  I don't know that I would
20  characterize it as that I didn't have the authority to
21  do it.
22    Q   Okay.  Could you have referred someone for an
23  MRI if you in your medical judgment thought that was
24  appropriate?
25    A   If in my medical judgment I thought that an MRI

14 (Pages 50 - 53)

Page 54

1 was appropriate, I would've said that they needed to
2 see Dr. Obaisi and then he would take it from there.
3    Q    So Dr. Obaisi was an innkeeper of sorts for
4 those kind of requests?
5    A    I don't know that that's a fair way to
6 characterize it.  It -- the referring patients out of
7 the facility to get testing done and to have
8 procedures and see specialists and all those things is
9 an extremely complicated process and one which
10 requires the communication of the, of the security
11 staff and also the medical staff and it makes a lot of
12 sense for there to be one point person for that
13 process and that was Dr. Obaisi at Stateville.
14    Q    Did you ever, did you ever request or otherwise
15 bring up with Dr. Obaisi that Mr. Hemphill should be
16 referred for an MRI?
17    A    Again, I don't remember having any specific
18 conversations with Dr. Obaisi or anybody else
19 about Mr. Hemphill.  I -- as far as I can tell when I
20 saw him, I wanted him to see Dr. Obaisi and I, I don't
21 see any assessments of mine any time since then and I
22 didn't think he needed an MRI at that time.
23    Q    Okay.  What about any type of referral to see
24 an orthopedist?  Did you ever discuss that with Dr.
25 Obaisi?

Page 55

1    A    Again, I don't remember any conversations I had
2 with Dr. Obaisi about this.  When I saw him, I said
3 that he needed to see Dr. Obaisi for further
4 evaluation and management, whether that be an
5 injection, whether that be imaging, whether that be a
6 specialist referral.  All I would have done was said
7 let me take care of you right now, which I did, and
8 then see Dr. Obaisi and go from there.
9    Q    Okay.  Do you know when the last time you would
10 have personally seen Mr. Hemphill was?
11    A    It -- in reviewing the records, it looks like
12 it was April; is that correct?  I mean, you know more
13 about the records than I do.
14    Q    Well, I'm asking if you remember seeing him
15 after that point.
16        MR. MARUNA:  So you're asking if there's an
17 independent recollection?
18        MR. BRITT:  Yes.
19        MR. MARUNA:  Okay.  Do you --
20    A    So I don't remember seeing Mr. Hemphill at all.
21 And the only record that I have of any encounter I had
22 with him is in the medical record which we've already
23 reviewed.
24    Q    Okay.  And that includes the documents you
25 reviewed in advance of the deposition.  There's

Page 56

1 nothing from those records that indicate that you saw
2 him after April; is that correct?
3    A    I haven't seen anything that indicated that,
4 no.
5    Q    Let me show you what will be marked as Exhibit
6 5.  And this will be a document beginning with IDOC
7 389 but the Bate-stamp, I'll just tell you the
8 Bate-stamp is a bit obscured on the record.
9        MR. MARUNA:  It's the prescription orders?
10        MR. BRITT:  That's the one.
11        MR. MARUNA:  First date is 6/26/13,
12 correct?
13        MR. BRITT:  I believe that's correct.
14        MR. MARUNA:  I've got 389 to it looks like
15 391.  Is that correct?
16        MR. BRITT:  Yes, I believe that's correct.
17        (EXHIBIT 5 WAS MARKED FOR IDENTIFICATION)
18    Q    And Dr. Davis, can you tell me what those
19 records are?
20    A    These are copies of order sheets from the, from
21 the medical records at Stateville.
22    Q    Okay.  And are these records of prescriptions
23 that were ordered for Mr. Hemphill?
24    A    Yes.
25    Q    Now did you, when you prescribed something for

Page 57

1 Mr. Hemphill, did you fill out a prescription order
2 form like this or did someone fill this out for you?
3    A    It depends on the situation.  Sometimes I did
4 it, sometimes they did.
5    Q    Okay.  Did you have to sign these orders
6 yourself?
7    A    Yes.
8    Q    Okay.  And looking at the first page, the
9 middle prescription, the second one that's on that
10 page, is that one of your prescriptions?
11        MR. MARUNA:  Which date?
12        MR. BRITT:  April 19, 2013.
13    A    Yes, that's my handwriting and my prescription.
14    Q    Okay.  And what did you prescribe at that time?
15    A    That goes along with the note that I wrote that
16 we talked about earlier wherein I prescribed scheduled
17 Naproxen.  So Naproxen 500 milligrams by mouth twice a
18 day for 30 days.  So not as needed but twice a day.
19    Q    Okay.  And why Naproxen as opposed to another
20 medication?
21    A    It's a strong anti-inflammatory, stronger than
22 the Motrin that he had been on.  The --
23    Q    If I can have you --
24        MR. MARUNA:  The witness was saying
25 something.

15 (Pages 54 - 57)

Page 58

1    A   I'm sorry.  I wanted to say one other thing.
2  The other thing is that I wrote number 6 from clinic
3  supply which means I gave him 6 tabs to take with him
4  that day.  So the other reason I would've chosen that
5  medication is because I could give him some right away
6  so that he could start to feel better right away
7  instead of having to wait for the prescription to come
8  in.
9    Q   Okay.  So part of that is due to availability
10 that you had the Naproxen on hand and you were able to
11 give them to him immediately?
12   A   Correct.  So again, he could start to feel
13 better right away.
14   Q   Okay.  And for the next prescription, is that
15 one, is that a form that you would have filled out
16 yourself or is that one that someone else filled out
17 and just listed your name?
18      MR. MARUNA:  You broke up again.  Would you
19 mind restating the question?
20   Q   Sure.  Did you fill out this April 19
21 prescription by yourself or did someone else fill it
22 out and just list you as the authorizing physician?
23   A   No, that's my handwriting.  I wrote that whole
24 prescription.
25   Q   Okay.  I'll have you go to the last page in

Page 59

1  this Exhibit 5 and at the very bottom, there's a
2  prescription dated September 11, 2013.  Do you see
3  that?
4    A   Yes.
5    Q   Okay.  Is that another of your prescriptions?
6    A   Yes.  I didn't fill out his name or the date or
7  his inmate number.  That's someone else's handwriting,
8  but I filled out the drug and then printed and signed
9  my name.
10   Q   Okay.  And this is another prescription for
11 Naproxen; is that correct?
12   A   Correct.  This correlates with the note that we
13 saw earlier about orange crush having taken his pain
14 medication.
15   Q   Okay.  So based on that, you had prescribed
16 Naproxen on April 19 and then again on September 11
17 to -- correct?
18      MR. MARUNA:  Did you get that?
19      THE COURT REPORTER:  No.
20      MR. MARUNA:  We need it restated.  It broke
21 up.  And actually, you're completely pixilated
22 right now.  Are you there?
23      MR. BRITT:  I am.
24   Q   Well, let me just actually clarify.  On both
25 April 19 and September 11, 2013, you prescribed

Page 60

1  Naproxen to Mr. Hemphill?
2    A   I did, but the instructions are different.  So
3  when I saw him in April, the instructions were 500
4  milligrams twice a day whether he needed it or not and
5  the prescription that I wrote in September is twice a
6  day as needed.
7    Q   Okay.  And why, why switch to as needed as
8  opposed to the scheduled regimen from April?
9    A   An acute pain issue, we tend to treat with
10 scheduled anti-inflammatories.  But then as it turns
11 into more of a chronic issue, the idea is that you
12 knock out the inflammation with scheduled dosing.  And
13 then as it goes into a longer term thing, just taking
14 it as you need it makes sense.
15   Q   Okay.  And had you -- so what, what -- let me
16 backup.  What caused you in September of 2013 to
17 determine that for Mr. Hemphill switching to the PRN
18 was appropriate?
19   A   I don't know.  What I can tell you is that
20 again that correlates with, with what we were talking
21 about with the orange crush having taken his pain
22 medications.  So I see that order and then the
23 previous order for Naproxen was in April.  So he
24 wasn't taking it twice a day, scheduled.  He was
25 taking it as needed, if he still had any pills left at

Page 61

1  all in September.  So that's probably why I changed
2  that to as needed.
3    Q   Okay.  So that was not necessarily based on any
4  findings from your examination of Mr. Hemphill,
5  correct?
6    A   Again, in reviewing the progress notes earlier,
7  it doesn't look like I examined him in September.
8    Q   Okay.  And let me ask, directly above that
9  September 11 prescription, there's a prescription
10 dated February 13, 2014.  Do you see that?
11   A   Yes, I do.
12   Q   And who's listed as the physician for that
13 prescription?
14   A   So that's listed as me as a verbal order and
15 then I came back later and signed it.
16   Q   Okay.  Do you -- and this is a prescription for
17 Naproxen again, correct?
18   A   Correct.
19   Q   Is there anything different about the dosage
20 here or the instructions for taking it as opposed to
21 the September 11, 2013 prescription?  Did anything
22 change?
23   A   No.  And again, I didn't see him.  That's the
24 day of that nursing sick call note that we went over
25 earlier.  So probably as -- and as I recall, her plan

16 (Pages 58 - 61)

Page 62

1 was for him to see Dr. Obaisi. So probably what
2 happened is she said Dr. Davis, may I renew his
3 medications until he sees Dr. Obaisi and I said yes
4 which would constitute a verbal order.
5     Q    Okay. What information would you have
6 wanted -- let me backup. What information did you
7 collect from the nurse before giving the verbal order
8 for that prescription?
9     A    I don't remember in this case specifically. I
10 could tell you that Miss Kits is an extremely good
11 nurse and is very, very qualified to make, to do
12 nursing sick call. And so I trusted her triage
13 opinion. So I knew that if she had seen him that it
14 wasn't an emergency and that it was something that she
15 thought could wait to see Dr. Obaisi. And so I would
16 have trusted her judgment and gone from there.
17    Q    And is there anything that you did as a result
18 of that RN order in February 2014, is there anything
19 else you did with regard to the treatment of Mr.
20 Hemphill other than prescribe this Naproxen?
21    A    No. And again, I didn't see him. So what this
22 would have been, it would have been me saying your
23 assessment and plan is sufficient. Let's go ahead
24 with that, renew his current medications, and see Dr.
25 Obaisi.

Page 63

1     Q    Okay. And each of these times that you
2 prescribed Naproxen for Mr. Hemphill, that was a
3 result of complaints of shoulder pain, correct?
4     A    Again, I -- whether you consider it me
5 prescribing it is an interesting issue. I agree that
6 the very first time that I saw him and I did the
7 assessment and plan for him, I prescribed that
8 medication. The other two times, I renewed his
9 medication which is not the same thing as prescribing
10 it. It's approving a renewal. Was the complaint
11 shoulder pain? Sure. I mean, that's in the record.
12    Q    Okay. Why -- so looking at the records, the
13 medical records for Mr. Hemphill show that he first
14 complained of shoulder pain in February of 2013; is
15 that correct?
16    A    Yes.
17    Q    And you first prescribed Naproxen for him in
18 April of 2013, correct?
19    A    Correct, when I saw him.
20    Q    Why would you have continued prescribing
21 Naproxen as opposed to trying a different course of
22 treatment when you renewed these prescriptions in
23 September of 2013 and February 2014 --
24    A    Because I didn't see him. I didn't see him and
25 evaluate him then.

Page 64

1     Q    Okay.
2     A    So I wouldn't change a treatment plan without
3 seeing him.
4     Q    So had you reviewed any of his medical records
5 before renewing these prescription?
6     A    I don't know. I may or may not have.
7     Q    These -- I mean, doesn't the February 2014
8 renewal in response to a complaint of shoulder pain,
9 doesn't that indicate that the Naproxen was not
10 working to manage his pain?
11    A    That renewal of the Naproxen prescription was
12 only part of her plan. Most of her plan was that she
13 wanted him to see Dr. Obaisi which I agreed with.
14    Q    Okay. But it's fair to say that the Naproxen
15 was not sufficiently managing Mr. Hemphill's pain,
16 correct?
17    A    I have --
18         MR. MARUNA: Objection, foundation.
19    A    I have no idea. I didn't see him. I can only
20 speak to the visits when I saw him.
21    Q    Outside of sick call, are there any other
22 circumstances where you would have interacted with
23 inmates?
24    A    As I said before, chronic clinics. So if a
25 patient had a diagnosis of hypertension or asthma or

Page 65

1 seizures or of diabetes, I would have seen them. I
2 also would have seen them where they admitted to our
3 infirmary. Or if for some administrative reason, I
4 needed to do either a physical exam on them, like, a
5 routine physical or if they were on a hunger strike or
6 something like that, if there was an administrative
7 reason why they needed to be seen by medical.
8     Q    Okay.
9     A    But in all of those cases, I would have written
10 a note in the chart.
11    Q    And those kinds of encounters would be
12 reflected in the sorts of medical records that we've
13 looked at, the Exhibits 1 through 4, correct?
14    A    Yes. With the exception of chronic clinics.
15 There was a chronic clinic section of the chart
16 wherein if someone had been seen there, they wouldn't,
17 it wouldn't necessarily be included. But I don't
18 think Mr. Hemphill was in those chronic clinics again,
19 because I don't remember him and I remember most of
20 the guys that were in the clinics.
21    Q    Okay. You said you left Stateville in April of
22 2014, correct?
23    A    Correct.
24    Q    And where did you go to after Stateville?
25    A    I was promoted to be medical director of

17 (Pages 62 - 65)

1 Sheridan Correctional Center.
2   Q   So that's equivalent to Dr. Obaisi's position
3 just at a different facility?
4   A   I had the same job title, but it's a very
5 different facility.
6   Q   Okay.  And what's, when you say it was a very
7 different facility, what kind of facility was that?
8   A   It was not maximum security.  And it was also,
9 didn't have nearly the medical acuity of Stateville.
10 There wasn't a dialysis unit.  I believe, I want to
11 say Sheridan was medium security.  I'm not sure.  It
12 was also much more remote and had a lot of -- most of
13 the inmates there were involved in a substance abuse
14 rehabilitation program and they have vocational
15 rehabilitation and that kind of thing.
16   Q   Okay.  Was there anything you did when you left
17 Stateville to ensure continuity of care for patients
18 that you had seen at Stateville?
19   A   Not really.  That wasn't really -- it's
20 different in correctional practice versus another kind
21 of practice.  I worked for Wexford and I trusted that
22 Wexford would pass along the care of my patients to
23 whoever had that job next.  It's not -- our records
24 were good.  I kept good records of everything.  I
25 don't -- there wasn't anybody that I specifically

1 needed to sign out to or anything like that because
2 that's not really the way that system worked.  The way
3 that system worked is that we took care of the
4 patients who were in front of us.  So if someone was
5 brought to me and I was the Doc that was there, I was
6 the one taking care of them.  With the exception of
7 chronic clinics, I wasn't the doctor for anybody at
8 Stateville.  That's not really how the system worked.
9   Q   Okay.  Did you ever speak with -- let me
10 backup.  Do you know if Stateville hired another staff
11 physician after you left?
12   A   I have no idea.
13   Q   All right.  Did you ever speak with anyone at
14 Stateville or who was stationed at Stateville about
15 patients you had treated at Stateville and -- chronic
16 clinic for now?
17   A   I'm sorry.  You were breaking up.  Could you
18 repeat that?
19   Q   Sure.  So setting aside the chronic clinic, so
20 the people with chronic conditions, leaving that aside
21 for the moment, did you speak with anyone at
22 Stateville about patients that you had treated at
23 Stateville?
24       MR. MARUNA:  After the promotion to
25   Sheridan?

1       MR. BRITT:  Yes.
2   A   No, I didn't.
3   Q   Okay.  If anyone -- did anyone at Hill
4 Correctional Center ever contact you regarding Mr.
5 Hemphill?
6   A   No, I never talked to anybody from Hill about
7 anything.
8       MR. MARUNA:  Objection to foundation that
9   Dr. Davis was working for Wexford or at Stateville
10   at the time.
11   Q   Sure.  And how long were you at --
12       MR. MARUNA:  Were you saying Sheridan?
13   Q   Yeah.  How long did you have the position at --
14 you said it was Sheridan, correct?
15   A   Correct.  I worked there from April till I want
16 to say August.
17   Q   Okay.  And did you have any other positions
18 with Wexford or the Department of Corrections after
19 that?
20   A   No.
21   Q   Okay.  So that was just from April to August of
22 2014?
23   A   Yes.
24   Q   Okay.  Let me just ask you for -- here.  I'll
25 introduce what will be marked as Exhibit 6 and that

1 will be IDOC 220 and 221.
2   A   Okay.
3       (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION)
4   Q   Have you ever seen this document before?
5   A   No.
6   Q   So -- on the bottom of the first page, you'll
7 see that there's some writing that's there in bold
8 face.  Do you see that?
9   A   I'm sorry.  That was garbled.  Could you repeat
10 it?
11   Q   Sure.  So do you see at the bottom of the first
12 page, there is some text that's in bold face beginning
13 Impression?
14   A   Yes, I see.
15   Q   Okay.  Can you review, there's 3 numbered items
16 carrying over to the next page, can you just review
17 those really quick?
18   A   Okay.
19   Q   So looking at those impressions, are those
20 consistent with the diagnosis that you had for Mr.
21 Hemphill when you saw him in April of 2013?
22       MR. MARUNA:  Objection to the form of
23   question, consistent with.  That's vague.  Dr.
24   Davis, you understand you can answer or seek
25   clarification.

18 (Pages 66 - 69)

Page 70

1    A   This is 3 years after I saw him.  I, I don't
2  know.
3    Q   Okay.  Well, let me just ask.  Is there
4  anything that is listed here in these 3 impressions
5  that you did not diagnose in April of 2013?
6        MR. MARUNA:  Objection, foundation.  Record
7    3 years after the witness saw the patient, form of
8    the question.  It's vague as to diagnose and just
9    the wording in general.  Dr. Davis, you can answer
10   over the objections or ask for clarification.
11   A   It shows that there's bursitis and tendon
12 damage.  I -- again, it was 3 years later.
13   Q   Sure.  And understanding that it's 3 years
14 later, is there anything that is listed here that was
15 not included in your diagnosis in April of 2013?
16       MR. MARUNA:  Okay.  Same objections.  I'm
17   adding asked and answered.  Dr. Davis, you can ask
18   for clarification or you can give your answer
19   again.
20   A   The only thing that is diagnosed here that I
21 didn't diagnose is arthritis in the AC joint which I
22 assumed.  I mean, I could have said that.  Saying
23 tendon impingement on exam and saying a partial
24 thickness tear on MRI are relatively equivalent.
25 Looking at something on an MRI is different than

Page 71

1  looking at it physically.  I mean, I feel like a
2  physical exam saying that the joint is boggy and that
3  there's a full range of motion passively but there was
4  pain with active motion, I mean, all of those things
5  can go along with a partial thickness tear.  Again, it
6  doesn't show that there was a complete tear which I
7  didn't think there was a complete tear there either
8  and again, it was 3 years before.
9    Q   Okay.  So let me just ask.  If you had seen
10 this report and I understand this report was generated
11 some years later, but if you had seen a report like
12 this for Mr. Hemphill, would that have changed your
13 course of treatment?
14       MR. MARUNA:  Objection, foundation.  This
15   report is from 2016.  We just established the
16   Doctor hadn't seen the patient for 3 years.  I
17   don't know how she could possibly answer that
18   question.  So I'm going to add form, vague, assumes
19   facts not in evidence.  Dr. Davis, again, you can
20   answer over the objections or seek clarification.
21   A   That's a really strange question.  It's a
22 hypothetical situation that has a lot, there's a lot
23 of if's in there.
24   Q   Sure.
25   A   As a family medicine doctor, I don't deal with

Page 72

1  shoulder MRIs all that often, even in the outpatient
2  setting, even not in corrections.  The vast majority
3  of the time whether it's a partial thickness tear,
4  whether it's arthritis, whether it's a bursa, the
5  treatment is the same.  It's conservative.  If your
6  question is would I have freaked out at seeing this
7  MRI report and said, oh, no.  He needs to see a
8  surgeon.  The answer is no, I wouldn't have.  The
9  answer to how to treat this person with this MRI if I
10 had no more information and all I had was this MRI is
11 conservative treatment as best as we can.  Now there's
12 a million different things that go into that.  Again,
13 we talked about that a little bit earlier.  There's
14 functional status, you know.  Is this guy a major
15 league pitcher?  Is this somebody who is 80 years old
16 and has a bunch of other issues?  You know, there's a
17 lot that goes into that.  And it, to make an isolated
18 decision based on an imaging report is strange anyway.
19 And I wouldn't have even ordered this MRI nor did I
20 think that he needed an MRI in -- when I saw him in
21 2013.
22   Q   So when you say you would have continued with a
23 conservative treatment anyway, is that the same kind
24 of treatment that you had ordered for him?
25       MR. MARUNA:  Objection.  That was stated

Page 73

1    earlier as this line of questioning.  Dr. Davis
2    again, you can answer or seek clarification.
3    A   Again, it's just, it's kind of making my brain
4  hurt, like, how to answer a hypothetical question
5  based on an imaginary test that I didn't have the
6  answers to and wouldn't have ordered.  I just, I don't
7  know what to say to that.  Do I think that this MRI
8  represents a medical emergency?  No.
9    Q   Do you think there are any findings from this
10 MRI that could not have been picked up by a standard
11 x-ray?
12   A   If you're asking if MRI is a different test
13 than x-ray, sure.  There's all kinds of things that
14 can be picked up on an MRI that can't be picked up on
15 an x-ray.
16   Q   Okay.  Are the impressions given on this report
17 some of those findings?
18       MR. MARUNA:  Of what?  Are you asking are
19   the impressions on the MRI report something an MRI
20   could find?
21       MR. BRITT:  Something that an MRI could
22   find that an x-ray would not.
23   A   While an x-ray can't diagnose bursitis, a
24 physical exam can.
25   Q   Okay.  But an x-ray would not have picked up

19 (Pages 70 - 73)

Page 74

1 these findings essentially?
2   A   An x-ray would not have picked up a partial
3 tear.  It would not have picked up a bursa, a
4 bursitis.  It could have picked up inflammation and it
5 would have picked up the degenerative changes in the
6 joint, the spurring.  Those are all signs of
7 arthritis.
8   Q   Okay.
9   A   But again, an x-ray is not the only thing that
10 we were going on.  A physical exam is also very, very
11 good and can indicate those things.
12   Q   Okay.  I'll bring out what I think will be
13 Exhibit 7.  This is a document Bates numbered begins
14 with Wexford 319.  It's the Medical Policies and
15 Procedures excerpt.
16   A   Can I take a break for a minute?
17   Q   Yeah, sure.
18       (EXHIBIT 7 WAS MARKED FOR IDENTIFICATION)
19           (RECESS TAKEN)
20 BY MR. BRITT:
21   Q   Okay, Dr. Davis.  So you see in front of you
22 the document that's been marked as Exhibit 7?
23   A   Yes.
24   Q   And understanding that's an excerpt, can you
25 tell me what that document is?

Page 75

1   A   It looks like one of Wexford's policies.
2   Q   Okay.  And have you ever referred to this
3 document in connection with patient care or inmate
4 care at Stateville?
5   A   I didn't.  They were available.  There was a
6 room with a book shelf with binders on it and they
7 were all there, but I didn't never look at them.
8   Q   Okay.  And what were you told about those
9 policies and procedures?
10   A   I was told that there were -- first of all,
11 that the institutional and administrative directives
12 of the facility always outweighed anything that came
13 from Wexford and I knew where those were.  And
14 secondly, that they were there if I wanted to look at
15 them for guidance but that my medical judgment was
16 fine and I could also discuss any questions that I had
17 with Dr. Obaisi or with Dr. Fung.
18   Q   Okay.  So did you ever review any of the
19 policies and procedures issued by Wexford?
20   A   Not really.  I think I did it really cursorily
21 during my, my orientation but that's it.
22   Q   And do you know what the purpose of this
23 document was?
24   A   Not really.
25   Q   Okay.  Did you change any aspect of the care

Page 76

1 you provided to Mr. Hemphill or to any other patient
2 as a result of Wexford's policies and procedures?
3   A   No.  Certainly not anything printed.  Like I
4 said, I don't remember referencing any of the Wexford
5 policies really at all.
6   Q   Okay.  Were you ever consulted or asked about
7 any inmate grievances that were filed at Stateville?
8   A   No, I wasn't part of that process at all.
9   Q   Okay.  And I understand you weren't part of the
10 process.  Were you ever asked about any grievances
11 even informally?
12   A   No, I don't think so.  I mean, it was one of
13 the things that people sort of chattered about in the
14 background, but I don't remember anyone ever asking my
15 opinion or anything.
16   Q   Okay.  Do you remember if anybody -- ever spoke
17 to you about any grievances that had been filed by an
18 inmate?
19   A   I'm sorry.  That was garbled.  I didn't hear
20 you.  Could you repeat it?
21   Q   Sure.  Do you remember if anyone at, in the
22 administration of Stateville ever asked you about an
23 inmate grievance that had been filed?
24       MR. MARUNA:  The IDOC administration?
25       MR. BRITT:  Sure, yes.

Page 77

1   A   No, I don't think so.
2   Q   Are you aware of or do you remember any
3 grievances being filed by Mr. Hemphill?
4   A   No.
5   Q   Do you know if any of the IDs or ADs that were
6 in place at Stateville influenced any of your
7 treatment decisions for Mr. Hemphill in any way?
8   A   It's kind of a strange question.  Again, that I
9 was in a prison environment was, that was the
10 structure within which we -- I mean, one of the IDs or
11 ADs is that you can't have a handgun on you when you
12 walk in the building.  So, yes.  Did that influence
13 me?  Sure.  I mean, I followed the rules while I was
14 there.  But that doesn't mean that that had to do
15 with -- that that limited what I was doing medically.
16 It was just that that was the structure within which I
17 was, I was providing care.
18   Q   Okay.  Let me see if I can ask it a little
19 differently.  If you had been seeing Mr. Hemphill and
20 again, you know, understanding that your recollection
21 of your treatment of him is derived from these medical
22 records, understanding that, is there anything that
23 you would have done differently if you saw Mr.
24 Hemphill in a non-correctional outpatient setting?
25       MR. MARUNA:  Objection.  Form of the

20 (Pages 74 - 77)

Page 78

1 question, foundation. It's an incomplete
2 hypothetical. It assumes facts not in evidence and
3 it calls for speculation. But you can answer over
4 the objections, Dr. Davis.
5   A   I probably would have rather than giving him a
6 prescription for medicine, I probably would have told
7 him to take over-the-counter medicine because you have
8 the ability to do that in the outpatient world and you
9 don't in prison. I also probably would have given
10 him -- I may or may not have referred him to physical
11 therapy. I don't think that I would have at that
12 point. I think I probably would have instructed him
13 on just kind of general activity modification sorts of
14 things. But I -- in general, no. I mean, the answer
15 is conservative treatment and just how do you do that
16 within the framework where you're practicing. And
17 again, I was, I came from a free clinic background
18 wherein we never do things like prescribe physical
19 therapy anyway. And so I just, I treated him like I
20 would have treated anybody in that situation.
21         MR. BRITT: Okay. I have nothing further.
22         MR. MARUNA: Mike?
23         MR. STEPHENSON: I don't have any
24 questions.
25         MR. MARUNA: Yeah. I've got a few. Why

Page 79

1 don't we just take a minute and let me look over my
2 notes and see if I can cross some of them out. I
3 think we covered some stuff.
4         MR. BRITT: Sure.
5         (BRIEF RECESS TAKEN)
6         MR. MARUNA: All right. Back on.
7         EXAMINATION
8 BY MR. MARUNA:
9   Q   Dr. Davis, I have a few questions today. And
10 thank you again. I know it's been several years since
11 you worked in, for State -- for Wexford. You just
12 moved to another state. So appreciate you fitting us
13 in this afternoon. I want to go over your background
14 a bit. Did you obtain an undergraduate degree?
15   A   I did.
16   Q   And what was that in?
17   A   Biomedical engineering.
18   Q   And where did you obtain that degree?
19   A   Duke University.
20   Q
              we'll block out for the record.
22   A   Yeah.
23   Q   Did you ever intend to cause harm to Carl
24 Hemphill?
25   A   No.

Page 80

1   Q   In fact, Dr. Davis, is it true that you only
2 desire the best possible medical outcome for this
3 patient?
4   A   That's true of all my patients.
5   Q   With all your patients, correct?
6   A   Yes.
7   Q   If I use the term standard of care, are you
8 familiar with that term?
9   A   Yes.
10   Q   And you are a medical doctor licensed in the
11 State of Illinois and to practice medicine in all of
12 its branches, correct?
13   A   Correct.
14   Q   And you hold a medical license in the State of
15 North Carolina?
16   A   Yes, I do.
17   Q   Did you comply with the standard of care in
18 treating Carl Hemphill?
19   A   Yes, I did.
20   Q   And is that the basis for your opinion, your
21 education, experience, training as a medical provider
22 combined with your independent and refreshed
23 recollection of the patient?
24   A   Yes. Again, I don't have an independent
25 recollection but, yes.

Page 81

1   Q   So just your refreshed recollection?
2   A   Correct.
3   Q   When you saw inmates at Stateville Correctional
4 Center, did you maintain a custom and practice in
5 recording your medical progress notes?
6   A   Yes.
7   Q   When I say custom and practice, I mean
8 something you invariably do. I don't remember putting
9 on my seatbelt this morning but I've done it every day
10 since I was 16. So I can tell you with 100 percent
11 certainty that I did. Do you understand that?
12   A   Yes.
13   Q   All right. Now when you made medical progress
14 notes, we discussed the SOAP, S-O-A-P acronym,
15 correct?
16   A   Yes.
17   Q   And if you saw a patient on sick call and he
18 made a report of pain, would that be something noted
19 in your medical record?
20   A   Yes.
21   Q   Now Stateville had how many inmates, if you
22 could estimate?
23   A   I want to say 1,200. I might be wrong.
24   Q   Did you see each and every inmate for each and
25 every medical concern?

21 (Pages 78 - 81)

Page 82

1    A    No.
2    Q    So did you rely on other medical staff members
3 to treat inmates?
4    A    Yes.
5    Q    Now at sick call, I know you don't have any
6 formal role in the process but I want to understand a
7 bit.  If a patient makes a sick call request, he can't
8 just say, Put me on Dr. Davis' schedule and he
9 automatically goes on it, correct?
10    A    Correct.  There's a triage, there's a triage
11 process.
12    Q    Who performs that triage process?
13    A    It's a combination of the correctional medical
14 technicians and the nursing staff.
15    Q    So if a patient says I want sick call, someone
16 below you, I guess, in the professional hierarchy
17 decides whether or not that patient's needs can be
18 addressed at the lower provider level or needs to go
19 up to midlevel or even higher level provider, correct?
20    A    Correct.  And also, and also they look at it
21 and make sure that it's not an emergency.
22    Q    Right.  Are you -- we talked -- are you
23 familiar with the phrase lockdown?
24    A    Yes.
25    Q    Okay.  What is a lockdown?

Page 83

1    A    A lockdown is when there is restricted movement
2 in the prison.  There's different levels of movement
3 allowed and a level 1 lockdown means nobody's allowed
4 to move except for emergencies.
5    Q    Did you have any role in placing the facility
6 on lockdown?
7    A    I did not.
8    Q    Did Wexford have any role in placing the
9 facility on lockdown?
10    A    No.
11    Q    So was that something handled by the IDOC?
12    A    Yes.
13    Q    Was the facility on lockdown a lot when you
14 were there?
15    A    Yes.
16    Q    How often?
17    A    We had different stretches of it.  I remember
18 September, October that I was there, we had lockdown
19 for a long time.  I want to say at least a month,
20 maybe 6 weeks.
21    Q    And medical appointments may have to be
22 rescheduled during that time period if there's a
23 lockdown, correct?
24    A    Correct.
25    Q    And that's pursuant to IDs and ADs, correct?

Page 84

1    A    Correct.
2    Q    We discussed that -- couple of pain medications
3 today.  We discussed Motrin and Naproxen, correct?
4    A    Correct.
5    Q    Is Mobic a type of pain medication?
6    A    Yes, it is.
7    Q    What about Tylenol?
8    A    Yes, it is also.
9    Q    Now you said -- Counsel asked you some
10 questions earlier about maybe speculatively how you
11 would treat this patient differently if he was coming
12 to you in an outpatient clinic versus in a
13 correctional institution.  You said one of the
14 differences, you probably would've just told him in an
15 outpatient clinic to take OTC, over-the-counter
16 medicines, correct?
17    A    Correct.
18    Q    Now in the prison, some OTC medicines are
19 actually prescription, correct?
20    A    Correct.
21    Q    So they require you -- that's a type of
22 treatment you can give someone even if it's an
23 over-the-counter dose, you can give them a
24 prescription so they can have that medication inside
25 the prison, correct?

Page 85

1    A    Correct.
2    Q    Is ice a type of treatment for bursitis or
3 impingement?
4    A    Yes.
5    Q    What about pain injections?
6    A    Yes.
7    Q    And those would be steroid injections, correct?
8    A    Correct.
9    Q    And they're working because the idea is it's
10 going to reduce the inflammation, correct?
11    A    Correct.
12    Q    Physical therapy, would that be another type of
13 treatment?
14    A    Yes.
15    Q    Dr. Davis, would you ever recommend that a
16 patient not take a medication that his doctor has
17 prescribed for him?
18    A    Not unless there was a change in treatment plan
19 or an adverse reaction or something.
20    Q    So if a provider prescribed a patient
21 medication and the patient refused it, would he be
22 acting against the doctor's orders, more or less?
23    A    Yes.
24    Q    And some of these medications have time
25 components.  Like, the Motrin taken every few hours,

22 (Pages 82 - 85)

Page 86

1 that's a cumulative effect over time, it builds up to
2 reduce the inflammation, correct?
3    A    Correct.
4    Q    So if a patient didn't take a dose or two, that
5 could actually cause the inflammation to last longer
6 than necessary, correct?
7    A    Correct.
8    Q    You testified earlier that given that this
9 gentleman still had pain medication several months
10 after your initial prescription for him was written,
11 he likely wasn't taking it as directed, correct?
12    A    Correct.
13    Q    What are medical permits, Dr. Davis?
14    A    They're permits that allow patients to have
15 different privileges while they're in the prison. So
16 like if they -- lower bunk or something like that.
17 Like, if they don't have the ability to -- or like a
18 low gallery permit if they've got a bad knee or
19 something and they can't climb the stairs.
20    Q    So it gives a patient a special privilege not
21 available to the general population of inmates,
22 correct?
23    A    Correct.
24    Q    And could that be a type of treatment as well?
25    A    Yes, especially in the correctional setting.

Page 87

1    Q    And that's because we're modifying the
2 lifestyle accommodations, I guess, with the inmate,
3 like, giving them a low bunk, for example, or a low
4 gallery?
5    A    Correct.
6    Q    Doctor, are you familiar with the term
7 evidence-based medicine?
8    A    Yes.
9    Q    And do you --
10        MR. BRITT: James, can you please speak up
11 a bit? We're losing you on this end.
12        MR. MARUNA: Yeah, sure. Is that better?
13        MR. BRITT: Yes. Thank you.
14 BY MR. MARUNA:
15    Q    All right. Do you practice evidence-based --
16 I'll ask the last question back. Doctor, are you
17 familiar with the term evidence-based medicine?
18    A    Yes.
19    Q    Do you practice evidence-based medicine?
20    A    Yes.
21    Q    And so that means that you only order treatment
22 that is clinically indicated for a patient, correct?
23    A    Correct.
24    Q    So if a patient demanded an MRI but there was
25 no clinical need for the MRI, you would not give the

Page 88

1 patient an MRI, correct?
2    A    Correct.
3    Q    Are you familiar with PA LaTonya Williams?
4    A    Yes.
5    Q    Did you find her to be a competent medical
6 practitioner?
7    A    Yes.
8    Q    Are you familiar with Dr. Obaisi?
9    A    Yes.
10    Q    Did you find him to be a competent medical
11 practitioner?
12    A    Yes.
13    Q    By the way, when you were at Stateville, were
14 you out in the cells with the inmates or were you
15 working in the healthcare unit?
16    A    I was in the healthcare unit.
17    Q    So you weren't out in the cells saying does
18 anyone need help out here, more or less, correct?
19    A    Correct. There were other people that had that
20 job.
21    Q    And in fact, if an inmate was on your schedule
22 to be seen, you didn't go out to the cell and unlock
23 the cell door and bring him in for you, correct?
24    A    Correct. I was in the healthcare unit and they
25 brought the patients to me.

Page 89

1    Q    So someone else had to set the inmate for an
2 appointment with you and someone else had to bring the
3 inmate to you, correct?
4    A    Correct.
5    Q    I want to talk about the medical records and, I
6 guess, I'll just use one as an example here. Let's
7 just grab maybe one of the April notes. So let's take
8 a look at Exhibit 2, for example, the 4/19/13 note.
9    A    Okay.
10    Q    At the very bottom of the page here, I see
11 there's, it looks like a -- is that a counter
12 signature, Doctor?
13    A    Yes.
14    Q    What is a counter signature? Can you explain
15 that whole process to me?
16    A    Sure. So when I wrote my notes in the
17 healthcare unit, I would then put the charts aside for
18 the nurses to note and they would go through and enact
19 any of the orders that I had written.
20    Q    So you write the order and then someone else,
21 it's their job to enter it into the system, so to
22 speak, make sure the prescription is put in place, the
23 appointment is scheduled, correct?
24    A    Correct.
25    Q    You didn't do that, right?

23 (Pages 86 - 89)

Page 90

1   A   Correct.  I usually wrote the prescription
2   orders and then that would have to be noted as well.
3   But yes, in terms of actually enacting any of the
4   orders, that was the nurse's job.
5   Q   But even when you wrote a prescription order,
6   you didn't go to the pharmacy, grab the bottle of
7   medicine and give it to the inmate, correct?
8   A   Correct.
9   Q   Someone else had to actually ensure that the
10  inmate received the prescription as you ordered it,
11  correct?
12  A   Correct.
13  Q   By the way, is that consistent with your
14  experience in the private practice that the doctor
15  doesn't do everything, the doctor makes the order and
16  then individuals down the line are expected to enforce
17  those or to ensure those orders are complied with?
18  A   Correct.
19  Q   And just to confirm, Doctor, you had no role in
20  the utilization, management, referral process at the
21  prison, correct?
22  A   At Stateville, no.
23  Q   Right.  Let me correct it.  At Stateville,
24  correct?
25  A   Correct.

Page 91

1   Q   That was handled by Dr. Obaisi?
2   A   Yes.
3   Q   Counsel asked you some questions in one of the
4   last Exhibit 7 about Wexford's medical policies and
5   procedures.  And I want to confirm here, Doctor, your
6   understanding is that Wexford's policies, that you're
7   to practice medicine in accordance with your medical
8   judgment and the standard of care, correct?
9   A   Correct.
10  Q   And you didn't consult these policies or
11  procedures on how you practice medicine, correct?
12  A   I didn't.
13  Q   And that would apply to Carl Hemphill as well,
14  correct?
15  A   That would apply to everyone.
16  Q   But definitely Carl Hemphill if it applied to
17  everyone, right?
18  A   Yes.
19  Q   Dr. Davis, you've been a practicing medical
20  provider for many years now, correct?
21  A   Yes.
22  Q   In your experience, do reasonable medical minds
23  sometimes differ in how to best treat a patient?
24  A   Yes.
25  Q   And can reasonable medical minds differ in how

Page 92

1   to treat a patient but still be complying with the
2   standard of care?
3   A   Yes.
4   Q   I want to turn back to your first examination
5   on 4/11/13, correct?  And I think that was Exhibit 1.
6   A   Okay.
7   Q   Do you have that in front of you, Doctor?
8   A   I do.
9   Q   The patient was presenting to you on that day
10  for an emergency situation.  We didn't really get into
11  it.  What was the actual complaint he saw you for on
12  April 11, 2013?
13  A   It says that he dropped a weight on his hand.
14  Q   So he was exercising and he sought treatment
15  from you for his hand, correct?
16  A   Correct.
17  Q   He didn't actually seek treatment from you for
18  his shoulder on April 11, 2013, correct?
19  A   Correct.
20  Q   For the patient's shoulder complaints that we
21  discussed over the various notes today, at any time
22  was he in an emergent condition?
23  A   No.
24  Q   He was in chronic condition, correct?
25  A   Correct.

Page 93

1   Q   At the beginning of the deposition, Counsel
2   asked you some questions about if you reviewed records
3   if you were examining a patient and I want to be clear
4   here, Doctor.  You would only review the records if
5   you were treating the patient and they were pertinent
6   to the examination, correct?
7   A   Correct.
8   Q   So in other words, you wouldn't review the
9   inmate's entire chart every time you saw a patient,
10  correct?
11  A   Correct.
12  Q   You would review the parts that you felt were
13  necessary to help you make the medical judgments you
14  needed to, correct?
15  A   Correct.
16  Q   And if you felt you needed additional records
17  or you needed to review more, you would review them,
18  correct?
19  A   Correct.
20  Q   As a family medical practitioner, you are more
21  than qualified to assess the inmate's medical
22  conditions that he complained about, correct?
23  A   It's within the scope of practice of a family
24  medicine doctor to take care of him, yeah.
25  Q   Counsel asked you some questions about

24 (Pages 90 - 93)

Page 94

1 Wexford's role at the DOC and the prison more
2 specifically. I want to confirm, Doctor. You're by
3 no means familiar with the details of Wexford's
4 arrangement with the DOC or Stateville, correct?
5 A Correct.
6 Q As part of your examination, do you consider
7 the functional needs of the patient?
8 A Yes.
9 Q And so for a patient with the symptoms that Mr.
10 Hemphill had, would you consider his functional needs?
11 A Yes.
12 Q You used a couple of times throughout this
13 deposition the example of is he a major league
14 pitcher. Can you explain that example to me? I want
15 to understand it a little bit more.
16 A Sure. So everyone has different requirements
17 in terms of what they are asking their body to do.
18 And if their livelihood is directly dependent upon
19 their shoulder because they do something like, you
20 know, pitch for the major leagues, then it changes the
21 acuity of the situation and it changes the rehab plan.
22 It's a general, it's a general principle of medicine
23 that sort of the risk and benefit of procedures and of
24 treatments has a lot to do with what the requirements
25 that that person has are.

Page 95

1 Q You saw Inmate Carl Hemphill inside of
2 Stateville Correctional Center, correct?
3 A Yes.
4 Q Stateville Correctional Center is a maximum
5 security prison, correct?
6 A Yes.
7 Q Did Mr. Hemphill have low demand functional
8 needs when you treated him?
9 A Yes.
10 Q And would that be something that would factor
11 into your treatment decisions for the patient?
12 A Yes, yes. Because it would be about how do we
13 get him to his best day-to-day functioning. And his
14 day-to-day functioning did not require anything, any
15 untoward demands on the shoulder.
16 Q So conservative treatment would be in
17 accordance with that, correct?
18 A Correct. As it would be again for the vast
19 majority of people that didn't have some sort of a job
20 that required --
21 Q Can a nurse refer a Stateville inmate for an
22 MRI?
23 A No.
24 Q That needs to be done by a doctor, correct?
25 A Correct. The only person who did that at

Page 96

1 Stateville was Dr. Obaisi.
2 Q And at Stateville, the only doctor that did
3 that was Dr. Obaisi, correct?
4 A Correct.
5 Q Counsel asked you some questions about when the
6 medical prescription for Naproxen was removed and the
7 frequency was PRN versus on a schedule. Do you recall
8 those questions?
9 A Yes.
10 Q When the orange -- one of the April
11 examinations, the April 14 examination I believe it
12 was -- mind if I -- I might have the date wrong here.
13 When the nurse did the examination and then took the
14 order to renew the Naproxen, do you recall that
15 examination?
16 A Yes.
17 Q You said you found that nurse to be extremely
18 competent?
19 A Yes.
20 Q If that nurse thought the telephone order that
21 you or the verbal order that you took was not
22 appropriate, would you have expected her to discuss
23 that with you?
24 A Yes.
25 MR. BRITT: Object to form.

Page 97

1 Q And ultimately you provided the order that you
2 felt was appropriate based on the nurse's report to
3 you, correct?
4 MR. BRITT: I'm going to object to form
5 again.
6 A Correct. So I trusted her assessment and
7 judgment of the patient's condition.
8 Q Right. And based on what we reviewed today
9 that was the appropriate order, the Naproxen that you
10 prescribed at that time, correct?
11 A As far as I can tell, yes. I mean, I agreed
12 with her assessment and that's what her assessment
13 was.
14 Q When was your last date in the prison, Doctor,
15 at Stateville?
16 A At Stateville. I believe it was April 1st of
17 2014.
18 Q And what was your last day working for Wexford?
19 A The end of August of 2014.
20 Q Once you went to Sheridan, you testified
21 earlier that you handed off treatment, so to speak, to
22 whoever else was at the prison at that time, correct?
23 A Correct.
24 Q That the expectation was we've developed
25 medical records, we have processes in place where

25 (Pages 94 - 97)

Page 98

1 someone else can come in and treat this patient. I
2 don't have to do what I've heard called a sign-out
3 which you might see in a hospital, correct?
4        MR. BRITT: Object to form.
5    A   Correct.
6    Q   You didn't have to give any sort of verbal
7 report to the oncoming staff as to this patient,
8 correct?
9    A   Correct.
10   Q   I assume you've, you have no memory of Carl
11 Hemphill, correct?
12   A   Correct.
13   Q   So I assume you have not seen or examined Mr.
14 Hemphill since 2013, correct?
15   A   Correct.
16       MR. MARUNA: All right. Nothing further.
17 I reserve my right to re-question but consistent
18 with the rules. Anything else?
19       MR. STEPHENSON: I have a few questions but
20 I'll pass the witness here to Plaintiff if he has
21 questions first.
22       EXAMINATION
23 BY MR. BRITT:
24   Q   Just one quick couple of questions. Your
25 attorney asked you about medical permits, like, low

Page 99

1 bunk permits and the like?
2    A   Yes.
3    Q   Do you remember that?
4    A   Yes, I do.
5    Q   Okay. Did you ever issue any such permits for
6 Mr. Hemphill?
7    A   I don't know. I didn't do permits very often
8 and the vast majority of the time I only did temporary
9 permits. I didn't do permanent permits. That was Dr.
10 Obaisi's job for the most part. I don't know whether
11 I issued any permits for him.
12   Q   Okay. Did Dr. Obaisi consult with you about
13 the need to issue such permits?
14       MR. MARUNA: In general or for this
15 patient?
16   Q   We'll say for Mr. Hemphill. Did Dr. Obaisi
17 ever discuss with you the need for a medical permit
18 for him?
19   A   There's no reason why he would have. He would
20 have just written it.
21       MR. BRITT: Okay. I have nothing further.
22       EXAMINATION
23 BY MR. STEPHENSON:
24   Q   Good afternoon, Doctor. My name is Mike
25 Stephenson. I represent the State Defendants in this

Page 100

1 case which include Mr. Lemke, Miss O'Brien and Dr.
2 Shicker. You mentioned that lockdowns occur at the
3 facility here specifically Stateville; is that right?
4    A   Yes.
5    Q   And during those lockdowns, there is reduced
6 movement?
7    A   Yes.
8    Q   If there is an emergency during a lockdown that
9 inmate will still be provided medical treatment; is
10 that right?
11   A   Yes, absolutely.
12   Q   Okay. Now Mr. Hemphill's right shoulder pain
13 that he's complaining about that was alleged in this
14 case was, in your opinion, nonemergent; is that right?
15   A   Correct.
16   Q   And lockdowns in general during your time at
17 Stateville and while treating Mr. Hemphill, those
18 lockdowns didn't affect your treatment of him,
19 correct?
20   A   I don't, I mean, I don't know. I don't think
21 so. It looks like the only times that I really
22 treated him were those two times I saw him in April.
23   Q   Right. And you don't recall any other time
24 that you personally treated Mr. Hemphill, correct?
25   A   Correct.

Page 101

1    Q   And for those two times that you did treat in
2 the lockdowns, if any occurred at that time, didn't
3 affect your treatment of Mr. Hemphill, right?
4        MR. MARUNA: Objection. Incomplete
5 hypothetical.
6    A   I just, I have no idea.
7    Q   You don't recall any lockdowns occurring at the
8 time that you provided treatment to Mr. Hemphill?
9    A   I don't, and I don't think that -- I wouldn't
10 have seen him on lockdown for those things. Well, I
11 might have seen him for the hand when he dropped the weight on
12 his hand, if that happened during lockdown. But
13 routine scheduled appointments wouldn't have happened
14 during a lockdown.
15       MR. STEPHENSON: Thank you, Doctor. I
16 don't have any further questions. I'll pass the
17 witness.
18       MR. MARUNA: Anything?
19       MR. BRITT: No.
20       MR. MARUNA: Going once, going twice, all
21 right. Doctor, you have the right to waive
22 signature or review the transcript.
23       THE WITNESS: I'll waive signature.
24       MR. MARUNA: That's what I figured.
25       THE COURT REPORTER: This is the court

26 (Pages 98 - 101)

Page 102

1   reporter.  Just real quickly before we sign off,

2   Mr. Britt and Mr. Stephenson, do you both want a

3   copy of the transcript once it's done?

4        MR. BRITT:  Yeah.  I'll take an electronic

5   copy.

6        MR. STEPHENSON:  E-tran for Mr. Stephenson.

7        MR. MARUNA:  I'll take an e-tran with

8   exhibits.

9

10       (DEPOSITION CONCLUDED AT 3:56 P.M.)

11           (SIGNATURE WAIVED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

1  STATE OF NORTH CAROLINA

2  COUNTY OF FORSYTH

3           REPORTER'S CERTIFICATE

4       I, Jana Collins, a Notary Public in and for the

5  State of North Carolina, do hereby certify that there

6  came before me on Thursday, the 7th day of December,

7  2017, the person hereinbefore named, who was by me

8  duly sworn to testify to the truth and nothing but the

9  truth of his knowledge concerning the matters in

10 controversy in this cause; that the witness was

11 thereupon examined under oath, the examination reduced

12 to typewriting under my direction, and the deposition

13 is a true record of the testimony given by the

14 witness.

15      I further certify that I am neither attorney or

16 counsel for, nor related to or employed by, any

17 attorney or counsel employed by the parties hereto or

18 financially interested in the action.

19      IN WITNESS WHEREOF, I have hereto set my hand,

20 this the 18th day of December, 2017.

21

22

23

24        Jana Collins, Notary Public

25        Notary Number: 200733100028

27 (Pages 102 - 103)

Hemphill vs Wexford Health Sources, Inc.

15 CV 4968

Deposition of: LaTonya Williams, PA

Taken on: March 09, 2018

**JENSEN LITIGATION SOLUTIONS**
180 North LaSalle Street
Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.jensenlitigation.com



Exhibit D

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018                                    Page 1

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
     CARL HEMPHILL,                        )
 4                                         )
                        Plaintiff,         )
 5                                         )
                 vs.                       )No. 15 CV 04968
 6                                         )
     WEXFORD HEALTH SOURCES, INC.; SALEH   )
 7   OBAISI; ANN HUNDLY DAVIS; LATONYA     )
     WILLIAMS; LOUIS SHICKER; MICHAEL      )
 8   LEMKE; and DORRETTA O'BRIEN,          )
                                           )
 9                      Defendants.        )

10

11            The deposition of LaTONYA WILLIAMS, PA, called

12   by the Plaintiff for examination, taken pursuant to

13   notice and pursuant to the Federal Rules of Civil

14   Procedure for the United States District Courts

15   pertaining to the taking of depositions, taken before

16   Traci L. Gidley, Certified Shorthand Reporter,

17   Registered Professional Reporter, and Notary Public, at

18   16830 Route 53, Crest Hill, Illinois, commencing at

19   10:17 a.m. on March 9, 2018.

20

21

22

23

24
```



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 2..5

Page 2

```
1    APPEARANCES:
2         FOLEY & LARDNER, LLP
          MR. ANDREW T. MCCLAIN
3         321 North Clark Street
          Suite 2800
4         Chicago, Illinois 60654
          Phone:  (312) 832-4500
5         E-Mail:  amcclain@foley.com
6              On behalf of the Plaintiff;
7         CASSIDAY SCHADE, LLP
          MR. JAMES F. MARUNA
8         222 West Adams Street
          Suite 2900
9         Chicago, Illinois 60606
          Phone:  (312) 641-3100
10        E-Mail:  jmaruna@cassiday.com
11             On behalf of the Defendants Wexford Health
               Source, Inc., Saleh Obaisi, Ann Hundly Davis,
12             and Latonya Williams;
13        ASSISTANT ATTORNEY GENERAL
          MR. MICHAEL POWELL (Via Teleconference)
14        100 West Randolph Street
          13th Floor
15        Chicago, Illinois 60601
          Phone:  (312) 814-3588
16        E-Mail:  mpowell@atg.state.il.us
17             On behalf of the Defendants Louis Shicker,
               Michael Lemke, and Dorretta O'Brien.
18
19
20                    *    *    *    *    *    *
21
22
23
24
```

Page 3

```
1                    I N D E X
2    WITNESS                                          PAGE
3    LaTONYA WILLIAMS, PA
4       Examination by Mr. McClain...............   5
5       Examination by Mr. Maruna...............   76
6       Further Examination by Mr. McClain........ 108
7       Further Examination by Mr. Maruna......... 117
8       Further Examination by Mr. McClain........ 119
9       Further Examination by Mr. Maruna......... 122
10
11
12                 E X H I B I T S
13   WILLIAMS DEPOSITION EXHIBIT                       PAGE
14      No. 1 (Staff Position Requirements).......   11
15      No. 2 (Medical Policies & Procedures).....   23
16      No. 3 (Offender Outpatient Progress)......   34
17      No. 4 (Prescription Order)................   42
18      No. 5 (Medical Permit)....................   44
19      No. 6 (Offender Outpatient Progress)......   49
20      No. 7 (Offender Physical Examination).....   50
21      No. 8 (Offender Grievance)................   64
22      No. 9 (Offender Outpatient Progress)......  111
23      No. 10 (Operative Report).................  119
24
```

Page 4

```
1                    (Witness sworn.)
2         MR. MCCLAIN:  Good morning, Ms. Williams.  My name
3    is Andrew McClain.  We briefly met off the record.  I
4    represent the plaintiff in this matter, Carl Hemphill.
5    I'm going to be asking you a series of questions today.
6         Have you ever been deposed before?
7         THE WITNESS:  Yes, I have.
8         MR. MCCLAIN:  Okay.  I just want to set -- you
9    know, just want to kind of remind you of a few ground
10   rules.
11        You understand that you're under oath,
12   correct?
13        THE WITNESS:  Yes, I do.
14        MR. MCCLAIN:  And if you don't understand a
15   question, can you please let me know, and I'll rephrase
16   the question for you?
17        THE WITNESS:  Yes.
18        MR. MCCLAIN:  And if you answer a question, I will
19   assume that you understood the question; is that fair
20   assumption?
21        THE WITNESS:  It is.
22        MR. MCCLAIN:  And, also, our court reporter here is
23   taking down everything, so when you answer, just answer
24   audibly, no nods of the head or uh-huhs or uh-uhs or
```

Page 5

```
1    things like that.
2         THE WITNESS:  Understood.
3         MR. MCCLAIN:  Okay.  And if you want a break at any
4    time, just let us know.  But I would just ask before we
5    take a break that you answer my pending question, if
6    there is one pending.
7         THE WITNESS:  Yes.
8    WHEREUPON:
9              LaTONYA WILLIAMS, PA,
10   called as a witness herein, having been first duly
11   sworn, was examined and testified as follows:
12                    EXAMINATION
13   BY MR. MCCLAIN:
14        Q.   Okay.  What have you done to prepare for
15   today's deposition?
16        A.   I reviewed some portions of the medical file
17   with my attorney.
18        Q.   And is that Mr. Hemphill's medical file?
19        A.   It is.
20        Q.   And what was in that medical file?
21        A.   Some progress notes.
22        Q.   Is that it?
23        A.   That was basically it, yes.
24        Q.   Okay.  And have you talked to anyone besides
```



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 6..9

---

Page 6

1  your attorney?  And I don't want to know what you and
2  your attorney discussed.
3       A.   No, I have not.
4       Q.   Are you familiar with an individual named Carl
5  Hemphill?
6       A.   My memory was refreshed when I reviewed some
7  the records, yes.
8       Q.   Do you know what Mr. Hemphill's -- back up.
9            Do you under that Mr. Hemphill has filed a
10 lawsuit against Wexford as well as yourself,
11 individually?
12      A.   Yes.
13      Q.   Do you know what Mr. Hemphill's medical
14 diagnosis was as it relates to his lawsuit against you?
15      MR. MARUNA:  Objection to the form of the question,
16 vague.
17           You can ask for clarification or answer if you
18 understand.
19 BY THE WITNESS:
20      A.   Something in regards to his shoulder.  That's
21 what I recall seeing him for.
22      Q.   What is your highest level of education?
23      A.   A master's in physician assistant's studies
24 advanced.

---

Page 7

1       Q.   And where did you receive your master's from?
2       A.   University of Nebraska in 2000.
3       Q.   And, I'm sorry, what was that in?
4       A.   Physician assistant studies -- actually,
5  advanced physician's assistant studies.
6       Q.   And who your current employer?
7       A.   Wexford Health Sources.
8       Q.   And you work at the Stateville Correctional
9  Facility, correct?
10      A.   Yes, I do.
11      Q.   Do you work at any other IDOC facilities?
12      A.   No, I don't.
13      Q.   How long have you worked at Stateville?
14      A.   I've been at Stateville since 2002.
15      Q.   Backing up, when did you receive your
16 master's?
17      A.   2000.
18      Q.   And how long have you been employed at Wexford
19 or by Wexford?
20      A.   I've been employed by Wexford on two different
21 occasions.
22      Q.   Okay.  Let's talk about the first occasion.
23           When was that?
24      A.   That was some time after 2002 for a short

---

Page 8

1  period of time.
2       Q.   Do you recalled how long that employment
3  lasted?
4       A.   I do not.
5       Q.   And why did you stop working for Wexford
6  during that time?
7       A.   Someone else got the contract with IDOC.
8       Q.   Someone other than Wexford?
9       A.   Someone other than Wexford.
10      Q.   And then when did you begin working for
11 Wexford for a second time?
12      A.   Once again, I don't know exact dates, but it's
13 been since that point.  Somewhere around 2006, 2007,
14 approximately, and it's been consistently Wexford since
15 that point.
16      Q.   And what is your current position with
17 Wexford?
18      A.   Physician's assistant.
19      Q.   And how long have you been in that role?
20      A.   From 2002 through current.
21      Q.   Have you held any other positions with Wexford
22 besides physician's assistant?
23      A.   I have not.
24      Q.   Can you tell me what the difference between a

---

Page 9

1  physician's assistance and a registered nurse is?
2       A.   I don't exactly know what all the functions
3  and duties are of nurse is.  I've never been a nurse, so
4  I don't know exactly.
5       Q.   And would that be the same answer for a nurse
6  practitioner?
7       A.   Nurse practitioner are mid level practitioners
8  like physician's assistants.  We do have licenses to
9  prescribe medications, we can order various
10 laboratories.  We can treat and diagnose patients.
11      Q.   So you can actually write a prescription for a
12 patient?
13      A.   I can.
14      Q.   And what do you mean when you said you can
15 order various laboratories?
16      A.   An X-rays is considered a laboratory, blood
17 work is considered a laboratory, uranalysis, things such
18 as that.
19      Q.   Would that include an MRI, as well?
20      A.   No, sir.
21      Q.   Who can order an MRI?
22      A.   That has to be the medical director.
23      MR. MARUNA:  Are you asking at Stateville or are
24 you talking in just the general practice of medicine?

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 10..13

Page 10

1        MR. MCCLAIN:  At Stateville.
2        MR. MARUNA:  Okay.
3   BY THE WITNESS:
4        A.   (Continuing.)  That would be the medical
5   director.
6        Q.   And who is the medical director at Stateville?
7        A.   Currently?
8        Q.   Currently.
9        A.   It's Dr. Roz.
10       Q.   And who was it previously?
11       A.   Prior to January, it was Dr. Obaisi.
12       Q.   Sorry to hear about Dr. Obaisi's passing.
13       A.   Thank you.  We miss him desperately.
14       Q.   I want to go back just generally to your
15   education.
16            Are you currently an Illinois licensed
17   physician -- or, excuse me, an Illinois licensed
18   physician's assistant?
19       A.   Yes, I am.
20       Q.   And have you been a licensed physician's
21   assistant since the year 2013?
22       A.   I have.
23       Q.   And did you work as a licensed physician's
24   assistant for more than one year prior to the year 2013?

Page 11

1        A.   Yes, I did.
2        Q.   Are you CPR certified?
3        A.   I am.
4        Q.   Were you CPR certified for the years 2013
5   through 2016?
6        A.   Yes, I was.
7                 (Williams Deposition Exhibit No. 1
8                  marked as requested.)
9   BY MR. MCCLAIN:
10       Q.   Okay.  I want to hand you what I've marked as
11   Exhibit 1.
12       A.   Thank you.
13       Q.   It's an exhibit to Wexford's contract with the
14   IDOC.
15            Are you familiar with the fact that Wexford
16   has a contract to provide medical services at certain
17   IDOC facilities?
18       A.   I am.
19       Q.   Have you ever seen this document?
20       A.   I don't believe that I have.
21       Q.   If you could flip to page -- it's the second
22   page of this exhibit.  It's Wexford 171.
23       A.   Yes.
24       Q.   At the top of the page, it says, Physician

Page 12

1   Assistant, slash, Nurse Practitioner.
2            Can you review those minimum requirements,
3   please?
4        A.   Illinois license for PA, physician assistant.
5   One year of working experience and CPR certification --
6   I'm sorry.
7        Q.   Do you meet those minimum requirements?
8        A.   Yes, I do.
9        Q.   Now, I want you to flip to the next page
10   please.  It's Wexford 183.
11       A.   Yes.
12       Q.   I want to talk about your specific duties as a
13   physician assistant at Stateville.
14            If you could just take a moment to review this
15   document.  You don't have to read it out loud, just so
16   you become familiar with it.
17       A.   Yes.
18       Q.   The first section indicates that physician
19   assistants shall perform mid level professional
20   services.
21            What are mid level professional medical
22   services?
23            MR. MARUNA:  Are you asking what it means under the
24   contract or are you asking what her interpretation of it

Page 13

1   is?
2   BY MR. MCCLAIN:
3        Q.   I'm asking what mid level professional medical
4   services means under this contract?
5            MR. MARUNA:  Okay.  Objection to foundation.  I
6   don't know if the witness has explained that she's ever
7   reviewed the contract before or was involved in this
8   drafting.
9   BY THE WITNESS:
10       A.   I've not.
11       Q.   Okay.  What does mid level professional
12   medical services mean to you personally?
13       A.   Well, I can tell you what mid level
14   practitioner means.
15            Mid level practitioner is under a physician
16   and above a nurse.  Mid level practitioners work under
17   the supervision of a physician whether -- yeah.  We work
18   under the supervision of a physician.
19       Q.   Do you have autonomy to make certain medical
20   decisions without consulting the physician who
21   supervises you?
22       A.   I do.
23       Q.   Do you supervise the nurses that you described
24   as below a physician assistant?



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 14..17

Page 14

1    A.   I do not supervise nurses, no, I don't.
2    Q.   Do you supervise any employees of Wexford?
3    A.   No, I don't.
4    Q.   I want to skip down to Point 1 which indicates
5  that physician assistants ensures that proper medical
6  practices are observed.
7         What does this mean to you in terms of
8  providing medical services to inmates at Stateville?
9    MR. MARUNA:  I'm going to object to the witness
10 testifying as to what the contract means for the reasons
11 stated earlier.
12        Ms. Williams, you can answer about what it
13 means to you generally outside of the contract.
14 BY THE WITNESS:
15   A.   I mean, to me, I interpret this as meaning
16 that I perform my services in compliance with standard
17 of community care.
18   Q.   And you previously testified that you are you
19 are an employee of Wexford, correct?
20   A.   I did.
21   Q.   And you understand that there is a contract
22 between Wexford and the IODC to provide certain medical
23 services?
24   MR. MARUNA:  IDOC.

Page 15

1  BY THE WITNESS:
2    A.   IDOC.  Yes, in general I understand that, yes.
3    Q.   I want to skip down to Point 2 which indicates
4  that physician assistants will examine for, recognize,
5  and interpret symptoms of offender's conditions.
6         What does this mean to you in your practice as
7  a physician assistant?
8    MR. MARUNA:  Same objection as stated.
9         Ms. Williams, over the objection, you may
10 answer.
11 BY THE WITNESS:
12   A.   Once again, that -- that I treat and manage
13 the patient in accordance to the standard of care in the
14 community.
15   Q.   And Point 3 indicates that physician
16 assistants can order medications for offenders.
17        And I believe we previously touched on this,
18 but does that mean that you are authorized to prescribe
19 medications for offenders?
20   MR. MARUNA:  Same objection.
21        Ms. Williams, you can answer over the
22 objection.
23 BY THE WITNESS:
24   A.   Yes.

Page 16

1    Q.   Is there a limit on what medications you can
2  or cannot prescribe?
3    A.   No.
4    Q.   So you can prescribe any sort of medicine to
5  inmates?
6    A.   Yes.
7    Q.   Do you conduct physical examinations of
8  inmates at Stateville?
9    A.   Can you clarify what you mean by physical
10 examinations?
11   Q.   Sure.  For instance, an annual checkup or just
12 I would say, like, an overall diagnostic review of an
13 individual's health.
14   A.   I do participate in annual physical
15 examinations of a patient, and, of course, when I see a
16 patient for sick call or for an emergency, I do
17 examinations, as well.
18   Q.   Is there any sort of policy that inmates are
19 to receive annual or biannual physical exams?
20   A.   There is.
21   Q.   What is that policy?
22   A.   Just off the top of my head, in accordance to
23 age, 20s, between 20 and 29, they receive physicals --
24 well, let me preface that by saying when an inmate comes

Page 17

1  into an institution, goes through central receiving,
2  they receive a physical examination at that time.  After
3  that point, it's in accordance to their age:  20 to
4  29, it's every five years, I believe; 30 to 39, it's
5  every three years; 40 and above, it's every other year.
6    Q.   As a physician assistant, are you authorized
7  to give cortisone shots to inmates?
8    A.   I do not participate interarticular
9  injections, no.
10   Q.   Who provides those to inmates?
11   A.   Let me back up and ask you exactly what you
12 mean by cortisone injections.  They come in several
13 different forms.
14        So what exactly --
15   Q.   Are you aware that Mr. Hemphill received
16 cortisone injections?
17   A.   Once again, if you could clarify exactly where
18 that was.  There's several different locations that
19 cortisone injection can --
20   Q.   I believe it was given into his shoulder.
21   A.   Okay.  I do not give interarticular
22 injections.  Never have.
23   Q.   Okay.  Who is authorized to give those
24 injections?



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 18..21

Page 18

1    A.   Well, it's not so much who is authorized to
2  give the injections as opposed to who normally took on
3  that task.  In the past, it had been the medical
4  director.  When I worked under Dr. Obaisi, he would give
5  interarticular injections.
6       Q.   Are you authorized by Wexford to give these
7  sort of injections?
8       A.   I'm authorized to do what I am trained in and
9  what I feel comfortable in doing.
10      Q.   Are you -- Go ahead.  Sorry.
11      A.   I was -- didn't desire to give interarticular
12  injections.  I left that for determination by someone
13  above myself.
14      Q.   Have you been trained in giving these sort of
15  injections?
16      A.   I've been a PA now for 30-plus years.  I don't
17  recall my -- though training that I did in the past.
18      Q.   Okay.  Are you authorized to order X-rays?
19      A.   Yes, I am.
20      Q.   And what is the procedure for ordering an
21  X-ray for an inmate at Stateville?
22      A.   Can you be a little more clear on what you
23  mean?
24      Q.   Sure.  I'll just give an example:  If an

Page 19

1  inmate comes in and you examine him and you determine
2  that he needs an X-ray or he should have an X-ray, what
3  do you do to order that X-ray for the inmate?
4       A.   When I'm seeing the patient, I see him with
5  his chart, his file, I'm documenting our visit on a
6  progress note.  Within that progress note, there are
7  several different components and it follows -- it
8  follows a SOAP format.
9            I can order an X-ray under the P, which is the
10  plan.  I write that down as part of my plan, and then I
11  follow a requisition with the patient's information the
12  X-ray that I line and submit that.
13      Q.   Is that the only way that you order the X-rays
14  for inmates?
15      A.   It is.
16      Q.   And once you submit the requisition, what
17  happens to that request?
18      A.   When I finish my visit with the patient and
19  put all of my information, the nurse that signs off or
20  countersigns my chart for that day will then make sure
21  the documents get to the appropriate departments.
22      Q.   So it's the nurse's responsibility to ensure
23  that the X-ray requests gets to the appropriate
24  authority?

Page 20

1       A.   That's correct.
2       Q.   Did you ever order an X-ray for Mr. Hemphill?
3       A.   As I recall reviewing, I did.
4       Q.   Do you recall why you ordered that X-ray?
5       A.   It was in accordance with his complaint of
6  shoulder pain, right shoulder pain, as I recall.
7       Q.   Do you know if he had previously received an
8  X-ray for his right shoulder prior to you ordering this
9  X-ray?
10      A.   I don't recall.
11      Q.   And I believe we touched on this I just want
12  to confirm, though, are you authorized to order MRIs?
13      A.   I am not.
14      Q.   Are you authorized to recommend orthopedic
15  evaluation of an inmate at Stateville?
16      A.   I'm not.
17      Q.   Are you authorized to recommend an inmate at
18  Stateville for surgery?
19      A.   I'm not.
20      Q.   Who is authorized to recommend orthopedic
21  evaluation of an inmate at Stateville?
22      A.   That would be a medical director.
23      Q.   And who is authorized to recommend surgery for
24  an inmate at Stateville?

Page 21

1       A.   Perhaps whatever specialist who evaluated that
2  patient for that particular discipline.
3       Q.   I want to go back to Exhibit 1, Wexford 187.
4            Duty No. 5 states that a physician assistant
5  will prepare offenders for and perform or assist in
6  special treatments, procedures and examinations.
7            What does that mean to you in terms of your
8  practice at Stateville as a physician assistant?
9       A.   I have no idea what this prepare offenders for
10  and perform or assist in special treatments.  I have no
11  idea what that means.
12      Q.   Does the term special treatments mean anything
13  to you as a physician's assistant?
14      A.   It does not.  This is actually kind of vague,
15  so that's why this is kind of throwing me off.
16      Q.   Who reviews your work at Stateville?
17      A.   The medical director reviews a certain
18  percentage of my work.
19      Q.   And what does that mean specifically?  Can
20  elaborate on that?
21      A.   I don't know exactly each and every record
22  that the medical director would review.
23      Q.   Does he review the progress notes?
24            MR. MARUNA:  Objection, foundation.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 22..25

Page 22

1    You can answer, if you know, Ms. Williams.
2  BY THE WITNESS:
3    A.  I don't know exactly what he would review.
4    Q.  Do you have any sort of meeting with the
5  medical director or any other Wexford staff to review
6  your performance throughout the year?
7    A.  Yes, sir.
8    Q.  And can you describe that process to me,
9  please?
10   A.  I would have annual reviews with the medical
11 director.  I can't give you those exact dates that it
12 would occur, but it would be on an annual basis that my
13 medical director would review my performance.
14   Q.  And what sort of things do you discuss at this
15 annual review with the medical director?
16   A.  In detail, I couldn't tell you.
17   Q.  When is the last time that you had a review
18 with the medical director?
19   A.  I'm sure it was some time in 2017.
20   Q.  And I apologize.  I don't mean to offend you
21 by this question, but have you ever been reprimanded or
22 disciplined by the medical director?
23   A.  I have not.
24   Q.  That's great.

Page 23

1    Are you familiar with Wexford's medical
2  policies and procedures?
3    A.  I am aware that it exists.  I know where to
4  locate it in case I need to use it as a source of
5  reference.
6                (Williams Deposition Exhibit No. 2
7                 marked as requested.)
8  BY MR. MCCLAIN:
9    Q.  Ms. Williams, have you ever seen that
10 document?
11   A.  Yes, I have.
12   Q.  And what is this document?
13   A.  This is the Wexford Health Source medical
14 policies and procedure manual.
15   Q.  And what is contained in this document -- and,
16 actually, I should back up.
17       Just a quick disclaimer, this is not the
18 entire medical policies and procedures; it is certain
19 excerpts of this, but it has been produced by Wexford in
20 this case.
21       So what is contained in the medical policies
22 and procedures?
23   A.  Well, in just reviewing it briefly right here,
24 there are guidelines for different medical conditions,

Page 24

1  illnesses.
2    Q.  And how is this policy conveyed to you as a
3  physician assistant at Wexford?
4    MR. MARUNA:  Objection to foundation as to policy.
5       Over the objection, Ms. Williams, you can
6  answer.
7  BY THE WITNESS:
8    A.  I don't know understand clearly what you mean
9  by that.
10   Q.  When you became employed by Wexford in 2006,
11 were you given a copy of Wexford's medical policies and
12 procedures?
13   A.  I was advised where it's located in the
14 healthcare unit, and, once again -- I apologize -- once
15 again, I know where to locate it in case I needed to
16 reference it for any reason.
17   Q.  Have you ever referenced this medical policies
18 and procedures?
19   A.  Yes, I have.
20   Q.  Do you recall when the last time you
21 referenced it was?
22   A.  No, I don't.
23   Q.  Are you involved in formulating any of these
24 policies and procedures?

Page 25

1    A.  No.
2    Q.  Who is involved in that process?
3    A.  I can't confirm exactly who is involved in
4  that.  I don't know.
5    Q.  Does Wexford provide any sort of annual
6  training or certification in -- for physician assistants
7  of these medical policies and procedures?
8    A.  I wouldn't say specifically in regards to each
9  and every policy and procedure in here.  We do
10 continuing medical education updates.
11   Q.  And what are these continuing educational --
12 continuing educational medical updates?
13   A.  That's correct.
14   Q.  What are those?
15   A.  Different medical conditions that may occur in
16 a patient.
17   Q.  And is it a class or is it a webinar?  What is
18 it?
19   A.  We've had classes, we do some computer
20 training, as well.
21   Q.  And is that Wexford sponsored?
22   A.  Some of it is, yes.
23   Q.  If you could please flip to -- it's Bates
24 labeled Wexford 540?


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 26..29

Page 26

1    A.   Yes.
2    Q.   **Ms. Williams, what is this?**
3    A.   This has pain management on this particular
4    page.
5    Q.   **And if you flip through Wexford 541 through**
6    **546, have you seen this document before?**
7    A.   I'm sure I may have reviewed it at some point
8    or another.  I can't recall specifically.
9    Q.   **And what is this document?**
10   A.   This particular on 541 says, Treatment of mild
11   to moderate pain.
12   Q.   **And -- So what is this page providing?**
13   A.   It's providing a guideline that can be
14   referenced in managing a patient with mild to moderate
15   pain.
16   Q.   **Did you ever consult this guide when examining**
17   **Mr. Hemphill?**
18   A.   I can't confirm or deny whether I did or not.
19   Q.   **Did you treat Mr. Hemphill for mild to**
20   **moderate pain?**
21   MR. MARUNA:  Objection to form.
22       Ms. Williams, you can answer if you
23   understand.
24

Page 27

1    BY THE WITNESS:
2    A.   I don't recall independently what degree of
3    pain, but I remember managing this patient due to a
4    complaint of pain.
5    Q.   **Can you please flip to Page 546?**
6    A.   Yes.
7    Q.   **Roman Numeral XIII, what does that state?**
8    A.   Pharmacologic treatment of mechanical, slash,
9    compressive pain.
10   Q.   **What is mechanical, slash, compressive pain?**
11   A.   I can't given you 100 percent definition of
12   what this means.
13   Q.   **In your medical opinion, what does mechanical**
14   **compressive pain mean?**
15   A.   Mechanical movement, compressive, I don't know
16   what they mean by that.
17   Q.   **Would -- Are you familiar with the term**
18   **impingement syndrome?**
19   A.   I am.
20   Q.   **What is impingement syndrome?**
21   A.   Just in general, it can be impingement of a
22   nerve possibly.
23   Q.   **And what does that mean?**
24   A.   Impingement, when something is caught between

Page 28

1    two structures.
2    Q.   **Do you know if Mr. Hemphill was diagnosed with**
3    **impingement syndrome?**
4    A.   I don't independently recall.
5    Q.   **Would impingement syndrome qualify as**
6    **mechanical, slash, compressive pain?**
7    A.   Compressed.  It could possibly.
8    Q.   **Would degenerative -- Do you know the term**
9    **degenerative changes in the AC joint?**
10   A.   I know degenerative changes in general.  I
11   can't say specific in regards to an AC joint.
12   Q.   **What does degenerative changes mean?**
13   A.   Deterioration of.
14   Q.   **And if that was located in the AC joint, what**
15   **would that mean?**
16   A.   Degenerative changes such as osteoarthritis as
17   osteoarthritis, degenerative joint disease.
18   Q.   **If you look at Subsection A on Wexford 547,**
19   **can you please read that out loud to me?**
20   A.   547?
21   Q.   **546.  I'm sorry.**
22   A.   Okay.  I'm sorry.  Would you repeat that for
23   me, please?
24   Q.   **Yes.  It's Section -- Roman Numeral VIII,**

Page 29

1    Subsection A.
2    A.   Medications are less effective.  Treatment of
3    causes may include surgical decompression or
4    stabilization, splinting, strengthening, and use of
5    assistive devices.
6    Q.   **Ms. Williams, what does that statement mean to**
7    **you as a medical professional?**
8    A.   This says in regards to pharmacologic
9    treatment of mechanical, slash, compressive pains, that
10   medications are less effective.  Treatment of causes may
11   include surgical decompression or stabilizations,
12   splinting, strengthening, and use of assistive devices.
13   Q.   **So just to clarify, if an individual suffering**
14   **from mechanical compressive pain, medical treatment --**
15   **excuse me -- prescribing medicine is a less effective**
16   **treatment for that pain, correct?**
17   MR. MARUNA:  Objection to foundation.
18       Ms. Williams, you can answer.
19   BY THE WITNESS:
20   A.   As a general statement, that's what this
21   appears this says.
22   Q.   **Is prescribing Tylenol considered a medication**
23   **treatment?**
24   A.   Yes.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 30..33

Page 30

1    Q.   Is prescribing Naprosyn a medication
2  treatment?
3    A.   Yes.
4    Q.   Is prescribing Motrin a medication treatment?
5    A.   Yes.
6    Q.   Are you familiar with an offender sick call,
7  slash, medical services request?
8    A.   In general, yes, I am.
9    Q.   And does Stateville utilize offender sick
10 call, slash, medical services requests?
11   A.   Yes.
12   Q.   If I just use the term sick call requests,
13 will you understand that that means sick call, slash,
14 medical services requests?
15   A.   Yes.
16   Q.   What is a sick call request at Stateville?
17   A.   A sick call request is a form that the
18 offender can obtain, fill it out, and submit it
19 requesting medical services.
20   Q.   And who does the offender submit the form to?
21   A.   That was actually a past practice.  When it
22 was in effect, it would be submitted to -- well,
23 actually, within their cell house or cell block, there
24 was a designated area that they could put those forms

Page 31

1  into, and someone would collect them on a daily basis to
2  review them.
3    Q.   This procedure that you just described, was
4  that utilized in 2013?
5    A.   I can't recall exactly when the transition
6  occurred with the way they access medical care.  I don't
7  recall.
8    Q.   So do you know who picks up these sick call
9  request slips from the bin that you described?
10   A.   Back when that was occurring, it was the med
11 techs, the CMTs.
12   Q.   What is a med tech?
13   A.   A med tech, CMT was or is someone that is not
14 a nurse or mid level practitioner or physician.  This is
15 someone who had designated duties specifically for that
16 position.
17   Q.   And once the med tech -- Strike that.
18        What is a CMT or what does CMT stand for?
19   A.   It's a certified medical -- I'm not sure
20 exactly what the C stands for.  We just refer to them as
21 med techs.  But I know their official title is CMT.
22   Q.   And once the CMT picks up the sick call
23 request, what does he or she do with that?
24   MR. MARUNA:  Objection to foundation.

Page 32

1    Ms. Williams, you can answer, if you know.
2  BY THE WITNESS:
3    A.   100 percent, I can't say what they do with
4  them.
5    Q.   Have you ever reviewed sick call requests?
6    A.   That is not my job or responsibility as
7  assigned to me as such.  No.
8    Q.   Okay.  So how does an inmate obtain an
9  examination via these sick call requests?
10   A.   They would be placed on -- If it was for me,
11 they would be placed on my schedule of patients to see
12 for a particular day.
13   Q.   And who places the inmates on your schedule?
14   A.   In the past, it would be either a med tech or
15 a nurse.
16   Q.   Did you ever review a request from Mr. -- Did
17 you ever review a sick call request from Mr. Hemphill?
18   A.   I don't recall doing that.
19   Q.   What is MDSC mean?
20   A.   MD, medical doctor, sick call.  It, basically,
21 refers to -- And I guess they hadn't changed it or put
22 any such documentation, PA sick call, nurse practitioner
23 sick call.  It all falls under MD sick call.
24   Q.   So you would see patients on MD sick call?

Page 33

1    A.   That's what it's referred to, yes.
2    Q.   And then what is RNSC?
3    A.   Those are nurses that have sick call.
4    Q.   And what is the difference between the MDSC
5  and the RNSC?
6    A.   Once again, RNs refer to nurse, MD refers to
7  your medical -- medical staff such as your physician,
8  your physician assistant, or your nurse practitioner.
9    Q.   Why would an inmate be placed on an MDSC
10 rather than an RNSC?
11   A.   Well, now the procedure is patients will sign
12 up for nurse sick call.  They will be evaluated and
13 triaged at that point and determined whether or not the
14 patient needs further care or evaluation other than
15 nurse sick call.
16   Q.   So the inmate has the ability to sign up for
17 the RN sick call; is that correct?
18   A.   That's correct.
19   Q.   And when did that policy go into effect?
20   A.   I couldn't give you exact time on that.
21   Q.   Do you know if it was the policy in 2013?
22   A.   I really don't recall when that policy took
23 effect.
24   Q.   Do you know if it was before or after the year

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 34..37

Page 34

1   2013?
2       A.   Well, I know it wasn't such when I started in
3   2002.  I can't recall exactly when the policy took
4   effect.
5       Q.   Okay.  Do you recall the first time that you
6   examined Mr. Hemphill?
7       A.   Well, independently, I don't recall the first
8   time that I saw him.
9                   (Williams Deposition Exhibit No. 3
10                  marked as requested.)
11  BY MR. MCCLAIN:
12      Q.   Ms. Williams, I handed you a document that --
13  several documents that I marked as Exhibit 3.  It's
14  Bates labeled IDOC 63, 75, 96, 126, and 128.
15           Are you familiar with these documents?
16      A.   I am.
17      Q.   What are these documents?
18      A.   This is an offender outpatient progress note.
19      Q.   And what is an offender outpatient progress
20  note?
21      A.   These are notes that are kept in a patient's
22  file regarding visits or anything medically regarding a
23  patient.
24      Q.   So who makes the notes that are on these

Page 35

1   offender outpatient progress notes?
2       A.   It can be multiple people that may make the
3   notes.
4       Q.   What sort of titles do those individuals have?
5       A.   CMTs, which I believe is correctional medical
6   technician.
7       Q.   It came back to you?
8       A.   Yeah.  It did.
9            It can be a CMT, it can be a nurse, it can be
10  a provider such as a physician, a physician assistant, a
11  nurse practitioner.  I don't know if I said nursing
12  staff, but those are normally the people that document
13  in the progress notes.
14      Q.   On IDOC 63, the first page of Exhibit 3, I
15  want to point you to the entry dated February 15th,
16  2013.  Do you see that?
17      A.   I do.
18      Q.   What is this?
19      A.   This is an encounter or visit that I had with
20  this patient on this particular day.
21      Q.   And who is the patient?
22      A.   Carl Hemphill.
23      Q.   And do you recall this visit?
24      A.   Independently, no.

Page 36

1       Q.   Does this document refresh your recollection
2   of this visit?
3       A.   It does.
4       Q.   And what is Mr. Hemphill indicating is the
5   reason for his visit?
6       A.   Patient, 35-year-old African-American male
7   complaining of pain in the right shoulder over the last
8   month.  He's right-handed.  No history of working out,
9   he stated, nor trauma.
10      Q.   And can you continue to read down that center
11  column?
12      A.   Certainly.
13           What I just read was the subjective portion of
14  his visit.
15      Q.   And does subjective mean that it's based on
16  the inmate's description to you?
17      A.   Yes, it does.
18      Q.   Okay.
19      A.   The second portion here is the objective.
20           Under objective, there was general.  The
21  patient appeared within normal limits.  No acute
22  distress.  Next is heart -- well, H, slash, L, appeared
23  to be within normal limit.  EXT stands for extremities.
24  And, at that point, I noted poor effort for range of

Page 37

1   motion, right arm, slash, shoulder, no swelling, no
2   deformity, no palpation or crepitus.
3            Shall I continue?
4       Q.   Please.
5       A.   The next section is the assessment.  Under
6   assessment, I put alteration and comfort right shoulder.
7   Probable bursitis.
8       Q.   Okay.  I just want to unpack that a little
9   bit.
10           And what does the note poor effort or ROM
11  mean?
12      A.   Poor effort, it was noted by myself that those
13  patient didn't put very much effort in performing the
14  range of motion.  Range of motion, basically, is
15  movement, range of motion.
16      Q.   Okay.  And why would you be having the inmate
17  perform a range of motion?
18      A.   To, basically, assess the condition or the
19  problem that the patient was complaining of.
20      Q.   And then the portion that states -- I think it
21  says alt in comfort?
22      A.   Alteration in comfort, yes.
23      Q.   What does that mean?
24      A.   Basically, that he had some pain or problems.



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 38..41

Page 38

1      Q.   So your analysis was that Mr. Hemphill was
2  suffering from pain on this date?
3      A.   According to what the patient stated, yes.
4      Q.   And your examination of him, correct?
5      A.   Yes.
6      Q.   What is bursitis?
7      A.   Bursitis is an inflammation of the bursa which
8  is a sack within the shoulder.
9      Q.   That sounds painful.
10          Does that cause pain in patients?
11     MR. MARUNA:  Objection; argumentative.
12          Ms. Williams, you can answer over the
13  objection.
14  BY THE WITNESS:
15     A.   It could cause pain.
16     Q.   Is that a standard symptom of bursitis?
17     MR. MARUNA:  Objection; form of the question.
18  Vague as to standard symptom.
19          Ms. Williams, you could answer over the
20  objection.
21  BY THE WITNESS:
22     A.   It just, basically, means inflammation of
23  which can equate to pain or equal pain.
24     Q.   And then I want to move to the final column,

Page 39

1  Plans.
2          Can you read through what your plans were for
3  Mr. Hemphill at this visit?
4      A.   I can.  Number 1, one bag of ice, BID, which
5  is twice a day, times one month, with an ABOM, which is
6  analgesic balm twice a day.
7          Number 2 -- excuse me -- Tylenol,
8  650 milligrams, one tablet, BID, which is twice a day,
9  times six weeks.
10          Number 3, return to clinic, which is RTC,
11  six weeks for follow up.
12          Number 4, patient education and reassurance.
13          And Number 5 had to do with the patient's
14  responsibility for a copay for that particular visit.
15     Q.   I just want to back up.
16          How did you come to your diagnosis of probable
17  bursitis?
18     A.   Probably regarding several different things in
19  regards to this patient.  He was a young man, had no
20  history, as he stated, of trauma or working out.  I
21  cannot 100 percent say how patients develop bursitis or
22  pain within his shoulder, but I didn't see any cause to
23  think it may be anything other than that at the time.
24  It was a complaint of a recent onset.

Page 40

1      Q.   And is that common with bursitis?
2      A.   It can be.
3      Q.   Okay.
4      A.   So I said probable bursitis.  I didn't say
5  100 percent it could have been.
6      Q.   And so the plan that you just described, was
7  that in response to your conclusion that he had probable
8  bursitis?
9      A.   Basically, an alteration in comfort in the
10  right shoulder.
11     Q.   And if you look just above your notes in the
12  same Column 3, the plan section, it looks like there is
13  an entry for February 1st of 2013.  Do you see that?
14     A.   I do.
15     Q.   And in those plan sections, was there a
16  prescription written for Tylenol?
17     A.   The med techs are not -- don't have
18  prescriptive rights.  At the time, they had access to
19  over-the-counter strength doses of medication, and it
20  appears that that particular CMT gave the patient
21  Tylenol 325 milligrams and recommended two tablets
22  orally times QID, which is four times a day, for -- I'm
23  not sure if that's -- I'm not sure what's after QID.
24     Q.   Okay.  Is 325 milligrams an over-the-counter

Page 41

1  strength of Tylenol?
2      A.   It is.
3      Q.   And 14 days later, you prescribed
4  650 milligrams of Tylenol, correct?
5      A.   That's correct.
6      Q.   Why was there an increase of double the
7  milligrams of Tylenol for this inmate?
8      A.   Actually, it wasn't.  The med tech on 2/1
9  recommended 325, 2 tablets which is 650 milligrams.
10     Q.   Where do you see three?
11     A.   Three?
12     Q.   Yeah.  The three -- You stated that it's
13  three, two tablets?
14     A.   No.
15     MR. MARUNA:  Objection; mischaracterizes the
16  witness' testimony.
17          Ms. Williams.
18  BY THE WITNESS:
19     A.   The med tech recommended 325 milligrams,
20  two tablets orally, four times a day.  325, two tablets
21  will equal 650 milligrams.
22     Q.   And remind me what your prescription was?
23     A.   My prescription was 650 milligrams twice day
24  for six weeks in addition to analgesic balm --

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 42..45

Page 42

1    Q.   Okay.
2    A.   -- and ice.
3    Q.   And what was the ice treating?
4    A.   Pain, inflammation.
5    Q.   And what about the balm?
6    A.   Pain.
7              (Williams Deposition Exhibit No. 4
8              marked as requested.)
9    BY MR. MCCLAIN:
10   Q.   Ms. Williams, I've handed you a document that
11   I've marked Exhibit 4.
12        Are you familiar with this document?
13   A.   Yes, I am.
14   Q.   What is this document?
15   A.   In general, it's a prescription order that
16   providers will document on to order equipment,
17   medication for patients.
18   Q.   And the first prescription order at the top of
19   the page, what is that prescription order for?
20   A.   This is for Carl Hemphill dated February 15,
21   2013.  It says, Number 1, analgesic balm to effected
22   area twice a day with ice times two months.
23        Number 2, Tylenol 650 milligrams, one orally,
24   BID, twice a day times six weeks, my signature, the

Page 43

1    nurse that signed this off.
2    Q.   So in the noted by section, that's the nurse's
3    signature?
4    A.   That's correct.
5    Q.   Okay.  I want to go back to Exhibit 2,
6    Wexford 540.  It's the pain management policy.
7    A.   Yeah.  Pain management.
8    Q.   So on Wexford 541, we previously looked at
9    this, you indicated this is a guide for mild to moderate
10   pain treatment, correct?
11   A.   It's a source of reference for us, yes.
12   Q.   Can you flip to Wexford 543, please?
13   A.   Yes.
14   Q.   What is this document?
15   A.   It says, Pharmacologic treatment of chronic
16   pain.
17   Q.   When you prescribed Mr. Hemphill the Tylenol
18   on February 15th, 2013, were you treating mild to
19   moderate pain or chronic pain?
20   A.   Mild to moderate.
21   Q.   Do you recall the next time that you saw
22   Mr. Hemphill?
23   A.   Independently, no, I don't.
24   Q.   Are you aware that Mr. Hemphill was provided a

Page 44

1    low bunk medical permit?
2    A.   Independently, no, I don't.
3    Q.   What do you mean independently, you don't
4    know?
5    A.   Without me reviewing the documents, I don't
6    recall independently what all was prescribed for him.
7    Q.   In your preparation of today's deposition, did
8    you review a low bunk medical permit for Mr. Hemphill?
9    A.   I did not.
10   Q.   Okay.  Why would an inmate be given a low bunk
11   medical permit?
12   A.   There could an number of reasons, and it
13   depends on the -- there are a lot of things to take into
14   account when prescribing a low bunk permit for a
15   patient.
16             (Williams Deposition Exhibit No. 5
17             marked as requested.)
18   BY MR. MCCLAIN:
19   Q.   You previously testified that you reviewed
20   certain medical records of Mr. Hemphill, correct?
21   A.   I did.
22   Q.   Based on your review of those medical records
23   and your personal review of Mr. Hemphill, why do you
24   believe he would be issued a low bunk medical permit?

Page 45

1    A.   What was reviewed today were the documents
2    that I was involved with in seeing the patient, so I did
3    not review the entire medical record today in
4    preparation.
5    Q.   Understood.
6         But based on the documents that you reviewed,
7    why do you think he would be given a low bunk permit?
8    MR. MARUNA:  Objection; calls for speculation.
9         Ms. Williams, you can answer.
10   BY THE WITNESS:
11   A.   I can't answer that because I didn't prescribe
12   it, and I don't recall under what circumstances he was
13   prescribed a low bunk.
14   Q.   Okay.  I'm handing you what I've marked as
15   Exhibit 5.
16   A.   Yes.
17   Q.   Ms. Williams, what is this document?
18   A.   This is a medical permit for Stateville
19   Correctional Center, and it appears to be a permit
20   written for Carl Hemphill.
21   Q.   And what does it provide?
22   A.   This says low bunk and waist chains from
23   October 30th, 2013 to October 30th, 2014.
24   Q.   I want you to flip to the next page of

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018                                  Pages 46..49

Page 46

1    Exhibit 5.  It's IDOC 231.
2               What is this document?
3        A.   This is the same document for low bunk.  It
4    says, Front cuffing from November 12th of 2014 to
5    November 12th of 2015.  And both of these were issued by
6    the medical director, Dr. Obaisi.
7        Q.   All right.  I'm sorry.  There are a lot of
8    moving parts, but can you please flip back to Exhibit 3?
9    It's the offender outpatient progress notes
10       A.   Yes.
11       Q.   And please flip to IDOC 96?
12       A.   Yes.
13       Q.   What is this document?
14       A.   This is an outpatient progress note for
15   Stateville, and it appears to be an entry that I made
16   into the patient's chart on November 14th of 2014.
17       Q.   And what does the entry state?
18       A.   It states permit valid through November of
19   2015.
20       Q.   Okay.  Is that entry referring to the low bunk
21   permit as part of Exhibit 5, IDOC 231?
22       A.   Yes.
23       Q.   Did you see Mr. Hemphill on November 14th,
24   2014?

Page 47

1        A.   No, I did not.
2        Q.   Why did you make this entry?
3        A.   Independently, I can't recall.  I'd have to
4    see the entire patient file to put things together as to
5    why this was made.
6        Q.   Do you recall making this entry?
7        A.   No, sir, I don't.
8        Q.   Are you authorized to issue low bunk permits
9    as a physician's assistant?
10       A.   I am.
11       Q.   Did you authorize the renewal of
12   Mr. Hemphill's low bunk permit on February 14th, 2014?
13       A.   February 14th?
14       Q.   Excuse me.  November 14th, 2014.
15   MR. MARUNA:  Can you have the question read back?
16   Sorry.
17               (Whereupon, the record was read back
18                as requested.)
19   MR. MARUNA:  Objection to foundation,
20   mischaracterizes the witness' testimony.
21           Ms. Williams, you may answer.
22   BY THE WITNESS:
23       A.   It doesn't appear that I did.  The permit was
24   formulated on November 12th of 2014 through

Page 48

1    November 12th of 2015.  My entry was on November 14th of
2    2014 stating that the patient's permit was valid through
3    November of 2015.
4        Q.   What's the expiration date listed on the
5    November 14th, 2014 permit?
6        A.   November 12th of 2015.
7        Q.   So you're testifying that you don't recall if
8    you renewed Mr. Hemphill's permit; is that correct?
9    MR. MARUNA:  Objection; mischaracterizes the
10   witness' testimony on the issue.
11           Ms. Williams.
12   BY THE WITNESS:
13       A.   No, that is not what I said.
14           According to these -- this document right
15   here, there would have been no need for me to renew it.
16   It would have already been issued by the medical
17   director two days before I made this entry.
18       Q.   And my question is why would you make this
19   entry on November 14th, 2014?
20       A.   Without the patient's file, I cannot answer
21   that question.
22       Q.   But you did make this entry, correct?
23       A.   Absolutely.
24   MR. MCCLAIN:  Do you want to take a break?

Page 49

1    THE WITNESS:  I would like to, yes.
2    MR. MCCLAIN:  Off the record.
3               (Whereupon, a short break was had.)
4               (Williams Deposition Exhibit No. 6
5                marked as requested.)
6    BY MR. MCCLAIN:
7        Q.   Ms. Williams, before the break, we were
8    discussing Mr. Hemphill's low bunk permit dated
9    November 12th, 2014.
10       A.   Yes.
11       Q.   I'm going to hand you what I've marked as
12   Exhibit 6.
13           What is that document?
14       A.   This is the offender outpatient progress note
15   for Carl Hemphill, Stateville Correctional Center.
16       Q.   And what does the MD note in that section
17   state?
18       A.   November 4th, 2015, permit renewal for low
19   bunk; indication, shoulder injury; objective, grossly
20   normal right shoulder with normal range of motion;
21   assessment, as above; key, temporary given; continue PT,
22   which is physical therapy valuation; long-term permit to
23   be discussed with Dr. Obaisi; and then Dr. Marty, her
24   signature, and countersignature by someone.



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 50..53

Page 50

1    Q.   So this entry indicates that Mr. Hemphill's
2  low bunk permit is being renewed in November of 2015,
3  correct?
4    A.   It is.
5    Q.   And the reason for that renewal is what?
6    A.   Indication shoulder injury.
7    Q.   Thank you.
8         Do you recall the next time that you saw
9  Mr. Hemphill?
10   A.   Independently, no, I don't.
11   Q.   We previously discussed your ability to
12 conduct physical examinations of inmates.  Do you recall
13 that?
14   A.   I do.
15              (Williams Deposition Exhibit No. 7
16               marked as requested.)
17 BY MR. MCCLAIN:
18   Q.   I'm handing you what I've marked as Exhibit 7.
19        What is this document?
20   A.   This is an offender physical examination form.
21   Q.   And what does it state under the explanation?
22   A.   In reviewing the history with the patient, I
23 documented right shoulder still hurts since 2013.
24 Nothing ever helps.  Mom with multiple sclerosis in her

Page 51

1  40s -- onset in her 40s.  Now she's 63 years old.
2    Q.   And if you could flip to the second page of
3  Exhibit 7.  It's IDOC 58.
4         At the very bottom in the assessment portion,
5  what does it state there?
6    A.   Number 1, No known drug allergies.
7         Number 2, Annual PE, which is physical
8  examination.
9         Number 3, right shoulder pain, chronic.
10   Q.   Okay.  I want to back up to the first page,
11 IDOC 57 when it states, Nothing ever helps.
12        What is that referring to?
13   A.   That was what the patient stated.
14   Q.   And what was the patient stating that in --
15 Strike that.
16        What was the patient describing as nothing
17 ever helps?
18   A.   In regards to the discomfort pain in his right
19 shoulder.
20   Q.   So is that indicating that the treatment that
21 he's receiving is not helping?
22   A.   I would assume so.  And the treatment, I can't
23 exactly document what that had been up through this
24 point.

Page 52

1    Q.   And in the assessment portion, you indicate
2  that this patient has right shoulder pain, chronic.
3         Are you diagnosing this individual with
4  chronic pain in his right shoulder?
5    A.   I am.
6    Q.   Okay.  And what was the basis for that
7  diagnosis?
8    A.   Patient, number one, complained of shoulder
9  pain, and obviously I had reviewed some medical records.
10 Chronic refers to anything beyond a three-month period.
11   Q.   And so since he indicated he'd been having
12 this pain since 2013 and this examination occurred in
13 2015, that would be longer than three months, correct?
14   A.   Yes.
15   Q.   Now, I want to direct you to IDOC 58.
16   A.   Yes.
17   Q.   In the plan section, what does that state?
18   A.   Number 1, Return to clinic per protocol for
19 annual physical examination.
20        Number 2, Patient education reassurance given.
21        Number 3, Refer to medical director, right
22 shoulder for reevaluation.
23   Q.   That last portion, refer to medical director,
24 right shoulder reevaluation, what does that mean?

Page 53

1    A.   That I wanted an appointment scheduled for
2  Mr. Hemphill to see the medical director so that he
3  could reevaluate the patient in regards to his right
4  shoulder pain.
5    Q.   Why would the medical director need to
6  reevaluate Mr. Hemphill for his right shoulder pain?
7    A.   Without having access to the entire medical
8  record, I can't say when and by whom this patient was
9  seen; I can only surmise at this time the patient
10 complained of continued pain for what appears to be at
11 least two years now.
12        It's a chronic condition, in my assessment.
13 It had been beyond three months.  My hands are tied, at
14 this point, so -- to have him reassessed for this
15 chronic condition by the medical director.
16   Q.   And when you say your hands are tied, what
17 does that mean?
18   A.   There is nothing else that I appear to be able
19 to do for this patient than perhaps had been done for
20 him in the past.  I can't say without seeing the
21 complete medical records.
22   Q.   So what would be medical director be able to
23 provide for this patient than you would not be able to
24 provide?


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 54..57

Page 54

1    A.   Determination on whether he felt the patient
2    would need more than was currently given.
3        Q.   Would that more include an MRI?
4        A.   A medical director wouldn't order an MRI.  He
5    wouldn't directly order an MRI just from this visit with
6    the patient.
7        Q.   Would it include a referral for an orthopedic
8    evaluation?
9        A.   It very well could, yes, sir.
10       Q.   Okay.  And would it also potentially include
11   surgery on his shoulder, if needed?
12       A.   That wouldn't be an assessment that the
13   medical director would have made.  It would come from
14   whatever evaluation was made or given by a specialist.
15       Q.   Do you recall the next time that you saw
16   Mr. Hemphill after this February 11th, 2015 visit?
17       A.   Independently, no, I don't.
18       Q.   If I could refer you back to Exhibit 3, it's
19   the offender outpatient progress notes exhibit.
20       A.   Yes.
21       Q.   Page IDOC 126.
22       A.   Yes.
23       Q.   What is this document?
24       A.   This is, once again, an outpatient progress

Page 55

1    note for Stateville Correctional Center, IDOC, for Carl
2    Hemphill dated January 19th of 2016 for an MD sick call
3    visit.
4        Q.   And the MD sick call visit, that's the medical
5    doctor sick call visit that we discussed previously?
6        A.   Yes.
7        Q.   And how would Mr. Hemphill get this
8    appointment to be seen on January 19th, 2016?
9        A.   He would have had to have been put in my
10   schedule by someone for a visit.
11       Q.   Was this in relation to a request to be seen?
12       A.   I have no idea.
13       Q.   Can you read through the subjective,
14   objective, and assessment column?
15       A.   I can.
16            38-year-old African-American male on MD sick
17   call with complaint of painful right shoulder.  Can I
18   get another X-ray?  It's been since January of 2013,
19   approximately.  Can't relate it to anything.
20            Under the objective, In general, he appeared
21   to be within normal limits.  No acute distress noted.
22   H, slash, L, heart and lungs, within normal limits.
23   Extremities, some decreased range of motion was noted.
24   No deformities noted at that time.  The assessment was

Page 56

1    right shoulder pain, chronic.
2            My plan was, number 1, X-ray the right
3    shoulder.
4            Number 2, to confirm with physical therapy
5    that the patient was on the waiting list.
6            Number 3, patient education reassurance given.
7            Number 4, Naprosyn, 500 milligrams, one orally,
8    twice a day as needed for three months.
9            Number 5, analgesic balm to effected area
10   twice a day or three times a day as needed times one
11   month with heat.
12            Number 6, return to clinic for a follow-up in
13   three weeks.
14            My signature and countersignature.
15       Q.   Is it standard operating procedure to have two
16   signatures on these entries?
17       A.   Yes.  The provider that made the note always
18   signs it and then there's always someone that carries
19   out the requested or ordered items for the patient.
20       Q.   And is that a nurse that carries out the
21   requested items or orders?
22       A.   That is a nurse at this point, yes.
23       Q.   Okay.  In your assessment, you indicate right
24   shoulder pain, chronic.

Page 57

1            Are you concluding that Mr. Hemphill is
2    suffering from right shoulder pain that is chronic pain?
3            MR. MARUNA:  Objection; foundation, form of the
4    question as to suffering.
5            You may answer, Ms. Williams.
6    BY THE WITNESS:
7        A.   His complaint of shoulder pain was beyond
8    three months, so that would actually absolutely
9    categorize it as chronic.
10       Q.   And the patient requested another X-ray,
11   correct?
12       A.   He did.
13       Q.   And you ordered that X-ray in the plans,
14   correct?
15       A.   I did order that X-ray in the plans.
16       Q.   Why did you order that X-ray?
17       A.   I'm glad you asked that question.  I cannot
18   100 percent say why.  It is never just because the
19   patient asked for it.  Without having the complete
20   medical record, I can't say how I came to my
21   determination to repeat his X-ray.
22       Q.   What does an X-ray show?
23       A.   X-ray, basically, can show bone and joint,
24   boney structures.  Basically, the boney structures.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Page 58

1    Q.   So what were you hoping to determine when you
2  ordered an X-ray for Mr. Hemphill in this situation?
3    A.   With the generalized X-ray such as this,
4  you're, basically, ruling out visible signs of
5  osteoarthritis or degenerative joint disease. You're
6  ruling out any type of -- basically, looking at the
7  bulging joints and seeing if there's anything that could
8  tie the patient's compliant of shoulder pain with what's
9  visualized in the X-ray.
10   Q.   We've established that you've seen
11 Mr. Hemphill on several occasions before this January
12 2016 date.
13       Why did you not order an X-ray at those prior
14 visits?
15   A.   I can't answer that question without seeing
16 the entire patient file.
17   Q.   But you did not order an X-ray at any of those
18 prior visits that we've reviewed, correct?
19   A.   It doesn't appear so.
20   Q.   Do you recall anything specifically from this
21 January 2016 visit that prompted you to order the X-ray?
22   A.   Without complete patient information, no, I
23 can't.
24   Q.   And you also prescribed Naprosyn

Page 59

1  500 milligrams, correct?
2    A.   I did.
3    Q.   What is the difference between Tylenol and
4  Naprosyn?
5    A.   Naprosyn is a nonsteroidal anti-inflammatory
6  medication.
7    Q.   Is Tylenol also a nonsteroid anti-inflammatory
8  medication?
9    A.   It is not.
10   Q.   So does Tylenol treat for anti-inflammatory --
11 that's a bad question.
12       Does Tylenol provide anti-inflammatory relief?
13   A.   It can employ relief for pain, yes, it can.
14   Q.   But does it provide anti-inflammatory relief?
15   MR. MARUNA:  Object to the form of the question.
16 Provide anti-inflammatory relief.
17 BY THE WITNESS:
18   A.   Tylenol can be used for pain.
19   Q.   That's not my question.
20       Does Tylenol treat for anti-in- -- Does
21 Tylenol treat for inflamed muscles?
22   A.   Inflamed muscles?  I'm not treating him for an
23 inflamed muscle.  Tylenol can be used for pain.
24   Q.   Is Tylenol used to treat inflammation?

Page 60

1    A.   It can be.
2    Q.   Is 500 milligrams of Naprosyn stronger than
3  650 milligrams of Tylenol?
4    MR. MARUNA:  Objection; foundation.  It's two
5  different medicines.
6        Over the objection, you can answer,
7  Ms. Williams.
8  BY THE WITNESS:
9    A.   And I agree.  They're two different
10 medicine -- medications with different compounds.
11   Q.   Why did you decide to prescribe Naprosyn
12 instead of Tylenol on this visit?
13   A.   Once again, without having complete
14 information, I can't put everything together in my
15 reasoning for making this decision without seeing what
16 had happened previously.
17   Q.   And we've gone through several visits that
18 you've had with Mr. Hemphill, correct?
19   A.   That's correct.
20   Q.   Based on all of the visits that we've reviewed
21 up until January 2016, why would you prescribe Naprosyn
22 as opposed to Tylenol?  And if you want to take a moment
23 to review the offender outpatient progress notes as part
24 of Exhibit 3, you can?

Page 61

1    MR. MARUNA:  Do you have other records from around
2  this time?  I think that's what the witness was asking
3  for, not just her own notes.
4    MR. MCCLAIN:  There's the prior Hemp 111, which I
5  believe we marked as Exhibit 6 that has entries and
6  dates of November 15th, November -- excuse me --
7  November 3rd, 2015, November 4th, 2015, and
8  November 5th, 2015.
9    MR. MARUNA:  But you don't have copies of the --
10   MR. MCCLAIN:  I don't have copies of the entire
11 file.
12   MR. MARUNA:  The 24th, the January 1st, any of
13 those notes?  I guess 13th, the 24th, and the 10th of
14 January are the ones -- -
15   MR. MCCLAIN:  I think we're getting a little
16 sidetracked.
17 BY MR. MCCLAIN:
18   Q.   Ms. Williams, based on what's in Exhibit 3,
19 can you determine for me why you would have ordered
20 Naprosyn on January 19th, 2016?
21   A.   You said Exhibit 3?
22   Q.   Yes.
23   A.   Okay.  I can say that my decision to prescribe
24 this medication wasn't just based on this visit for this

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 62..65

Page 62

1  particular day.  There are other things to take into
2  account that I would have.
3      Q.   And what sort of things would you have taken
4  into account?
5      A.   I would have looked back over previous medical
6  records to see what had been done for the patient up
7  through this point.
8      Q.   Are you aware that Mr. Hemphill received
9  surgery on his right shoulder?
10     A.   No.
11     Q.   That was not in any of the medical records
12 that you reviewed?
13     A.   No.
14     Q.   Have you seen Mr. Hemphill since January --
15 excuse me -- June 2016?
16     A.   I have no idea independently.
17     Q.   How many inmates do you see a day?
18     A.   On a day like today, none.
19     Q.   Lucky you.
20     A.   It really -- It varies.  I don't have a set
21 number, a minimum or a maximum amount of inmates I see
22 per day.
23     Q.   Do you have an estimate you see on a typical
24 day?

Page 63

1      A.   There are a number of things that may effect
2  that, if the institution is on a lockdown, depending on
3  what level of a lock do you.  On an average day -- On an
4  average day, 10 to 15 to 20.
5      Q.   Okay.  Are you familiar with the grievance
6  process at Stateville?
7      A.   I know it exists.  I'm not involved in it, so
8  I don't know the particulars of the grievance process.
9      Q.   Can you just generally describe to me what the
10 grievance process is?
11     A.   It's a form by which a patient I guess can
12 complain about something they're not happy with or
13 satisfied with or concerned about.
14     Q.   Would that include grievances for medical
15 services that may have been provided?
16     A.   It's whatever the patient decides that they
17 want to formulate the complaint about.
18     Q.   Have you ever seen any inmate grievances
19 related to medical services?
20     A.   I'm not involved with the process, so I don't
21 get the paperwork.
22     Q.   So you've never seen any grievance filed by an
23 inmate related to medical services?
24     A.   I've visualized documents.  I've seen them

Page 64

1  laying around, but they're not part of my responsibility
2  nor duty to deal with them.
3      Q.   Okay.  So if an inmate files a grievance which
4  indicates that you provided unsatisfactory medical care,
5  would you be notified of that grievance?
6      A.   No.
7                    (Williams Deposition Exhibit No. 8
8                     marked as requested.)
9  BY MR. MCCLAIN:
10     Q.   I've given you what I've marked as Exhibit 8.
11     A.   Yes.
12     Q.   Ms. Williams, are you familiar with this
13 document?
14     A.   As I said, in general, I -- visualizing, I
15 know what it is.  It states it's an offender grievance.
16 And this one appears to be filed by Mr. Hemphill on
17 July 28th of 2013.
18     Q.   Can you take a minute to just read to yourself
19 the brief summary of grievance on IDOC 308?
20     A.   Sure.
21          Okay.  I've read this portion.
22     Q.   Is your name mentioned in the summary?
23     A.   It is.
24     Q.   And if you continue down the page to the

Page 65

1  counselor's response box?
2      A.   Yes.
3      Q.   Can you read that to yourself, please?
4      A.   Yes.
5      Q.   The response indicates that a copy of the
6  grievance has been forwarded to the HCU for review and
7  response; is that correct?
8      A.   It is.
9      Q.   What does HCU stand for?
10     A.   Healthcare unit.
11     Q.   Do you know who this grievance was forwarded
12 to at the healthcare unit?
13     A.   I do not.
14     Q.   Have you ever seen a copy of this grievance
15 prior to today?
16     A.   Not that I recall, no.
17     Q.   Did anyone ever speak to you about this
18 grievance?
19     A.   Not that I recall.
20     Q.   Do you know what response was -- was taken in
21 response to this grievance?
22     A.   I do not.
23     Q.   Do you know who at Wexford reviews these
24 responses?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 66..69

Page 66

1    MR. MARUNA:  Objection; foundation.
2         Ms. Williams, you can answer.
3  BY THE WITNESS:
4    A.  No.
5    MR. MCCLAIN:  I just want to take a minute to
6  gather my thoughts.  I might possibly be done.
7    MR. MARUNA:  Yeah.  Sure.
8  BY MR. MCCLAIN:
9    Q.  Ms. Williams, I want to direct you back to
10 Exhibit 3, Page -- IDOC Page 63.  It's the progress
11 notes.
12   MR. MARUNA:  First page.
13 BY THE WITNESS:
14   A.  Yes.
15   Q.  And we previously discussed that your
16 assessment was that Mr. Hemphill had probable bursitis.
17 Do you recall that testimony?
18   A.  I do.
19   Q.  What led you to conclude that he had probable
20 bursitis?
21   MR. MARUNA:  Objection; asked and answered.
22        Ms. Williams, you can answer.
23 BY THE WITNESS:
24   A.  My diagnosis was that he had an alteration in

Page 67

1  comfort in his right shoulder.  It could have possibly
2  been bursitis.
3    Q.  Then you previously testified on several
4  occasions that you could not give me definitive answers
5  in response to certain of my questions because you did
6  not have the full medical record of the individual in
7  front of you; is that a fair assessment of some of your
8  responses?
9    A.  Yes, it is.
10   Q.  So in seeing a patient, do you always review
11 their entire medical file when you see the patient?
12   A.  The entire medical file, no, I don't.
13   Q.  What do you view or review in anticipation of
14 examining an inmate?
15   A.  Information pertinent to the patient's
16 complaint.  I review to see if there had been a history
17 of it in the past.  I take a look at a number of things
18 in a patient's records.
19   Q.  And does that allow you to assess the patient
20 during the visit?
21   A.  That contributes to my assessment, yes.
22   Q.  And so you're relying on notes from other
23 medical providers in your assessment of patients,
24 correct?

Page 68

1    A.  Not only notes from medical providers;
2  previous information such as X-rays -- X-rays are
3  something that I would have taken into account.
4  Different portions of the patient's medical records can
5  help me kind of make an assessment.
6    Q.  And when you ordered the X-ray in January of
7  2016, did you look at Mr. Hemphill's prior X-ray
8  results?
9    A.  I am sure I did.
10   Q.  Okay.  And do you recall what the analysis of
11 those prior X-ray results were?
12   A.  I don't independently recall.
13   Q.  If I tell you that the analysis was negative,
14 would that refresh your recollection?
15   A.  On which occasion?  Are you speaking
16 previously or the one --
17   Q.  Prior to your January 2016 request.
18   A.  It doesn't refresh my recollection, but I
19 accept what you say.
20   MR. MCCLAIN:  Could we go off the record?
21        (Whereupon, a short break was had.)
22 BY MR. MCCLAIN:
23   Q.  Ms. Williams, we briefly went off the record
24 to discuss X-ray results of Mr. Hemphill, and your

Page 69

1  counsel showed you two documents Bates labeled IDOC 222
2  and IDOC 223; is that correct?
3    A.  Yes.
4    Q.  And what did each of those documents indicate?
5    A.  The document 222 on June 6 of 2013 showed
6  negative study of the right shoulder.  Document 223
7  dated November 12th of 2014, right pain, right shoulder,
8  negative study.
9    Q.  Thank you.  And we've established that on
10 January 19th, 2016, you ordered an X-ray of
11 Mr. Hemphill's right shoulder, correct?
12   A.  That's correct.
13   Q.  And you previously testified that in
14 anticipation of viewing patients, you will review
15 certain medical records and documents of that patient,
16 correct?
17   A.  That's correct.
18   Q.  Before this January of 2016 examination, did
19 you review these two documents regarding Mr. Hemphill's
20 prior X-ray results?
21   A.  I'm sure that I did, yes.
22   Q.  If Mr. Hemphill has had two prior negative
23 X-rays, why would you order a third X-ray?
24   A.  The reason I would order an X-ray because the



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 70..73

Page 70

1    one prior to the one I ordered had been well over a
2    year.  It had been well over a year and structurally,
3    there could have been some changes that may have
4    occurred within that timeframe, and I would have been
5    remiss in referring that patient up to another provider
6    without having updated information on that patient.
7        Q.   Do you recall the results of this January 2016
8    X-ray?
9        A.   It says right here, Negative study.
10       Q.   And what document are you looking at?
11       A.   IDOC No. 225.
12       Q.   And what is the -- What is that document?
13       A.   This is an X-ray requisition for Carl
14   Hemphill.
15       Q.   And what is the date of that?
16       A.   January 19th of 2016.
17       Q.   Is there a different date on there next to his
18   signature of the negative study?
19       A.   That is the radiologist's signature, and he
20   dated that as January 22nd of 2016.
21       Q.   And so what does negative study indicate --
22   excuse me -- what does negative study mean?
23       A.   He didn't find anything on the X-ray.  No
24   positive findings.  He didn't find anything on that

Page 71

1    study.
2        Q.   So negative study means that the radiologist
3    was unable to determine the source of the pain from the
4    X-ray, correct?
5        MR. MARUNA:  Objection; foundation on the
6    radiologist's findings.
7            Ms. Williams, you can answer.
8    BY THE WITNESS:
9        A.   I won't say all of that.  I would say -- I
10   can't speak for the radiologist.
11       Q.   Understood.
12            But you indicated that negative study means
13   that he did not find anything wrong based on the X-ray,
14   correct?
15       A.   That's correct.
16       Q.   And the purpose of the X-ray was to determine
17   the source or cause of Mr. Hemphill's right shoulder
18   pain, correct?
19       A.   No.
20       Q.   What was the purpose of the X-ray?
21       A.   To rule out any structural changes that may
22   have occurred within the timeframe of the previous --
23   the prior X-ray and current one.
24       Q.   If there were structural changes, would those

Page 72

1    structural changes cause pain to Mr. Hemphill?
2        A.   The basic reason for ordering the X-ray was to
3    compare one to the other to see if there had been any
4    notable changes per the radiologist's read of that
5    particular X-ray.
6        Q.   And why is it important to note if there had
7    been any changes between the time periods of the
8    different X-rays?
9        A.   Once again, I would have been remiss if I had
10   referred this patient out to a higher level, such as my
11   medical director.  In anticipation of him seeing that
12   patient, I'd want to have all of my basis covered to do
13   everything within my power to prepare that patient to
14   see him without any delay perhaps in between.
15       Q.   And -- But my question is why are we comparing
16   the three different X-rays?  What is the purpose of
17   doing that?
18       MR. MARUNA:  Objection; asked and answered.
19            Ms. Williams, you can answer over the
20   objection.
21   BY THE WITNESS:
22       A.   Well, certainly within a three-year period,
23   there may be possible changes.
24       Q.   And why is it important to note those possible

Page 73

1    changes?
2        A.   I don't quite know how to answer that.  This
3    is a source of comparison.  You're comparing one time
4    frame to another timeframe which is a substantial amount
5    of time passed.  The patient is aging.
6        Q.   Uh-huh.
7        A.   So basically as a comparison.
8        Q.   And you've testified you're looking for
9    changes, correct?
10       A.   That would be what the radiologist is looking
11   for.  I don't quite know how to explain it and say this
12   in a different way.  The radiologist is the one who
13   reviews, reads the X-rays he compares to previous X-rays
14   I'm sure if he has access to them.  I can't speak for
15   him, but he's looking at these boney structures that
16   were requested of him.
17       Q.   Okay.  Are you aware that Mr. Hemphill
18   obtained an MRI on his right shoulder?
19       A.   I can only surmise that if you told me that he
20   had surgery.
21       Q.   So you are not aware of whether he did or did
22   not received an MRI on his right shoulder?
23       A.   In my medical experience, I wouldn't know of
24   an orthopedist or a specialist to perform a procedure

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Page 74

1  such as a surgery on a shoulder without having a prior
2  MRI.
3      Q.   Did you review the radiologist's report dated
4  January 22nd, 2016?
5      A.   Are you referring to my visit with my attorney
6  this morning?
7      Q.   At any time, have you reviewed that document?
8      A.   I must have reviewed it at some time or
9  another.
10     Q.   Did you review it in the year 2016?  My
11 question is you ordered the X-ray, so did you receive
12 the results of the X-ray?
13     A.   I did not receive the results of the X-ray and
14 signed them off.  I saw the patient January 19th of 2016
15 and I put for the patient to return for follow-up in
16 three weeks.  So I can only surmise that I may have seen
17 that X-ray requisition or report.
18     Q.   Okay.  So had you seen the patient at his
19 three week follow-up, you would have seen the report?
20     A.   Most likely.
21     Q.   Okay.  If an inmate requests to receive
22 certain medical treatment, are you obligated to provide
23 the requested medical treatment?
24     A.   Absolutely not.

Page 75

1      Q.   If an inmate routinely requests receiving
2  certain medical treatment, are you obligated to provide
3  it?
4      A.   I don't treat patients according to what they
5  request.  As a medical provider, it's my duty and
6  responsibility to assess the patient, to manage and to
7  treat him as I've been trained to do.
8      Q.   Do you take into consideration the patient's
9  request for treatment when prescribing the treatment?
10     A.   Sometimes I might.
11     Q.   When Mr. Hemphill requested the X-ray on
12 January 19th, 2016, did that request effect whether or
13 not you were going to prescribe an X-ray?
14     A.   As I stated before, there are a number of
15 things that I take into consideration when I provide a
16 plan for a patient.  At that time, he did, in fact, ask
17 for another X-ray.  It wasn't something that I felt
18 would be harmful.  The prior X-ray had been well over a
19 year.  So I could absolutely see why I would have
20 ordered another X-ray.
21     MR. MCCLAIN:  I don't have any further questions at
22 this time.  But I'll reserve my right?
23     MR. MARUNA:  Sure.  On the phone, any questions?
24     MR. POWELL:  No questions.

Page 76

1      MR. MARUNA:  All right.  I'll start then.
2                    EXAMINATION
3  BY MR. MARUNA:
4      Q.   Good morning, Ms. Williams, or -- still good
5  morning.  There are no clocks in here --
6      A.   Good morning.
7      Q.   -- or did we cross into the noon hour.
8           I want to go over a couple of the medical
9  records that you had in the chart that counsel didn't
10 ask any questions about.  Just bear with me here.
11     MR. MARUNA:  And, you know, I'm going to be honest,
12 we don't have copies of them for counsel.  So what I'll
13 do is direct to the page, and then we'll read off of
14 that, and then we'll have to supplement the record, if
15 counsel wants.
16 BY MR. MARUNA:
17     Q.   The first one I'll direct you to is IDOC 108.
18 All right?
19     A.   Yes.
20     Q.   At IDOC 108, is that a medical record from
21 August 5th of 2015?
22     A.   It is.
23     Q.   Okay.  And is that your medical progress note,
24 Ms. Williams?

Page 77

1      A.   Starting at August 5th, 2015, yes, it is.
2      Q.   Could you please read your medical progress
3  note for us?
4      A.   MD sick call.  37-year-old African-American
5  male complained of pain left ear canal times one week or
6  so.  No DC, which is discharge.  Just pain, slash,
7  swelling.  Maybe something due -- may be due to ear
8  buds.  No cold or prior infection.
9           Shall I continue?
10     Q.   Yes, please.
11     A.   Under objective, In general, within normal
12 limits.  No acute distress noted.  H, slash, L, heart
13 and lungs within normal limits.  Lymph nodes, within
14 normal limits.  HEENT, which is head, eyes, ears, nose
15 throat, noted swelling, slash papule at the interest to
16 the canal.  It appeared to be resolving.
17          Number -- or actually A, assessment, well
18 adult.  Under P, plan, number 1, patient education
19 reassurance, and, number 2, return to clinic PRN, which
20 is as needed, my signature, and a countersignature by a
21 nurse.
22     Q.   On August 5th, 2015 when you examined
23 Mr. Hemphill, did he make any complaints about shoulder
24 pain?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Page 78

1    A.    He did not.

2    Q.    Would it be your expectation that if a patient

3 was experiencing complaints of shoulder pain, he would

4 voice those complaints to you during the examination?

5    A.    Yes.

6    Q.    And if a patient had voiced that complaint of

7 shoulder pain to you, would that be something noted in

8 your medical progress note?

9    A.    I would have documented it, yes.

10    Q.    So the fact that your medical progress note

11 from August 5th, 2015 does not contain any notation

12 about shoulder complaints, does that mean that the

13 patient must not have voiced any shoulder complaints to

14 you during the examination on August 5th, 2015?

15    A.    That's correct.

16    MR. MCCLAIN:    Objection; form.

17 BY MR. MARUNA:

18    Q.    Could we next go to IDOC 116, and I show -- is

19 that a note from August 21st, 2015, Ms. Williams?

20    A.    It is.

21    Q.    And is that your medical progress note,

22 Ms. Williams?

23    A.    It is.

24    Q.    And can you please your medical progress note

Page 79

1 to us from August 1st, 2015?

2    A.    MD, slash, ER, 37-year-old African-American

3 male added on for a cut to the left middle finger with a

4 can last night in the kitchen at work.  In continuing

5 the assessment -- or actually the objective portion, In

6 general, well developed, well nourished.  He appeared to

7 be in no acute distress.  Heart and lungs were within

8 normal limits.  Extremities, left middle finger

9 laceration was noted.

10        My assessment was laceration to left middle

11 finger.  My plan, the patient got a tetanus vaccination

12 update.  Patient was prescribed Augmentin which is an

13 antibiotic, 500 milligrams, one orally three times a

14 day.  Number 6 were dispensed to him at that time.

15        Number 3, Lidocaine 1 percent -- 1 cc was

16 used.

17        Number 4 suture tray was used.

18        Number 5, silk suture.

19        Number 3 -- and there were four sutures.

20        Number 6, the patient was returned to clinic

21 in one day for a wound recheck.

22        Number 7, patient was returned to clinic in

23 five days for the suture removal.

24        Number 8 patient was advised to elevate, keep

Page 80

1 dry, and clean.

2        Number 9, patient was ordered Tylenol, 500

3 milligram, twice day times five days, and it appears

4 that he refused that particular medication.

5        Number 10, a splint and dressing.

6        Then my signature and then the nurse's

7 signature, as well.

8    Q.    You used the term, No acute distress in

9 reading your medical progress note from August 21st,

10 2015.

11        What does that mean, Ms. Williams?

12    A.    No acute distress in visualizing the patient,

13 looking at the patient, there was no wincing or

14 grimacing or appearance of the patient being in any --

15 any pain or discomfort that was grossly obviously.

16    Q.    Now, on your August 21st, 2015 medical

17 progress note, did Mr. Hemphill make any complaints

18 about shoulder pain?

19    A.    August 21st?

20    Q.    October 21st, the one we're talking about?

21    A.    No.

22    Q.    So on October 21st, 2015, Mr. Hemphill made no

23 complaints of shoulder pain, correct?

24    A.    That's correct.

Page 81

1    Q.    And as you just testified to in regards to the

2 prior note, had Mr. Hemphill made a complaint of

3 shoulder pain, would that be noted in your progress?

4    A.    Yes.

5    Q.    So the fact that your August -- or

6 October 21st, 2015 medical progress note does not

7 contain any comments about a complaint of shoulder pain

8 by the patient, could we take that to mean that

9 Mr. Hemphill did not make any complaints of shoulder

10 pain to you when you examined him on October 21st, 2015?

11    MR. MCCLAIN:    Objection; form, speculation.

12 BY THE WITNESS:

13    A.    Yes.

14    Q.    And you noted that the patient refused

15 Tylenol; is that correct?

16    A.    That's what it looks like that states.

17    Q.    So you offered Mr. Hemphill Tylenol.

18        Is Tylenol a pain medication?

19    A.    Yes.

20    Q.    And you offered Mr. Hemphill a pain medication

21 and he refused it; is that correct?

22    A.    It appears to be.

23    Q.    All right.  The next note that I want to

24 direct you to is IDOC 128.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 82..85

Page 82

1      Is that a medical progress note from
2  February 9th, 2016?
3      A.   Yes, it.
4      Q.   And would this be your -- this would then be
5  after the x-ray was ordered by you on January 19th,
6  2016; is that correct?
7      A.   That's correct.
8      Q.   All right.  Can you take a second to read your
9  progress note to us from February 9th, 2016?
10     A.   Certainly.  MD sick call.  38-year-old
11 African-American male for X-ray results.  Advised X-rays
12 negative.  I have a copy of my records that show
13 Wexford's approval for MRI for the end of last summer.
14 Provider searched records.  Unable to locate such.
15 Patient advised to bring his copy for further research.
16          Shall I continue?
17     Q.   Please.
18     A.   Objective:  General.  Within normal limits.
19 No acute distress.  Heart and lungs, within normal
20 limits.  Extremities, no acute findings or changes
21 noted.  Assessment, right shoulder pain, chronic.
22          Plan, number 1, continue all medications as
23 directed.
24          Number 2, Tylenol, 500 milligrams, two orally

Page 83

1  between the doses of naproxen times two months as
2  needed.
3           Number 3, continue waiting list for physical
4  therapy as ordered on September 16th of 2015.
5           Number 4, patient education.
6           My signature and a countersignature.
7      Q.   So when counsel asked you some questions
8  earlier about whether or not you saw the X-ray report
9  from January of 2016, would this reported confirm that
10 you did review that X-ray report?
11     A.   Yes, it would.
12     Q.   And the finding on the X-ray report was
13 negative, correct
14     A.   That is correct.
15     MR. MCCLAIN:  What is the date of this injury?
16     MR. MARUNA:  Ms. Williams?
17     THE WITNESS:  February 9th of 2016.
18     MR. MCCLAIN:  Thank you.
19 BY MR. MARUNA:
20     Q.   Now, I want to ask you some questions about
21 the part of the note where the patient said that
22 Wexford -- he had a copy of a record showing that
23 Wexford approved him for an MRI.
24          Is that in your medical notes, Ms. Williams?

Page 84

1      A.   Yes, it is.
2      Q.   Now, you testified earlier that there would
3  never just be a standalone approval for an MRI; that
4  would come from an orthopedic specialist, correct?
5      A.   As a result of a visit with an orthopedist,
6  yes.
7      Q.   And it says here in the note that you actually
8  checked the patient's medical chart to see if you could
9  find any proof that this standalone MRI had been ordered
10 in June of last year, correct?
11     A.   I looked for such documentation, yes.
12     Q.   Or -- I don't think it said June of last year.
13 What did you say?  Sorry.  You're holding my note.
14     A.   The end of last summer, he stated.
15     Q.   Sure.  So you checked the progress note to see
16 if you could find any proof that this patient had been
17 approved for an MRI at the end of last summer, so end of
18 last summer of 2015, correct?
19     A.   Yes.
20     Q.   And you couldn't find any proof to support the
21 patient's claim that he'd been approved for a standalone
22 MRI, correct?
23     A.   I didn't find any such documentation.
24     Q.   And you told him to bring a copy of that

Page 85

1  approval with him if he had the record, correct?
2      A.   Yes.
3      Q.   Do you recall if he ever brought that to you
4  at any subsequent visits?
5      A.   Independently, I don't recall.
6      Q.   And then we see again you found no acute
7  distress her for this patient, correct?
8      A.   Yes.
9      Q.   And you prescribed him both the Tylenol and
10 the Naprosyn, correct?
11     A.   I did.
12     Q.   Tell me why there is two different medications
13 prescribed here for pain.  What is the treatment thought
14 process behind that?
15     A.   Sometimes the addition of a medication in
16 between the two doses of Naprosyn.  Naprosyn is
17 prescribed twice a day which is every 12 hours.
18 Sometimes the patient might obtain some relief with a
19 different dose of medication in between.  And it's --
20 I'm sorry.  I was just attempting to get the patient
21 some relief with his complaint of pain.
22     Q.   So you aren't adopting a static course of
23 treatment with medication; you're attempting a new
24 course of treatment with medication to see if that

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 86..89

Page 86

1    relieves the patient's complaints of pain, correct?
2        A.   That's correct.
3        Q.   Now, I want to direct you last to IDOC 131.
4             And is that a medical progress note by
5    yourself, Ms. Williams?
6        A.   It is.
7        Q.   And the date of that progress note,
8    Ms. Williams?
9        A.   March 18th of 2016.
10       Q.   And can you read your progress note from
11   March 18th, 2016 for us?
12       A.   PA note, 38-year-old African-American male
13   complains of heartburn times three weeks.  Feels
14   pressure in mid chest.  Never had this before.  Nothing
15   new or different with diet.  Not a lot of spicy, hot
16   foods.  No coffee.  No dark sodas.
17            Under objective:  General, within normal
18   limits.  No acute distress.  Heart and lugs, within
19   normal limits.  Abdomen, within normal limits.  HEENT.
20            Assessment was GERDs.  Under plans, number 1,
21   Zantac, 150 milligrams, twice a day, times three months.
22            Number 2, antacids two twice a day and at
23   bedtime times three months.
24            Number 3, patient education.

Page 87

1             And, number 4, for the patient to return as
2    needed.
3             My signature and the countersignature.
4        Q.   Once against, Ms. Williams, we see that you
5    reported the patient had no signs of acute distress,
6    correct?
7        A.   That's correct.
8        Q.   And there are no -- Are there any complaints
9    of shoulder pain in your March 18th, 2016 progress
10   notes?
11       A.   There are not.
12       Q.   And consistent with how you testified earlier,
13   if the patient had made a complaint of shoulder pain,
14   would that be noted in your March 18th, 2016 progress
15   note?
16       A.   Yes, it would.
17       Q.   So the fact that your March 18th, 2016
18   progress note does not contain a notation that the
19   patient made any complaints of shoulder pain means that
20   the patient did not give you a report of shoulder pain
21   on March 18th, 2016; is that correct?
22       MR. MCCLAIN:  Objection.  Objection; speculative,
23   form, foundation.
24

Page 88

1    BY THE WITNESS:
2        A.   That's correct.
3        Q.   Ms. Williams, did you ever intend to cause any
4    harm to the patient through your treatment?
5        A.   No.
6        Q.   And did you only desire the best possible
7    medical outcome for the patient?
8        A.   Yes.
9        Q.   If I use the term standard of care, are you
10   familiar with that term?
11       A.   I am.
12       Q.   And you are a physician assistant licensed in
13   the State of Illinois, correct?
14       A.   Yes.
15       Q.   Did you comply with the standard of care in
16   treating the patient, Carl Hemphill?
17       A.   In my opinion, yes, I did.
18       Q.   We touched on this a little earlier but I want
19   to clarify it.
20            Do you have a custom and practice in making
21   medical notes when you see patients at Stateville?
22       A.   Yes.
23       Q.   And you use the acronym SOAP, correct?
24       A.   Yes.

Page 89

1        Q.   Can you explain to us what SOAP means?  What
2    does the S mean, the O, the A, the P?
3        A.   The acronym, SOAP, the S stands for the
4    subjective portion, which is what the patient tells you.
5    The objective portion, which is the provider's
6    examination and findings.  The A is the assessment or
7    diagnosis.  The P is the plan that the provider
8    determines.
9        Q.   And you testified earlier when we were talking
10   about the medical notes just now that if a patient may
11   report a shoulder pain to you, that's something you that
12   would note in your medical progress note, correct?
13       A.   I document the patient's complaints, yes.
14       Q.   And as we discussed if a complaint of shoulder
15   pain is not contained in one of your medical progress
16   notes, that must mean that the patient did not give you
17   a report of shoulder pain, correct?
18       MR. MCCLAIN:  Objection; form, speculation.
19   BY THE WITNESS:
20       A.   That's correct.
21       Q.   Do you have any role in a -- Strike that.
22            Are you familiar with the term lockdown?
23       A.   I am.
24       Q.   What is lockdown?



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 90..93

Page 90

1    A.    Lockdown is when the institution -- The
2  inmates, basically, don't have movement.
3    Q.    Do you have any role in placing the facility
4  on lockdown?
5    A.    I do not.
6    Q.    Is that handled by IDOC, as far as you know?
7    A.    Yes.
8    Q.    In terms of physical therapy, when we reviewed
9  some medical notes where you mentioned the patient was
10 on a wait list for physical therapy, correct?
11   A.    That's correct.
12   Q.    You're not a physical therapist, right?
13   A.    No, I'm not.
14   Q.    And when you give an order for physical
15 therapy, is that consistent with your other orders where
16 someone else down the line has to put the order in,
17 correct?
18   A.    That's correct.
19   Q.    You don't physically go ensure that the
20 patient is receiving physical therapy, your expectation
21 is that whoever's job it is to place the order in puts
22 the order in, correct?
23   A.    That's correct.
24   Q.    It would be up to the physical therapist,

Page 91

1  then, to determine when or how often he sees the patient
2  for physical therapy, correct?
3    A.    Yes.
4    Q.    Would you ever recommend that a patient not
5  take a medication that his doctor has prescribed for
6  him?
7    A.    I would not.
8    Q.    And I wanted to understand a bit about how
9  some of these medications work.  So let's talk about the
10 NSAIDS, the nonsteroidal anti-inflammatory drugs.
11        Does that take a bit of time with those
12 medications to develop their efficacy?
13   A.    There has to be consistency with taking
14 medications.  There is a period of time that that should
15 be -- that should occur, yes.
16   Q.    So if I'm skipping doses here and there of the
17 medication, I may diminishing the effect of that
18 meditation, correct?
19   A.    That's correct.
20   Q.    And you said consistency.
21        Is that that you should take the medication as
22 directed by the medical provider, correct?
23   A.    That's correct.
24   Q.    And it may take some time for the patient to

Page 92

1  relies the benefits of that medication, not all -- in
2  other words, not all medications provide instantaneous
3  relief, correct?
4    A.    That's correct.
5    Q.    Counsel asked you some questions earlier about
6  whether you would take a patient's request -- whether
7  you -- Strike that.
8         Counsel asked you some questions earlier about
9  whether you take a patient's requests or demands for
10 certain medical treatments into consideration when
11 you're making your treatment plan for a patient.  Do you
12 recall those questions?
13   A.    I do.
14   Q.    And do you practice something I've heard
15 called evidence-based medicine?  Is that a term you're
16 familiar with?
17   A.    Yes.
18   Q.    What does that mean to you?
19   A.    Evidence-based medicine -- evidence- --
20 positive findings.  Positive findings.
21   Q.    So if a patient comes in and says, I want
22 surgery, aside from the fact that you're not a surgeon,
23 obviously, there has to be some medical basis to suggest
24 that he needs a consultation for surgery, for example,

Page 93

1  correct?
2    A.    Correct.
3    Q.    You would never order treatment that didn't
4  have a clinical basis, correct?
5    A.    That's correct.
6    Q.    Have you worked with Dr. Saleh Obaisi before?
7    A.    I have.
8    Q.    He was the medical director here from 2012 to
9  December of 2017, more or less, correct?
10   A.    More or less.
11   Q.    Why did you have find a Dr. Obais to be a
12 competent physician?
13   A.    I did.
14   Q.    Have you ever worked with Dr. Ann Davis?
15   A.    Yes, I have.
16   Q.    Dr. Davis was a staff physician here for a
17 couple of years, correct?
18   A.    That's correct.
19   Q.    Did you find Dr. Ann Davis to be a competent
20 physician?
21   A.    I did.
22   Q.    Counsel asked you some questions earlier
23 related to Exhibit 1 which were selections from the
24 IDOC-Wexford contract?



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 94..97

Page 94

1    A.   Yes.
2    Q.   And I just want to clarify, you had no role in
3  drafting this contract, correct?
4    A.   That's correct.
5    Q.   You had no role in negotiating the contract,
6  correct?
7    A.   Correct.
8    Q.   You actually testified that you've never seen
9  this document before, correct?
10   A.   I don't recall seeing this document before.
11   Q.   So as to what specific terms mean or what
12 their intended meaning was under the contract, you have
13 no foundation to render those opinions, correct?
14   A.   That's correct.
15   Q.   Do you schedule your own appointments with
16 patients or does someone else in the healthcare unit
17 handle your schedule?
18   A.   Someone else in healthcare handles my
19 schedule.
20   Q.   And you physically go out in the cells,
21 Ms. Williams, and get the patients and bring them to
22 their appointment or does someone else do that?
23   A.   No.  Someone else does that.
24   Q.   So you're relying on other individuals to

Page 95

1  bring the patients for that appointment, correct?
2    A.   Yes.
3    MR. MCCLAIN:  Objection; form.
4  BY MR. MCCLAIN:
5    Q.   Do you have any role in the collegial review
6  process?
7    MR. MCCLAIN:  Objection; form, foundation.
8  BY THE WITNESS:
9    A.   No, I do not.
10   Q.   When a patient transfers to another IDOC
11 prison, do you have any further role in that patient's
12 treatment?
13   A.   No, I do not.
14   Q.   Are you familiar with the 1-to-10 pain scale?
15   MR. MCCLAIN:  Objection; foundation.
16 BY THE WITNESS:
17   A.   Yes.
18   Q.   What does the 1-to-10 pain scale mean?
19   A.   That's a subjective number that the patient
20 can use to assign his perceived level of pain, providers
21 can make interpretations, as well.
22   Q.   So the patient is told to give a number on
23 1-to-10 on what his pain level is, correct?
24   A.   That's correct.

Page 96

1    Q.   And then it's incumbent on the practitioner to
2  determine whether there is objective evidence to
3  corroborate that subjective report of pain, correct?
4    A.   That's correct.
5    Q.   Are there certain objective indicators you can
6  look to in order to corroborate whether a patient's
7  subjective report of pain is objectively demonstrated?
8    MR. MCCLAIN:  Objection; form.
9  BY THE WITNESS:
10   A.   There are things that we take into
11 consideration when observing the patient, yes.
12   Q.   What are some of those things, Ms. Williams?
13   A.   What I take into account and the way that
14 my -- the way that I work, I note a patient as they're
15 walking into a particular area, even before they see me.
16 I take note of a patient as a patient is walking into my
17 area, whether it be my offices or, say, the healthcare
18 unit, the emergency room.
19        I note the patient as they're sitting, talking
20 to me, giving me information, and I -- I also note what
21 I see and evaluate on physical assessment and objective
22 portion.
23   Q.   What about vital signs?
24   A.   Vital signs can be an indication of a patient.

Page 97

1    Q.   How can vital signs indicate that a patient is
2  experiencing pain?
3    A.   Well, depending on the degree of pain, if a
4  patient is in a significant amount of pain, they may
5  have elevated blood pressure, they may have elevated
6  heart rate, they may have elevated respiratory rate.
7    Q.   And if you found that a patient had abnormal
8  vital signs, would that be noted in your medical
9  progress note?
10   A.   The vital signs are normally taking during a
11 patient encounter, yes.
12   Q.   During any of the medical progress notes that
13 were reviewed for you, did this patient have concerning
14 vital signs?
15   A.   I didn't make any notation of such, no.
16   Q.   And, in fact, several times in your medical
17 records, Ms. Williams, you noted no acute distress or no
18 apparent distress?
19   A.   That's correct.
20   Q.   And would that be consistent with your
21 testimony that you were evaluating the patient's gait,
22 grimacing in the face to objectively confirm their
23 subjective report of pain?
24   A.   To a degree, yes.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 98..101

Page 98

1    Q.   I want to direct your attention now to
2  Exhibit 2 which was the selections of the Wexford P&P.
3    A.   Yes.
4    Q.   I'm going to have a couple questions of this
5  document.
6         The first page I'm going to direct you to is
7  Page -- Wexford Page 321.  It's entitled, Preface.
8    A.   Yes.
9    Q.   I'm going to direct you -- and this is, again,
10 this document on 321 is titled Preface to the Wexford
11 medical policies and procedures.  I want to direct you
12 to the third paragraph.  Do you have that in front of
13 you?
14   A.   I do.
15   Q.   Could you please read that into the record,
16 Ms. Williams?
17   A.   Clinical pathways do not replace sound
18 clinical judgment nor are they intended to strictly
19 apply to all patients.  The specific strategies and
20 pathways presented in this manual provide a clinical
21 management approach, but their application is a decision
22 made by the practitioner accounting for individual
23 circumstances.
24   Q.   What does that paragraph mean, Ms. Williams?

Page 99

1    A.   This paragraph, basically, states that the
2  provider can use their clinical judgment, their
3  education, their experience, and that you have to take
4  each individual patient into account, their
5  circumstances, and their conditions, individually.
6    Q.   These documents in Exhibit 2, this isn't a
7  step-by-step manual for providing medical care, is it,
8  Ms. Williams?
9         MR. MCCLAIN:  Objection.
10 BY THE WITNESS:
11   A.   This is a source of reference, and it doesn't
12 replace, by any means, the clinical provider's
13 assessment of a patient.
14   Q.   And, in fact, on the Preface, Ms. Williams,
15 can you just read the very first sentence of that
16 document for us, the very first sentence under, Preface?
17   A.   This manual is intended to serve as a
18 reference tool for physicians practicing medicine in the
19 jails and prisons.
20   Q.   This is just a reference tool, isn't this
21 document, Ms. Williams?
22        MR. MCCLAIN:  Objection; form.
23 BY THE WITNESS:
24   A.   That's correct.

Page 100

1    Q.   Ms. Williams, I want to direct you to -- it's
2  Bates stamped Wexford 546 in Exhibit 2.  It's titled
3  No. 8, Pharmacologic Treatment of Mechanical Compressive
4  Pain.  I'll tell you it's the last page of the stapled
5  packet to help speed it up.
6    A.   Yes.
7    Q.   And, again, is this section here beginning,
8  Medications are less effective, this is within the
9  medical policy and procedures that we just reviewed the
10 preface to, correct?
11        MR. MCCLAIN:  Objection; form.
12 BY THE WITNESS:
13   A.   Yes.
14   Q.   And, again, as we just said, this is a -- the
15 document, itself, says it's a reference tool, and
16 physicians may -- it does not replace sound clinical
17 judgment, correct?
18        MR. MCCLAIN:  Objection; form.
19 BY THE WITNESS:
20   A.   Yes.
21   Q.   Now, when you first started treating
22 Mr. Hemphill, did he have a diagnosis of a mechanical
23 disorder?
24   A.   He did not.

Page 101

1    Q.   His assessment was probable bursitis?
2    A.   Probable.
3    Q.   So this section wouldn't even apply until
4  there was a diagnosis of a mechanical disorder, correct?
5         MR. MCCLAIN:  Objection; form, foundation.
6  BY THE WITNESS:
7    A.   In my opinion, that's correct.
8    Q.   And, again, as we discussed, even if it did
9  apply to the situation, a provider is free to prescribe
10 alternative treatment to this treatment guideline so
11 long as that treatment complied with the standard of
12 care, correct?
13   A.   That's correct.
14   Q.   Next I want to direct you to your medical
15 progress note of February 11st, 2013, which is on
16 IDOC 57, and I think that was in Exhibit 7.
17   A.   Yes.
18   Q.   I need this book back.
19   A.   Okay.  Exhibit 7?
20   Q.   Yes, please.
21   A.   Yes.
22   Q.   Now, on Exhibit 7, this is the physical that
23 you performed for the patient on February 11, 2015,
24 correct?


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Page 102

1    A.   Yes, it is.

2    Q.   And in the subjective portion at the top, the

3 patient is complaining that his right shoulder still

4 hurts since 2013 and nothing ever helps, correct?

5    MR. MCCLAIN:  Object to form.

6 BY THE WITNESS:

7    A.   Yes.

8    Q.   Is that what the document says?

9    A.   Yes.

10    Q.   And that's your own handwriting, correct?

11    A.   It is.

12    Q.   Now, if we flip the pain to Page 58, under

13 your plan, number 3 is refer to medical director for

14 right shoulder reexamination, correct?

15    A.   Reevaluation, yes.

16    Q.   And that was dated February 11th, 2015,

17 correct?

18    A.   That's correct.

19    Q.   Now, can I direct you to --

20    MR. MARUNA:  And I don't think we have a copy of

21 it, Counsel.

22 BY MR. MARUNA:

23    Q.   -- it's IDOC 97?

24    MR. MCCLAIN:  I just want to put an objection on

Page 103

1 the record of using documents that were now putting into

2 evidence that I don't have a copy of.

3    MR. MARUNA:  Well, it's been produced to you, but

4 okay.

5 BY MR. MARUNA:

6    Q.   March 4th, 2015.

7        Is that the date of the medical note?

8    A.   It is.

9    Q.   And is that a note by Dr. Obaisi?

10    A.   Yes, it is.

11    Q.   Does the patient under the S -- S is

12 subjective, what the patient is talking about; is that

13 correct?

14    A.   That's correct.

15    Q.   Does the patient give a report about the

16 consistency of his pain in his shoulder?

17    A.   Pain, right shoulder is back, on and off.

18    Q.   So when you referred the patient to Dr. Obaisi

19 following his report that his pain -- nothing has

20 changed about his pain since 2013, when he actually goes

21 to see Dr. Obaisi, he self reports that the pain is

22 actually on and off, correct?

23    A.   Yes, he does.

24    Q.   Counsel asked you some questions about

Page 104

1 IDOC 96, which is Exhibit 3?

2    A.   Yes.

3    Q.   This is the November 14th, 2014 note where you

4 wrote, Permit valid through 11 of 2015, correct?

5    A.   Yes.

6    Q.   And you testified earlier that you would not

7 have actually physically seen Mr. Hemphill that day,

8 correct?

9    MR. MCCLAIN:  Objection; form, foundation,

10 misstates prior testimony.

11 BY THE WITNESS:

12    A.   I did not see Mr. Hemphill on that particular

13 day.

14    Q.   How do you know you did not see Mr. Hemphill

15 on November 14th, 2014 based on your review of IDOC 96?

16    A.   For two reasons:  It was 5:35 in the evening.

17 My patients don't have appointments extended into the

18 evening like that.  And, secondly, there is no

19 documentation as far as patient's vital signs.  So I

20 know this patient was not seen.  This was just an entry.

21    Q.   And if we turn to Exhibit 5 which as the

22 medical permits?

23    A.   Yes.

24    Q.   And if I can direct you to IDOC 231?

Page 105

1    A.   Yes.

2    Q.   Do you see that on November 12th, 2014,

3 Dr. Obaisi issued a low bunk permit and front cuffing

4 permit for the patient, correct?

5    A.   That's correct.

6    Q.   And your note in Exhibit 3 is November 14th,

7 2014, so two days after Dr. Obaisi issued the permit,

8 correct?

9    A.   That's correct.

10    Q.   Is it possible that someone just called the

11 healthcare unit to confirm that the patient did have a

12 permit for the low bunk and waist -- or front cuffing,

13 and you just reviewed the chart to confirm it?

14    A.   That's a possibility, yes.

15    MR. MCCLAIN:  Objection; form, foundation.

16 BY MR. MARUNA:

17    Q.   But whatever the possibility is, it's clear

18 that you did not see Mr. Hemphill on November 14, 2014

19 based on your custom and practice and charting as you

20 testified to just a second ago, correct?

21    MR. MCCLAIN:  Objection; form, foundation

22 speculation.

23 BY THE WITNESS:

24    A.   That's correct.



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 106..109

Page 106

1     Q.   Counsel asked you a question at one point in
2  the deposition that, essentially, the patient was just
3  getting medications was the treatment for a while.
4          And I want to confirm the patient wasn't just
5  getting medication here, correct?
6     MR. MCCLAIN:  Objection; misstates prior testimony,
7  form, foundation.
8  BY THE WITNESS:
9     A.   Patient was not just receiving medication.
10    Q.   Was he receiving lifestyle modification in the
11 form of medical permits, correct?
12    A.   Yes.
13    Q.   So he was given a low bunk permit, correct?
14    A.   That's correct.
15    Q.   He was given a front cuffing permit, correct?
16    A.   That's correct.
17    Q.   By the way, what does front cuffing mean?
18    A.   I'm by know means a security person, but front
19 cuffing means just that, that the cuffs are placed in
20 front of the patient as opposed to behind the back.
21    Q.   So normally inmates are cuffed with their
22 hands behind their back, correct?
23    A.   That's correct.
24    Q.   Can that put strain on a shoulder, to put your

Page 107

1  arms behind your back and hold them there?
2     A.   It can.
3     Q.   So one of the ways we are -- one of the ways
4  that could be -- alleviate that pain would be asking the
5  security staff if they can handcuff the patient in the
6  front of his -- and have his hands handcuffed in front,
7  correct?
8     A.   That's correct.
9     Q.   The idea is that puts less strain on the
10 shoulder, correct?
11    A.   Yes.
12    Q.   Now, certainly, it's up to security staff to
13 enforce that, and security is going to come first,
14 correct?
15    A.   That's correct.
16    Q.   This patient was also referred to you for
17 physical therapy, correct?
18    A.   Yes, he was.
19    Q.   So it would be incorrect to say that the
20 patient was just given medications, correct?
21    MR. MCCLAIN:  Objection; form.
22 BY THE WITNESS:
23    A.   That's correct.
24    MR. MARUNA:  I'm going to go ahead and pass the

Page 108

1  witness.  I think I covered anything.  I might have one
2  or two follow-up, but I figure you got some.
3     MR. MCCLAIN:  Sure.  Yeah.
4     THE WITNESS:  Excuse me.
5     MR. MCCLAIN:  Do you want to take a break?
6     THE WITNESS:  Yes, please.
7     MR. MARUNA:  Of course.
8              (Whereupon, a discussion was held off
9               the record.)
10    MR. MCCLAIN:  We're back on the record.
11             FURTHER EXAMINATION
12 BY MR. MCCLAIN:
13    Q.   Are you familiar with the nature of
14 Mr. Hemphill's complaint in this case that he filed in
15 the Northern District of Illinois?
16    MR. MARUNA:  For clarification, the medical or the
17 legal complaint?
18    MR. MCCLAIN:  The legal complaint.
19    MR. MARUNA:  Objection; foundation.
20         Ms. Williams, you can answer, if you know.
21 BY THE WITNESS:
22    A.   I don't recall exactly what that is.
23    Q.   Ms. Williams, did you have counsel that filed
24 an appearance on your behalf in this complaint?

Page 109

1     MR. MARUNA:  To the degree you know what that
2  means, Ms. Williams.
3  BY THE WITNESS:
4     A.   Yes.
5     Q.   Did you have counsel answer the second amended
6  complaint filed by Carl?
7     MR. MARUNA:  To the degree you know what that
8  means, Ms. Williams.
9  BY THE WITNESS:
10    A.   Yes.
11    MR. MARUNA:  Don't guess.  If you know don't, say
12 you don't know.
13 BY MR. MCCLAIN:
14    Q.   Are you aware that Mr. Hemphill's legal
15 complaint stems from medical care related to his right
16 shoulder?
17    A.   Yes.
18    Q.   Okay.  And Mr. Hemphill's legal complaint does
19 not relate or complain about an ear infection, does it?
20    MR. MARUNA:  It's to the degree you know,
21 Ms. Williams.
22 BY THE WITNESS:
23    A.   In general, I believe this to be related to
24 his complaint of right shoulder pain.


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 110..113

Page 110

1    Q.   And Mr. Hemphill's legal complaint does not
2  complain of or relate to a cut finger, does it?
3    MR. MARUNA:  Again, Ms. Williams -- Objection to
4  foundation.  Asking for a legal opinion from the
5  witness.
6        Ms. Williams, you can answer over the
7  objection, if you know.
8  BY THE WITNESS:
9    A.   I don't recall everything that's in that
10 document, but I believe it's in regards to his right
11 shoulder.
12   Q.   And Mr. Hemphill's legal complaint does not
13 complain of or relate to heartburn, does it?
14   MR. MARUNA:  Again, same objections.
15   Ms. Williams, you can answer.
16 BY THE WITNESS:
17   A.   And I would state the same.
18   Q.   Your counsel ran through a few documents which
19 I don't have copies of, and I'm going to run through, at
20 least based on dates, so feel free to correct me if I'm
21 wrong.
22       The first document was dated August --
23 August 5th, 2015, and it related to a progress note of
24 Mr. Hemphill related to an ear infection or ear pain; is

Page 111

1  that correct?
2    A.   Patient complained of left ear pain, yes.
3    Q.   And your counsel asked you questions of
4  whether Mr. Hemphill complained of shoulder pain during
5  this examination.  Do you recall that testimony?
6    A.   I do.
7             (Williams Deposition Exhibit No. 9
8                  marked as requested.)
9  BY MR. MCCLAIN:
10   Q.   Ms. Williams, I'm going to hand you what I've
11 marked as Exhibit 9.
12   Ms. Williams, what is that document?
13   A.   This document is a nursing med tech protocol
14 sheet which is part of the offender outpatient progress
15 note Stateville IDOC for Carl Hemphill.
16   Q.   And what is the date of the entry of this
17 progress note?
18   A.   September 9th of 2015.
19   Q.   Does September 9th, 2015 occur after
20 August 5th, 2015?
21   A.   It does.
22   Q.   And in the S section, can you please read that
23 into the record?
24   A.   It's been hurting for two years.  I was told I

Page 112

1  was going to UIC.  What caused the pain:  Lifting,
2  sports, et cetera.  Woke up with the pain.
3    Q.   Just to clarify, What caused the pain:
4  Lifting, sports, et cetera, that's part of the form,
5  correct?  That's not a statement that the individual
6  made?
7    A.   The typed portion, what caused the pain,
8  that's correct.  That's correct.
9    Q.   And down below, it says, Describe location of
10 pain, what does it state in that box?
11   A.   Location, type, characteristic, and pattern of
12 pain, right shoulder.
13   Q.   So Mr. Hemphill was indicating that he's
14 having pain in his right shoulder, and the pain has been
15 occurring for over two years, correct?
16   A.   How long has the pain been present, for two
17 years, yes.
18   Q.   And the -- Another document that your counsel
19 reviewed with you was a progress note dated
20 October 21st, 2015, and I believe that this related to a
21 laceration of Mr. Hemphill's finger, correct?
22   A.   Yes.
23   Q.   And your counsel asked you whether
24 Mr. Hemphill complaint of shoulder pain during this

Page 113

1  examination, correct?
2    A.   That's correct.
3    Q.   I want to direct you back to Exhibit 6.  It's
4  labeled Hemp 111?
5    A.   Yes.
6    Q.   And there is a progress note entry of
7  November 4th, 2015, correct?
8    A.   Yes.
9    Q.   And the date of November 4th, 2015 occurs
10 after date October 21st, 2015, correct?
11   A.   It does.
12   Q.   And this note indicates that Mr. Hemphill is
13 getting a renewal of his lower bunk permit, and it's an
14 indication of a shoulder injury as the reason; is that
15 correct?
16   A.   That's correct.
17   Q.   Your counsel also asked you about a progress
18 report dated March 18th, 2016, and it related to
19 Mr. Hemphill's complaint of heartburn.  Do you recall
20 that testimony?
21   A.   I do.
22   Q.   And your counsel asked you if that progress
23 report -- actually, he did not ask you if that progress
24 report indicated that there was shoulder pain.



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 114..117

Page 114

1        But if you could read me that progress report,
2   what does that progress report state in regards to
3   shoulder pain?
4        A.  It doesn't state anything in regard to
5   shoulder pain.
6        Q.  Excuse me.  You are correct.
7            I want to, actually, discuss the February 9th,
8   2016 report -- progress report that your counsel showed
9   you.
10       A.  Yes.
11       Q.  Within that report, is there any indication of
12  shoulder pain suffered by Mr. Hemphill?
13       A.  There is no specific complaint of shoulder
14  pain mentioned here.
15       Q.  There is no mention of right shoulder pain,
16  chronic?  It might have been a conclusion you came to.
17       A.  Excuse me.  I'm sorry.  Under the subjective
18  portion.
19       Q.  Okay.  And I apologize.  I don't have a copy
20  of this document in front of me because it was not
21  provided by counsel.
22           But in your assessment, is there any mention
23  of shoulder pain?
24       A.  Yes.  There.

Page 115

1        Q.  And what does it state?
2        A.  Right shoulder pain, chronic.
3        Q.  And so on February 9th, 2016, you concluded
4   that Mr. Hemphill was suffering from chronic shoulder
5   pain in his right shoulder, correct?
6        A.  Yes.
7        Q.  And, Ms. Williams, just because an inmate
8   doesn't complain of shoulder pain during everything
9   single medical visit does not necessarily mean that he
10  is not suffering from shoulder pain; is that correct?
11       MR. MARUNA:  Objection; foundation to the term
12  suffering.
13           Ms. Williams, you can answer over the
14  objection.
15       THE WITNESS:  I would ask that question to,
16  suffering?
17       MR. MCCLAIN:  Sure.  I'll rephrase.
18  BY MR. MCCLAIN:
19       Q.  Just because an inmate does not mention that
20  he is experiencing shoulder pain during every
21  examination does not necessarily mean that he is not
22  experiencing shoulder pain; is that correct?
23       MR. MARUNA:  Objection; form of the question,
24  vague, assumes facts not in evidence, calls for

Page 116

1   speculation.
2           Ms. Williams, over the objections, you may
3   answer.
4   BY THE WITNESS:
5        A.  Subjective portion is what the patient tells
6   the provider.
7        Q.  Understood.
8           But what I'm -- That was not my question.  My
9   question was just because an inmate is not complaining
10  that they are experiencing shoulder pain does not
11  necessarily mean that they are not experiencing shoulder
12  pain, correct?
13       MR. MARUNA:  Same objections.  Same objections to
14  the question.  Over the objections, you may answer.
15  BY THE WITNESS:
16       A.  I can't read anything into that.
17       Q.  Read anything into what?
18       A.  I can't say that the patient isn't having back
19  pain at that particular visit.  I can't say that he's
20  not having abdominal pain.  I can't say that he's not
21  having a number of other issues.
22       Q.  Exactly.  So just because he doesn't mention
23  it doesn't mean he's not experiencing it, correct?
24       A.  My only point is I document what the patient

Page 117

1   tells me.
2        Q.  Understood.
3           But just because a patient is not indicating
4   that he is experiencing shoulder pain does not mean that he is
5   not suffering from that pain; is that correct?
6        MR. MARUNA:  Objection; foundation.  Suffering.
7           Ms. Williams, over the objection.
8   BY THE WITNESS:
9        A.  Once again, I'm not reading anything into it.
10  I can't neighboring any summations or any -- I can't
11  make any summations what's going on with the patient
12  other than what he tells me.  That's what I address
13  during that visit, what the patient subjectively tells
14  me.
15       MR. MCCLAIN:  Understood.
16           I don't think I have any questions, but I
17  reserve my right.
18       MR. MARUNA:  Sure.  Just one follow-up,
19  Ms. Williams, kind of on counsel's last question.
20           FURTHER EXAMINATION
21  BY MR. MARUNA:
22       Q.  You can only treat what's in front of you,
23  correct?
24       MR. MCCLAIN:  Objection; form.



Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 118..121

Page 118

1  BY MR. MARUNA:
2      Q.   You rely on the patient to give you a
3  subjective report of his medical complaints when you see
4  him, correct?
5      A.   That's correct.
6      Q.   And if a patient doesn't make a subjective
7  report of a condition, you can't read his mind, correct?
8      MR. MCCLAIN:  Objection; form, foundation.
9  BY THE WITNESS:
10     A.   That's correct.
11     Q.   Especially if your objective findings is that
12  the patient is in no apparent distress, correct?
13     MR. MCCLAIN:  Objection; form.
14  BY THE WITNESS:
15     A.   That's correct.
16     Q.   So you rely on and expect that your patients
17  tell you what their medical complaints are when you
18  examine them; is that correct?
19     A.   If it's an issue for them, yes.
20     MR. MARUNA:  Nothing further.
21     MR. MCCLAIN:  I have no further questions.
22     MR. MARUNA:  I just want to quickly -- because I
23  just want to make sure we did get this on the record.
24  On 131 which is the March 18th, 2016 note, I just want

Page 119

1  to clarify in case we didn't discuss it earlier.
2  BY MR. MARUNA:
3      Q.   This is the one with the complaint about
4  heartburn, correct?
5      A.   Yes.
6      Q.   There was no complaint of shoulder pain
7  March 18th, 2016, correct?
8      A.   The patient did not voice any complaints of
9  shoulder pain, correct?
10     MR. MARUNA:  Nothing further.
11            (Williams Deposition Exhibit No. 10
12             marked as requested.)
13            FURTHER EXAMINATION
14  BY MR. MCCLAIN:
15     Q.   Ms. Williams, I'm handing you what which have
16  I've marked as Exhibit 10.
17          Is that -- What is this document?
18     A.   This document appears to be an operative from
19  Galesburg Cottage Hospital.  The date of admission
20  June 9th of 2016.
21     Q.   And what is DOS at the top of that report
22  mean?
23     A.   Date of service.
24     Q.   And this is an operative report for Carl

Page 120

1  Hemphill, correct?
2      A.   It is.
3      Q.   And about halfway down, IDOC 2107 where it
4  says, Procedure, what does that state?
5      A.   Acromioplasty right shoulder with Mumford
6  procedure, resection of right distal clavicle.
7      Q.   So this report indicates that Mr. Hemphill
8  received this surgery on his right shoulder in June
9  2016, correct?
10     A.   That's correct.
11     Q.   And Mr. Hemphill wouldn't just receive surgery
12  for no reason, correct?
13     MR. MARUNA:  Objection; foundation, form of the
14  question, calls for speculation.
15          Ms. Williams, you may answer over the
16  objections.
17  BY THE WITNESS:
18     A.   On this document, there is a preoperative
19  diagnosis.
20     Q.   And what is that preoperative diagnosis?
21     A.   Chronic impingement syndrome, right shoulder
22  and, degenerative arthritis, right acromioclavicular
23  joint.
24     Q.   And there is a postoperative diagnosis,

Page 121

1  correct?
2      A.   That's correct.
3      Q.   Before we get to that, the preoperative
4  diagnosis indicates that Mr. Hemphill was diagnosed with
5  these two conditions prior to June 9th, 2016, correct?
6      MR. MARUNA:  Objection to foundation, and it's just
7  going to be a standing objection that you're asking
8  Physician Assistant Williams about an operative
9  procedure performed by an orthopedic surgeon.
10          But over the objection, Ms. Williams, you can
11  read the document.
12     MR. MCCLAIN:  You can answer that question.
13     THE WITNESS:  Can you repeat it, please?
14     MR. MCCLAIN:  Court Reporter, you can read it back.
15          (Whereupon, the record was read back
16           as requested.)
17     MR. MARUNA:  And the standing objection remains.
18  BY THE WITNESS:
19     A.   Yes.
20     Q.   And can you read the postoperative diagnosis?
21     MR. MARUNA:  And the same objections.
22          Ms. Williams.
23  BY THE WITNESS:
24     A.   Chronic impingement syndrome, right shoulder,


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
LaTonya Williams, PA - 03/09/2018

Pages 122..125

Page 122

1  and degenerative arthritis right acromioclavicular
2  joint.
3      Q.   So that indicates that Mr. Hemphill had these
4  two conditions post surgery, as well, correct?
5      MR. MARUNA:  Same objection.
6          Ms. Williams, you may answer.
7  BY THE WITNESS:
8      A.   Postoperative diagnosis, yes.
9      MR. MCCLAIN:  No further questions.
10     MR. MARUNA:  One final one.  I think this will
11 really be it this time, Ms. Williams.
12                 FURTHER EXAMINATION
13 BY MR. MARUNA:
14     Q.   Date of service here on this document,
15 Exhibit 10, is June -- June 9th, 2016, correct?
16     A.   Yes.
17     Q.   Galesburg Cottage Hospital is in Galesburg,
18 Illinois, correct?
19     A.   Yes.
20     Q.   The patient's referring physician was Dr. Kul
21 Sood under primary care physician, correct?
22     A.   That's correct.
23     Q.   Dr. Sood was not the medical director at
24 Stateville during that time, correct?

Page 123

1      A.   That's correct.
2      Q.   It was Dr. Obaisi, right?
3      A.   Yes.
4      Q.   Does this tell you that the surgery occurred
5  when the patient had left Stateville Correctional
6  Center?
7      A.   Yes.
8      Q.   And as we discussed earlier, when a patient
9  leaves Stateville Correctional Center, that treatment is
10 handed off to the new physicians at the receiving
11 prison, correct?
12     A.   That's correct.
13     MR. MARUNA:  Nothing further.
14     MR. MCCLAIN:  Reserve or waive?
15     THE WITNESS:  Whatever you decide, Counsel.
16     MR. MARUNA:  The witness waives.
17          (Witness excused.)
18
19
20
21
22
23
24

Page 124

1   UNITED STATES OF AMERICA      )
    NORTHERN DISTRICT OF ILLINOIS )
2   EASTERN DIVISION              )  SS.
    STATE OF ILLINOIS             )
3   COUNTY OF COOK                )
4
5      I, Traci L. Gidley, Certified Shorthand
6  Reporter, Registered Professional Reporter, and Notary
7  Public, do hereby certify that LaTONYA WILLIAMS, PA, was
8  first duly sworn by me to testify to the whole truth and
9  that the above deposition was reported stenographically
10 by me and reduced to typewriting under my personal
11 direction.
12     I further certify that the said deposition was
13 taken at the time and place specified and that the
14 taking of said deposition commenced on March 9, 2018, at
15 10:17 a.m.
16     I further certify that I am not a relative or
17 employee or attorney or counsel of any of the parties,
18 nor a relative or employee of such attorney or counsel,
19 nor financially interested directly or indirectly in
20 this action.
21
22
23
24

Page 125

1      In witness whereof, I have hereunto set my
2  hand and affixed my seal of office at Chicago, Illinois,
3  this 22nd day of March, A.D., 2018.
4
5
6
7
8
9          Traci L. Gidley
10         TRACI L. GIDLEY, CSR, RPR
           180 North LaSalle Street
11         Suite 2800
           Chicago, Illinois  60601
12         Phone:  (312) 236-6936
13
14 CSR No.  084-004643
15
16
17
18
19
20
21
22
23
24



Hemphill vs Wexford Health Sources, Inc.

15 CV 4968

Deposition of: Arthur Funk, M.D.

Taken on: March 02, 2018

**JENSEN LITIGATION SOLUTIONS**
180 North LaSalle Street
Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.jensenlitigation.com



Exhibit E

1

2                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4
      CARL HEMPHILL,                       )
5                                          )
                       Plaintiff,          )
6                                          )
              vs.                          )   No.15-CV-04968
7                                          )
      WEXFORD HEALTH SOURCES, INC.;        )
8     SALEH OBAISI; ANN HUNDLY             )
      DAVIS; LATONYA WILLIAMS; LOUIS       )
9     SHICKER; MICHAEL LEMKE; and          )
      DORRETTA O'BRIEN,                     )
10                                         )
                       Defendants.         )
11

12

13            The deposition of ARTHUR FUNK, M.D., called by

14    the Plaintiff for examination, taken pursuant to notice

15    and pursuant to the Federal Rules of Civil Procedure for

16    the United States District Courts pertaining to the

17    taking of depositions, taken before Alexandra Sonne,

18    Certified Shorthand Reporter and Registered Professional

19    Reporter, at 222 West Adams Street, Suite 2900, Chicago,

20    Illinois, commencing at 9:16 a.m. on March 2, 2018.

21

22

23

24



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 2..5

Page 2

```
1    APPEARANCES:
2        FOLEY & LARDNER LLP
         MR. ANDREW T. MCCLAIN
3        321 North Clark Street
         Suite 2800
4        Chicago, Illinois 60654
         Phone:  (312) 832-4500
5        E-Mail:  amcclain@foley.com
6            On behalf of the Plaintiff;
7        CASSIDAY SCHADE, LLP
         MR. JAMES F. MARUNA
8        222 West Adams Street
         Suite 2900
9        Chicago, Illinois 60606
         Phone:  (312) 641-3100
10       E-Mail:  jmaruna@cassiday.com
11           On behalf of the Defendants Wexford Health
             Source, Inc., Saleh Obaisi, Ann Hundly Davis
12           and Latonya Williams;
13       ASSISTANT ATTORNEY GENERAL
         MR. NICHOLAS S. STALEY  (VIA TELEPHONE)
14       100 West Randolph Street
         13th Floor
15       Chicago, Illinois 60601
         Phone:  (312) 814-3588
16       E-Mail:  nstaley@atg.state.il.us.
17           On behalf of the Defendants Louis Shicker,
             Michael Lemke and Dorretta O'Brien.
18
19
20                    *    *    *    *    *    *
21
22
23
24
```

Page 3

```
1              I N D E X
2    WITNESS                            PAGE
3    ARTHUR FUNK, M.D.
4        Direct Examination by Mr. McClain ......   4
5        Cross-Examination by Mr. Maruna ........ 100
6        Redirect Examination by Mr. McClain .... 132
7
8            E X H I B I T S
9    FUNK DEPOSITION EXHIBIT                PAGE
10       No. 1  (Notice) ........................   6
11       No. 2  (Contract) ......................  10
12       No. 3  (Medical policies and procedures).  20
13       No. 4  (Utilization management
14              policies and procedures) ........  64
15       No. 5  (Screenshots) ...................  67
16       No. 6  (Offender outpatient
17              progress notes) ................  84
18       No. 7  (E-mail exchange) ...............  93
19
20
21
22
23
24
```

Page 4

```
1              (Funk Deposition Exhibit Nos. 1-7
2               premarked as requested.)
3              (Witness sworn.)
4    WHEREUPON:
5                  ARTHUR FUNK, M.D.,
6    called as a witness herein, having been first duly
7    sworn, was examined and testified as follows:
8                  DIRECT EXAMINATION
9    BY MR. MCCLAIN:
10       Q.   Good morning, Dr. Funk.  My name is Andrew
11   McClain.  I represent the plaintiff in this matter.
12       Can you please state your full name for the
13   record.
14       A.   It's Arthur Funk.
15       Q.   Can you spell that?
16       A.   A-r-t-h-u-r, F-u-n-k.
17       Q.   Dr. Funk, have you ever been deposed?
18       A.   Yes.
19       Q.   I just want to remind you of a few of the
20   ground rules.  You understand that you're under oath,
21   correct?
22       A.   Yes.
23       Q.   The court reporter here is taking down
24   everything that we speak; do you understand that?
```

Page 5

```
1        A.   Yes.
2        Q.   I'm going to ask you a series of questions.
3    If you don't understand a question, can you please let
4    me know?
5        A.   Sure.
6        Q.   If you answer a question, I'll assume that you
7    understood that question; is that a fair assumption?
8        A.   It is.
9        Q.   Also, I want to remind you when you answer a
10   question, answer audibly.  No shaking of the head or
11   uh-huh or uh-uh because that doesn't reflect well on the
12   record.
13       If you need a break at any time, just let me
14   know, but before we take a break, I just ask that you
15   please answer my question before we take a break.
16       A.   Sure.
17       Q.   Are you authorized to testify on behalf of
18   Wexford Health Sources, Inc.?
19       A.   Yes.
20       Q.   And you're here providing testimony pursuant
21   to plaintiff's notice of deposition of Wexford Health
22   Sources, Inc., correct?
23       A.   Correct.
24       Q.   I went ahead and marked the notice as
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 6..9

Page 6

1    Exhibit 1.
2            What have you done to prepare for today's
3    deposition?
4        A.   I met with counsel.  I reviewed documents that
5    were provided, including medical records.
6        Q.   And what documents did you review?
7        A.   The complaint, notice of deposition, some
8    other ancillary legal correspondences, some
9    communications between the plaintiff and the Department
10   of Corrections.  That's all that comes to mind.
11       Q.   And what medical records did you review?
12       A.   What were provided, so the medical records
13   from the facility for a selected period of time, then
14   some records from a procedure that he had at an outside
15   facility, X-ray reports.
16       Q.   Who is "he" that you're referring to?
17       A.   The inmate in question.
18       Q.   Is that Carl Hemphill?
19       A.   Yes.
20       Q.   So you are familiar with an individual named
21   Carl Hemphill?
22       A.   From review of his records.
23       Q.   Have you reviewed anything else prior to
24   today's deposition?

Page 7

1        A.   Not that comes to mind.
2        Q.   What is your educational background?
3        A.   I'm an MD physician.
4        Q.   Do you have any other certifications or
5    degrees besides your medical degree?
6        A.   No.  I have specialty training in internal
7    medicine, CCHP certification.
8        Q.   What is CCHP?
9        A.   It's certified correctional health care
10   provider.
11       Q.   Who is your current employer?
12       A.   Wexford Health Sources.
13       Q.   And how long have you been at Wexford?
14       A.   Most of the past 22 years.
15       Q.   And where were you prior to Wexford?
16       A.   Prior to that I worked in the local -- for the
17   local 705 board of teamsters.
18       Q.   What is the 705 board of teamsters?
19       A.   It's a union.
20       Q.   For what sort of trade?
21       A.   Semi-truck drivers.
22       Q.   And did you serve as a doctor in that
23   capacity?
24       A.   Yes.

Page 8

1        Q.   What is your current position at Wexford?
2        A.   I am the Northern Illinois regional medical
3    director.
4        Q.   And how long have you been the Northern
5    Illinois regional medical director?
6        A.   Since 2005.
7        Q.   What was your position prior to?
8        A.   I was the medical director at Pontiac
9    Correctional Center.
10       Q.   As regional medical director, are you
11   currently practicing medicine, or is it more
12   administrative managerial duties?
13       A.   It's both administrative and clinical.
14       Q.   What are your administrative duties as the
15   regional director?
16       A.   I interview potential applicants, I
17   participate in meetings, I do analysis of data that's
18   provided, I review statistics, sit on different
19   committees, whatever is assigned to me by my
20   supervisors.
21       Q.   Who are your supervisors?
22       A.   My clinical supervisor is Dr. Tom Lehman, and
23   my administrative supervisor is Shannis Stock.
24       Q.   Can you spell Shannis' name?

Page 9

1        A.   S-h-a-n-n-i-s and Stock, S-t-o-c-k.
2        Q.   You stated you interview potential applicants.
3    What does that mean?
4        A.   Medical director applicants, physician
5    applicants, nurse practitioners that work for us at the
6    various facilities.
7        Q.   So employees of Wexford then?
8        A.   Correct.
9        Q.   What committees do you sit on?
10       A.   Whatever I'm assigned to.  Credentials
11   committees, medical advisory committees, pharmacy
12   therapeutics.  Those would be some.
13       Q.   What are your clinical duties?
14       A.   Direct patient care, reviewing care provided
15   by others, reviewing blocks of care or segments of care
16   provided to different patients.
17       Q.   Did you ever see the patient Carl Hemphill?
18       A.   I don't believe so.
19       Q.   You indicated that you review others.  What
20   does that mean?
21       A.   I supervisor medical directors, so I will
22   review their work.
23       Q.   And reviewing their work, does that entail
24   reviewing doctors' notes, nurses' notes, things of that

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 10..13

Page 10

1  nature?
2      A.   Yes.
3      Q.   And what are you looking for when you review
4  their notes?
5      A.   For quality of care and to ensure that the
6  care is appropriate.
7      Q.   And how do you determine care is appropriate?
8      A.   By applying the prevailing community standard
9  against what the physician has done.
10      Q.   What is Wexford's role in terms of providing
11  medical care to Illinois Department of Corrections
12  facilities?
13      A.   They're contracted to provide certain services
14  of medical care that's specified in the contract between
15  Wexford, the Department of Corrections and Health and
16  Family Services.
17      Q.   I've marked as Exhibit 2 the contract between
18  Wexford and IDOC, State of Illinois.
19          Are you familiar with that document, Doctor?
20      A.   Yes.
21      Q.   What is that document?
22      A.   This is a contract that I was referring to.
23      Q.   That's the contract between Wexford and the
24  State of Illinois?

Page 11

1      A.   And Health and Family Services.
2      MR. MARUNA:   These are selections from the
3  contract, right?
4      THE WITNESS:   Yes.  It is not the entire contract.
5  BY MR. MCCLAIN:
6      Q.   It is not the entire contract, correct.  It is
7  excerpts of the contract.
8          So this contract governs the relationship
9  between Wexford and IDOC, correct?
10      A.   It governs specified services between Wexford
11  and the Department of Corrections and Health and Family
12  Services.
13      Q.   And what sort of services does this contract
14  govern?
15      A.   It states within the contract certain medical
16  services, and then there's certain services that are not
17  provided.
18      Q.   If you flip to page 4 of that contract, it's
19  Wexford 39.  The very top, Section 2, description of
20  supplies and services, is that an accurate
21  representation of the general services that Wexford
22  provides to IDOC?
23      A.   You're saying under 2.2 or under 2?
24      Q.   Under 2.

Page 12

1      A.   I see.
2          Yes.  Except otherwise where it's explained in
3  the contract.  For example, it says here that we are to
4  provide pharmaceutical, but then further in the contract
5  it will specify that we are not to provide certain
6  pharmaceutical services.
7          Mental health, we provide some mental
8  services, but not all.  It's not comprehensive.  It's
9  not incorrect, but it's not -- it would be taken out of
10  context of the contract to just take a look at that one
11  paragraph.
12      Q.   Understood.  Within Section 2, it states,
13  vendor is to arrange and provide for services on-site as
14  necessary -- as necessary off-site at local
15  hospitals, outpatient facilities and consultative
16  physician offices.
17          Did I read that correctly?
18      A.   Yes.  The portion of the sentence that you
19  read, yes.
20      Q.   So what does that sentence mean in terms of
21  providing care to the inmates at IDOC?
22      A.   It means that necessary care is to be provided
23  and whether that includes on-site or off-site.
24      Q.   So all of the services that Wexford provides

Page 13

1  is not necessarily provided at the facility where an
2  inmate is housed, correct?
3      A.   Correct.
4      Q.   And if an inmate needs medical treatment that
5  is not provided at the facility, they would be sent
6  elsewhere for that treatment, correct?
7      A.   Correct.
8      Q.   Doctor, do you know if Stateville has an MRI
9  machine?
10      A.   It does not.
11      Q.   So if an inmate needs an MRI, that inmate will
12  be sent elsewhere to receive that?
13      A.   They are.
14      Q.   Does Stateville have an X-ray machine?
15      A.   Yes.  Actually, Stateville has use of an X-ray
16  machine.  It's on the neighboring facility, which is
17  called NRC.  It's on the same campus, so the same area,
18  but it's not in the same -- it's actually not in
19  Stateville itself.  It's in the neighboring facility.
20  They share it.
21      Q.   And this contract, Exhibit 2, this applies to
22  all IDOC facilities at which Wexford provides medical
23  services, correct?
24      A.   Yes.

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 14..17

Page 14

1    Q.   That would include Stateville, correct?
2    A.   Yes.
3    Q.   That would include Henry Hill facility?
4    A.   Yes.
5    Q.   What is the difference between an X-ray and an
6    MRI?
7    A.   They are different diagnostic studies.
8    Q.   What does an X-ray reveal?
9    A.   It reveals an image that's taken by use of
10   X-ray, X-ray beams.
11   Q.   So if you were to take an X-ray image of a
12   shoulder, what would that reveal?
13       MR. MARUNA:  Objection; calls for speculation.
14       Over the objection, Doctor.
15   BY THE WITNESS:
16   A.   It would be a radiographic picture of the
17   shoulder -- of the shoulder structures.
18   Q.   Shoulder structures, is that bone structure?
19   A.   Bone and tissue of the shoulder and skin.  So
20   whatever is there would show radiographically.
21   Q.   And what does an MRI reveal?
22   A.   MRI is a different type of diagnostic study
23   that's done with magnetic waves.
24   Q.   Are there images that will appear in an MRI

Page 15

1    image that will not appear in an X-ray image?
2    A.   Yes.
3        MR. MARUNA:  By images, do you mean -- what do you
4    mean?  They're both images.
5    BY THE WITNESS:
6    A.   The answer is yes.
7    Q.   What is revealed in an MRI that is not
8    revealed in an X-ray?
9    A.   It is a different modality.  It shows the
10   structures differently.  It better defines soft tissue
11   structures than an X-ray would.
12   Q.   Would an X-ray reveal a tear in muscle tissue?
13   A.   It may reveal signs of a tear.
14   Q.   Would an MRI reveal a tear in muscle tissue?
15   A.   It could.
16   Q.   If you're trying to determine if a muscle has
17   been torn, would you use an MRI as opposed to an X-ray?
18   A.   That's primarily a clinical diagnosis.
19   Neither diagnostic test would generally be necessary,
20   but if one were elected, the better one would be an MRI.
21   Q.   How many doctors are employed by Wexford at
22   Stateville?
23       MR. MARUNA:  Currently or at a point in time?
24       MR. MCCLAIN:  Currently.

Page 16

1    BY THE WITNESS:
2    A.   There are two physicians and a nurse
3    practitioner.
4    Q.   How many doctors were employed at Wexford in
5    the year 2013?
6    A.   You're asking about Stateville?
7    Q.   Stateville, yes.
8    A.   Same.
9    Q.   And what about 2014?
10   A.   Same.
11   Q.   And 2015?
12   A.   Same.
13   Q.   How many doctors were employed -- Strike that.
14       How many Wexford doctors were employed at the
15   Henry Hill location in 2013?
16   A.   One.
17   Q.   And in 2014?
18   A.   One.
19   Q.   And in 2015?
20   A.   One.  Now, I'm answering the questions as the
21   positions -- and whether the position was filled for the
22   entire year, I couldn't recall whether that's the case.
23   It probably was, but employment records would show
24   whether the position was filled throughout those -- for

Page 17

1    those years in question in all of those months of the
2    years in question.
3    Q.   You indicated there's one nurse practitioner
4    at Stateville.  Are there other nurses, for instance, a
5    registered nurse employed at Stateville?
6    A.   Yes.
7    Q.   How many registered nurses are currently
8    employed at Stateville?
9    A.   I don't know the number, but it's quite a few.
10   Let's say about 30.
11   Q.   How many were employed in 2013 at Stateville?
12   A.   The number from 2013 to today has increased by
13   several, but I couldn't tell what year exactly the
14   number is.
15   Q.   So there would be less than 30 nurses in 2013
16   at Stateville?
17   A.   The number was less in 2013 than it is today.
18   Q.   Do you know how many inmates there currently
19   are at Stateville?
20   A.   Approximately 1,600.  Just for clarification,
21   there's two facilities named Stateville.  Stateville
22   Correctional Center and Stateville NRC.  Those are
23   neighboring facilities.  The facility we're talking
24   about is Stateville.  So the population if you look it



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 18..21

Page 18

1  up is about 3,400 would be the combined population of
2  the two.
3       Q.   And I'm just focusing at the location that
4  Carl Hemphill was housed.
5       A.   Okay.
6       Q.   So if I reference Stateville, do you
7  understand that it applies to that facility and not the
8  entire campus?
9       A.   Yes.
10      Q.   Do you know how many inmates were at
11 Stateville in 2013?
12      A.   Approximately the same number.
13      Q.   Would that also apply for the years of 2014
14 and 2015?
15      A.   Yes.  It varies according to different factors
16 under the control of the Department of Corrections, but
17 generally 1,700 is the average population.
18      Q.   So it would currently be under the average
19 right now?
20      A.   Due to political factors and early release,
21 yes.  The census is actually lower now than it has been
22 for several years.
23      Q.   Was Dr. Obaisi an employee of Wexford prior to
24 his passing?

Page 19

1       A.   Yes.
2       Q.   Is Dr. Ann Davis a Wexford employee?
3       A.   Currently or was?
4       Q.   Currently.
5       A.   No.
6       Q.   Was she a Wexford employee in the years 2013
7  and 2014 and 2015?
8       A.   She was a Wexford employee.  The exact dates I
9  would have to refer to employment records, but around
10 2013, '14 she was an employee.
11      Q.   Do you know when she left Wexford as an
12 employee?
13      A.   No.
14      Q.   Is Latonya Williams a current Wexford
15 employee?
16      A.   Yes.
17      Q.   And what is Latonya Williams' position with
18 Wexford?
19      A.   She's a physician assistant.
20      Q.   So this contract dictates the terms of the
21 agreement between Wexford and IDOC to provide certain
22 medical services, correct?
23      A.   And Health and Family Services as I've stated.
24      Q.   Does Wexford utilize its own internal policies

Page 20

1  and procedures to carry out its requirements under this
2  contract?
3       A.   Some.
4       Q.   As regional medical director, are you familiar
5  with Wexford's policies and procedures regarding
6  providing medical services to inmates?
7       A.   Yes.
8       Q.   And how are you familiar with those policies
9  and procedures?
10      A.   From my involvement with those policies and
11 procedures and from actual practice within the
12 Department of Corrections implementing the policies and
13 procedures.
14      Q.   Doctor, are you familiar with a document
15 entitled medical policies and procedures, region
16 Illinois?
17      A.   Yes.
18      Q.   I've just handed you excerpts of the document
19 entitled medical policies and procedures.  Are you
20 familiar with that document?
21      A.   Yes.
22      Q.   What is that document?
23      A.   They are Wexford's medical policies and
24 procedures.

Page 21

1       Q.   Excerpts?
2       A.   Excerpts, yes.
3       Q.   And have you ever reviewed this document
4  before?
5       A.   Yes.
6       Q.   When have you reviewed this document?
7       A.   Whenever called for.
8       Q.   Would you review this document in carrying out
9  your clinical duties?
10      A.   Probably not.  It would be unlikely that I
11 would refer to it.
12      Q.   You indicated that you would review this when
13 called for?
14      A.   Yes.
15      Q.   When would you be required to review this?
16      A.   In the medical advisory committee, we would
17 review the policy.  If there was a question regarding a
18 certain policy, it would be looked at and discussed.  If
19 a provider had a question that he would refer to the
20 policy, that would be discussed in reference to the
21 applicable section, but it's not something that in a
22 day-to-day practice a physician who is experienced would
23 rely on utilizing this to direct patient care.  They are
24 guidelines and served as a reference source, but they

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 22..25

Page 22

1  don't dictate how a specific patient should be taken
2  care of.
3      Q.    Do these policies and procedures apply to
4  medical services at Stateville?
5      A.    They may.
6      Q.    Do they apply to medical services provided at
7  Henry Hill?
8      A.    They may.
9      Q.    How does Wexford develop these policies and
10 procedures?
11     A.    Through its medical advisory committee.
12     Q.    Do you sit on the medical advisory committee?
13     A.    I have.
14     Q.    Do you currently sit on the medical advisory
15 committee?
16     A.    Yes.
17     Q.    And what does the medical advisory committee
18 do to develop these policies and procedures?
19     A.    They review different standards, different
20 areas of care.  The committee provides input, and then
21 the committee votes on adapting changes that are
22 recommended or to extend the current policy that exists.
23     Q.    How frequently does the medical advisory
24 committee review these policies and procedures?

Page 23

1      A.    There is a review that occurs by direction of
2  the chairman of the medical advisory committee, and he
3  reviews it every year to two years approximately.
4      Q.    How many individuals are on the medical
5  advisory committee?
6      A.    Approximately 15, 18.
7      Q.    Are all of those individuals medical doctors?
8      A.    No.
9      Q.    What is your role on the medical advisory
10 committee?
11     A.    As a voting member, I provide input, I give my
12 opinion, and then I vote on motions that are presented
13 to the committee.
14     Q.    When these policies and procedures are
15 reviewed, what factors is the committee considering when
16 reviewing the policy as to determine if a change should
17 be made?
18     A.    Changes to the community standard of care as
19 it applies to the specific environment that we practice
20 in.
21     Q.    And how would the committee know that there
22 are changes to the community standard of care?
23     A.    By staying current with changes in therapy and
24 practices, and those are brought forward and implemented

Page 24

1  in our environment.
2      Q.    Is there like a general manual of community
3  standard of care?  How do you stay current on the
4  community standard of care?
5      A.    There is no specific manual, but there are --
6  it is what the current practice standard is that's shown
7  by current literature, current practice standards, the
8  way other physicians practice.  But there's no specific
9  manual that would dictate that.
10     Q.    Does the committee review grievances filed by
11 inmates when considering making changes to these
12 policies and procedures?
13     A.    Not as part of the committee.  The individual
14 physicians will give their opinions based upon their
15 experiences that may include an event that occurred
16 through a grievance, but we don't review -- the
17 committee does not review grievances that are issued by
18 inmates.
19     Q.    Can you recall an instance where there was a
20 grievance filed by an inmate that prompted a change to
21 these policies and procedures?
22     MR. MARUNA:  Objection; foundation,
23 mischaracterizes the doctor's testimony.
24         Doctor, you can explain.

Page 25

1  BY THE WITNESS:
2      A.    None come to mind.  However, the opinion by
3  the member of the medical advisory committee may or may
4  not have been explained as -- his opinion may not have
5  been influenced by that event, and he may not disclose
6  that as to the reasoning for his decision or his wanting
7  the specific policy to be changed.  So I couldn't answer
8  that.  The information would not necessarily be
9  disclosed.
10     Q.    How are these policies and procedures
11 communicated to the doctors, nurses and other Wexford
12 personnel?
13     A.    They are provided at the time of orientation,
14 and then when they're updated, they are sent to the
15 facility and kept in a binder for reference.
16     Q.    Is there an alert or notification sent out
17 when there are changes made to these policies?
18     A.    It is sent to the site manager of each
19 facility to then disseminate it to staff and notify them
20 that there's been an update.
21     Q.    Does Wexford provide any sort of training to
22 its doctors?
23     A.    Yes.
24     Q.    What sort of training does it provide?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018
Pages 26..29

Page 26

1      A.   We have regular CME, continuing medical
2  education seminars.  We have a quarterly meeting where
3  we discuss clinical matters.  We provide reference
4  material, specifically a program called up-to-date for
5  the physicians.  Wexford also provides annual CME
6  allowances and time off for the CME to be completed.
7  They require that the physician attain the required
8  number of CME units that the state requires to maintain
9  licensure.  Those are some, but there's other ways --
10 there's other educational -- there's in-services.
11 There's individual trainings or individual sessions with
12 providers as needed.
13     Q.   What transpires at quarterly meetings?
14     A.   We discuss clinical matters.  We usually have
15 a presenter who gives a lecture on a topic relevant to
16 our practice.  We discuss cases or cases in general,
17 statistical information.  We answer questions by the
18 medical directors that are presented where they have
19 questions in different things.
20     Q.   And do doctors receive annual reviews?
21     A.   Yes.
22     Q.   Can you describe the annual review process to
23 me?
24     A.   The annual review is done by the regional

Page 27

1  manager that's assigned to that facility.  Regional
2  manager obtains information from a number of
3  individuals, including me as the physician supervisor,
4  and then formulates an evaluation on a several page
5  document where there's areas that are reviewed.
6      Q.   What areas are reviewed?
7      A.   Things like their communications within the
8  facility in the corporate office, their timeliness in
9  arriving at the facility, their level of knowledge of
10 their position, their efficiency in providing medical
11 services, their leadership skills and ability, their
12 communications and relationship with the Department of
13 Corrections and the office of health services, the
14 agency medical director, their qualities as a leader of
15 the health care unit.
16          So those would be areas.  There are some
17 others.
18     Q.   You mentioned timeliness.  Does that -- What
19 does that mean?
20     A.   Arrival is what I was referring to, whether
21 they were timely as far as their arrival but also in
22 completing tasks.  Submission of records, different
23 things that are called for in their position.  Whether
24 they complete those tasks, not just complete them but

Page 28

1  whether they're done in a timely manner.
2      Q.   Would this include keeping scheduled inmate
3  appointments?
4      A.   That would be part of the review but not where
5  I was talking about the timeliness.  That was something
6  different, but that would be part of their clinical
7  performance that would also be reviewed.
8      Q.   Does Wexford track how frequently doctors miss
9  appointments?
10          MR. MARUNA:  Objection; form of the question, vague
11 by "missing appointments."
12 BY THE WITNESS:
13     A.   Yeah.  I don't know what you mean by missing
14 appointments.
15     Q.   For instance, if a doctor schedules an
16 appointment with an inmate for October 23rd and the
17 inmate shows up to that appointment but the doctor does
18 not show up and the appointment needs to be rescheduled,
19 is that something that Wexford tracks?
20     A.   That's tracked within a document at the
21 facility.  There's a monthly document produced called
22 the CQI meeting minutes.  So the rescheduling of
23 patients would be noted and addressed within that
24 meeting.

Page 29

1      Q.   What does CQI standard for?
2      A.   Continuous quality improvement.
3      Q.   If a doctor exhibits a pattern of rescheduling
4  appointments, is that something Wexford is concerned
5  about?
6          MR. MARUNA:  Objection; form of the question, vague
7  as to "pattern," foundation, assumes facts not in
8  evidence.
9          Doctor, over the objections, you may answer.
10 BY THE WITNESS:
11     A.   Yes.  They would be concerned about that.
12     Q.   Do you know what an offender sick call medical
13 services request is?
14     A.   Yes.
15     Q.   What is that?
16     A.   It's a request for medical services that an
17 offender would compete if they were requesting medical
18 services.
19     Q.   Can you explain to me the process of how an
20 offender obtains this form and completes the form?
21     A.   The forms are kept on the gallery along with
22 the other forms that an inmate would use on a day-to-day
23 basis.  They would complete the form and then submit it
24 to the health care unit with an explanation after



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018
Pages 30..33

Page 30

1  completing it of what their request is.
2      Q.   Who at the health care unit receives these
3  requests?
4      A.   So in responding to this, this is not the
5  current process.  The process changed about two years
6  ago, but it was the process prior to that.  So it would
7  be somebody in the health care unit, a nurse, would
8  review the requests.
9      Q.   What does the nurse do with these requests
10  after he or she reviews them?
11      A.   They review the nature of the requests and
12  then route it to the appropriate department, or if it's
13  a medical request, they may provide treatment by
14  treatment protocol, or they would schedule the person
15  for sick call or for a physician, depending on what the
16  request was, after they complied with the copayment --
17  the state copayment process.
18      Q.   What is the average timeframe in reviewing
19  each request?
20      A.   Within 24 hours.
21      Q.   Is that a Wexford policy?
22      A.   State policy.
23      Q.   Is there a hierarchy of importance of request?
24  For instance, if an inmate indicates in the request that

Page 31

1  he's in excruciating pain, would that take precedent
2  over an inmate that describes having a cold?
3      A.   Sure.
4      Q.   Is there a Wexford policy in determining that
5  hierarchy?
6      A.   Yes.
7      Q.   What's that policy?
8      A.   It would be what practice guidelines are, what
9  would define something that's emergent, urgent versus
10  routine.
11      Q.   What would qualify as an emergent request?
12      A.   You said emergent or urgent?
13      Q.   Emergent.
14      A.   Something that was life or limb-threatening.
15  Severe pain might be an emergent need.
16      Q.   Is there a medical definition of severe pain?
17      A.   It's what a practitioner sees relative to
18  other patients.  Patients themselves are not the
19  barometer of that because they generally -- all pain is
20  not good, but what a physician recognizes as a severe --
21  as a condition, which would be associated with severe
22  pain.
23      Q.   Would pain that interrupts sleep patterns be
24  described as severe pain?

Page 32

1      A.   Generally not, no.
2      Q.   What qualifies as an urgent request?
3      A.   Something between, again, where time is a
4  factor where the treatment is more time-dependent than a
5  routine type of contact.
6      Q.   And the third category was routine?
7      A.   Routine, yes.
8      Q.   What would qualify as a routine request?
9      A.   A general request that is -- somebody that has
10  a chronic problem, and somebody that is receiving
11  treatment already for a chronic problem but needs follow
12  up or needs to be reevaluated.  A problem that has
13  minor -- relatively minor symptoms compared to other
14  conditions.
15      Q.   You indicated that the pain threshold is not
16  necessarily driven by the inmate's description but kind
17  of a general barometer.  Is that a fair recollection of
18  your testimony?
19      A.   Not quite.  The patients experience and report
20  their symptom as it is.  In judging the treatment and
21  the severity of a condition, physicians would use
22  reference of other patients that have had similar
23  conditions and other conditions in relating the severity
24  of the pain and the treatment for those conditions.

Page 33

1      Q.   Does the reviewing individual consider the
2  inmate's prior medical history in determining where the
3  request falls on the hierarchy?
4      A.   Yes.
5      Q.   And what sort of factors are they considering
6  in their medical history when evaluating the request?
7      A.   The mechanism of injury, their previous
8  history, past injuries, their physical findings, their
9  response to medications and treatments, diagnostic
10  studies, their reporting of their symptoms, observations
11  by health care staff in addition to the clinician who is
12  providing medical care.  And then other diagnostic
13  studies.  The opinions of consultants.  Those would be
14  the main things.
15      Q.   You mentioned response to treatment.  Is that
16  based on the inmate's feedback as given to the doctor?
17      A.   Partially.
18      Q.   And what is the other part?
19      A.   Objective findings.
20      Q.   So, for instance, if a patient has been
21  prescribed Tylenol, and he reports that the Tylenol is
22  not relieving his pain, what would be the next logical
23  step in that treatment?
24      A.   Asking him how his pain is different, how the


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 34..37

Page 34

1  pain effects his activities of daily living.  The goal
2  of treatment is not to erase pain entirely, but many
3  patients believe that's the case.  So where they report
4  that the pain -- that the medication is ineffective,
5  what they're really saying is they have an unreasonable
6  expectation and not a medical goal in the treatment of
7  pain.
8          So first is to define what they mean by not
9  effective.  What may be reporting as noneffective
10 may be completely effective as to the goal of the
11 medication that's being prescribed.  So it's first to
12 define what their response is, what their symptoms are,
13 how they changed with the medications, and then
14 providing education in many cases that this is what the
15 purpose of it is, is to reduce the pain but not to
16 eliminate it entirely.  Pain is a protective mechanism
17 symptom that we don't even want to erase in many cases.
18      Q.   Why would you not want to erase pain?
19      A.   Because it serves to protect the structures.
20 Pain is not a punishment by God.  It is to protect the
21 joints in this case from further damage by limiting the
22 motion of the joint at the time when it's inflamed.
23          So that tells us that the joint is still
24 inflamed, and it shows how the response is to time and

Page 35

1  treatment.  But erasing the pain would eliminate those
2  factors or that factor in determining whether this is
3  actually improving or not.  And there's ways of actually
4  eliminating the pain, but we don't utilize that because
5  it would not be beneficial.
6      Q.   When an inmate indicates in one of his
7  requests that he wants to receive an X-ray, how is that
8  evaluated on Wexford's side?
9      A.   It's reviewed by the clinician as any other
10 request that is made by the inmate.  And the decision as
11 to whether that's appropriate or not is based upon
12 clinical guidelines and not their specific request.
13      Q.   What about when an inmate requests to receive
14 an MRI?
15      A.   Same.
16      Q.   What about a request to receive surgery?
17      A.   Same.
18      Q.   In reviewing those types of requests, would
19 the clinical individual refer to the medical policies
20 and procedures?
21      A.   It may be one thing that would be referred to,
22 but it would not be limited to the policies and
23 procedures.
24      Q.   How does Wexford track the treatment of

Page 36

1  inmates?
2      A.   I'm not sure I understand the question.
3  You're talking about the services that are provided?
4      Q.   Correct.
5      A.   There's monthly tallies of services that are
6  provided at each facility in categories.  So surgeries
7  would be one category, consultative services, and then
8  that's broken up specifically to the type of service.
9  Hospitalizations.  Then there's short-term
10 hospitalization.  Observation stays, and then full
11 hospitalizations are tracked.  X-rays, blood draws,
12 diagnostic studies are done.  How many X-rays are done
13 or other diagnostic studies.  All of that is
14 statistically tracked.
15      Q.   How does Wexford track these services provided
16 to an individual inmate?
17      A.   By review of that particular case by somebody
18 else, a supervisor or other physicians that are involved
19 in the care of the patient.
20      Q.   When an inmate is seen by a Wexford employee
21 for medical purposes, does the Wexford employee take
22 notes of that visit?
23      A.   Generally, yes.
24      Q.   And where do they record those notes?

Page 37

1      A.   In the progress notes section of the medical
2  record.
3      Q.   That's the offender outpatient progress notes?
4      A.   Yes.
5      Q.   Who has access to these notes?
6      A.   The practitioners that are participating in
7  their care, or if the case is being reviewed by someone
8  else.
9      Q.   When you're conducting your annual reviews of
10 doctors, do you review their progress notes?
11      A.   Just adding, the patient also has access to
12 those records.  I'm sorry.  Your last question was?
13      Q.   When you're reviewing Wexford employees for
14 their annual review, do you review these progress notes?
15      A.   The care that's provided will be reviewed
16 throughout the year, and that information is utilized in
17 the annual evaluation.  However, specific charts or
18 records are not reviewed when the evaluation occurs.
19      Q.   If an inmate is not receiving adequate care,
20 how does Wexford become aware of that?
21      A.   Several mechanisms.  One is from the patient's
22 complaint.  That would be either from a correspondence
23 through the facility or directly to Wexford.  The review
24 of the care by the person's supervisor or co-managing

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                    Pages 38..41

Page 38

1  physicians or physicians that are participating in the
2  care of the patient, such as the utilization management
3  physician or other physicians at the facility that will
4  also see a patient, the same patient.
5         We conduct peer reviews where charts are
6  randomly selected, and the care is reviewed.  And then
7  we're called upon where there is a concern, and that
8  would be either the patient voiced a complaint, perhaps
9  filed a grievance that prompted a review of the
10 patient's care, or the state has its own system of
11 oversight through a person called the health care
12 administrator, who is assigned to the facility where
13 there was a complaint or concern or grievance.  They
14 would conduct their own review, and then they could
15 consult with a physician in the Department of
16 Corrections called the agency medical director if they
17 had concerns.
18     Q.    When you're conducting these peer reviews,
19 what are you looking for in terms of determining if
20 adequate care is being provided?
21     A.    Exactly that.  That adequate care is being
22 provided by the judgment of the physician, their
23 documentation, their treatment being consistent with the
24 diagnosis, their examination being adequate for the

Page 39

1  patient's complaint.  So there's a number of aspects of
2  care that are looked at in the review of specific
3  patients.
4      Q.    Regarding whether treatment is consistent, if
5  there is a pattern of rescheduling and canceling
6  appointments, would you consider that consistent
7  treatment?
8      MR. MARUNA:  Objection; foundation, assumes facts
9  not in evidence.
10        Doctor, over the objection.
11 BY THE WITNESS:
12     A.    I'm not sure what you mean by "consistent
13 treatment".
14     Q.    Well, you indicated one of the factors in your
15 peer review is determining whether treatment is
16 consistent.
17     A.    Consistent with a diagnosis is what I meant.
18 I think that's what I said.  Maybe it didn't come out.
19 The treatment was consistent with the patient's symptoms
20 and diagnosis.
21     Q.    So for instance, if they're treating the
22 diagnosis properly?
23     A.    Correct.
24     Q.    We were previously talking about the sick

Page 40

1  request forms that inmates can complete to request
2  visits or treatment.  How are inmate exams scheduled?
3      A.    According to what their request is on the sick
4  call form.  If it's with mental health, it would be sent
5  to mental health.  If it's vision problem, it goes
6  to the eye clinic.  If it's for a dental problem, it would
7  go to dental.  If it's a pharmacy, like medication, it
8  would go to the medication room.  If it's a nursing
9  question, it would go to the nurse.  If it's a medical
10 question, if it's for a symptom that would require
11 contact with a provider, it would be triaged according
12 to what the complaint was.
13        So if it was athlete's foot verus chest pain,
14 those things would be handled differently, but they
15 would be treated according to what are called treatment
16 protocols.
17        I'm just going to grab some coffee, but you
18 can continue asking.
19     Q.    Do you want to take a break?
20     A.    No.  No.
21     Q.    What are the treatment protocols?
22     A.    They are standards and guidelines of treatment
23 for specified illnesses that direct nurses on how to
24 respond to certain complaints and provide treatment for

Page 41

1  common ailments.
2      Q.    Are those provided for in the medical policies
3  and procedures?
4      A.    No.
5      Q.    Is there a different manual that provides
6  treatment protocols?
7      A.    Yes.
8      Q.    What is that?
9      A.    It's a set of protocols called the Department
10 of Corrections nursing protocols.
11     Q.    Are those protocols developed by Wexford?
12     A.    No.
13     Q.    Who develops those protocols?
14     A.    The office of health services within the
15 Department of Corrections.
16     Q.    Is that an agency of the State of Illinois?
17     A.    Yes.
18     Q.    And the IDOC would then give those to Wexford
19 employees to use?
20     A.    Yes.
21     Q.    Does Wexford have its own treatment protocols?
22     A.    They do, yes.
23     Q.    Are those part of the medical policies and
24 procedures?


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                    Pages 42..45

Page 42

1    A.   No.
2    Q.   Where are those recorded?
3    A.   Those are in a separate -- it's a separate
4  document called nursing treatment protocols.
5    Q.   What policies does Wexford use to ensure that
6  patients are seen when scheduled?
7    A.   The monthly meeting that I made reference to.
8  The CQI meeting tracks that data and would address where
9  there is -- there are problems with scheduling.  That's
10 one of the functions of that meeting is to review
11 document problems and at the same time to address those
12 problems.
13   Q.   If an inmate shows up for a scheduled
14 appointment and there's no provider, would you consider
15 that a problem in scheduling the inmate's appointment?
16   MR. MARUNA:  Objection to the form of the question,
17 vague.
18        Doctor, you can answer if you understand the
19 question.
20 BY THE WITNESS:
21   A.   It may be.  It's some sort of problem.
22   Q.   If that happens on more than one occasion as
23 it relates to the same doctor, would that be a problem?
24   A.   It would be a concern if that happened

Page 43

1  repeatedly.
2             (Phone interruption.)
3    MR. MCCLAIN:  Off the record.
4             (Discussion off the record.)
5  BY MR. MCCLAIN:
6    Q.   Before we took a break, we were talking about
7  doctors missing or rescheduling appointments.  You had a
8  chance to review Carl Hemphill's medical file, correct?
9    A.   Yes.
10   Q.   Within that medical file, did you see any
11 notes that indicated Mr. Hemphill had appointments
12 rescheduled?
13   A.   Yes.
14   Q.   Did you see any notes that said no provider
15 was available on these scheduled appointment dates?
16   A.   I believe that was written, yes.
17   Q.   In your review of these documents, did you
18 find any sort of or did you have any sort of concern
19 about the frequency of the rescheduled appointments?
20   A.   Without knowing the reason behind it, I would
21 like -- I don't like to see appointments being
22 rescheduled, but it didn't clarify or define the
23 reasoning for the rescheduling of the appointment.
24   In other words, even where it says provider

Page 44

1  was not here, I don't know what the person meant by
2  that.  If they were attending to an emergency, I hope
3  the doctor did do that and left the other appointment to
4  be rescheduled.  That certainly would be appropriate.
5  And he shouldn't have been attending to this person's
6  shoulder instead of the other issue.
7        The nurse may very well have written he was
8  not there or available, but that would be completely
9  appropriate as we do deal with emergencies.  He may have
10 been ill himself.  I know he had taken off some time for
11 illness.  So if that happened and he wasn't available, I
12 would rather him stay home and take care of his own
13 health than come into the facility and tend to a
14 patient.
15   Q.   But the records you reviewed did not indicate
16 that he missed scheduled appointments due to treating
17 another emergency or staying home because of his health,
18 correct?
19   A.   It didn't elaborate on the reasoning, so there
20 was no explanation as to the reasoning other than he was
21 not there.
22   Q.   Does Wexford track internally no-shows for
23 inmate appointments?  Back up.
24        Does Wexford track internally whether doctors

Page 45

1  have to reschedule appointments?
2    A.   We discussed this where the rescheduling would
3  be addressed in the monthly CQI meeting, and Wexford
4  participates, the medical director, the site manager and
5  other staff are at that meeting.
6    Q.   Are there statistics that Wexford has
7  regarding whether -- the frequency of appointments being
8  rescheduled?
9    A.   Within that meeting, they keep the statistics
10 and those statistics are available to Wexford.
11   Q.   Can you recall any of those statistics during
12 the year 2013?
13   A.   No.
14   Q.   Can you flip to Exhibit 3, the medical
15 policies and procedures manual.  It's Bates labeled 540.
16   A.   (Complying.)
17   Q.   What is this document?
18   A.   This is Wexford's policy or guidelines
19 relating to pain -- treatment of pain.
20   Q.   And does this apply to all treatments of pain?
21   A.   No.
22   Q.   What does this apply to?
23   A.   These are general guidelines for treatment of
24 some types of pain.  What they define here, for example,

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 46..49

Page 46

1    on Bates 541 is mild to moderate pain.
2        Q.    Would you walk me through this chart on 541?
3        A.    Okay.  So first it defines this to be mild to
4    moderate pain.  Then there's an asterisk, which makes
5    reference to the source where these guidelines came
6    from.  And then on the top, there's a header that says
7    the pathways do not replace sound clinical judgment, nor
8    are they intended to strictly apply to all patients.
9            From there, you go to box number one, so that
10   would we be the first step in the process deciding
11   whether it's acute or not acute pain.
12       Q.    Is acute a medical defined term?
13       A.    Yes.
14       Q.    What is the definition of acute?
15       A.    A sudden onset.
16       Q.    I'm sorry.  What was that?
17       A.    Sudden onset.  Abrupt onset.
18       Q.    Like a sharp pain or shooting pain?
19       A.    No.  That's the quality of pain.  Acute is the
20   time of the pain -- is the inception of the pain so to
21   speak.  So whether the person has had recurring pain
22   condition, or whether this is a new symptom for the
23   patient.  That would define whether it's an acute event
24   or not.

Page 47

1        Q.    Would recurring pain be acute pain?
2        A.    It may be in some circumstances.  If the pain
3    was relieved and then recurred, then you would say they
4    had recurrent acute exacerbations of pain.
5        Q.    Okay.  So if the patient does exhibit acute
6    pain, what does box two indicate?
7        A.    It proposes a different treatment for that.
8        Q.    Are these all antiinflammatory treatments?
9        A.    They are -- The last is an antiinflammatory.
10   The middle two are aspirin products, which are also
11   antiinflammatories, and then the first is Tylenol, which
12   is not really an antiinflammatory medication.  It's just
13   an analgesic.
14       Q.    In this box it lists the dosage, correct?
15       A.    Yes.
16       Q.    And it provides the frequency -- Strike that.
17             The length of the dosage?
18       A.    It does for the first, second and third, but
19   it doesn't -- first, second and fourth but not for the
20   third.
21       Q.    So let's just say for an example an inmate
22   comes in with acute pain and the treating physician
23   wants to prescribe ibuprofen.  Would that physician
24   prescribe 400 milligrams for ten days?

Page 48

1        A.    If it was appropriate for the clinical
2    situation, yes.
3        Q.    So a doctor can I guess stray from these
4    guidelines, correct?
5        MR. MARUNA:  Objection to the form of the question
6    as to "stray."
7             Doctor, over the objection, if you understand.
8    BY THE WITNESS:
9        A.    Yeah.  Again, I don't know what you mean by
10   stray.
11       Q.    A doctor can adapt these guidelines to the
12   specific patient's symptoms?
13       A.    Yes.
14       Q.    So, for instance, if it's just short-term
15   acute pain, he might prescribe it for five days as
16   opposed to ten?
17       A.    Or he may pick a different dosage or may pick
18   a different medication.  So these are suggestions and
19   would apply for many circumstances, but as the header on
20   the top says, they are not meant to replace sound
21   clinical judgment.  And we require sound clinical
22   judgment in the treatment of our patients.
23       Q.    So skipping down, box three asks if the pain
24   has been resolved, correct?

Page 49

1        A.    Yes.
2        Q.    And if it has not been resolved, then the
3    doctor would repeat box two; is that correct?
4        A.    That's a possibility, yes.
5        Q.    And what are the other possibilities a doctor
6    could do?
7        A.    The gamut of what's available in the
8    community.  All different sorts of medications,
9    different therapies, whatever is available in the
10   community.
11       Q.    And if that does not resolve the pain, this
12   chart indicates that the doctor should reevaluate the
13   source of the pain?
14       A.    As one course of action.  Certainly that would
15   be appropriate.
16       Q.    So based on Mr. Hemphill's treatment, I just
17   want to name a few of the drugs he was prescribed.
18   Tylenol, naprosyn, Motrin and Mobic.  Would these all be
19   a variation of the drugs in box two?
20       MR. MARUNA:  Objection to the form of the question.
21   BY THE WITNESS:
22       A.    I don't know what you mean by variation.  The
23   medications in box two are all over-the-counter
24   medications.  The medications that you mentioned as



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 50..53

Page 50

1  prescribed are not over-the-counter medications.  They
2  are in the same class and they have similar properties,
3  but they are not the same as this.  They are more potent
4  antiinflammatory medications than what would be listed
5  here.
6      Q.  I believe you said the first one, A-p-a-p, was
7  Tylenol?
8      A.  Yes.
9      Q.  Mr. Hemphill was prescribed Tylenol, correct?
10     A.  Right.  But you mentioned other medications,
11 Mobic, Naprosyn and what was the other one?
12     Q.  Motrin.
13     A.  The dosages that were prescribed to Motrin I
14 think it was 600 milligrams, which is not what's being
15 prescribed here differentiating between whether it was
16 an over-the-counter dose and a prescription dose.
17     Q.  So for higher dosage, that would qualify as a
18 prescription?
19     A.  It would require it to be -- it is required as
20 a prescription.
21     Q.  When would a doctor prescribe one of these
22 drugs as opposed to using one of these over-the-counter
23 drugs?
24     A.  As the clinical circumstance called for.  So

Page 51

1  based upon the patient's symptoms, their findings, their
2  diagnosis, how they responded to other treatment for the
3  same condition.  And other factors, other medications
4  they're on, and tolerances, side effects of medication,
5  interactions between medications, expected duration of
6  therapy sometimes is a factor in deciding what
7  medication is given.  Other things like whether they've
8  had substance abuse problem.  So there are many factors
9  that are taken into consideration in judging in what
10 sort of medication is appropriate for a specific
11 patient.
12     Q.  If a patient begins out being prescribed
13 Tylenol and continuously complains of pain, what would
14 be the next appropriate step for that clinical
15 treatment?
16     A.  Are you talking about a theoretical case or in
17 fact the patient in question?
18     Q.  We can use the patient in question.
19     A.  So I don't agree from my review of the record
20 that he was continuously complaining of pain.  I think
21 the record shows clearly different.
22     Q.  You don't believe that Mr. Hemphill submitted
23 several requests indicating that he was in pain and the
24 pain medications were not working?

Page 52

1      A.  That's not what I said.  The documentation in
2  the record indicates that he had relief of pain for
3  periods of time -- extended periods of time.  The
4  documentation when he presented specified periods of
5  time that he was having pain -- which were limited to
6  months.  I think once was three months.  Once was four
7  months -- he reported different symptoms throughout his
8  interactions with health care staff, but he also
9  reported and it was clear that he had relief from -- let
10 me give you from my review.  He would say the pain
11 medication was ineffective but then would come and ask
12 for pain medication.
13     So from my review as a clinician, that tells
14 me that the medication that he was receiving could only
15 have actually relieved his pain.  Now, as we've already
16 discussed, it may not have achieved the goal that he was
17 looking for, and that is the absence of any pain or
18 discomfort.  But it was effective in alleviating pain,
19 and that was the goal and intent of the treatment that
20 he was receiving.
21     Similarly, he complained or wrote I think in
22 letters or grievances that the cortisone injections
23 didn't help at all I think was one term he said.  But
24 then it just didn't make sense that someone who has pain

Page 53

1  in their shoulder would then ask to have a procedure
2  that itself is clearly painful, and that is because
3  there's a needle inserted into the shoulder.  If it was
4  ineffective, a reasonable person wouldn't ask for that.
5  It just doesn't really make sense.  His statements were
6  not consistent throughout his -- in his presentation and
7  his correspondences.  They were internally conflicting
8  was my observation.
9      Q.  Do you know if Mr. Hemphill is a medical
10 doctor?
11     A.  I don't believe he is.
12     Q.  Do you know his highest form of education?
13     A.  No.
14     Q.  You mentioned cortisone shots.  What is the
15 purpose of a cortisone shot?
16     A.  It is to treat a condition that he was
17 diagnosed with.  It is an antiinflammatory medication.
18 So the purpose of it is to reduce inflammation of
19 structures and alleviating pain and improving mobility
20 in this particular case.
21     Q.  What is the duration of the effectiveness of
22 the cortisone shot?
23     A.  It may be very long-term, many years.
24     Q.  And it may not be, correct?



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 54..57

Page 54

1    A.    It may not be in some circumstance, yes.
2    Q.    **And that varies from patient to patient?**
3    A.    It varies from clinical circumstance.
4    Q.    **What does that mean?**
5    A.    It depends on the disease, but it also depends
6  on the reporting of the patient.  So if a patient -- as
7  we've already discussed, if a patient has a reduction in
8  their pain and an improvement in their mobility but it's
9  not to where it was, let's say, when they were 15, they
10 may be dissatisfied, and they may report it didn't work.
11         But having improvement in the pain level and
12 having improvement in the mobility shows that there's a
13 response.  It may not be a complete response, and that
14 complete response may further come with time and natural
15 healing.  So it's not just the reporting of the person's
16 pain, but it's what the actual result is.  And the
17 effectiveness of the treatment will depend on the
18 condition that is being treated and then other factors
19 like where exactly it's injected and the medication.
20 Sometimes it's combined with other medications.  There's
21 longer term and short-term steroids and other analgesics
22 that are sometimes added.
23   Q.    **But to determine the effectiveness, it**
24 **essentially comes down to what the patient is reporting,**

Page 55

1  **correct?**
2    A.    In part, but as I just explained, the patient
3  may be unhappy when the expected clinical response is
4  achieved.  It may not relieve the pain entirely but if
5  it relieves the pain significantly and it improves
6  function significantly, then the treatment is
7  successful.
8         It may by an unhappy patient, a very
9  dissatisfied patient, but that doesn't mean that the
10 treatment didn't accomplish what it was intended to and
11 wasn't successful from a medical standpoint.
12   Q.    **Understood.  To determine if the pain has been**
13 **relieved, whether temporarily or in severity, that would**
14 **be based on feedback from the patient, correct?**
15   A.    The patient's reporting would be taken --
16 would be noted, but there are other objective factors
17 that would be looked at.  You would also look at the
18 patient's behavior and not just reporting one event but
19 reporting over a period of time.
20         So, for example, if a patient said, you know,
21 I can't do anything with my shoulder because it kills me
22 but then they come in and they're lifting weights, we
23 listen to both of those things and note that there's a
24 glaring inconsistency with that, with that person saying

Page 56

1  my shoulder -- I can't do anything, but then they're
2  able to do something which is very stressful and
3  strenuous on the shoulder.
4    Q.    **If a patient is reporting that it's hard to**
5  **sleep and the pain is disrupting their sleep, would you**
6  **as a medical doctor interpret that to mean that the**
7  **treatment -- the pain treatment is working?**
8    A.    In determining whether the pain treatment was
9  working was relative to how the pain had been
10 previously.  I would say in that circumstance, I would
11 be concerned that the pain treatment wasn't sufficient,
12 that therapy was not sufficient, and an adjustment in
13 that, either pain medication or other modalities, and
14 that is doing something different.  Heat packs or
15 physical therapy, those kind of things would be
16 indicated.
17   Q.    **I want to go next to Bates label Wexford 543.**
18 **It's part of Exhibit 3.  What is this document, Doctor?**
19   A.    This is from Wexford's policies -- medical
20 policies and procedure addressing the pharmacologic
21 treatment of chronic pain.
22   Q.    **Is there a medical definition of chronic pain?**
23   A.    There is.  There isn't a uniform accepted
24 definition, but chronic roughly is a daily pain of more

Page 57

1  than six months in duration or daily event of more than
2  six months.
3    Q.    **Section 3 is entitled determine biological**
4  **mechanisms of pain.  What does this mean?**
5    A.    It's determining the underlying cause of the
6  pain.  So there are different types of pain for which
7  treatments are better suited or are different.
8    Q.    **Do you know what Mr. Hemphill was diagnosed**
9  **with when he started to receive his pain treatment?**
10   A.    Yes.
11   Q.    **What was he diagnosed with?**
12   A.    Impingement syndrome and bursitis.
13   Q.    **What is impingement syndrome?**
14   A.    Impingement syndrome is a collection of
15 disorders where the tendons or muscles in the shoulder
16 are compressed during normal -- within the normal range
17 of motion of the shoulder.
18   Q.    **I'm not a medical doctor, but does that mean**
19 **when an individual is performing normal range of motion,**
20 **there is a strain or compression of the tendons and**
21 **muscles which would cause pain which a normal individual**
22 **would not feel; is that a fair --**
23   A.    What you said was actually very correctly
24 described except that not in all motions, only in



Page 58

1   certain motions.  So it's a condition where in the
2   absence of those, there is no impingement.  It would
3   require specific motions and specific -- it would
4   require specific motions that narrow the space in
5   question that compress the tendons and muscles.  And in
6   the absence of those, there is no impingement and no
7   symptoms.
8       Q.   And how does a doctor determine that
9   impingement syndrome is a cause of pain?
10      A.   By the patient's history, their physical
11  findings, radiographic findings, examination
12  maneuverers.  That would be the way it's determined.
13      Q.   Would the syndrome be reflected on an X-ray?
14      A.   There would be X-ray findings that would be
15  supportive of that.
16      Q.   Do you know if Mr. Hemphill's X-rays indicated
17  a finding of impingement syndrome?
18      A.   The X-ray would not be read or interpreted as
19  impingement syndrome.  What I said was the X-ray would
20  be supportive of impingement syndrome.
21      Q.   So there would be something on the X-ray that
22  would point a doctor to concluding it was impingement
23  syndrome?
24      A.   It would be -- the clinical interpretation of

Page 59

1   the X-ray would be whether it was consistent with
2   impingement syndrome.
3       Q.   Do you know if there were any indications on
4   Mr. Hemphill's X-rays which would give rise to a
5   diagnosis of impingement syndrome?
6       A.   It was supportive of the fact of him having
7   impingement syndrome, yes.
8       Q.   I believe the X-ray reports were marked as
9   negative.  What does that mean?
10      A.   It means that there were no significant
11  radiographic findings.  He had several X-rays.  One of
12  them showed that he had mild DJD of his AC joint.  I
13  think the other ones were read as negative.
14      Q.   What is mild DJD?
15      A.   DJD is degenerative joint disease or also
16  known as osteoarthritis.
17      Q.   Is that severe degeneration changes of AC
18  joints?  Is that the same thing, or no?
19      A.   It's degeneration of AC joints.  The severity
20  is different.  On the X-ray they read it as mild.  On
21  the MRI, the interpretation was that it was severe.  So
22  that was an inconsistency because the X-ray usually has
23  a similar appearance to the MRI for bony structures.
24      Q.   Why would there be a discrepancy between the

Page 60

1   X-ray diagnosis and the MRI diagnosis?
2           MR. MARUNA:  Objection to mischaracterizes the
3   testimony as to diagnosis.
4           Doctor, you can answer.
5   BY THE WITNESS:
6       A.   The diagnosis is the same.  It's the
7   categorization of the severity that's different.
8       Q.   Why was there a difference of categorization
9   of the severity?
10      A.   It was the judgment of the person who
11  interpreted the study.  So the person who read the MRI
12  interpreted that to be severe.  He was looking at a
13  different study, at an MRI study rather than a
14  radiographic study.
15      Q.   Previously you indicated that an MRI would be
16  better utilized to determine issues with muscles and
17  tendons.  Had the MRI been completed at the same time as
18  the X-ray, would the categorization have been severe at
19  that time?
20          MR. MARUNA:  Objection; form of the question,
21  vague, assumes facts not in evidence, calls for
22  speculation, mischaracterizes the witness's prior
23  testimony on the issue.
24          Over the objections, Doctor.

Page 61

1   BY THE WITNESS:
2       A.   The categorization of whether it's -- the
3   categories are either mild, moderate or severe is based
4   upon the judgment of the person who is reading the
5   X-ray.  It probably would have been a different person,
6   so they may have interpreted that level of change to be
7   a different category, but it really depends on the
8   person that's interpreting it, their experience and
9   their judgment as to what constitutes severity.
10      Q.   In this condition that we're discussing, the
11  mild versus severe condition, where does that fall on
12  this biological mechanisms of pain?
13      A.   It would be under C.
14      Q.   And what is C?
15      A.   Inflammatory pain.
16      Q.   What about a torn muscle or tendon, where
17  would that fall on the mechanisms of pain?
18      A.   Under D.
19      Q.   Are you able to view a torn rotator cuff on
20  X-rays?
21      A.   No.
22      Q.   Are you able to view a torn rotator cuff on
23  MRIs?
24      A.   Perhaps.


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 62..65

Page 62

1    Q.   So if an individual was suffering from a torn
2  rotator cuff and they were given an X-ray, that would
3  not reveal that they have a torn rotator cuff, correct?
4    A.   It would reveal findings that would be
5  consistent -- clinically consistent with them having a
6  torn rotator cuff if that was suspected.
7    Q.   And this document that we've been discussing,
8  the pharmacological treatment of chronic pain, does this
9  include surgery?
10    A.   No.
11    Q.   Does this only apply to prescribing of drugs?
12    A.   Yes.
13    Q.   Once an inmate is prescribed certain treatment
14  of drugs, how do they get that medicine?
15    A.   I'm not quite sure.  Are you talking about the
16  mechanism of how they physically get the medication?
17    Q.   Let's start from the beginning.  When a doctor
18  writes a prescription, what does that doctor do with the
19  prescription?
20    MR. MARUNA:  Are you talking at Stateville?
21    MR. MCCLAIN:  Yes.
22  BY THE WITNESS:
23    A.   He hands it to the nurse.
24    Q.   And what does the nurse do with the

Page 63

1  prescription?
2    A.   She notes it, and then processes it.
3    Q.   "Processes it," what does that mean?
4    A.   So depending on what is ordered, if it's a
5  stat or immediate to be given medication, she would go
6  to the medication room, retrieve the medication, and
7  then issue it to the patient.
8        If it was a regular prescription, she would,
9  after noting it, she would pull the -- it's a triplicate
10  form.  She would pull the one page out of it.  That is
11  then faxed to a pharmacy, who then fills it.  They ship
12  the medication to the facility.  It goes through the
13  gatehouse to the pharmacy room or medication room, then
14  it's disseminated by health care staff to the patient.
15    Q.   Does Wexford perform surgeries at Stateville?
16    A.   Wexford is a company.  As a company, it does
17  not perform surgery, but its providers may perform
18  surgery, yes.
19    Q.   At Stateville?
20    A.   Yes.
21    Q.   If a patient needs surgery that's not provided
22  at Stateville, what is the process of referring the
23  patient to a location that will provide the surgery?
24    A.   So for routine requests, it would go through a

Page 64

1  process called a collegial review where the request is
2  voiced to a physician.  The physician then makes a
3  decision as to whether that's appropriate or not, and
4  then the request then would be scheduled.
5    Q.   Doctor, are you familiar with a document
6  called the utilization management policies and
7  procedures?
8    A.   Yes.
9    Q.   I am handing you Wexford utilization
10  management policies and procedures.  We marked it as
11  Exhibit 4.  What is that document?
12    A.   As it states.  It's Wexford's policies and
13  procedures for utilization management.  And do you want
14  me to explain what utilization management is?
15    Q.   That was my question.
16    A.   Utilization of specialized services -- medical
17  services for the patients at the facility.  Generally
18  those are for services outside the boundaries of the
19  facility.
20    Q.   Could you please turn to Wexford 613?
21    A.   Yes.
22    Q.   What is this document?
23    A.   This is the collegial review, referral request
24  policy.

Page 65

1    Q.   And you were briefly just discussing this.
2  So, for instance, if an inmate -- we'll take Carl
3  Hemphill -- needs a surgery -- I apologize.  I don't
4  know how to pronounce his surgery.
5    A.   Acromioplasty.
6    Q.   Yes.
7    A.   Okay.
8    Q.   What are the -- what is the process of
9  scheduling that surgery?
10    A.   So it begins with a request that's made by the
11  site medical director.  And upon approval, an
12  authorization is given to the facility, the site
13  scheduler, and then the procedure would then be
14  scheduled.
15        The facility or physicians that were to
16  perform that procedure, they usually will have requests,
17  preoperative testing, preparations for surgery,
18  cleansing of the area, showering the day before, blood
19  testing, things like that are then accommodated.
20        And then the actual transfer is coordinated
21  with security for the person to arrive in time for the
22  procedure.  The patient is prepped.  That usually means
23  not having anything to eat the night before.  All those
24  things have to be done and put in place.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 66..69

Page 66

1     Q.   You mentioned arranging transportation.  What
2  mechanisms does Wexford have in place to ensure the
3  transportation is timely provided?
4     A.   We notify security of the request of the need
5  for the person to be at a certain place at a certain
6  time, and the security then takes it from there to
7  arrange for the officers, their security procedures, a
8  number of personnel, the transport vehicle to comply
9  with that request.
10     Q.   So is it Wexford's responsibility to notify
11  the correctional facility of the procedure?
12     A.   The security in the -- Yes.  It's Wexford's
13  obligation to notify security of the need of the
14  transport.
15     Q.   So if an inmate were to miss an appointment
16  that was offsite because notice was given too late to
17  arrange for transportation, would that have been
18  Wexford's fault?
19     A.   It depends what that notice was.  If the
20  notice was to pick up the patient to move them, that
21  would have been a responsibility of security where they
22  failed to do that in a timely manner.
23         Our obligation is to notify them of the
24  appointment.  They then have to make the arrangements,

Page 67

1  including factors like traffic, construction, so that
2  the person arrives there in a timely manner.
3     Q.   Are you aware that Mr. Hemphill missed an
4  offsite appointment?
5     A.   Yes.
6     Q.   How are you aware of that?
7     A.   From documentation in the medical record.
8     Q.   Do you know the cause or the reason why he
9  missed that appointment?
10     A.   Not specifically.  It had something to do with
11  security transport is what I remember from reviewing it.
12     Q.   Does Wexford utilize a computer system to
13  track notes and authorization comments related to
14  patient care?
15     A.   The medical record is not computerized.  The
16  utilization management record is computerized.  That is
17  in the corporate office.
18     Q.   I'm handing you Wexford 1 through 35.
19     MR. MARUNA:  Are we entering that as an exhibit?
20     MR. MCCLAIN:  Yeah.
21  BY MR. MCCLAIN:
22     Q.   What are those, Doctor?
23     A.   These are screenshots from the computer system
24  in the Pittsburg office in the utilization management

Page 68

1  department.
2     Q.   Who enters the text into the text box on these
3  screenshots?
4     A.   A utilization management nurse in the
5  Pittsburg office.
6     Q.   How does that utilization management nurse get
7  the information to record?
8     A.   From different sources, primarily from the
9  provider at the facility or other personnel at the
10  facility.
11     Q.   Can you please flip to Wexford 9, and please
12  read the entry there.
13     A.   4/18/16?
14     Q.   Yes.
15     A.   Received referral for CDO for a patient with R
16  shoulder pain times three years and previous steroid
17  injections ineffective.  Patient, a recent transfer from
18  Stateville, on 3/23/16.  Per Dr. Sood's notes 4/06/16,
19  PE showed limited ROM in elevation, abduction and
20  adduction.  Mobic given for pain relief.  Case discussed
21  in collegial between Dr. Ritz and Dr. Sood.  Patient
22  missed his appointment at UIC ortho on 4/15/16 because
23  Hill was given too late notice -- too late of notice and
24  transportation, slash, security was not feasible.

Page 69

1  Plan: Approved for orthopedic eval with local provider.
2  No IQ.  F, slash, U MD dates extended accordingly.
3     Q.   Do you know who conveyed this information to
4  the Wexford representative in Pennsylvania?
5     A.   No.
6     Q.   Is there any other information on this
7  screenshot that would indicate the reporting individual?
8     A.   No.
9     Q.   This entry indicates that the patient missed
10  his appointment because Hill was given too late notice.
11  Does that mean that Wexford provided too late notice to
12  the security personnel to arrange transportation?
13     A.   No.  It doesn't state that.  It doesn't state
14  who gave or didn't give timely notice.
15     Q.   What is an orthopedic eval?
16     A.   It's an orthopedic consultation.
17     Q.   And what is the purpose of that?
18     A.   It's a consultation with an orthopedic
19  surgeon.
20     Q.   And this record applies to Carl Hemphill,
21  correct?
22     A.   Yes.
23     Q.   And to be seen by the orthopedic doctor, he
24  had to be transported offsite, correct?



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                                    Pages 70..73

Page 70

1    A.   Yes.
2    Q.   And this entry also indicates that previous
3  steroid injections were ineffective, correct?
4    A.   That's what it states here, yes.
5    Q.   Is cortisone a steroid?
6    A.   Yes.
7    Q.   Are MRIs also referred out to outside
8  facilities?
9    A.   Yes.
10   Q.   I want to turn your attention back to the
11 medical policies and procedures.  Can you please flip to
12 Wexford 531?
13   A.   You said medical policies and procedures?
14   Q.   Yes.
15   MR. MARUNA:  I think it's a different exhibit.
16 BY MR. MCCLAIN:
17   Q.   What is this document?
18   A.   These are the orthopedic guidelines for
19 Wexford's medical policies and procedures for orthopedic
20 surgery.
21   Q.   Can you explain to me how this shoulder
22 guideline works?  For instance, there's three columns.
23   A.   Right.  In the first, the DX is diagnosis so
24 that would be the condition that's being treated, and

Page 71

1  then primary unit treatment.  RX is reissue for
2  retreatment would be the first line of treatment, and
3  then secondary would explain other treatments, assuming
4  that the first was not successful.
5    Q.   What does primary unit mean?
6    A.   Primary unit is the first line of treatment or
7  first modality of treatment -- modalities.  So it would
8  be medication and other things like physical therapy or
9  sling as it mentions here.
10   Q.   And what is secondary Wexford RX?
11   A.   So that's if the primary didn't -- the first
12 line of treatment was not successful, other courses of
13 treatment considerations.
14   Q.   Is there a reason there's a distinction
15 between unit and Wexford?  Does that mean somebody else
16 is providing the primary initial treatment and Wexford
17 is only providing the secondary?
18   A.   No.  Why it says Wexford in parenthesis I
19 think was to -- there's an asterisk after the RX, and
20 then it says under there below that, unless emergent,
21 contact collegial review.  So these would be subject to
22 the collegial review of the utilization review process.
23 The first would not be.  And I think that's what the
24 distinction was why they added Wexford in there.

Page 72

1    Q.   Okay.  Does FX mean fracture?
2    A.   Yes.
3    Q.   Where does a torn rotator cuff fall on the
4  column one under shoulder?
5    A.   It doesn't list that diagnosis here.
6    Q.   If you had to categorize it into one of these
7  six categories, which one would you categorize it?
8    MR. MARUNA:  Objection to foundation that it can be
9  categorized.
10   Doctor, over the objection.
11 BY THE WITNESS:
12   A.   It would be either B or C.  It could be either
13 one.
14   Q.   What about AC joint separation, where would
15 that fall?
16   A.   That would be in E.
17   Q.   Is the diagnosis of severe degeneration
18 changes of AC joint part of E?
19   A.   No.
20   Q.   Where would that diagnosis fall in this chart?
21   A.   That would be under C.
22   Q.   So applying this chart to Carl Hemphill, he
23 was initially given treatment as it applies to column A;
24 is that correct?

Page 73

1    A.   Yes.
2    Q.   And then after some time, Wexford decided to
3  reevaluate his treatment and sent him for an ortho eval;
4  is that correct?
5    A.   Well, that is I think too simplistic.  He was
6  seen many times, received different forms of treatment.
7  I think four cortisone injections, many X-rays, was
8  evaluated many times and by many providers.  And then he
9  received an MRI or was sent to an orthopedic surgeon
10 then had an MRI.  And then after review of the MRI, it
11 was decided that he was a candidate for surgery.
12   Q.   Right.  Mr. Hemphill first complained that he
13 had pain in his shoulder in February of 2013; is that
14 correct?
15   A.   I think he said January.  He wasn't clear on
16 the date.  I think this was also odd because he had this
17 abrupt onset without any inciting event that seemed to
18 have developed abruptly on a specific day, but he didn't
19 recall what that day was.  He said some time in the
20 beginning, on or about.
21   Q.   Do you know what day he received his MRI?
22   A.   It would be in the record.  I don't know what
23 that date is.
24   Q.   I believe it was May 6, 2016.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 74..77

Page 74

1  A.  That sounds right.
2  Q.  So it's effectively over three years between
3  his first treatment of pain management and the time he
4  received his MRI; is that correct?
5  A.  From the first time he reported -- for him to
6  have reported that he had pain after waking up to the
7  time that he had the MRI, it was probably three years.
8  Q.  And in your medical experience, is it typical
9  for a patient to wait three years before being able to
10  obtain an MRI?
11  MR. MARUNA:  Objection to the form of the question
12  and the use of the word "typical".
13  Doctor, you can answer.
14  BY THE WITNESS:
15  A.  Yeah.  I will add also that he didn't wait
16  three years for an MRI.  I think that is completely
17  inaccurate.
18  Q.  Well, he was not given an MRI for over three
19  years; is that correct?
20  MR. MARUNA:  Objection; mischaracterizes the record
21  and the doctor's testimony on the issue.
22  Doctor, you can clarify.
23  BY THE WITNESS:
24  A.  Between given and waiting are two different --

Page 75

1  to me, there's two different meanings.  He didn't wait
2  for the MRI.  He had the expectation that he was to
3  receive or should have received an MRI.  That's clear.
4  He also had the expectation of needing surgery.
5  Q.  Which he did ultimately have, correct?
6  MR. MARUNA:  Please let the doctor finish his
7  answer, Counsel.
8  Doctor, continue.
9  BY THE WITNESS:
10  A.  He did have surgery, yes.
11  Q.  My question is, though, it was three years
12  from the date, not exactly three years, approximately
13  three years and several months from the date he first
14  started to receive treatment for his shoulder to the day
15  he received his MRI, correct?
16  A.  I would disagree with that.  The findings that
17  he had indicated that he must have had pain in his
18  shoulder.  He had the disorder that he had, that is what
19  was categorized as severe degenerative joint disease of
20  AC joint.  That existed for many years, even decades --
21  would have expectedly been present for decades in a
22  patient to get to that level during which time he would
23  have had symptoms on and off.
24  Him presenting with an episode of pain with no

Page 76

1  inciting event, to me, as a clinician, means that he
2  obviously didn't have an injury that caused this, so he
3  had an existing pathology.  He had an existing disorder.
4  And what he was diagnosed with was a chronic condition
5  that was -- would have been longstanding, and he must
6  have had symptoms for years prior to that.
7  So although he didn't report it or make note
8  of it or acknowledge it, it's inconsistent with one of
9  the inconsistencies with his reporting and what is
10  objectively seen and known how disease progresses in
11  individuals.
12  So it's not correct to say that his pain
13  started January 1st or whatever.  His pain must have
14  started many years prior, even decades prior.  And that,
15  as a clinician, I could say that with a very high degree
16  of medical certainty.
17  Q.  So you believe he would have had severe
18  degradation or degeneration of his AC joint in
19  February of 2013?
20  A.  Absolutely.  Whether it was severe, as I
21  sated, was the judgment of the person that read his MRI.
22  Those changes occur very slowly over many years and even
23  several decades.  It certainly was present close to
24  that, if not identical, in January, but I wouldn't be

Page 77

1  surprised if he had findings even 20 years earlier.
2  Q.  So had an MRI been scheduled in February of
3  2013, it would have been discovered that he had this
4  condition, correct?
5  A.  What condition are you talking about?
6  Q.  The severe degeneration of the joint.
7  A.  Again, it's up to the judgment of the
8  physician who is interpreting the X-ray, but as I
9  stated, the X-ray -- degenerative changes would have
10  been present for decades.
11  Q.  Understood.  Decades would have been decades
12  prior to May 2016, correct?
13  A.  I was referring prior to January 1st when he
14  first reported to have a shoulder problem.
15  Q.  Right.  The condition was present on
16  January 1st, 2013?
17  A.  The degenerative -- There's several conditions
18  that he had just to be clear.  He had degeneration of
19  his AC joint or the acromial clavicular joint.  He had
20  impingement syndrome, and he had bursitis of his
21  shoulder.  All three are shoulder conditions, but
22  they're different.  The arthritic condition he had
23  was -- is longstanding.  In absence of a significant
24  injury would occur over many, many years.


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 78..81

Page 78

1    Q.   And Mr. Hemphill reported that he did not
2  suffer any sort of trauma or significant injury,
3  correct?
4    A.   He did.  He also reported that he hadn't had
5  previous pain of his shoulder.  And, again, this is part
6  of the inconsistency that was noted in Mr. Hemphill's
7  presentation.  His inconsistency with his reporting and
8  the objective findings that existed in him.
9    Q.   Can you please flip to Wexford 19 of
10 Exhibit 5?
11   A.   (Complying.)
12   Q.   Can you please read to yourself -- you don't
13 have to read it out loud -- the text in the text box
14 there.
15   A.   I have.
16   Q.   And this text indicates that Mr. Hemphill
17 received an MRI on May 6, 2016, correct?
18   A.   Yes.
19   Q.   And what did that MRI reveal?
20   A.   Well, this is the person's rendering of that
21 information, and it is not the report of the MRI.  The
22 MRI report is the MRI report, but if you want to know
23 what the person stated, it says, revealed partial
24 tearing and tendinosis of rotator cuff with impingement.

Page 79

1  No complete RCT.  Severe degenerative changes of AC
2  joint.
3    Q.   And there's a recommendation for surgery,
4  correct?
5    A.   Yes.
6    Q.   In your medical experience, which one of these
7  symptoms, any or all, would result in the scheduling of
8  the surgery?
9    A.   The surgery was done for a number of reasons,
10 not for a specific reason.
11   Q.   And what were those reasons?
12   A.   One was to address the impingement.  One was
13 for an inspection of the rotator cuff, a visual
14 inspection of the rotator cuff, and then the third
15 reason was for a decompression of the acromial
16 clavicular joint.  That's specifically the distal
17 clavicle.
18   Q.   So that decompression was addressing the
19 severe degenerative changes of the AC joint, correct?
20   A.   That is -- that is why it was done, yes.
21   Q.   In your medical experience, have you ever seen
22 one of these surgeries scheduled solely for resolving
23 severe degenerative changes of AC joints?
24   A.   Yes.

Page 80

1    Q.   When would that be done?
2    A.   When a person had symptoms of an inflamed AC
3  joint that was not amenable to conservative therapy.
4    Q.   For instance, Mr. Hemphill here?
5    A.   No.  He had -- not Mr. Hemphill, other
6  patients.
7    Q.   However, he was diagnosed with this severe
8  degenerative change of AC joint, correct?
9    A.   At the time of his MRI, not at the time of
10 his -- one of the physicians noted that the AC joint was
11 boggy.  I think it was Dr. Davis, but Dr. Shier
12 (phonetic), the orthopedic surgeon, I think actually
13 wrote that the AC joint was normal.  And also there were
14 no signs of AC joint pain from examination maneuvers.
15 None of those were mentioned.
16   Q.   But it's your belief that Mr. Hemphill
17 suffered from this for decades, correct?
18   A.   I wouldn't say suffered.  The condition
19 existed.  It's a slowly progressive condition that was
20 present over a long period of time, many years, and
21 probably decades, especially if his history is correct
22 that there was no inciting injury.  That would take many
23 years for that to develop, and it would be a chronic
24 condition that he would have on a daily basis.  It would

Page 81

1  get better and worse depending on activities and
2  sometimes weather changes, but it would be a fairly
3  stable condition.
4    MR. MCCLAIN:  Do you want to take a break?
5    Off the record.
6         (Discussion off the record.)
7  BY MR. MCCLAIN:
8    Q.   Doctor, you previously mentioned occasionally
9  Wexford is given notification of grievances filed by
10 inmates, correct?
11   A.   Well, not quite what I said.  We're not
12 occasionally notified.  We're involved in the process.
13   Q.   Okay.  When an inmate files a grievance and it
14 involves a grievance against medical conditions or care,
15 is Wexford always notified?
16   A.   Where they're involved with it they would
17 certainly be, and then they're apprised of the
18 grievances through what was referred to as the
19 continuous quality improvement process.
20   Q.   What does Wexford do with information that's
21 contained in the grievances?
22   A.   They respond according to what findings exist.
23   Q.   Will they adapt patient care as a result of
24 grievances?



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 82..85

Page 82

1    A.   They will make an implement corrective action
2  as appropriate.  If it's an employee issue, there would
3  be employee discipline.  If it was a procedure issue,
4  assuming there was merit to it and the complaint was
5  founded, there would then be changes implemented either
6  on the Wexford side or on the state side.
7    Q.   Did you have a chance to review any of
8  Mr. Hemphill's grievances?
9    A.   I may have.  I reviewed some correspondences.
10 I may have seen some grievances, but I'm not sure that I
11 did.
12   Q.   Is it important that the inmates receive
13 prompt medical care?
14   MR. MARUNA:  Objection to the form "prompt".
15 BY THE WITNESS:
16   A.   Can you define prompt?
17   Q.   In a timely manner.
18   A.   In a timely manner for their condition, yes.
19   Q.   And so, that varies depending on what?
20   A.   Their condition.
21   Q.   Does pain factor into that?
22   A.   Certainly.
23   Q.   Does repeated pain -- does continuous pain
24 factor into that?

Page 83

1    A.   If it existed, yes, it would.
2    Q.   Does physical symptoms of not being able to
3  sleep factor into that?
4    A.   If it existed, that would factor into it, yes.
5    Q.   What about the ability to carry on a normal
6  life?
7    A.   Absolutely.
8    Q.   Are doctors the only medical providers able to
9  give cortisone shots?
10   A.   No.
11   Q.   Can nurses give cortisone shots?
12   A.   Nurse practitioners or physician assistants
13 can, but not nurses if that's your question.
14   Q.   You've previously said that Mr. Hemphill has
15 received -- he did receive several cortisone shots.  The
16 first one was scheduled in April of 2013.  Do you recall
17 that from your review of his medical records?
18   A.   I believe I said he received either three or
19 four.  I think it was four cortisone injections, and I
20 don't recall the timing without referring to the record.
21 So I don't want to speculate the time.
22   Q.   I'm going to enter as Exhibit 6, it's a batch
23 of documents.  It begins at Hem 2 and goes to Hem 157.
24 It's not in sequential order necessarily.  It's excerpts

Page 84

1  between those Bates numbers.
2    Can you please flip to Hem 10, please?
3    A.   Yes.
4    Q.   What is this, Doctor?
5    A.   Progress notes by Dr. Davis.
6    Q.   And the right column is plan of treatment; is
7  that correct?
8    A.   Yes.
9    Q.   Can you read what is written in the right
10 column?
11   A.   I think so.  It says, arrow, scheduled,
12 abbreviation of with, Dr. Davis and Obiasi on Tuesday,
13 April 23rd for injection.  Right AC joint.  And it says,
14 shoulder sling.  Naprosyn 500 milligrams BID times 30
15 days.  And then it says number 6 out of clinic supply.
16   Q.   In the middle column at the very end, there's
17 handwritten notes.  The third to last line, can you read
18 that?
19   A.   Third from the bottom?
20   Q.   Yes.
21   A.   It says, corticosteroid injection of AC joint.
22   Q.   Does this progress note reflect that
23 Mr. Hemphill is to receive a cortisone injection on
24 April 23rd?

Page 85

1    A.   It indicates a plan for him to receive a
2  cortisone injection of his AC joint under those
3  specifications.  So the 23rd with Dr. Davis and
4  Dr. Obiasi.
5    Q.   And also, in the center column, middle of the
6  page beginning "O," can you read those notes?
7    A.   It looks like it says, tender over AC joint,
8  right.  Pain with external and internal rotation.  ROM
9  is range of motion, full.  Passive, comma, active.
10 Passive, comma, active limited, and then there's a
11 crossout by pain.  Left shoulder normal.
12   Q.   So what does that note indicate?
13   A.   The physician here notes that he has
14 tenderness of his AC joint and that he has pain with
15 external and internal rotation.
16   Q.   Would tenderness of an AC joint be a symptom
17 of degeneration changes of the AC joint?
18   A.   Could very well be, yes.
19   Q.   Can you flip to the next page.  It's Hem 11.
20 What does the very first note indicate?
21   A.   It says, 4/23, I, slash, M not seen today due
22 to no provider.  IM, slash, scheduled -- rescheduled for
23 4/28/13.
24   Q.   So this note indicates that Mr. Hemphill did

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 86..89

Page 86

1  not receive his cortisone shot on April 23rd as
2  scheduled because there was no provider, correct?
3       A.   No.  It states he was not seen because there
4  was no provider.  And, again, no provider doesn't mean
5  that Dr. Obaisi or a doctor didn't exist.  They were not
6  available.  They could have very well been in the
7  facility attending to a sick patient.  They may have
8  been tied up in a deposition, for example, and not been
9  able to have kept it.  They were not available for could
10 have been personal reasons, illness or whatever.
11      Q.   Do you know who made this note?
12      A.   It was written by the nurse that had signed
13 off, an LPN.
14      Q.   What is an LPN?
15      A.   License practical nurse.
16      Q.   Is that a nurse practitioner?
17      A.   No.
18      Q.   Is an LPN authorized to give cortisone shots?
19      A.   No.
20      Q.   Do you know when Mr. Hemphill finally received
21 his cortisone shot that was supposed to be scheduled for
22 April 23rd?
23      A.   So this was a plan.  It was not something that
24 was his -- to use your verbiage.  It was a plan by the

Page 87

1  physician, Dr. Davis, who had seen him.  Dr. Obaisi is
2  obligated to carry out his own independent evaluation
3  and may or may not agree with Dr. Davis' plan.  He's not
4  there as her -- as her assistant.  So he did see him
5  subsequently and elected on a different course of
6  treatment.  So to categorize it that he was not
7  receiving something that he was entitled to or should
8  have received is not accurate.
9       Q.   If you're told by a doctor that you're going
10 to receive a cortisone shot, do you have a belief that
11 you're going to receive that cortisone shot?
12      A.   I would have that expectation if in fact that
13 was relayed to the patient.  And there was no indication
14 that it was.
15      Q.   Except the report of 4/19 indicates that
16 there's progress notes stated that he is scheduled to
17 receive an injection on April 23rd?
18      A.   Right.  But this doesn't state anything of
19 what was relayed of the plan to the patient.  And
20 appropriately, as she cannot dictate to Dr. Obaisi what
21 his decision-making and treatment is going to be, she
22 would not be appropriate to say this is what's going to
23 happen.  At best, she would say, I think it would be a
24 good idea or I would recommend having a cortisone, but

Page 88

1  I'll have Dr. Obaisi evaluate you.
2       Her documentation would include her plan, not
3  a prediction of the future where it's beyond her
4  control.  And it would not be appropriate for her to
5  make a statement not knowing what Dr. Obaisi's clinical
6  judgment was.
7       Q.   Are inmates assigned to specific doctors?
8       A.   No.
9       Q.   So inmates will see whatever doctor is
10 available?
11      A.   They will see whatever doctor is available and
12 appropriate for their medical complaints.  So if
13 Dr. Obaisi or Dr. Davis had scheduled something like
14 this, they will make an effort to accommodate that.  If
15 there's inability of the provider -- unavailability of
16 the provider, they'll schedule it with another provider.
17      Q.   So basically what you're telling me is one
18 doctor can prescribe a certain plan of treatment but
19 then the inmate may not see that doctor again and would
20 be seen by a different doctor, correct?
21      A.   That could happen.  Although, there is an
22 effort to follow for continuity to schedule it with a
23 person that had previously seen him.
24      Q.   And so, based on what you've said, is a reason

Page 89

1  that Mr. Hemphill did not receive his cortisone shot
2  because Dr. Obaisi did not agree with Dr. Davis' plan of
3  giving that shot?
4       A.   That is apparent from the record because he
5  elected on a different course of treatment other than
6  giving a cortisone injection into AC joint.
7       Q.   So this results in inconsistent treatment
8  received by inmates?
9       MR. MARUNA:  Objection; foundation.
10 BY THE WITNESS:
11      A.   That's entirely incorrect.  Your conclusion is
12 inaccurate.
13      Q.   If Dr. Davis prescribes giving a cortisone
14 shot on one day and then the inmate is seen by
15 Dr. Obaisi on a different day, Dr. Obaisi decides that
16 he does not want to give a cortisone shot, those are two
17 inconsistent medical plans, correct?
18      MR. MARUNA:  Objection; foundation.
19 BY THE WITNESS:
20      A.   You're characterization of it being prescribed
21 treatment is not accurate.  Dr. Davis did not prescribe
22 this treatment.
23      Q.   Understood.  My choice of words might not be
24 the most accurate words.


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 90..93

Page 90

1    A.    And the --
2    Q.    Dr. Davis --
3    MR. MARUNA:  Let the doctor --
4  BY THE WITNESS:
5    A.    And the meaning behind it was also not
6  accurate.  It was not a treatment that was decided on
7  whether the word prescribe was -- is being utilized here
8  or not.  It is what she proposed as being reasonable
9  treatment, subject -- understanding that in this
10  context, her recommendation where it involved the
11  actions of another physician incumbent upon that was his
12  agreement with it.  Her belief was that he would be in
13  agreement with it.  This is not dictating to Dr. Obaisi.
14  It's not a decision of what needed to be done.
15        If it were, she had the ability to execute
16  that herself and didn't need to involve Dr. Obaisi, for
17  example.  So if this was something that she felt should
18  have been done, she had the authority and had the
19  license to be able to complete that procedure herself.
20  She chose to involve Dr. Obaisi not as a technician but
21  to involve his clinical judgment.  And from the flow of
22  the records and subsequent notes, it's clear from his
23  decision that he chose a different pathway or a
24  different form of treatment.

Page 91

1    Q.    But it's true that Dr. Davis developed this
2  plan to give Mr. Hemphill a cortisone shot, and that
3  plan was not followed by Dr. Obaisi?
4    MR. MARUNA:  Objection; foundation.  And once
5  again, it mischaracterizes Dr. Funk's testimony.
6        Dr. Funk, for the third time you can explain.
7    MR. MCCLAIN:  I don't appreciate speaking
8  objections.
9    MR. MARUNA:  It's not a speaking objection.
10        Continue.
11  BY THE WITNESS:
12    A.    I don't agree with your interpretation of what
13  this is.  I think if I have to explain it, I'll explain
14  it again if necessary.  This is not a plan to be
15  executed the way it's specified here as it involves
16  somebody else's involvement where their clinical
17  judgment is not only expected.  It's required.
18        She cannot determine for Dr. Obaisi what the
19  appropriate clinical decision is and treatment without
20  him having his own -- until he renders his own opinion.
21  She can anticipate what that may be, and that's what
22  she's done here.  This is a plan.  It's not a directive
23  or it's not a mandate.  It is her -- it is a plan, and
24  that plan is an expectation.

Page 92

1        In this case, that plan was altered after
2  Dr. Obaisi entered his independent clinical judgment.
3  So there is no inconsistency here in the treatment of
4  disorders.  Physicians commonly disagree with how a
5  disorder should be treated.  These are all consistent.
6  They're reasonable.  They're not opposing or
7  contradictory or conflicting.  They are -- they are both
8  reasonable forms of treatment.
9    Q.    How long has Dr. Davis been employed at
10  Wexford?
11    MR. MARUNA:  Objection to foundation.
12  BY MR. MCCLAIN:
13    Q.    If you know.
14    A.    About two years, maybe year and a half or two
15  years.
16    Q.    As of today's date?
17    MR. MARUNA:  I just want to clarify.  You said has
18  been employed?
19  BY THE WITNESS:
20    A.    I thought you asked has been.  We have
21  established she's not currently employed.
22    Q.    Correct.  So she was at Wexford for about a
23  year and a half?
24    A.    Two years.

Page 93

1    Q.    Do you know how long she had been practicing
2  medicine prior to joining Wexford?
3    A.    A few years.  She was a younger physician.  I
4  think she was out in practice like three, four years.
5    Q.    Dr. Funk, I'm handing you what we marked as
6  Exhibit 7.  Are you familiar with that document?
7    A.    Yes.
8    Q.    What is that document?
9    A.    This is an e-mail that was sent from the
10  utilization -- the risk management office at Wexford to
11  Cindy Garcia where I was copied with a concern of
12  Mr. Hemphill.
13    Q.    Who is Cynthia Garcia?
14    A.    She is director of nursing.
15    Q.    Is she a medical doctor?
16    A.    No.
17    Q.    What does her role entail -- Strike that.
18        What are her duties as director of nursing?
19    A.    She supervises the nursing staff of Wexford
20  and oversees the nursing staff of the state, the nurses
21  from the state.
22    Q.    And who Asten Pacellio?
23    A.    He worked in the risk management office at
24  Wexford.



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 94..97

Page 94

1    Q.   Is the risk management office located at
2  Wexford's headquarters?
3    A.   Yes.
4    Q.   In Pennsylvania?
5    A.   Yes.
6    Q.   And what was Asten's title?
7    A.   He was the legal assistant.  He was an
8  assistant is what I recall.  I don't remember what his
9  actual title was.  There's some documentation it's legal
10 assistant.
11   Q.   And so, this is an e-mail from Asten to
12 Cynthia.  What does Asten request of Cynthia in this
13 e-mail?
14   A.   It asks her to read the attached letter.  He
15 interprets what his complaints are and what his
16 statement is, and then he says, please look into this
17 matter and ensure his medical needs are being met as
18 medically necessary.
19   Q.   Can you flip to Wexford 661.  It's the last
20 page of the exhibit.
21   A.   Yes.
22   Q.   What is this document?
23   A.   This appears to be a letter from Carl Hemphill
24 dated July 24, 2013.

Page 95

1    Q.   Can you take a moment to read the letter.  You
2  don't have to read it out loud.
3              (Witness viewing document.)
4    A.   Okay.
5    Q.   We previously discussed how Wexford becomes
6  aware of inmate complaints or grievances.  Is this an
7  example of how Wexford becomes aware of grievances and
8  complaints filed by inmates?
9    A.   This is not a grievance, but this is one of
10 the ways Wexford would become aware of a complaint by an
11 inmate patient.
12   Q.   It's not a formal grievance is what you're
13 stating?
14   A.   Grievances in the Department of Corrections,
15 it's written on a specific form.  There's a specific
16 process.  It's not a -- he may be grieving an issue.
17 It's not what's referred to as a grievance.
18   Q.   Okay.  What is the basis of Mr. Hemphill's
19 complaint?
20   A.   Lack of MRI and surgery.
21   Q.   Does he complain of anything else?
22   A.   He says that no one has given him a diagnosis
23 and that they gave him three different types of
24 medications plus a shoulder sling from chronic pains.

Page 96

1  And he says here, I've been having pain since
2  February 1st, 2013, exclamation point, exclamation
3  point.
4    Q.   What action did Cynthia take in response to
5  this e-mail and letter?
6    A.   I don't see her response here.
7    Q.   Do you recall what her response was?
8    A.   No.
9    Q.   Why were you copied on this e-mail?
10   A.   Because I was the regional medical director
11 for Stateville.  That's probably why he had included me
12 in it.
13   Q.   Are you copied on all e-mails regarding inmate
14 complaints submitted to utilization management?
15   A.   Yes.  I would be for my facility, yes.
16   Q.   Did you take any specific action in relation
17 to this e-mail?
18   A.   I don't recall.  This is several years now.
19 This is almost five years ago.  I don't recall if I did
20 or what that was.
21   Q.   Can you flip back to Exhibit 6, and it's Bates
22 No. Hem 91.
23   A.   Okay.
24   Q.   What does the note for date 7/31 indicate?

Page 97

1    A.   7/31 of '13 is an MD note.  It's a procedure
2  note, and it is Dr. Obaisi's note where he injected the
3  right shoulder.
4    Q.   So that indicates that Carl Hemphill received
5  a cortisone injection on July 31st, 2013, correct?
6    A.   A cortisone lidocaine injection, yes.
7    Q.   Do you know if this was the first cortisone
8  shot that Mr. Hemphill receive?
9    A.   I think the first was April.
10   Q.   That was when he was scheduled.
11   A.   I would go by the record, whatever the record
12 indicates.  It may be the first.  It very likely is.
13   Q.   What is the date of the e-mail from Asten to
14 Cynthia Garcia?
15   A.   July 24th.
16   Q.   I believe it's July --
17   A.   Oh.  I'm sorry.  It's July 29th.  The letter
18 is referenced as July 24th.
19   Q.   And the letter is dated July 24th?
20   A.   Correct.
21   Q.   Do you find it interesting that Mr. Hemphill
22 wrote a letter dated July 24th, knowing there's a
23 complaint in that letter about insufficient treatment,
24 that complaint was then forwarded to you and Cynthia

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 98..101

Page 98

1  Garcia, and then two days later, Mr. Hemphill received
2  his first cortisone shot?
3      MR. MARUNA:  Objection to the form of the question.
4  Objection as argumentative in the question.
5      Doctor, you can answer.
6  BY THE WITNESS:
7      A.    Not at all, no.  I think you're insinuating
8  that the letter prompted the injection where the record
9  clearly shows that not to be the case, but if you want
10 to ...
11     Q.    How does a record clearly show?
12     A.    Because on the entry of 7/18 --
13     MR. MCCLAIN:  Please don't coach the witness.
14     MR. MARUNA:  I'm directing the witness to refer to
15 the record in front of him.
16 BY THE WITNESS:
17     A.    My response is without his involvement.  As
18 I've already started, the note indicating on 7/18 is
19 that a nurse had spoken with a medical director to
20 schedule him for a steroid injection on 7/31.  So that
21 entry was on 7/18.  So that would have been prior to the
22 date that this correspondence was even written by
23 Mr. Hemphill.
24     Q.    Who is the medical director?

Page 99

1      A.    Dr. Obaisi.
2      Q.    But if this cortisone shot is the first
3  cortisone shot that the inmate received, it was
4  originally scheduled in April of 2013, correct?
5      MR. MARUNA:  Objection; mischaracterizes the
6  witness's testimony on the issue.
7  BY THE WITNESS:
8      A.    Are you referring to the notes by Dr. Davis?
9      Q.    Yes.
10     A.    No.  This is not that injection.
11     Q.    Do you believe that this was a separate
12 injection unrelated to the injection that was indicated
13 in the plan for October -- excuse me -- April 23rd,
14 2013?
15     A.    It's not my belief.  It's what is stated.
16 What she had stated -- the injection that she had stated
17 is not the injection that was given.
18     MR. MCCLAIN:  I don't think I have anymore
19 questions at this time.  I'm going to reserve the right
20 to ask more questions.
21     MR. MARUNA:  Nick, do you have anything?
22          (Brief pause.)
23     MR. STALEY:  Can you guys hear me?
24     MR. MARUNA:  Yeah.  Do you have any questions?

Page 100

1      MR. STALEY:  No, I don't.
2                  CROSS-EXAMINATION
3  BY MR. MARUNA:
4      Q.    Doctor, you are a licensed medical doctor with
5  the state of Illinois, correct?
6      A.    Yes.
7      Q.    And as part of your duties, you still maintain
8  certain clinical responsibilities?
9          In other words, you still practice medicine
10 and treatment patients, correct?
11     A.    Yes.
12     Q.    If I use the term "standard of care," are you
13 familiar with that term?
14     A.    Yes.
15     Q.    Did Dr. Obaisi's treatment of Mr. Hemphill
16 based on your review of the records comply with the
17 standard of care in treating this prisoner?
18     A.    Patient, yes.
19     Q.    Did Latonya Williams' treatment of
20 Mr. Hemphill comply with the standard of care for
21 treating this patient?
22     A.    Yes.
23     Q.    Did Dr. Davis' treatment of Mr. Hemphill
24 comply with the standard of care in treating this

Page 101

1  patient?
2      A.    Yes.
3      Q.    And, in fact, Dr. Funk, you, your yourself
4  reviewed the overall chart, and did this patient's
5  entire treatment that you reviewed in the medical chart
6  for his condition comply with the standard of care?
7      A.    For his specific condition in his specific
8  circumstance, yes, it did.
9      Q.    As a medical doctor licensed in Illinois,
10 Dr. Funk, do you approve of the treatment that
11 Mr. Hemphill received for his complaint of condition?
12     A.    I agree with it, yes.
13     Q.    I want to go back to some questions we talked
14 about earlier regarding the patient's specific complaint
15 that he woke up one day with, quote, severe excruciating
16 pain in right shoulder, closed quote.  And that's from
17 paragraph 19 of his pleading of the issue.
18     A.    Yes.
19     Q.    Dr. Funk, is that type of report consistent
20 with someone who has the degenerative condition that
21 this patient complained of or was ultimately found to
22 have?
23     A.    No.
24     Q.    Why is that inconsistent?

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 102..105

1      A.   Because it's a longstanding condition.  It's
2  not something that would flare-up and be severely
3  painful one day without there being some significant
4  inciting event.
5      Q.   And as a medical provider, is that something
6  that would be taken into account?
7           In other words, the subjective report of the
8  patient versus what we objectively know about what we're
9  finding?
10     A.   That would be taken into consideration and
11  account in determining what mechanism of injury or
12  pathology existed as well as his reporting of pain that
13  in determining what the underlying problem might be and
14  what his concept of severe pain might be as well.
15     Q.   What are the actual medical conditions that
16  Mr. Hemphill has -- I want to clarify that for the
17  record -- that were ultimately led to his surgery?
18     A.   He had bursitis of the shoulder, he had
19  impingement syndrome, and he had arthritis or DJD of the
20  AC joint in an advanced form.
21     Q.   Now, the first level of treatment here for
22  those conditions, would that be pain medications,
23  correct?
24     A.   That would be one of the earlier treatments,

1  yes.
2      Q.   Would rest be a type of treatment?
3      A.   Yes.
4      Q.   What about activity lifestyle modification?
5      A.   Yes.
6      Q.   Now, in the prison, if I use the term medical
7  permit, do you understand what I'm referring to?
8      A.   Yes.
9      Q.   So a low bunk permit, for instance, correct?
10     A.   Well, that would be one thing.  First thing
11  would be to avoid aggravating factors, that is not to do
12  the specific activities that would cause pain, use of
13  his other arm, applying heat.  The medication also would
14  be part of the treatment and then things like you
15  mentioned, different permits, that is either to allow
16  him to be in a lower bunk and to be off work if that was
17  actually a problem, which in this case, I don't think he
18  had a problem going to work, which again was
19  inconsistent with his reporting of having severe pain by
20  not doing anything but then when he goes to work he was
21  able to do that.
22     Q.   If a patient, such as Mr. Hemphill, reports
23  that he wakes up one day with severe excruciating pain
24  of his shoulder, should he be lifting weights on the

1  yard?
2      A.   That just doesn't make any sense at all.  Even
3  if -- if he had pain, severe excruciating pain, it would
4  not even be feasible or reasonable to believe that he
5  could be lifting weights, even the process of going to
6  yard.  These are inmates.  They tend to be rough.  They
7  don't respect personally boundaries.  They bump into
8  each other.  You say, hey, don't bump into me.  My
9  shoulder is hurting.  It's not likely to be complied
10  with.  They are probably going to bump into you.
11          Somebody that had pain in his shoulder, even
12  the process of moving, that is walking down stairs, the
13  jarring motion from that, that would extenuate pain.
14  And somebody with severe pain at rest, which is what he
15  was stating, would elect not to go to yard.  Even just
16  to get to yard would extenuate and make the pain from
17  excruciating to unbearable.  And then again, to be
18  lifting weights, it just doesn't make sense.
19     Q.   Now, we -- based on the medical images and
20  examinations, can we understand -- let me ask it this
21  way rather:  Would Mr. Hemphill have had pain over his
22  entire range of motion of his shoulder based on our
23  objective findings?
24     A.   The different disorders would cause different

1  forms of pain, but they would be provoked by certain
2  positions and movements.
3      Q.   And that's what I'm getting at, Doctor.  I
4  want to understand that better.
5           What positions or movements would provoke?
6           In other words, if I'm standing up and my
7  hands are at rest dropping down right now, so my
8  shoulder is, you know, right along the side of my body
9  there.
10     A.   Yes.
11     Q.   Would that be causing pain for Mr. Hemphill?
12     A.   Not with the conditions that he was diagnosed
13  with.  They would not, no.
14     Q.   Conversely, if I raise my arm all the way up
15  and try to reach as high as I can over my head, could
16  that cause pain for Mr. Hemphill?
17     A.   That would, yes.
18     Q.   So when he's lifting weights, Doctor, that
19  would be completely inconsistent with his report of
20  pain, correct?
21     A.   Not only the range of motion incurred by
22  lifting weights but the strain on the joint would be a
23  secondary factor and even greater than the overhead
24  motion.  So that would be -- it would be pain aggravated



JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                              Pages 106..109

Page 106

1  on top of pain.
2      Q.   And to be clear, if my arm is just lying at
3  rest here, Mr. Hemphill, based on what we know about his
4  condition, would not have been expected to experience
5  pain, correct?
6      A.   Correct.
7      Q.   We discussed kind of the base level would be
8  pain medications, rest, lifestyle modification, if that
9  doesn't work, then do we escalate the treatment to
10 steroid injections, correct?
11     A.   Well, there would be other things.  It would
12 be first utilizing stronger pain medications, longer
13 duration, ensuring that he's compliant with activity,
14 modifications, avoiding aggravating factors.
15         If somebody is not compliant with the
16 instructions that they're given, the therapy will not be
17 effective.  So, for example, if somebody is advised to
18 rest their shoulder, but they engage in weightlifting
19 activity, the treatment cannot be effective.  It will
20 not -- it will not overcome that, and it's not
21 conceivable or reasonable that the condition will
22 improve.
23     Q.   We talked about this a little bit earlier with
24 the steroid injection.  So that is a needle that is

Page 107

1  inserted into the arm, correct?
2      A.   Joint.
3      Q.   The joint, rather, but it penetrates the skin
4  and goes into the joint, correct?
5      A.   Correct.
6      Q.   There is some degree of pain just with the
7  procedure itself because you're entering the body,
8  correct?
9      A.   Only if you are the one having it done.
10 Otherwise, it's fine.
11     Q.   So we discussed earlier that even though
12 Mr. Hemphill claimed that he was getting no relief from
13 any of these steroid injections, he kept asking for them
14 in the records, correct?
15     A.   Yes, he did.
16     Q.   And that would be inconsistent with someone
17 not receiving relief if they're voluntarily asking to
18 undertake a procedure that involves sticking a needle in
19 the joint?
20     A.   Completely inconsistent.  If you're already
21 having pain, you're not going to ask for something that
22 creates pain.  And his reporting that it was ineffective
23 is just completely inconsistent.
24     Q.   I want to talk about the pain medications as

Page 108

1  well.  Counsel asked you some questions where the gist
2  of the question was Mr. Hemphill was reporting the pain
3  medications weren't providing him relief.
4      A.   Yes.
5      Q.   Doctor, isn't it true that time and time
6  again, we see Mr. Hemphill go ask providers for more
7  medications, correct?
8      A.   Yes, he did.
9      Q.   Now, there's a reference in the medical
10 records to something called Orange Crush.  Do you know
11 what that means?
12     A.   Yes.
13     Q.   What is Orange Crush, Doctor?
14     A.   It's a tactical team that functions to search
15 cells and extract inmates.  They do some routine
16 searches of a cell at cell houses when there's a concern
17 of contraband or whether an assault has occurred.
18     Q.   And, actually --
19         Off the record.
20         (Discussion off the record.)
21 BY MR. MARUNA:
22     Q.   Doctor, can I direct you back to exhibit -- is
23 this 6, Counsel?
24     MR. MCCLAIN:  (No verbal response.)

Page 109

1  BY THE WITNESS:
2      A.   6, correct.
3      Q.   Doctor, I want to direct you to Hemp 93 on
4  Exhibit 6.  It's a medical record from 9/11/13, correct?
5          This is an RN note, right?
6      A.   Correct.
7      Q.   So in this medical record, Doctor, do we see
8  that Mr. Hemphill is complaining that Orange Crush took
9  his pain medications, correct?
10     A.   Yes.
11     Q.   But what is he asking this nurse to do for
12 him?
13     A.   The inference is he's requesting the nurse to
14 renew the medication, to authorize the doctor -- to
15 obtain the medication, which required approval by a
16 provider.  In this case, it was Dr. Davis.
17     Q.   So even though Mr. Hemphill is stating that
18 his pain medications aren't working, we see in the
19 medical records that when the Orange Crush tac team took
20 his pain medications, he didn't hesitate to come back to
21 a medical provider to ask to get those very same pain
22 medications back; is that correct?
23     A.   Yeah.  The inference is that it was a request
24 made to the nurse.  The action was that the nurse



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 110..113

Page 110

1   reissued it, but there are other entries where he
2   clearly stated specifically that he wanted medication.
3       Q.   Now, Doctor, in the medical records, we
4   actually see that the inmate's -- the patient's pain is
5   intermittent pain, correct?
6       MR. MCCLAIN:  Objection; misstates the record.
7   BY THE WITNESS:
8       A.   Is that a question?
9       Q.   Yes, Doctor.
10      A.   The record clearly shows the pain was
11  intermittent.
12      Q.   Doctor, I'm going to hand you a record to
13  refresh your recollection here.  Counsel and I had some
14  conversations off the record about how we'll handle
15  this.
16           For the record, we're directing the doctor to
17  Bates stamp IDOC00097.  It's a medical record dated
18  March 4, 2015.
19      A.   Yes.
20      Q.   Doctor, this is an MD note, correct?
21      A.   Yes.
22      Q.   And is the S -- by the way, S means
23  subjective.  That's what the patient tells the doctor,
24  correct?

Page 111

1       A.   Yes.
2       Q.   What does the patient report about his pain
3   specifically in his shoulder?
4       A.   It says, pain right shoulder is back on and
5   off.
6       Q.   What does that mean to you as a medical
7   provider, pain is on and off?
8       A.   It's intermittent.
9       Q.   So that's the patient himself reporting to the
10  doctor that his pain is not consistent but rather it's
11  intermittent pain, correct?
12      A.   It's not constant.  Right.  It's intermittent.
13      Q.   Now, we discussed that after we did the
14  injections, which we did several of them, then the next
15  decision by the provider was to send the patient outside
16  of the prison for a consultation with an orthopedic
17  surgeon, correct?
18      A.   He also had physical therapy, but at one
19  point, yes, it was a decision to have an orthopedic
20  surgeon evaluate it.
21      Q.   I want to talk about sick call for a second,
22  Doctor.  When the patient puts in for an initial sick
23  call request, who does he first see?  Who is the first
24  level of medical provider he sees in that process?

Page 112

1       A.   Generally it's a nurse.
2       Q.   Is that a triage system where the nurse
3   decides whether she can evaluate and handle the
4   complaint or it needs to be referred up the chain so to
5   speak?
6       MR. MCCLAIN:  Objection; vague question.
7   BY THE WITNESS:
8       A.   So the complaint is triaged.  And based upon
9   what the complaint is, it will determine whether it's
10  appropriate for a nurse to address it or whether it
11  should be something addressed by a physician or somebody
12  else.  As we mentioned, there's other possibilities.
13      Q.   What I'm getting at, Doctor, is every time a
14  patient puts in a request for sick call, they do not
15  automatically go and see a medical doctor, correct?
16      A.   Correct.
17      Q.   And the medical doctors don't review the
18  inmate's sick call request to see whether they should
19  see the patient.  They rely on the nurse to refer the
20  patient up and place the patient on their schedule; is
21  that correct?
22      A.   Yes.  Unless the nurse has a question, she'll
23  sometimes ask the provider.
24      Q.   Are you familiar with the term lockdown?

Page 113

1       A.   Yes.
2       Q.   What is a lockdown, Doctor?
3       A.   It's a security term that refers to restricted
4   movement because of a security concern.  So generally
5   it's some altercation or there's an escape plan detected
6   or some other disturbance in the facility, so it
7   minimizes the movement.
8       Q.   Is lockdown an IDOC procedure or a Wexford
9   procedure?
10      A.   It's a security IDOC.
11      Q.   And the decision to place the facility on
12  lockdown, is that made by the DOC or Wexford?
13      A.   By the warden.
14      Q.   Who is --
15      A.   IDOC, correct.
16      Q.   Does a lockdown restrict Wexford's ability to
17  provide medical treatment to certain inmates?
18      A.   It restricts it.  It limits it because the
19  inmates are contained in their cell or their cell
20  houses, and only emergencies would be brought over.
21      Q.   So if there's an emergency, we still can bring
22  an inmate over for treatment, or sorry, the DOC can
23  bring the inmate over for treatment, but if it's a
24  routine or chronic condition, the treatment may have to



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 114..117

Page 114

1  be deferred or rescheduled?
2      A.  Correct.
3      Q.  Doctor, are you familiar with the term
4  evidence-based medicine?
5      A.  Yes.
6      Q.  What does that mean?
7      A.  Evidence-based medicine is treatment that's
8  directed and guided according to proven therapy and
9  treatment rather than on beliefs or inferences made from
10  anecdotal treatment or events.
11      Q.  So another way of saying that is if a patient
12  demands particular treatment, is it the role of the
13  provider -- the medical provider to make a determination
14  whether that treatment is clinically indicated?
15      A.  It's always the obligation of the clinician to
16  determine what's medically appropriate irrespective of
17  whether it's requested by the inmate -- the patient or
18  not.
19      Q.  And, Doctor, I think here we discussed that
20  the patient in the beginning of 2013 was demanding that
21  he receive an MRI for his condition; would you agree
22  with that?
23      A.  Correct.
24      Q.  Was an MRI clinically indicated for this

Page 115

1  patient in 2013?
2      A.  No.
3      Q.  What about in 2014?
4      A.  No.  I would say not.
5      Q.  What about 2015?
6      A.  No.
7      Q.  The patient also in that same time frame was
8  demanding surgery; is that correct?
9      A.  I think he did right from the beginning, right
10  from the first month or first presentation.  He demanded
11  both an MRI and surgery, yes.
12      Q.  And the same question, Doctor.  Was that
13  indicated in the 2013 through, let's say, end of '15
14  time period?
15      A.  No.
16      Q.  Was it appropriate during that time period to
17  explore other treatments for his subjective reports of
18  pain?
19      A.  Yes.
20      Q.  I'm going to direct you to Exhibit 3, which
21  was the Wexford's medical policies and procedures.
22  Specifically, Doctor, I'm going to direct you to Bates
23  stamp Wexford 321.
24      A.  Okay.

Page 116

1      Q.  The title of page 2 of this document, Bates
2  321, is preface, correct?
3      A.  Yes.
4      Q.  I want to direct you to the third paragraph
5  down; do you see that, clinical pathways?
6      A.  Yes.
7      Q.  Could you read that into the record for us?
8      A.  Clinical pathways do not replace sound
9  clinical judgment, nor are they intended to strictly
10  apply to all patients.  The specific strategies and
11  pathways presented in this manual provide a clinical
12  management approach, but their application is a decision
13  made by the practitioner accounting for individual
14  circumstances.
15      Q.  Doctor, does that mean that this isn't a
16  ironclad manual that each medical provider must follow?
17      A.  Certainly not.
18      Q.  We rely on our providers' clinical experience
19  and their judgement, correct?
20      A.  Absolutely.
21      Q.  And if a provider felt that a certain type of
22  treatment was indicated, even if it's not discussed in
23  this manual, we would defer to the medical provider's
24  judgment in that case, correct?

Page 117

1      MR. MCCLAIN:  Objection to the term "we".
2  BY MR. MARUNA:
3      Q.  Wexford would defer to the judgment in that
4  case?
5      A.  Wexford and the expectation in the community,
6  yes.
7      Q.  Counsel asked some questions earlier, and we
8  discussed some chronic care guidelines developed by the
9  IDOC; do you recall those questions?
10      A.  Yes.
11      Q.  Now, you indicated at the time as well that
12  Wexford has certain guidelines as well, correct?
13      A.  Yes.
14      Q.  At Stateville, Wexford providers, do they
15  follow the IDOC chronic care guidelines?
16      A.  Yes.  If there is a conflicting or similar,
17  they will follow the IDOC guidelines by contract.
18      Q.  So by contract, if a Wexford guideline
19  intersects or runs up against an IDOC policy or
20  guideline --
21      MR. MCCLAIN:  Objection.
22      MR. MARUNA:  Can I finish my question, please?
23  BY MR. MARUNA:
24      Q.  (Continuing) -- or IDOC policy or guideline,

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                                   Pages 118..121

Page 118

1    does the IDOC policy or guideline control?
2        MR. MCCLAIN:  Objection to the form of the
3    question.  Vague.
4    BY THE WITNESS:
5        A.   The IDOC guidelines would trump Wexford's
6    where they are similar.
7        Q.   I want to talk a bit about scheduling
8    outpatient appointments at UIC in particular, Doctor.
9    So we see here in this case that Mr. Hemphill was
10   eventually approved to go offsite to UIC Orthopaedics
11   for a consultation, correct?
12       A.   Yes.
13       Q.   When that occurs, who sets the appointment
14   date?  Is that a Wexford decision or a UIC decision?
15       A.   It's determined by UIC.
16       Q.   Counsel asked you some questions right at the
17   beginning of the deposition about the staffing level at
18   Stateville and Henry Hill Correctional Center; do you
19   recall those questions?
20       A.   Yes.
21       Q.   Was the staffing level -- the medical staffing
22   level at Stateville adequate during the 2013 through
23   2016 timeline?
24       MR. MCCLAIN:  Objection to the term "adequate".

Page 119

1    BY THE WITNESS:
2        A.   In my opinion, yes.
3        Q.   And what about the staffing level at Henry
4    Hill from 2016 through I think 2017 is what we
5    discussed, were those adequate?
6        A.   '16 to '17, is that the timeframe here?
7        Q.   I'm asking about Henry Hill.
8        A.   You're talking about 2016 to --
9        Q.   Sure.  I'll ask it this way:  The timelines
10   that counsel asked about earlier at Henry Hill, were
11   those staffing levels adequate?
12       A.   Yes.
13       MR. MCCLAIN:  Same objection.
14   BY MR. MARUNA:
15       Q.   Mr. Hemphill's medical condition, was that a
16   chronic condition or an emergent condition?
17       A.   I would say neither of those.  I would define
18   it as a recurring condition that he had.
19       Q.   Counsel asked you some questions about some of
20   the medical records that indicated no provider in the
21   medical record; do you recall those questions?
22       A.   Yes.
23       Q.   Now, at Stateville, for instance, Dr. Obaisi,
24   does he set his own appointment schedule?

Page 120

1        A.   No.
2        Q.   What about Dr. Davis, would she have set her
3    own appointment schedule?
4        A.   No.
5        Q.   What about Latonya Williams, would she set her
6    own appointment schedule?
7        A.   No.
8        Q.   You indicated that it's possible that the
9    providers could have been engaged in other medical
10   duties that day, such as an emergency response, correct?
11       A.   Yes.
12       Q.   Even if the medical records said no provider
13   available, were there still other medical providers
14   available in the health care unit that could have seen
15   the patient if he had an issue that needed to be
16   addressed that day?
17       A.   Yes.
18       Q.   So just because the medical records say no
19   provider available, it doesn't mean that his condition
20   could not have been addressed that day if it warranted
21   addressing that day?
22       MR. MCCLAIN:  Objection; speculation.
23   BY THE WITNESS:
24       A.   That's clearly the case.  I'm familiar with

Page 121

1    the terminology.  It doesn't refer to what it literally
2    means.  It means that the person it was scheduled for
3    was not available.  And the term "no provider available"
4    is what's used.  It's actually incorrect.  There is
5    always a provider available.  And it's the terminology
6    that they use, that the doctor -- the specific provider
7    was not there.
8        Q.   To clarify, that would mean if the patient was
9    scheduled for January 21st to see Dr. Obaisi, and
10   Dr. Obaisi wasn't available, the term "no provider
11   available" just means that Dr. Obaisi was not available
12   that day, correct?
13       A.   Correct.  It would be unreasonable and very
14   extremely unlikely that the other two providers were not
15   available.
16       Q.   And when you say the other two providers, can
17   you explain what you mean by that?
18       A.   The physician or the physician assistant.
19       Q.   At Stateville, do the physician's assistant,
20   staff physician and medical director function as
21   practitioners?  In other words, higher level providers?
22       A.   Yes.
23       Q.   And below them would be the nurses, correct?
24       A.   Yes.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                                                Pages 122..125

Page 122

1    Q.   And then below the nurses would be -- I heard
2    the abbreviation CNT; is that accurate?
3    A.   Technicians and CNT, LPN, yes.
4    Q.   Counsel asked that earlier, too.  Can you
5    explain what the difference is between LPN, RN and an
6    MD?
7    A.   LPN is licensed practical nurse, has less
8    training than RN, a registered nurse.  And that person
9    has less training than a nurse practitioner.  So to
10   become an RN, you need to first be -- satisfy the
11   requirements for LPN.  And to be a nurse practitioner or
12   physician's assistant, you need to satisfy requirements
13   for a nurse, RN.
14   Q.   What did the MRI in this case say about
15   Mr. Hemphill's rotator cuff specifically; do you recall?
16   A.   That he had impingement signs, that there was
17   a longitudinal tear in the supraspinatus tendon.  I
18   think he had edema of the supraspinatus muscle.  And I
19   think some irregularity in the dome of the acromial
20   clavicular space.
21   Q.   To a layman, can you explain what that means?
22   A.   He had signs of what would be diagnosed as
23   having impingement syndrome and as well as degenerative
24   changes of the AC joint.  And I think he also had edema,

Page 123

1    swelling of the bursa, which would be diagnosed as
2    bursitis.
3    Q.   And that's what an MRI shows the radiologist,
4    correct?
5    A.   Yes.  That was the interpretation.
6    Q.   The patient later goes on to get the
7    operation, correct?
8    A.   Yes.
9    Q.   And did you review the operative report for
10   Mr. Hemphill?
11   A.   Yes.
12   Q.   What did the operative report find?
13   A.   Well, the procedure was the -- he had a
14   Mumford procedure with resection at distal clavicle,
15   explained how the procedure was done.  There was no tear
16   in the rotator cuff.  There was specific mention that it
17   was not the case.  There was irregularity in the dome of
18   the subacromial space that was addressed surgically.
19   The others were details of the procedure.
20   Q.   So when they went in to perform -- Strike
21   that.
22        When the surgeon went in to perform the
23   operation, they didn't find a tear in the rotator cuff
24   upon their visual inspection when they actually opened

Page 124

1    up Mr. Hemphill, correct?
2    A.   Correct.  At least it was not mentioned.  I
3    mean, I can only assume it would have been mentioned had
4    it been there.
5    Q.   I'm going to direct you to the utilization
6    management notes, which were Exhibit 5.  I'm going to
7    ask you some questions about Wexford Bates 0009.
8    A.   Okay.
9    Q.   This is the medical UM note of April 18, 2016
10   where it discusses that PT misses appointment at UIC
11   Ortho on 4/15/16 because Hill was given too late of
12   notice, and transportation of security was not feasible,
13   correct?
14   A.   Yes.
15   Q.   Where was Henry Hill located in the state of
16   Illinois?
17   A.   The western part of the state in Galesburg,
18   Illinois.
19   Q.   About how many hours is that from Chicago?
20   A.   About -- Depending on traffic, three and a
21   half to four and a half.
22   Q.   So it's certainly much further than Stateville
23   is, correct?
24   A.   Oh, yes.

Page 125

1    Q.   So after this occurs that security and
2    transportation was determined to not be feasible, did
3    Wexford change its plan on where they were going to send
4    Mr. Hemphill for evaluation?
5    A.   Yes.
6    Q.   Where did they say they were going to send
7    him?
8    A.   Local provider.
9    Q.   What does that mean, Doctor?
10   A.   Someone in the area of Galesburg or in
11   Galesburg.
12   Q.   Because Wexford learned that there were
13   transportation issues getting Mr. Hemphill across the
14   state of Illinois, the plan was to send him to an
15   orthopedic surgeon more local to his new prison, Henry
16   Hill, correct?
17   A.   Yes.
18   Q.   When an inmate submits a grievance, Doctor, is
19   that automatically sent to Wexford, or is that collected
20   by an IDOC employee, if you know?
21   A.   It's collected and processed by an IDOC
22   employee.
23   Q.   So an IDOC employee would have to categorize
24   the grievance as needing review by a Wexford employee,


JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 126..129

Page 126

1    and then physically send it to a Wexford employee,
2    correct?
3         A.   If it involved a Wexford employee, they would
4    be part of the investigation so they would have
5    knowledge of the issue from that.  And then the
6    grievances with merit are categorized and reviewed at
7    the monthly site CQI meeting, and they also usually have
8    a tally of the total number of grievances and categorize
9    the issues.
10        But all the grievances with merit would be
11   discussed at the monthly QI meeting, and then wherever a
12   provider was involved or if it involved input by a
13   medical staff, they would be involved.
14        Q.   I'm going to direct you back to Exhibit 6,
15   which was the stack of medical records.  Specifically,
16   Doctor, I want to direct you to Hemp 10.
17        A.   Got it.
18        Q.   Hemp 10 is Dr. Davis' April 19, 2013 note.  I
19   want to clarify your testimony.
20        In the plan section when it says schedule with
21   Dr. Davis and Obaisi on Tuesday, April 23rd for
22   injection R AC joint, that plan is Dr. Davis' referral
23   for the patient to be seen by Dr. Obaisi to consider an
24   injection, correct?

Page 127

1         MR. MCCLAIN:  Objection; misstates the evidence,
2    misstates prior testimony, assumes facts not in
3    evidence.
4    BY THE WITNESS:
5         A.   Yes.  That is correct.  That is what this
6    note -- what is inferred and what occurs in practice
7    from a documentation like this.
8         Q.   Dr. Davis would not tell Dr. Obaisi
9    specifically what he must do, correct?
10        A.   She could not.  She could not besides the fact
11   that Dr. Obaisi is her supervisor and not the other way
12   around, but even if that relationship didn't exist, one
13   physician cannot dictate to another what type of
14   clinical situation for a procedure is appropriate.  It
15   mandates there in all circumstance that the physician is
16   in agreement.  It would breach standard of care if a
17   doctor simply followed direction by another physician
18   and failed to conduct their own evaluation.
19        Q.   And so, it would be incumbent upon Dr. Obaisi
20   when he saw Mr. Hemphill to evaluate whether he thought
21   an injection was clinically indicated at that time,
22   correct?
23        A.   Yes.
24        Q.   If we can turn a few pages to I believe the

Page 128

1    next page, Hemp 11.  We see on June 6, 2013, Dr. Obaisi
2    does see Mr. Hemphill, correct?
3         A.   Yes.
4         Q.   Does he perform an evaluation on Mr. Hemphill?
5         A.   Yes.
6         Q.   And does he decide to give Mr. Hemphill the
7    injection?
8         A.   He did not, no.
9         Q.   Does he arrange for an alternative treatment?
10        A.   He did an X-ray, and he asked him to come back
11   in a week.
12        Q.   If we flip the page to Hemp 13, do we see he
13   sees Mr. Hemphill shortly thereafter, about two weeks
14   after?
15        A.   20 days after, yes.
16        Q.   And after the X-ray is complete, does he order
17   treatment for Mr. Hemphill?
18        A.   Yes.
19        Q.   And what is the treatment?
20        A.   Mobic.
21        Q.   And Mobic is a type of pain medication?
22        A.   Yes.
23        Q.   That's a different pain medication than the
24   naprosyn; is that correct?

Page 129

1         A.   Yes.
2         Q.   So Dr. Obaisi's evaluation was that he wanted
3    to try a pain medication first before considering
4    injections, correct?
5         A.   Yes.
6         Q.   And if we actually flip the record just a few
7    more pages to Hemp 17 --
8         A.   Yes.
9         Q.   -- we see that on -- that's an X-ray report,
10   correct?
11        A.   Yes.
12        Q.   We see the date of the X-ray request is listed
13   as June 6, 2013, correct?
14        A.   Yes.
15        Q.   That would be consistent with when Dr. Obaisi
16   saw Mr. Hemphill as we saw on Hemp 11, correct?
17        A.   Yes.
18        Q.   And we see on June 18th that an X-ray was
19   performed or at least reviewed by the radiologist,
20   correct?
21        A.   Yes.
22        Q.   And then we see Dr. Obaisi reviewed the X-ray
23   reports on June 20, 2013, correct?
24        A.   Yes.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018

Pages 130..133

Page 130

1      Q.   And then he views them June 26, 2013, and
2  that's when he prescribes the Mobic, correct?
3      A.   Yes.
4      Q.   Was Dr. Davis' evaluation and treatment on
5  April 19th consistent with the standard of care?
6      A.   Yes.
7      Q.   And was Dr. Obaisi's decision to render a
8  different type of treatment than was suggested by
9  Dr. Davis also consistent with the standard of care?
10     A.   Yes.
11     Q.   Now, you've been a doctor for many years,
12  Dr. Funk, right?
13     A.   Yes.  I don't look as old, but ...
14     Q.   In your experience and practice, have you
15  found that sometimes reasonable medical minds may differ
16  on how to treat a patient?
17     A.   Very commonly, yes.
18     Q.   And just because reasonable medical minds may
19  differ on how to treat a patient, that doesn't mean that
20  either proposed treatment is necessarily wrong or not in
21  accordance with the standard of care, correct?
22     A.   That's correct.  There's a spectrum of
23  treatments that are consistent within the standard of
24  care.  There isn't a specific -- it's almost never a

Page 131

1  case that there's only a specific form of treatment.
2      Q.   Now, if I can direct you to Hemp 91, which is
3  July 18, 2013.  And that is a record where I want to
4  discuss the plan section and clarify the testimony on
5  this from earlier.  What was the treatment ordered on
6  July 18, 2013?
7      A.   The nurse wrote that she had discussed with
8  the medical director that she was to schedule him for a
9  steroid injection on July 31st.
10     Q.   And then if we review Exhibit 7, we see that
11  on July 24th, the patient writes a letter to utilization
12  management, correct?
13     A.   Yes.
14     Q.   And then we see that it was stamped received
15  July 29, 2013, correct?
16     A.   Yes.
17     Q.   And then if we look back on to Exhibit 6, we
18  see July 31st, 2013.  As ordered on July 18, 2013, the
19  patient receives that steroid injection, correct?
20     A.   Yes.
21     Q.   So when counsel asked you earlier some
22  questions about whether it was interesting -- I think
23  was the terminology used -- that the injection was
24  provided after this letter was written, we have

Page 132

1  objective evidence that the injection was ordered well
2  before this record, this letter was authored by the
3  patient, correct?
4      A.   Correct.
5      MR. MARUNA:  I'll pass the witness.  Do you have
6  any more, Counsel?
7      MR. MCCLAIN:  Yes, I do.
8                    REDIRECT EXAMINATION
9  BY MR. MCCLAIN:
10     Q.   Doctor, I want to direct you to Hem 91.  It's
11  part of that exhibit you have there.
12     A.   Okay.
13     Q.   Now, previously you testified that just
14  because it states in the plan section of these progress
15  notes that a procedure is to be scheduled, that is not
16  guaranteed to occur, correct?
17     A.   No.  That mischaracterizes what I stated.  I
18  have clearly stated that one person cannot make a
19  determination for someone else.  In this case, it's the
20  same person making a determination for himself, which he
21  can certainly do.  You cannot compare the two.
22     Q.   The entry on July 18, 2013 --
23     A.   Yes.
24     Q.   -- is made by RN SC note.  What does that

Page 133

1  mean?
2      A.   RN sick call.
3      Q.   Does RN mean registered nurse?
4      A.   Correct.
5      Q.   So this entry was not made by Dr. Obaisi,
6  correct?
7      A.   It was not made by Dr. Obaisi but defines that
8  she spoke with Dr. Obaisi and was following his order.
9      Q.   Where does it state that?
10     A.   In the plan section.  It says, spoke to
11  Dr. Obaisi to schedule for steroid injection 7/31/13.
12     Q.   Understood.  However, that is just the plan
13  that has been devised to provide these medical services,
14  correct?
15     A.   It is Dr. Obaisi's plan, correct.
16     Q.   Right.  And that is, as you testified earlier,
17  not necessarily guaranteed.  For instance, if Dr. Davis
18  had seen this individual on July 31st, 2013, then
19  Dr. Davis could have made her own independent finding
20  that the cortisone shots should not have been
21  administered on that date; is that correct?
22     MR. MARUNA:  Objection to the form of the question
23  and foundation.  Mischaracterizes the doctor's
24  testimony.



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                     Pages 134..137

Page 134

1          Doctor.
2    BY THE WITNESS:
3          A.   Dr. Davis can make her own determination, but
4    she cannot substitute for Dr. Obaisi's determination.
5    In this case, he made his determination, and this is the
6    plan that would be followed without any unexpected
7    events, such as illness or something else.  It would
8    follow through and take place irrespective of what
9    Dr. Davis' opinion was.
10         Q.   So Dr. Davis would not be able to exercise her
11   own independent medical discretion and not prescribe the
12   injection on July 31st?
13         MR. MARUNA:  Objection; form and foundation.
14   BY MR. MCCLAIN:
15         Q.   Or is she required to follow what Dr. Obaisi
16   indicates on his plan on July 18th?
17         A.   So this plan refers to Dr. Obaisi giving an
18   injection on the 31st.
19         Q.   Correct.
20         A.   She may render her own opinion, but she cannot
21   alter that decision of Dr. Obaisi to carry out that
22   plan.
23         Q.   So had Dr. Davis seen the inmate on July 31st,
24   she would have been required to give him the cortisone

Page 135

1    injection?
2          A.   No.  That's not what I said.
3          Q.   You said she cannot alter that plan.
4          A.   She cannot alter Dr. Obaisi's plan.  This is
5    Dr. Obaisi's plan relayed to the nurse and documented by
6    the nurse.
7          Q.   Exactly.  That is my question.  The plan is,
8    and correct me if I'm wrong, that the inmate was to
9    receive the cortisone shot on July 31st, correct?
10         A.   By Dr. Obaisi.
11         Q.   Correct.  Now, if Dr. Davis had seen the
12   inmate on July 31st, would she have been required to
13   follow Dr. Obaisi's plan of injecting the cortisone
14   shot?
15         A.   No.
16         Q.   I want to back up to your prior testimony
17   about the operative report.  You indicated that there
18   was -- and I apologize if I did not get this correct --
19   irregular space in the subabdominal space?
20         A.   No.  Irregularity in the subacromial space.
21         Q.   Okay.  What does that mean?
22         A.   There was bony irregularity of the underside
23   of the acromial process -- acromion.
24         Q.   What is that?

Page 136

1          A.   Bony structure of the shoulder.
2          Q.   Does that relate to degradation of the AC
3    joint?
4          A.   No.
5          Q.   Doctor, does bursitis cause pain in
6    individuals?
7          A.   It can.
8          Q.   Does impingement syndrome cause pain in
9    individuals?
10         A.   When the shoulder is in certain positions, it
11   variably can cause pain.
12         Q.   So if an individual has been diagnosed with
13   impingement syndrome, they would suffer pain if they
14   move in the right sequence to cause the compression?
15         MR. MARUNA:  Objection to the form of the question.
16   Use of the word "suffer."
17         Doctor, you can answer.
18   BY THE WITNESS:
19         A.   So impingement syndrome -- if the person were
20   symptomatic, in other words, if the joint were inflamed,
21   they would have symptoms when the joint space was
22   compressed.  So specific maneuvers are known to tighten
23   or confine that space, and that would elicit discomfort
24   or pain.

Page 137

1          Q.   Does degradation of the AC joint cause pain in
2    individuals?
3          A.   It causes a different type of pain.  It is
4    a -- it does cause shoulder pain, but it's a different
5    type of pain and different maneuvers.  It tends to be
6    lower in severity but more of a chronic nature.
7          Q.   Does the irregularity discovered during the
8    operation cause pain?
9          A.   Not in itself, no.
10         Q.   Coupled with another medical condition, would
11   it cause pain?
12         A.   Yes.
13         Q.   You've previously testified and insinuated at
14   some points that Mr. Hemphill should not request a
15   cortisone shot because it causes pain.
16         Have you administered cortisone shots in your
17   medical career?
18         MR. MARUNA:  Objection to the foundation,
19   mischaracterizes the witness's testimony.
20   BY THE WITNESS:
21         A.   I didn't state that, but, yes, I have
22   administered cortisone injections.
23         Q.   There was testimony that -- I don't recall the
24   exact words, but you basically stated that it was odd

JENSEN
Litigation Solutions

Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                                    Pages 138..141

Page 138

1  that the individual was requesting a cortisone shot,
2  which would cause him pain.
3         So my question is, are you really testifying
4  that an individual should not receive an operation or
5  medical procedure because it might cause temporary pain
6  but will relieve pain long term?
7     A.  I don't agree that that characterizes my
8  testimony at all.  And, no, I don't disagree with what
9  you're saying.  A patient should receive procedures that
10 may cause pain, such as an injection, but what I stated
11 otherwise was entirely different.
12    Q.  And just because a patient is not complaining
13 of pain every single hour of the day does not mean that
14 they are suffering from pain; is that correct?
15    A.  If they're not having -- if they're not
16 complaining of pain or not having pain?
17    Q.  Not complaining of pain.
18    A.  If they're not complaining of pain, they may
19 or may not have pain.
20    Q.  You previously defined chronic pain as pain
21 that lasts longer than six months in duration; is that
22 correct?
23    A.  No.
24    Q.  That's not correct?

Page 139

1     A.  That's partially correct.  I said it's
2  something that occurs on a daily basis for six months.
3     Q.  Mr. Hemphill had surgery on his right
4  shoulder, correct?
5     A.  Yes.
6     Q.  Are you familiar with his conditions
7  postsurgery?
8     A.  I saw some notes subsequent to his procedure.
9     Q.  Do you know if he is still suffering from pain
10 postsurgery?
11    A.  I have issue with your characterization of him
12 suffering with pain.  As I've testified, the record
13 clearly indicates and his condition is consistent with
14 him having intermittent pain that would be provoked by
15 certain positions.  The vast majority of which he would
16 not be called on to engage in his capacity as an inmate.
17 He wasn't working.  He wasn't engaged in activities that
18 would aggravate impingement.  So his suffering and pain,
19 that's not accurate and not words that I used -- a
20 description that I used.
21    Q.  At some point, a Wexford employee determined
22 that Mr. Hemphill was qualified for surgery, correct?
23    A.  I wouldn't say that he was qualified.  Surgery
24 is an option based upon his objective findings, his

Page 140

1  report, his reporting of pain in response to treatment.
2  Surgery was a reasonable choice of therapy for him.
3     Q.  And surgery would not be ordered unless an
4  individual is suffering from a medical condition that
5  would warrant surgery, correct?
6     A.  That's not correct.
7     Q.  Would surgery be ordered when a person is not
8  suffering from a medical condition?
9     A.  Again, your term suffering -- we employ
10 treatment when it's medically appropriate.  Suffering is
11 not part of what would require to be present, and I
12 don't believe that Mr. Hemphill was suffering.  I think
13 that's an inaccurate characterization of his pain that
14 he had.
15    Q.  Mr. Hemphill was diagnosed with certain
16 medical conditions that led a Wexford employee to
17 determine that surgery should be carried out, correct?
18    A.  Again, as I stated, surgery was a viable, a
19 reasonable course of treatment at that point.  And
20 that's why surgery was an optional course of treatment.
21    Q.  And that surgery was given, correct?
22    A.  It was accomplished, yes.
23    Q.  And during that surgery, they did discover
24 that Mr. Hemphill had certain medical conditions that

Page 141

1  needed to be corrected during the surgery, correct?
2     A.  No.  I disagree with that.
3     Q.  You testified that he had these irregularities
4  that were addressed during the surgery?
5     A.  Correct.
6     Q.  What does that mean?
7     A.  They were surgically removed.  They were
8  surgically honed down.
9     Q.  And why were they removed or honed down?
10    A.  Because at that point of having the joint
11 open, it was a reasonable course of action to do that.
12 Your characterization that it was necessary to do was my
13 disagreement.  It was not necessary.  He could have been
14 treated otherwise.
15    Q.  So you're saying that they could have done
16 nothing during the surgery?
17    A.  No.  That's not what I'm saying at all.  It
18 would have been unreasonable not to do anything at
19 surgery.  Once the joint was opened and the finding was
20 there, it was easily addressed, and it should have been
21 addressed.  It was to his benefit, and it was
22 appropriate that it was.
23    Q.  Mr. Hemphill missed scheduled doctor
24 appointments for reasons other than lockdowns, correct?



Hemphill vs Wexford Health Sources, Inc.
Arthur Funk, M.D. - 03/02/2018                                                          Pages 142..145

Page 142

```
1        MR. MARUNA:  Objection; foundation.  Objection to
2   the form of the question.
3   BY THE WITNESS:
4        A.   From the record, it indicates the term no
5   provider available, which is a term as I explained
6   that's utilized to where the physician is not
7   immediately present at the clinic to see the patient.
8   So he was rescheduled for that reason.
9        Q.   And there are other notes in the record, which
10  indicate that the inmate is unable to see a medical
11  provider due to lockdown, correct?
12       A.   I believe there was a note.  I don't know that
13  for a fact.  There may have been.  At Stateville it's
14  fairly common because of it being a high maximum
15  security facility that lockdowns do occur more than at
16  other facilities.  So I may have seen it.  It wouldn't
17  surprise me or be unexpected.
18       Q.   Doctor, if you could flip to Hem 93 --
19       A.   All right.
20       Q.   -- the entry dated September 24, 2013.  What
21  does that state?
22       A.   It says, medical director appointment,
23  lockdown, no movement, rescheduled for 10/22/13.
24       MR. MCCLAIN:  I don't have any other questions.
```

Page 143

```
1   MR. MARUNA:  I've got nothing further.
2        Reserve or waive?
3   THE WITNESS:  Waive.
4             (Witness excused.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 144

```
1   UNITED STATES OF AMERICA        )
    NORTHERN DISTRICT OF ILLINOIS   )
2   EASTERN DIVISION                ) SS.
    STATE OF ILLINOIS               )
3   COUNTY OF COOK                  )
4
5        I, Alexandra Sonne, Certified Shorthand
6   Reporter and Registered Professional Reporter, do hereby
7   certify that ARTHUR FUNK, M.D. was first duly sworn by
8   me to testify to the whole truth and that the above
9   deposition was reported stenographically by me and
10  reduced to typewriting under my personal direction.
11       I further certify that the said deposition was
12  taken at the time and place specified and that the
13  taking of said deposition commenced on March 2, 2018, at
14  9:16 a.m.
15       I further certify that I am not a relative or
16  employee or attorney or counsel of any of the parties,
17  nor a relative or employee of such attorney or counsel,
18  nor financially interested directly or indirectly in
19  this action.
20
21
22
23
24
```

Page 145

```
1        In witness whereof, I have hereunto set my
2   hand of office at Chicago, Illinois, this 13th day of
3   March, A.D., 2018.
4
5
6
7
8
9
10  ALEXANDRA SONNE, CSR, RPR
    180 North LaSalle Street
11  Suite 2800
    Chicago, Illinois 60601
12  Phone:  (312) 236-6936
13
14
        CSR No.  084-004778
15
16
17
18
19
20
21
22
23
24
```



Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

5    CARL HEMPHILL,                )

                  Plaintiff,       )

6         -vs-                     ) No. 1l15-cv-04968

    WEXFORD HEALTH SOURCES, INC.,)

7    SALEH OBAISI; and HUNDLY      )

    DAVIS; LATONYA WILLIAMS;       )

8    LOUIS SHICKER; MICHAEL LEMKE;)

    and DORRETTA O'BRIEN,          )

9                  Defendants.     )

10

11          The deposition of DR. LOUIS SHICKER,

12   called for examination pursuant to the Rules of

13   Civil Procedure for the United States District

14   Courts pertaining to the taking of depositions,

15   taken before Raelene Stamm, Certified Shorthand

16   Reporter, licensed by the State of Illinois, at

17   321 North Clark Street, Suite 2800, Chicago,

18   Illinois, on the 8th day of December, 2017, at the

19   hour of 9:00 a.m.

20

21

22

23   Reported by:  RAELENE STAMM, CSR

24   License No.:  084-004445

Exhibit F

Page 2

1  APPEARANCES:
2      FOLEY & LARDNER, LLP
       BY:  MR. JASON BRITT
3      321 North Clark Street
       Suite 2800
4      Chicago, Illinois 60654
       (312)
5      jbritt@foley.com
           On behalf of the Plaintiff;
6
       CASSIDAY SCHADE, LLP
7      BY:  MR. JAMES F. MARUNA
       20 North Wacker Drive
8      Suite 1000
       Chicago, Illinois 60606
9      (312) 641-3100
       jmaruna@cassiday.com
10         On behalf of the Defendants,
           Wexford Health Sources, Inc.,
11         Saleh Obaisi, Hundly Davis and
           Latonya Williams;
12
       OFFICE OF THE ATTORNEY GENERAL
13     BY:  MR. MICHAEL C. STEPHENSON
       100 West Randolph Street
14     Chicago, Illinois 60601
       (312) 814-4752
15     mstephenson@atg.state.il.us
           On behalf of the Defendants,
16         Louis Shicker, Michael Lemke and
           Dorretta O'Brien.
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2  WITNESS                    EXAMINATION
3  DR. LOUIS SHICKER
4    By Mr. Britt
5
6
7
8           E X H I B I T S
9  NUMBER                    IDENTIFICATION
10 Shicker Deposition
11 Exhibit No. 1  Excerpt of contract    14
12 Exhibit No. 2  Letter dated 2/25/14    44
13 Exhibit No. 3  Letter dated 12/9/13    50
14 Exhibit No. 4  Letter               54
15 Exhibit No. 5  Letter               54
16
17
18      (Exhibits retained by court reporter.)
19
20
21
22
23
24

Page 4

1           (WHEREUPON, the witness was
2           duly sworn.)
3           DR. LOUIS SHICKER,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6           EXAMINATION
7  BY MR. BRITT:
8      Q.  Good morning.  Can you state your name for
9  the record?
10     A.  Louis Shicker, S-h-i-c-k-e-r.
11     Q.  And you've been deposed before, correct?
12     A.  Correct.
13     Q.  So you understand that you're under oath?
14     A.  Yes.
15     Q.  I'm going to go over some ground rules
16 that you're probably familiar with.  Please let me
17 know if you don't understand a question.  Please
18 answer questions audibly.  The court reporter is
19 taking everything down.  She can't take down head
20 nods, shrugs, things like that.  So you've got to
21 answer out loud so she can take down your answer.
22     If you need a break, let me know.  The
23 only thing I'd ask is that you just answer any
24 question that's pending before taking that break.

Page 5

1      Do you understand those rules?
2      A.  Yes.
3      Q.  Okay.  Did you review any documents to
4  prepare for this deposition?
5      A.  Yes.
6      Q.  Which documents did you review?
7      A.  The documents that the lawyer sent me.
8  They included, I think, some medical records, the
9  subpoena to come here, the interrogatories, and I
10 think the complaint of the offender.
11     Q.  Okay.  Anything else?
12     A.  No, not that I recall.  That's all.
13     Q.  And do you remember which medical records
14 you reviewed to prepare?
15     A.  Which specifically?
16     Q.  Yeah.  I mean, if you remember which
17 records you reviewed or if you could describe those
18 for me.
19     A.  There were some records about
20 Mr. Hemphill.  Is that his name?
21     Q.  Yes.
22     A.  Mr. Hemphill's care during his stay at
23 Stateville.  I don't remember the exact dates, but
24 it covered, I think, from sometime in 2013; and I

2 (Pages 2 - 5)

Page 6

1  think the last records that I saw was when he was
2  seen by an orthopedic doctor in Cottage Hill, and I
3  forget the date of that.
4      Q.   Okay.  Did you speak with anyone other
5  than your attorney to prepare for this deposition?
6      A.   No, sir.
7      Q.   You're currently employed by the State of
8  Illinois; is that correct?
9      A.   No, that's not correct.
10     Q.   Okay.  You were formerly employed by the
11 State of Illinois?
12     A.   Yes.
13     Q.   Okay.  And were you the chief of medical
14 services for the Department of Corrections?
15     A.   Right.  I call it the medical director for
16 the Department of Corrections.
17     Q.   Okay.  How long were you in that role?
18     A.   From November 2009 to June 2016.
19     Q.   And what were your responsibilities in
20 that role?
21     A.   The responsibilities for the medical
22 director is to oversee healthcare services for the
23 Department of Corrections, to help renew or create
24 or adjust policies and procedures for the

Page 7

1  department related to healthcare, to be a
2  spokesperson for the department on healthcare
3  related issues, so generally it's to cover all
4  healthcare related matters.  I would be the final
5  say.
6      Q.   Okay.  Are you a medical doctor?
7      A.   Yes, sir.
8      Q.   Okay.  Where did you go to medical school?
9      A.   Albert Einstein College of Medicine in the
10 Bronx, New York.
11     Q.   And when --
12     A.   Can I just go back?  Did I say the
13 interrogatories also were sent in the first
14 question?
15     Q.   Yes.
16     A.   I'm sorry.  I thought I forgot that.
17     Q.   So you completed medical school at
18 Einstein?
19     A.   Yes.
20     Q.   And when did you graduate from there?
21     A.   1986.
22     Q.   And did you complete a residency or any
23 other training program after completing medical
24 school?

Page 8

1      A.   Yes, internal medicine.
2      Q.   Okay.  Is that a residency?
3      A.   It was first year's internship, then two
4  years residency afterwards.
5      Q.   And did you complete those at the same
6  place?
7      A.   No.  I completed those here in Chicago at
8  Rush Presbyterian St. Luke's Medical Center.
9      Q.   For both your internship and the
10 residency?
11     A.   Yes, sir.
12     Q.   Okay.  And when did you complete that?
13     A.   1989.
14     Q.   And did you conduct any fellowships
15 afterward?
16     A.   No fellowships.
17     Q.   Okay.  Have you received any training
18 related to the diagnosis or treatment of orthopedic
19 injuries or problems?
20     A.   No direct training in orthopedics, just
21 part of primary care to be able to make certain
22 assessments of complaints related to orthopedic
23 problems.
24     Q.   Before you were the medical director at

Page 9

1  IDOC, what was the last position you had before
2  taking over as the medical director?
3      A.   So for the few months before, from July of
4  2009 until November, I was the medical director at
5  Dwight Correctional Center here in Illinois, and I
6  had had that position previously.  I went back to
7  that position.
8      Q.   Okay.  And when had you had that position
9  previously?
10     A.   So I started working there as a part-time
11 physician in 2000 -- October, I think, of 2002.
12 And then I became the medical director there in, I
13 believe, March of 2003.  I was there until the end
14 of April 2008, and then I did a stint in a private
15 practice from May 2008 until again July 2009 when I
16 went back to Dwight Correctional Center.
17     Q.   And what was that private practice?
18     A.   That was a practice in Arlington Heights,
19 mostly primary cares.
20     Q.   And what was the name of that practice?
21     A.   It was called, Physician Care, Ltd.  It no
22 longer exists.
23     Q.   Okay.  When you were in your role as the
24 medical director at IDOC, did you have

3 (Pages 6 - 9)

Page 10

1 responsibilities to supervise --
2    A.   Sorry.
3          (Short interruption.)
4    THE WITNESS:  Yes.
5 BY MR. BRITT:
6    Q.   I'll start that over.
7    A.   That's not a strategy.
8    Q.   When you were the medical director at
9 IDOC, did you have responsibilities to supervise
10 medical directors at correctional centers?
11    A.   You'll have to clarify what supervise
12 means.
13    Q.   Did you monitor the performance of medical
14 directors at the facility level?
15    A.   Okay.  So the answer to that is, no,
16 because they were not my employees.  They were
17 employees of the vendor, so the vendor had do the
18 monitoring of their performance.  I was certainly
19 in contact with vendors if there was a concern
20 about a particular provider's performance.
21    Q.   Did you ever communicate with the vendor
22 about Dr. Obaisi, the medical director at
23 Stateville?
24    A.   In general terms or performance or --

Page 11

1    Q.   In general terms.
2    A.   Sure.
3    Q.   What kind of communications did you have
4 about Dr. Obaisi?
5    A.   Well, Dr. Obaisi had been in the
6 department for many years, so I was -- he was I
7 think a long time at Logan Correctional Center, and
8 then he was going to move up to Stateville for -- I
9 forget the exact reasons.  I think it was family
10 related.
11         So I interacted with him often.  I saw him
12 at the meetings that we had.  Whenever I would
13 review with Wexford their positions, we would go
14 over physician's care, and he would be part of that
15 conversation.
16    Q.   Now, you say you went over physician's
17 care.  Did you have any communications with Wexford
18 about the care that Dr. Obaisi delivered at
19 Stateville?
20    A.   You mean concern about his care?
21    Q.   Concern or even just any sort of review of
22 the quality of care he was giving?
23    A.   I don't recall having any formal review,
24 but I again do not recall any major concerns about

Page 12

1 the adequacy of the care he was providing.
2    Q.   Okay.  Were there any concerns that you
3 had that weren't major?
4    A.   Now this is several years ago.  I don't
5 recall anything specific.  He -- I remember he had
6 some health issues that was of a concern at one
7 time.  That's really -- that's really it that I
8 recall.
9    Q.   Okay.  And were those health issues that
10 you were concerned would impact his performance at
11 the facility?
12    MR. MARUNA:  Objection, form, vague.
13    THE WITNESS:  I mean, again as I recall, they
14 were related to his heart.  So it could potentially
15 cause him difficulty in performing his duties, but
16 I did not know of any problem.
17 BY MR. BRITT:
18    Q.   And about when did these concerns arise?
19    A.   I don't recall the date.
20    Q.   Okay.  Do you remember about what year?
21    A.   2015 or so, that's what I would guess.
22    Q.   And what was the outcome of any
23 communications that you had with Wexford about
24 those concerns?

Page 13

1    A.   Dr. Obaisi returned to work when he was
2 cleared to work by his doctors and when he felt up
3 to it, and there was into restriction.
4    Q.   Okay.  Did he take time off from work?
5    A.   He took some time.  I don't remember how
6 long, but he took some time.
7    Q.   Did you interview Dr. Obaisi before he
8 took the position at Stateville?
9    A.   No.  He had already been a medical
10 director within the system, so he was just moving
11 from one place to another.
12    Q.   Had you interviewed him before he became
13 medical director at the other facility?
14    A.   No.  He preceded me.
15    Q.   What steps did you take to monitor the
16 performance of medical directors at the facility
17 level?
18    MR. STEPHENSON:  Objection, mischaracterizes
19 testimony.  I believe he testified that he didn't
20 monitor the performance.
21    MR. MARUNA:  Join in the objection.
22    THE WITNESS:  Right.  So that's correct.  So I
23 didn't do any formal monitoring of medical
24 directors.  I just had conversations with Wexford

4 (Pages 10 - 13)

Page 14

1 when the need arose or sometimes general
2 conversations.
3        And what was the rest of the question?
4 BY MR. BRITT:
5    Q.  Just what steps did you take to monitor
6 their performance?
7    A.  That answers it.
8    MR. BRITT:  Okay.  I'll show you what will be
9 marked as Exhibit 1.
10        (WHEREUPON, Shicker Deposition
11         Exhibit No. 1 was marked for
12         identification.)
13 BY MR. BRITT:
14    Q.  So I'll represent to you that this is an
15 excerpt, but can you tell me what this is?
16    A.  This is the contract between the State of
17 Illinois Department of Corrections and Wexford
18 Health Services --
19    Q.  And --
20    A.  -- for the care of -- for the medical
21 services at the correctional facilities in
22 Illinois.
23    Q.  Are you -- were you familiar with this
24 document while you were working for IDOC?

Page 15

1    A.  Yes.
2    Q.  So I'll have you turn to I believe it is
3 Page 4 of this contract and direct you to
4 Section 2.2.1.1.
5        Are you the or were you during the time
6 period from 2013 to 2016 the IDOC medical director
7 referred to there?
8    A.  Yes.
9    Q.  And in the responsibilities that are
10 listed in that Section 2.2.1.1, are there any
11 responsibilities that go beyond what we've
12 discussed as your role with the State?
13    A.  No.
14    Q.  Okay.  So I'll direct you to Subsection A
15 there where it says that you oversee the medical
16 services for correctional centers.  Can you tell me
17 what you did when you were the medical director to
18 fulfill that responsibility?
19    A.  Yes.  We have what's called a QI program,
20 a quality insurance program, a quality improvement
21 program, and so each facility had a monthly review
22 of the services that they provided.  And at that
23 monthly review, one of my correctional nurses that
24 worked for me who was assigned to that facility

Page 16

1 would attend, and she would ultimately -- would
2 subsequently report to me about what was going on
3 there.
4        And then once a year there was an annual
5 meeting where we reviewed the entire year's worth
6 of those meetings and the healthcare at each
7 facility.  Now, those meetings I would attend.  I
8 would also go to facilities as needed, so, you
9 know, it wouldn't just be once a year.  It would
10 be, depending on the facility, multiple times a
11 year that I would visit a facility.  But those were
12 the formal.
13        Those quality improvement programs were a
14 review of almost all if not all, healthcare related
15 issues.  So it included utilization management,
16 emergency room visits, mortality, morbidity, new
17 diagnoses, contract monitoring, studies that they
18 were doing on the care, grievances.  There's a few
19 more.  I think there was a list of about 12 items
20 that we went through, and they would have to report
21 on those; and if there was a problem, we would try
22 to develop a plan to deal with those problems.
23    Q.  Okay.  So I'll step through some of those.
24 So you mentioned that there were monthly reviews at

Page 17

1 the facility level that you had a nurse attend,
2 correct?
3    A.  Correct.
4    Q.  And what kind of issues were reviewed
5 during those monthly review meetings?
6    A.  The same that I mentioned in the previous
7 question.  There's -- there was actually an
8 administrative directive about the -- about these
9 reviews or reports.  And I think it's either 12 or
10 13 areas that they go through on a regular basis.
11    Q.  And is a written report generated from
12 these meetings?
13    A.  The facility has a written report, yes.
14    Q.  Does the facility maintain those reports?
15    A.  Yes, they do.
16    Q.  Do you know for how long?
17    A.  I don't know exactly.  I would say several
18 years.
19    Q.  And for the annual meetings, did those
20 review the same issues?
21    A.  The same issues, but a little bit of a
22 different format.  I mean, can't go through every
23 single month.  It was more summarized.  Each area
24 was summarized for me, and if I had questions, we

5 (Pages 14 - 17)

1 would go through them in more detail.
2    Q.  And were there reports generated as a
3 result of the annual review process?
4    A.  Yes.
5    Q.  And where are those kept?
6    A.  They're kept at the facility.  I used to
7 keep a copy in my office also.  I don't know if
8 they're still there or not.
9    Q.  And did you say that reviewing inmate
10 grievances was part of that process?
11    A.  Yes.  I mean, not specific grievances, but
12 just the numbers, ones that were found with merit,
13 how they dealt with them, things like that.
14    Q.  Now, focusing on the 2013 to 2015 time
15 frame, do you remember any issues that arose with
16 the monthly or the annual reports at Stateville?
17    A.  It's really difficult to remember specific
18 issues.  I can say that I'm sure there were issues.
19 What I recall from Stateville, and I cannot say
20 from 2013 to 2015 --
21    Q.  Okay.
22    A.  -- you know, sometimes there were issues
23 in contract monitoring for staffing.
24        Nursing staffing particularly was

1 difficult at times there, and we were trying to
2 revamp their sick call process as well.  Those are
3 the two main areas I remember.  And another area is
4 offsite visits to UIC.
5    Q.  So going through those, you mentioned
6 contract monitoring for staffing was an issue.  Can
7 you explain what you mean by that?
8    A.  Yeah.  The contract has a certain staffing
9 level that the vendors require to meet, and there
10 were gaps in nursing care mostly occasionally with
11 medical staff, mid levels and medical director.
12 But nursing was, as I recall, more of a difficult
13 issue.
14    Q.  And did that result in patient care
15 issues?
16    A.  It's hard to answer that question exactly.
17 It resulted in people having to do overtime and
18 sometimes working with a lower staffing capability
19 to take care of the patients there.  So potentially
20 it can cause a problem in getting to see certain
21 patients on sick call, et cetera, like that.
22    Q.  And you mentioned there were issues with
23 sick call, you know, beyond the nurse staffing
24 issues.  What issues do you remember coming up at

1 Stateville about the sick call process?
2    A.  Right.  So sick call what I'm referring to
3 is when an offender wants to be seen by healthcare
4 for an acute problem.  There was a process for that
5 person to see the nurse first.  He would submit a
6 kite or a request to be seen, and then the nurse
7 would schedule that person to be seen and see them.
8 And if by her protocol she can handle the problem,
9 she took care of it.  If she couldn't, then she
10 would refer out as necessary.
11        So by the contract and by what we were
12 trying to achieve by some national guidelines is to
13 get that person seen within a certain period of
14 time of the kite being submitted to make sure the
15 kites were reviewed within again a certain period
16 of time.  So what we had found is that there are
17 often delays in meeting those time periods.
18    Q.  And again these are delays that you saw
19 being reported at Stateville?
20    A.  Yes.
21    Q.  And you think that was during the -- at
22 some point in the 2013 to '15 time frame?
23    A.  I mean, you know, it wasn't a problem that
24 happened just for, you know, a month.  This was a

1 process we were working on for a while.  We
2 ultimately went to what's called, open sick call,
3 which was a -- it worked out much better, and I
4 think they're continuing to use that.
5    Q.  Okay.  And when did they implement that
6 program?
7    A.  That's a good question.  I don't know
8 exactly.  It was a year or two before I left.
9    Q.  And what's the difference between open
10 sick call and the process that was in place before?
11    A.  Right.  So an open sick call basically
12 says that the patient sign up on the previous night
13 that they want to be seen for an acute problem.
14 The nurses go to every unit and will see whoever
15 signed up for sick call on the previous night the
16 next day.
17        So that ensured that anybody with an acute
18 problem was at least being screened initially.  And
19 the goal was that if they could be seen quickly,
20 then the numbers of people needing to be seen on a
21 regular basis would decrease.  And from what I
22 recall, again when I was still there, I don't know
23 what it is now, it worked out very well.  Everyone
24 was very happy with it.

1    Q.   And I think you mentioned one of the other
2  issues that came up was getting inmates seen off
3  site at UIC.  Can you explain that a little bit
4  more for me?
5    A.   Yeah.  So the four or five, one closed
6  down, northern Illinois sites did their outpatient
7  consultative services if they were nonemergent at
8  the University of Illinois.  We had an arrangement
9  with the University of Illinois to provide those
10 services for the inmates.
11        And I don't know if it's written in the
12 contract or not, I think it is, that there were --
13 that for those four sites, let's leave Dwight out
14 because they closed.  For those four sites there
15 was going to be about a total of 180 consults per
16 month, about 8 or 9 per day.  And a certain amount
17 of hospitalizations were permitted as well.  And so
18 the problems that we had were coordinating
19 scheduling with the University of Illinois so that
20 there wouldn't be long delays in getting people in
21 to see their consults.
22    Q.   When you say problems with coordinating,
23 what kind of problems did you see?
24    A.   Again, the clinics at the university, they

1  saw the community patients as well, and they would
2  see our population.  And so some of them would only
3  see on certain days.  Some of them would only see a
4  certain number per week.  So trying to get them
5  scheduled within a reasonable period of time
6  sometimes was difficult because of what was going
7  on at the university with their clinics.  Sometimes
8  there was a security problem on our side.  So
9  sometimes, sometimes, you know, patients were not
10 seen for a consultative problem for a while.
11    Q.   And when you say security issues on your
12 end would interfere with scheduling, what does that
13 mean?
14    A.   Yeah.  So if there was a specific lockdown
15 due to security concerns, sometimes that would be a
16 problem.  Usually not, but sometimes.  If there
17 was -- if there was a lack of, let's say, someone
18 needed an AVA van, a specific van to travel, and
19 that was not available or if they didn't have
20 enough staffing, there was too many people going
21 out at the same time, and on that day they could
22 not provide the security with the patient going
23 out, those types of things.
24    Q.   Were there any procedures in place to make

1  sure that when a consult was requested at UIC to
2  make sure that that took place in a timely manner?
3    A.   We tried very hard.  We had meetings with
4  UIC often and with Wexford and the department.
5  And, you know, we made progress in certain places,
6  and certain places were difficult.  There was some
7  specific consultative services that took longer
8  than others.  We work with them.  And then the
9  direction was that if someone could not be seen
10 within a reasonable period of time and it wasn't --
11 it was getting -- it was a situation where we
12 thought that he needed to be seen and could not
13 wait, then we would have them go to a local
14 provider.
15    Q.   And who was responsible for making sure
16 that when a consult was requested, that it was
17 carried out in a reasonable period of time?
18    A.   It was a coordination between the facility
19 and Wexford.
20    Q.   And which individuals took part in that
21 process?
22    A.   At the facility?
23    Q.   Yes.
24    A.   It was mostly done by their medical

1  records department, I believe.  But, you know,
2  again at one point Wexford had offered to put
3  someone at UIC, one of their employees there to try
4  to help them with staffing.  Wexford offered to
5  have their -- one of their own people in Pittsburgh
6  be essential go-to person to help with -- to sort
7  out who needed to be seen quicker than others.
8  Those are the types of things that were tried over
9  time.
10    Q.   When you say that at the facility that the
11 medical records department was responsible for
12 that, are those medical personnel or -- I'm just
13 trying to make sure I understand who was actually
14 keeping an eye on this to make sure people were
15 seen properly.
16    A.   Right.  So the medical records people are
17 not medical -- are not medical personnel.  Many of
18 them have training in medical records or in coding
19 or things like that.
20    Q.   Did the medical professionals at the site
21 have any responsibility to make sure that consults
22 were carried out quickly?
23        MR. MARUNA:  Objection to the form of the
24 question, vague.

7 (Pages 22 - 25)

Page 26

1    THE WITNESS:  It's a hard question to answer.
2  Certainly if they felt that someone needed to be
3  seen that was not being seen, the expectation would
4  be that they would bring that to their supervisor
5  and say, I have a problem here with someone I can't
6  get an appointment for, and they would try to work
7  something out to get them seen either quicker there
8  or someplace else.
9  BY MR. BRITT:
10   Q.  And where did that expectation come from?
11   A.  Well, it certainly came from me and my
12  office, and I conveyed that to Wexford on several
13  times.
14   Q.  And do you remember when you would have
15  conveyed that to Wexford?
16   A.  When specifically?
17   Q.  Or even generally.  If you don't remember
18  exact dates, obviously that's fine, but if you
19  remember generally when you communicated that to
20  them.
21   A.  No.  This was -- intermittently this was
22  done.  I can't give you an exact time or even how
23  often it was done.  But the four sites, if there
24  were delays, we had instructed them or had asked

Page 27

1  them to go to local providers.  And they certainly
2  did that in Dixon.  They did that sometimes at
3  Stateville as well.  Pontiac occasionally, and not
4  so much was needed at Sheridan.
5   Q.  And do you remember if you had conveyed
6  this expectation to Wexford by 2013?
7   A.  I'm sure it had been discussed by then.
8   Q.  Okay.  And was it discussed further in the
9  2013 to 2015 time period?
10   A.  I can't tell you specifically.  I can tell
11  you that this was a recurrent issue, so it came up
12  multiple times.
13   Q.  During that time period, do you think?
14   A.  I really don't --
15   MR. STEPHENSON:  Objection, asked and answered.
16   THE WITNESS:  I really can't answer a hundred
17  percent.
18  BY MR. BRITT:
19   Q.  Aside from what you've already told me,
20  were there any efforts that you made or that
21  Wexford made to improve the coordination issues
22  with UIC while you were the medical director?
23   MR. STEPHENSON:  Objection, compound.
24   MR. MARUNA:  Join in the objection, add

Page 28

1  foundation.
2    THE WITNESS:  So can you explain the question?
3  BY MR. BRITT:
4   Q.  Sure.  I'll see if I can rephrase.
5    While you were the medical director, what
6  steps did you take other than what you've already
7  testified to to improve coordination with UIC for
8  outside consults?
9   A.  Those were the main steps that we took.
10  The other thing that we were looking into, but it
11  didn't come to fruition in other areas, was trying
12  to have a telemedicine program started in certain
13  specialties.  We had telemedicine for Hepatitis C
14  and HIV.  And we were exploring possibilities of
15  doing that for other services.  Now, I don't know
16  if they have it now, but while I was there, it was
17  not -- it did not come to be in the medical care --
18  in the medical services.
19   Q.  And are you aware of any efforts that
20  Wexford took to improve this coordination other
21  than what you've already testified to?
22   A.  No.
23   Q.  So going back to this contract, that
24  Section 2.2.1.1, Sub B, says, you know,

Page 29

1  responsibilities to provide medical direction to
2  vendor and IDOC medical staff.
3    What does that mean, to provide medical
4  direction?  How did you do that?
5   A.  Again, so that's through our
6  administrative directives for our clinical
7  guidelines, if there was a question that came up
8  about specific healthcare issues.
9   Q.  What kind of clinical guidelines are you
10  talking about?
11   A.  We had guidelines for chronic care,
12  chronic disease.  So those covered -- do you want
13  the specifics?  These covered hypertension,
14  diabetes, asthma, seizures, few others.
15   Q.  Sure.  Were there clinical guidelines for
16  conditions or injuries other than those sorts of
17  chronic conditions?
18   A.  From my office?
19   Q.  Sure.
20   A.  Other than the ADs which really don't
21  cover specific conditions usually, no.
22   Q.  Were there clinical guidelines issued by
23  offices other than yours?
24   A.  Clinical guidelines, no.  The only other

8 (Pages 26 - 29)

Page 30

1 guideline I should have mentioned are the nursing
2 protocol guidelines.
3    Q.   And what were those?
4    A.   Those are -- as I mentioned earlier when a
5 patient had a specific problem, so there were
6 nurses who saw that patient first.  And they would
7 have -- there was a booklet of specific complaints
8 that offenders might have that they would have to
9 make sure that they went through the protocols in
10 those guidelines.
11    Q.   And who issued those nursing protocol
12 guidelines?
13    A.   Those came from our office.  They were
14 updated every so often.
15    Q.   And do you remember were those in place in
16 the 2013 to '15 time period?
17    A.   Yes.
18    Q.   Were there any other steps that your
19 office took to provide medical direction under this
20 contract?
21    A.   I mean, we had quarterly meetings where we
22 would review things that came up, questions that
23 came up in the past quarter.  They would be gone
24 over with the entire group.  We would have an

Page 31

1 educational program at those meetings as well.
2 Those are the types of things.
3    Q.   And what kind of issues did those
4 quarterly meetings address?
5    A.   So they addressed problems that we saw,
6 let's say, in pharmacy or in other areas that we
7 would discuss.  And I would try to get a sense of
8 who else is having the problem, how other places
9 have dealt with the problem, is there a unique
10 situation here, those types of things.
11    Q.   And who participated in those meetings?
12    A.   So I ran those meetings, and we usually
13 had a guest lecturer.  And then we would have every
14 site would send their medical director and their
15 healthcare unit administrator.  Their director of
16 nursing usually they would send them, and
17 occasionally some wardens, usually assistant
18 wardens would attend.  And really the sites were
19 allowed to invite anybody in their facility that
20 they felt needed to be there, so there were some --
21 certainly the vendor, the vendor was there with
22 some of the upper level vendors.  Some of the
23 supervisory staff of the vendor were there as well.
24    Q.   And did these quarterly meetings ever deal

Page 32

1 with issues at the specific facility level?
2    A.   Well, it wasn't a -- you know, it wasn't a
3 talk between me and that facility.  It was, hey,
4 this facility is having Problem A.  How does the
5 southern region deal with this specific problem?
6 Has anybody else had this problem in communication?
7 You know, those types of things.
8    Q.   Were there issues specific to Stateville
9 that were brought up at these quarterly meetings?
10    A.   Okay.  So Stateville, there's -- see, when
11 you say Stateville, if you mean just the --
12 Stateville and RNC kind of go a little bit
13 together.  So Stateville had -- Stateville had the
14 RNC which has its own issues because they're an
15 intake facility.
16         So a lot of issues came up with RNC
17 because RNC was doing the intake, and they would
18 distribute the patients to the other facilities.
19 So there had to be a lot of coordination in making
20 sure the records were sent and they knew the
21 patients were coming, so that was that was often
22 discussed, okay.
23         Stateville, per se, you know, they had the
24 dialysis unit, so sometimes issues related to

Page 33

1 dialysis.  They were one of the University of
2 Illinois users, so that was an issue that came up.
3 You know, in general, in corrections, some of the
4 long-term patient care issues come up at the
5 maximum care facilities because the patients are
6 there the longest, they probably have a little bit
7 of an older population.  So come of the things come
8 up I wouldn't say necessarily only Stateville, but
9 as a maximum facility, as a maximum level, they had
10 certain problems as did other maximum level
11 facilities.
12    Q.   And you said the issue with the University
13 of Illinois came up at these meetings.  Do you
14 remember what was discussed about University of
15 Illinois referrals at these meetings?
16    A.   Yeah.  Again, so there was a couple of
17 issues.  One was, you know, making sure that we can
18 get coordination and try to improve care.  Because
19 it was four facilities we were talking about, five
20 when I started.  The other thing was sometimes
21 there were people in the central and southern
22 regions that needed tertiary care services in their
23 local communities or even in some of the other
24 places.  They were not either willing or unable to

9 (Pages 30 - 33)

Page 34

1 deal with a difficult medical problem. So there
2 were questions about transferring them to
3 Stateville or one of the northern facilities so
4 that they could get care or could be seen at the
5 University of Illinois. So exactly how to
6 coordinate that was done through my office, but we
7 talked about things like that.
8    Q.  Do you remember any discussion at these
9 quarterly meetings of how to improve or expedite
10 referrals to UIC for specialist care?
11    MR. STEPHENSON:  Objection, asked and answered.
12    THE WITNESS:  Yeah, that wasn't really the
13 focus of this meeting.
14 BY MR. BRITT:
15    Q.  Did you ever receive or hear of any
16 complaints from inmates at Stateville about how
17 long it took to execute a referral to the
18 University of Illinois?
19    A.  I received lots of letters from offenders
20 about complaints of care. Whether that was one of
21 them, certainly I'm sure over the years there were
22 letters saying that I'm supposed to go see, I'm
23 supposed to be followed up, and it's not happening.
24 Things like that I'm sure I got.

Page 35

1    Q.  And did you receive complaints like that
2 prior to 2013?
3    A.  Prior to 2013, I would think so.
4    Q.  Okay.  Did you ever get any such
5 complaints about referrals for MRIs?
6    A.  That patients wanted to have an MRI?
7    Q.  That they wanted to have an MRI or that
8 they had been referred for an MRI, and it wasn't
9 happening fast enough?
10    A.  Yeah.
11    MR. MARUNA:  Objection, foundation.
12    THE WITNESS:  I don't recall the latter about
13 being referred for an MRI and not happening.
14 Certainly there were complaints that patients felt
15 that they needed to see a specialist or they needed
16 to get a study done, and it wasn't being ordered.
17 BY MR. BRITT:
18    Q.  Okay.  And did you take any action in
19 response to receiving these complaints?
20    A.  So with the letters, my general policy for
21 letters, and there is no written policy for it, was
22 to review the letter; and if I felt there was a
23 significance to the complaint or something that I
24 wanted to check up on, I would get in touch with

Page 36

1 the facility provider that was seeing that patient.
2 This was almost always done by e-mail, but
3 occasionally by phone. And I would get a summary
4 or a status of what they were doing, and then based
5 on that, I would respond to the letter.
6    Q.  So I'm thinking of the time period from
7 2013 to '16 when I ask this, but other than the
8 contract, the excerpt of which you have as
9 Exhibit 1 there, other than that contract, is there
10 anywhere I'd go to see where Wexford's
11 responsibilities for patient care are defined?
12    A.  I don't think so.
13    Q.  So again thinking of the 2013 to '16 time
14 frame, are you familiar with the grievance process
15 at Stateville?
16    A.  I'm familiar in general with the grievance
17 process.
18    Q.  Okay.  For a medical grievance, do you
19 know who reviews those grievances?
20    A.  So the general process is that an offender
21 submits a grievance, and there's a grievance
22 officer that's assigned to review those grievances.
23 And that officer is supposed to distribute it to
24 the appropriate people for research and response --

Page 37

1 review and response.
2    Q.  And who are the appropriate people for a
3 medical grievance?
4    A.  It would normally start with the
5 healthcare unit administrator.
6    Q.  And is that a medical professional or
7 someone else?
8    A.  It was almost always a registered nurse.
9    Q.  And do you know if it was a registered
10 nurse at Stateville during that time period?
11    A.  Yes, it was.
12    Q.  Okay.  Do you remember who that was?
13    A.  Well, they changed their healthcare unit
14 administrators over my time, so I don't know
15 exactly who was there.  But there was Royce Brown.
16 There was -- I don't know if Cindy Garcia was a DON
17 or a healthcare unit administrator.  There were
18 others.  I can't remember their names.  So but all
19 of those are registered nurses.
20    Q.  Okay.  And with that HC administrator, is
21 that the person who would provide input on whether
22 the grievance should be approved or denied?
23    A.  Well, it's not so much of approved or
24 denied.  I think the response is whether there was

10 (Pages 34 - 37)

1 merit to the complaint or not. So that person
2 would try to find out the information, you know,
3 normally you wouldn't want the person being grieved
4 against to respond to a grievance. You want to get
5 more of an objective response, so she or he would
6 gather some information and make the
7 recommendations.
8     Q. And what would those recommendations be
9 based on? What criteria were used?
10     A. You know, it depended. A lot of it
11 depended on what the complaint was. I mean, if the
12 person was complaining he's not getting his
13 medications, for example. So she would look at the
14 MAR, the medication administration record, and see
15 if he was getting it. And if he was, then she
16 would say, well, I have this listed, if he refused.
17 So she would respond based on the facts she found
18 out. And if there was a problem distributing the
19 medication, she would be responsible for making
20 sure that that was corrected.
21     Q. And is there an exercise of a medical
22 professional judgment in reviewing that
23 information?
24     A. Well, can you explain the question better?

1     Q. I can try.
2     A. Okay.
3     Q. Was the HCU administrator reviewing the
4 grievance, was that person relying on their medical
5 training to decide whether, you know, inmate
6 was being properly treated?
7     MR. STEPHENSON: Objection, speculation.
8     MR. MARUNA: Join in the objection.
9     THE WITNESS: You know, the expectation is that
10 the person responding to that grievance would
11 respond only in areas that that person was
12 qualified to respond to. If there was a specific
13 medical concern that the person was bringing up
14 that that person did not have knowledge about or
15 did not have enough knowledge about, then she would
16 go to the person who did.
17 BY MR. BRITT:
18     Q. Okay. And for -- when you say that the
19 HCU administrator would go to the person who did
20 have that knowledge, were they strictly talking to
21 people on site at the facility or could they go
22 outside the facility to ask specialists whether
23 appropriate care was being given?
24     MR. STEPHENSON: Objection, foundation.

1     MR. MARUNA: Join in the objection.
2     THE WITNESS: All right. It would be very
3 unusual for them to go outside to specialists. It
4 would not be unusual for them to ask me.
5 BY MR. BRITT:
6     Q. Did the HCU administrator have the final
7 say in whether a grievance would be -- in deciding
8 whether a grievance had merit?
9     MR. STEPHENSON: Objection, foundation, also
10 mischaracterizes his testimony.
11     MR. MARUNA: Join in the objection.
12     THE WITNESS: So, you know, it's been a long
13 time since I reviewed the AD for grievances, so I
14 don't know if that is accurate. There may be the
15 assistant warden of programs or warden, so I don't
16 know where that final say. I do know that once the
17 offender got the grievance back, you know, the
18 answer, that, you know, they had the right to
19 appeal it to the administrative review board,
20 things like that.
21 BY MR. BRITT:
22     Q. And what's the administrative review
23 board?
24     A. That's a second level of central office in

1 Springfield that would get complaints. That's the
2 process. They went through the grievance process a
3 few times. It didn't work or they're not happy
4 with the results, so they're going to someone
5 outside the facility. And they have a staff that
6 would review them, and they would do their
7 investigation; and if it was a medical question
8 that they had, they sometimes would send it to me
9 for a response.
10     Q. Who or what was the -- I'm sorry. Let me
11 start over.
12     Who sat on the administrative review
13 board?
14     A. I can't give you the names. I don't know.
15 It was a group of people.
16     Q. Did you ever sit on the ARB?
17     A. No.
18     Q. Okay. Did you have any responsibilities
19 for overseeing or developing the medical grievance
20 process?
21     A. No.
22     MR. MARUNA: Objection to foundation. That's a
23 medical grievance process.
24

11 (Pages 38 - 41)

1 BY MR. BRITT:
2     Q.   What about for ensuring that grievances
3 related to medical issues were properly addressed,
4 did you have any responsibilities in that regard?
5     MR. STEPHENSON:  Objection, vague.
6     THE WITNESS:  Can you clarify a little bit for
7 me before I respond?
8 BY MR. BRITT:
9     Q.   Sure.
10      So when a -- as part of your role as the
11 medical director at IDOC --
12     A.   Yes.
13     Q.   -- did you do any work on or otherwise
14 supervise the process for addressing grievances
15 related to medical issues at the facility level?
16     A.   Okay.  So I had no formal role in the
17 grievance process, but as mentioned earlier, the
18 grievance -- the grievances on a monthly basis,
19 numbers, how many were found with merit, were
20 reviewed.  And then on an annual basis, they were
21 also reviewed.
22      So although I would not go through every
23 single grievance, I would get a sense of what
24 people are grieving.  And, you know, sometimes if I

1 felt that they were being too, what's the word, too
2 strict in terms of, you know, not finding merit; in
3 other words, that they were being overly -- I don't
4 know the term, that they were not finding merit to
5 anything.  Then I would think that there's a
6 problem, and I would try to find out, well, what
7 types of things are you finding merit for, what
8 types of things are you not.  And I may look more
9 closely at specific grievances.  Those are the
10 types of things.
11     Q.   Did you ever see that kind of an issue
12 with Stateville?
13     A.   Yeah, I cannot remember.
14     Q.   Okay.  I'll be a bit more specific.  Did
15 you ever see an issue with Stateville, you know, a
16 disproportionate number of grievances being found
17 to have no merit?
18     A.   Being found to have no merit?
19     Q.   More than you would have expected.
20     A.   Not that I recall.
21     Q.   Do you remember reviewing any grievances
22 submitted by the plaintiff in this case, Carl
23 Hemphill?
24     A.   No, I don't.

1     Q.   Did you ever discuss Mr. Hemphill with
2 anyone at Stateville?
3     A.   Well, part of the medical record that was
4 sent to me was I had written a letter to him, so
5 usually if I'm writing a letter to him, then I was
6 getting some information, so -- although, I have no
7 personal recollection.  Just by my practice, I
8 would say, that I would have had to have spoken to
9 someone about him.
10     MR. BRITT:  I'll show you what I'll have marked
11 as Exhibit Number 2.
12      (WHEREUPON, Shicker Deposition
13       Exhibit No. 2 was marked for
14       identification.)
15 BY MR. BRITT:
16     Q.   Is that the letter you're referring to?
17     A.   Yes.
18     Q.   And did you write this letter?
19     A.   Yes.
20     Q.   And why did you write this?
21     A.   Well, as it says in the beginning, there
22 was a complaint made to what's called GOCA,
23 Governor's Office of Citizen Action, I think I left
24 out the A, where he submitted a complaint.  And

1 their office forwarded that complaint to me, so
2 therefore I looked at the matter and responded.
3     Q.   And what did you do to look into the
4 matter?
5     A.   Okay.  So I don't remember exactly, but I
6 can tell you my general practice was to contact the
7 facility medical director.  And with that contact I
8 would cc the healthcare unit administrator, the
9 supervisor of that medical director from Wexford
10 which was Dr. Funk, and my nurse that covered that
11 facility which was -- I forget.
12      And I would ask them to update me on this
13 gentleman's condition, what's being done, and that
14 would -- there would usually be an e-mail chain
15 with that.  And based on those responses, I would
16 respond to the patient.  If it merited more
17 investigations, then either I would have my nurse
18 do it or I would ask them for more information.
19 And usually, again, usually I would respond to the
20 letter, and I would keep a copy in my office along
21 with the e-mail correspondences with that.
22     Q.   And do you remember any of the
23 communications you had with Wexford or anyone else
24 related to Mr. Hemphill?

12 (Pages 42 - 45)

Page 46

1    A.  No, sir.
2    Q.  So looking at the letter, the second
3 paragraph says that the decision for an MRI is a
4 clinical one and depends on functionality.  Can you
5 just explain what that means?
6    A.  Right.  So what this means is that a
7 person who is in our correctional system, if he has
8 an orthopedic type of complaint whether it be a
9 knee or hip or shoulder, so that I would -- the
10 decision for getting an MRI on that person is
11 mostly based on the exam.  The clinical means a
12 physical exam.  Functionality means how much this
13 is affecting his day-to-day function at the
14 facility, more specifically, whether he can hold
15 down a job, whether he can whether he can partake
16 in activities.  Those are the types of things that
17 we're looking at.
18    Q.  And did you review any clinical findings
19 or findings regarding Mr. Hemphill's functionality
20 before writing this letter?
21    A.  So I can't answer that question.  I would
22 have to check the e-mails that I got related to
23 him.
24    Q.  Is that because you don't remember

Page 47

1 reviewing those records?
2    A.  I don't remember anything about
3 Mr. Hemphill, so I need something to jar my memory.
4 And those e-mails would be, you know, specific
5 questions, and there should be a specific response.
6    Q.  Now, in the next sentence of this letter
7 you say Dr. Obaisi has been following you and
8 treating you symptomatically.  What does that mean
9 to say, treating you symptomatically?
10    A.  I think based on some of the records I
11 saw, one of his complaints was pain.
12 Symptomatically means treating the pain and
13 treating the inflammation.
14    Q.  So when you are treating the pain and
15 inflammation, does that deal with the underlying
16 medical issue that gives rise to that pain and
17 inflammation?
18    A.  Sometimes yes, sometimes no.
19    Q.  So just to make sure I'm clear.  Before
20 drafting this letter, who would you have spoken to
21 or otherwise communicated with about this case?
22    A.  So my general practice is the medical
23 director at the facility, and that would be the --
24 who the e-mail would be addressed to, but cc'ed on

Page 48

1 that e-mail or maybe addressed to as well would be
2 the facility medical -- the facility healthcare
3 unit administrator, the medical director's regional
4 supervisor from Wexford which I believe was
5 Dr. Funk, and my regional nurse that was covering
6 that site.
7        And as you -- in the letter, again I don't
8 like to offer things, but as in the letter, my cc
9 of my response is all the people that may have some
10 involvement in his care.  So I -- since this came
11 from the governor's office, I included the director
12 of the department and then the chief of programs
13 within the department, the chief of the constituent
14 services.  So those are the people who are sending
15 me this letter basically, and then the warden at
16 Stateville, the medical director, and Royce V.
17 Brown, and Martha Ross is my regional nurse, and
18 then Dr. Funk.
19    Q.  Okay.  Would you have relied upon
20 Dr. Obaisi as the medical director to provide
21 information about the care being given to
22 Mr. Hemphill?
23    A.  In general, yes.
24    Q.  And are there any other sources of

Page 49

1 information about the care being given to
2 Mr. Hemphill that you would have used?
3    A.  Again, some of it would depend on what I
4 found or if there were any concerns or red flags
5 that were raised making me decide to go further.
6    Q.  And what kind of red flags do you mean?
7    A.  Well, you know, not about his case, but I
8 can give you other examples.  If someone said, if
9 someone was complaining that they're having, let's
10 say, bleeding from their rectum, and it's not being
11 addressed.  And I noticed that there was a
12 hemoglobin that was kind of low, and he had not had
13 a workup for it.  Then I would contact probably
14 Dr. Funk or Dr. Obaisi and say, hey, this guy needs
15 to get worked up.  There's something going on over
16 here, what's going on.
17    Q.  And that's based on your medical
18 experience reviewing the complaint that comes in?
19    A.  Yes.
20    Q.  So this Exhibit 2 -- I'll show you what
21 will be marked as Exhibit 3.  The letter that you
22 wrote, is it in response to this letter?
23
24

13 (Pages 46 - 49)

Page 50

1      (WHEREUPON, Shicker Deposition
2      Exhibit No. 3 was marked for
3      identification.)
4    MR. STEPHENSON: Want to take a quick five?
5    MR. BRITT: Yeah, we can take a quick five.
6      (WHEREUPON, a short recess was
7      taken.)
8  BY MR. BRITT:
9    Q. So going back to Exhibit 2, the letter
10 that you wrote, is that in response to the letter
11 that's been marked as Exhibit 3?
12   A. I mean, usually there's a heading of GOCA,
13 but seems reasonable to say that this is that
14 letter.
15   Q. Okay. And in this letter, Mr. Hemphill is
16 complaining of shoulder pain that he had been
17 experiencing since February of 2013, right?
18   A. Since February 1, 2013, yes.
19   Q. And the letter was sent on or about
20 December 9, 2013, right?
21   A. Yes.
22   MR. STEPHENSON: Object. Objection,
23 foundation.
24   THE WITNESS: That's the date that's on the

Page 51

1 letter.
2 BY MR. BRITT:
3    Q. Okay. And Mr. Hemphill complains that
4 Dr. Obaisi is providing inadequate treatment,
5 doesn't he?
6    MR. MARUNA: Objection, misstates the letter,
7 foundation.
8    THE WITNESS: Right. It doesn't comment on his
9 ability. It just says that he won't send him to an
10 outside hospital or get him an MRI.
11 BY MR. BRITT:
12   Q. So do you remember what records you
13 reviewed when you were responding to this letter?
14   MR. STEPHENSON: Objection, mischaracterizes
15 his testimony. He didn't testify that he responded
16 to this letter.
17   MR. MARUNA: Join in the objection.
18   THE WITNESS: I think what I said earlier is
19 that I would do -- contact them most often by
20 e-mail and go by the response of the e-mail. There
21 wouldn't necessarily have been or maybe most of the
22 time not be medical records involved at that time.
23 BY MR. BRITT:
24   Q. And when you're talking about the e-mails

Page 52

1 with them, that's the people that you referred to
2 earlier, the folks at Wexford and the medical
3 director at the facility as well as a couple other
4 people you mentioned, right?
5    A. Yes, sir.
6    Q. Did you review any of -- did you review
7 any grievances that Mr. Hemphill had filed when you
8 responded to this letter?
9    A. I cannot recall any -- reviewing any
10 grievances. That would not be my general practice.
11 I don't get the grievances.
12   Q. Okay. Aside from the e-mails that you
13 would have exchanged with the folks you mentioned
14 earlier, did you discuss Mr. Hemphill's medical
15 treatment with anyone?
16   A. I don't recall.
17   Q. Did you discuss his treatment with
18 Dr. Obaisi?
19   A. Directly without the e-mail?
20   Q. Yes.
21   A. I don't recall.
22   Q. So other than drafting the letter that's
23 there as Exhibit 2, did you take any other action
24 in response to Mr. Hemphill's letter?

Page 53

1    A. No.
2    MR. STEPHENSON: Objection, mischaracterizes
3 his testimony. He didn't say that he responded
4 specifically to this letter. He doesn't even know
5 when it was sent or whether he received it.
6    THE WITNESS: Can you repeat the question now?
7 BY MR. BRITT:
8    Q. Before sending the letter that's marked as
9 Exhibit 2, your letter, aside from sending that
10 letter, did you take any action in response to any
11 complaint by Mr. Hemphill?
12   A. Not that I recall, no.
13   Q. Why were you -- let me start over.
14     Why did GOCA have you address the letter
15 marked as Exhibit 3?
16   A. I can't really speak for GOCA. I think
17 anything that had medical and offender in it came
18 to my office.
19   Q. And why would that have been the case?
20   A. Why would that have been the case?
21   Q. Yeah.
22   A. Well, I was the medical director of IDOC,
23 and they were not doctors or nurses or they weren't
24 involved in the correctional services.

14 (Pages 50 - 53)

Page 54

1    Q.  The letter that's marked as Exhibit 3, in
2  that third paragraph, he references letters being
3  sent to Michael Lemke and Assistant Warden of
4  Operation O'Brien.  Do you remember if those
5  letters were attached with this letter when you
6  received it?
7    A.  I don't remember, but I doubt it.
8    MR. BRITT:  Okay.  I'll go ahead and show you
9  what will be marked as Exhibit 4.
10         (WHEREUPON, Shicker Deposition
11          Exhibit No. 4 was marked for
12          identification.)
13  BY MR. BRITT:
14    Q.  Do you remember receiving a copy of that
15  letter?
16    A.  No, I do not.
17    MR. BRITT:  And this will be marked as
18  Exhibit 5.
19         (WHEREUPON, Shicker Deposition
20          Exhibit No. 5 was marked for
21          identification.)
22  BY MR. BRITT:
23    Q.  Do you remember receiving a copy of this
24  letter?

Page 55

1    A.  No, I do not.
2    Q.  So setting these aside for a moment and
3  looking at Exhibit 3, Mr. Hemphill's letter to the
4  governor, when did -- when was Mr. Lemke the warden
5  at Stateville?
6    A.  I don't have the exact dates.  I can't
7  answer that question.
8    Q.  Okay.  And do you know when Assistant
9  Warden O'Brien was at Stateville?
10    A.  Also can't give you exact dates.
11    Q.  Okay.  Did you ever follow up with either
12  Mr. Lemke or Miss O'Brien about these letters?
13    A.  About the GOCA letter?
14    Q.  About the GOCA letter or about either of
15  the letters that Mr. Hemphill wrote to them?
16    A.  Okay.  So I was unaware of these letters
17  as far as I know.  And for the letter sent to me,
18  it would be highly unusual for me to get in touch
19  with Warden O'Brien or Warden Lemke.
20    Q.  And Warden O'Brien and Lemke are mentioned
21  in the GOCA letter, right?
22    A.  Yes, they are.
23    Q.  Okay.  And, you know, while it may have
24  been unusual to reach out to them generally, did

Page 56

1  you reach out to them in this case because they
2  were mentioned in this letter?
3    A.  Not that I recall.  I mean, on my letter,
4  there is a cc to the warden at the current time of
5  Stateville.
6    Q.  Okay.  Did you have any communications
7  with Warden Magana about Mr. Hemphill or any of
8  these three letters?
9    A.  Not that I recall.
10    Q.  So looking at your letter, Exhibit 2, is
11  it fair to say that you concluded that Dr. Obaisi
12  was providing appropriate care to Mr. Hemphill?
13    A.  Yes.
14    Q.  And how did you reach that conclusion?
15    A.  All I can say is that I don't have the
16  information that was sent to me, but it must have
17  been based on the information that was sent to me.
18    Q.  And did you do any follow-up after this
19  letter was sent to ensure that Mr. Hemphill was
20  receiving adequate care?
21    A.  I don't recall.
22    Q.  Just to be clear, the letter that's marked
23  as Exhibit 3, would you have read that letter in
24  its entirety before sending the letter marked as

Page 57

1  Exhibit 2?
2    A.  In general, yes.
3    Q.  Aside from the e-mails that you mentioned,
4  are there any other communications that you would
5  have had with any of the people listed as cc
6  recipients on your letter marked as Exhibit 2?
7  Would you have communicated with any of them about
8  Mr. Hemphill?
9    MR. STEPHENSON:  I'm going to object, compound.
10  There's two different questions in there.
11    MR. BRITT:  Sure I'll rephrase that.
12  BY MR. BRITT:
13    Q.  For the cc recipients on Exhibit 2, aside
14  from the e-mails that you mentioned earlier, did
15  you have any communications with any of these
16  people about Mr. Hemphill?
17    A.  I don't recall any, so I would say no.
18    MR. BRITT:  I have nothing further.
19    MR. STEPHENSON:  I don't have any questions for
20  you, Doctor.  I'm going to pass the witness to
21  Mr. Maruna here who represents Wexford itself and
22  Wexford defendants.
23
24

15 (Pages 54 - 57)

Page 58

1              EXAMINATION
2 BY MR. MARUNA:
3    Q.  Morning, Doctor.  Thanks for coming in.
4 Same rules that counsel discussed earlier apply;
5 namely, if I'm talking too fast or you don't
6 understand what I'm saying, let me know.  I'm happy
7 to rephrase the question, okay?
8    A.  Sure.
9    Q.  I want to discuss -- we talked about how
10 Dr. Obaisi took some time off because he had a
11 medical condition, a heart condition.  While he was
12 gone, there were still other providers who could
13 see inmates at the prison, correct?
14    A.  Correct.
15    Q.  It wasn't that Dr. Obaisi was gone, and
16 all of a sudden the inmates are sitting there
17 waiting to be seen.  There's other doctors, staff
18 can be brought in and et cetera, correct?
19    A.  Correct.
20    Q.  Counsel asked you some questions.  We
21 discussed that there was an issue with nursing
22 staff, I guess the total number of nursing staffing
23 provided at times.  I want to be clear.  You said
24 sometimes people had to work overtime, correct?

Page 59

1    A.  Correct.
2    Q.  Which would again show that even if the
3 there were staffing problems, the inmates were
4 still receiving medical care for their conditions,
5 correct?
6    A.  Correct.
7    Q.  We also discussed that there was over time
8 some processes on the sick call that were changed.
9 The kites went away, and now the inmates do an open
10 signup.  Do you recall those questions?
11    A.  Yes, I do.
12    Q.  And we discussed that you participated in
13 a program called, Quality Improvement, QI.  So the
14 idea is over time, we improve our processes,
15 correct?
16    A.  We try.
17    Q.  It doesn't necessarily mean the original
18 process was bad.  It just means there might be a
19 better way of doing it, and so we want to explore
20 those probabilities, correct?
21    A.  Correct.  It's usually in response to a
22 finding.  You know, if things are going great, I
23 mean, we're not going to change it going great.  If
24 a problem was found or a concern, we're trying to

Page 60

1 look for something better.
2    Q.  UIC -- Stateville inmates go to UIC for
3 chronic conditions, correct?  In other words,
4 nonemergent conditions?
5    A.  Correct.
6    Q.  And we discussed that sometimes if UIC's
7 backed up, an inmate may be redirected to a
8 community hospital.  And I think there were two
9 criteria you said there.  One, they weren't going
10 to be seen in a reasonable time at UIC.  And, two,
11 they can't wait to be seen at UIC the day provided;
12 is that correct?
13    A.  If they couldn't wait, then it was more of
14 an urgent emergent condition.  So then they would
15 have to go locally, yeah.
16    Q.  I want to direct you to Exhibit 3 which
17 was the letter, the December 9, 2013, letter that
18 doesn't have a stamp on it.  The inmate in this
19 letter, by the way, does he note that the pain --
20 the cortisone shots that Dr. Obaisi were providing
21 were providing up to a half year of pain relief at
22 the time?  It's the third to the last line at the
23 bottom.
24    A.  Yes.

Page 61

1    Q.  And, by the way, he said in the second
2 paragraph that only an MRI can give him a good -- I
3 think he meant diagnosis on his medical issues.
4 Doctor, didn't earlier you testified that physical
5 examinations can also be extremely important in
6 assessing a patient's condition?
7    MR. BRITT:  Object to form.
8    THE WITNESS:  I mean, physical exams are what
9 we use to guide us on when we have to go further or
10 not, so the answer is yes.
11 BY MR. MARUNA:
12    Q.  All right.  And the physical exam may
13 indicate that there's no need for further
14 treatment, correct?  That it can be addressed
15 locally with the treatment available on site at the
16 prison; is that fair?
17    A.  Yes.
18    MR. MARUNA:  Nothing further.
19    MR. BRITT:  Nothing further.
20    MR. STEPHENSON:  I'm going to seek one
21 clarification for the future readers of the
22 deposition transcript.
23
24

16 (Pages 58 - 61)

Page 62

1          EXAMINATION
2   BY MR. STEPHENSON:
3     Q.   A kite is in reference to letters that
4   inmates send internally; is that right?
5     A.   It's a request to be seen.
6     MR. STEPHENSON:  I have no further questions.
7   We'll reserve.  Thanks.
8          FURTHER DEPONENT SAITH NAUGHT.
9          (WHEREUPON, the deposition
10         concluded at 10:30 a.m.)
11         (WHEREUPON, a transcript of
12         proceedings was ordered by
13         Mr. Britt at this time, copies
14         ordered by Mr. Maruna and
15         Mr. Stephenson.)
16
17
18
19
20
21
22
23
24

Page 64

1   said witness as aforesaid.
2       I further certify that the signature to
3   the foregoing deposition was not waived by counsel
4   for the respective parties.
5       I further certify that the taking of this
6   deposition was pursuant to Notice, and that there
7   were present at the deposition the attorneys
8   hereinbefore mentioned.
9       I further certify that I am not counsel
10  for nor in any way related to the parties to this
11  suit, nor am I in any way interested in the outcome
12  thereof.
13      IN TESTIMONY WHEREOF:  I have hereunto set
14  my hand this 2nd day of January, 2018.
15
16
17
18
19  *Raelene Stamm*
20  CERTIFIED SHORTHAND REPORTER
21
22
23
24

Page 63

1  STATE OF ILLINOIS  )
2               ) SS:
3  COUNTY OF C O O K  )
4       I, RAELENE STAMM, a Certified Shorthand
5  Reporter licensed by the State of Illinois, do
6  hereby certify that heretofore, to-wit, on the
7  8th day of December, 2017, personally appeared
8  before me, at 321 North Clark Street, Suite 2800,
9  Chicago, Illinois, DR. LOUIS SHICKER, in a cause
10 now pending and undetermined in the Circuit Court
11 of Cook County, Illinois, wherein CARL HEMPHILL is
12 the Plaintiff, and WEXFORD HEALTH SOURCES, INC.,
13 SALEH OBAISI; and HUNDLY DAVIS; LATONYA WILLIAMS;
14 LOUIS SHICKER; MICHAEL LEMKE; and DORRETTA O'BRIEN
15 are the Defendants.
16      I further certify that the said witness
17 was first duly sworn to testify the truth, the
18 whole truth and nothing but the truth in the cause
19 aforesaid; that the testimony then given by said
20 witness was reported stenographically by me in the
21 presence of the said witness, and afterwards
22 reduced to typewriting by Computer-Aided
23 Transcription, and the foregoing is a true and
24 correct transcript of the testimony so given by

Page 65

1          Veritext Legal Solutions
             1 North Franklin Street - Suite 3000
2           Chicago, Illinois 60606
             Phone: 312-442-9087
3
4
   January 4, 2018
5
   To: Mr. Stephenson
6
   Case Name: Hemphill, Carl v. Wexford Health Sources, Inc., et al.
7
   Veritext Reference Number: 2770801
8
   Witness: Louis Shicker      Deposition Date:  12/8/2017
9
10 Dear Sir/Madam:
11 Enclosed please find a deposition transcript.  Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change.  Have the witness' signature at the bottom
15 of the sheet notarized and forward errata sheet back to us at the
16 address shown above, or email to production-midwest@veritext.com.
17
18 If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21
22 Sincerely,
23
24 Production Department

17 (Pages 62 - 65)

Page 66

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT NO: 2770801
3        CASE NAME: Hemphill, Carl v. Wexford Health Sources, Inc., et
al.
         DATE OF DEPOSITION: 12/8/2017
4        WITNESS' NAME: Louis Shicker
5        In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
6        my testimony or it has been read to me.
7          I have made no changes to the testimony
         as transcribed by the court reporter.
8        _____
9        Date          Louis Shicker
10         Sworn to and subscribed before me, a
         Notary Public in and for the State and County,
11       the referenced witness did personally appear
         and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
             Statement; and
14         Their execution of this Statement is of
             their free act and deed.
15
           I have affixed my name and official seal
16
         this _____ day of_____, 20____.
17       _____
18         Notary Public
19       _____
20         Commission Expiration Date
21
22
23
24
25
```

Page 67

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT NO: 2770801
3        CASE NAME: Hemphill, Carl v. Wexford Health Sources, Inc., et
al.
         DATE OF DEPOSITION: 12/8/2017
4        WITNESS' NAME: Louis Shicker
5        In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
6        my testimony or it has been read to me.
7          I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
8        well as the reason(s) for the change(s).
9          I request that these changes be entered
         as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11       as this Certificate, and request and authorize
         that both be appended to the transcript of my
12       testimony and be incorporated therein.
13       _____
         Date          Louis Shicker
14
           Sworn to and subscribed before me, a
15       Notary Public in and for the State and County,
         the referenced witness did personally appear
16       and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18           in the appended Errata Sheet;
           They signed the foregoing Sworn
19           Statement; and
           Their execution of this Statement is of
20           their free act and deed.
21         I have affixed my name and official seal
22       this _____ day of_____, 20____.
23       _____
           Notary Public
24       _____
25         Commission Expiration Date
```

Page 68

```
1            ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 2770801
3        PAGE/LINE(S) /       CHANGE       /REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19       _____
         _____     _____
20       Date          Louis Shicker
21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22       DAY OF _____, 20_____ .
23       _____
           Notary Public
24       _____
25         Commission Expiration Date
```

18 (Pages 66 - 68)

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

CARL HEMPHILL,
                    Plaintiff,
        V.          Case No.:  15-cv-4968
WEXFORD HEALTH SOURCES, INC.;
SALEH OBAISI; ANN HUNDLY DAVIS;
LATONY A. WILLIAMS; LOUIS SHICKER;
MICHAEL LEMKE; DORRETTA O'BRIEN;
and KEVIN HALLORAN,
                    Defendants.
_____/

DEPOSITION OF DR. DAVID HELLERSTEIN
_____
THURSDAY, AUGUST 9, 2018

REPORTED BY:  DONNA WILLIAMS, CSR NO. 11133

Page 2

APPEARANCES

FOR THE PLAINTIFF:
    ANDREW T. McCLAIN, ATTORNEY AT LAW
    FOLEY & LARDNER, LLP
    321 North Clark Street, Suite 2800
    Chicago, IL 60654-5313
    312-832-4500
    amcclain@foley.com

FOR WEXFORD, OBAISI, DAVIS, WILLIAMS:

    JAMES F. MARUNA, ATTORNEY AT LAW
    Cassiday Schade, LLP
    222 West Adams Street, Suite 2900
    Chicago, IL 60606
    312-641-3100
    jmaruna@cassidy.com

Page 3

I N D E X

                                              PAGE
EXAMINATION OF DR. HELLERSTEIN
    BY MR. MARUNA                               4

E X H I B I T S
EXHIBIT NO.      DESCRIPTION          PAGE
No.  1    "Amended Notice of Deposition"        4
No.  2    "Carl Hemphill's Rule 26(a)(2)         4
          Expert Disclosure"

No.  3    "Offender Outpatient Progress Notes"  68
          IDOC 74
No.  4    "Offender Outpatient Progress Notes"  77
          IDOC 83

No.  5    "Offender Outpatient Progress Notes"  83
          IDOC 106
No.  6    "Offender Outpatient Progress Notes"  86
          IDOC 119

No.  7    "Offender Outpatient Progress Notes"  87
          IDOC 121

Page 4

REGUS - 500 CAPITOL MALL, #2350, SACRAMENTO, CA
THURSDAY, AUGUST 9, 2018; 10:15 A.M.
---oOo---
(Deposition Exhibit Nos. 1 and 2 were
marked for identification.)
---oOo---
DR. DAVID HELLERSTEIN,
having been first duly sworn, was examined and testified
as hereinafter set forth.
---oOo---
EXAMINATION
BY MR. MARUNA:
    Q.  Sir, would you go ahead state your name and
spell it for the record.
    A.  David Hellerstein, D-a-v-i-d,
H-e-l-l-e-r-s-t-e-i-n.
    MR. MARUNA:  Let the record reflect this is the
deposition of Dr. David Hellerstein taken pursuant to
notice and continued to today's date by agreement of the
parties.  The deposition is taken pursuant to the federal
rules of civil procedure, the local rules of the northern
district of Illinois and all their applicable rules.
    Dr. Hellerstein, before we begin counsel and I
just want to put something on the record here.  We have
attempted to reach counsel for the stayed defendants who

Exhibit G

## Page 5

1  are Shicker, Lemke, and O'Brian several times by e-mail
2  and phone.  We've also confirmed the notice was sent to
3  the state.  We've not received a response.  It is now
4  10:15 Pacific so we are going to go ahead and begin.
5      Counsel, are you in agreement?
6      MR. McCLAIN:  Yes.
7  BY MR. MARUNA:
8      Q.  And one other thing my office did do a mix up
9  with the check we'll get that to you would you prefer we
10 mail it to counsel or do you want to provide me the
11 address?
12     A.  I'll provide the address.
13     Q.  Why don't we do that.  We'll put that on the
14 record, and appreciate your accommodation.
15     MR. McCLAIN:  I want to put an objection on the
16 record that the witness has not been compensated pursuant
17 to court rules despite being told he was going to be
18 compensated today.
19     MR. MARUNA:  And we appreciate your help.
20     Q.  Dr. Hellerstein, have you ever given a
21 deposition before?
22     A.  Yes.
23     Q.  How many times?
24     A.  It's, I think, either three or four.
25     Q.  I just want to go over a couple rules here.

## Page 6

1  They may sound familiar, but that way we're on the same
2  page.
3      The court reporter is going to take down
4  everything we say today in a line-by-line transcript.
5  There's a couple things we can do to make her job easier.
6  The first is yes, no, as opposed to uh-huh or yeah
7  doesn't come across clear on the page.  Similarly you
8  have to give verbal answers, so nods of the head and
9  shrugs of the shoulder, while in the room I may know what
10 you mean, it doesn't come across on the page.  Fair
11 enough?
12     A.  Yes.
13     Q.  If you don't understand a question I've asked
14 today, please let me know.  I'll happy to rephrase it,
15 and I can rephrase it however many times we need to.  If
16 you don't ask me, I'm going to assume you understand it
17 and can give an answer to that question.  Is that fair?
18     A.  Yes.
19     Q.  From time to time there may be an objection in
20 the deposition.  If that occurs I'll ask that you let the
21 attorney state his objection on the record, and your
22 attorney will direct you how to proceed.  Okay?
23     A.  Yes.
24     Q.  We're not going to be here more than a couple
25 hours.  If you need a break at any time, I'm happy to

## Page 7

1  accommodate.  I just ask that you answer any question
2  pending before we stop and take a break.  Okay?
3      A.  Yes.
4      Q.  Let's go ahead and show what's been marked as
5  Exhibit 1.
6      MR. McCLAIN:  You have three copies of it?
7      MR. MARUNA:  I was going to mark the one and
8  hand you a courtesy.
9      Q.  Doctor, showing you what we've marked as Exhibit
10 1, the document in front of you, this document is titled
11 "Amended Notice of Deposition."  Is that correct?
12     A.  Yes.
13     Q.  If you direct to the bottom of the page, you'll
14 see language pursuant to Fed R Civ P 30(b)(2).
15     Do you see that, Doctor?
16     A.  Yes.
17     Q.  I asked you to bring a couple documents today.
18 I'm going to the first request was for any and all
19 communications between counsel and the witness discussing
20 the compensation of the witness for the expert's study or
21 testimony.
22     Did you bring any documents responsive to this
23 request?
24     A.  I was told that Mr. McClain would bring any
25 documents that you needed.

## Page 8

1      Q.  And I see Mr. McClain has them now.  Can you
2  tender them, counsel?  Thank you.
3      MR. McCLAIN:  I've handed you the letter between
4  Foley and Lardner and David Hellerstein dated June 13,
5  2018.
6      MR. MARUNA:  Thank you.
7      Q.  Besides the letter that counsel just hand me,
8  are there any other documents responsive to request No.
9  1?
10     A.  Again, I was told if there were any such
11 document, that Mr. McClain would provide them.
12     MR. MARUNA:  Do you have anything else?
13     MR. McCLAIN:  No.
14 BY MR. MARUNA:
15     Q.  The second request was for any and all
16 communications that identify the facts or data that the
17 party's attorney provided and that the expert considered
18 in forming the opinions to be expressed.
19     Did you bring any documents responsive to
20 request No. 2?
21     A.  I did not, although, again, that Mr. McClain
22 would bring any documents that were appropriate.
23     MR. McCLAIN:  I'm handing you an e-mail between
24 my firm and Dr. Hellerstein dated June 6, 2018, in which
25 we sent an FTP link to Dr. Hellerstein providing copies

Page 9

1   of the documents that are in the record.
2   BY MR. MARUNA:
3       Q. Besides the document the June 6, 2018, e-mail
4   that counsel just handed me, are there any other
5   documents that you have responsive to Exhibit No. 2?
6       A. No.
7       Q. That the plaintiff's attorney provided and that
8   the expert relied on in forming the opinions to be
9   expressed, did you bring any documents responsive to that
10  request?
11      A. There were no documents and no assumptions.
12      MR. MARUNA: Mr. McClain?
13      MR. McCLAIN: There are none.
14  BY MR. MARUNA:
15      Q. Okay. You can put away Exhibit 1, Doctor, and I
16  think just to keep it easy, why don't we put it in the
17  front here. All right, Doctor, can I direct your
18  attention to what we've previously marked as Exhibit 2.
19  I think it's right here.
20      Dr. Hellerstein, showing you what we've marked
21  as Exhibit 2, the document is entitled Carl Hemphill's
22  Expert Disclosure, and there's multiple pages attached to
23  the document.
24      Do you recognize this document as what I'm going
25  to call your expert report?

Page 10

1       A. The expert report is everything following page
2   marked Exhibit A, and then there was some attachments to
3   it that are also present here.
4       Q. For purposes of the deposition, if I refer to
5   your report, you understand I'm referencing everything
6   after the first three pages of Exhibit 2.
7       A. Yes.
8       Q. And, Doctor, I want to direct you to page 13 of
9   the documents begins in compliance with Rule 26. Do you
10  have that page in front of you?
11      A. Yes, I do.
12      Q. Doctor, there's several certification statements
13  here, and I want to go through them with you ever so
14  briefly.
15      The first certification statement says, quote,
16  this document contains a complete statement of all
17  opinions I will express at trial and the basis and reason
18  for them, close quote.
19      Is that on the page, Doctor?
20      A. Yes.
21      Q. And it that statement correct?
22      A. Yes.
23      Q. And below that at the bottom of the page we see
24  your signature. Correct?
25      A. Yes.

Page 11

1       Q. With the date of July 6, 2018. Correct?
2       A. Correct.
3       Q. Statement No. 2 says certification, quote, a
4   listing of the data and other information I have
5   considered in forming my opinions as provided on page
6   three of this report, close quote.
7       Is that statement on the page, Doctor?
8       A. Yes.
9       Q. And is that statement correct, Doctor?
10      A. Yes.
11      Q. And below that we see your signature. Correct?
12      A. Yes.
13      Q. And, again, a date of July 6, 2018. Correct?
14      A. Yes.
15      Q. Did you prepare this report?
16      A. Yes.
17      Q. Did you prepare this report with the assistance
18  of counsel?
19      A. No.
20      Q. Were there any preliminary drafts of this
21  report?
22      A. I believe so.
23      Q. How many, Doctor?
24      A. I don't know the answer to that.
25      Q. More or less than five?

Page 12

1       A. Probably around five, to the best of my
2   recollection.
3       Q. Did you share any of the drafts of the report
4   with counsel?
5       A. I believe I did.
6       Q. How many of the five drafts or about five drafts
7   did you share with counsel?
8       A. I don't know the answer to that. It would
9   probably be around three, but I'm not sure.
10      Q. Did counsel provide comments or feedback on the
11  drafts?
12      MR. McCLAIN: I'm going to object to the extent
13  that you're requesting privileged information.
14      THE WITNESS: I know we discussed typographical
15  errors and issues, but it's possible we discussed
16  content.
17  BY MR. MARUNA:
18      Q. Besides counsel did you share the drafts of the
19  report with anyone else?
20      A. No.
21      Q. Did you review any scientific literature in
22  preparation for drafting your report?
23      A. Yes.
24      Q. Which scientific literature did you review?
25      A. The literature that I considered in forming my

Page 13

1  opinions is all referenced in my report.
2      Q. Did you consider or review any literature in
3  drafting this report or forming your opinions that is not
4  listed in the report?
5      A. I -- as a physician, I read literature all the
6  time. But the literature that I used in forming my
7  opinions for this report are all -- is all listed in the
8  report. In forming my opinions I also used my
9  educational training and experience, and that would
10  include continuing education.
11      Q. So let's unpack that a little bit.
12      All of the literature that you expressly
13  reviewed to form your opinions is contained in the
14  report. Correct?
15      A. Yes.
16      Q. On top of that you may have reviewed other
17  materials as part of your continuing medical education.
18  Correct?
19      MR. McCLAIN: Objection; mis-characterizes
20  testimony.
21  BY MR. MARUNA:
22      Q. Did I state that correct or --
23      A. You'll have to repeat it.
24      Q. Sure. And I'm trying to understand your answer,
25  Doctor.

Page 14

1      You said that any reports or literature that you
2  reviewed to form your opinions is listed in the report.
3  Correct?
4      A. Correct.
5      Q. There was also some testimony just based on your
6  medical education and experience you continually review
7  literature. Correct?
8      A. Yes.
9      Q. Did any of the literature that you continually
10  review factor into any of the opinions discussed in your
11  report?
12      A. I think I've already answered that.
13  Contributing to my report, the literature I reviewed in
14  forming my opinions and my education, training, and
15  experience to the extent that education, training, and
16  experience involves literature review, that all
17  contributes to the education, training, and experience
18  component that I brought to bear in my opinion.
19      Q. But any literature that you expressly reviewed
20  in this report. Correct? I guess I'm trying to
21  understand what. Truly, I'm confused here, Doctor. Let
22  me back track.
23      Did you review any documents for this report or
24  literature, did you review any literature for this report
25  that is not contained or cited there in?

Page 15

1      A. I'm going to have to go back to the fact that I
2  have -- that any of the literature that I reviewed that I
3  considered in forming my opinion, it may be -- in forming
4  my opinion is identified in this report.
5      Q. Understood. And thank you.
6      Did you ask counsel or anyone from counsel's law
7  firm to provide you with additional materials in
8  preparation for drafting this report?
9      A. It is my practice after reviewing initial
10  materials if there are other materials that I want or
11  think are indicated, I will ask for them. I may have
12  done it in this case, but I don't know if I did or not.
13      Q. If you did that would that be over the telephone
14  or an e-mail?
15      A. I think a -- I think this would be both.
16      Q. So you would have asked for any additional
17  materials by e-mail possibly, and you did so. Correct?
18      A. It is my practice to do that in cases that I
19  participate in.
20      Q. Are there any documents that you felt that you
21  needed to draft this report that you were not provided by
22  counsel?
23      A. No.
24      Q. Did you conduct any medical literature research
25  in preparation for drafting this report?

Page 16

1      A. Yes.
2      Q. Tell me about it.
3      A. I reviewed literature relating to shoulder
4  impingement syndrome, and that literature which I used in
5  forming my opinions is included in this report.
6      Q. Besides the literature for shoulder impingement
7  syndrome, did you conduct any medical literature research
8  in preparation for drafting this report?
9      A. I'm going to have to go back to what I said
10  before. Any literature that I reviewed that contributed
11  to my opinion in this report has been included.
12      Q. And my question wasn't asking if it contributed
13  to your opinion. It was more open-ended.
14      Did you do any other literature research as part
15  of this report?
16      MR. McCLAIN: Asked and answered.
17      THE WITNESS: It's my practice to review
18  literature continuously. To the extent reviewing that
19  literature might have contributed to my opinions for this
20  report, I will have documented that in the report itself.
21  BY MR. MARUNA:
22      Q. Is there any literature that you reviewed for
23  this case that did not contribute to the opinions in this
24  report?
25      MR. McCLAIN: Objection; form.

Page 17

1    THE WITNESS: Of course I review literature all
2  time that does -- did not contribute to this report.
3  That's part of my obligation as a physician.
4  BY MR. MARUNA:
5    Q.  And my question was as part of drafting this
6  report, did you review literature that did not contribute
7  to the opinions in this report?
8    MR. McCLAIN:  Asked and answered.
9    THE WITNESS:  I'm confused by that question.
10   MR. MARUNA:  Happy to rephrase.
11   Q.  I understand that as part of your obligations as
12 a physician you continually review literature, and what
13 I'm asking is there's definitely literature cited here in
14 the report.  I want to know as part of drafting the
15 report did you review an article and said, you know, this
16 has nothing to do with this case or has nothing to do
17 with what I'm looking for, that's where I'm getting as to
18 this question.
19   A.  I really can't answer that.  As part of this
20 report did I review literature and not include it?  My
21 review of literature continues as part of my education,
22 and to the extent that the literature contributes to this
23 report, I don't know how else to answer that.
24   Q.  Do you expressly recall reviewing any articles
25 as part of drafting this report and deciding they had

Page 18

1  nothing to do with this report or you didn't want to cite
2  them in the report?
3    MR. McCLAIN:  Asked and answered.
4    THE WITNESS:  I expressly reviewed many articles
5  that did not contribute to this report.
6  BY MR. MARUNA:
7    Q.  Tell me about them.
8    A.  I don't remember.
9    Q.  What were they concerning?
10   A.  I don't know.  It's my general education.  I
11 review articles all the time.  I think I've tried to make
12 that clear, and those articles that contribute to this
13 report I've specified here.
14   Q.  Did you ask anyone else to assist you in doing
15 any research in drafting this report?
16   A.  No.  Let me correct that.  I may have asked
17 counsel to produce documents that I thought -- documents
18 related to the records that may have been missing but not
19 in terms of research medical research or legal research.
20   Q.  Did you speak with the plaintiff?
21   A.  No.
22   Q.  Have you ever spoken with Dr. Obaisi?
23   A.  No.
24   Q.  What about physician's assistant Williams?
25   A.  No.

Page 19

1    Q.  What about Dr. Davis?
2    A.  No.
3    Q.  Did you speak with the surgeon, Dr. Shicker I
4  think was his name?
5    A.  No.
6    Q.  Did you speak with any Wexford employees?
7    A.  I don't believe so.
8    Q.  Have you spoken with any IDOC employees?
9    MR. McCLAIN:  Objection; form.
10 BY MR. MARUNA:
11   Q.  I'll clarify as part of drafting this report.
12   A.  No.
13   Q.  Do you currently treat incarcerated patients?
14   A.  No.
15   Q.  When was the last time you treated an
16 incarcerated patient?
17   A.  Oh, goodness, to the best of my recollection,
18 2005.
19   Q.  Where was that?
20   A.  It was either High Desert State Prison, San
21 Quentin or Mule Creek.
22   Q.  So the State of California?
23   A.  Yes.
24   Q.  And was that in your capacity with the
25 California Department of Corrections?

Page 20

1    A.  Yes.
2    Q.  Let's go over your CV which was included in the
3  report, Doctor.
4    I believe it's on page 14.  There's not a number
5  on it, but I guess the 14th page of the document.
6    Do you have that in front of you, Doctor?
7    A.  Yes, I do.
8    Q.  I show that you obtained your medical doctorate
9  in 1972.  Is that correct?
10   A.  Yes.
11   Q.  And are you currently medically licensed?
12   A.  Yes.
13   Q.  When did you obtain your medical license?
14   Let me strike that.
15   Are you licensed in California?
16   A.  Yes.
17   Q.  When did you obtain your California medical
18 license?
19   A.  I believe it was 1974.  It's possible it was
20 1973, but I'm almost sure it was 1974.
21   Q.  Besides California have you ever held a medical
22 license in other state?
23   A.  Yes.
24   Q.  Can you please tell me all the states in which
25 you've been licensed?

Page 21

1   A. Nevada.
2   Q. When did you obtain your Nevada license?
3   A. I don't remember.
4   Q. Decade?
5   A. At least.
6   Q. Which decade?
7   A. I don't know. It's probably been 20 years since
8  I was licensed, and I was only licensed there for four or
9  five years.
10   Q. That was my next question. Four or five years
11  you said?
12   A. I believe so. I'm not sure.
13   Q. Why did you obtain a Nevada medical license?
14   A. At the time I was working for an emergency
15  medical group that had just obtained a responsibility for
16  the emergency treatment of a hospital in Nevada, and they
17  sent me down there to help provide care, help them set up
18  their program.
19   Q. And you held that license for at most five years
20  you think?
21   A. Might have been more. Between five and ten
22  years perhaps.
23   Q. I do have to ask this question of every doctor,
24  and I hope you'll draw no offense.
25     Has your medical license ever been suspended or

Page 22

1  revoked in any state?
2   A. No.
3   Q. Have you ever been subjected to investigation by
4  a state medical licensing board?
5   A. No.
6   Q. Turning back to your CV, Doctor, I see that you
7  completed a residency in internal medicine between 1973
8  to 1976. Is that accurate?
9   A. Yes.
10   Q. I also show you're board certified in internal
11  medicine. Is that correct?
12   A. Yes.
13   Q. And the certification of internal medicine was
14  obtained in 1976. Correct?
15   A. Yes.
16   Q. Do you have to recertify?
17   A. I don't have to recertify. I've been
18  grandfathered in. However, the American Board of
19  Internal Medicine, in order to assure the quality of the
20  physicians who maintain certification have a process
21  called maintenance of certification, and I'm currently in
22  my maintenance of certification requirements.
23   Q. Can you explain the difference between
24  maintenance certification and recertification to me?
25   A. The American Board of Internal Medicine requires

Page 23

1  current licensees and recent licensees to recertify, I
2  believe it's every ten years. I'm not sure how often it
3  is, but those of us who obtained their board
4  certification prior to that requirement maintain our
5  certification in perpetuity. But that's one of the
6  reasons that they implemented these certification
7  requirements.
8   Q. What's part of the certification? Taking CV
9  classes?
10   A. You need to take a certain number of classes
11  that they require and that they've certified, and then
12  you need to take exams periodically too to maintain that
13  certification.
14   Q. Have any of these classes involved correctional
15  medicine?
16   A. No, I don't believe so.
17   Q. Have any of these classes involved shoulder
18  impingement syndrome?
19   A. None of the classes I've taken.
20   Q. You do not hold a board certification in
21  surgery. Correct?
22   A. That's correct.
23   Q. And you've never held a board certification in
24  surgery. Correct?
25   A. That's correct.

Page 24

1   Q. Continuing on with the CV from 1976 to 1984, you
2  were working as an emergency room doctor. Is that
3  correct?
4   A. I was working as an emergency physician.
5   Q. Okay. And, I'm sorry, from 1976 to 1984 you
6  were working as an emergency physician and that was at
7  two different hospitals. Correct?
8   A. It was at multiple hospitals.
9   Q. I see Mt. Zion listed. Mt. Diablo.
10     Were you working at any other hospitals during
11  that time period?
12   A. Well, I worked for emergency physicians. I
13  worked for two medical groups, emergency physicians
14  medical group which placed me in a number of hospitals
15  including it Mt. Zion, Mercy San Juan, and Mercy San
16  River, and I worked very briefly -- well, perhaps not --
17  I worked also for the Fisher Mangle Group, and with them
18  I worked at Mt. Diablo Hospital in Concord, and I believe
19  I pulled shifts at John Muir Hospitals. Those two
20  hospitals are combined now.
21   Q. From 1984 to 1988 I see that you're working in
22  private practice, as listed on your CV, and it then
23  denotes internal medicine. Is that correct?
24   A. That's correct.
25   Q. Tell me what the private practice involved?

Page 25

1      A. I had an independent hospital. I had hospital
2   privileges at Mt. Diablo Hospital, and I saw patients in
3   my practice, and I admitted them to the hospital. I also
4   functioned at that time as a hospitalist for some of the
5   family physicians in the area that were -- preferred not
6   to manage in-patients.
7      Q. From 1988 to 1994 you were director of ED
8   quality management at Mercy American River and San Juan
9   Hospitals, CQI Information for EPMG, and we see Emergency
10  Physicians Medical Group. Correct?
11     A. Correct.
12     Q. Was that a clinical or administrative role?
13     A. I -- I worked both as a emergency physician with
14  EPMG seeing patients, and I also had responsibilities for
15  managing their quality management program which involved
16  clinical review and evaluation of the quality of care
17  delivered by the physicians in the group.
18     Q. While you were holding this position from 1988
19  to 1994, what percentage of your work was clinical versus
20  what percentage was administrative?
21     A. Oh, goodness. I would say 90 percent was
22  clinical and ten percent, if you consider the CQI
23  administrator, and I'm not sure that that's appropriate,
24  that is, in my mind, review of clinical quality of care
25  is not necessarily administrative. It might be

Page 26

1   considered clinical, but as long as we make that
2   distinction, probably ten percent of my time was involved
3   in clinical quality management and 90 percent in seeing
4   patients.
5      Q. Understood.
6         From 1994 to 1997 you were working in clinical
7   medicine and health information technology at Foundation
8   Health Medical Group where you developed RX manager,
9   occupational medicine, data base, directed development,
10  and workers' comp tracking system is what's listed on the
11  CV. Correct?
12     A. Correct.
13     Q. Was this job clinical or administrative?
14     A. It was primarily clinical.
15     Q. Primarily or exclusively?
16     A. Well, I pulled the normal number of clinical
17  shifts as anyone else in the group, and then added onto
18  that I did the additional work, but I was a full-time
19  clinical physician at that time.
20     Q. Between 1994 to 1997 what percentage of your
21  time at Foundation Health Medical Group was clinical
22  versus administrative?
23     A. Well, if you consider the health information
24  technology work with Foundation, again, we're probably 90
25  percent clinical and 10 percent involved with health

Page 27

1   information technology.
2      Q. 90 percent clinical, 10 percent information
3   technology?
4      A. Or 90 to 95 percent and 5 to 10 percent.
5      Q. From 1997 to 2001 you're working at
6   PricewaterhouseCoopers as manager of the health care
7   consulting practice. Correct?
8      A. Initially I started out as a senior associate,
9   and then after a year or so I was promoted to manager.
10     Q. And from 1997 to 2001 at Pricewaterhouse, was
11  that clinical or administrative?
12     A. That was administrative.
13     Q. A hundred percent. Correct?
14     A. Yes.
15     Q. Unless Pricewaterhouse is operating hospitals
16  now?
17     A. Right.
18     Q. From 2001 to 2006 you were the chief medical
19  officer medical and public health programs of the
20  California department of corrections and rehabilitation.
21  Correct?
22     A. That was my ultimate title I started out as a
23  physician and surgeon and -- I started out, correct that
24  please, I started out as a physician in their quality
25  management assistance team, and after several years I was

Page 28

1   promoted then to the director the chief medical officer
2   for medical and public health programs.
3      Q. Are there multiple chief medical officers with
4   the California Department of Corrections?
5      A. Please ask that again.
6      Q. Sure.
7         So you said you're the chief medical officer
8   for, and then you gave the medical and public health
9   programs. I'm not familiar with California Department of
10  Corrections. Are there multiple chief medical officers?
11     A. There were. The titles keep changing. They're
12  now chief executive officers and so on. And you will
13  have chief medical -- at that time chief medical officers
14  at each institution. However, I, as chief medical
15  officer at headquarters, was responsible for their
16  programs. They didn't actually report to me, but I was
17  responsible for the programs, the medical and public
18  health programs directly from headquarters.
19     Q. Can you give me an example of what a medical or
20  public health program director from headquarters would
21  be? Are we talking the site administrator of medical
22  care or are we talking something else?
23     A. We developed policies and procedures for
24  managing clinical issues. I was closely involved in
25  developing a TB surveillance in management, and I believe

Page 29

1    the seizure program too.  I was involved as we were
2    developing a formulary for use in all the institutions,
3    and there was also a clinical review component which I
4    maintained through the quality management assistance team
5    in which I continued to participate where we reviewed
6    each institution for the quality of care delivered at
7    those institutions.
8        Q.  While you were working for the California
9    Department of Corrections from 2001 to 2006, was your
10   role administrative or clinical?
11       A.  You'll have to define administrative for me.
12       Q.  Well, how would you define it if I put the term
13   out there?
14       A.  Well, seeing patients is one aspect of clinical
15   work.  Evaluating quality of care, reviewing charts,
16   making determination as to whether the standard of care
17   was met and evaluating the standard of care is heavy
18   clinical.  So I don't think of that as administrative.
19   That's why I asked you to define it.
20       Q.  Let's use your definition then for the purposes
21   of this question.  Let's --
22       A.  My definition is it's all clinical.
23       Q.  Okay.  So can -- let's take out the reviewing
24   charts, the CQI information.
25           Physically seeing a patient in an exam room,

Page 30

1    what percentage of your time at California Department of
2    Corrections involved that work?
3        A.  Very little.  Probably five to ten percent at
4    most.
5        Q.  Five to ten percent at most.  The remaining
6    would be the review of charts, policies, procedures.
7    Correct?
8        A.  Yes, correct.
9        Q.  And then if we go to the top of the CV, from
10   2006 to present there are two jobs listed.  The first is
11   correctional health care consultant and expert witness.
12   Correct?
13       A.  Correct.
14       Q.  The second being office of the Inspector
15   General, State of California, Retired Annuitant.
16   Correct?
17       A.  Correct.
18       Q.  Let's start with the bottom one first.
19           What is a retired annuitant from the Office of
20   the Inspector General, State of California?
21       A.  The inspector general for the prison systems for
22   California has a number of roles.
23           One of them is to monitor the quality of care --
24   of health care that's delivered in our prison system.
25   That has become an important role since the department of

Page 31

1    corrections and rehabilitation in California is now under
2    federal receivership.  And part of federal receivership,
3    the receiver depends, relies, I should say relies on the
4    inspector general for health care in terms of monitoring
5    and evaluating the quality of care delivered as part of
6    the lawsuit that resulted in receivership.
7            As I -- as retired annuitant, after retiring as
8    chief medical officer for medical and public health
9    programs, I was subsequently brought back by the
10   inspector general's office to participate in developing
11   and monitoring and participating in the monitoring of the
12   charge that we have to -- both by the State and by the
13   federal receiver to evaluate on a continuing basis the
14   quality of care that we deliver in the prisons.
15       Q.  What does the monitoring involve?  How do you
16   monitor?
17       A.  Primarily it's chart review.  We look at the
18   charts.  We have a set of criteria, and I actually helped
19   to set up the criteria that we use to set up the charts
20   because we have a scoring system, and that's how we do
21   most of the monitoring.
22           When issues arise they go out to the
23   institutions and speak with the physicians and the
24   administrative -- the administrative medical people to
25   help resolve questions that we can't resolve by simply

Page 32

1    looking at the chart.
2        Q.  How many hours?  And it says retired here.  Is
3    this a full-time job or part-time?
4        A.  It's part-time.  The hours vary from month to
5    month.
6        Q.  In a slow month, how many hours a month?
7        A.  Slow month, probably 10 to 12 hours.  Busy
8    month, probably 40.
9        Q.  And you've been doing that from 2006 to present?
10       A.  I believe I started in 2007, or I believe there
11   was a gap there between when I retired and when they
12   brought me into it for the inspector general.
13       Q.  The second professional activities listed from
14   2006 to present is as a consultant and expert witness.
15   Correct?
16       A.  Correct.
17       Q.  There's a correctional health care title on
18   that.  Is that a company?
19       A.  The --
20       Q.  Up at the top, see it says consultant expert
21   witness, and then in bold, correctional health care.
22           Is that a company or just a title?
23       A.  That's just a title heading.
24       Q.  When you do your consultant and expert work, is
25   that through a company you've created or just as

Page 33

1 yourself?
2     A. Just as an independent practitioner. Sole
3 proprietor, I guess is it.
4     Q. Do you advise your medical services as an expert
5 witness?
6     A. No.
7     Q. Have you ever advertised your services as an
8 expert medical witness?
9     A. I never advertised.
10      I believe I once signed up for some company that
11 said they would find me work, but they never did.
12     Q. Do you remember the name of this company?
13     A. No.
14     Q. When did you sign up for this company?
15     A. Oh, probably three, four years ago.
16     Q. So you signed up and they said we'll put your
17 name in a book or mailer?
18     A. Basically.
19     Q. And you said you've never received any work from
20 them?
21     A. No.
22     Q. Besides the reference we just made to this
23 company, did you ever seek advertising with anyone else
24 as part of your expert medical consulting work?
25     A. No.

Page 34

1     Q. How did you come to receive this case?
2     A. I believe Andrew e-mailed me, I believe. But I
3 don't -- I'm not sure. I assume it came through my -- I
4 have a network of people whom I know, and they refer and
5 refer, and I assume on that basis I was either called or
6 e-mailed to start with.
7     Q. What is this network that you're referencing?
8     A. These are physicians that I have worked with in
9 the past.
10     Q. And have you indicated these physicians that you
11 do consulting work?
12     A. Yes.
13     Q. And is the idea that they do consulting work as
14 well?
15     A. Pardon me?
16     Q. Do the other physicians do consulting work?
17     A. I don't know if they call it consulting work.
18 They all have obligations or they do work related to
19 their expertise as prison physicians.
20     Q. Sometimes I -- and just to get to the point
21 here, I've seen some physicians will have reciprocal
22 networks where if I hear of a case that might be in your
23 purview, I'll steer it your way, and if you hear one in
24 my purview, you'll steer it my way.
25      Is that what you're describing here?

Page 35

1     A. I've never developed any kind of formal
2 arrangement, and I've never even asked for informal
3 arrangement. But the physicians in my network are aware
4 that I take cases, and they will refer them to me.
5     Q. Through this informal network besides this case,
6 if indeed this is how you obtained the case, and I
7 recognize you said you're not entirely sure, have you
8 received any other cases through this informal network?
9     A. I think I've received all my cases through this
10 informal network.
11     Q. When were you first contacted about this case?
12     A. I don't remember.
13     Q. Was it after or before May of this year?
14     A. I must have been before May, but I'm not sure.
15 The letter that you've been given would have occurred
16 within a few weeks of our initial contact.
17     Q. You said all of your cases came from this
18 informal network?
19     A. I believe they have.
20     Q. How many cases we talking about here?
21     A. You know, I don't really know the answer to
22 that.
23      I put down as required by Federal Rule 26 all
24 the cases that I've testified on in the past four years,
25 but I have frequent cases that were -- some will call me

Page 36

1 informally and we'll discuss it and they send me files
2 and I'll give an informal opinion and usually without an
3 actual formal arrangement, employment or contractual
4 arrangement. And then based on that they decide whether
5 or not they want to use me as a consultant. And
6 depending after the initial consultation then they decide
7 whether or not they want me to be designated as an expert
8 witness.
9     Q. How many cases have you reviewed since you began
10 in consulting work in 2006?
11     A. I don't -- I don't know the answer to that.
12     Q. More or less than ten?
13     A. Oh, more than ten.
14     Q. More or less than 20?
15     A. It's possible.
16     Q. More or less than 30?
17     A. It's possible.
18     Q. More or less than 40?
19     A. I don't know the answer to that.
20     Q. More or less than 50?
21     A. I'm sure it's less than. I'm confident it's
22 less than 50, but I could stand to be corrected on that.
23     Q. Do you think it's more than 75?
24     A. No, I don't think it's more than 75.
25     Q. What percentage of your present earned income is

Page 37

1    derived from work as a medical expert or medical
2    consultant in the legal cases?
3        A. You'll have to define "earned income."
4        Q. How much of money of your present income that
5    you're making comes from your expert or consulting work?
6    I'll make it very simple.
7        A. In my last year, it was less than ten percent.
8        Q. What about the year prior?
9        A. I think I was busier then. It may have been --
10   it's always been less than 20 percent.
11       Q. From 2006 to present it's always been less than
12   20 percent?
13       A. Oh, yeah, yes, to the best of my recollection.
14           Do I have to preface that all of my answers are
15   to the best of my recollection?
16       Q. You can preface that.
17           I want to take a look at the expert work you've
18   done from 2006 to present. And I want to know what
19   percentage of the work you've done has been on behalf of
20   plaintiffs and what percentage has been on behalf of the
21   defendants.
22       A. I don't know the answer to that. I work for
23   both plaintiff and defendants, and percentage you have to
24   decide are we talking percentage dollar wise, time wise,
25   because I've done some pro bono work.

Page 38

1        Q. Let's do number of cases.
2        A. I don't know the number of cases.
3        Q. Is it 50/50?
4        A. I don't know the answer to that.
5        Q. Is it 75/25 in favor of one or the other?
6            MR. McCLAIN: Asked and answered.
7            THE WITNESS: I don't know the answer to that.
8    BY MR. MARUNA:
9        Q. Let's flip the page, two pages actually, three
10   pages, four pages to the prior testimony section.
11       A. What page are we talking about?
12       Q. It's the one that's got the testimony, I think
13   it's three or four pages after where we just were in the
14   exhibit.
15       A. Okay.
16       Q. This is where you disclosed your testimony from
17   2013 to 2017. We see three cases are disclosed.
18   Correct?
19       A. Correct.
20       Q. I have to ask at the top it does say through
21   2017. Have you done any testimony in the year 2018?
22       A. No.
23       Q. The three cases, the first is 2015 Adams versus
24   Cullinan, C-u-l-l-i-n-a-n, and this was involving Lee
25   County Jail in Dixon, Illinois. Correct?

Page 39

1        A. Correct.
2        Q. It says you prepared a report and testified in
3    deposition as an expert witness for the defendant.
4    Correct?
5        A. Yes.
6        Q. Was the defendant a medical provider or medical
7    company?
8        A. I don't remember.
9        Q. Did you go to Illinois to testify?
10       A. I don't believe so.
11       Q. Was this case in federal court or state court?
12       A. I don't remember. Wait. It says deliberate
13   indifference. So there must have been a federal
14   component.
15       Q. And that's what I was getting at. So it would
16   have been a federal court.
17           Do you know if it was in the Central District of
18   Illinois?
19       A. I don't remember. I believe since I testified
20   in deposition, I believe that that was done in
21   California, that I didn't go to Illinois for that.
22       Q. So you didn't give trial testimony?
23       A. No.
24       Q. Let's turn to the second lawsuit.
25           2014, Hairston versus Ohio Department of

Page 40

1    Rehabilitation and Corrections.
2            In this case you testified were you testifying
3    on behalf of the plaintiff, Doctor?
4        A. No. I testified for the defendant.
5        Q. In Hairston?
6        A. Yes.
7        Q. It says as a consultant and expert witness for
8    the plaintiff.
9        A. Oh, I'm sorry. I -- I made an error. I
10   actually testified for the defendant -- for the
11   plaintiff. I confused plaintiff and defendant. I
12   testified for the plaintiff in that case.
13       Q. If it was a correctional case, the plaintiff
14   would be the inmate.
15       A. Right. I testified for the inmate.
16       Q. 2014 the Hairston case was an expert witness for
17   the plaintiff, the inmate, to clarify.
18       A. Correct.
19       Q. And do you know where this case was pending?
20   Was it in Ohio?
21       A. It was in Columbus, Ohio.
22       Q. Do you know if it -- if this was in state or
23   federal court?
24       A. I don't remember.
25       Q. Did you go to Ohio and give testimony?

Page 41

1    A. Yes.
2    Q. The next case listed as 2013 Chatham versus
3  Pinckneyville Correctional.
4    A. Yes.
5    Q. And this was a federal case. Correct?
6    A. Yes.
7    Q. Just looking at the way the case caption is
8  written.
9       And you were testifying here as an expert
10  witness for defendant Wexford Health Sources and its
11  employees. Correct?
12    A. Correct.
13    Q. Says you prepared a report and testified in
14  deposition and court. Correct?
15    A. Correct.
16    Q. I assume that means you went to the federal
17  courthouse in Illinois?
18    A. Yes.
19    Q. Was that a East St. Louis or?
20    A. I believe it was St. Louis. I'm not a hundred
21  percent sure.
22    Q. Just in the case of deliberate indifference
23  against Wexford?
24    A. Yes.
25    Q. You were retained by Wexford to be their expert

Page 42

1  witness. Correct?
2    A. I was retained by the law firm that Wexford
3  used, yes.
4    Q. Was that Rodney Sharp?
5    A. Yes, it was Rodney Sharp.
6    Q. With Sanberg Phoenix in St. Louis?
7    A. Yes.
8    Q. Did you speak with Mr. Sharp about the case?
9    A. Yes.
10    Q. How many times did you speak with Attorney Sharp
11  about the case?
12    A. Multiple times.
13    Q. More or less than five?
14    A. Probably five or more.
15    Q. And how long did these conversations last with
16  Attorney Sharp?
17    A. I don't remember.
18    Q. More or less than an hour?
19    A. I don't remember.
20    Q. And you gave both deposition and trial
21  testimony?
22    A. Correct.
23    Q. Did you have to meet with Attorney Sharp to
24  prepare to give deposition testimony?
25    A. It's my practice to have witness prep, and I

Page 43

1  assume I did.
2    Q. And the same question for trial preparation,
3  would you have met with Attorney Sharp to prepare to give
4  trial testimony?
5    A. It's my practice. I believe I did, but I don't
6  remember specifically.
7    Q. And I see that you prepared a report here as
8  well. Correct?
9    A. Yes.
10    Q. And am I correct, Doctor, that you would have
11  been sent documents by Attorney Sharp to draft this
12  report?
13    A. I would have access to documents, yes.
14    Q. And those documents, do you recall what they
15  included?
16    A. No.
17    Q. But they've included medical records?
18    A. Yes.
19    Q. Would they have included Wexford treatment
20  guidelines?
21    A. I don't -- let me think about that.
22       In all likelihood, it did because -- in all
23  likelihood, it did.
24    Q. Did you speak with any Wexford employees?
25    A. No.

Page 44

1    Q. Did you speak with the individual defendant
2  doctors that you were serving as an expert for?
3    A. Very briefly after the trial. After my
4  testimony at the trial, I believe I exchanged half a
5  dozen words with the defendant doctor.
6    Q. Besides Attorney Sharp, did you speak with any
7  other attorneys from Attorney Sharp's office?
8    A. I don't remember.
9    Q. We discussed that you reviewed medical records
10  and you very likely reviewed Wexford treatment
11  guidelines.
12       Do you recall any other documents that you
13  reviewed as part of that case?
14    MR. McCLAIN: Objection; mischaracterizes prior
15  testimony.
16    MR. MARUNA: If I mis-characterize, please
17  explain.
18    THE WITNESS: I reviewed -- I reviewed medical
19  records. I may have reviewed policies and procedures and
20  clinical guidelines.
21       Now, what was your question?
22  BY MR. MARUNA:
23    Q. Besides the two types of documents you just
24  referenced, did you review any other documents?
25    A. I don't remember.



Page 45

1    Q. Do you keep files on your cases when you serve
2  as an expert witness?
3    A. By and large I do, unless the attorneys who I
4  work with have asked me to destroy or return the files.
5    Q. Do you recall what happened in this case
6  Chatham?
7    A. I don't recall. I don't -- frequently I never
8  find out what happens.
9    Q. My question was vague, and I apologize, Doctor.
10 You said you'll keep a file on a case you work on unless
11 the attorney expressly tells you not to?
12   A. Typically.
13   Q. Do you recall if you kept a file on the Chatham
14 case?
15   A. I don't remember.
16   Q. And if you did keep that, would that be stored
17 in an office or home or is that electronic?
18   A. It would be stored electronically.
19   Q. On a computer or server?
20   A. Yes.
21   Q. Besides the three lawsuits that we discussed
22 above, have you ever given any deposition testimony in
23 any other prisoner deliberate indifference cases as a
24 retained expert witness?
25   A. I'm sure I have.

Page 46

1    Q. And there's three instances here on this report
2  of testimony from 2013 to '17. How many other times have
3  you given testimony, deposition testimony?
4    A. Deposition testimony?
5    Q. Yes.
6    A. I don't remember. Probably two or three more
7  cases.
8    Q. Has Wexford ever been a part of the other two or
9  three cases?
10   A. No.
11   Q. Have you ever given testimony in a case pending
12 in the Northern District of Illinois?
13   A. Pending? You mean currently pending? No.
14   Q. Ever pending.
15   A. I don't know.
16   Q. Besides the three cases listed here, have you
17 ever given, and I recognize you haven't given trial
18 testimony in several of the ones listed here, but have
19 you given trial testimony in any other cases besides
20 what's listed on the page in front of you right now as an
21 expert witness?
22   A. I believe I have.
23   Q. How many times, Doctor?
24   A. No more than -- no more than two or three
25 additional cases.

Page 47

1    Q. And have you ever testified at trial in the
2  Northern District of Illinois?
3    A. I don't believe so.
4    Q. It would be in Chicago or Rockford?
5    A. I don't believe so.
6    Q. Has your testimony ever been barred by a court?
7    A. No.
8    Q. Have any of your expert reports ever been barred
9  by a court?
10   A. No.
11   Q. Have any statements contained in any of your
12 expert reports ever been stricken by a court?
13   A. Not to my knowledge.
14   Q. Have you ever been named as a defendant in your
15 individual capacity?
16   A. Yes.
17   Q. How many times?
18   A. Three.
19   Q. Let's talk about the first time. Tell me about
20 it.
21   A. I'm not sure of the sequence, but I can go over
22 the three cases.
23   Q. Yeah, let's do that.
24   A. One case involved all three -- two of the cases
25 involved I worked as an emergency physician.

Page 48

1       You're talking about malpractice cases, I
2  believe. Correct?
3    Q. Well, I'm talking about as a defendant there's
4  an example where -- let's start with this.
5       Are there any cases where you've been named as a
6  defendant in your individual capacity that are not
7  related to the practice of medicine?
8    A. No.
9    Q. Simplifies it then. I'm not interested in
10 finding out if you were sued for a traffic ticket or
11 something.
12      Let's talk about the first one. Tell me about
13 it.
14   A. The first one is a patient I saw at Mt. Zion
15 Hospital, and I'm not exactly sure what year that was
16 where the patient came in with a foot injury and I
17 diagnosed it as a sprain. Ultimately the x-ray was
18 reported out as a fracture, not a sprain. The patient
19 was referred to an orthopedist who treated the patient
20 exactly the same as I had for the sprain. She filed a
21 suit against me for failure to diagnose, I believe. But
22 she failed to show up in court, so the case was
23 dismissed.
24   Q. Was that pending in Mt. Zion, so that was
25 California?

Page 49

1    A. That was California. All these cases are
2 California.
3        The second was a patient that I saw at Methodist
4 Hospital. It may have been Mercy Methodist by then.
5 Again, in California, and this patient came in with
6 either a sprained or broken lower extremity. I ordered a
7 splint. The patient complained that he had a
8 discoloration of his skin that resulted from his
9 scratching it by putting a wire coat hanger under the
10 splint in order to relieve his itching. I was named in
11 the suit, but when they took my deposition, they learned
12 that I had not applied the splint, that it had been
13 applied by a technician, and at that point they dismissed
14 me from the suit.
15        The last case was when I was in private practice
16 as an internist. I had a dentist in my private practice
17 who presented with abdominal pain, and I referred him
18 immediately to a surgeon who operated on him for
19 appendicitis.
20        As a result of this surgery the dentist alleged
21 that when they put the IV in his hand, that his fingers
22 became numb and he was no longer able to operate as a --
23 or at least temporarily at that point as a dentist.
24 Because of that, I was named in the suit. Despite the
25 fact that I was named in the suit, the dentist continued

Page 50

1 to see me as my patient as an internist.
2        I don't know the ultimate result of that case,
3 but there was never a judgment against me.
4    Q. In any of the three suits you just discussed,
5 and, by the way, are those only three times you've
6 been sued in your individual capacity as a medical
7 provider?
8    A. Yes.
9    Q. In any of those three suits, did you give
10 deposition testimony?
11    A. I gave deposition testimony in the suit
12 involving the discolored leg as a result of the splint.
13    Q. And in any of the three suits, did you give
14 trial testimony?
15    A. No.
16        MR. McCLAIN: We've been going about an hour.
17 You want to take a break?
18        MR. MARUNA: I've got two questions, then I
19 think it would be a perfect stop if you don't mind.
20        THE WITNESS: Sure. Okay.
21 BY MR. MARUNA:
22    Q. Have you ever been named as a defendant in your
23 role with the California Department of Corrections?
24    A. No.
25    Q. You mention that your current work is with the

Page 51

1 office of the inspector general due to -- pursuant to a
2 federal mandate. Correct?
3        MR. McCLAIN: Objection; mis-characterizes prior
4 testimony.
5        THE WITNESS: My current work is with the
6 inspector general's office. One of their charges is to
7 work in response to the receivership, the federal
8 receivership.
9 BY MR. MARUNA:
10    Q. Was the receivership the result of any
11 litigation that occurred?
12    A. Yes. I believe it was Plotter versus whatever
13 governor was present at the time.
14    Q. And were you working with the California
15 Department of Corrections during the time period
16 discussed in the Plotter lawsuit?
17    A. Plotter lawsuit extended over a long period of
18 time. When you say working with, can you be more
19 explicit as to what kind of work you mean?
20    Q. Well, I am just asking very generally, Doctor,
21 the Plotter lawsuit, did it encompass any medical care in
22 the California Department of Corrections prison from the
23 years 2001 to 2006, if you know?
24    A. The Plotter -- I'm not sure I'm answering your
25 question, but the Plotter lawsuit never involved any care

Page 52

1 that I provided to patients in the prison system. Does
2 that answer your question?
3    Q. Did the -- any of the care discussed in the
4 Plotter lawsuit occur between 2001 to the 2006 time
5 period?
6    A. I don't know.
7    Q. And the last question before the break, Doctor,
8 I see you were kind enough to provide a list of
9 publications. Are there any additions to that list of
10 publications?
11    A. No.
12        MR. MARUNA: Okay. Let's take a break. Five.
13        MR. McCLAIN: Sure.
14        THE WITNESS: Thank you.
15        (Break taken.)
16 BY MR. MARUNA:
17    Q. Doctor, and, back on the record.
18        If I can direct you to page 13 of Exhibit 2, I
19 want to direct you to No. 6. It states that you were to
20 be paid $350 an hour or consultation report preparation
21 and $450 an hour for testimony. Correct?
22    A. Yes.
23    Q. And those are your rates?
24    A. Yes.
25    Q. And how many hours did you spend drafting the

Page 53

1    report?
2        A. I don't remember the exact number of hours I
3    billed out. About $8000, I believe. Maybe some more.
4        Q. And that was for the report?
5        A. Yes.
6        Q. And then the testimony today will be on top of
7    that?
8        A. Yes.
9        Q. Let's take a look at the report itself. I want
10   to direct you to the middle of page two.
11       A. Okay.
12       Q. The first paragraph beginning "Carl Hemphill
13   first presented," you see that, Doctor?
14       A. Yes.
15       Q. I'm going to ask you about the sentences after
16   that. Says, "his health care providers promptly and
17   accurately diagnosed his shoulder impingement syndrome."
18   Do you see that?
19       A. Yes.
20       Q. Is that your opinion?
21       A. Yes.
22       Q. Can you briefly explain to me what is shoulder
23   impingement syndrome?
24       A. The shoulder joint is a complex joint. It's a
25   ball and socket joint where the head of the humorous, the

Page 54

1    arm bone fits into a little cup in the shoulder itself.
2    And motion of this joint is controlled by a cup of
3    muscles. There's four muscles in this cup that control
4    that motion and also provide support for the head of the
5    humorous there. So it's both structural support as well
6    as control of motion. The space between the cup is
7    fairly small, and then there's a space around the cup
8    which between the head of the humorous between that ball
9    and the structure of the shoulder itself, that's a fairly
10   narrow space.
11       When muscles -- the way the muscles work when
12   they elevate the shoulder or abduct or bring up the
13   shoulder is this cuff of muscles contracts and that
14   contraction raises the humorous.
15       Muscles aren't compressible, so when they
16   contract they have to expand. So as they get shorter,
17   they get fatter.
18       Well, when they get fatter in that little space
19   there, if there's any kind of inflammation or any kind of
20   impingement on that space, the -- which can happen for a
21   variety of reasons, there can be pain there. There can
22   be compression of the nerves there, and that's called
23   shoulder impingement syndrome when the space between the
24   head of the humorous and the surrounding bony structures
25   impinges on the muscles of the rotator cuff as they

Page 55

1    contract.
2        Q. What causes the impingement? You said there's a
3    variety of causes. What causes it?
4        A. You mean what pathology causes it?
5        Q. Correct.
6        A. We're getting out of my area of expertise now,
7    but any kind of -- part of it depends on the actual
8    anatomy of the shoulder itself.
9        The acromion process, people have different
10   shapes of the acromion which is part of the bony
11   structure around the rotator cuff and certain anatomical
12   configurations impinge on that space more than others so
13   you'd be more likely to have that happen.
14       People who use their -- those muscles a lot, so
15   those muscles tend to enlarge, are more likely to have
16   that. So if you're involved in an activity or occupation
17   where you're lifting your shoulders up a lot, those
18   muscles will tend to expand so you'd be more likely then
19   to have them be impinged upon by the shoulder.
20       Also there's the joint there called the
21   acromioclavicular joint, and if there's a lot of
22   arthritis in that joint, arthritis often produces --
23   makes the joint itself deform produces what we call bony
24   osteoses. The bone around the joint may expand if that's
25   happening at the level of the acromioclavicular joint

Page 56

1    that can again enter the space, the sub-acromial space
2    there where these muscles work. And so severe arthritis
3    of the AC joint, as it's called, can produce shoulder
4    impingement syndrome.
5        Q. And arthritis is a degenerative condition.
6    Correct?
7        A. It can be.
8        Q. Is it most commonly degenerative?
9        A. In the case of the shoulder impingement
10   syndrome, I think it's most common.
11       Q. And degenerative means it's over time. Correct?
12   It's not an acute occurring condition.
13       A. That's correct.
14       Q. Now, shoulder impingement syndrome, if we direct
15   you to the paragraph beginning shoulder impingement
16   syndrome refers on page two of your report, you indicate
17   that the main symptom is when a person lifts his arms
18   overhead. Correct?
19       A. Yes.
20       Q. When you're saying lift the arms overhead, are
21   you talking -- this is truly I'm just going to
22   demonstrate here straight out overhead or vertically
23   overhead. I want to understand.
24       A. Typically we talk about the straight out,
25   abduction is the most common way we evaluate for it, but

Page 57

1    it can be because the shoulder rotates. It's a very
2    complex joint. It can be elevation. Rotation is
3    unlikely, less likely to cause it, but, most typically,
4    it's when you after you started to elevate the abductor,
5    the shoulder which is the straight out motion you're
6    talking about, it gets to the point those muscles
7    contract and then fatten that the impingement is most
8    apparent.
9        Q. And just because we're on the record here and we
10   don't have a video camera, I'd like to describe the
11   motions you were doing here. And please stop me if I'm
12   wrong.
13       The first motion you did for the abduction was
14   you took the arm straight, moved it away from your body
15   up to about 90 degrees. Correct?
16       A. Correct.
17       Q. And the second motion you did was take the arm,
18   lift it up over your head so the hand was well above the
19   head. Correct?
20       A. I'm not sure that's correct.
21       Q. Do the second one --
22       The first one was the abduction motion.
23   Describe the second motion you did for me when you went
24   forward with the arm?
25       A. The forward is I was demonstrating a different

Page 58

1    motion, but it's less likely to cause problems. But
2    there are various tests that can be done, and these
3    really we rely on the orthopedist and physical therapist
4    to give us the opinion on that. But any kind of
5    elevation above the shoulder, above the 90-degree level
6    can, in my understanding, produce the pain. But the
7    primary one that I, as a primary physician, look for
8    would be the abduction.
9        Q. And the third motion that you did for us you
10   said typically does not cause the pain is the rotation.
11   Correct?
12       A. I want to retract that. I don't know that
13   rotation does or doesn't. In my experience as a
14   physician, rotation is less likely to cause shoulder pain
15   than the other motions.
16       Q. And rotation, just since, again, we can't show
17   on the record, was you rotated the arm at your side.
18   Correct?
19       A. Yes.
20       Q. Continuing down in the opinion section, it
21   indicates that a patient with shoulder impingement
22   syndrome whose pain and function have not been controlled
23   after three to six months of conservative treatment
24   should be considered for diagnostic work-up, MRI study of
25   choice, or referred or orthopedic evaluation. Is that

Page 59

1    your opinion, Doctor?
2        A. Yes.
3        Q. And first can you define what controlled is in
4    this context?
5        A. Generally control and in this context would mean
6    that the patient cannot perform his usual activity
7    without having to stop it because of pain.
8        Q. You said MRI or study of choice, Doctor.
9    Correct?
10       A. That's my understanding, yes.
11       Q. Is the basis for that from this up-to-date
12   article cited below?
13       A. Yes.
14       Q. Besides the MRI, are there other imaging studies
15   that can be used?
16       A. Yes.
17       Q. What other imaging studies?
18       A. I think the other is ultrasound.
19       Q. Could you use your x-ray?
20       A. X-rays are not generally useful in evaluating
21   shoulder impingement syndrome. They are useful in ruling
22   out other causes of shoulder pain.
23       Q. And is that because medicine -- is that because
24   medicine is sometimes -- I've heard a differential
25   diagnosis where you eliminate possibilities through

Page 60

1    diagnostic testing.
2        A. I'm not sure I understand your question.
3        Q. Sure.
4        You said an x-ray could be useful in ruling out
5    other causes?
6        A. Yes.
7        Q. So the idea would be we have a patient reporting
8    pain in the shoulder. Let's see if we can see something
9    on x-ray. If we see nothing, we can eliminate possible
10   causes of that shoulder pain.
11       MR. McCLAIN: Objection; form.
12       THE WITNESS: I wouldn't phrase it that way. We
13   -- no study is a hundred percent. No study can
14   completely rule out or in anything. You have to take the
15   entire patient the constellation of signs and symptoms
16   with which they present and come up with your best
17   opinion as to the various possible causes.
18   BY MR. MARUNA:
19       Q. And an x-ray would be a type of image. Correct?
20       A. Yes.
21       Q. And an image could be useful in diagnosing a
22   condition. Correct?
23       A. Yes.
24       Q. X-rays, do they show bones, Doctor?
25       A. Yes.

Page 61

1    Q. So if there was arthritis on a bone, would that
2  be visible in an x-ray?
3    A. It may be.  It may not be.
4    Q. Could x-rays show soft tissue?
5    A. Under certain circumstances, yes.
6    Q. All right.  Let's take a break at page four of
7  the report, Doctor.
8      Doctor, I'm going to direct you to a paragraph
9  which is under the heading of 4/9/13, and specifically
10  it's the bottom half of that paragraph beginning the
11  medical technicians scheduled an appointment for June 4
12  Dr. Obaisi finally saw Mr. Hemphill on June 6, more than
13  six weeks after he was first referred.  Is that what's
14  written on the page, Doctor?
15    A. Yes.
16    Q. Who made the referral for the steroid injection
17  referenced in the statement I just read?
18    A. I believe it was Dr. Davis.
19    Q. And what was Dr. Davis' role in the prison?
20    A. I believe she was a primary provider.
21    Q. And what was Dr. Obaisi's role?
22    A. He was the medical director, and I believe he
23  also saw patients primarily, but I'm not sure.
24    Q. Was Dr. Obaisi Dr. Davis' superior?
25    MR. McCLAIN:  Objection; foundation.

Page 62

1      THE WITNESS:  I don't know.
2  BY MR. MARUNA:
3    Q. You've worked in a variety of correctional
4  medical settings for a number of years.  Correct?
5    A. Yes.
6    Q. Would you say that a medical director would be
7  above someone entitled as staff physician in your
8  experience?
9      MR. McCLAIN:  Objection; form.
10      THE WITNESS:  I'm not sure what you mean by
11  above.
12  BY MR. MARUNA:
13    Q. Well, is there a hierarchy of medical doctors
14  inside many medical institutions?
15      MR. McCLAIN:  Objection; form.
16      THE WITNESS:  Again, I'm not sure what you mean
17  by hierarchy.
18  BY MR. MARUNA:
19    Q. You did a residency.  Correct?
20    A. Yes.
21    Q. Was there a chief resident?
22    A. Yes.
23    Q. Would the chief resident be the highest one in
24  the residency hierarchy?
25    A. The reason I'm having problems with this is that

Page 63

1  the person who hires you is --
2      MR. McCLAIN:  Do you want to rephrase the
3  question?
4      THE WITNESS:  Yes.  Please rephrase the
5  question.
6      MR. MARUNA:  What I'm getting at, and maybe we
7  can short circuit this, do you know Wexford's hierarchy
8  of medical providers in state department of corrections?
9      MR. McCLAIN:  Foundation.
10      THE WITNESS:  Do I know their -- no.
11  BY MR. MARUNA:
12    Q. Now, would you agree with me, Doctor, that if a
13  referral is made from one physician to another physician,
14  the physician receiving the referral needs to perform his
15  or her own independent medical evaluation of the patient
16  before performing a medical procedure?
17      MR. McCLAIN:  Objection; form.
18      THE WITNESS:  In most instances, yes, there may
19  be some specific types of referrals where that is not
20  necessary.  But in a case like this, I would agree that
21  the person performing an injection into the bursa of the
22  shoulder has an obligation to perform an evaluation.
23  BY MR. MARUNA:
24    Q. So if Dr. Davis recommended an injection and
25  referred the patient to Dr. Obaisi, would you agree that

Page 64

1  Dr. Obaisi had an obligation to perform his own
2  assessment before giving the injection into the patient's
3  shoulder?
4    A. Yes.
5    Q. Now, I'm looking at again directing you back to
6  the second paragraph below the 41913 section.  Is there
7  any mention of Dr. Obaisi performing an x-ray on the
8  patient's shoulder upon receiving this referral from
9  Dr. Davis?
10    A. I don't recall.
11    Q. Do you know what that x-ray result said?
12      MR. McCLAIN:  Objection; form, foundation.
13      THE WITNESS:  Dr. Obaisi diagnosed tenderness or
14  tendonitis.  The reason I used both words is that I had
15  trouble reading the signature, but, ultimately, I believe
16  he diagnosed tendonitis, and I think it was not
17  tenderness.  He ordered an x-ray this was June 6, which
18  was negligent.
19  BY MR. MARUNA:
20    Q. And then after Dr. Obaisi got the result of the
21  x-ray, did he perform the injection?
22    A. No.
23    Q. He did not?
24    A. He did not on June 6, he did not perform the
25  injection.

Page 65

1    Q. When did he get the results to the x-ray?
2    A. June 6. Well, I'm not sure when he got the
3  results of the x-ray. He ordered the x-ray, and I would
4  have to go back to record to determine when that report
5  was available, if he initialed it, when it was available,
6  and whether he dated it when he was available.
7    Q. Let's turn to page six of the report, Doctor.
8  I'm going to direct to you the top under the comments
9  section, the second sentence there, the sentence begins,
10 "By Wexford policy, the grievance officer must submit his
11 findings to the chief administrative officer within two
12 months of filing."
13     Is that a fair representation of what's on the
14 page?
15    A. Yes.
16    Q. What Wexford policy are you citing to when you
17 say by Wexford policy?
18    A. I referred to my footnote No. 2 --
19    Q. And your opinion is that that is a Wexford
20 policy, Doctor?
21    A. My opinion is that this is an IDOC Illinois
22 Department of Corrections' policy.
23    Q. So above in the comments' section where it says
24 by Wexford policy is that a typographical error and it
25 should say IDOC policy based on your footnote?

Page 66

1    A. Well, I'm not sure I would call it an error.
2  I'm not sure I understand the exact contractual
3  arrangement between Wexford and IDOC.
4    Q. But you do agree that the reference to the
5  sentence I just read the footnote does refer to an IDOC
6  --
7    A. Yes.
8    Q. -- directive. Correct?
9    A. Yes.
10    Q. Do you know who developed the grievance process
11 at Stateville, the Department of Corrections, or Wexford.
12     MR. McCLAIN: Objection; foundation.
13     THE WITNESS: No.
14 BY MR. MARUNA:
15    Q. Do you know who implements the grievance process
16 at Stateville, DOC, or Wexford?
17     MR. McCLAIN: Same objection.
18     THE WITNESS: No.
19 BY MR. MARUNA:
20    Q. Doctor, are you familiar with -- I've heard them
21 called SOAP notes or medical acronyms S-O-A-P?
22    A. Yes.
23    Q. What does the S stand for?
24    A. Subjective.
25    Q. O?

Page 67

1    A. Objective.
2    Q. A?
3    A. Assessment.
4    Q. And the P?
5    A. Plan.
6    Q. What is a subjective assessment, Doctor?
7    A. It's what the patient reports, and it's
8  generally -- we're generally instructed to use the
9  patient's own words in the subjective section, although
10 in practice that isn't always the case.
11    Q. And what is the objective mean?
12    A. Objective is any physical planning laboratory
13 study, any data that can be verified objectively. That
14 doesn't help.
15     Any verifiable data.
16    Q. So the subjective is what the patient tells you.
17 Correct?
18    A. Yes.
19    Q. And the objective is what the practitioner can,
20 and I'm going to do the same thing you did there, say
21 objectively verify. Correct?
22    A. Yes.
23    Q. And --
24    A. The reason -- sometimes in the objective section
25 providers documenting that will refer to the past medical

Page 68

1  history as part of the objective section although not
2  infrequently. The past medical history will include a
3  subjective component.
4    Q. But the objective is the verifiable information?
5    A. Yes.
6    Q. Based on the subjective and the objective, then
7  is the A, the assessment made?
8    A. Yes.
9    Q. And then the plan is how the doctor will respond
10 to the assessment. Correct?
11    A. Yes.
12    Q. So I want to direct you to the 8/31/13 note, and
13 it's about halfway through that paragraph. It's on page
14 7, Doctor. And I'm going to direct you, it begins on 10
15 -- strike that. On 10/22/13 Dr. Obaisi saw Mr. Hemphill
16 but did not ask him about his current symptoms and did
17 not perform an examination. Is that what's written on
18 the page, Doctor?
19    A. Yes.
20    Q. So if I can mark this as three, this is one of
21 the medical records I want to show you, Doctor.
22     (Deposition Exhibit No. 3 was marked for
23     identification.)
24 BY MR. MARUNA:
25    Q. And, Doctor, I put in front of you Illinois

Page 69

1  Department of Corrections offender outpatient progress
2  note Bates stamped IDOC-74. I'm going to direct you to
3  the bottom note on 10/22/13.
4      Do we see in this note there's an objective
5  assessment contained here?
6      MR. McCLAIN: Objection; form, foundation.
7      THE WITNESS: There is a letter O there, and
8  there's some handwriting after that.
9  BY MR. MARUNA:
10     Q. And you said an O would mean an objective
11 assessment. Correct?
12     A. Yes.
13     Q. So an O would be something that Dr. Obaisi could
14 objectively verify when he saw the patient?
15     A. Yes.
16     Q. On 10/22/13. Correct?
17     A. Yes.
18     Q. And we see in the top of the note the patient's
19 reporting to Dr. Obaisi that he would like a steroid
20 injection. Correct?
21     A. Yes.
22     Q. And does he report to the doctor that the pain
23 came back, I think it says, last week? Would that be
24 your reading of it?
25     A. I'm -- I'm not sure right shoulder pain came. I

Page 70

1  see I did not -- was not able to read that as back. But
2  last week was July -- pain came back last week was July
3  17. I don't understand that.
4      Q. Would you agree that it says right shoulder pain
5  came back? Could we read that part and agree on it?
6      MR. McCLAIN: Objection; form, calls for
7  speculation.
8      THE WITNESS: It says asking for steroid
9  something. I couldn't read that. Right shoulder pain
10 came, and I assume that's back, last week was July 17.
11 And tender right shoulder something, something, movement,
12 something.
13 BY MR. MARUNA:
14     Q. What does pain came back mean to you as a
15 medical provider?
16     A. I think that's self-evident.
17     Q. Well, what does it mean to you as a medical
18 provider if it's evident?
19     A. It means the pain came back.
20     Q. And we see the patient is asking for another
21 steroid injection. Correct?
22     A. Yes.
23     Q. Thank you, Doctor.
24     I'm going to direct you to the bottom of page 7.
25 You're discussing Dr. Shicker's e-mail to Dr. Obaisi on

Page 71

1  2/7/14. See that?
2      A. Yes.
3      Q. Okay. And does the report state Dr. Shicker
4  e-mailed Dr. Obaisi on 2/7/14 requesting a synopsis of
5  Mr. Hemphill's shoulder care in response to a letter Mr.
6  Hemphill had written to the governor's office requesting
7  an MRI. So that on the page, Doctor?
8      A. Yes.
9      Q. In the comments section below that the comment
10 is Dr. Obaisi's reply does not accurately convey the
11 course of Mr. Hemphill's treatment. The first bullet
12 point states Mr. Hemphill presented with symptoms on the
13 first of February 2013, but Dr. Obaisi's synopsis begins
14 six months later and covers a period of only three
15 months.
16     Is that correct?
17     A. Yes.
18     Q. First off, that's a typo where it says Mr.
19 Hemphill's, apostrophe S. Correct?
20     A. Yes, that's a typo.
21     Q. So it's Mr. Hemphill presented with symptoms on
22 the first of February of 2013 but Dr. Obaisi's synopsis
23 began six months later. Correct?
24     A. Yes.
25     Q. Would you agree with me that the word "synopsis"

Page 72

1  means a brief summary?
2      A. No.
3      Q. What does synopsis mean to you, Doctor?
4      A. It means extraction of a number of events.
5      Q. So the criticism here or the opinion -- strike
6  that, is that Dr. Obaisi's synopsis to Dr. Shicker did
7  not go far enough back in time?
8      A. In part.
9      Q. Why did it need to go back further in time than
10 the portion that Dr. Obaisi cited to Dr. Shicker?
11     A. Dr. Shicker requested a synopsis of his shoulder
12 care. His shoulder care began in February when he was
13 first seen by, I believe it was an LPN Dr. Davis and
14 Dr. Obaisi. That's when it began, and that's when the
15 synopsis should have begun.
16     Q. Have you been asked in a medical context before
17 to give a history of the patient?
18     A. Yes.
19     Q. And as a medical provider you make a judgment on
20 how far back the history goes. Correct?
21     A. By and large.
22     Q. Let's turn the page. I want to direct you to
23 the bullet point beginning Dr. Obaisi's statement that
24 the injection of 7/31/13, gave relief until 10/31/13 was
25 not consistent with the medical record even a -- as even

Page 73

1  a cursory review would have revealed to Dr. Obaisi as he
2  prepared his synopsis.
3      Is that accurate on the page, Doctor?
4      A. Yes.
5      Q. The first sub-bullet point you cite here as
6  evidence is that on 8/31/13, one month after the first
7  steroid injection Mr. Hemphill filed a request to see
8  Dr. Obaisi about his shoulder. Is that correct?
9      A. Yes.
10     Q. Do you know if Dr. Obaisi saw that request?
11     A. I don't know.
12     Q. Do you know how sick call requests work inside
13 Stateville correctional center?
14     MR. McCLAIN: Objection; foundation.
15     THE WITNESS: There is a standard by which
16 requests for service should be managed in a correctional
17 environment.
18 BY MR. MARUNA:
19     Q. You know who drafted the sick call request for
20 the IDOC or Wexford?
21     MR. McCLAIN: Objection; foundation.
22     THE WITNESS: I don't know.
23 BY MR. MARUNA:
24     Q. The next sub-bullet point is on 9/9/13 Mr.
25 Hemphill complained of pain in his shoulder and he told

Page 74

1  the nurse that he wanted a repeat steroid injection.
2  Correct?
3      A. Yes.
4      Q. I guess there's two questions there.
5      First, Doctor, if injection wasn't giving the
6  patient any relief, why would he ask for a second
7  injection?
8      MR. McCLAIN: Objection; calls for speculation,
9  foundation.
10     THE WITNESS: I've never said that the injection
11 didn't provide relief.
12 BY MR. MARUNA:
13     Q. Well, above in the bullet point Dr. Obaisi's
14 statement that the injection of 7/31/13 gave relief until
15 10/31/13 was not consistent, would you agree with me that
16 the patient was seeking another injection as of
17 September 9, 2013?
18     A. Yes.
19     Q. Would you agree that if the shoulder injection
20 was not providing relief, it would be inconsistent for a
21 patient to keep asking for it?
22     A. No.
23     MR. McCLAIN: Objection; form, foundation.
24 BY MR. MARUNA:
25     Q. And we see that this request on 9/9/13 was to a

Page 75

1  nurse. Correct?
2      A. Yes.
3      Q. Do you know if Mr. Obaisi ever learned of that
4  request?
5      A. I don't know.
6      Q. The next sub-bullet point on 9/11/13 another
7  physician ordered a 90-day supply of Naprosyn for Mr.
8  Hemphill. Is that correct, Doctor?
9      A. Yes.
10     Q. And that would be another physician besides
11 Dr. Obaisi?
12     A. I believe so. I'm not sure who ordered it.
13     Q. Well, it says another physician. Correct?
14     A. Yes.
15     Q. And since Dr. Obaisi's reference at the top of
16 this bullet point list, can we assume that would be not
17 Dr. Obaisi?
18     A. I believe so. I'd have to check the record to
19 be certain.
20     Q. The next sub-bullet point says on 10/11/13 Mr.
21 Hemphill filed a grievance requesting referral to an
22 outside physician. Is that correct?
23     A. Yes.
24     Q. Any evidence that you're aware of that Dr.
25 Obaisi saw this grievance?

Page 76

1      A. No.
2      Q. Do you know if grievances are contained in the
3  patient's medical chart?
4      MR. McCLAIN: Objection; foundation.
5      THE WITNESS: Request for medical services are
6  -- physicians usually -- usually are involved in managing
7  medical grievances, but I believe it will depend on the
8  institution as to whether the grievance is contained in
9  the medical chart.
10 BY MR. MARUNA:
11     Q. You said request for medical services are in the
12 medical services chart?
13     A. Yes.
14     Q. What is the basis for that opinion?
15     A. That's standard of care.
16     Q. Have you reviewed any Department of Corrections'
17 directive on that?
18     MR. McCLAIN: Objection; ambiguous.
19     THE WITNESS: I don't recall.
20 BY MR. MARUNA:
21     Q. Do you know who developed the medical exit
22 recall process for Stateville correctional center, the
23 Department of Corrections, or Wexford.
24     MR. McCLAIN: Objection; foundation.
25     THE WITNESS: No.

Page 77

1    BY MR. MARUNA:
2        Q.  Do you know who developed the grievance process
3    for Stateville Correctional Center, the Department of
4    Corrections, or Wexford?
5        A.  No.
6        Q.  Can I direct you to page nine, Doctor.  I'm
7    going to direct you to the first full paragraph on page
8    nine beginning "Throughout the remainder."  Do you see
9    that?
10       A.  Yes.
11       Q.  The statement reads, "Throughout the remainder
12   of 2014, Mr. Hemphill's medical condition did not
13   significantly improve."
14           Is that's what's on the page, Doctor?
15       A.  Yes.
16       MR. MARUNA:  Let's mark this as four.
17       (Deposition Exhibit No. 4 was marked for
18       identification.)
19   BY MR. MARUNA:
20       Q.  Doctor, we've placed in your hand what's been
21   marked as No. 4.  It's an Illinois Department of
22   Corrections Offender Outpatient Progress Notes with the
23   date of 5/1/14.  Correct?
24       A.  Yes.
25       Q.  I see a Bates number of IDOC-83.

Page 78

1            Any reason to disagree with me?
2        A.  No.
3        MR. MARUNA:  Counsel?
4        MR. McCLAIN:  No.
5    BY MR. MARUNA:
6        Q.  I want to direct you to the narrative note after
7    steroid injection last October, our shoulder pain
8    resolved.  Correct?  Is that what it says on there,
9    Doctor?
10       A.  Yes.
11       Q.  What does shoulder pain resolved mean to you as
12   a medical provider?
13       A.  It's plain, plain English.  The shoulder pain
14   resolved.
15       Q.  Then we see below that the patient is asking for
16   injection because pain started to come back.  Correct?
17       A.  Yes.
18       Q.  So Dr. Obaisi has before him on May 1, '14, a
19   report from the patient that the injection resolved his
20   pain.  Correct?
21       A.  Yes.
22       Q.  Now, he does have report that pain is coming
23   back.  Correct?
24       A.  Yes.
25       Q.  So Dr. Obaisi's plan here is to give another

Page 79

1    steroid injection.  Correct?
2        A.  Yes.
3        Q.  And is the basis of that plan because the
4    patient told Dr. Obaisi the pain resolved with the last
5    steroid injection?
6        MR. McCLAIN:  Objection; foundation.
7        THE WITNESS:  I disagree, no.
8    BY MR. MARUNA:
9        Q.  What's the basis for the next steroid injection?
10       MR. McCLAIN:  Objection; foundation.
11       THE WITNESS:  The entire medical record
12   including this examination which is right shoulder
13   abduction movement which is an incomplete evaluation, but
14   when you determine to repeat an injection, you take into
15   account the entire medical record, the entire history,
16   and the patient's clinical status.
17   BY MR. MARUNA:
18       Q.  Do you know what Dr. Obaisi's medical background
19   is?
20       A.  No.
21       Q.  Do you know what he's board certified in?
22       A.  No.
23       Q.  Do you know if Dr. Obaisi is a general surgeon
24   by training?
25       A.  I don't know.

Page 80

1        Q.  I'm going to direct you to the bottom of page
2    nine now, Doctor.  You can put away Exhibit 4.
3            At the bottom of page nine, the last sentence
4    indicates he, so Mr. Hemphill, refused nurse evaluation
5    at that time preferring to wait to be seen -- or strike
6    that.  Let me start again.
7            "He refused nurse evaluation at that time
8    preferring to wait to see a physician as rescheduled on
9    11/12/14."  Correct?
10       A.  Yes.
11       Q.  So Mr. Hemphill was offered a nurse evaluation
12   and refused to see the nurse.  Is that correct?
13       A.  Yes.
14       Q.  Instead he said he wanted to wait to see the
15   physician.  Correct?
16       A.  Yes.
17       Q.  Is refusing a medical appointment with a medical
18   provider consistent with a patient experiencing severe
19   pain?
20       MR. McCLAIN:  Objection; form, foundation, calls
21   for speculation.
22       THE WITNESS:  Would you rephrase the question?
23   BY MR. MARUNA:
24       Q.  Is refusing around appointment with a medical
25   provider consistent with someone who is experiencing

Page 81

1  severe pain?
2      MR. McCLAIN: Same objections.
3      THE WITNESS: It can be.
4  BY MR. MARUNA:
5      Q. How is that consistent, Doctor?
6      A. I'm -- I don't know how to answer that. How is
7  that inconsistent?
8      Q. Well, my question was very simple. If Mr.
9  Hemphill was experiencing severe pain and was seeing a
10  nurse and he declined to see the nurse and said I'll wait
11  to see the Doctor, is that what you would expect with a
12  patient experiencing severe pain, to wait?
13      MR. McCLAIN: Objection; form, foundation,
14  ambiguous.
15      THE WITNESS: It is possible. It depends on the
16  clinical situation.
17  BY MR. MARUNA:
18      Q. Explain that.
19      A. There are procedures. There's access to care
20  that a physician can provide that a nurse cannot. Mr.
21  Hemphill was supposed to be seen on September 26, and he
22  was not. He was supposed to be seen on October 9, and he
23  was not. He was supposed to be seen on October 11, and
24  he was not. He had wanted to see a physician because the
25  physician has access to care and procedures that a nurse

Page 82

1  would not.
2      And so under certain circumstances, and this was
3  possibly one of them, there will be situations where it
4  would be inappropriate to see a nurse, and it'd be more
5  appropriate to see a physician. Also I don't believe
6  there's anything here suggesting --
7      Let me see that. You said severe pain. Is it
8  your impression that he was in severe pain at the time?
9      Q. I'm asking you, Doctor. But you do agree he
10  refused, he was offered a nurse evaluation and he refused
11  and said he'd rather wait to see the doctor?
12      A. Right, correct.
13      Q. Do you know what a lockdown is?
14      A. Yes.
15      Q. What's a lockdown?
16      A. In a prison or a jail, if there's an event that
17  occurs that might impact the security of the institution
18  of the staff or inmates, inmates are ordered to return to
19  their cells. They're locked in their cells, and any
20  movement within the institution is curtailed until the
21  security situation can be brought under control. It's
22  called a lockdown.
23      Q. Do you know who controls lockdown at the
24  Department of Corrections, the IDOC, or Wexford?
25      A. Generally, the -- it is custody that controls

Page 83

1  the lockdown.
2      Q. Which would be the Department of Corrections?
3      A. Well, Department of Corrections includes health
4  care, but it's custody, then health care administrative,
5  then on and on. But it is custody officers and up their
6  chain of command that would control when a lockdown
7  occurs and when it's lifted.
8      Q. Let me show you, let's mark this -- were we on
9  five now?
10      (Deposition Exhibit No. 5 was marked for
11      identification.)
12  BY MR. MARUNA:
13      Q. Doctor, showing you what we've marked as No. 5,
14  it's an Illinois Department of Corrections Offender
15  Outpatient Progress Notes, Bates stamped IDOC 106. I
16  show the first entry as dated 7/24/15. Correct?
17      A. Yes.
18      Q. States, "the nurse went to treat inmate and he
19  refused RN, SC advised"?
20      A. Yes.
21      Q. So would you agree with me on July 24, 2015, the
22  patient refused an offer of nursing sick call. Correct?
23      A. It says, "Inmate not treated today, secondary
24  inmate refused RN sick call, advised to notify if any
25  problems arise."

Page 84

1      Q. So would you agree with me on July 24, 2015, the
2  inmate refused RN sick call?
3      A. Yes.
4      Q. If you go to the bottom of the page there's
5  another entry 7/29/15 says, "Inmate not seen in nurse
6  sick call due to going to yard." Correct?
7      A. Yes.
8      Q. So a week later he was set for sick call, and
9  the patient went to the yard instead of going to sick
10  call. Correct?
11      MR. McCLAIN: Objection; foundation.
12      THE WITNESS: I'm not sure. Say that again
13  please.
14  BY MR. MARUNA:
15      Q. July 29, 2015, the patient was set for sick call
16  and he was not seen in nurse's sick call due to going to
17  the yard. Correct?
18      A. Yes, according to the cell house staff.
19      Q. Let me show you another note here, Doctor.
20  Actually, strike that. Sorry.
21      Doctor, briefly, if I can direct you to page 11,
22  I see that your notes there's these italicized times
23  given 9/16/15, for example, on this page?
24      A. Yes.
25      Q. The patient didn't transfer down to hill until

Page 85

1    3/23 of 16.  Correct?  I think it's the next paragraph in
2    your report.
3         A.  Yeah, I see that.  I believe that's correct.
4    For some reason 3/26 sticks in my mind, but it says here
5    3/23.  I'll go with that.
6         Q.  What I'm trying to get at, Doctor, why is there
7    a gap of any discussion between 9/16/15 and 3/23/16 in
8    your report?
9         MR. McCLAIN:  Objection; mis-characterizes the
10   report.
11        THE WITNESS:  Could you rephrase that?
12   BY MR. MARUNA:
13        Q.  So your report, the last date I see at
14   Stateville discussed is the -- in the section titled
15   9/16/15, correct, and the last specific note I see
16   discussing 2016 is a sentence there, "A brief physical
17   therapy noted on 3/10/16 two weeks before Mr. Hemphill's
18   transfer to Hill Correctional Center.  Right?
19        That's all the discussion of 2016 I'm seeing,
20   correct, at Stateville, form.
21        MR. McCLAIN:  Objection; mis-characterizes the
22   report, form.
23        THE WITNESS:  At the top of page ten where I did
24   the Title 2015-2016 Stateville Correctional Center, I
25   summarize his overall course during his remaining time at

Page 86

1    Stateville.
2    BY MR. MARUNA:
3         Q.  Does the report mention an 11/4/15 medical note?
4         A.  No.
5         Q.  Let's take a look at that note.
6         (Deposition Exhibit No. 6 was marked for
7          identification.)
8    BY MR. MARUNA:
9         Q.  I'm showing you Illinois Department of
10   Corrections Offender Outpatient Progress Note with the
11   Bates stamp of IDOC 119.
12        I want to direct you to the 11/4/15 note.  This
13   is by a different doctor, Dr. Martye, and I want to
14   discuss the objective section of her note.
15        Do you see that, Doctor?
16        A.  Yes.
17        Q.  What was Dr. Martye's finding on 11/4/15?
18        A.  Grossly normal right shoulder with normal range
19   of motion.
20        Q.  You can put away Exhibit 6, Doctor.
21        Exhibit 6 is not mentioned in your report.
22   Correct?
23        A.  Correct.
24        Q.  Does your report discuss Dr. Obaisi's November
25   24, 2015, appointment with Mr. Hemphill?

Page 87

1         A.  I don't know.  You'll have to refer me to the
2    page.
3         Q.  Well, I will tell you I don't believe it does,
4    so I can't refer to you a page.
5         A.  You said November 24, 2015, meeting with Dr.
6    Obaisi?
7         Q.  11/24/15.
8         A.  No, the report does not.
9         Q.  Let's mark this as 7.
10        (Deposition Exhibit No. 7 was marked for
11         identification.)
12   BY MR. MARUNA:
13        Q.  Doctor, showing you what's been marked as No. 7,
14   it's an Illinois Department of Corrections Offender
15   Outpatient Progress Note with the date of 11/24/15.  I
16   show a Bates stamp of 121.  Correct?
17        A.  Yes.
18        Q.  Are you familiar with the medical acronym WNL?
19        A.  Yes.
20        Q.  What does that stand for?
21        A.  "Within normal limits."
22        Q.  To a layman what does that mean?
23        A.  Normal.
24        Q.  And we see that this is a Dr. Obaisi note from
25   November 24, 2015.  We see the patient is requesting a

Page 88

1    low bunk because of pain in the right shoulder and
2    Dr. Obaisi writes XRWNL exam WNL full range of motion.
3    Correct?
4         A.  Correct.
5         Q.  And then we see below that does it say,
6    "Offender informed he is not eligible for low bunk, left
7    exam room angry."  Is that on the page?
8         A.  Yes.
9         Q.  And is this report discussed in -- strike that.
10        Is this medical examination between Dr. Obaisi
11   and the patient discussed in your expert report?
12        A.  No.
13        MR. McCLAIN:  Objection; mis-characterizes the
14   report.
15   BY MR. MARUNA:
16        Q.  Let me direct you to page 12 of your report,
17   Doctor, second paragraph.  I want to direct you to the
18   sentence beginning, "And when Mr. Hemphill was
19   transferred to another correctional center, previously
20   three weeks before that appointment, Stateville failed to
21   notify the receiving institution of the referral
22   resulting in further delay."
23        Is that an accurate representation of the page,
24   Doctor?
25        A.  Yes.

Page 89

1  Q.  Is there any evidence that you have, Doctor,
2  that Dr. Obaisi knew that the patient was transferring
3  from Stateville down to the southern part of the state?
4      A.  I would have to review the records.
5      Q.  Did you review any transfer policies that the
6  Department of Illinois has?
7      A.  Transfer policies?
8      Q.  Yes.
9      A.  No.  I based my opinion on the standard of care
10 for transfers in a correctional facility.
11     Q.  But you didn't review any IDOC specific policies
12 --
13     A.  I don't recall.
14     Q.  Doctor, I want to talk briefly about the Hill
15 Correctional Center, and we'll just be very brief on
16 this.
17         The patient ends up getting an MRI at Hill?
18     A.  They ordered an MRI, and it was performed.
19     Q.  What did the MRI find?
20     A.  The MRI found evidence of --
21         I would have to see the MRI report.  It found
22 abnormalities in the shoulder.
23     Q.  What abnormalities?
24     A.  I would have to see the report.
25     Q.  Well, I'll ask this then, do you know if the

Page 90

1  operative report found indications of a tear of the
2  rotator cuff?
3      A.  Yes.
4      Q.  Was it specifically cited in the operative
5  report?
6      A.  Yes, I believe so.  It was -- to my
7  recollection, there was a partial tear of one of the four
8  muscles that constitute the rotator cuff.  Whether that
9  was on the MRI, on the op report, or both, I don't
10 recall.
11     Q.  Doctor, if you'll give me a second, I think I've
12 asked all my questions.  Let me look over my notes, and
13 then I'll pass the witness.
14     A.  Sure.
15         (Pause in proceedings.)
16 BY MR. MARUNA:
17     Q.  Doctor, did you make any handwritten personal
18 notes when reviewing this file?
19     A.  I don't think so.
20     Q.  Did you make any typed personal notes when you
21 were reviewing this file?
22     A.  I would have created a draft report as I went
23 where I would put notes that were -- constitute the
24 initial draft.
25     Q.  Did you dictate any findings that you had as a

Page 91

1  review in the records?
2      A.  No.
3          MR. MARUNA:  I have no further questions at this
4  time, Doctor.  Thank you.
5          MR. McCLAIN:  I have no questions.
6          THE REPORTER:  Do you want a copy?
7          MR. McCLAIN:  Yes, please.
8          (Time noted:  12:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1              REPORTER'S CERTIFICATE
2
3      I, DONNA J. WILLIAMS, CSR No. 11133, Certified
4  Shorthand Reporter, certify:
5      That the foregoing proceedings were taken before me
6  at the time and place therein set forth, at which time
7  the witness was put under oath by me;
8      That the testimony of the witness, the questions
9  propounded, and all objections and statements made at the
10 time of the examination were recorded stenographically by
11 me and were thereafter transcribed;
12     That the foregoing is a true and correct transcript
13 of my shorthand notes so taken.
14     I further certify that I am not a relative or
15 employee of any attorney of the parties, nor financially
16 interested in the action.
17     I declare under penalty of perjury under the laws of
18 California that the foregoing is true and correct.
19
20
21              <%17820,Signature%>
22              DONNA J. WILLIAMS, CSR NO. 11133
23
24
25

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

September 4, 2018

To: Andrew McClain, Esq.

Case Name: Hemphill, Carl v. Wexford Health Sources, Inc., et al.

Veritext Reference Number: 2982065

Witness: Dr. David Hellerstein Deposition Date: 8/9/2018

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change. Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

---

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 2982065
3  CASE NAME: Hemphill v. Wexford Health Sources, Inc., et al.
   DATE OF DEPOSITION: 8/9/2018
4  WITNESS' NAME: Dr. David Hellerstein
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date          Dr. David Hellerstein
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
       Notary Public
24
25 _____
       Commission Expiration Date

---

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 2982065
3  CASE NAME: Hemphill v. Wexford Health Sources, Inc., et al.
   DATE OF DEPOSITION: 8/9/2018
4  WITNESS' NAME: Dr. David Hellerstein
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  _____
   Date          Dr. David Hellerstein
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18 _____
       Notary Public
19
   _____
20     Commission Expiration Date
21
22
23
24
25

---

1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 8/9/2018
3  PAGE/LINE(S) /        CHANGE        /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____

20 _____
   Date          Dr. David Hellerstein
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
       Notary Public
24
   _____
25     Commission Expiration Date

Hemphill vs Wexford Health Sources, Inc.

15 CV 4968

Deposition of: Kennon Tubbs, M.D.

Taken on: December 13, 2018



LEXITAS™
180 North LaSalle Street, Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.lexitaslegal.com

Exhibit H

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
   _____
 3
   CARL HEMPHILL,                 )
 4                                )
               Plaintiff,         )
 5                                )
   vs.                            ) Case No. 15 CV 4968
 6                                )
   WEXFORD HEALTH SOURCES,        ) Judge:  Sharon Johnson
 7 INC., SALEH OBAISI, ANN        ) Coleman
   HUNDLY DAVIS, LATONYA          )
 8 WILLIAMS, LOUIS SHICKER,       ) Magistrate Judge:
   MICHAEL LEMKE, DORRETTA        ) Mary M. Rowland
 9 O'BRIEN,                       )
                                  )
10             Defendants.        )
   _____
11 _

12        DEPOSITION OF:  KENNON TUBBS, M.D.

13               DECEMBER 13, 2018

14            2:05 P.M. TO 7:06 P.M.

15

16        Location:  Tempest Reporting, Inc.
              175 South Main, Suite 710
17               Salt Lake City, UT

18    Reporter:  Phoebe S. Moorhead, CRR, RPR, CSR
    Certified Shorthand Reporter for the State of Utah

19

20

21

22

23

24

25
```



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 2..5

---

**Page 2**

```
 1            A P P E A R A N C E S
 2
 3 For the Plaintiff:
 4      Andrew T. McClain
        FOLEY & LARDNER LLP
 5      321 North Clark Street
        Suite 2800
 6      Chicago, IL 60654-5313
        (Appeared via videoconference)
 7
 8 For the Defendant:
 9      James F. Maruna
        CASSIDY SCHADE LLP
10      20 North Wacker Drive
        Suite 1000
11      Chicago, IL 60606
12                -ooOoo-
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            C O N T E N T S
 2
 3 Deposition of KENNON TUBBS, M.D.:        Page
 4   Examination by Mr. McClain...................   4
     Examination by Mr. Maruna...................  142
 5   Further Examination by Mr. McClain...........  160
 6                -ooOoo-
 7
 8            E X H I B I T S
 9 Exhibit  Description                           Page
10     1  Deposition Notice....................   6
       2  Tubbs Expert Report..................  11
11     3  Offender Outpatient Progress Notes...  43
       4  Offender Sick Call Requests..........  50
12     5  E-mail String Between Obaisi and
          Shicker............................  53
13     6  Offender Outpatient Progress Note....  57
       7  Offender Sick Call Requests..........  61
14     8  Medical Special Services Referral
          and Report..........................  64
15     9  Offender Outpatient Progress Notes...  77
      10  Offender Sick Call Request and
16        Offender Outpatient Progress Notes... 103
      11  Management of Shoulder Impingement
17        Syndrome and Rotator Cuff Tears...... 107
      12  Offender Sick Call Requests.......... 112
18    13  Offender Outpatient Progress Notes... 123
      14  Offender Outpatient Progress Notes... 137
19    15  Offender Sick Call Request.......... 148
20                -ooOoo-
21
22        I T E M S   R E Q U E S T E D
23                None
24                -ooOoo-
25
```

**Page 4**

```
 1            P R O C E E D I N G S
 2            KENNON TUBBS, M.D.
 3            called as a witness herein, having been
 4 first duly
 5   sworn by the Certified Court Reporter to tell the
 6   truth, was examined and testified as follows:
 7            EXAMINATION
 8 BY MR. MCCLAIN:
 9    Q.    Good afternoon, Dr. Tubbs.  My name is
10 Andrew McClain, and I represent Carl Hemphill.  I'm
11 attending this deposition by video conference.  So if
12 at any time you can't hear me, can't understand me, or
13 if the signal gets cut out or bad, please let me know.
14 You can raise your hand to signify that you can't hear
15 me.
16            Can you please state your name for the
17 record?
18    A.    Kennon Christopher Tubbs.
19    Q.    And can you please spell it?
20    A.    K-E-N-N-O-N; Christopher,
21 C-H-R-I-S-T-O-P-H-E-R, Tubbs, T-U-B-B-S.
22    Q.    Dr. Tubbs, have you ever been deposed
23 before?
24    A.    I have.
25    Q.    And you understand that you're under oath
```

**Page 5**

```
 1 today?
 2    A.    Yes.
 3    Q.    I'm going to be asking you a series of
 4 questions, and if you don't understand a question,
 5 please let me know, and I'll attempt to rephrase the
 6 question.  If you answer a question, I will assume
 7 that you heard the question correctly and that your
 8 answer was in regards to that question.  Is that a
 9 fair assumption?
10    A.    Yes.
11    Q.    And one thing I just want to remind you of
12 is please answer audibly.  No shaking of the head or
13 "uh-huhs" or "huh-uhs."  Please give "yes," "no," and
14 full answers.
15            If at any time you want to take a break,
16 please let me know.  We are here to accommodate you.
17 So feel free to take a break at any time.  But I ask
18 that before we take a break, you answer any pending
19 questions.  Do you understand that?
20    A.    Yes.
21    Q.    You've been retained by certain defendants
22 in this case, and those defendants are Wexford Health
23 Sources, Saleh Obaisi, Latonya Williams, and Ann
24 Davis. Is that correct?
25    A.    Yes.
```

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 6..9

Page 6

1     MR. MCCLAIN:  I just want to back up one
2 thing.  James, I'm going to put a note on the record
3 here about Shawn Peters.  Shawn Peters represents the
4 state defendants in this case.  He was previously
5 given notice of this deposition today.  And as of
6 right now, Shawn has not called in and is not
7 appearing in person. Both myself and James attempted
8 to contact Shawn to see if he was calling in.  We have
9 not heard otherwise.  So we both have agreed to
10 proceed with the deposition as scheduled.
11     MR. MARUNA:  Agreed.
12     Q.     (BY MR. MCCLAIN) Doctor, you've been
13 called to testify today pursuant to a notice of
14 deposition, correct?
15     A.     Yes.
16     MR. MCCLAIN:  Court reporter, can you
17 please tender to the witness Exhibit-1?
18     (Exhibit-1 marked.)
19 BY MR. MCCLAIN:
20     Q.     Dr. Tubbs, you've been tendered a notice
21 of deposition.  Have you seen this document before?
22     A.     Yes.
23     Q.     And this is the notice that summoned your
24 presence today at this deposition, correct?
25     A.     Yes.

Page 7

1     Q.     If you could please direct your attention
2 to the bottom half of page 1, there is a number 1
3 there, which indicates you were required to bring any
4 and all communications between counsel and the witness
5 discussing compensation of the witness for the
6 expert's study or testimony.  Do you have any
7 documentation
8 today responsive to that request?
9     A.     No.
10     MR. MARUNA:  Oh, can we go off real quick?
11     (Discussion off the record.)
12     Q.     (BY MR. MCCLAIN) There's a second request
13 for any and all communications that identify the facts
14 and data that the parties' attorney provided and that
15 the expert considered in forming the opinions to be
16 expressed.  Do you have any additional documentation
17 related to that request?
18     A.     I do not have any additional information
19 or documents.
20     Q.     And finally, Request 3 requests that you
21 bring any documentation or information regarding any
22 assumptions that the defendants' attorney provided and
23 that the expert relied on in forming the opinions to
24 be expressed.  Do you have any additional information
25 or documents related to that request?

Page 8

1     A.     No.
2     Q.     Thank you.  What have you done to prepare
3 for today's deposition?
4     A.     I have read the documents for the case.
5 Do you want me to list them?
6     Q.     Are they the documents referred to in your
7 report?
8     A.     They are.
9     Q.     Have you talked to anyone about the
10 deposition?
11     A.     Counsel.
12     Q.     Counsel being James Maruna?
13     A.     Correct.
14     Q.     And when did you talk to Mr. Maruna?
15     A.     Yesterday.
16     Q.     How many times have you talked to
17 Mr. Maruna?
18     MR. MARUNA:  Ballpark it if you don't know
19 an exact number.
20     THE WITNESS:  Approximately five times.
21     Q.     (BY MR. MCCLAIN) Did you review any
22 documents with Mr. Maruna yesterday?
23     A.     No.
24     Q.     Can you please describe your educational
25 background beginning with college?

Page 9

1     A.     I went to Colorado State University in
2 Fort Collins, Colorado.  I received a bachelor of
3 science degree.  I went to Georgetown University
4 medical school in Washington, D.C.  I graduated in
5 1996 with a medical degree, MD.  I went to Utah Valley
6 Family Practice residency in Provo, Utah, and
7 graduated in 1999.  I was board --
8     Q.     What year did you graduate -- go ahead.
9     A.     Oh, I became board-certified the year
10 after I graduated from residency in family practice.
11     Q.     And what year did you graduate college?
12     A.     1992.
13     Q.     And what was your major?
14     A.     Biology.
15     Q.     Where did you do your residency?
16     A.     Utah Valley Family Practice in Provo with
17 Intermountain Healthcare.
18     Q.     Did you complete any fellowships?
19     A.     No.
20     Q.     Have you ever been subject to any
21 disciplinary actions?
22     MR. MARUNA:  By --
23     MR. MCCLAIN:  In the practice of medicine.
24     MR. MARUNA:  Okay.  Thank you.
25     THE WITNESS:  No.

Page 10

1    Q.    (BY MR. MCCLAIN) Have you ever had your
2 medical license suspended?
3    A.    No.
4    Q.    And please don't take offense to this
5 question, but have you ever been convicted of a
6 felony?
7    A.    No.
8    Q.    What certifications as a doctor do you
9 currently hold?
10    A.    I hold a -- my DEA license.  I hold an X
11 license for a Drug Enforcement Agency.  I am a
12 certified CCHP provider for NCCHC.  I am
13 board-certified by the American Academy of Family
14 Physicians.  I hold a license in Wyoming and a license
15 in Utah.  And just general medical doctor license.
16 Physician surgeon license.
17    Q.    What was the CHP certification you
18 referenced?
19    A.    NCCHC is an organization for correctional
20 health care.  And it is not a license.  It's a
21 certification.  It's a certification to be a
22 correctional health care provider.
23    Q.    And is there certain training you need to
24 go through to obtain that certification?
25    A.    No.  You -- there's no training.  You take

Page 11

1 a test to become certified through the accreditation
2 process.
3    Q.    The NCCHC?
4    A.    Correct.
5    Q.    And is that a one-time test?  Or is that
6 an annual or biannual test you have to take?
7    A.    The first test you take is an
8 administrative test to become a CCHP professional.
9 And then you have to take a secondary test to become
10 accredited as a physician specifically.
11    Q.    Are you an orthopedist?
12    A.    I am not.  I'm a family practice
13 physician.
14    Q.    Have you ever been an orthopedist?
15    A.    No.
16          MR. MCCLAIN:  May the court reporter
17 please pass the witness and counsel Exhibit-2, which
18 is the expert report of Dr. Tubbs?
19          (Exhibit-2 marked.)
20    Q.    (BY MR. MCCLAIN) Dr. Tubbs, do you
21 recognize this document?
22    A.    I do.
23    Q.    What is this document?
24    A.    This is an expert report that I prepared
25 for this case, Mr. Hemphill's case.

Page 12

1    Q.    On behalf of the defendants that we
2 identified at the onset of the deposition, correct?
3    A.    Correct.
4    Q.    Can you please turn to page 12 of this
5 Exhibit-2?
6    A.    Okay.
7    Q.    Is that your signature at the bottom of
8 page 12?
9    A.    Yes.
10    Q.    And so after preparing this report, you
11 reviewed it and then signed it; is that correct?
12    A.    Correct.
13    Q.    For purposes of this deposition, I'll
14 refer to this as your expert report or your report.
15 Do you understand that?
16    A.    Yes.
17    Q.    And please follow along with me.  The
18 report contains four different sections.  The first
19 being entitled "Expert Report," followed by "Clinical
20 Basis and Standard of Care."  Your opinion -- excuse
21 me.  There's your expert report; there's a summary of
22 your litigation experience, your fee schedule, and
23 your CV, correct?
24    A.    Are you referring to the difference
25 sections of the report?  Or at the back of the report,

Page 13

1 my CV and litigation experience?
2    Q.    I'm referring to the whole Exhibit-2.
3    A.    Yes.
4    Q.    So Exhibit-2 contains your expert report,
5 a summary of your litigation experience, your fee
6 schedule, and your CV; is that correct?
7    A.    That is correct.  Except this particular
8 exhibit does not have the fee schedule attached.
9          MR. MARUNA:  It should be right after the
10 deposition testimony.  Oh, yeah.  You're right.
11          THE WITNESS:  It has a blank page on page
12 18.
13          MR. MARUNA:  So it should be 15 on the
14 report, your fee schedule.  So it goes 14 to 16.  It's
15 missing 15, which is the fee schedule.
16          THE WITNESS:  I'm missing page 15.
17          MR. MCCLAIN:  I do see that.  I'll just go
18 over your fee schedule to confirm that I have a
19 correct handle on it.
20          MR. MARUNA:  I've got a copy here.  Do you
21 want to just amend it?
22          MR. MCCLAIN:  Sure.  That's fine.
23          MR. MARUNA:  So stick that in there, I
24 guess.
25          THE WITNESS:  Okay.  I have an extra piece



Page 14

1 here that I'm putting -- attaching to the exhibit.
2 Q. (BY MR. MCCLAIN) So now with this
3 additional document added, this is a complete copy of
4 your expert report, correct?
5 A. That is correct.
6 Q. Doctor, I'd like to first go over your
7 clinical experience that's listed on your CV, which is
8 beginning on page 16. Are you there?
9 A. I am.
10 Q. So you graduated medical school in May
11 1996, correct?
12 A. Correct.
13 Q. And in 1997, you became an emergency room
14 physician at Orem Community Hospital and Utah Valley
15 Hospital, correct?
16 A. I did not become an emergency room
17 physician. I was moonlighting in the ER. During my
18 residency, after your first year of internship, once I
19 completed a year of internship, I was able to get a
20 license and then moonlight in the emergency room. But
21 I continued to be at the residency while moonlighting
22 at the emergency room.
23 Q. Okay. So in 1997, you were moonlighting
24 at the emergency room at Orem Community Hospital and
25 Utah Valley Hospital; is that correct?

Page 15

1 A. Correct. Those are the hospitals I did
2 residency at.
3 Q. And you worked at both of these hospitals
4 from 1997 to 2007; is that correct?
5 A. Correct.
6 Q. What were your duties as an emergency room
7 physician during this time?
8 A. I would cover open shifts where the ER
9 physicians -- the regular ER physicians needed
10 coverage. So I would basically cover emergency room
11 physician shifts.
12 Q. And so what would this coverage entail?
13 What were you actually doing?
14 A. Emergency room medicine. Any patient who
15 walked through the door, we would diagnose, treat,
16 admit, evaluate.
17 Q. And how many hours a week did you work as
18 an emergency room physician from 1997 to 2007?
19 A. I would average about one and a half
20 shifts a week. 12 hours.
21 Q. And how long is a shift?
22 A. 12-hour shifts.
23 Q. So about 18 hours a week, then?
24 A. On average.
25 Q. And was that 18 hours a week per hospital

Page 16

1 or total?
2 A. Total.
3 Q. So would it be split almost evenly, nine
4 hours at each hospital?
5 A. The majority of my shifts were at Orem
6 Community Hospital. One out of 40 shifts would be at
7 Utah Valley Hospital. But the majority were at Orem
8 Community.
9 Q. And in 1990 -- in July 1999, you have
10 listed that you were a physician for Utah State
11 Prison. Do
12 you see that?
13 A. Yes.
14 Q. And you held this position from September
15 -- from July 1999 to September 2015; is that correct?
16 A. Yes.
17 Q. How many hours a week did you work in this
18 role?
19 A. 40, average. 36 to 40.
20 Q. And you were doing this while moonlighting
21 at the two hospitals as an emergency room physician?
22 A. After finishing residency, my primary job
23 was the physician at the prison. And I would --
24 continued my moonlighting shifts at Orem Community
25 Hospital. But as a family life and kids came into my

Page 17

1 life, I started to decrease my shifts at the ER
2 drastically. So I didn't do 18 hours for ten years
3 consistently. I would pick up shifts here and there.
4 You know, the closer to 2007 came, the less shifts I
5 did at the ER because of family life and other
6 responsibilities.
7 Q. Understood. When did your residency end?
8 A. 1999.
9 Q. And this position as a physician at Utah
10 State Prison, is this at one specific prison? Is Utah
11 State Prison just one prison?
12 A. We have two prisons. One smaller prison
13 in rural Utah and one large prison here in Salt Lake.
14 I only practiced at the large prison in Salt Lake.
15 Q. Can you briefly explain to me your duties
16 as a physician at the Utah State Prison?
17 A. There was three physicians, and we split
18 up duties a little differently. I mainly focused on
19 -- my primary responsibilities were hepatitis,
20 flexible sigmoidoscopies, and chronic care for
21 hypertension, seizures, and diabetes. And I performed
22 all the OB
23 care and GYN care. I was also the physician that
24 oversaw the female care at the prison. The other two
25 physicians did not participate in female care.



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 18..21

Page 18

1    Q.    How much of your time was spent examining
2 female patients?
3    A.    25 percent.  We had 5,000 male inmates and
4 400 female inmates.
5    Q.    And is that an accurate description of
6 your duties for the entire time period, through
7 September 2015?  Or did your duties change?
8    A.    Those were my primary responsibilities,
9 but I also did the ER -- or urgent care.  I was on
10 call for the prison.  And we did normal sick call,
11 oversee the physician assistants, do referrals, take
12 on referrals from the physician assistants, and
13 general medicine of all types of primary care,
14 including cardiology, pulmonology, orthopedics,
15 neurology.
16    Q.    What were your -- can you describe your
17 responsibilities for overseeing the physician
18 assistants?
19    A.    I was specifically required to oversee
20 three physician assistants.  And I would review their
21 chart work.  I would do co-clinics with them each once
22 a
23 week, and I would accept any of their referrals of
24 difficult patients.  They would refer them directly to
25 me.

Page 19

1    Q.    What do you mean by referrals of difficult
2 patients?
3    A.    Patients -- any patient that was seen by a
4 physician assistant on two separate occasions for the
5 same complaint, then they would then have a physician
6 see them as well for the third time.
7    Q.    Is that a Utah Prison state-specific
8 procedure?
9    A.    No.
10    Q.    That after two similar complaints, they
11 would see a physician on the third time?
12    A.    No.  That is my common practice myself,
13 that if I have told my physician assistants if they
14 see a patient two times for the same complaint and
15 they --
16 the patient has not improved, then to refer them to
17 me, and I would see them to make sure that we weren't
18 missing anything.
19    Q.    Are there any guidelines, for instance, at
20 the NCCHC, that provide for that sort of care?
21    A.    No.  There is no regulations or
22 requirements of that sort.
23    Q.    During this time period at Utah State
24 Prison, how much of your time was spent performing
25 clinical work versus administrative work?

Page 20

1    A.    I was not an administrator.  I would -- 97
2 percent of the time, I was doing clinical care.  We
3 had a medical director at the prison who did all the
4 administrative work.
5    Q.    Beginning in 2002, you became the medical
6 director of -- is it Duchesne County?
7    A.    Yes.  The county jails in Utah also house
8 state inmates.  They have both county and state
9 inmates.  And several of these county jails are rural
10 jails and they don't have doctors available in their
11 towns.  So as I would go out to see these state
12 inmates, on one of my regular scheduled duties, then
13 the county jails would ask me to see their county
14 inmates as well for medical care.  And because that
15 was a conflict of interest with my job as a -- being
16 paid
17 by the state, they asked me to see them on a separate
18 contract, to cover that jail.
19    Q.    And so -- I'm sorry.  What?
20    A.    To cover Duchesne County Jail.  And then
21 subsequently, once other jails found out that I was
22 doing that, they began asking me to provide coverage
23 at their jail.  And it kind of snowballed from there.
24    Q.    And in 2002, you also started at Daggett
25 County Jail; is that correct?

Page 21

1    A.    Yes.  That's a very small county in Utah
2 as well.
3    Q.    And your CV lists your role as medical
4 director.  What sort of responsibilities does that
5 entail?
6    A.    Well, each of the county jails is required
7 to provide medical care for their inmates.  And most
8 of these county jails are very small county systems
9 where they don't have a medical staff or medical --
10 any idea on how to implement a medical system.  And so
11 they hire me to organize and train and evaluate their
12 medical system and so their patients can get the care
13 that they need.  So I coordinate with the --
14    Q.    So as medical director --
15        MR. MARUNA:  Andrew, he was still
16 answering. Sorry if it didn't come through.  Continue,
17 Doctor.
18        THE WITNESS:  So I help train the officers
19 on basic medical care.  I set up a health care system
20 in that they submit health care requests and access to
21 care.  I also oversee the nursing staff and help with
22 the hiring and firing of the nursing staff for
23 different jails.  Well, I misspoke.  I don't do any of
24 the firing.  I assist with the hiring, but I don't do
25 any of the firing.  Nursing staff is hired by the



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 22..25

---

Page 22

1 county jails, typically.

2         In one of my county jails, Teton County
3 Jail, the nursing staff there works for me directly
4 and not for the county. But all the other counties,
5 the nursing staff is employed by the county.

6    **Q.**   **What do you mean the nursing staff works**
7 **for you directly?**

8    A.   At Teton County Jail, the contract is set
9 up so that I am to provide both medical care and
10 nursing care. So I hire the nursing staff and pay
11 them
12 directly off of my contract, versus all the other
13 jails, the nursing staff are staff of the county jails
14 themselves.

15    **Q.**   **So at Teton County, the nurses are**
16 **employees of you?**

17    A.   Correct. They are not employees of the
18 county. I employ them myself. Versus at Duchesne
19 County, for instance, we have three nurses, and they
20 are employed by the county, not by me.

21    **Q.**   **Are you the only doctor that's employed at**
22 **Duchesne County and Daggett County --**

23    A.   Yes.

24    **Q.**   **-- Jail?**

25    A.   That's correct.

---

Page 23

1    **Q.**   **And so do you see inmates at these jails**
2 **for medical services?**

3    A.   In all of the jails that I cover, I
4 employ -- two physician assistants and myself go out
5 and see these inmates once a week.

6    **Q.**   **And so that is Duchesne County, Daggett**
7 **County, Uintah County, Salt Water --**

8    MR. MARUNA: Sweet Water.

9    **Q.**   **(BY MR. MCCLAIN) Sweet Water, Wasatch,**
10 **Utah County, Lincoln County, Juab, Teton, and Uintah**
11 **up**
12 **until April 2017. Is that correct?**

13    A.   That's correct. I might add that in -- on
14 January 1st, 2019, Tooele County, T-O-O-E-L-E County,
15 has asked me to begin coverage of their jail as well.
16 They are a jail of approximately 250 inmates.

17    **Q.**   **And so are your duties identical at each**
18 **one of these county jails where you're listed as a**
19 **medical director?**

20    A.   Right. They contract with me to set up
21 medical care, provide medical care, train the staff,
22 organize the medical system, and advise the sheriff on
23 medical issues within the jail.

24    **Q.**   **And how many hours a week do you spend**
25 **serving as a medical director for these ten jails?**

---

Page 24

1    A.   Well, some weeks, it's more than others.
2 But it's a full-time job.

3    **Q.**   **About average.**

4    A.   It's a full-time job. 40 hours a week.
5 There's a lot of traveling involved and a lot of phone
6 communication and things like that.

7    **Q.**   **You indicated that you employ two**
8 **physician assistants. Do those physician assistants**
9 **assist you**
10 **at each one of these ten jails?**

11    A.   Actually, it's three physician assistants.

12    **Q.**   **Oh, I'm sorry.**

13    A.   One physician assistant lives in Jackson
14 Hole, Wyoming, and covers the Jackson Hole Jail in
15 Teton County. One physician assistant of mine, Joe
16 Coombs, covers the Park City, Uintah County, Lincoln
17 County, and Sweet Water County Jails. And he goes to
18 those jails once a week. And one of my physician
19 assistants is full-time, 40 hours a week, at Utah
20 County Jail. And he also goes to Juab County and
21 Duchesne County once a week.

22    **Q.**   **Approximately how many inmates do you see**
23 **a week for medical services?**

24    A.   Are you talking over the entire
25 corporation? Or me personally?

---

Page 25

1    **Q.**   **I'm talking about you personally.**

2    A.   I probably average 100 and -- over 100.
3 110.

4    **Q.**   **Per week?**

5    A.   Yes.

6    **Q.**   **And have you set up a corporation that**
7 **enters into these contracts with these counties?**

8    A.   Correct. Yes.

9    **Q.**   **What is the name of that corporation?**

10    A.   Kennon C. Tubbs, MD, LLC.

11    **Q.**   **And is that a Utah LLC?**

12    A.   Correct.

13    **Q.**   **Has your LLC ever been the subject of any**
14 **litigation related to medical services you provided at**
15 **these jails?**

16    A.   Yes.

17    **Q.**   **Is it currently involved in any**
18 **litigation?**

19    A.   Yes.

20    **Q.**   **How many different cases is it currently**
21 **involved in?**

22    A.   Three active.

23    **Q.**   **Can you describe for me the nature of the**
24 **litigation for each one of the three active cases?**

25    A.   One case --



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 26..29

---

Page 26

1    MR. MARUNA:  Just before you do that,
2 Doctor, because they're pending, just try to keep it
3 as -- don't reveal anything your attorneys in those
4 cases may have told you or anything.  Just generally
5 describe what the medical issue is.
6        Is that fair, counsel?
7    MR. MCCLAIN:  That's a good point, James.
8 I only want to know public information.  So if a
9 complaint has been filed, the nature of the complaint.
10 If you guys have filed an answer, counterclaims,
11 things like that.  I certainly do not want to know any
12 confidential attorney-client privileged information.
13    THE WITNESS:  No problem.  I believe all
14 three of these complaints were 1983 complaints, not
15 medical malpractice complaints.
16        The first complaint was from Utah County
17 Jail and an inmate named Rosa, R-O-S-A.  This involved
18 an inmate who had a testicular infection.  We sent him
19 to the hospital.  He had surgery on his testicle.  He
20 had his testicle removed.  He was sent back to the
21 hospital -- back from the hospital to the jail.  He
22 was at the jail for just a few hours and they deported
23 him. And subsequently, he sued the jail for his
24 deportation and lack of follow-up care.
25    **Q.    When you say "deportation," he was**

---

Page 27

1 deported out of the United States; is that correct?
2    A.    He was an ICE inmate, yes.
3    **Q.    And the second active lawsuit?**
4    A.    The second active lawsuit is a lawsuit out
5 of Duchesne County.  Her name is Heather Miller, I
6 believe.  She was a -- she came into jail on heroin
7 charges.  She went into withdrawals and she was
8 throwing up.  The nurse at the jail thought that she
9 had the flu and triaged her that way.  When we came on
10 our regular weekly visit on the Thursday of that week,
11 the -- my physician assistant went to evaluate her and
12 she was already deceased in her cell by the first time
13 we saw her.  We had never been notified that she was
14 even in the jail prior to that point.
15        And the third --
16    **Q.    And --**
17    A.    Go ahead.
18    **Q.    I was just going to say, and the third**
19 **active case?**
20    A.    Yeah.  The third active case involves a
21 suicide death.  The patient came in to jail.  She --
22 it was a female patient.  She did not indicate to the
23 officers that she had any suicidal behavior or that
24 she had any suicidal thoughts or depression.  She
25 denied being on any medication for mental health

---

Page 28

1 reasons.
2 They housed her appropriately and she hung herself.
3 The mother --
4    **Q.    Do you recall this -- go ahead.**
5    A.    The mother is suing for -- stating that
6 she was on mental health medication but we didn't
7 provide them for her.  Though, she never disclosed
8 that to us.
9    **Q.    Do you recall the name of this inmate?**
10    A.    If you give me one second, I can look it
11 up. I wasn't prepared for this question.  Okay.  I
12 have the complaint here on my phone.  Hold on.
13    MR. MARUNA:  Just give the plaintiff's
14 name. Can I see that, actually?  Let me make sure
15 we're disclosing it right.  Fillmore, F-I-L-L-M-O-R-E.
16 First name, Tanna, T-A-N-N-A, is the name.
17    THE WITNESS:  That is the name of the girl
18 who killed herself.  Not the mother's name.  The
19 mother's name is Zoumadakis, Z-O-U-M-A-D-A-K-I-S.
20    **Q.    (BY MR. MCCLAIN) Thank you.  Are there any**
21 **other pending lawsuits against your LLC?**
22    A.    No.
23    **Q.    Have there been any judgments entered**
24 **against your LLC?**
25    A.    No.

---

Page 29

1    **Q.    Are you named individually in these three**
2 **lawsuits?**
3    A.    I believe my company is named.
4    MR. MARUNA:  You're not being sued as
5 Dr. Tubbs?
6    THE WITNESS:  No.  I never saw -- any of
7 these three patients, I never saw them personally.
8 But my company is contracted with the sheriff's
9 department; and therefore, my company has been named.
10    **Q.    (BY MR. MCCLAIN) Have there been any**
11 **medical malpractice lawsuits brought against your**
12 **company?**
13    A.    No medical malpractice.  All of the
14 complaints have been 1983 complaints.  It's hard in
15 Utah for patients to sue for malpractice in a jail
16 system in Utah.  So they usually sue for civil
17 reasons.
18        (Reporter request for clarification.)
19    **Q.    (BY MR. MCCLAIN) Have you -- were you**
20 **still speaking?**
21    A.    I was speaking to the court reporter.
22    **Q.    Have you authored any articles within the**
23 **past ten years?**
24    A.    No.
25    **Q.    I want to go through your memberships and**

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 30..33

Page 30

1 licensures. I think we've covered some of these.
2 What is the Utah CS Schedule 25 license?
3      A.    "CS" stands for controlled substance.
4 Narcotics, barbiturates, amphetamines.
5      Q.    And so what is the purpose of that
6 license?
7      A.    So I can prescribe Percocet. You know, a
8 Class 1 would be -- like cocaine is a Class 1. Or
9 propofol or ketamine are Class 1 type of agents.
10 Class 2 agents are like oral narcotics, barbiturates,
11 benzodiazepines, amphetamines.
12      Q.    And I apologize if some of these questions
13 seem rudimentary. I just need to create a record.
14 I'm not trying to insult you or, you know, waste your
15 time.
16 I just need to make a record here. So bear with me on
17 some of the questions.
18          The DEA license, is that the Drug
19 Enforcement Administration license that you referenced
20 earlier?
21      A.    That's correct.
22      Q.    Did you renew that license?
23      A.    Yeah. I was just looking on my CV. It's
24 renewed for 2020. I need to update my CV.
25          MR. MARUNA: This was disclosed before, so

Page 31

1 you don't need to update it. That's why it says --
2 this was a couple months ago.
3          THE WITNESS: Okay.
4      Q.    (BY MR. MCCLAIN) The ACLS license, what is
5 that?
6      A.    ACLS is advanced cardiac life support.
7 BLS is basic life support. CPR.
8      Q.    You just answered my next question.
9      A.    It's CPR.
10      Q.    Have you previously served as an expert
11 witness?
12      A.    Yes.
13      Q.    Approximately how many cases have you
14 served as an expert witness in?
15      A.    Are you asking how many cases have I been
16 asked to review? Or how many have I been deposed on?
17      Q.    Let's start with how many cases you've
18 been deposed on.
19      A.    This will be my fifth.
20      Q.    And how many cases have you been asked to
21 review?
22      A.    Approximately 20.
23      Q.    And how many cases have you prepared
24 expert reports on?
25      A.    It would not be an exact number, but I

Page 32

1 would say probably 15.
2      Q.    And have you ever given testimony at
3 trial?
4      A.    No.
5      Q.    Of the five cases you've been deposed,
6 what are the nature of those cases?
7          MR. MARUNA: What do you mean? Objection.
8 Form. Vague. If you can clarify what you mean by
9 "nature."
10          MR. MCCLAIN: I can clarify that.
11      Q.    (BY MR. MCCLAIN) What are the types of
12 lawsuits that were brought in the five cases in which
13 you were deposed?
14      A.    They were all correctional health
15 care-related lawsuits where an inmate was displeased
16 with his health care.
17      Q.    And of these five cases, how many did you
18 represent the defendants in?
19      A.    Three.
20      Q.    And the other two, you represented the
21 plaintiff?
22      A.    Correct. No. The defense. Three for the
23 plaintiff and two for the defense.
24      Q.    Doctor, what is Corizon Health?
25      A.    Corizon is one of the largest health care

Page 33

1 providers in the United States for correctional health
2 care, private entity. I think it has -- I think it
3 covers probably over 100 different facilities.
4      Q.    And are you affiliated in any way with
5 Corizon Health?
6      A.    I have no affiliation.
7      Q.    You've been asked to review cases on
8 behalf of Corizon Health, though, correct?
9      A.    That's correct.
10      Q.    And how do you get your work from Corizon
11 Health?
12      A.    They call me and say, "We have a case for
13 you to review. Would you mind doing that?"
14      Q.    Are you currently working on any other
15 cases as an expert witness?
16      A.    Right now?
17      Q.    Yes.
18      A.    Yes.
19      Q.    How many?
20      A.    I probably have around 10 active cases.
21      Q.    And are those all prisoner -- I'm sorry.
22 Go ahead.
23      A.    Ten active cases.
24      Q.    And are those all prisoner rights cases?
25      A.    Yes.



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 34..37

Page 34

1  Q.  How much of your annual income is derived
2 from serving as an expert witness?
3  A.  10 percent.
4  Q.  Of the 10 active cases, what percentage of
5 your workload is on behalf of the plaintiff?
6  A.  I would say approximately 30 percent.
7  Q.  So 70 percent would be on behalf of the
8 medical providers?
9  A.  Correct.
10  Q.  Is that correct?
11  A.  That's correct.
12  Q.  On page 14 of your report, about --
13 almost -- a little more than halfway down, right above
14 "Court Experience," it says, "All depositions have
15 been taken as a treating physician."  What does that
16 mean?
17  A.  It means I am not an administrator.  I am
18 a treating physician.  I'm not being deposed as an
19 expert in the administration portion of being a
20 physician.
21 I'm being deposed -- or giving opinions as a treating
22 physician.
23  Q.  How did you first learn about this case?
24  A.  I was contacted by Wexford Health to
25 review the case.  Oh, yeah.  James -- sorry.

Page 35

1  MR. MARUNA:  Andrew, we're going to
2 clarify that answer.  Can you --
3  THE WITNESS:  Yes.  I was contacted by
4 James to review the case.
5  Q.  (BY MR. MCCLAIN) When did James contact
6 you?
7  A.  I don't remember the exact date.  Several
8 months ago.
9  Q.  And what information were you provided at
10 the time that James contacted you?
11  A.  He e-mailed me the medical record.  I
12 could look back in --
13  Q.  Are the medical records you're referring
14 to the Illinois Department of Correction medical
15 records, Bates numbered 1 through 439?
16  A.  Correct.
17  Q.  Did he provide you any other
18 documentation?
19  A.  I could look back in my e-mail record and
20 know exactly all the information he provided me for
21 our first contact.  But I reviewed all the documents
22 that
23 he sent me that are in my expert report.
24  Q.  Did you execute a retainer agreement for
25 this case?

Page 36

1  A.  Yes.
2  MR. MCCLAIN:  I don't believe we were
3 given a copy of that retainer agreement.  So I'd like
4 to request a copy of that.
5  MR. MARUNA:  I'll review it and see.  I'll
6 double-check.  If we've got it, we'll give it to you.
7 That's fair.
8  Q.  (BY MR. MCCLAIN) Have you received
9 compensation for your work in this case?
10  A.  I will receive compensation.  I have not
11 yet.
12  Q.  So you have not been paid?
13  A.  No.
14  Q.  Do you charge hourly for your work?
15  A.  Yes.  I charge hourly for document review,
16 phone consultations, written summaries, depositions.
17 And then I charge $500 per hour.  And then for
18 testimony or depositions, I charge $3,500 per day if
19 it's, you know, for a full day or something.
20  Q.  Is your compensation in any way dependent
21 on the outcome of this case?
22  A.  No.
23  (Discussion off the record.)
24  Q.  (BY MR. MCCLAIN) Did anyone else assist
25 you with working on this case?

Page 37

1  A.  No.  Well, I had my wife proofread it
2 after I wrote it.  I had my wife proofread it for
3 clerical errors.
4  Q.  Proofread your report?
5  A.  Yeah.  For typos and mistakes.
6  Q.  Was your wife given access to any --
7  A.  She has no medical training or she was not
8 given access to the medical records or anything like
9 that.
10  Q.  You mentioned that James provided you
11 copies of the medical records.  How were those
12 provided?
13  A.  Via e-mail, Dropbox.
14  Q.  If you could flip to page 1 of your expert
15 report and let me know once you get there.
16  A.  I'm there.
17  Q.  At the bottom half of that page, there's a
18 list of materials.  Can you please review that list?
19  A.  Okay.
20  Q.  Are these all the documents that you were
21 provided for this case?
22  A.  It continues on to page 2.
23  Q.  Correct.
24  A.  Correct.  Those 10?
25  Q.  Yes.

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 38..41

Page 38

1    A.    Yes.
2    Q.    Were you provided any materials that are
3 not on pages 1 and 2 of your expert report?
4    A.    No.
5    Q.    Did you review any other materials besides
6 the ten documents listed on page 1 and 2 of your
7 expert report?
8    A.    I reviewed the standard of care by the
9 American Academy of Family Physicians that pertained
10 to this situation.
11    Q.    And what is that standard of care?
12    A.    The American Academy of Family Physician
13 standard of care is published in the American Family
14 Physician.  I reviewed the management of shoulder
15 impingement syndrome and rotator cuff tears.
16    Q.    And that's cited on page 7 of your report.
17 Is that what you're referring to?
18    A.    Correct.
19    Q.    And so this article listed in footnote 1
20 on page 7 would be the standard of care that you
21 applied
22 in this case?
23    A.    Correct.  I also reviewed UpToDate, which
24 is a journal review of all journals, just to make sure
25 that the standard of care was consistent, and it was.

Page 39

1    Q.    Is that cited -- is UpToDate cited in your
2 report?
3    A.    No.  I do not believe it is.  I just
4 cross-referenced it.
5    MR. MARUNA:  Explain what UpToDate is.
6    THE WITNESS:  UpToDate is a website that
7 you -- physicians subscribe to that reviews journal
8 articles from all different aspects of medicine and
9 then provides an expert summary of all those review
10 articles.  And so I reviewed the Family Physician
11 standard of care and then cross-referenced it with the
12 UpToDate standard of care to make sure that it was
13 consistent.
14    Q.    (BY MR. MCCLAIN) And so you found -- did
15 you find any changes in the standard of care?
16    A.    No.  The standard of care was consistent.
17    Q.    Did you prepare your expert report with
18 the assistance of counsel?
19    A.    No.
20    Q.    Did you consult with anyone in preparation
21 of this report?
22    A.    No.
23    Q.    Do you have any preliminary drafts of your
24 report?
25    A.    No.  When I write my reports, I write it

Page 40

1 and I -- I write it on Google Docs and then I just go
2 back and rewrite it or edit it.  But it's a work in
3 progress.  I don't submit a draft and then another
4 draft and another draft.
5    Q.    Did you share your draft with counsel?
6 And by counsel, I mean James.
7    A.    I don't remember if I did or not.
8    Q.    Do you recall if James provided you any
9 comments to the report?
10    A.    I remember that he read it and he made a
11 comment that he had never seen in expert witness
12 reports my section on discrepancies in the complaint
13 and Hellerstein's opinion.
14    Q.    Doctor, I'm going to start to get in kind
15 of the meat of your expert report.  So I don't know if
16 you want to take a break or if you want to just keep
17 plowing along.  It's totally up to you.
18    MR. MARUNA:  Why don't we take five?  Come
19 back?
20    MR. MCCLAIN:  Okay.
21    MR. MARUNA:  It's probably a good stopping
22 point.
23    MR. MCCLAIN:  Yeah.  That's kind of what I
24 thought.
25    MR. MARUNA:  Okay.  Thanks.

Page 41

1    (Off the record from 3:05 p.m. to
2 3:12 p.m.)
3    Q.    (BY MR. MCCLAIN) Doctor, I want to direct
4 you to Exhibit-2, your expert report.  This report
5 contains your medical opinion regarding the standard
6 of care for the medical services rendered in this
7 case, correct?
8    A.    Correct.
9    Q.    And in rendering this opinion, you relied
10 on the documents listed on page 1 and 2, correct?
11    A.    Correct.
12    Q.    Did you make any assumptions in forming
13 your opinion?
14    A.    No.
15    Q.    And your opinion is that to a reasonable
16 degree of medical certainty, the standard of care was
17 met with respect to medical services provided to Carl
18 Hemphill, correct?
19    A.    Correct.
20    Q.    What methodology did you employ to come to
21 this medical opinion?
22    A.    I reviewed the medical record.  I relied
23 upon my medical experience as well as my medical
24 training and my medical background as well as the
25 current literature for the diagnosis and treatment of

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018                                                    Pages 42..45

Page 42

1 shoulder impingement.

2    **Q.    Doctor, this seems like a silly question,**
3 **but what is a diagnosis?**

4    A.    A diagnosis is a problem related to an
5 illness.

6    **Q.    How would you define treatment of a**
7 **patient?**

8    A.    A medication, therapy, procedures to
9 improve the current condition.

10    **Q.    Is it possible to make a correct diagnosis**
11 **of a patient but then provide improper treatment to**
12 **that patient?**

13        MR. MARUNA:  Objection.  Form.  Incomplete
14 hypothetical.  Assumes facts not in evidence.

15        Over the objection, you can answer the
16 question, Doctor, or seek clarification.

17        THE WITNESS:  Can you repeat the question?

18    **Q.    (BY MR. MCCLAIN)  Sure.  Is it possible to**
19 **make a correct diagnosis of a patient but then provide**
20 **incorrect or improper treatment to that patient?**

21        MR. MARUNA:  Same objections.

22        THE WITNESS:  It is possible.

23    **Q.    (BY MR. MCCLAIN) Doctor, can you turn to**
24 **page 2 of your report, please?**

25    A.    I'm there.

Page 43

1    **Q.    When did Mr. Hemphill first complain of**
2 **shoulder pain?**

3    A.    On February 1st, 2013.

4    **Q.    And do you recall what he was initially**
5 **diagnosed with?**

6    A.    Shoulder pain.

7    **Q.    And then was he diagnosed with anything**
8 **specifically?**

9    A.    On February --

10    **Q.    Besides shoulder pain?**

11    A.    On February 15th, he was seen by PA
12 Williams, and she believed it was possible bursitis.
13 Probable bursitis.  Sorry.  Probable.

14    **Q.    Do you recall what his initial treatment**
15 **was at this phase?**

16    A.    The treatment prescribed was ice twice a
17 day, a topical medication called A-balm, and Tylenol
18 twice a day, 650 milligrams.

19    **Q.    Is Tylenol a nonsteroidal**
20 **anti-inflammatory?**

21    A.    Tylenol is an anti-inflammatory, yes.
22 It's a pain medication.  It has less inflammatory
23 effect
24 than typical NSAIDs like Naprosyn and ibuprofen.

25    **Q.    In April 2013, what was his diagnosis?**

Page 44

1    A.    On April 11th, 2013?  Is that what you're
2 referring to?

3    **Q.    April 19th specifically.**

4    A.    Mr. Hemphill complained of pain for two
5 months, and they diagnosed him with a right rotator
6 cuff impingement and bursitis.

7        MR. MCCLAIN:  Court reporter, can you
8 please tender to the witness Exhibit-3?  And this
9 exhibit contains a document Bates-labeled IDOC 68
10 through 75.

11        (Exhibit-3 marked.)

12        THE WITNESS:  I have the document.

13    **Q.    (BY MR. MCCLAIN) On April 23rd, Mr.**
14 **Hemphill was scheduled to see Dr. Obaisi, correct?**

15    A.    On April 23rd, it reads, "Inmate not seen
16 today due to no provider.  Inmate rescheduled for
17 4/28/13."  I do not know who --

18    **Q.    In your --**

19    A.    I do not know who --

20    **Q.    Go ahead.**

21    A.    I don't know who he was actually scheduled
22 with.  It simply says that he was not seen today.

23    **Q.    Okay.  In your report for April 23rd, what**
24 **does it say regarding the doctor Mr. Hemphill was**
25 **supposed to see?**

Page 45

1    A.    It does say Hemphill missed an appointment
2 with Obaisi as provider was not available.

3    **Q.    And he was rescheduled on April 23rd to**
4 **what date?**

5    A.    The exhibit states 4/28/13.

6    **Q.    Do you know if Mr. Hemphill saw a doctor**
7 **on 4/28/13?**

8    A.    No, I do not know that.

9    **Q.    Moving along with Exhibit-3, I'll direct**
10 **you to the entry dated May 31st, 2013.  Can you read**
11 **that**
12 **to yourself to get familiar with it?**

13    A.    Would you like me to read it out loud for
14 the reporter?

15    **Q.    No.  Just for yourself.**

16    A.    I'm done.

17    **Q.    Was Mr. Hemphill scheduled to see a doctor**
18 **as a result of this visit on May 31st?**

19    A.    They scheduled him for June 4th, 2013.

20    **Q.    Do you know if he saw a doctor on June**
21 **4th, 2013?**

22    A.    No.

23    **Q.    Moving along on IDOC 68 to June 6th, 2013.**
24 **This is an entry of a medical doctor note.  Is that**
25 **correct?**



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 46..49

Page 46

1    A.    That's correct.

2    Q.    And do you know which doctor he saw on
3 June 6th?

4    A.    I believe it was Dr. Obaisi.

5    Q.    Did Dr. Obaisi schedule any sort of plan
6 as a result of Mr. Hemphill's complaint of shoulder
7 pain?

8    A.    He scheduled a right shoulder x-ray and
9 follow-up in one week.

10    Q.    In your review of the records, did that
11 one-week follow-up occur?

12    A.    He was seen next on June 26th.

13    Q.    Do you know who he saw on June 26th?

14    A.    The signature is difficult, but I believe
15 it was Dr. Obaisi.

16    Q.    And did Mr. Hemphill make any complaints
17 -- go ahead.

18    A.    When you asked me earlier if I had made
19 any assumptions, I assumed that that was Dr. Obaisi's
20 signature, though I could not decipher it
21 specifically.

22    Q.    Thank you.  Did Mr. Hemphill make any
23 complaints to Dr. Obaisi on June 26th?

24    A.    Yes.

25    Q.    And what were those complaints?

Page 47

1    A.    He complained of pain in his right
2 shoulder. He reported that the naproxen did not help.

3    Q.    What is the next dated entry in Exhibit-3?

4    A.    On 7/18, July 18th.

5    Q.    Yes.  And at the top there, it -- go
6 ahead.

7    A.    He was seen by a nurse.

8    Q.    And is that a result of a sick call?

9    A.    Yes.  It says "RN SC."  I assume the "SC"
10 means "sick call" note.

11    Q.    And what were Mr. Hemphill's complaints on
12 this date?

13    A.    His right shoulder was in pain.  And the
14 meds were not helping him.

15    Q.    Did he mention anything about his pain
16 meds?

17    A.    They were not helping.

18    Q.    And what was the plan of treatment as a
19 result of this July 18th visit?

20    A.    The nurse scheduled him to see the doctor
21 for a steroid injection on July 31st, 2013.

22    Q.    Did Mr. Hemphill receive a steroid
23 injection on July 31st?

24    A.    Yes.  It is the next entry.  He received
25 Depo-Medrol, 40 milligram injection, in the right

Page 48

1 shoulder.

2    Q.    On July 31st, correct?

3    A.    July 31st, 2013, 2:30 p.m.

4    Q.    Can you please flip to the portion of
5 Exhibit-3 IDOC 73?

6    A.    I'm there.

7    Q.    What is the date of the first entry on
8 that page?

9    A.    August 31st, 2013.

10    Q.    And what are Mr. Hemphill's complaints on
11 that date?

12    A.    No change.

13    Q.    What does the portion of the "O" in the
14 report state?

15    A.    Complaints of pain in the right shoulder.

16    (Reporter request for clarification.)

17    THE WITNESS: He asked:  What does the
18 objective state in that note?  And the objective
19 portion of the note states that he complained of pain
20 in his right shoulder.

21    Q.    (BY MR. MCCLAIN) And the "A" in that note,
22 what does that "A" stand for?

23    A.    Assessment.

24    Q.    So is that the individual who saw
25 Mr. Hemphill making the assessment?

Page 49

1    A.    That's correct.

2    Q.    And what was the assessment on August
3 31st, 2013?

4    A.    Pain in right shoulder.

5    Q.    Moving along to the entry on September
6 9th, 2013.  What complaints did Mr. Hemphill make on
7 that date?

8    A.    That he would like to see the medical
9 director to have his shoulder injected.

10    Q.    Did he complain of any pain on that date?

11    A.    Yes.  He complained of pain in his right
12 shoulder.

13    Q.    And moving along to the entry on September
14 11th, 2013, did Mr. Hemphill make any pain -- any
15 complaints of pain on that date?

16    A.    Yes.  Yes.

17    Q.    And what were his complaints?

18    A.    He complained of pain in his right
19 shoulder, and he also reported that "'Orange crush'
20 took my pain medication."  I assume that orange crush
21 was a cell shakedown or custody.  But that's an
22 assumption of
23 mine.  I don't know specifically what orange crush is.

24    Q.    What were the plans that were formulated
25 as a result of the September 11th visit?

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 50..53

Page 50

1  A.  He -- Mr. Hemphill stated that they took
2 his pain medication and Dr. Davis renewed his pain
3 medication and scheduled him for a steroid injection
4 on September 24th, 2013.
5      Q.  And what is the date of the next entry on
6 this page?
7  A.  September 24th, 2013.
8      Q.  And what does that entry indicate?
9  A.  That the medical director appointment was
10 rescheduled because of lockdown and no movement.  The
11 appointment was rescheduled for October 22nd, 2013.
12     Q.  And on October 22nd, 2013, did Mr.
13 Hemphill have a medical appointment?
14 A.  Yes.
15     Q.  Who was he seen by?
16 A.  Again, I believe this signature is
17 Dr. Obaisi, but it's a very poor signature.
18     Q.  Did Mr. Hemphill make any complaints of
19 pain on October 22nd?
20 A.  He asked for a steroid injection.  He
21 reported that the pain in his right shoulder came back
22 last week.  Oh, sorry.  I'm sorry.  His last injection
23 was in July 2013.  July 17th.
24     Q.  And was he again scheduled for an
25 injection?

Page 51

1  A.  He was scheduled for an injection in five
2 days.
3      Q.  Do you know when Mr. Hemphill ultimately
4 received that injection?
5  A.  On October 30th, 2013.
6      Q.  Now, I want to revert you back to your
7 report.  On page 3 at the bottom, you indicate, "After
8 October 30th, 2013, Mr. Hemphill had no complaints of
9 pain for the next 100 days."  Do you see that?
10 A.  I do see that.
11     Q.  And what time period of 100 days are you
12 referring to?
13 A.  Starting on October 30th and ending
14 February 7th, I believe.
15     Q.  I'm sorry.  Were you still talking?
16 A.  Give me one --
17     Q.  You don't need to calculate it.
18 A.  Oh, I don't?  Okay.
19     Q.  So it was just 100 days after October
20 30th, 2013, correct?
21 A.  I believe so, yes.
22     Q.  And what was the basis for this
23 conclusion?
24 A.  I reviewed the health care requests
25 submitted by Mr. Hemphill, and there were no health

Page 52

1 care requests during that time.
2           MR. MCCLAIN:  Will the court reporter
3 please tender to the witness and counsel Exhibit-4,
4 which contains Bates-labeled documents HEM 27 to 29?
5           (Exhibit-4 marked.)
6      Q.  (BY MR. MCCLAIN) Doctor, what are these
7 documents?
8  A.  This is a medical service request.
9      Q.  And let's take a look at Bates Number HEM
10 27.  What is the date of that request?
11 A.  December 30th.
12     Q.  Of what year?
13 A.  2013.
14     Q.  Can you please read to yourself the
15 handwritten provision that says "Briefly state your
16 request"?
17 A.  "I've received a cortisone shot on October
18 30th, 2013.  And the shot only lasted for 60 days.
19 And December 30th, 2013, makes that!  I'm asking to be
20 rescheduled for a cortisone shot by medical director
21 S. Obaisi.  Plus, I'm asking to be sent out for an MRI
22 on my right shoulder.  My right shoulder feeling like
23 it's on fire on my shoulder" -- can't read that word
24 --
25 "Goes numb when I'm sleeping with" -- is that

Page 53

1 "writhing"? -- "when I'm sleeping" -- something -- "et
2 cetera, et cetera.  I need an MRI real bad on my right
3 shoulder."
4      Q.  And at the top, what is the name of the
5 inmate who completed this request?
6  A.  Carl Hemphill.
7      Q.  Can you please flip to the next page, HEM
8 28?  What is the date -- what is this document?
9  A.  The date is January 21st, 2014.  It is a
10 medical health care request.
11     Q.  And what is the name of the inmate who
12 made this request?
13 A.  Carl Hemphill.
14     Q.  And if you could just briefly read to
15 yourself the section "Briefly state your request."
16 You don't need to read it out loud.
17 A.  I've read it.
18     Q.  Does Mr. Hemphill request to have another
19 cortisone shot?
20 A.  He's requesting to have an MRI on his
21 right shoulder.
22     Q.  Did he ask for another cortisone shot?
23 A.  Yeah.  And be rescheduled for his
24 cortisone shot.
25     Q.  Can you please flip to the next document,



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 54..57

Page 54

1 HEM 29.

2    A.    I'm there.

3    Q.    What is this document?

4    A.    Medical health service request dated
5 January 31st, 2014, by Carl Hemphill.

6    Q.    And can you please read to yourself the
7 portion "Briefly state your request"?

8    A.    I've reviewed it.

9    Q.    Does Mr. Hemphill make reference to his
10 prior sick call request on December 30th and January
11 24th -- excuse me -- 21st?

12    A.    Yes.

13    Q.    He indicates that this is his third
14 request about his right shoulder; is that correct?

15    A.    Yes.

16    Q.    And he complains that he has pain in his
17 right shoulder; is that correct?

18    A.    Yes.

19    Q.    And he asks for an MRI to be done on his
20 right shoulder; is that correct?

21    A.    Yes.

22    Q.    So is it still your position that from
23 October 30th, 2013, to February 2014, Mr. Hemphill
24 made no complaints of pain?

25    A.    No.  I would say he made no complaints of

Page 55

1 pain for the next 60 days.

2    Q.    And what 60-day period are you referring
3 to?

4    A.    That would be October 30th to December
5 30th.

6    Q.    On page 3 of your report, for the entry
7 dated February 7th, 2014, you make reference to an
8 e-mail from Dr. Obaisi, correct?

9    A.    Yes.

10    MR. MCCLAIN:  Will the court reporter
11 please hand the witness and counsel Exhibit-5?

12    (Exhibit-5 marked.)

13    Q.    (BY MR. MCCLAIN) Is this the e-mail that
14 you're referring to in your report?

15    A.    Yes.

16    Q.    And Bates Label Wexford 654.  And the
17 purpose of this e-mail was what, Doctor?

18    A.    The purpose was that Dr. Obaisi wanted --
19 wanted to notify Dr. Shicker what was going on with
20 his diagnosis and treatment of Hemphill's care.

21    Q.    Can you please read to me Dr. Shicker's
22 specific request to Mr. Obaisi on February 7th, 2014?

23    A.    "R. Obaisi, can you give me a synopsis
24 about the above-named offender especially related to
25 shoulder problems?  Thanks.  Louis Shicker."

Page 56

1    Q.    And who's the above-named offender?

2    A.    Carl Hemphill.

3    Q.    And your report quotes from that e-mail,
4 stating, "On July 31st, I" -- being Dr. Obaisi --
5 "injected a steroid into the shoulder joint which gave
6 relief until October 30th."  Is that correct?

7    A.    That's correct.

8    Q.    And that's what's listed in Exhibit-5,
9 correct?

10    A.    Correct.

11    Q.    However, we already established that on
12 August 31st, 2013, Mr. Hemphill did complain of
13 shoulder pain, correct?

14    A.    Not to Dr. Obaisi, but, yes, he put in a
15 health care request.

16    Q.    And he was also seen on September 9th and
17 11th, and he complained of shoulder pain on those
18 dates too, correct?

19    A.    Right.  But that was prior to November
20 30th -- sorry -- October 30th.

21    Q.    Correct.  But the statement Mr. Obaisi
22 makes is that the July 31st injection gave him relief
23 until October 30th, correct?

24    A.    Correct.

25    Q.    So that statement would be inaccurate

Page 57

1 because on October -- excuse me -- on August 31st,
2 September 9th, and September 11th, Mr. Hemphill did,
3 in fact, complain of shoulder pain, correct?

4    MR. MARUNA:  Objection.  Foundation.

5    Over the objection, Doctor, you can
6 answer.

7    THE WITNESS:  So Dr. Obaisi, I believe, is
8 reporting the pain that -- you know, the interactions
9 that he had with the patient, not necessarily the
10 other interactions that Mr. Hemphill had with other
11 staff.

12    Q.    (BY MR. MCCLAIN) If we --

13    A.    So if Hemphill --

14    MR. MARUNA:  The doctor is still
15 answering.

16    THE WITNESS:  If Hemphill complained of
17 pain to other staff members, Dr. Obaisi may or may not
18 have been aware of that.  And according to this
19 statement,
20 he was not aware of any complaints that Hemphill made
21 to the other staff during that time period.

22    Q.    (BY MR. MCCLAIN) The complaints that
23 Mr. Hemphill made were written down in Mr. Hemphill's
24 offender outpatient progress notes, correct?

25    A.    That's correct.

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 58..61

Page 58

1    Q.    Did Mr. -- excuse me -- did Dr. Obaisi
2 have a duty to review Mr. Hemphill's medical file
3 before responding to Dr. Shicker?
4    A.    I don't know what his duty would have
5 been, but I certainly would review a medical record
6 before sending a reply.
7    Q.    And would that be consistent with the
8 standard of care, to review the medical record prior
9 to responding to Dr. Shicker?
10           MR. MARUNA:  Objection.  Foundation.
11           Over the objection.
12           THE WITNESS:  Dr. Shicker asked for a
13 synopsis.  A synopsis is a generalized opinion, not
14 necessarily a detailed report.
15    Q.    (BY MR. MCCLAIN) Understood.  But is it
16 part of the standard of care to review a patient's
17 medical records so you can determine what care they'd
18 received to date?
19           MR. MARUNA:  Objection.  Foundation.
20 Asked and answered.
21           Over the objection, Doctor.
22           THE WITNESS:  The -- you know, Dr. Shicker
23 asked for a synopsis.  And in my opinion, the
24 definition of a synopsis is a generalized overview of
25 the care, not a specific detailed report.  And if he

Page 59

1 requested a detailed report or a detailed summary,
2 then it would be an obligation to review the entire
3 chart.
4 But if he asked for a simple synopsis, I believe the
5 synopsis that Dr. Obaisi gave was a generalized
6 overview of the care he received.
7    Q.    (BY MR. MCCLAIN) But it was an inaccurate
8 overview, correct?
9           MR. MARUNA:  Objection.  Foundation.
10           Over the objection.
11           THE WITNESS:  It was a synopsis.  It did
12 not include detailed information.
13    Q.    (BY MR. MCCLAIN) It did not include the
14 full medical history from July 31st to October 30th,
15 correct?
16    A.    Correct.  It was a synopsis.
17           MR. MCCLAIN:  Can the court reporter
18 please give the witness and counsel Exhibit-6?  It's
19 IDOC 88.
20           (Exhibit-6 marked.)
21    Q.    (BY MR. MCCLAIN) Doctor, what is this?
22    A.    This is an Offender Outpatient Progress
23 Note dated September 16th, 2014, from Mr. Hemphill,
24 written by Dr. --
25    Q.    Is this a --

Page 60

1           MR. MARUNA:  Hold on.  He's still
2 answering, Andrew.
3           MR. MCCLAIN:  Yep.
4           THE WITNESS:  It is an MD note written by
5 Dr. Obaisi.
6    Q.    (BY MR. MCCLAIN) Can you read the note out
7 loud, please?
8    A.    Dr. Obaisi's handwriting is difficult, but
9 I will read it as best I can.
10           "On 5/12/14," I believe, "was given
11 steroid injection right shoulder.  Never reported
12 recurrent
13 pain to health care staff.  Last filed grievance to be
14 e-mailed" -- no -- "charted."  "Last filed grievance
15 to be" -- either --
16    Q.    That's okay if you can't read that part.
17    A.    "Enabled" or "enlisted."  I'm unclear what
18 that last word is.  Then it says, "Dr. Obaisi" --
19 something -- "in 9/26/2014 was already scheduled."
20    Q.    The portion of the report that states
21 Mr. Hemphill never reported recurrent pain to health
22 care staff but filed grievance to be -- I think that's
23 evaluated --
24    A.    Oh, you're correct.  It is evaluated.
25    Q.    That statement is not accurate, is it?

Page 61

1           MR. MARUNA:  Objection.  Foundation.  Form
2 of the question.
3           Over the objections.
4           THE WITNESS:  Can you repeat that
5 question?
6    Q.    (BY MR. MCCLAIN) Sure.  The portion of
7 this progress note, which states that Mr. Hemphill
8 never reported recurrent pain to health care staff but
9 filed grievance to be evaluated, is not accurate, is
10 it?
11           MR. MARUNA:  Same objections.
12           Over the objections, Doctor.
13           THE WITNESS:  I believe that Dr. Obaisi's
14 referring to the time frame between 5/12/14 and
15 9/16/14 and not -- and when he uses the word "never,"
16 it does not encompass an entire detailed timeline but
17 just from the timeline of 5/12/14 to 9/16/14.  That's
18 how I interpret that statement.
19    Q.    (BY MR. MCCLAIN) And this entry also
20 indicates that Dr. Obaisi was made aware that
21 Mr. Hemphill had filed at least one grievance,
22 correct?
23    A.    Correct.  Dr. Obaisi was aware of the
24 grievance that was filed on 9/16.
25    Q.    And that grievance would have been related



Page 62

1 to a medical complaint because it indicates that he
2 was to be evaluated as a result of that grievance,
3 correct?
4      A.      I'm sorry.  Repeat that question.
5      Q.      Sure.  The progress note indicates that
6 he, being Mr. Hemphill, filed a grievance to be
7 evaluated, correct?
8      A.      Well, when you file a grievance, the
9 grievance is evaluated by custody staff, not medical
10 staff.  If you want to be seen by medical staff, you
11 submit a health care request.  If you want to be --
12 your case evaluated by custody staff, then you submit
13 a grievance.  So by submitting -- by submitting a
14 grievance, Mr. Hemphill is asking that his health care
15 be reviewed by custody staff, not by medical staff.
16     Q.      And this progress note is made by
17 Dr. Obaisi, correct?
18             MR. MARUNA:  The 9/16 note you're asking
19 about still?
20             MR. MCCLAIN:  Yes.
21             MR. MARUNA:  Okay.  Thank you.
22             THE WITNESS:  Yes.  Exhibit-6, I believe,
23 is Dr. Obaisi's signature.
24     Q.      (BY MR. MCCLAIN) And it would indicate
25 that Dr. Obaisi has been made aware of the grievance

Page 63

1 that
2 Mr. Hemphill filed, correct?
3      A.      Correct.
4      Q.      Moving on to page 4 of your report at the
5 bottom portion.  And I'll wait until you get there.
6 Let me know when you're there.
7      A.      Are you speaking of the March 2015 area?
8      Q.      I'm thinking November 16th, 2014.
9      A.      I am there.
10     Q.      So on November 16th, 2014, you indicate
11 that Mr. Hemphill had an x-ray on his right shoulder.
12 The finding was negative.  And then you indicate,
13 "Health care requests to see nursing or provider" --
14 "no health care requests to see nursing or provider
15 were placed
16 for the next 90 days."  Is that correct?
17     A.      That's correct.
18     Q.      What 90-day period are you referring to?
19     A.      From November 16th going forward.
20     Q.      November 16th, 2014?
21     A.      Or November 12th -- yeah.  November 12th,
22 2014, going forward.
23             MR. MCCLAIN:  Will the court reporter
24 please give the witness and counsel Exhibit-7, which
25 is Bates-labeled HEM 41 to 43?

Page 64

1             (Exhibit-7 marked.)
2             THE WITNESS:  I have Document 7.
3      Q.      (BY MR. MCCLAIN) So, Doctor, what are
4 these three documents that are part of Exhibit-7?
5      A.      They're health care requests.
6      Q.      And what is the date of the first health
7 care request?
8      A.      December 9th, 2014.
9      Q.      And the name of the inmate that made that
10 request?
11     A.      Carl Hemphill.
12     Q.      And can you please take a moment to read
13 that request?
14     A.      Out loud?
15     Q.      No.  You can read it to yourself.
16     A.      I've completed it.
17     Q.      Does Mr. Hemphill make any complaints in
18 here regarding shoulder pain?
19     A.      Yes.
20     Q.      And does Mr. Hemphill make a request to
21 receive an MRI?
22     A.      Yes.
23     Q.      Can you please flip to the next page?
24 It's HEM 42.
25     A.      Yes.  I'm here.

Page 65

1      Q.      And what is the date of this document?
2      A.      January 10th, 2015.
3      Q.      And the name of the inmate that made this
4 document?
5      A.      Carl Hemphill.
6      Q.      And can you take a moment to read the
7 brief description?
8      A.      The copy that I have is very faint.
9      Q.      Okay.  I will try to read it to you.  And
10 let me know if you think this is inaccurate.
11     A.      Okay.
12     Q.      "I'm writing a request to be seen by the
13 medical director, S. Obaisi, for my right shoulder
14 pain.  I would like to be scheduled to be seen" -- I'm
15 having difficulty reading some of the words.  The very
16 last sentence would appear to say, "Need to have an
17 MRI, please."
18     A.      I agree with that.
19     Q.      So Mr. Hemphill is complaining of shoulder
20 pain on January 10th, 2015, correct?
21     A.      Correct.
22     Q.      And he requests to have an MRI, correct?
23     A.      Correct.
24     Q.      Do you know if Mr. Hemphill was given an
25 MRI January 2015?

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 66..69

Page 66

1    A.    I did not review an MRI during that period
2 of time.
3        Q.    Can you flip to the next page?  It's
4 Bates-labeled HEM 43.
5    A.    I have it.
6        Q.    What is the date of this document?
7    A.    January 25th, 2015, Carl Hemphill, medical
8 service request.
9        Q.    Are you able to read --
10   A.    I can read some of it.  It's very faint.
11       Q.    Does Mr. Hemphill request to have an MRI
12 done on this date?
13   A.    Yes.  The very last sentence reads, "I
14 need an MRI."  "I would like to have an MRI."
15       Q.    So going back to your report where you
16 indicate that no health care requests to see nursing
17 staff or a provider were made for 90 days from
18 November 24th, 2014, do you still believe that that's
19 an accurate statement?
20   A.    No.
21       Q.    Do you know when Mr. Hemphill was first
22 referred to see an orthopedist?
23   A.    When he got -- well, I believe that
24 Dr. Obaisi is a surgeon.
25       Q.    Okay.  Was he ever referred to an outside

Page 67

1 orthopedist?
2    A.    He was.
3        Q.    Do you recall what date that was?  I can
4 make it easier for you.
5        MR. MCCLAIN:  Will the court reporter
6 please give the witness Exhibit-8, please?  It's IDOC
7 2.
8        (Exhibit-8 marked.)
9        THE WITNESS:  I believe it was April 26,
10 2016, was the answer to your question.
11   I have the document IDOC 2, Exhibit-8, in
12 front of me.
13       Q.    (BY MR. MCCLAIN) What is the date of this
14 document?
15   A.    June 15th -- sorry -- June 4th, 2015.
16       Q.    And who is the practitioner that signed
17 this document?
18   A.    I believe it's Dr. Obaisi.
19       Q.    And about a third of the way down from the
20 top, it says "Refer to."  What does it say after that?
21   A.    "Refer to orthopedics."
22       Q.    And what is this document?
23   A.    This is a referral request for orthopedics
24 for a medical service request for referral.
25       Q.    And who is the offender that this referral

Page 68

1 applies to?
2    A.    Dr. -- the offender is Carl Hemphill.
3        Q.    And what's the rationale for the referral?
4    A.    Chronic pain in the right shoulder.  Has
5 had steroid injection.
6        Q.    So Mr. Hemphill was referred to an
7 orthopedist on June 4, 2015; is that correct?
8    A.    Yes.
9        Q.    And he first complained of shoulder pain
10 in February 2013, correct?
11   A.    Correct.
12       Q.    So it was about two and a half years after
13 his initial complaint that he was referred to an
14 orthopedist; is that correct?
15   A.    Correct.
16       Q.    Do you know when Mr. Hemphill ultimately
17 saw an orthopedist?
18   A.    Well, I believe I answered that question.
19 April 2016.
20       Q.    So April 2016 is about 11 months after he
21 was initially referred, correct?
22   A.    Correct.
23       Q.    Now, Doctor, I want to get into the
24 portion of your report regarding your opinion.  So
25 beginning on page 7, entitled "Clinical Basis and

Page 69

1 Standard of Care."  We briefly touched on this.  You
2 concluded that the standard of care that was
3 applicable to this case is from the American Family
4 Physician, and you cite the article in Footnote 1; is
5 that correct?
6    A.    That's correct.
7        Q.    In the first paragraph, you discuss,
8 "Conservative therapy is usually sufficient."  What do
9 you mean by that statement?
10   A.    The majority of --
11       Q.    Conservative treatment.
12   A.    I mean that the majority of patients who
13 receive conservative treatment with shoulder
14 impingement improve and don't ultimately require
15 surgery or further treatment.
16       Q.    And what constitutes conservative
17 treatment?
18   A.    Rest, ice, physical therapy, and
19 anti-inflammatory medication.
20       Q.    Did Mr. Hemphill receive conservative
21 treatment for his shoulder pain?
22   A.    Yes.
23       Q.    How long did Mr. Hemphill receive
24 conservative treatment for?
25   A.    Several years.

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 70..73

Page 70

1    Q.    And the last sentence in that paragraph
2 states that, "Some benefit" -- "some patients benefit
3 from steroid injection," correct?
4    A.    Correct.
5    Q.    When should a doctor make a determination
6 to give a steroid injection?
7    A.    When conservative treatment is not
8 maintaining the patient's treatment and they need to
9 increase treatment.
10    Q.    Is a steroid injection part of
11 conservative treatment?
12    A.    No.  It's an invasive procedure.
13        MR. MARUNA:  The doctor is still
14 answering, Andrew.
15        Dr. Tubbs?
16        THE WITNESS:  A steroid injection is an
17 invasive procedure.
18    Q.    (BY MR. MCCLAIN) And the last portion of
19 that sentence states, "A few require surgery."  This
20 is a silly question, but what do you mean by that?
21    A.    Well, if you'll -- statistically, the
22 majority of patients' treatment resolves with
23 conservative treatment.  The next -- then you're left
24 with a group of patients that have not improved on
25 conservative therapy, so you give them steroid

Page 71

1 injections.  And the majority of patients in that
2 category receive a benefit from a steroid injection,
3 and you're left with a few patients who have not
4 improved on steroid treatments or conservative therapy
5 and, thus, would require surgical evaluation.  And
6 even those --
7    Q.    And how do you determine --
8        MR. MARUNA:  He's still answering.
9 Andrew, I'm sorry if it's not coming through.  The
10 doctor is still going.
11        THE WITNESS:  And even those patients that
12 do ultimately undergo surgery, still, some of those
13 don't improve as well.  So there is a portion of
14 patients that don't improve even with surgery.
15    Q.    (BY MR. MCCLAIN) And so how does a doctor
16 make a determination that a patient's not doing well
17 with conservative therapy and then next move on to
18 injections?
19    A.    Based on examination and patient
20 complaints and patient's performance, meaning their
21 lifestyle is inhibited, or their job performance or
22 their inability to function.
23    Q.    And similar question.  When does a doctor
24 determine to move from injections to surgery?
25    A.    When the patients receive multiple

Page 72

1 injections and they're no longer effective.  A patient
2 isn't --
3    Q.    How long --
4        MR. MARUNA:  Andrew, maybe if we just put
5 a pause there.  I think maybe there's a delay.  The
6 doctor is still answering again.
7        THE WITNESS:  So you asked me, you know,
8 when do you determine when steroid injections are not
9 working and you need to go on to surgery?  And I would
10 say after a patient has received multiple steroid
11 injections and he's no longer receiving a benefit from
12 the injections, then surgical evaluation would be
13 appropriate.
14    Q.    (BY MR. MCCLAIN) What is the determining
15 factor of whether the patient is receiving a benefit
16 from the injections?
17    A.    Well, it would be based on the patient's
18 complaints, their physical examination, and their
19 lifestyle modifications.
20    Q.    Typically, how long do you expect a
21 cortisone shot to be effective of relieving pain?
22    A.    It is patient-specific.  Some patients
23 receive benefit for one to two months.  Some patients
24 receive benefit for one to two years.  It's very
25 patient-specific.

Page 73

1    Q.    So you need to rely on feedback from the
2 patient to determine if the shot is effective, then,
3 correct?
4    A.    Right.  Typically, whenever the shot wears
5 off and the pain returns, the patient will then
6 request another injection.  However, if they are -- if
7 they didn't receive any benefit from the injection,
8 then
9 they would not be requesting another injection because
10 they didn't receive any benefit from it.  But if they
11 request another injection, you as a physician would
12 assume they received some benefit when they received
13 an injection.  That's why they're requesting another
14 one.
15    Q.    In paragraph 3, you discuss the use of
16 radiographs.  How are radiographs helpful to treat
17 conditions such as the one that Mr. Hemphill had?
18    A.    Well, x-rays are determined -- are used to
19 determine if the patient has any calcific tendonitis
20 or calcification of the shoulder, or if they have an
21 abnormal acromion.  If they have an abnormal acromion,
22 that could be causing impingement and would require
23 surgery with an abnormal x-ray.  But in this
24 particular case --
25    Q.    And --



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 74..77

Page 74

1    MR. MARUNA:  Still going.
2    THE WITNESS:  In this particular case,
3 Mr. Hemphill did have normal x-rays and did not have
4 an abnormal acromion.
5    MR. MARUNA:  Can we go off for a second?
6    (Discussion off the record.)
7    Q.    (BY MR. MCCLAIN) Doctor, you describe,
8 "MRI, though expensive, is the best modality for
9 evaluation
10 of the rotator cuff."  What do you mean by that
11 statement?
12   A.    Current radiographic imaging includes
13 x-rays, CT, ultrasound, and MRI.  And of those four
14 modalities, an MRI is the most detailed information
15 you can obtain from a joint.
16   Q.    And so you can see --
17   A.    An MRI -- I'm sorry.  An MRI shows soft
18 tissue that an x-ray doesn't.
19   Q.    So an MRI provides a more thorough
20 picture -- more complete picture than an x-ray.  Is
21 that a fair description?
22   A.    Correct.
23   Q.    You also mentioned physical therapy
24 several times in this session.  Is physical therapy
25 helpful to treat the condition that Mr. Hemphill had?

Page 75

1    A.    Yes.  Exercises and strengthening the
2 rotator cuff is helpful for impingement.
3    Q.    Do you recall if Mr. Hemphill ever
4 received physical therapy?
5    A.    I do not recall.
6    Q.    Do you recall seeing any notes ordering
7 him to use physical therapy?
8    A.    I do not recall.  I do recall that
9 Mr. Hemphill was working out in the gym and reinjured
10 his shoulder after his initial treatments in 2013.
11   Q.    Can you direct me to that portion of your
12 report?
13   A.    On page 2, April 11th, 2013, "Mr. Hemphill
14 was lifting weights in the yard when a weight fell on
15 his right hand."
16   Q.    I'm sorry.  What was the date on that?
17   A.    On April 11th, 2013.
18   Q.    Have you ever interviewed Mr. Hemphill?
19   A.    I have not.
20   Q.    Do you know specifically what type of
21 exercise he was doing on April 11th, 2013?
22   A.    No.
23   Q.    It's possible for an individual suffering
24 from a shoulder injury to still do weight training?
25 For instance, leg lifts and other leg-related

Page 76

1 exercises, correct?
2    A.    It's possible that they also do shoulder
3 exercises as part of their physical therapy.  Yes.
4 They should be doing all types of exercises.
5    Q.    But you don't know what type of exercise
6 Mr. Hemphill was doing on April 23rd -- April 2013,
7 correct?
8    A.    I do not know his workout regimen.
9    Q.    Moving to page 8 of your report.  I want
10 to discuss the second bullet point at the top of the
11 page there.  It's entitled "Diagnostic Technique."
12 And you state, "If a patient fails to improve
13 following a subacromial space injection and has normal
14 radiographs with an ambiguous physical examination,
15 the rotator
16 cuff may not be the problem.  Thus, after the
17 injection, repeat impingement testing will verify the
18 diagnosis if the pain is ameliorated."  Did I read
19 that correctly?
20   A.    Yes.  You read that correctly.
21   Q.    For the first sentence, is that what
22 happened to Mr. Hemphill here?  He received a
23 subacromial injection, had normal radiographs, and had
24 ambiguous physical examination?
25   A.    Yes.  Originally, they believed he had

Page 77

1 possible bursitis with impingement.  And they injected
2 his subacromial bursa.  And then they reevaluated him
3 and determined he had an impingement diagnosis.
4    Q.    And then the last sentence states, "After
5 the injection, repeat impingement testing will verify
6 the diagnosis if the pain is ameliorated."
7    So what are you basing that sentence on?
8    A.    I'm not sure what you mean, the basis of
9 the sentence.  You inject the -- the procedure is you
10 inject the patient with steroid injection and see if
11 they improve.  If they don't improve or they don't
12 have a rotator cuff problem, then you repeat the
13 impingement testing.  And impingement testing requires
14 range of motion testing against force.
15   Q.    So --
16   A.    And if they --
17   Q.    To see if they improve --
18   MR. MARUNA:  Andrew.  Andrew, hold on.  He
19 was still going.
20   THE WITNESS:  So you evaluate their pain
21 based on -- when you're testing them for impingement
22 on examination.  So I would use examination --
23 physical examination to determine whether they had a
24 rotator
25 cuff or impingement problem.

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 78..81

Page 78

1    Q.    (BY MR. MCCLAIN) So for this assumption
2 and treatment plan to work, it would necessitate
3 follow-up appointments, correct?
4    A.    That's correct.
5    Q.    Moving along to the bottom of page 8, do
6 you know --
7         MR. MARUNA:  Andrew, we're going about a
8 little over an hour, is our last break.  If you can
9 reach a good stopping point any time whenever you see
10 one.
11        MR. MCCLAIN:  We can stop right now.
12        MR. MARUNA:  Okay.
13        (Off the record from 4:15 p.m. to
14 4:23 p.m.)
15   Q.    (BY MR. MCCLAIN) Doctor, we just got back
16 from a break.  Did you discuss this case with anyone
17 on the break?
18   A.    Yes.  My counsel.
19   Q.    Is James representing you individually?
20   A.    Oh, sorry.  No.  He is not representing me
21 individually.  He has hired me to be the expert.
22   Q.    What specifics did you discuss during the
23 break?
24        MR. MARUNA:  Object to conversations under
25 attorney work product doctrine.  But Doctor,

Page 79

1 generally, you can talk about what we said.
2         THE WITNESS:  I asked him if he had
3 provided me those health care requests for review that
4 you submitted as evidence, Exhibit-4 and 7.  I had not
5 reviewed those previously to my report and I asked him
6 if I had missed them.  And he said he had not provided
7 those to me.
8    Q.    (BY MR. MCCLAIN) Do you know why those
9 were not provided?
10   A.    We did not discuss that.
11   Q.    Doctor, getting back to your report on
12 page 8, at the bottom there, the second-to-last
13 paragraph, beginning, "Hemphill complaint to medical
14 staff."  Do you see that?
15   A.    I do.
16   Q.    Your report states, "Hemphill complained
17 to medical staff on seven different occasions from
18 February 2013 to October 30th, 2013."  Did I read that
19 correctly?
20   A.    Yes.
21   Q.    And what is the basis of your conclusion
22 in that statement?
23   A.    By -- my basis is a review of the medical
24 record.
25        MR. MCCLAIN:  Phoebe, can you please give

Page 80

1 the witness Exhibit-9 and also provide a copy to
2 counsel?  And Exhibit-9 contains Bates Number HEM 10,
3 11, 21, 22, 25, 13, 15, 23, 53, 54, 58 through 61, 70
4 through 71, 91, 92, and 93.
5         (Exhibit-9 marked.)
6    Q.    (BY MR. MCCLAIN) Doctor, do you have
7 Exhibit-9 in front of you?
8    A.    I do.
9    Q.    Can you briefly take a minute to --
10 actually, we'll go through each one of these
11 individually.  The first page, HEM 10, what is this
12 document?
13   A.    The first page is Offender Outpatient
14 Progress Note.  Carl Hemphill.  Date:  April 19th,
15 2013.  A note by, I believe, Dr. Obaisi, MD note.
16 Maybe not Dr. Obaisi.  The signature is not clear.
17 But the handwriting is not consistent with Dr.
18 Obaisi's.
19   Q.    In the objective portion of this progress
20 note, what does it state?
21   A.    "Tender over the AC joint on the right.
22 Pain with external and internal rotation.  Range of
23 motion, full, passive, and active.  Limited by pain.
24 Left shoulder normal."
25   Q.    And what was the assessment made on this

Page 81

1 date?
2    A.    Right AC joint boggy.  Assessment:  Right
3 rotator cuff impingement.
4    Q.    And I'm sorry.  I should have began with
5 this.  At the very top, what is it it indicates that
6 Mr. Hemphill was seeing the doctor for on that date?
7    A.    Complains of two months of left shoulder
8 pain.  But --
9    Q.    Do you believe that that should indicate
10 right shoulder pain?
11   A.    Yeah.  I believe in my report, I indicated
12 it says left shoulder pain, but throughout the entire
13 time, he complains of right shoulder pain.
14        And furthermore, in this note, it states,
15 "Left shoulder normal" -- under assessment -- under
16 "Objective," it says, "Left shoulder normal and right
17 shoulder is limited by pain."
18   Q.    And what is the plan resulting from this
19 April 19th, 2013, visit?
20   A.    "Right shoulder sling, corticosteroid
21 injection of acromioclavicular joint.  Will schedule
22 with Dr. Obaisi.  Will also give nonsteroidal
23 anti-inflammatory drug.  Schedule with Dr." --
24   Q.    Was Mr. Hemphill scheduled to see Dr.
25 Obaisi on a specific date?



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 82..85

Page 82

1    A.      I believe he was scheduled on April 23rd
2 for his injection of his right AC joint.  He was
3 ordered Naprosyn 500 milligrams twice a day.
4    Q.      Can you flip to the next page, HEM 11?
5    A.      Okay.
6    Q.      And what is this document?
7    A.      This is from the health care record,
8 offender outpatient progress note of Carl Hemphill.
9    Q.      And what is the first date there?
10    A.      April 23rd, 2013, the inmate was not seen
11 during that date due to no provider available.
12    Q.      And what is the next date?
13    A.      May 31st, 2013.
14    Q.      And what is the nature of the visit for
15 Mr. Hemphill on that date?
16    A.      He's requesting to be seen by a doctor for
17 ongoing right shoulder pain.
18    Q.      And was Mr. Hemphill scheduled to have any
19 follow-ups as a result of this May visit?
20    A.      Yes.
21    Q.      And what is the next date?
22    A.      June 6th, 2013.
23    Q.      The pages are a little out of order, but
24 if you flip to HEM 13, which is the next page, what is
25 the date at the top there?

Page 83

1    A.      June 4th, 2013.
2    Q.      And does it indicate -- does it indicate
3 that Mr. Hemphill had any complaints on that date?
4    A.      No.
5         MR. MCCLAIN:  You know, I'm just going to
6 object to foundation.  These were the same records
7 that were contained in Exhibit-3 that we're going over
8 right now, I believe, the 6/6/13 and 6/4/13.  I don't
9 know if that was intentional or not, but I wanted to
10 bring it
11 to counsel's attention.
12         MR. MCCLAIN:  Thank you.
13         MR. MARUNA:  So I'm going to object to
14 foundation and asked and answered.
15         But over the objections, you can answer,
16 Doctor.
17         THE WITNESS:  I'm sorry.  I didn't hear
18 the question.  Can you repeat the question?
19    Q.      (BY MR. MCCLAIN) Sure.  Was Mr. Hemphill
20 scheduled to see a doctor on June 4th, 2013?
21    A.      According to the medical record, he -- the
22 nurse saw him on May 31st and said that they made an
23 appointment with him for June 4th, which was the "next
24 available date."  He saw a nurse on the 4th and then
25 saw the doctor on the 6th of June.

Page 84

1    Q.      And on the 6th of June, did Mr. Hemphill
2 complain of shoulder pain?
3    A.      Yes.
4    Q.      Moving along to HEM 13, on June 26th,
5 2013, did Mr. Hemphill complain of shoulder pain?
6    A.      Yes.
7    Q.      If you could flip to HEM 21, please.
8    A.      I'm there.
9    Q.      What is this document?
10    A.      This is an offender sick call medical
11 service request dated 5 -- May 15th, 2013, by Carl
12 Hemphill.
13    Q.      And is Mr. Hemphill requesting to see a
14 doctor for his right shoulder?
15    A.      He is requesting to be rescheduled for his
16 shoulder.
17    Q.      Moving on to HEM 23, what is this
18 document, Doctor?
19    A.      Health service request dated June 24th,
20 2013, by Mr. Carl Hemphill.  He's requesting to be
21 seen for his shoulder.
22    Q.      And does he complain of pain within this
23 request?
24    A.      Yes.
25    Q.      Moving on to HEM 25, what is the date of

Page 85

1 this medical services request?
2    A.      8/31/13.
3    Q.      And does Mr. Hemphill complain of shoulder
4 pain on August 31st, 2013?
5    A.      Yes.
6    Q.      If we continue along to HEM 53 --
7    A.      I'm sorry.  Give me a minute to read this
8 request on 8/31.  I don't believe I've reviewed this.
9 It says --
10    Q.      Okay.
11    A.      He wants to be rescheduled for his right
12 shoulder.  Okay.  So he says that he got the steroid
13 injection in his right shoulder and it's hurting
14 again.
15    Q.      Does he give a time frame of when it
16 started to hurt again?
17    A.      On the date of July 31st, 2013, at 2:30
18 a.m., he received a cortisone shot.  And 24 hours
19 later, his right shoulder began to hurt, the very next
20 day, August 1st, 5:00 a.m.
21    Q.      Thank you.  If you flip to HEM 53, there's
22 a progress note dated July 18th, 2013.  Do you see
23 that, Doctor?
24    A.      On HEM 53?
25    Q.      Yes.

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 86..89

Page 86

1   A.      Correct.  7/18/2013.
2   Q.      Correct.
3   A.      This is a --
4   Q.      And did --
5   A.      This is an RN sick call note by Mr. Carl
6 Hemphill.
7   Q.      Does he complain of shoulder pain on this
8 date?
9   A.      My right shoulder is still hurting.
10  Q.      If you flip to HEM 54, what does this
11 document appear to be?
12  A.      A letter.
13  Q.      From whom?
14  A.      Mr. Carl Hemphill.
15  Q.      And what is the date of this letter?
16  A.      July 24th, 2013.
17  Q.      Please take a moment to read the letter.
18  A.      I've reviewed the letter.
19  Q.      Does Mr. Hemphill complain of shoulder
20 pain on this date?
21  A.      He reports chronic pain.
22  Q.      If we flip to HEM 58, what is this
23 document?
24  A.      This is an offender grievance.
25  Q.      And at the very top, there's a portion

Page 87

1 that says "Nature of grievances" -- "grievance."  Do
2 you see that, Doctor?
3   A.      I do.
4   Q.      And in the third column, there's a box for
5 medical treatment.  Do you see that?
6   A.      I do.
7   Q.      So are inmates allowed to submit
8 grievances complaining of medical treatment?
9   A.      Yes.
10  Q.      If you could just briefly read through the
11 brief summary of the grievance and let me know when
12 you're done.
13  A.      I've reviewed this document.
14  Q.      Does Mr. Hemphill complain of shoulder
15 pain in this document?
16  A.      He reports chronic pain in his right
17 shoulder.
18  Q.      At the bottom of that document, there's an
19 area for counselor's response.  Do you see that,
20 Doctor?
21  A.      Yes.
22  Q.      And what does the response state?
23  A.      "A copy of this grievance has been
24 forwarded to the HCU" -- I believe that to be health
25 care administrator -- "for review and response.  And

Page 88

1 the original grievance has been forwarded to the
2 grievance office.  You will receive a final response
3 from the grievance office when the health care unit
4 responds to the same."  So "HCU" is "health care
5 unit."
6   Q.      Thank you, Doctor.  And what is the date
7 of this grievance?
8   A.      This grievance is dated July 28th, 2013.
9   Q.      Can you please flip to HEM 71?  Excuse me.
10 70.
11  A.      I'm there.  71 or 70?  70, right?
12  Q.      70, please.
13  A.      Yes.
14  Q.      What is this document?
15  A.      It's a grievance dated October 11th, 2013,
16 from Carl Hemphill.
17  Q.      And what is the nature of the grievance?
18  A.      It is a -- he is grieving staff conduct
19 and medical treatment.
20  Q.      And can you please take a moment to read
21 the brief summary of grievance?
22  A.      I reviewed it.
23  Q.      Does Mr. Hemphill complain of shoulder
24 pain in this grievance?
25  A.      He complains of chronic pain.

Page 89

1   Q.      Is that pain in his right shoulder?
2   A.      Yes.  "For pain in my right shoulder."
3   Q.      At the bottom of HEM 70, there's a box for
4 counselor response.  Do you see that, Doctor?
5   A.      I do.
6   Q.      Does a counselor indicate that this
7 grievance has been forwarded to the HCU or health
8 care unit?
9   A.      "A copy of this grievance has been
10 forwarded to the health care unit."
11  Q.      For review and response, correct?
12  A.      Correct.
13  Q.      And it indicates that Mr. Hemphill will
14 receive a response from the grievance officer when the
15 health care unit responds to same.  Is that correct?
16  A.      Correct.
17  Q.      Doctor, can you please flip to HEM 91?
18  A.      Yes.
19  Q.      And this is an offender outpatient
20 progress note, correct?
21  A.      Yes.
22  Q.      On July 31st, 2013, there's an MD entry.
23 Do you see that?
24  A.      Yes.
25  Q.      What occurred on that date?



Page 90

1    A.    Dr. Obaisi injected a 40 milligram
2  Depo-Medrol injection into the right shoulder,
3  subacromial space.
4    Q.    Can you please turn to HEM 92?
5    A.    Okay.
6    Q.    What is this document?
7    A.    Offender progress note, Carl Hemphill,
8  dated 8/31/13.
9    Q.    And is there also another entry on that
10 date?
11   A.    There is --
12   Q.    Excuse me.  On that form.
13   A.    Yeah.  On that form.  For September 9th,
14 2013, by a nurse.  A nursing note.
15   Q.    Does Mr. Hemphill complain of shoulder
16 pain on August 31st, 2013, and September 9th, 2013?
17   A.    Yes.
18   Q.    And can you please flip to HEM 93?
19   A.    Okay.
20   Q.    And what is this document?
21   A.    It is an offender outpatient progress note
22 dated September 11th, 2013, Carl Hemphill.
23   Q.    And does Mr. Hemphill complain of shoulder
24 pain on September 11th, 2013?
25   A.    He's complaining that his pain medication

Page 91

1  had been taken by the officers.
2         MR. MARUNA:  I'm going to just object to
3  asked and answered on that.  It was discussed in
4  Exhibit-3.
5         Over the objection, let's keep going.
6         THE WITNESS:  Mr. Hemphill complained that
7  orange crush, the officers, I believe, took his pain
8  medication.  And he was requesting to have it back.
9  And it was given -- renewed by Dr. Davis.
10   Q.    (BY MR. MCCLAIN) And what does it say in
11 the objective portion of that entry?
12   A.    "Inmate alert and oriented times 3.
13 Ambulatory.  Complains of pain in right shoulder."
14   Q.    Is there an entry on this page for
15 September 24th, 2013?
16   A.    There is.
17   Q.    And what occurred on that date?
18   A.    He was scheduled for an appointment with
19 the medical director, but due to lock down and no
20 movement, the appointment was rescheduled for October
21 22nd, 2013.
22   Q.    And is there an entry for October 22nd,
23 2013?
24   A.    There is.  "MD note:  Asked for steroid
25 injection.  Right shoulder.  Pain.  Came back.  Last

Page 92

1  injection was in July."
2    Q.    Thank you.  So at the bottom of page 8 in
3  your report, you indicate that it's your opinion that
4  health care requests were answered timely and
5  appropriately during these dates.  Do you see that
6  portion?
7    A.    Yes.
8    Q.    What dates are you referring to?
9    A.    February 2013 to October 30th, 2013.
10   Q.    Can you please return to HEM 10?  It's the
11 first page of Exhibit-9.
12   A.    Okay.
13   Q.    And Mr. Hemphill was scheduled to see
14 Dr. Obaisi on April 23rd, correct, for an injection?
15   A.    Correct.
16   Q.    Do you recall when Mr. Obaisi actually had
17 that injection?
18   A.    I believe his first injection was in July,
19 correct?  Yes.  July 31st, 2013?
20   Q.    It was three months from when he was first
21 scheduled to receive his injection when he ultimately
22 received his injection, correct?
23   A.    Correct.
24   Q.    Do you think that injection was timely
25 provided?

Page 93

1    A.    Well, I disagree with the statement that
2  you made stating that he was scheduled to have that
3  injection.  He was actually scheduled to see Dr.
4  Obaisi for evaluation for the treatment.  On April
5  19th --
6    Q.    Can you please --
7         MR. MARUNA:  Hold on.  The doctor is still
8  answering.
9         Doctor, continue.
10        THE WITNESS:  On April 19th, he was seen
11 by a different physician, who then referred Mr.
12 Hemphill
13 to Obaisi for evaluation for a steroid injection.  Not
14 to have a steroid injection, but for an evaluation to
15 see if it was appropriate.
16   Q.    (BY MR. MCCLAIN) Can you please flip to
17 HEM 10?
18   A.    I'm on HEM 10.
19   Q.    In the "Plans" column, can you please read
20 what is written there?
21   A.    "Schedule with Dr. Davis and Obaisi on
22 Tuesday, April 23rd, for injection of right AC joint.
23 Shoulder sling, naproxen 500 milligrams PO BID times
24 30 days.  Number 6 out of clinical supplier."
25   Q.    So that plan would actually indicate that



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Page 94

1 he was scheduled to have the injection, correct?

2    A.    When any medical doctor refers a patient
3 to another medical doctor, they cannot dictate -- Dr.
4 A cannot dictate to Dr. B what treatment he should
5 provide.  He simply refers -- Dr. A refers to Dr. B
6 for recommendations of treatment and, if appropriate,
7 treatment.  But they can certainly make suggestions,
8 but they can't dictate treatment plans.

9    Q.    Can you flip to HEM 11, please?

10    A.    Sure.

11    Q.    There's an entry for April 23rd, correct?

12    A.    Correct.

13    Q.    And Mr. Hemphill was rescheduled on that
14 date because there was no provider, correct?

15    A.    That's correct.

16    Q.    And at the bottom of HEM 11, there's an MD
17 note, correct?

18    A.    Yes.  On 6/6/13?

19    Q.    Yes.

20    A.    Yes.

21    Q.    And this note is made by Dr. Obaisi,
22 correct?

23    A.    Correct.

24    Q.    Is there any indication in this note that
25 Dr. Obaisi considered the injection that was

Page 95

1 originally referenced and referred to him on April
2 19th, 2013?

3    A.    Can you repeat that question, please?

4    Q.    Sure.  Is there any indication on June
5 6th, 2013, in this progress note, that Dr. Obaisi
6 considered giving the injection of which the doctor on
7 April 19th referred Mr. Hemphill for?

8    A.    Dr. Obaisi saw the patient for the
9 referral, evaluated the patient, assessed the patient
10 to have a tender right shoulder, and ordered an x-ray
11 of his shoulder for further evaluation.

12    Q.    But he did not give an injection on this
13 date, correct?

14    A.    He did not receive an injection on this
15 date.  Correct.

16    Q.    Doctor, based on your review of Exhibit-9
17 and the various documents included in Exhibit-9, is it
18 still your position that Mr. Hemphill complained to
19 medical staff only seven times from February 2013 to
20 October 30th, 2013?

21    A.    I would need a moment to count again.

22    Q.    Please take your time.

23    MR. MARUNA:  Doctor, don't -- do you want
24 the full chart?  I mean, you're just looking at
25 Exhibit-9.

Page 96

1    THE WITNESS:  Well, when I say that he
2 complained on seven different occasions, some of these
3 occasions are grouped into one large patient visit.
4 Meaning, patient visits on 5/31 and 6/4 and 6/6 are
5 all one -- one period of time.  Would not be three
6 individual complaints but yet one period of time.

7    Q.    (BY MR. MCCLAIN) How do you determine what
8 a period of time is?

9    A.    Clinical experience.

10    Q.    So what determines what a period of time
11 is?

12    A.    Well, different -- different diagnoses
13 have different time frames.  You know?  A period of
14 time for chest pain could be a very short period of
15 time, like five to 10 minutes, or even 10 to 15
16 seconds.  But shoulder pain can be a chronic process
17 of several
18 years.  So you have to use your clinical experience to
19 determine if this is all one complaint or if it's
20 three different complaints.  And complaints from
21 5/31/13, 6/4/13, and 6/6/13 all seem to be the same
22 complaint, not a new different complaint.

23    Q.    So based on your entire review of the
24 record -- and I'm referring you to the medical records
25 that are referenced in your report -- every single

Page 97

1 time that Mr. Hemphill complained of shoulder pain
2 over the course of three years would only be
3 considered one period of complaint?

4    MR. MARUNA:  Objection.  Foundation.  Form
5 of the question.  Mischaracterizes the doctor's
6 testimony.

7    Doctor, over the objections.

8    THE WITNESS:  Well, I believe in my
9 report, I didn't state it was one time.  I stated it
10 was seven times during that time period that I
11 determined it to
12 be -- you know, seven groups of time periods that he
13 had complained of pain.  Pain gets --

14    MR. MARUNA:  He's still answering.

15    THE WITNESS:  Patients can have pain and
16 then their pain improve, and then have pain again and
17 their pain improve.  Or they can have pain
18 consistently for a week and then improve.  And then
19 pain-free for
20 two weeks and then have pain for a week.

21    So in this situation, I believe that
22 Mr. Hemphill was having pain consistently from 5/31,
23 6/4, and 6/6 as a consistent period, but he may have
24 had pain-free periods as well.  Such as the time
25 between February and April, he had a -- what seemed to



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 98..101

Page 98

1 me on my review a pain-free period.
2      Q.      (BY MR. MCCLAIN) And so how are you
3 determining that this period ends on June 6th?
4      A.      Well, it doesn't end on June 6th.  June
5 6th is when Dr. Obaisi does an x-ray of him and then
6 sees him in follow-up.  And he's continuing to have
7 pain on 6/26.  He has not -- he's still in that same
8 period of pain because he's had pain complaints on the
9 31st, the 4th, the 6th, and the 26th.  And because he
10 had pain complaints all during that one time, that's
11 why he's going to get a steroid injection.  And that's
12 a
13 patient --
14      Q.      I understand.  And if you're --
15      A.      And if I was seeing that patient, then I
16 would say, all right, he's been on anti-inflammatory
17 medication.  Well, during this period of time that
18 I've been seeing him, his pain has not improved and a
19 steroid injection would be appropriate.
20      Q.      So in Exhibit-9, we reviewed various
21 documents which indicate Mr. Hemphill voicing
22 complaints for his shoulders beginning April 19th
23 through October 22nd, 2013.  How many periods of pain,
24 in your opinion, occurred during that period of time?
25      A.      Well, he certainly has pain during April

Page 99

1 19th, which would be one period of time.  Then he has
2 reported pain from the 31st all the way into June
3 26th, which would be a second period of time.  He
4 continues
5 to have pain in June, which would be 7/18, into the
6 period of time where he receives a joint injection on
7 June -- sorry -- July 31st, which would be a third
8 period of time.
9            Then he appears to be pain-free from the
10 time he received the injection on the 31st, up until
11 the 31st, which would be a new period of time when he
12 starts complaining of pain again, on 8/31.  And I
13 would consider 8/31 and 9/9 a combined period of time,
14 as one period of time.
15            Did I answer your question?
16      Q.      You did.
17      A.      Okay.
18      Q.      So that total, I believe, four periods of
19 time, your report indicates that he complained on
20 seven different occasions.  I'm just trying to
21 determine --
22      A.      So I would also consider the -- we just
23 stopped there in -- sorry -- in September 9th.  But
24 then another period of time is whenever he again
25 begins complaining on 10/22/13.  And he asks for the

Page 100

1 steroid injection again.  He says, "Right shoulder
2 pain came back," which indicates to me that the
3 shoulder pain had went away for a period of time.  So
4 this would be a new period of time.
5            And then of course the two periods in
6 February that we spoke of that aren't included in this
7 exhibit, equaling seven periods of time.  That's kind
8 of -- that's the basis of that seven periods.
9      Q.      It says "seven different occasions"?
10      A.      Right.
11      Q.      So you believe that to be seven different
12 periods of pain?
13      A.      Yes.  "Occasions" and "periods" would be
14 -- a "period" would be a more appropriate word than
15 "occasions."  I could amend my report to say
16 "periods."
17      Q.      Staying on page 8, Doctor, at the bottom,
18 you indicate that the initial therapy was successful
19 and returned Hemphill to a functional state as he was
20 able to lift weights in the yard by April of 2013.
21 Did I read that correctly?
22      A.      Yes.
23      Q.      What is your basis to make the conclusion
24 that the initial therapy was successful?
25      A.      Well, number one, he did not have repeated

Page 101

1 or new complaints during March and early April.  And
2 he was able to lift weights in the yard, which shows
3 that -- you know, he is being able to do some physical
4 therapy.  He's not having a lot of pain complaints.  I
5 would consider that successful treatment.  He's
6 functional.
7      Q.      Where did you see that he was doing
8 physical therapy?
9      A.      I'm suggesting to you that lifting weights
10 in the yard is a physical exercise and a form of
11 physical therapy.
12      Q.      But he was not being treated?
13      A.      He was not being treated by physical
14 therapists, but he was doing physical exercises.
15      Q.      And you've never interviewed Mr. Hemphill,
16 correct?
17      A.      I have not.
18      Q.      And you don't know what type of
19 weightlifting he was doing on April -- in April of
20 2013, correct?
21      A.      I do not.  I would like to add that
22 conservative management includes instructions on
23 physical therapy.  When I see a patient with this type
24 of diagnosis, I instruct them on exercises to do
25 themselves.  They don't necessarily need a physical



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 102..105

Page 102

1 therapist to undergo physical therapy. Home physical
2 therapy or outpatient physical therapy without a
3 physical therapist is appropriate conservative
4 treatment.
5      Q.     And Mr. Hemphill complained of pain on
6 April 19th, 2013, correct?
7      A.     That's correct. I believe he -- yes.
8      Q.     And he made at least two sick call
9 requests in May of 2013, correct?
10           MR. MARUNA: Objection. Foundation.
11           Over the objection, Doctor, you can
12 answer.
13           THE WITNESS: The health care requests
14 that you referenced in Exhibit-9, I had not reviewed
15 for my report. HEM --
16      Q.     (BY MR. MCCLAIN) But that is dated May
17 15th, 2013, correct?
18      A.     Yes. HEM 00021. I did not reference that
19 in my report or review that document.
20      Q.     And Mr. Hemphill is complaining of
21 shoulder pain, correct?
22      A.     On that particular document?
23      Q.     Yes.
24      A.     Yes, he is.
25      Q.     Okay. Doctor, if you could please turn to

Page 103

1 page 9 of your report. In the middle portion, towards
2 the top, you briefly discuss grievances, correct?
3      A.     Correct.
4      Q.     And you state, "The grievance process is
5 not an appropriate method to access health care in a
6 correctional setting." Do you see that portion of
7 your report?
8      A.     Yes.
9      Q.     And a little further in that paragraph,
10 you state, "It is well known that the grievance
11 process is controlled by custody and does not involve
12 the
13 providers in the process of grievances." Did I read
14 that correctly?
15      A.     Correct.
16      Q.     Doctor, can you refer back to Exhibit-9?
17 And it's Document HEM 58.
18      A.     Okay.
19      Q.     And we previously discussed this document.
20 This is a grievance filed by Mr. Hemphill regarding
21 medical treatment and staff conduct, correct?
22      A.     Correct.
23      Q.     And we also discussed, at the bottom, the
24 counselor's response stated that a copy of the
25 grievance was forwarded to the health care unit,

Page 104

1 correct?
2      A.     Correct.
3      Q.     And that Mr. Hemphill would receive a
4 final response once the health care unit has responded
5 to his grievance. Is that correct?
6      A.     Correct.
7      Q.     So the health care unit is actually made
8 aware of grievances filed by inmates for medical
9 treatment, correct?
10           MR. MARUNA: Objection. Foundation.
11           Over the objection, Doctor.
12           THE WITNESS: If you refer to my report,
13 it says, "It is well known that the grievance process
14 is controlled by custody and does not involve the
15 providers in the process of grievances." Typically,
16 the health care team has a grievance coordinator
17 assigned to the team. It is not a physician. It can
18 be a secretary or a nurse or a med tech who is the
19 health care grievance coordinator for the health care
20 unit. They receive the grievance, gather the
21 information, the custody requests, and reply to them.
22           Typically, the provider is not involved or
23 notified that the grievance has been filed. That's
24 customary. At least where I -- in my practice. I
25 don't know what Wexford's grievance process is

Page 105

1 specifically, but it's customary that -- it appears
2 that the health care unit was notified. It's not
3 clear that a provider was notified.
4      Q.     (BY MR. MCCLAIN) Are providers part of the
5 health care unit?
6      A.     Certainly. As are janitors.
7      Q.     Would a janitor get a copy of a medical
8 treatment grievance?
9      A.     I don't know Wexford's policy on answering
10 grievances. But in my system, janitors and providers
11 do not answer grievances.
12      Q.     Previously, we discussed a progress report
13 by Dr. Obaisi where he acknowledged a grievance filed
14 by Mr. Hemphill. Do you recall that?
15      A.     I do recall that.
16      Q.     So at least in that instance, a provider
17 was made aware of a grievance filed by Mr. Hemphill;
18 is
19 that correct?
20      A.     That's correct.
21      Q.     Dr. Obaisi was notified at that period of
22 time. He was also notified by Dr. Shickner.
23           MR. MARUNA: Shicker.
24           THE WITNESS: Shicker. Did you get that
25 spelling right?

Page 106

1    Q.    (BY MR. MCCLAIN) Okay, Doctor. Staying on
2 page 9 of your report, I want to go down to the bottom
3 portion where it states, "After the steroid injection
4 May 2014, Hemphill did not file any health care
5 requests for the next nine months." Do you see that?
6    A.    I do see that.
7    Q.    And what is the nine-month period that
8 you're referring to?
9    A.    It says -- if you read further down in
10 that paragraph, it states, "He did not notify Wexford
11 or defendants of any serious medical needs during a
12 nine-month time period from May 2014 to March 2015."
13    MR. MCCLAIN: Well, then, Phoebe, can you
14 please pass -- it's going to be Exhibit-10. But it's
15 the batch of exhibits beginning HEM 95.
16    (Discussion off the record.)
17    (Exhibit-10 marked.)
18    THE WITNESS: I have Exhibit-10 in front
19 of me.
20    Q.    (BY MR. MCCLAIN) Okay. We can go back on
21 the record, then.
22    A.    This is a medical --
23    Q.    Doctor, you've been handed Exhibit-10,
24 which contains the documents Bates-labeled HEM 95, 30,
25 and

Page 107

1 31. Beginning with HEM 95, what is this document?
2    A.    This is an offender outpatient progress
3 note dated March 5th, 2014, a nursing note.
4    Q.    And what does the nursing note state?
5    A.    "Medical director appointment rescheduled.
6 No provider available. Reschedule for April 4th" --
7 sorry -- "April 3rd, 2014." Then on April --
8    Q.    Then there's an entry for --
9    A.    Yeah. April 3rd, 2014, an RN note states,
10 "No provider available. Will reschedule for May 1st,
11 2014."
12    Q.    So this document indicates that Mr.
13 Hemphill was scheduled to see a doctor twice and he
14 was rescheduled. Is that correct?
15    A.    Correct.
16    Q.    And can you flip to HEM 30, please?
17    A.    Okay.
18    Q.    What is the date of that document?
19    A.    This is a medical health service request
20 dated March 17th, 2014, by Mr. Carl Hemphill.
21    Q.    And what is Mr. Hemphill requesting in
22 that document?
23    A.    "I had a call scheduled for the following
24 date of March 5th, 2014. I was told that my passing
25 was" -- "that my pass was canceled by the medical

Page 108

1 director, Dr. Obaisi, who hadn't" -- I can't read
2 that -- "been rescheduled for a cortisone shot on my
3 right shoulder. Also, I would still like to be
4 scheduled for an MRI on my right shoulder."
5    Q.    So Mr. Hemphill is requesting to have an
6 MRI in April -- excuse me -- in March 2014, correct?
7    A.    March 17th, 2014, correct.
8    Q.    And if you could flip to HEM 31, please.
9    A.    Okay.
10    Q.    Are you able to read this service request,
11 Doctor?
12    A.    This is dated April 25th, 2014, by Carl
13 Hemphill. Would you like me to read it to you?
14    Q.    You can just read it to yourself. And let
15 me know when you're familiar with it.
16    A.    I have reviewed it.
17    Q.    And is Mr. Hemphill requesting medical
18 treatment in this document?
19    A.    He's requesting a steroid injection.
20    (Discussion off the record.)
21    THE WITNESS: Yes. He is requesting a
22 steroid injection.
23    Q.    (BY MR. MCCLAIN) And I want to refer you
24 back to your report, the third from the last paragraph
25 on page 9. The last sentence states, "In fact, he was

Page 109

1 seen by Dr. Obaisi for follow-up in May and did not
2 complain to the medical department about pain for the
3 last 90 days." 
4    Q.    So based on your review of this
5 Exhibit-10, is that an accurate statement that Mr.
6 Hemphill did not complain about pain for the last 90
7 days?
8    A.    Based on these two health care requests,
9 dated March 17th and April 25th, that would be
10 inaccurate based on those two health care requests.
11    Q.    Moving along on page 9, you indicate in
12 the paragraph -- second paragraph from the bottom,
13 "When Hemphill did again complain of pain, he was
14 treated
15 with another steroid injection as it had been
16 successful in treating Hemphill's pain for since
17 October 2013." Did I read that correctly?
18    A.    Yes. It's a poor sentence, but yes.
19    Q.    What is the basis of your opinion that the
20 October 2013 injection was successful?
21    A.    My opinion that it was successful is that
22 he was able to go a significant amount of time without
23 further pain. And he's requesting another steroid
24 injection, which means that he did receive some
25 benefit from it in his health care here on 3/17/2014.



Page 110

1 When patients request a second or third or fourth
2 steroid injection, it implies that they received some
3 benefit from it.
4     Q.    But Mr. Hemphill did complain that his
5 pain came back after the October 2013 injection,
6 correct?
7     A.    That's a natural course of the disease,
8 that you get a steroid injection and it's not a
9 permanent fix. Many times, a patient's pain does
10 return later
11 on. Most steroid injections are not a permanent fix.
12     Q.    In the same paragraph there, Doctor, you
13 state that this one -- "This is within the standard of
14 care and noted to be the treatment of choice by the
15 American Academy of Family Physicians." Did I read
16 that correctly?
17     A.    Yes.
18     Q.    And what standard of care are you
19 referring to there?
20     A.    The American Academy of Family Practice
21 publishes standard of care guidelines in their -- in
22 their annual publications or their monthly
23 publications. And they had an article in the magazine
24 that I reference in my opinion that reports that
25 steroid injections are standard of care for this

Page 111

1 treatment.
2     Q.    And that's the article you cite in
3 Footnote 1, correct, entitled, "Management of Shoulder
4 Impingement Syndrome and Rotator Cuff Tears"?
5     A.    Correct.
6     MR. MCCLAIN: Phoebe, can you please hand
7 the doctor what's now Exhibit-11? It's the article.
8     (Exhibit-11 marked.)
9     THE WITNESS: I have it. This is the
10 article that I reviewed.
11     Q.    (BY MR. MCCLAIN) Doctor, is this -- you
12 anticipated my question. I would like you to flip
13 to -- it's the second-to-last page. At the very
14 bottom, there's a section called "Operative
15 Treatment." Let me know once you get there.
16     A.    I am there.
17     Q.    Can you please read the last two sentences
18 of the paragraph beginning, "Not all cuff tears"?
19     A.    You're talking about the -- "Not all cuff
20 tears," right under "Operative Treatment"?
21     Q.    Yes. So can you please read the last two
22 sentences of that paragraph?
23     A.    "Most older patients with impingement and
24 rotator cuff tears actually do well without surgery.
25 However, surgery might be considered in a patient who

Page 112

1 has failed to improve after six months of conservative
2 treatment or in a patient less than 60 years of age
3 with a debilitating tear that impairs function."
4     Q.    So in May 2014, Mr. Hemphill received a
5 third cortisone shot, correct?
6     A.    Correct.
7     Q.    And he received his first cortisone shot
8 in July 2013, correct?
9     A.    Correct.
10     Q.    And he first complained in February 2013,
11 correct?
12     A.    Correct.
13     Q.    So more than 15 months after Mr. Hemphill
14 had been treated with conservative therapy and was
15 made -- and he indicated on several occasions that he
16 was still in pain, he was not considered for surgery,
17 was he?
18     A.    At what point in time are you speaking of?
19     Q.    I'm spoking of from when he first
20 complained in February of 2013 until May 2014 when he
21 received his third cortisone shot.
22     A.    And then you're asking was he considered
23 for surgery at that point?
24     Q.    Was he considered for surgery at any point
25 during that 15 months?

Page 113

1     A.    He certainly was not referred for surgery
2 at that point, no. But he was continued to be
3 followed by a surgeon, Dr. Obaisi. He was being
4 followed clinically.
5     Q.    Based on this article, which you indicated
6 was the standard of care that applied here, surgery
7 could have been considered after six months of
8 conservative treatment, correct?
9     MR. MARUNA: Objection. Foundation.
10     Over the objection, Doctor, you can read
11 what's in here.
12     THE WITNESS: I'll refer to you about the
13 standard here on this last sentence. It says,
14 "However, surgery might be considered in a patient who
15 has failed to improve after six months." It does not
16 say surgery must be considered. It says surgery might
17 be considered. And the reason it says might be
18 considered is because surgery is not successful in a
19 majority of patients who -- not majority, but, you
20 know, surgery is not the end-all, be-all to
21 impingement therapy. In fact, in this case, Mr.
22 Hemphill did have surgery and it did not relieve or
23 resolve his shoulder pain. He continued to have
24 shoulder pain postsurgery.
25 He is not pain-free today even after the surgery.



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 114..117

Page 114

1    Q.    But there was no indication in the report
2 that any of the defendants considered surgery for
3 Mr. Hemphill after six months of conservative therapy,
4 correct?
5    A.    There's no indication that they didn't
6 consider it.  They -- I can't say whether they did or
7 didn't consider it.  They certainly didn't indicate in
8 the charting that they absolutely would not consider
9 orthopedic surgery or would definitely consider
10 orthopedic surgery.  They didn't make mention of that
11 during that time period.
12    Q.    Did you see any notes which indicate that
13 they considered surgery during that 15-month period?
14    A.    You gave me a document earlier, Exhibit-8,
15 IDOC 002, that stated that they did consider it.
16    Q.    And where do you say -- where does it
17 state there that they considered surgery?
18    A.    Well, this says, "Referring practitioner,
19 Dr. Obaisi, referred to orthopedics for chronic right
20 shoulder pain.  Has had steroid injection."
21    Q.    And what is the date of that referral?
22    A.    6/4/15.  Oh, yeah.  Okay.  This is a year
23 later.  6/4/15.
24    Q.    And that's over two years after Mr.
25 Hemphill initially complained of shoulder pain,

Page 115

1 correct?
2    A.    Yes.  But this is -- this is not to say
3 that Dr. Obaisi all along was thinking in the back of
4 his mind at some point, "If this isn't helpful, he may
5 need a surgical evaluation."  And every patient is
6 specific. And the physician has to think, "Okay, this
7 hasn't been helpful.  We need to consider other
8 options."  And
9 Dr. Obaisi is certainly considering other options on
10 6/4/15.
11    Q.    Doctor, moving along to the very end of
12 page 9.  You indicate there that Mr. Hemphill did not
13 file any health care requests for the next nine
14 months.  The nine months you're referring to is the
15 nine months following May 2014, correct?
16    A.    He did not notify Wexford defendants of
17 any -- for a nine-month period from May 2014 to March
18 2015.
19        MR. MCCLAIN:  Phoebe, can you please hand
20 the doctor and counsel Exhibit -- what will be 12,
21 beginning HEM 32?
22        (Exhibit-12 marked.)
23    Q.    (BY MR. MCCLAIN) Doctor, do you have
24 Exhibit-12 in front of you?
25    A.    Yes, I do.

Page 116

1    Q.    Beginning with HEM 32, what is this
2 document?
3    A.    Health service request by Mr. Carl
4 Hemphill dated July 8th, 2014.
5    Q.    And take a brief moment to review the
6 nature of the request.
7    A.    He wants to see Dr. Obaisi pertaining to
8 his right shoulder for a cortisone shot.
9    Q.    And does he indicate he's in pain?
10    A.    Yes.
11    Q.    Please flip to HEM 33.
12    A.    July 20th, 2014, health care service
13 request, Carl Hemphill.
14    Q.    And take a moment to read the request,
15 please.
16    A.    It's very faint handwriting.  But, yes, he
17 is indicating that he's still in pain in his shoulder.
18    Q.    And flipping to HEM 34, can you please
19 identify that document?
20    A.    Medical service request dated 9/1/2014 by
21 Mr. Carl Hemphill.
22    Q.    And take a moment to please read that
23 request.
24    A.    I've reviewed it.
25    Q.    Does Mr. Hemphill complain of shoulder

Page 117

1 pain on September 1st, 2014?
2    A.    Yes.
3    Q.    And he's submitting a request to be seen,
4 correct?
5    A.    Yes.
6    Q.    Flip to HEM 36, please.
7    A.    This is a health care service request
8 dated October 6th, 2014, by Mr. Carl Hemphill.
9    Q.    And take a moment to review that request,
10 please.
11    A.    He wants an MRI.
12    Q.    And what does the last sentence of that
13 request state, beginning "My right shoulder"?
14    A.    "My right shoulder" -- and again, it's
15 very faint on my copy, on the exhibit.  "My right
16 shoulder" -- something, something -- "very bad" --
17 "hurting very bad.  I need to have an MRI."
18    Q.    Okay.
19    A.    "On my shoulder."
20    Q.    Can you please flip to HEM 39?
21    A.    This is a medical health service request
22 dated October 28th, 2014, by Carl Hemphill.
23    Q.    And what is the nature of this request?
24    A.    He is still writing to be rescheduled for
25 his right shoulder with the medical director,



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 118..121

---

Page 118

1 Dr. Obaisi. He wants to be put on the sick call list.

2 **Q. And please flip to HEM 40.**

3 A. November 5th, 2014, medical service

4 request by Carl Hemphill. Again, this one is very

5 faint.

6 **Q. Did Mr. Hemphill make a request for an MRI**

7 **in this?**

8 A. Yes. The very last sentence, he wants an

9 MRI.

10 **Q. For his right shoulder?**

11 A. Yes.

12 **Q. And please flip to HEM 41.**

13 A. This is a health care service request on

14 December 9th, 2014, by Carl Hemphill. "Once again, I

15 want to be rescheduled to be seen by the medical

16 director. I need to have an MRI."

17 **Q. Thank you. And the next document?**

18 A. This is HEM 42. January 10th, 2015. Carl

19 Hemphill. He is requesting to see the medical

20 director, Dr. Obaisi. "I need to have an MRI."

21 **Q. On his right shoulder?**

22 A. Yes. On his right shoulder. And yes,

23 he's in pain.

24 Okay. Number 43 is January 25th, 2015,

25 Carl Hemphill, health service request.

---

Page 119

1 He's complaining of right shoulder pain,

2 wants to see the medical director, Dr. Obaisi. "I

3 would like to have an MRI."

4 **Q. And that related to his right shoulder?**

5 A. Correct.

6 **Q. Then finally, HEM 44.**

7 A. This is a health service request on

8 February 25th, 2015. Carl Hemphill. Very faint

9 writing, but he does want an MRI on his right shoulder

10 and wants to see the medical director, Dr. Obaisi.

11 **Q. So on page 9, where you indicate that**

12 **Mr. Hemphill did not file any health care requests, he**

13 **failed to notify pill line, nursing staff, or**

14 **providers that he was in any pain or distress, is not**

15 **accurate,**

16 **is it?**

17 A. I did not review these health care

18 requests for my -- for my expert opinion. I have no

19 way of verifying whether these health care requests

20 were in

21 the medical record -- I don't believe these health

22 care requests were in the medical record from the

23 state that I reviewed. So I don't know if these are

24 authentic health care requests or if they were triage.

25 However, when I look at these -- each one of these

---

Page 120

1 health care requests, it's my expert opinion that they

2 weren't properly submitted, because if you note on

3 each one of them, it says "Date received." And in my

4 report, I state, "Nursing staff or med techs were not

5 notified." Can you see that in my report?

6 **Q. I do.**

7 A. Well, on these health care requests, each

8 and every one of them, there was no date received.

9 There was no date scheduled to be seen by the

10 provider. There was no copay charged for the health

11 care request. No staff member wrote their name on the

12 printed staff name or staff signature, which indicates

13 to me that these health care requests may have been

14 falsified or never submitted on the dates that they

15 were indeed.

16 Mr. Hemphill may have wrote these on the date that's

17 indicated. However, it was never received by medical

18 staff on each one of these health care requests.

19 So my opinion still stands that no nurse

20 or med tech or provider saw these health care

21 requests. I don't see a staff member who actually

22 acknowledged any of these health care requests, nor

23 did I acknowledge them for my report.

24 **Q. And you have no other evidence that these**

25 **health care requests were not submitted, correct?**

---

Page 121

1 A. The policy and procedures at -- in

2 correctional medicine, typically, is when a patient

3 submits a health care request, it is triaged by a med

4 tech or a nursing staff. And they write on it that

5 they've received it. And they write who received it

6 and they sign it.

7 And it's interesting to me that not one of

8 these health care requests, not in Exhibit-12 or

9 Exhibits 10, 7, 4, or 9, none of the health care

10 requests that you've submitted to me today were

11 triaged appropriately.

12 **Q. You have no basis to determine whether**

13 **they were or were not triaged, do you?**

14 MR. MARUNA: Objection. Form of the

15 question. Foundation. Argumentative.

16 Over the objections, Doctor, you can

17 answer.

18 THE WITNESS: It is my opinion that these

19 health care requests were not triaged appropriately.

20 Because if they were triaged appropriately, it would

21 have been documented the date they received them, the

22 date they were scheduled to be seen by the provider.

23 A copay would have been instituted. And the staff

24 member who triaged it would have written his name and

25 number and signed it. That's -- that's typical policy

---



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 122..125

Page 122

1 and procedure.  And that's why it's on the form.  "For
2 official use only."
3       Q.      (BY MR. MCCLAIN) It's also possible that
4 --
5       A.      Many times --
6       Q.      Go ahead.
7       A.      Many times, inmates will fill out health
8 care requests but not file them, for whatever reason.
9       Q.      And do you have any reason --
10      A.      I'm not disagreeing that Mr. Hemphill,
11 this is his handwriting and that he filled out these
12 health care requests.  I'm simply stating that in my
13 report, that he didn't properly notify the nursing
14 staff and
15 the med techs that he had filled out these health care
16 requests because they weren't triaged appropriately.
17      Q.      And you are basing these on hypothetical
18 assumptions with no other proof in the record,
19 correct?
20      A.      No.  I'm basing this on the fact that no
21 staff member acknowledged the receipt of this health
22 care request via a staff signature or a date received
23 or a copay.  I would suggest to you --
24      Q.      And it's also possible that --
25              MR. MARUNA:  Go ahead.

Page 123

1       Q.      (BY MR. MCCLAIN) Please go, Doctor.
2       A.      I'm simply suggesting to you that I don't
3 believe these health care requests were submitted in a
4 timely manner as they -- as they're presented to me
5 today.
6       Q.      And it's also possible that these were
7 submitted in a timely manner, but whomever received
8 them failed to make a record of it; is that correct?
9               MR. MARUNA:  Objection.  Form of the
10 question.  Incomplete hypothetical.  Calls for
11 speculation.
12              But Doctor, with that hypothetical, you
13 can give an answer, I guess.
14              THE WITNESS:  It is my expert opinion --
15              MR. MCCLAIN:  Please don't give speaking
16 objections, James.
17              MR. MARUNA:  I'm directing him to answer
18 your question consistent with your rules.
19              Over the objection, go ahead.
20              THE WITNESS:  I have seen thousands of
21 health care requests over my years.  And it's
22 interesting that there's a common theme of all of
23 Mr. Hemphill's medical service requests.  None of them
24 were triaged appropriately.  Yet, I am speculating
25 that Wexford has many different health nurses and med

Page 124

1 techs that triage these.  And it's interesting that
2 they were all triaged the same way by not signing them
3 or acknowledging them or triaging them.
4       Q.      (BY MR. MCCLAIN) And your testimony on
5 this subject is entirely speculative, as you just
6 indicated, correct?
7       A.      That is correct.  I have no way to confirm
8 that this was triaged and not signed.  I also have no
9 way to confirm that it was not submitted in an
10 appropriate manner.  However, I can confirm that this
11 health care request was not filled out completely.  It
12 was not signed --
13      Q.      By an individual --
14      A.      It was not signed by a staff member.
15      Q.      It was filled out completely by Carl
16 Hemphill, correct?
17      A.      Well, completely would indicate that he
18 submitted it to the health care staff as well.  Just
19 filling it out is not a way to access health care.
20 You actually have to fill it out and submit it to a
21 health care staff member for acknowledgment.
22      Q.      And you're not -- I'm sorry, Doctor.  Go
23 ahead.
24      A.      You have to submit the health care request
25 form for acknowledgment.

Page 125

1       Q.      And you're not employed by the Illinois
2 Department of Corrections, correct?
3       A.      I am not.
4       Q.      And you're not employed to work at a
5 Stateville Correctional Center, are you?
6       A.      I am not.
7       Q.      Doctor, I want to flip to page 10 of your
8 report.  In the first full paragraph, the third
9 sentence, you indicate, "Dr. Obaisi did consider
10 referral to orthopedics during the summer, but by
11 November 2015, Hemphill was found to have a normal
12 exam and normal x-ray."  Did I read that correctly?
13      A.      You did read that correctly.
14      Q.      What was your basis for determining that
15 Dr. Obaisi did consider orthopedics during the summer
16 of 2015?
17      A.      Can we review -- can I review the chart
18 notes?  Do we have the chart notes?
19              MR. MARUNA:  In the front of your report,
20 Doctor?
21              THE WITNESS:  So on July 24th, 2015, it
22 says, "Hemphill refused an appointment with Dr.
23 Obaisi. Nursing staff notified Hemphill that if any
24 problems arise -- Hemphill voiced understanding and
25 was agreeable.  And then on July 29th, 2015, Hemphill



Page 126

1 refused nursing sick call due to going to the yard for
2 recreation."
3          "And on September 5th, 2015, Hemphill
4 discussed with the nurse that he believed Obaisi told
5 him he would be going to the outside hospital for
6 shoulder review."
7          Now, when you say what is my basis for
8 that, Hemphill himself believed that Dr. Obaisi told
9 him he would be going to the -- to an outside hospital
10 for shoulder pain review.  So I believe that Obaisi
11 wouldn't have told Mr. Hemphill "I'm considering
12 sending you up to the hospital for review," because
13 that's what Hemphill thought, if Obaisi hadn't told
14 him that.  So in my report, I state that, you know,
15 Obaisi thought about sending him to the hospital, but
16 because he refused a couple appointments and he wasn't
17 having any health care request complaints, that he
18 decided not to send him for that orthopedic referral.
19          And when he saw him in November, on
20 November 24th, 2015, for the bottom bunk clearance, he
21 had a normal x-ray and normal reason and full range of
22 motion, which indicated no reason for an orthopedic
23 referral at that point.  Why would you refer someone
24 for an orthopedic referral with a normal examination,
25 a normal x-ray, and full range of motion?  That's

Page 127

1 certainly not an indication for surgery.
2      Q.     Which exam -- which November exam are you
3 referring to that was normal?
4      A.     November 24th, 2015, the IDOC 000121
5 document.
6          MR. MCCLAIN:  Phoebe, can you please hand
7 the doctor -- it will be Exhibit-13.  It begins HEM
8 0 -- excuse me -- HEM 105.
9          THE WITNESS:  Do you have that note there,
10 the one I just referenced?
11          MR. MARUNA:  IDOC 121?
12          THE WITNESS:  Yes.
13          MR. MARUNA:  So Andrew, the doctor has
14 just asked to review a note that he referenced there,
15 IDOC 121, which is in his report.  I'm going to tender
16 a
17 copy to the doctor if that's okay with you.
18          MR. MCCLAIN:  IDOC -- which is it?
19          MR. MARUNA:  IDOC 121.  It's November
20 24th, 2015.
21          THE WITNESS:  I refer in my report to this
22 document.  I just wanted to review the document.
23          (Exhibit-13 marked.)
24 BY MR. MCCLAIN:
25      Q.     So Doctor, you've been given Exhibit-13,

Page 128

1 which contains the documents HEM 105, 113, and 115.
2 Beginning with 105, can you please identify what that
3 document is?
4      A.     This is an outpatient progress note on
5 Mr. Carl Hemphill dated September 16th, 2015, a
6 medical note by Dr. Obaisi.
7      Q.     And does Mr. Hemphill complain of shoulder
8 pain on that date?
9      A.     Yes.
10      Q.     And does Dr. Obaisi make any reference to
11 the range of motion on that date?
12      A.     Yes.  Full range of motion.  It states,
13 "Motion:  Full range."
14      Q.     And flipping to HEM 113, can you please
15 identify that document?
16      A.     This is an outpatient progress note by
17 Mr. Carl Hemphill dated November 24th, 2015, MD note.
18 He is requesting a bottom bunk because of his right
19 shoulder pain.  His range of motion is within normal
20 limits.  Full exam is normal.  Full range of motion
21 normal.  "Offender informed he is not eligible for
22 lower bunk.  Left the room angry."
23      Q.     On these two dates, Dr. Obaisi makes
24 reference to range of motion, correct?
25      A.     That's correct.

Page 129

1      Q.     And I'm not trying to insult you, but do
2 you know the difference between active range of motion
3 and passive range of motion?
4      A.     I do.
5      Q.     What is the difference between active
6 range of motion and passive range of motion?
7      A.     Passive range of motion is movement
8 without resistance.  Active range of motion is
9 movement with resistance.  For instance, if you're
10 walking, you're moving your body, that's active range
11 of motion.  If you're just sitting on a table moving
12 your leg back and forth, that's passive range of
13 motion.
14      Q.     So when you're examining a shoulder, what
15 is the difference between active range of motion and
16 passive range of motion?
17      A.     When a patient can do it themselves or
18 against resistance versus when I'm just moving it for
19 him and he's relaxed.  So I just say, "Okay, can you
20 take your arm and put it over your head?  Like this?"
21 Or do it against resistance.  Versus me holding his
22 shoulder and picking it up over his head.
23      Q.     And what does active range of motion
24 evaluation show?
25      A.     So active range of motion is your neurons



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018                                    Pages 130..133

Page 130

1 are telling your muscles to move that joint.  Versus
2 passive range of motion, your muscle's totally
3 relaxed. Your brain's not telling you to move that
4 arm.  The doctor's doing it for you.  The doctor's
5 holding your arm and moving your arm around, and
6 you're totally relaxed, not moving it.
7     Q.     And so do an active range of motion and a
8 passive range of motion give you different information
9 about the patient?
10     A.     Yes.  Many times, a patient -- passively,
11 you can take their arm and lift it above their head.
12 It moves that way.  But they can't make it move that
13 way because pain inhibits them from picking their arm
14 up over their head.  They stop because of pain.  The
15 shoulder can actually go in that direction passively.
16 But actively, they can't make it go in there because
17 pain restricts their movement.
18     Q.     When you're evaluating a patient for a
19 shoulder complaint, do you want to examine both active
20 range of motion and passive range of motion?
21     A.     Yes.  And typically, it's my practice that
22 if a patient has full active range of motion, there's
23 no need to do a passive examination, meaning if they
24 can do everything actively, then they'll be able to do
25 everything passively.  But if there's a position that

Page 131

1 they can't get their arm in actively, then you need to
2 see if they can get it there -- you can put their arm
3 in that position passively.
4          So in this case, when he has full range of
5 motion, he's able to move his arm in all different
6 directions by himself.  There's no reason to do a
7 passive examination if he's able to do an active
8 examination.
9     Q.     Neither of these reports state that he had
10 full active range of motion, do they?
11     A.     It states "full range of motion," which
12 infers active.
13     Q.     But neither report specifies whether
14 Dr. Obaisi examined active range of motion or passive
15 range of motion, do they?
16     A.     No.  It does not state that specifically.
17 Again, it's my practice -- I would chart full range of
18 motion on a patient who had full active range of
19 motion.  I would not specify the two for someone who
20 has full range of motion.  I would specify the
21 difference between active and passive if there was a
22 discrepancy, meaning he did not have full active range
23 of motion.  Then I would specify.  But he did have
24 full passive range of motion.  But active range of
25 motion

Page 132

1 was limited in this particular -- you know, in
2 abduction or flexion.
3     Q.     Turning to HEM 115, can you please
4 identify that document?
5     A.     This is an outpatient progress note by
6 Mr. Carl Hemphill dated January 14th, 2015, at 9:25
7 a.m.  It is a nursing protocol for muscle strain of
8 joint.
9     Q.     And did Mr. Hemphill complain of shoulder
10 pain?
11     A.     He states, "My right shoulder hurts.  I
12 need more medication."
13     Q.     And moving along that column in the box
14 that states, "Describe location, type, characteristic,
15 and pattern of pain," what is the note written there?
16     A.     "Right shoulder limited range of motion.
17 Moving arm with pain." Or sorry.  Sorry.  "Moving arm
18 CX pain," and "CX" means "complains of pain."  "With"
19 would be a "C" with a line over the top of it.
20     Q.     So about six weeks after his alleged
21 normal exam on November 24th, he had an exam on
22 January 14th where he had limited range of motion and
23 was
24 complaining of pain, correct?
25     MR. MARUNA:  Objection.  Form of the

Page 133

1 question.  Argumentative, use of the word "alleged."
2          Over the objections, Doctor, you can
3 answer.
4          THE WITNESS:  Mr. Hemphill had pain
5 complaints on 1/14/15, necessitating the nurse doing a
6 muscle strain joint protocol.
7     Q.     (BY MR. MCCLAIN) Okay.  Moving to the
8 third full paragraph on page 10, you indicate --
9     A.     Oh, you're talking about my report?
10     MR. MARUNA:  Hold on.  The doctor is
11 pulling it up.
12     MR. MCCLAIN:  Okay.
13     MR. MARUNA:  Page 10, third full
14 paragraph.
15     THE WITNESS:  "Hemphill did receive
16 surgery"?
17     Q.     (BY MR. MCCLAIN) Yes.
18     A.     Okay.
19     Q.     So you state, "Hemphill did receive
20 surgery in a timely manner, yet he continues to
21 complain of
22 pain in his shoulder postoperatively several years
23 later."  Did I read that correctly?
24     A.     Correct.
25     Q.     And you go on to state, "His continued



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 134..137

Page 134

1 pain complaint verifies that surgery on a degenerative
2 acromioclavicular joint may not relieve the pain, and
3 further treatment with anti-inflammatory medication is
4 indicated." Did I read that correctly?
5      A.      Correct.
6      Q.      What is the basis of the opinion you state
7 in this paragraph?
8      A.      Patients who have degenerative
9 acromioclavicular joints, surgery may not relieve
10 their pain. And when you have those types of
11 patients, they will need anti-inflammatory medication
12 going forward, possibly lifetime, because they'll
13 continue to have
14 pain in that joint. It's just the history of the
15 disease. The basis of that opinion is clinical
16 experience.
17      Q.      And you state that "His continued pain
18 verifies that surgery may not relieve the pain." So
19 what -- what is the basis that his continued pain
20 verifies that surgery may not relieve the pain?
21      A.      Well, the patient had the surgery. And
22 postoperatively, he continues to complain of pain. So
23 when I say "may not relieve the pain," he had the
24 surgery and it didn't relieve the pain. That's the
25 basis.

Page 135

1      Q.      Is it possible that a delay in surgery can
2 cause further degeneration of a joint?
3           MR. MARUNA: Objection. Foundation. Form
4 of the question. Incomplete hypothetical.
5           Over the objections.
6           THE WITNESS: Anything's possible. As
7 time goes on, all of our joints deteriorate. Every
8 joint in our body deteriorates with aging. It's the
9 normal
10 aging process. When we participate in activity that
11 degenerates our joints quicker, such as football,
12 basketball, skiing, you know, high-end athletic
13 activity, we get degenerative joints faster. Every
14 year that goes by, our joints degenerate one year
15 more. But that does not necessarily mean that you need
16 to
17 rush to surgery today because your joint is going to
18 be deteriorated two years from now. Because even with
19 surgery, the degenerative process continues two years
20 from now.
21           The reason to do surgery is not because of
22 degeneration. The reason to do surgery is because
23 he's failed conservative treatment, failed steroid
24 injection, has MRI findings that surgery would
25 possibly improve his condition. And that's what

Page 136

1 happened for him. They did conservative treatment.
2 They gave him steroid injections. They did all the
3 conservative therapy he possibly could. He still
4 complained of
5 pain. They sent him to the orthopedic surgeon, and
6 the orthopedic surgeon said, "Well, let's try
7 surgery."
8 The MRI was not conclusive for there is a surgical
9 problem that can definitely be fixed, but they tried
10 surgery anyways. And after surgery, it was not a
11 success. He was not pain free.
12      Q.      (BY MR. MCCLAIN) And so just so I'm clear,
13 your testimony is that every year, our joints
14 generally deteriorate more and more, correct?
15      A.      That is clear, yes. On every person.
16      Q.      So if you need surgery in Year 1, but you
17 don't receive surgery until Year 3, your joint would
18 be more degenerated in Year 3 than it was in Year 1,
19 correct?
20           MR. MARUNA: Objection. Foundation. Form
21 of the question. Incomplete hypothetical. Assumes
22 facts not in evidence.
23           Over the objections, Doctor, you can
24 answer.
25           THE WITNESS: Your question is a difficult

Page 137

1 question in that there are -- to do surgery on a joint
2 is very patient-specific. And I'll give you an
3 example. There are many patients who I see with
4 severe degenerative joint disease. Right? And I say
5 severe, their knees are bone on bone or their hips are
6 bone on bone. And I send them to an orthopedic
7 surgeon for a total knee replacement. And the
8 orthopedic surgeon says, "Let's wait five years on
9 your knee replacement. Let's get as much use out of
10 this knee until you can't walk, and then we'll do the
11 joint replacement."
12           And they send them back to me. And I'm
13 like, "Okay." And so there's many cases where
14 degenerative joint disease, rushing to surgery, the
15 orthopedic surgeons don't do that. They'll wait until
16 the pain is so severe that the patient's, you know,
17 not functional to replace the hip or replace the knee.
18 You know, do shoulder surgery.
19           You know, in this case, Mr. Hemphill had a
20 pain-free period in November. He had pain-free
21 periods in September. In July, he was refusing
22 appointments because he was pain-free. That's not a
23 person that needs to rush to surgery. It's whenever
24 their pain complaints are inhibiting their daily
25 function and the treatments that you're giving him



Page 138

1 aren't successful
2 that you need to consider surgical options.
3          Dr. Obaisi considered surgical options in
4 the summer, but the patient improved and wasn't
5 complaining of anything, so surgery would not be
6 indicated at that point.  And then whenever he started
7 having more consistent complaints, later on in 2016,
8 they went ahead and sent him to the surgeon, which was
9 appropriate.
10     Q.    (BY MR. MCCLAIN) So his consistent
11 complaints contributed to the reason to refer him to
12 an orthopedist.  Is that what your testimony is?
13     A.    Yes.  My testimony is that if I had a
14 patient who I treated conservatively, and he wasn't
15 getting better or receiving some relief from the
16 treatments that I was giving him, then I would refer
17 him to an orthopedic surgeon.  In this case,
18 Mr. Hemphill did receive benefits from treatments.  He
19 did receive improvement when he received steroid
20 injections.  He did have pain-free periods.  He did
21 have normal examinations during that time.  He did
22 have pain-free periods.
23     Q.    When Mr. Hemphill ultimately saw the
24 orthopedist, he, being the orthopedist, determined
25 that surgery would be appropriate, correct?

Page 139

1     A.    That's correct.
2     Q.    And the orthopedist did ultimately order
3 the surgery, correct?
4     A.    Correct.  Now, I would say that the
5 orthopedic surgeon who ultimately ordered surgery was
6 able to review the chart and know that Mr. Hemphill
7 had already been conservatively treated for several
8 years and that, you know, surgery was the next option.
9 Had Mr. Hemphill went to an orthopedic surgeon back in
10 September, you know, 2014, I don't believe that the
11 orthopedic surgeon would have recommended surgery at
12 that point.  He would have recommended steroid
13 injections, physical therapy, ice, anti-inflammatory
14 medications.
15     Q.    Mr. Hemphill was not referred to an
16 orthopedic surgeon in September 2014, was he?
17     A.    No, he was not.
18     Q.    And you are not an orthopedic surgeon,
19 correct?
20     A.    I am not.
21     Q.    On page 11, you discuss at the top that
22 "Numerous grievances were filed, yet these requests
23 were not backed by medical service requests notifying
24 the medical department that a grievance had been
25 submitted regarding the health care provided."

Page 140

1          Did I read that correctly?
2     A.    I'm sorry.  I did not see -- direct me to
3 the right paragraph again.
4     Q.    I'm sorry.  It's at the very top, the
5 first sentence on page 11.
6     A.    Oh, okay.  All right.  Okay.  You read
7 that correctly.
8     Q.    But Mr. Hemphill did, in fact, complete
9 medical service requests during this time period from
10 February 2013 until ultimately receiving the surgery,
11 didn't he?
12          MR. MARUNA:  Objection.  Foundation.
13 Assumes facts not in evidence.
14          Over the objections, Doctor.
15          THE WITNESS:  I don't know if
16 Dr. Hellerstein's opinion included these health care
17 requests that I -- that have just been provided to me
18 today for the first time.  When I wrote my opinion, I
19 did not include these numerous health care requests in
20 the exhibits that you provided to me today.  If
21 Dr. Hellerstein was provided these health care
22 requests for his opinion, he would certainly have a
23 different opinion than I would -- than I did.
24          But this report where I say "these
25 requests are not backed by medical service requests,"

Page 141

1 I did not review these numerous health care requests
2 that you provided to me today for my report.
3     Q.    Doctor, I'm almost to the end of my
4 questioning.  So I appreciate your time.  At the end
5 of page 11 -- and it is the second-to-last paragraph
6 --
7     A.    I did find evidence --
8          MR. MARUNA:  Hold on.  We want to make
9 sure we have the right one.  Paragraph 93?
10          MR. MCCLAIN:  Yes.
11          MR. MARUNA:  Okay.  Thank you.
12     Q.    (BY MR. MCCLAIN) You discuss that a nurse
13 referred Mr. Hemphill to see Dr. Obaisi for physical
14 therapy and an MRI.  Do you see that portion of your
15 report?
16     A.    That's correct.
17     Q.    And that referral is made in March.  Is
18 that correct?
19     A.    I would have to read the complaint,
20 paragraph 93.
21          THE WITNESS:  Is this the complaint?
22          THE COURT REPORTER:  No.  This is my
23 notice.
24     Q.    (BY MR. MCCLAIN) I can help you out,
25 Doctor.



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 142..145

Page 142

1    A.    Please do.
2          MR. MCCLAIN:  Phoebe, can you please hand
3 the witness the final exhibit?  Which begins IDOC 81.
4          (Exhibit-14 marked.)
5          THE WITNESS:  Okay.  I'm looking at an
6 outpatient progress note dated February 13th, 2014, a
7 nursing protocol muscle strain by Mr. Carl Hemphill,
8 regarding right shoulder pain.
9    Q.    (BY MR. MCCLAIN) On the right side of that
10 document in the "Plan" section, what do the notes say?
11   A.    "Refer Dr. Obaisi.  Question PT/MRI.
12 Question Naprosyn, UA sent.  X-ray negative.
13 Appointment 6/6/13."
14   Q.    And what was the date of the visit that
15 generated this progress note?
16   A.    3/5/14, I believe.  The progress note --
17   Q.    I would direct you to -- go ahead.
18   A.    It seems to me that the health care
19 request was triaged on February 13th, 2014.  The nurse
20 referred him for March 5th, 2014.  But if you review
21 those notes that Dr. Obaisi was not available on
22 3/5/14 and was subsequently seen later in May, I
23 believe.
24   Q.    So Mr. Hemphill originally complained of
25 shoulder pain in February 2013, correct?

Page 143

1    A.    That's correct.
2    Q.    So this progress note reflects that one
3 year after his original complaint, he was referred to
4 see
5 Dr. Obaisi for PT/MRI, correct?
6    A.    Yes.  Refer to Dr. Obaisi, question,
7 physical therapy versus MRI.
8    Q.    And he was supposed to see Dr. Obaisi on
9 March 5th, 2014, correct?
10   A.    Correct.
11   Q.    If we flip to IDOC 82, what is this
12 document?
13   A.    We were -- this was in a previous -- this
14 is a document outpatient progress note that was in a
15 previous exhibit.  Stating --
16   Q.    And what is the entry for March --
17         MR. MARUNA:  Hold on.  He's still going.
18         THE WITNESS:  It's March 5th, 2014,
19 nursing note stating that the appointment was
20 rescheduled for April 3rd.  Then on April 3rd, the
21 RN's note reported that there was no provider
22 available and they would reschedule it for May 1st,
23 2014.
24   Q.    (BY MR. MCCLAIN) And if you go to IDOC 83,
25 there's an entry for May 1, 2014, correct?

Page 144

1    A.    That's correct.
2    Q.    And what is this entry?
3    A.    He's seen by Dr. Obaisi on May 1st, 2014.
4 "And after steroid injection last October, right
5 shoulder pain resolved.  Asked for injection today
6 because pain started to come back last few weeks.
7 Right shoulder" -- objection -- not objection.  Sorry.
8 "Objective data.  Right shoulder.  Abduction."  I
9 don't know what that word means.  "Admonished"?  If
10 you can help me out with that word.
11   Q.    That's okay if you can't.
12   A.    "Assessment:  Right shoulder impingement
13 syndrome.  Plan:  Schedule for steroid injection of
14 right shoulder next week."
15   Q.    Is there anywhere in this note that
16 indicates Dr. Obaisi considered referring Mr. Hemphill
17 to physical therapy?
18   A.    No.
19   Q.    Is there anywhere in the note that
20 Dr. Obaisi considered having an MRI done on
21 Mr. Hemphill?
22   A.    No.
23   Q.    But --
24         MR. MARUNA:  The doctor was still going.
25 Hold on.

Page 145

1          THE WITNESS:  But an MRI would not be
2 indicated because he says that his pain got better.
3 But the pain started to come back the last few weeks.
4 So you don't do an MRI on someone who you gave him an
5 injection and they got better, and then they've been
6 better for a significant period of time, and then the
7 pain just got worse the last couple weeks.  That's not
8 a reason for an MRI, so he would not consider an MRI
9 at this point.
10   Q.    (BY MR. MCCLAIN) Dr. Obaisi made an
11 assessment of shoulder impingement syndrome, correct?
12   A.    Yes.  That is correct.  Right shoulder
13 impingement syndrome.
14   Q.    And a review of Mr. Hemphill's entire
15 medical history on May 1st, 2014, would have revealed
16 that he had previously complained on many occasions
17 regarding shoulder pain, correct?
18   A.    Correct.
19   Q.    And the purpose of Mr. Hemphill seeing
20 Dr. Obaisi was because the nurse, on February 13th,
21 2014, referred him to Obaisi for consideration of PT
22 and MRI, correct?
23   A.    Correct.  It's my belief that the nurse --
24 you know, she just takes the requests from the patient
25 and sends them on to the doctor and schedules the

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 146..149

Page 146

1 doctor.  And it's likely or possible that Mr. Hemphill
2 asked the nurse, "Hey, I need an MRI of my shoulder
3 and I need some physical therapy."  And that's why she
4 put that in the plan.  And the reason I would say that
5 is because of the numerous health care requests that
6 you presented to me today of him requesting an MRI.
7 He put in multiple health care requests that we went
8 through
9 in Exhibit-12 requesting an MRI.  So the nurse likely
10 put on her health care request -- or on the triage
11 slip, "Question of an MRI."
12      Q.   So you believe that the nurse referred
13 Mr. Hemphill to see Dr. Obaisi partially based on his
14 request to have an MRI in those slips?
15           MR. MARUNA:  Objection.  Foundation.
16 Mischaracterizes the doctor's testimony.
17           THE WITNESS:  Well, you provided me today
18 with Exhibit-12 stating multiple requests by
19 Mr. Hemphill for an MRI.  Certainly, the nurse, on her
20 response to this triage on 2/13/14, says, "Refer to
21 MD, question of physical therapy or MRI."
22           So she doesn't know whether he needs an
23 MRI or not.  That's up to the physician to decide.
24 But she puts it on the health care -- on the "refer to
25 MD" to decide whether an MRI or physical therapy is

Page 147

1 appropriate.  When Dr. Obaisi --
2           MR. MARUNA:  Hold on.  He's still
3 answering.
4           THE WITNESS:  When Dr. Obaisi sees the
5 patient in May, he decides that physical therapy and
6 MRI are not in the plan, which I believe is
7 appropriate.
8           MR. MCCLAIN:  I have no further questions,
9 Doctor.  I reserve my right to question if James has
10 additional questions, but I have nothing further at
11 this time.  So thank you for your time.  I appreciate
12 it.
13           MR. MARUNA:  I'm going to have a few, but
14 I honestly need to use the restroom.  Can we take two
15 or three minutes?
16           MR. MCCLAIN:  Yeah.  Go for it.
17           (Off the record from 6:25 p.m. to
18 6:31 p.m.)
19                EXAMINATION
20 BY MR. MARUNA:
21      Q.   Doctor, thank you for staying with us this
22 evening.  I do appreciate it.  Just a few questions
23 here on what counsel asked.  I'm going to jump around,
24 so please just bear with me.  If you need me to
25 provide another clarification, let me know.  I'm just

Page 148

1 going off my notes here to try to get us out.
2           So you've -- I want to talk a bit about
3 some testimony you gave earlier.  You said in your
4 practice if a physician's assistant sees a patient two
5 times for the same complaint, no improvement, your
6 personal practice is you'd refer that patient to --
7 you'd ask that PA to refer that patient to the doctor.
8 Is that correct?
9      A.   That's correct.
10      Q.   And that's your personal custom and
11 practice, right?
12      A.   Correct.
13      Q.   There's not a standard regulation?  NCCHC
14 designation you look to for that or anything, right?
15      A.   Correct.
16      Q.   Another physician may have a different
17 practice, correct?
18      A.   Correct.
19      Q.   You said you currently practice medicine
20 clinically about 40 hours a week, if I did the math
21 right; is that correct?
22      A.   Total?
23      Q.   Yeah.
24      A.   Probably more like 50-plus.  But, yes, 40
25 or more.

Page 149

1      Q.   And that's clinical.  In other words,
2 you're seeing patients in clinic providing medicine to
3 them, correct?
4      A.   Correct.
5      Q.   You're not just reviewing other people's
6 work or developing -- you know, reviewing work.
7 You're treating patients on your own?
8      A.   Some of it is driving.  Like traveling
9 from jail to jail.
10      Q.   Okay.  But about 40 hours a week, if we
11 cut out traveling, seems reasonable, right?
12      A.   Right.
13      Q.   Now, you said you see over 100 patients
14 per week in clinic, correct?
15      A.   Yes.
16      Q.   And counsel asked you some questions about
17 a statement in your report, or your prior deposition
18 testimony, and you said you were rendering your
19 testimony as a treating physician.  And I want to
20 clarify that.  You're saying that you were providing
21 testimony as an expert from the prospective of a
22 medical doctor, not, for instance, a health care unit
23 administrator or some other bureaucratic position,
24 correct?
25      A.   Correct.  From the standpoint of a



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 150..153

Page 150

1 clinical physician.

2    Q.    Now, in large prisons, Doctor, is it
3 common that there be multiple members in a health care
4 unit staff?

5    A.    Yes.

6    Q.    And Stateville, I know you're not from
7 Illinois, but if I told you it's a maximum security
8 prison, do you have any reason to disagree with me?

9    A.    I would ask how many patients are in a
10 facility? And if it was over a thousand, there would
11 be multiple providers.

12    Q.    So assume it meets that criteria and
13 there's multiple providers, correct?

14    A.    Correct.

15    Q.    Below those levels of providers, there's
16 going to have to be some administrative support staff,
17 correct?

18    A.    Correct.

19    Q.    There's going to be nurses, correct?

20    A.    Correct.

21    Q.    Medical technicians, correct?

22    A.    Correct.

23        (Reporter request for clarification.)

24    Q.    (BY MR. MARUNA) In other words, the doctor
25 doesn't do everything in that facility, correct?

Page 151

1    A.    Correct.

2    Q.    He relies on other staff members to do
3 their jobs, correct?

4    A.    Correct.

5    Q.    And that's common in a facility the size
6 of Stateville, correct?

7    A.    Correct.

8    Q.    Now, when a doctor schedules to see a
9 patient, the doctor hands his order off to someone
10 else who then enters that into whatever the jail
11 management system is to set that appointment
12 typically, correct?
13 In other words, the doctor doesn't make his own
14 schedule and physically go get the inmate from the
15 cell, right?

16    A.    Correct.

17        MR. MCCLAIN:  Objection.  Vague.
18 Compound. Form.

19        THE WITNESS:  I believe that's correct.

20    Q.    (BY MR. MARUNA) They rely on other staff
21 members at the prison to bring the inmate to the
22 health care unit, correct?

23    A.    Correct.

24    Q.    They rely on other individuals in the
25 health care unit to set those schedules, correct?

Page 152

1    A.    Correct.

2        (Discussion off the record.)

3    Q.    (BY MR. MARUNA) Now, you testified
4 earlier -- and counsel showed you several exhibits
5 today of these yellow offender sick call medical
6 services requests, correct?

7    A.    Correct.

8    Q.    Representative, I've got Exhibit-12 being
9 representative, Exhibit-4, Exhibit-10.  You know the
10 forms I'm talking about?

11    A.    Yes.

12        MR. MCCLAIN:  Objection.  Form.

13    Q.    (BY MR. MARUNA) And you testified that if
14 you look at the part of these forms that say "for
15 official use only," all of them were blank, date
16 received, date scheduled, $5 copay, print staff name,
17 staff signature.  All blank, correct?

18        MR. MCCLAIN:  Objection.  Foundation.

19        THE WITNESS:  All the health care requests
20 in Exhibit-12 were inappropriately filled out.  The
21 health care requests in Exhibit-10 were
22 inappropriately filled out.  The health care requests
23 in Exhibit-7 were inappropriately filled out.  And the
24 health care Exhibit-4 were inappropriately filled out.

25    Q.    (BY MR. MARUNA) And by "inappropriately

Page 153

1 filled out," you're referencing that there's no data,
2 signature, or writing on the "for official use only"
3 portion of those slips, correct?

4    A.    Correct.

5        MR. MARUNA:  What exhibit are we on to?

6        THE COURT REPORTER:  15.

7        MR. MARUNA:  It's Bates stamp IDOC 230.

8        MR. MCCLAIN:  I don't have that document,
9 so I'm going to object to your use of it.

10        MR. MARUNA:  There's the Bates stamp on
11 it.

12        MR. MCCLAIN:  I mean, I can see it.
13 You're showing it to me on the video, but I have no
14 opportunity to actually read it and review it.

15        MR. MARUNA:  Okay.  State your objection.
16 I'm marking this as 15.

17        (Exhibit-15 marked.)

18        THE WITNESS:  Okay.  I will tell you what
19 it is.  Exhibit-15 is a medical service request dated
20 August 31st, 2013, submitted by Carl Hemphill.
21 Medical request.  "I'm writing to be rescheduled for
22 my right shoulder.  Medical director S. Obaisi gave me
23 a cortisone shot on the above date of July 31st, 2013,
24 at 2:30 p.m."

25        This health service request was in one of



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 154..157

Page 154

1 your exhibits earlier.  Can I say can we go off the
2 record?
3              MR. MARUNA:  Yeah.
4              THE WITNESS:  I don't know if I can say
5 that.  He submitted this.  Just a second.
6              MR. MCCLAIN:  I believe it's Exhibit-9.
7 It's HEM 25.
8              MR. MARUNA:  25, I think it is.
9              THE WITNESS:  Okay.  So this is a document
10 that is similar to HEM 0025.  However, the Exhibit-9,
11 the health care request that is filled out is -- there
12 is no information on the date received, date
13 rescheduled, copay, print staff name, or staff
14 signature.
15              However, on Exhibit-15, that counsel has
16 submitted to me, it is different because it states on
17 the bottom, "Offender has appointment with medical
18 director 9/24/13," and then gives the staff name "S.
19 Barnett CNP."  And then it has her signature, "S.
20 Barnett."  It also states on the top that it was
21 received and faxed on 8/31/13.
22              MR. MCCLAIN:  Can we go off the record for
23 a second?
24              MR. MARUNA:  Yeah.  Sure.
25              (Discussion off the record.)

Page 155

1              (Off the record from 6:40 p.m. to
2 6:46 p.m.)
3         Q.   (BY MR. MARUNA) Doctor, back on.
4 Counsel's back.  So we're talking about IDOC 230 here.
5 And what
6 I wanted to ask you is this is signed by someone named
7 S. Barnett.  Does that say "CNT" after it?
8         A.   Yeah.  I believe so.
9         Q.   And that'd be consistent with your
10 testimony earlier that, typically, these are handled
11 by med techs or other lower level individuals in the
12 medical department, right?
13         A.   Right.  The certified medical technicians
14 obtain the health care requests, triage them, and then
15 send them to a nurse or doctor where appropriate.
16         Q.   Is this sick call request signed by
17 Dr. Obaisi?
18         A.   No.  It's signed by S. Barnett, CNT.
19         Q.   Is it signed by Dr. Davis?
20         A.   No.  It's signed by Barnett.
21         Q.   Is it signed by Latonya Williams, PA?
22         A.   No.
23         Q.   And we see here all the plan here is that
24 this CNT's indicated that they're going to put the
25 patient on the medical director's schedule for

Page 156

1 September 24th, 2013, correct?
2         A.   Yes.  However, on September 24th, there
3 was a prison lockdown and he was rescheduled for the
4 22nd
5 of October.
6         Q.   So there's no evidence here, looking at
7 IDOC 230, one of the sick call requests, that any of
8 the individual medical defendants in this case ever
9 saw
10 this document, correct?
11         A.   Correct.
12         Q.   You discussed lockdown just a second ago.
13 In your experience, medical staff don't control
14 facility lockdown, correct?
15         A.   Lockdowns inhibit medical care frequently,
16 especially in a maximum security facility where a lot
17 of fights and incidents, security management incidents
18 happen that health care is not being able -- you know,
19 sick call is not able to be performed.
20         Q.   During the deposition, you used the term
21 either "functional needs" or "activities of daily
22 living."  I think I heard both interchangeably.
23 Functional needs, can you briefly explain what you
24 meant by that?
25              MR. MCCLAIN:  Objection.  Mischaracterizes

Page 157

1 prior testimony.
2         Q.   (BY MR. MARUNA) Doctor?
3         A.   So functional need is a person needs to be
4 able to do this particular type of function to
5 complete their job or their activity.  Activities of
6 daily
7 living is your basic needs of being able to go to the
8 bathroom, feed yourself, sleep, eat, put on your
9 clothes.
10         Q.   Any evidence that Mr. Hemphill's
11 activities of daily living were impacted by his
12 complaints of
13 pain?
14         A.   I did not review any evidence that
15 supported that.
16         Q.   In fact, the incidences found that he
17 could qualify for a low bunk, correct?
18         A.   Originally, he had a lower bunk, and then
19 the lower bunk was rescinded because of his normal
20 exam.
21         Q.   I'm sorry.  I meant to say upper bunk.
22 The lower bunk permit was removed, correct?
23         A.   Correct.
24         Q.   Counsel asked you some questions earlier
25 about the report -- I believe it was in April of '13



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018                                    Pages 158..161

Page 158

1 to Dr. Ann Davis -- that Mr. Hemphill gave that he was
2 performing exercises and that he injured his hand,
3 correct?  I think he was lifting weights, correct?
4      A.     Correct.
5      Q.     Counsel asked --
6             MR. MCCLAIN:  Objection.  Assumes facts
7 not in evidence.  Mischaracterizes prior testimony.
8 Foundation.
9      Q.     (BY MR. MARUNA)  Okay.  And counsel asked
10 you if you knew what sort of exercises he was doing,
11 correct?
12     A.     Correct.
13     Q.     So I want to direct you to -- one of the
14 documents you said you reviewed was the deposition of
15 Carl Hemphill, correct?
16     A.     Correct.
17     Q.     I want to direct you to page 49 of
18 Mr. Hemphill's deposition.  And why don't you start
19 reading at 15?  Line 15.
20     A.     Okay.  Page 49, line 15.
21            "Q.  And was this for that injury we
22       discussed earlier where you dropped the weight
23       on your hand while lifting weights?
24            A.  Yes.
25            Q.  I see that you didn't make any

Page 159

1       shoulder-related complaints during that visit
2       with Dr. Davis; is that correct?
3            A.  No.  I explained to her the reason
4 why
5       I dropped the weight on my hand was because my
6       right shoulder gave out."
7      Q.     Thank you.  So that would indicate that
8 Mr. Hemphill was lifting weights in April of '13,
9 correct?
10     A.     Correct.
11     Q.     And that would indicate that the lifting
12 of the weights impacted his shoulder enough that his
13 shoulder gave out, causing the injury to his hand,
14 correct?
15     A.     Correct.
16     Q.     You discussed -- go on.
17     A.     It would imply -- what I get from that is
18 that he was indeed weightlifting with his right
19 shoulder, or doing activity with his shoulder.
20     Q.     Now, I want to ask you a bit about the
21 treatment progression for this patient from February
22 of '13 when he first complained until he left
23 Stateville
24 in 2016.  You said there's, from my gathering of your
25 testimony, essentially three steps.  The conservative

Page 160

1 treatment phase; then it moves to the next step, which
2 would be the injections; then the third option would
3 be orthopedic consultation and surgery.  Is that a
4 fair representation of your testimony?
5      A.     Correct.
6      Q.     A to B to C, correct?
7      A.     Correct.
8      Q.     We see here that Mr. Hemphill, though,
9 immediately wanted to jump to Step C almost
10 immediately after his first complaint in 2013,
11 correct?
12            MR. MCCLAIN:  Objection.  Form.
13 Foundation. Assumes facts not in evidence.  Improper
14 hypothetical.
15     Q.     (BY MR. MARUNA) Doctor?
16     A.     Correct.
17     Q.     And you've testified that based on the
18 literature you've reviewed, based on your own practice
19 in correctional medicine, conservative treatment was
20 appropriate in this case, correct?
21     A.     Correct.
22     Q.     When conservative treatment failed, it was
23 appropriate to move to steroid injections, correct?
24     A.     Correct.
25     Q.     And you've testified steroid injections

Page 161

1 are actually an invasive procedure, correct?
2      A.     Correct.
3      Q.     And once steroid injections were not
4 resolving the patient's subjective complaints of pain,
5 it was appropriate to make a referral for orthopedic
6 consultation, correct?
7      A.     Correct.
8      Q.     And based on your review of the medical
9 chart from Mr. Hemphill, from 2013 through his time at
10 Stateville in 2016, is that the progression the
11 physicians took for his complaints of shoulder pain?
12     A.     Correct.
13     Q.     Counsel asked you some questions about an
14 Exhibit-9.  It was page HEM 10, if we can pull that
15 up.
16     A.     Sorry.  I got them all confused.  Okay.  I
17 have Exhibit-9.
18     Q.     Do you have HEM 10?
19     A.     Yes.
20     Q.     Okay.  And do you mind if I come over?  It
21 will be faster to point.  This is the medical note
22 from April 19th, 2013, where there was a plan to
23 schedule with Dr. Obaisi for an injection on April
24 23rd,
25 correct?

LEXITAS

Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 162..165

Page 162

1 A. Correct.
2 Q. I want to clarify here. You said you
3 didn't know who authored this note. If I told you
4 previous testimony established this note was authored
5 by Dr. Ann Davis, will you just assume that for the
6 purposes of this question?
7 A. Yes.
8 Q. Dr. Davis, if she made a referral to see
9 Dr. Obaisi for a steroid injection, Dr. Obaisi as
10 medical director doesn't simply follow the direction
11 of another staff physician. He must make his own
12 independent medical judgment, correct?
13 A. Correct.
14 Q. And we see here that when the patient
15 presented to Dr. Obaisi, he ordered an x-ray, correct?
16 A. Correct.
17 Q. And then after receiving the results of
18 the x-ray, scheduled and then performed a steroid
19 injection to the patient's shoulder, correct?
20 A. Correct.
21 Q. Counsel showed you documents today that
22 you indicated were not listed in your report and you
23 had
24 not seen until your deposition today. And what I want
25 to ask you, Doctor, is after reviewing those

Page 163

1 documents, do they change the opinions rendered in
2 your report on page 8?
3 MR. MCCLAIN: Objection. Form.
4 THE WITNESS: I just need to review page
5 8.
6 Q. (BY MR. MARUNA) It's the numbers 1 through
7 4, is where your opinions are summarized.
8 A. My opinion for Dr. Obaisi is still the
9 same. My opinion for Latonya Wilson -- Williams --
10 Latonya Williams has not changed. My opinion for Dr.
11 Davis has not changed. My opinion for Wexford Health
12 Source policies and procedures has not changed.
13 Q. And do you hold those opinions as you sit
14 here today to a reasonable degree of medical
15 certainty?
16 A. Yes.
17 Q. Finally, Doctor, you indicated the
18 patient's still reporting pain today, correct? Or as
19 of the last medical records you reviewed, correct?
20 A. As of the last --
21 MR. MCCLAIN: Objection. Form.
22 Q. (BY MR. MARUNA) And that would be after he
23 had surgery, the patient was still reporting pain in
24 the shoulder, correct?
25 A. He had surgery on June 9th, 2016, by

Page 164

1 Dr. Schneider. However, he did have postoperative
2 pain complaints.
3 Q. So even after having surgery, the pain
4 complaints still persist with this patient, correct?
5 A. Correct. I don't know if they still exist
6 today, but as of my last review.
7 Q. Mr. Hemphill very clearly has an
8 expectation that he was -- he needed an MRI from the
9 earliest days of his complaints, or at least from 20
10 --
11 MR. MCCLAIN: Objection. Form.
12 Q. (BY MR. MARUNA I'll rephrase. I'll
13 rephrase. Mr. Hemphill very clearly communicated a
14 desire for an MRI in the year 2013, correct?
15 A. Correct.
16 Q. Was an MRI required in 2013 for this
17 patient?
18 A. No.
19 Q. When was an MRI required for a patient
20 like Mr. Hemphill?
21 A. Prior to surgery.
22 Q. And that would be after the orthopedic
23 consultation, correct?
24 A. Correct.
25 Q. And that would be when an orthopedist

Page 165

1 said, "We need to consider surgery as an option for
2 this patient," correct?
3 A. It would be after conservative management
4 and aggressive management with steroid injection
5 failed and the patient continued to complain of pain,
6 an orthopedic referral and MRI would be appropriate.
7 And I believe that April 2016 was an
8 appropriate time frame for that to happen.
9 Q. You stand by the care of Dr. Obaisi,
10 Dr. Williams, and Dr. Davis, correct?
11 A. Correct.
12 MR. MCCLAIN: Objection. Form.
13 Q. (BY MR. MARUNA) And I want to talk a bit
14 about your Opinion Number 4 here, about Wexford Health
15 Sources.
16 A. Page 8?
17 Q. Yes, Doctor. You indicated here that
18 Wexford Health Sources' policies and procedures are
19 within National Commission of Correctional Health Care
20 Standards, correct?
21 A. Correct.
22 Q. You're an NCCHC certified physician,
23 correct?
24 A. Correct.
25 Q. You've drafted correctional policies and



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018
Pages 166..169

Page 166

1 procedures in your past, correct?
2      A.      Correct.
3      Q.      You've reviewed policies and procedures of
4 multiple other correctional institutions, correct?
5      A.      Correct.
6      Q.      And the second part of your finding in
7 Opinion 4 is that Wexford's policies did not prevent
8 or obstruct the quality or quantity of care provided
9 to Hemphill, correct?
10     A.      Correct.
11     Q.      And you hold that opinion to a reasonable
12 degree of medical certainty; is that correct?
13     A.      That's correct.
14             MR. MARUNA:  No further questions at this
15 time.  Reserving my right to requestion consistent
16 with the rules.  Counsel?
17                    FURTHER EXAMINATION
18 BY MR. MCCLAIN:
19     Q.      Doctor, at the beginning of counsel's
20 questioning, you describe the various medical services
21 requests as being inappropriately filled out.  Your
22 classification of these being inappropriately filled
23 out is based solely on the fact that the portion of
24 the form entitled "for official use only" has not been
25 filled out, correct?

Page 167

1      A.      Correct.
2      Q.      And there is no indication in these forms
3 that Mr. Hemphill incorrectly filled out these forms,
4 correct?
5      A.      Correct.
6      Q.      And there's no indication in these forms
7 that Mr. Hemphill did not, in fact, submit these sick
8 call requests, correct?
9      A.      I'm not familiar with the Department of
10 Corrections in Illinois as to how they -- what
11 procedure that an inmate goes through to submit the
12 health care requests, whether they hand it
13 specifically to a medical technician, whether they
14 place it in a
15 box, or whether they submit it in a pill line.  There
16 are many different ways that the health care
17 requests -- different facilities have different
18 procedures of having inmates notify them with the
19 health care requests.  I don't know how they do it in
20 Illinois.  All I know is that there's no staff
21 signature as to receipt of these health care requests.
22     Q.      And again, there's nothing on these
23 requests that would indicate he did not submit these
24 requests, correct?
25             MR. MARUNA:  Objection.  Foundation.

Page 168

1             Over the objection.
2             THE WITNESS:  There is no staff signature
3 on these requests, indicating that -- to me -- that
4 staff never saw these requests.
5      Q.      (BY MR. MCCLAIN) I would direct you to
6 Exhibit-15, IDOC 230.
7             MR. MARUNA:  That's the one I handed you,
8 Doctor.
9             THE WITNESS:  I think you took it back.
10            MR. MARUNA:  Did I?
11            THE WITNESS:  I don't know where it went.
12 Okay.  I got it.  Sorry.
13     Q.      (BY MR. MCCLAIN) And I would also direct
14 you to Exhibit-9, which contains HEM 25.
15     A.      I have the health care requests in front
16 of me.
17     Q.      So, Doctor -- and please correct me if I'm
18 wrong -- HEM 25 is Mr. Hemphill's medical services
19 request dated August 31st, 2013, correct?
20     A.      That is correct.
21     Q.      And on HEM 25, the portion "for official
22 use only" is blank, correct?
23     A.      Correct.
24     Q.      And IDOC 230 also contains Mr. Hemphill's
25 medical services request dated 8/31/13, correct?

Page 169

1      A.      Correct.
2      Q.      And on IDOC 230, there's signatures from
3 an S. Barnett, who is identified and signed in the
4 staff signature section, correct?
5      A.      Correct.
6      Q.      And there's also a note that the offender
7 has an appointment with the medical director on
8 9/24/13, correct?
9      A.      Correct.
10     Q.      So IDOC 230 would actually, in fact,
11 confirm that HEM 25 was submitted and reviewed by a
12 staff
13 member at Stateville Correctional Center, correct?
14     A.      Correct.  This is -- this is what I was
15 getting at earlier when we spoke about I don't know if
16 these health care requests are appropriate because
17 they didn't have a printed staff signature and name.
18 However, this one is appropriately filled out,
19 Exhibit-15.  IDOC 230 is appropriately filled out.
20 This is what I would expect every health care request
21 to look like.
22     Q.      Understood.  And IDOC 230 evidences that
23 HEM 25 was, in fact, submitted and reviewed by a staff
24 member?
25     A.      Correct.  And it was reviewed by me, I



Hemphill vs Wexford Health Sources, Inc.
Kennon Tubbs, M.D. - 12/13/2018

Pages 170..171

Page 170

1 might add.  I reference it in my report.

2          MR. MCCLAIN:  Thank you.  I have no

3 further questions.

4          MR. MARUNA:  Nothing further.  Reserve or

5 waive, Doctor?  Which would you prefer?

6          THE WITNESS:  Waive.

7          (Proceedings concluded at 7:06 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 171

1              C E R T I F I C A T E

2 State of Utah        )

                       ss.

3 County of Salt Lake  )

4          I, Phoebe Moorhead, a Registered Professional

  Reporter and Certified Realtime Reporter, do hereby

5 certify:

          That the testimony of KENNON TUBBS, M.D.,

6 the said witness in the foregoing proceeding named,

  was taken on December 13, 2018; that said witness was

7 by

  me, before examination, duly sworn to testify the

8 truth, the whole truth, and nothing but the truth in

  said cause;

9          That the testimony of said witness was reported

  by me in stenotype and thereafter transcribed into

10 typewriting and that a full, true, and correct

  transcription of said testimony so taken and

11 transcribed is set forth in the preceding pages;

          That the witness having waived his right to

12 review the transcript, the Original transcript has

  been sealed and returned to the attorney noticing the

13 deposition.

          I further certify that I am not of kin or

14 otherwise associated with any of the parties of said

  cause of action and that I am not interested in the

15 event thereof.

16          Certified and dated this 18th day of

  December, 2018.

17

18

19

20          PHOEBE S. MOORHEAD, RPR, CRR

            Certified Shorthand Reporter

21          for the State of Utah

22

23

24

25



## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL HEMPHILL,                    )
                                  )
        Plaintiff,                )
                                  )
    vs.                           ) No. 15 CV 04968
                                  )
WEXFORD HEALTH SOURCES, INC.;     )
SALEH OBAISI; ANN HUNDLY DAVIS;   )
LATONYA WILLIAMS; LOUIS           )
SHICKER; MICHAEL LEMKE; and       )
DORRETTA O'BRIEN,                 )
                                  )
        Defendants.               )

        The deposition of CHADWICK C. PRODROMOS,
M.D., called by the Plaintiff for examination, taken
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Carrie L. Brown, Certified Shorthand Reporter and
Registered Professional Reporter, at 1714 Milwaukee
Avenue, Glenview, Illinois, commencing at 4:07 p.m. on
the 20th day of December, A.D., 2018.

## Page 2

```
 1    APPEARANCES:
 2        FOLEY & LARDNER, LLP
          MR. ANDREW T. McCLAIN
 3        321 North Clark Street
          Suite 2800
 4        Chicago, Illinois 60654
          Phone: (312) 832-4500
 5        E-mail: amcclain@foley.com
 6            On behalf of the Plaintiff;
 7        CASSIDAY SCHADE, LLP
          MR. JAMES F. MARUNA
 8        222 West Adams Street
          Suite 2900
 9        Chicago, Illinois 60606
          Phone: (312) 641-3100
10        E-mail: jmaruna@cassiday.com
11            On behalf of the Defendants Wexford Health
          Sources, Inc., Saleh Obaisi, Ann Hundly Davis
12        and LaTonya Williams.
13
14                * * * * * *
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2    WITNESS                          PAGE
 3    CHADWICK C. PRODROMOS, M.D.
 4        Direct Examination by Mr. McClain ..... 5
 5        Cross-Examination by Mr. Maruna ....... 145
 6        Redirect Examination by Mr. McClain ... 151
 7        Recross-Examination by Mr. Maruna ..... 152
 8
 9
10              E X H I B I T S
11    DR. PRODROMOS DEPOSITION EXHIBIT        PAGE
12        No. 1 (Notice of Deposition) .......... 6
          No. 2 (Expert Report of
13            Chadwick Prodromos, M.D.) ...... 10
14        No. 3 (Offender Outpatient Progress
              Notes, Bates 67-69) ............ 63
15
16        No. 4 (Offender Outpatient Progress
              Notes, Bates 70, 73-75) ........ 73
17        No. 5 (Offender Sick Call/Medical
              Services Request,
18            Bates HEM27-29) ................ 88
19        No. 6 (Offender Outpatient Progress
              Notes, Bates IDOC83) ........... 102
20
21        No. 7 (Offender Outpatient Progress
              Notes, Bates IDOC95 and
22            IDOC223) ...................... 107
23        No. 8 (Wexford Health Sources,
              Incorporated, Bates IDOC1 and 2
24            and WEXFORD3, 4, 5, 9 and 10)... 111
```

## Page 4

```
 1          E X H I B I T S (continued)
 2    DR. PRODROMOS DEPOSITION EXHIBIT        PAGE
 3        No. 9 (Galesburg Cottage Hospital
 4            Operative Report, Bates IDOC217
              and 218) ...................... 140
 5
          No. 10 (Offender Outpatient Progress
 6            Notes, Bates IDOC64) .......... 145
 7        No. 11 (Pages 33-36 of the Deposition
              of Carl Hemphill) ............. 152
 8
 9
10
11
12
13
14
15
16        Exhibits attached.
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

Exhibit I

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

| Page 5 |
| --- |

1                    (Witness sworn.)
2          WHEREUPON:
3                    CHADWICK C. PRODROMOS, M.D.,
4          called as a witness herein, having been first duly
5          sworn, was examined and testified as follows:
6                    DIRECT EXAMINATION
7          BY MR. McCLAIN:
8              Q.  Doctor, my name is Andrew McClain, I represent
9          the plaintiff, Carl Hemphill, in this matter.  I'll be
10         asking you a series of questions today on behalf of my
11         client.  To begin, can you please just state your name
12         for the record?
13             A.  Chadwick C. Prodromos, M.D.
14             Q.  Can you spell it as well please?
15             A.  P R O D R O M O S.
16             Q.  Doctor, have you ever been deposed?
17             A.  Yes.
18             Q.  I'm just going to remind you that you are
19         under oath today and you understand that, correct?
20             A.  Yes.
21             Q.  And if at any point you don't understand a
22         question, will you please ask me to rephrase the
23         question and I will?
24             A.  Yes.

| Page 6 |
| --- |

1              Q.  And if you answer a question that I ask, I
2          will assume that you understood the question, is that a
3          fair assumption?
4              A.  Yes.
5              Q.  I also ask that you answer audibly, no nodding
6          of the head or uh-huhs or uh-uhs.  Do you understand
7          that?
8              A.  Yes.
9              Q.  We're here to accommodate you, so if at any
10         point you want to take a break, just let us know and we
11         can certainly do that.  I just ask that if there's a
12         pending question that you answer the question before we
13         take a break.
14             A.  Okay.
15             Q.  You've been retained by the defendants Wexford
16         Health Sources, Inc., Saleh Obaisi, LaTonya Williams,
17         and Ann Davis as an expert witness; is that correct?
18             A.  Yes.
19             Q.  And you've been called to testify today
20         pursuant to a Notice of Deposition; is that correct?
21             A.  Yes.
22             Q.  Doctor, I'm going to hand you what we're going
23         to mark as Exhibit 1.  Doctor, is this the Notice of
24         Deposition that calls for your deposition today?

| Page 7 |
| --- |

1              A.  Presumably.
2              Q.  Have you ever seen this document?
3              A.  I'm not sure.  My office schedules these.
4              Q.  Okay.  Well, will you please just take a look
5          and confirm that this is the document requesting your
6          deposition today?
7              A.  Yes, it appears to be.
8              Q.  Doctor, what have you done to prepare for
9          today's deposition?
10             A.  I reviewed my report that I made a while ago
11         yesterday.
12             Q.  You reviewed the report yesterday?
13             A.  Yes.
14             Q.  And did you talk to anyone prior to today's
15         deposition?
16             A.  Yes.
17             Q.  Who did you talk to?
18             A.  The counsel, defense counsel, Mr. Maruna.
19             Q.  And when did you talk to him?
20             A.  Just now.
21             Q.  Is that the only time you talked to him?
22             A.  We may have spoken -- Yeah, we did.  We spoke
23         on the phone last night or the night before, I don't
24         remember which.

| Page 8 |
| --- |

1              Q.  And did you review any documents in
2          anticipation of today's deposition?
3              A.  No.  Do you want that back (indicating)?
4              Q.  No, that's yours.  Can you please describe to
5          me your educational background beginning with college?
6              A.  Yes.  Bachelor's degree from Princeton
7          University in 1975, an M.D. degree from Johns Hopkins in
8          1979, internship University of Chicago 1980, residency
9          at Rush-Presbyterian-St. Luke's Medical Center, finished
10         in 1984, a fellowship at the Harvard Medical School and
11         Massachusetts General Hospital, completed in 1985.
12             Q.  Doctor, please don't take offense to this
13         question but have you ever been subject to any
14         disciplinary actions?
15             A.  No.
16             Q.  Have you ever had your license to practice
17         medicine suspended?
18             A.  No.
19             Q.  Have you ever been fired from a job?
20             A.  No.
21             Q.  Have you ever been convicted of a felony?
22             A.  No.
23             Q.  What certifications do you currently hold?
24             A.  I'm board-certified in orthopedic surgery and

                                          2 (Pages 5 to 8)

Electronically signed by Carrie Brown (101-369-569-5178)                                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 9

1    regenerative medicine.
2        Q.   What was the last name?
3        A.   Regenerative medicine.
4        Q.   Have you held any other certifications in
5    regards to the practice of medicine?
6        A.   You mean board certifications?
7        Q.   Yes, board certifications.
8        A.   No.
9        Q.   Any other certifications besides board
10   certifications?
11       A.   Gosh, so I have memberships in professional
12   societies, I guess those are not certifications, right?
13   So I guess not.
14       Q.   And let's talk about your memberships to
15   professional societies.  What memberships do you
16   currently hold?
17       A.   The American Academy of Orthopedic Surgeons,
18   The Arthroscopy Association of North America, The
19   American Orthopedic Society for Sports Medicine, The
20   International Cartridge Repair Society.  There's one the
21   acronym of which is IFATS, and I forgot what it stands
22   for, but it's a stem cell society that deals with stem
23   cells from fat.  The ISLA, which is the International
24   Society For Laser something or other.  There's one the

---

Page 10

1    initials for which are ESSKA and it is essentially the
2    European Sports Medicine and Knee Association, The
3    American Medical Association, The Illinois State Medical
4    Society.  I think that's all of them, I might be
5    forgetting one.
6        Q.   Doctor, I'm handing you now what's entitled
7    Expert Report of Chadwick Prodromos, M.D.  We're going
8    to mark it as Exhibit 2.  Do you recognize this
9    document, Doctor?
10       A.   Yes.
11       Q.   What is this document?
12       A.   The report that I prepared for this case for
13   the -- the law firm that retained me, or maybe it's for
14   Wexford, whoever the retaining entity is, but regarding
15   Mr. Hemphill.
16       Q.   And you prepared this report on behalf of the
17   defendants who we identified earlier at the beginning of
18   the deposition; is that correct?
19       A.   Yes.
20       Q.   Can you please turn to the fourth page of the
21   document?  Is that your electronic signature on that
22   page?
23       A.   So the page that has a 4 on it doesn't have a
24   signature that I can see.  Is that the page that you

---

Page 11

1    want?
2        MR. MARUNA:  I think he's looking at this one here
3    (indicating).  Should be...
4    BY THE WITNESS:
5        A.   Is it after that?
6        Q.   It's in the beginning.
7        MR. MARUNA:  Start at the top and then move four
8    pages in, 1, 2, 3, 4.
9    BY THE WITNESS:
10       A.   1, 2, 3, 4.  Oh, yeah, I suppose it is.
11       Q.   Is that or is that not your electronic
12   signature?
13       A.   You know, it's my name typed on a page, beyond
14   that, I really couldn't tell you.
15       Q.   Did you type your name on this page?
16       A.   I don't remember.  I did this report and I --
17   I mean is this my report?  Yes.  The mechanisms of the
18   electronics I could not tell you for sure, so I guess I
19   should just say yes.
20       Q.   Well, I want you to answer truthfully, Doctor.
21       A.   Well, I do answer truthfully.
22       Q.   Your electronic signature appears on this
23   page, correct?
24       MR. MARUNA:  That's your name with an S slash next

---

Page 12

1    to it?
2        THE WITNESS:  Is that what that means?
3        MR. MARUNA:  Yes.
4    BY THE WITNESS:
5        A.   Yes, okay, so I guess so.
6        Q.   And by affixing your electronic signature to
7    that page, you're certifying that you prepared this
8    report and the opinions are rendered to a reasonable
9    degree of medical certainty; is that correct?
10       A.   Yes.
11       Q.   So you stand by your opinions in this report
12   as you sit here today?
13       A.   Yes.
14       Q.   Doctor, you mentioned that you completed your
15   internship at the University of Chicago, what were your
16   duties as an intern?
17       A.   Those typically associated with surgical
18   internships.
19       Q.   And what are those duties?
20       A.   Primarily patient care.
21       Q.   And what specifically were you doing?
22       A.   So are you looking for a list of some of the
23   activities that I did as a surgical intern?
24       Q.   Yes.

---

3 (Pages 9 to 12)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 13

1      A.   We would make rounds, primarily inpatients, on
2    inpatients, we would order tests, we would see how
3    people were doing, we would make evaluations, we would
4    assist in surgery, those are the main things.
5      Q.   And were those patients at University of
6    Chicago Hospital?
7      A.   Yeah, at that point it was called the
8    University of Chicago Hospitals and Clinics, yes.
9      Q.   Did you ever work in a prison during your
10   internship?
11     A.   No.
12     Q.   Did you ever work in a jail --
13     A.   No.
14     Q.   -- during your internship?
15     A.   No.
16     Q.   Did you ever work in any sort of correctional
17   facility during your internship?
18     A.   No.  Or anytime thereafter.
19     Q.   You completed your residency in 1984, correct?
20     A.   Yes.
21     Q.   And what were your duties as a resident?
22     A.   Same.
23     Q.   Same being same as your duties as an intern?
24     A.   Yes, except that they were all orthopedic

---

Page 14

1    patients, whereas during the internship they were
2    different kinds of patients in different locations.
3      Q.   And during your residency you never worked in
4    a jail, prison or correctional facility, correct?
5      A.   As I said, I've never worked in any of those
6    places ever in my life, during the residency or anytime
7    before or after.
8      Q.   And you completed your fellowship in 1985,
9    correct?
10     A.   Yes.
11     Q.   And what were your duties as a fellow?
12     A.   Pretty much the same, assisted surgery, take
13   care of patients, inpatients, however, during the
14   fellowship I also saw outpatients in the office of my
15   fellowship director.
16     Q.   And following that you became an assistant
17   professor at Rush University; is that correct?
18     A.   Yes.
19     Q.   And when did you start that position?
20     A.   About 1988, sometime late '80s, I don't
21   remember exactly.
22     Q.   And did you start as an assistant professor or
23   were you -- did you hold a different position?
24     A.   I started as assistant professor.

---

Page 15

1      Q.   And how long did you work as assistant
2    professor?
3      A.   Until 2014, 20 -- I know I got my 25-year
4    plaque, so it was a little longer than that, but...  So
5    how long would that be?
6      Q.   That's fine.
7      A.   26 years maybe.
8      Q.   What were your duties as an assistant
9    professor?
10     A.   Well, I would teach residents surgery mostly.
11   Part of being assistant professor is -- I did research
12   and I write publications so that isn't so much a duty
13   but something that falls under the rubric of being in
14   academic medicine.
15     Q.   So how much of your time as an assistant
16   professor was clinical work versus teaching or scholarly
17   work?
18     A.   Well, initially -- So I do surgery, I see
19   patients in an office and I do research.  So my practice
20   is mostly seeing patients in an office and doing
21   surgery.  And when I would do surgery at Rush, I would
22   teach residents, and when I wasn't at Rush, I wouldn't
23   be teaching residents, so I guess...  So to begin with,
24   probably more clinical then later on more research.

---

Page 16

1      Q.   And when did you make the transition from
2    clinical to research?
3      A.   You know, there never really was a transition.
4    I've always -- So clinical research involves following
5    up your patients and writing papers about them and doing
6    some med research, so I've always integrated the two in
7    my practice.  I did -- I did more -- As I got in the
8    practice more, I had more to do research about so I did
9    more of it as I've been out a while than I did early on
10   for that reason.
11     Q.   Did you hold any other jobs during these 25 to
12   26 years while at Rush?
13     A.   So to be clear, that's a voluntary position,
14   so it was not a salary position, and I just said it
15   because of your use of the word job.  I've been, for the
16   entirety of my career, an orthopedic surgeon in the
17   private practice of orthopedic surgery, I'm
18   self-employed.
19     Q.   So after your fellowship then you were private
20   practice as well as an assistant professor?
21     A.   That's correct.
22     Q.   And where did you practice medicine I guess
23   beginning in 1985?
24     A.   In Chicago.  I opened the office here I think

---

4 (Pages 13 to 16)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 17

1   in '86. I had an office in Evanston when I first
2   started, then I opened the office here, I don't
3   remember, a year or two later, and I've been here ever
4   since. And then I have -- Well, I did a satellite
5   office or two, you know, I'd see patients in Chicago now
6   once a week, for example, twice a week, but this has
7   been home base for almost all of my career.
8       Q. So beginning in 1985 how much of your time was
9   dedicated to seeing patients versus working as an
10  assistant professor?
11      A. You mean as opposed to doing research? The
12  assistant professor is kind of an onlay to what I did,
13  so I held the title of assistant professor, and when I
14  would operate at Rush I would teach residents because
15  they were there, and the research I've always just kind
16  of did, but it isn't as though I was employed -- an
17  employee of the institution. Being an assistant
18  professor really didn't affect my practice in any way,
19  shape or form except I would teach residents when I did
20  cases down there.
21      Q. And why did you stop being an assistant
22  professor?
23      A. Well, I used to live in Chicago and I would do
24  a lot of surgery down there, and then I moved to the

Page 18

1   suburbs and it's just kind of far to go down there,
2   honestly, to do surgery, and also my practice became 100
3   percent outpatient surgery, so I wasn't admitting to the
4   medical center anymore, so I really had no use for that,
5   and to remain assistant professor, there were an
6   increasing number of kind of clerical things I sort of
7   had to do, with paperwork to fill out, and finally it
8   just became kind of not what the bother to do it
9   anymore.
10      Q. And currently you're president of Illinois
11  Sports Medicine and Orthopedic Centers, correct?
12      A. Yes.
13      Q. And you made reference to starting your own
14  practice back in 1985, is that the practice Illinois
15  Sports Medicine and Orthopedic Centers or was it called
16  something else?
17      A. It's a d/b/a. It was North Shore Sports
18  Medicine and Orthopedic Centers, d/b/a is Illinois, and
19  I don't think I incorporated until I've been in practice
20  for a year, I honestly don't remember. But since, you
21  know, 1986 or 7 it was North Shore and then d/b/a
22  Illinois.
23      Q. Doctor, are you familiar with the National
24  Commission of --

Page 19

1       A. By the way, with the Rush thing, so I actually
2   still do cases down there sometimes, and I do research
3   down there, always getting down to research, so I do
4   things there just sort of less formal, but go ahead.
5       Q. And if at any point you want to correct an
6   answer or add on to an answer, feel free to do it.
7       A. (Nodding.)
8       Q. Are you familiar with the National Commission
9   of Correctional Healthcare?
10      A. No.
11      Q. So you've never been a member of the National
12  Commission of Correctional Healthcare then, correct?
13      A. Correct.
14      Q. Doctor, would you agree that inmates are
15  entitled to the same quality of orthopedic care as your
16  patients that you see in private practice?
17      A. Yes.
18      Q. And you would agree that giving an inmate
19  patient lesser medical care than a nonincarcerated
20  patient is not a component of one's punishment, correct?
21      MR. MARUNA: Objection to the form of the question,
22  vague, assumes facts not in evidence, foundation. Over
23  the objection, Doctor, you may answer it.
24  BY THE WITNESS:

Page 20

1       A. I mean on a personal moral level, I don't -- I
2   think that's true.
3       Q. What about in terms of the practice of
4   medicine generally?
5       A. Well, that's what I mean.
6       Q. So that would apply to --
7       A. Yeah, I would not treat a prisoner any
8   different than anybody else.
9       Q. And you would expect other professionals in
10  your profession to also do the same, correct?
11      MR. MARUNA: Foundation. Over the objection --
12  BY THE WITNESS:
13      A. With all due respect, I think in my opinion
14  everybody should be then, but I can only speak for
15  myself.
16      Q. Doctor, how many times have you served as an
17  expert witness? You can estimate.
18      A. Yeah, I would say... You mean for a
19  deposition or testifying in court or what?
20      Q. Just being retained as an expert witness.
21      MR. MARUNA: If you understand what that means or
22  you can ask for a clarification if it's unclear.
23  BY THE WITNESS:
24      A. Yeah, because there are different things...

5 (Pages 17 to 20)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 21

1    Q.  So how many times have you been asked by an
2    attorney to render an opinion, a medical opinion --
3    A.  And been paid for it, huh, would that be fair?
4    I've had a couple of friends who asked me some
5    questions --
6    Q.  Right.
7    A.  -- and said --
8    Q.  Yeah.
9    A.  You don't mean that, you mean --
10   Q.  Exactly.
11   A.  -- like somebody paying me to look at
12   something?
13   Q.  Someone is paying you to look --
14   A.  I would say -- Using that standard where I got
15   sent the medical records and I looked at them and
16   somebody paid me something?
17   Q.  Yes.
18   A.  Maybe 10 to 15 times.
19   Q.  And have you ever testified at a trial?
20   A.  I've testified in court twice a long time ago;
21   one for sure I was a treater, a treating doctor, the
22   other one I don't remember, I think I was a treater too
23   but I'm not sure.
24   Q.  So when you mean treater, were you being sued?

Page 22

1    A.  No, no.  I was -- I was the doctor and then it
2    was, I don't remember, like a personal injury or
3    worker's comp case or some kind of thing, and then it
4    went to trial, and then they asked me to come to trial,
5    give my opinion about the person's medical care.
6    Q.  Got it.  How many times have you been deposed?
7    A.  As an expert where I got paid?
8    Q.  Correct.
9    A.  I think like five to 10.
10   Q.  Have you ever been the subject of a Daubert
11   motion?
12   MR. MARUNA:  If you know what that is, Doctor.
13   BY THE WITNESS:
14   A.  Well, since I don't know what it is, I'd have
15   to say no.
16   Q.  Just to give you some background, Daubert is a
17   standard that experts must meet to serve as an expert in
18   a case and so --
19   MR. MARUNA:  In federal court.
20   BY MR. McCLAIN:
21   Q.  In federal court.  (Continuing.) -- certain
22   times if you're being retained as an expert and somebody
23   doesn't believe you're qualified as an expert then
24   they'll challenge your qualifications.  So does that

Page 23

1    change your answer?
2    A.  Well, no one's at least to my face ever
3    challenged my qualifications, so I guess I would say no.
4    Q.  And you're not aware of anyone filing
5    anything --
6    A.  No.
7    Q.  -- in the 10 to 15 cases that you served --
8    A.  No.
9    Q.  -- as an expert witness?
10   A.  No.
11   Q.  Have you ever worked in a case involving a
12   prisoner?
13   A.  You mean as an expert?
14   Q.  Yes.
15   A.  Yes.
16   Q.  How many?
17   A.  Three, four.
18   Q.  What were the nature of those cases?
19   MR. MARUNA:  In terms of the claim or the injury?
20   BY MR. McCLAIN:
21   Q.  Well, in terms of the claim.
22   A.  Well, in one the inmate plaintiff was claiming
23   that he should have gotten -- I'm just going to kind of
24   summarize, is that what you want -- was claiming that he

Page 24

1    had a minor surgical procedure and he should have gotten
2    more narcotics instead of nonnarcotic pain medicines,
3    was kind of the gist of that one.
4    And then in another one an inmate claimed that
5    he had knee pain and then he had surgery, had
6    conservative treatment, but that the care should have
7    been rendered like faster, I think, what he was saying,
8    that they were slow to treat him and he suffered I think
9    was kind of the gist of that one.
10   There's another one where the inmate had an
11   injury when he was very young to the tibia and then when
12   he got older -- and I wasn't -- just what I'm telling
13   you I wasn't deposed but they asked me to look at the
14   record, and he -- so he had problems when he was an
15   inmate --
16   MR. MARUNA:  Doctor, did you author a report in
17   that case?
18   THE WITNESS:  I don't remember.
19   MR. MARUNA:  So I'm going to object.  If he didn't
20   author a report, I think that -- I don't know whose case
21   it was but they may have a claim of privilege and
22   protection over it if he were a nondisclosed retained
23   expert.
24   BY THE WITNESS:

6 (Pages 21 to 24)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 25

1    A.  I know I wasn't deposed, and I remember
2  looking at it and I'm sure I talked to the attorney over
3  the phone, I don't know that I filed a report, I don't
4  know.
5    Q.  How long ago was that case?
6    A.  When did I look at it?
7    Q.  Yeah.
8    A.  Oh, six months maybe.
9    Q.  So that case was six months ago?
10    A.  Well, I looked at it something like six months
11  ago.  It might have been three, four, it might have been
12  seven, eight, a little while ago.
13    Q.  And the attorney that gave you the medical
14  records, was that on behalf of defendants or plaintiff?
15    A.  Defendant.
16    Q.  So that would be on behalf of medical
17  providers then?
18    A.  Yes.
19    Q.  In the first case regarding the inmate that
20  had surgery and wanted narcotics, when was that case?
21    A.  You mean when did I review it?
22    Q.  Yes.
23    A.  And I don't even know if I gave a deposition
24  to tell you the truth, but it would have been, I think,

---

Page 26

1  nine, 10 months ago maybe.
2    Q.  And were you serving as an expert on behalf of
3  the plaintiff inmate or the defendants?
4    A.  Defendants.
5    Q.  And do you know the outcome of that case?
6    A.  No.
7    Q.  And the second case regarding the knee pain --
8    A.  Uh-huh.
9    Q.  -- how long ago was that case?
10    A.  A couple hours ago, my deposition.
11    Q.  So you were deposed earlier today in that
12  case?
13    A.  Yeah.
14    Q.  And were you retained by the plaintiff inmate
15  or the defendant?
16    A.  Defendant.
17    Q.  Have you ever served as an expert witness on
18  behalf of an inmate?
19    A.  No.
20    Q.  Have you ever served as an expert witness on
21  behalf of a plaintiff patient?
22    A.  I think I'm pretty sure I have once, maybe
23  twice.
24    Q.  So in the 10 to 15 cases that you served as an

---

Page 27

1  expert witness, presumably nine to 14 of those were on
2  behalf of the defense?
3    A.  So when you say witness, if I distribute the
4  charts, that -- that categorizes me as an expert
5  witness?
6    Q.  Did you render an opinion in those cases?
7    A.  There's a number where I didn't.
8    Q.  In the 10 to 15?
9    A.  Yeah.
10    Q.  How many of them, of the 10 to 15 did you
11  render an opinion in?
12    A.  I think like nine or 10.  I think there's
13  three, four, five where I looked at it but talked to
14  the -- The attorney said would you look at it, I looked
15  at it, and I called him and I told him what I thought
16  and that was the end of it.
17    Q.  So the nine to 10 -- You served as an expert
18  witness on behalf of the defendants in eight to nine of
19  them; is that correct?
20    A.  Yeah, so if there were 10, then eight might
21  have been defense and two might have been the plaintiff,
22  something like that.
23    Q.  Doctor, how much of your annual income is
24  derived from serving as an expert witness?

---

Page 28

1    MR. MARUNA:  Could we do in a percent, counsel?
2    MR. McCLAIN:  Yes.
3  BY THE WITNESS:
4    A.  Oh, one, one and a half.
5    Q.  When did you first learn about this case?
6    A.  When did I first -- Oh, gosh.  I don't
7  remember exactly, maybe, I don't know, four, five, six
8  months, maybe a little more than that.
9    Q.  And who contacted you?
10    A.  An attorney; which attorney, I don't remember.
11    Q.  And what information were you provided at that
12  time?
13    A.  Medical records.  I think they're listed here.
14    Q.  We'll get to that.  How many times did you
15  speak with counsel regarding the case before you
16  rendered your written opinion?
17    A.  I don't know, once for sure, maybe more than
18  once.
19    Q.  And what was the specific assignment that you
20  were given by the attorney that contacted you?
21    A.  Well, he asked me to review the records and
22  render my opinion.  And so what did he ask me to render
23  my opinion about, is that what you're saying?
24    Q.  Yes.

---

7 (Pages 25 to 28)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 29

1      A. I think -- I can't say exactly what he said,
2  but in a general way the appropriateness of care.
3      Q. And have you received compensation for your
4  work in this case?
5      A. I think so.
6      Q. You're not aware if you've been paid or not?
7      A. Well, here's the thing, I have -- I try to
8  tell the people in the office I reviewed some records, I
9  talked to somebody, and I ask them to send a bill out
10  and to tell you the truth, I don't really look at it too
11  much, so...
12      Q. You don't look at what too much?
13      A. Whether I've gotten paid or not. So probably
14  I've gotten paid something but I'm not sure.
15      Q. And do you know how much you've been paid to
16  date in this case?
17      A. No.
18      Q. Do you charge hourly rates or do you have a
19  fixed rate?
20      A. Hourly rate.
21      Q. And is your compensation in any way dependent
22  upon the outcome of the case?
23      A. No.
24      Q. Have you ever interviewed the plaintiff, Carl

Page 30

1  Hemphill?
2      A. No.
3      Q. Do you think it would have been helpful in
4  rendering your opinion to interview him?
5      A. You know, I think for what I was asked to
6  comment on, I think I can tell pretty clearly from the
7  records. I mean I would never want to say that more
8  information might not be helpful but I don't know that
9  it would have added much.
10      Q. Did anyone assist you with preparing your
11  report?
12      A. No.
13      Q. And you mentioned that you were provided
14  records in this report -- Excuse me, strike that.
15      You mentioned that you were provided records
16  in this case, how were those records provided to you?
17      A. Digitally I think.
18      Q. Do you know who provided those?
19      A. I think the law firm.
20      Q. Do you know how these documents were selected?
21      A. I think they were felt to be the relevant
22  medical records for the case.
23      Q. And who made that decision to determine them
24  the relevant medical records?

Page 31

1      A. The attorney.
2      Q. Doctor, can you please identify for me all
3  documents on which you relied on in forming your
4  opinion?
5      A. So on the expert report, on the second page,
6  or the first page after the title, there is a list of 10
7  or so of them. Do you want me to read them? You got
8  that, right?
9      Q. I have that. So you're identifying the
10  documents listed on the second page of your report by
11  the bullet points?
12      A. Yes.
13      Q. Did you review any other documents besides
14  these documents that are bulleted?
15      A. No.
16      Q. Did you rely on every single one of these
17  documents or did you determine some to be more important
18  than others?
19      A. I read them all. I think some were more
20  relevant than others.
21      Q. How did you determine the document was more
22  relevant than another?
23      A. Well, that's a complicated question. I mean
24  there were some that were just some random lab tests,

Page 32

1  for example, which probably weren't too relevant, and
2  blood pressure and temperature, you know, and then there
3  were somewhere where there was a physician describing
4  findings or an MRI scan, that kind of thing, so it's
5  hard for me to -- kind of what the practice of medicine
6  is about, I suppose, you know, sorting through things
7  and assigning a hierarchy of relevance to the task at
8  hand.
9      Q. Did you bring any documents with you today?
10      A. Well, a copy of the report that you gave me a
11  copy of, too, and a copy of the CV; otherwise, no.
12      Q. Did you prepare this report with the
13  assistance of counsel?
14      A. I prepared the report and I sent it into
15  counsel and then counsel made some recommendations,
16  basically formatting, might have asked me to render more
17  of an opinion on something like that, that kind of
18  thing. The opinions -- So I didn't -- The opinions were
19  entirely my own, none from counsel either for the
20  original one or for this (indicating).
21      Q. And by counsel, you're referring to
22  Mr. Maruna's firm, correct?
23      A. Right.
24      Q. Did you have any other counsel, your own

8 (Pages 29 to 32)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

## Page 33

1   personal counsel review this report?
2       A.   No.
3       Q.   Were there any preliminary drafts of this
4   report?
5       A.   Well, there's one that I sent in.  Was there
6   one before that?  I don't think so.
7       Q.   So you sent a draft of your report to
8   Mr. Maruna's firm and they provided you with what you
9   described as formatting revisions?
10      A.   Yes.
11      Q.   Were there any other drafts besides that?
12      A.   No.
13      Q.   How much time did you spend on drafting this
14  report?
15      A.   Just the drafting of the report, not reviewing
16  medical records?
17      Q.   Yes.
18      A.   Oh, I don't remember exactly.  I kind of tried
19  to be like an attorney and write it down as I went
20  along, keep track of my time, and so I would say that...
21  I don't know, a couple hours maybe.
22      Q.   And how many hours did you spend reviewing the
23  records?
24      A.   I don't remember exactly, but...  If I were

## Page 34

1   counting, something like seven or eight maybe.
2       Q.   And how did you go about actually preparing
3   the report?
4       MR. MARUNA:  In terms of the process or how he
5   physically typed it up?
6       MR. McCLAIN:  In terms of the process.
7       MR. MARUNA:  Okay.
8   BY THE WITNESS:
9       A.   Well, I read through the records and I just
10  kind of scribbled some notes kind of thing, you know,
11  and then...  And basically then just wrote, typed.
12      Q.   Doctor, I want to direct you back to Exhibit
13  1, at the bottom of the first page there, there's -- the
14  beginning of three requests of documents I requested you
15  bring today.  The first one --
16      A.   I'm sorry?  You're talking about this Exhibit
17  1, the CV (indicating)?
18      MR. MARUNA:  No.
19      MR. McCLAIN:  No.
20      MR. MARUNA:  The notice.
21      MR. McCLAIN:  The Notice of Deposition.
22      MR. MARUNA:  The one you folded up, yeah.
23  BY THE WITNESS:
24      A.   I'm sorry, you said the three requests were?

## Page 35

1       Q.   At the bottom of the first page is the first
2   request.  Did you bring any documents today that are
3   responsive to that request?
4       A.   You know, communications between counsel and
5   the witness discussing the compensation of the
6   witness...  So communications between the law firm and
7   me about what I was going to charge, is that what you're
8   saying?
9       Q.   Yes.
10      MR. MARUNA:  Do you have any documents here today
11  responsive to that?
12  BY THE WITNESS:
13      A.   No, I don't -- No.  As I said, I don't know if
14  there's anything in writing anyway.
15      Q.   Flipping to the next page, any communications
16  that identify the facts or data that Mr. Maruna provided
17  that the expert considered in forming his opinion?
18      A.   So those, I think if I'm understanding this
19  right, would be those medical records that are listed,
20  did I bring them with me?
21      Q.   No.  Are there any other documents responsive
22  to that request besides --
23      A.   Besides those records?  No.
24      Q.   And finally, were you provided any assumptions

## Page 36

1   to rely on in forming your opinion?
2       A.   No.
3       Q.   Okay.  Thank you, Doctor.  We're done with
4   that.
5       A.   All right.
6       Q.   Doctor, I'm going to kind of get into the meat
7   of your report, so now would be a good break point if
8   you want to take a break or we can keep going?
9       A.   Yeah, that's...
10      (A short break was had.)
11      (Dr. Prodromos Deposition Exhibits
12      Nos. 1 and 2 marked as requested.)
13  BY MR. McCLAIN:
14      Q.   Doctor, I want to direct you back to Exhibit
15  2, which is your expert report.  And just to clarify,
16  you did, in fact, draft this report, correct?
17      A.   Yes.
18      Q.   In rendering your opinion, what documents did
19  you rely on?
20      A.   All of the ones listed.
21      Q.   Did you rely on any assumptions in forming
22  your opinion?
23      A.   No.
24      Q.   And it is your opinion in this report that to

9 (Pages 33 to 36)

Electronically signed by Carrie Brown (101-369-569-5178)          4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 37

1    a reasonable degree of medical certainty the standard of
2    care was met with respect to the medical services
3    provided to Carl Hemphill, correct?
4        A.   Yeah.
5        Q.   What is the standard of care that you base
6    this on?
7        A.   The -- My opinion based on the sum total of my
8    training, education, and experience.
9        Q.   And so that's based on the experience that
10   you've developed over the course of your career?
11       A.   It's the sum total of my training, education,
12   and experience.
13       Q.   And is that the appropriate standard of care
14   to apply in this case?
15       A.   Yes.
16       Q.   And how did you determine that that was the
17   standard of care?
18       A.   So the standard of care is my -- is my
19   judgment as to what that would be, so then you would be
20   asking me why I would think that my judgment as to what
21   that would be would be appropriate for this case, and
22   the answer to that would be that I'm a board-certified
23   orthopedic surgeon, mostly, and then in addition to
24   that, I'm a board-certified orthopedic surgeon who's

Page 38

1    fellowship trained in knee and shoulder surgery whose
2    surgical practice is almost entirely limited to
3    arthroscopic knee and shoulder surgery and the kinds of
4    problems that Mr. Hemphill had.
5        Q.   So just to kind of summarize, the standard of
6    care is your judgment based on training, education,
7    experience over the course of your career?
8        A.   Correct.
9        Q.   So would that standard of care be different if
10   a different doctor, orthopedic surgeon, reviewed these
11   records?
12       MR. MARUNA:  Objection, foundation, form, calls for
13   speculation.  Over the objection, Doctor, you can
14   answer.
15   BY THE WITNESS:
16       A.   So assuming that we're talking about the same
17   thing when we say standard of care, different doctors
18   prioritize different aspects of care a little
19   differently, so another board-certified orthopedic
20   surgeon might feel a little differently about some
21   aspects of care.
22       Q.   Is there one standard that applies uniformly
23   across the practice of orthopedic medicine?
24       A.   So a standard -- and I think -- I'm not sure

Page 39

1    if I'm asking, because I'm about to say I think you must
2    know, it isn't -- this isn't a formulaic, algorithmic,
3    black-and-white set of rules, like coding Python or
4    something, so there's always an element of judgment
5    involved and doctors are human beings so they will have
6    some differences about things.
7        Q.   So getting back to my question:  Is there a
8    standard that applies uniformly across the practice of
9    orthopedic medicine?
10       MR. MARUNA:  Objection, form, asked and answered.
11   BY THE WITNESS:
12       A.   So I tried to answer that, I guess since you
13   asked me the same question again, I apparently didn't.
14   So can you help me out a little in what part of my
15   answer maybe isn't responsive or what else -- how I can
16   embellish on it to your satisfaction?
17       Q.   I'm just trying to get to the bottom of the
18   standard of care because you indicated that the standard
19   of care is your judgment, so if we went to one of your
20   colleagues who is also an orthopedic surgeon and we
21   asked him what the standard of care was, would he also
22   then say, Well, it's my judgment?
23       A.   He would, and within our judgment we're
24   expected to have a level of appropriateness based on the

Page 40

1    training and education we have and the board
2    certification and all that sort of thing, but it's not
3    as though it's written down with rules.
4        Q.   So when you're looking to determine if certain
5    care has met the standard of care, you're looking for
6    whether it was appropriate; is that a fair
7    characterization?
8        A.   Yes.
9        Q.   What methodology did you employ to reach your
10   medical conclusions in your report?
11       A.   Cognition, cerebration, I looked at the facts
12   that were presented and through conclusions as best as I
13   could from them.
14       Q.   And how did you determine which facts to draw
15   conclusions from and which facts to not draw conclusions
16   from?
17       A.   Well, based on extensive training and
18   education and experience, I used my best judgment to
19   make those decisions.
20       Q.   Doctor, would you agree that it's possible to
21   make a correct diagnosis of a patient but then provide
22   incorrect treatment?
23       A.   Yes.
24       Q.   Doctor, can you explain what shoulder

                                    10  (Pages 37 to 40)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 41

1   impingement syndrome is?
2       A.  Sort of.  It's -- There's some -- There's been
3   evolution of the terminology and there's some debate and
4   there's some controversy, but in a general way, rotator
5   cuff tendinitis and subacromial bursitis and impingement
6   syndrome are to some degree interchangeable and reflect
7   changing thoughts within our profession as to the cause
8   of the clinical syndrome.  So impingement syndrome was a
9   term that was coined in the latter third of the last
10  century, and it supposed that people who had
11  inflammation or damage of their rotator cuff and also
12  the bursa in that area had it because the tendon, which
13  is usually the supraspinatus tendon or the rotator cuff,
14  is impinged upon by the acromial process which is just
15  above it.  So that isn't really talking about what the
16  syndrome is, it -- contained within that name of the
17  syndrome is kind of a conclusion as to its etiology.  So
18  that viewpoint isn't held nearly as strongly as it used
19  to be, as to what causes it, and, in fact, there's some
20  uncertainty as to what it does cause.  In general, what
21  we're talking about is rotator cuff inflammation within
22  the rotator cuff supraspinatus.  So, you know, we within
23  this field recognize that there's different ways of
24  talking about this, so -- so impingement syndrome

Page 42

1   basically involves inflammation of the supraspinatus
2   tendon and the bursa, pretty much every case.  Whether
3   or not that's a result of being impinged upon by the
4   acromion is kind of highly debatable; nonetheless, you
5   know, we kind of know what the term means when people
6   use it, and people who aren't in orthopedics are going
7   to be maybe not quite as up to date as those within
8   orthopedics about the latest thoughts as to what causes
9   the clinical picture.
10      Q.  And how do you diagnose shoulder impingement
11  syndrome?
12      A.  It's a combination of the history, physical
13  exam, X-rays in some cases.
14      Q.  You mentioned X-rays in some cases, can you
15  elaborate on that a little more?
16      A.  Sure.  So people with impingement syndrome
17  basically have shoulder pain, so if you see a shoulder
18  specialist for shoulder pain, someone like myself, we
19  attempt to come to a diagnosis.  So we always take a
20  history and we always perform a physical, and often we
21  get X-rays, although they're not always necessary,
22  at least not to begin with, and it depends a little bit
23  upon other patient-related facts.  If it's an older
24  person, we're much likely to get an X-ray because we're

Page 43

1   trying to differentiate shoulder pain as to whether it's
2   impingement syndrome versus shoulder arthritis, for
3   example.  If -- If it was a very severe clinical
4   picture, we get an X-ray because sometimes the X-ray can
5   give information about the integrity of the rotator
6   cuff, so, you know, you'd be less likely to get an X-ray
7   right from the get-go in a young person than an older
8   person, so it would depend upon their age, their
9   physical exam, their complaints, other facts about the
10  case.  So what one endeavors to do is to get those tests
11  that are felt to be necessary to come to an appropriate
12  working diagnosis, so you usually get X-rays but you
13  don't always need to, and I try not to get unnecessary
14  ones, for example.
15      Q.  And what is a torn rotator cuff?
16      A.  Well, the rotator cuff is four tendons, and in
17  common parlance -- So technically it can mean a tear,
18  just a physical tear of any of the four.  As a practical
19  matter, one of them never tears, one of them pretty much
20  always tears first and another second and another one
21  third.  But even tear is -- is an ambiguous term because
22  a tear can mean -- So tears can be full thickness or
23  partial thickness, for example.  So a tear, a complete
24  tear can represent a discontinuity of the tendon and the

Page 44

1   structure, that's a full thickness tear.  A tear -- A
2   partial tear can be one in which the tendon is
3   continuous from its origin to its insertion but has
4   structural damage to it.  In the MRI world, there is
5   high signal and low signal.  So there's normal and
6   abnormal, it's binary, and that's all that MRIs do.  But
7   high signal can be subject to the interpretation of the
8   viewer as a tear versus inflammation and that's a little
9   bit subjective.
10      The biggest differentiation to make is between
11  full thickness and partial thickness, continuous versus
12  discontinuous.  Although the distinction between partial
13  thickness and inflammation even with an MRI, actually
14  especially with an MRI, could be tough to determine, and
15  there's actually different standards for MRI
16  determinations and direct determination, for example,
17  with arthroscopic surgery, which is the other way that
18  you can actually image.  You can image it directly
19  through arthroscope or if you open it up, I
20  suppose, or with an MRI.
21      Q.  So to diagnose a torn rotator cuff you either
22  use an MRI or the arthroscopic scope or you do it
23  surgically?
24      A.  You mean full thickness or partial thickness

11 (Pages 41 to 44)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 45

1    or any tear?
2        Q.  Well, let's start with full thickness.
3        A.  So in each case what one does is takes a
4    history and does a physical exam and then comes up with
5    a provisional diagnosis or a differential diagnosis.
6    So, you know, and -- One can often determine that it
7    appears to be a rotator cuff problem but is not sure of
8    the severity, in some cases it's not even totally clear
9    it's a rotator cuff problem.
10       Q.  And that's during the physical examination
11   you're referring to?
12       A.  And history.
13       Q.  And history?
14       A.  Right.
15       Q.  Okay.
16       A.  So at that point if one thinks that there's a
17   full thickness tear and there are various historical and
18   physical exam findings that are highly suggestive of
19   that, none of this is a hundred percent, you know, when
20   we get an X-ray and one might get an MRI right from the
21   start.  There are cases where one doesn't think it's
22   full thickness and we'll treat a patient and they're not
23   getting better, one might get an MRI at that point.
24   There are cases where it seems highly unlikely that it's

Page 46

1    full thickness and probably get an X-ray but wouldn't
2    get an MRI.  And there are cases where it might be felt
3    to be not torn at all but impingement syndrome which can
4    be inflammation, can be a small partial tear, where you
5    wouldn't -- you don't get advanced tests on every
6    patient you see with an ache or a pain, right, so you
7    determine or -- you know, the proper way to practice
8    medicine is to get the test that you need to help you
9    come to a determination that will effect treatment.
10       Q.  So can you view a full thickness tear on an
11   X-ray?
12       A.  Well, it depends.  Full thickness, large full
13   thickness tears are associated in severe cases with
14   upriding of the ball from the socket, and so if you see
15   that X-ray, you're pretty sure.  Those are really
16   advanced cases.
17       Q.  Is that only in a small number of cases?
18       A.  Yeah, it's pretty small, pretty small number.
19   For the typical full thickness tear, you really can't
20   diagnose it by X-ray.
21       Q.  Can you diagnose a partial tear by X-ray?
22       A.  No.
23       Q.  And we kind of gone through this, but can you
24   diagnose a full thickness tear with an MRI?

Page 47

1        A.  Yes.  One qualifier, it's better to have a
2    good MRI.  There are some low field MRIs that tend --
3    But almost all of them, and there are some that are
4    ambiguous, you have to inject dye in the shoulder, but
5    in general, yes.
6        Q.  And can you diagnose a partial thickness tear
7    on an MRI?
8        A.  Pretty much.  I say pretty much because the
9    word tear when applied to MRIs, unless it's
10   discontinuous, is subjective on the part of the
11   radiologist or the surgeon, because you see high signal,
12   that's binary, so you take in a given situation, you
13   know -- If you got a 10-year-old, you call it a
14   contusion, if you got it in a 60-year-old you call it a
15   partial tear of the rotator cuff.  And whether you call
16   it a partial tear versus inflammation or degeneration is
17   also a little bit subjective, but basically yes.
18       Q.  So the best way to determine whether there's a
19   tear, whether it be full or partial, would be through an
20   MRI; is that correct?
21       MR. MARUNA:  Objection, foundation,
22   mischaracterizes his testimony.
23   BY THE WITNESS:
24       A.  So it kind of depends upon what you mean by

Page 48

1    best.
2        Q.  To make the most accurate diagnosis of a
3    partial or full tear, full thickness tear.
4        A.  So let me just say that you know to make the
5    most dia -- the most accurate diagnosis of anything, I
6    would have every patient who comes in here getting an
7    MRI scan, maybe a CAT scan, so we're expected to
8    exercise judgment.  So if it is not clear clinically,
9    then the best way would be to get an MRI.
10       Q.  And what does an X-ray show?
11       A.  X-rays show degrees of density, and the main
12   densities they differentiate are -- So bone is calcified
13   and bone is very dense, so it's good for detecting most
14   abnormalities of bone, such as fractures, and they're
15   good at detecting whether a joint is in place or out of
16   place, because it's bony structure within a bony
17   structure although there's space in it which is
18   cartilage.  There are -- You can use X-rays for soft
19   tissue abnormalities in some cases, but basically and
20   especially in the orthopedic world it's looking at the
21   integrity of bone, looking for bone spurs, whether
22   something is in the joint or out of the joint, tumors of
23   bone.
24       Q.  And what does an MRI show?

12 (Pages 45 to 48)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 49

1    A. Well, MRIs shows a lot of things. It's based
2  on magnet that makes protons spin and different things
3  generate different fields based on that, so as a
4  practical matter in the world of orthopedics, in a
5  general way X-rays are better for bones, CAT scans are
6  even better than X-rays for bones, MRIs will often use,
7  as with rotator cuffs, what we call soft tissue.
8    Q. In the practice of orthopedic medicine if a
9  patient had shoulder pain and you order an X-ray, what
10  are you looking for on that X-ray?
11    A. It depends on the patient. It depends upon
12  the scenario. If we get somebody that has significant
13  traumatic injury and has a lot of pain, we may be
14  looking for an occult fracture, you know, some fractures
15  are pretty obvious but sometimes there can be a crack in
16  the bone you can see. If it's a youngish patient with
17  long-standing pain, we might be looking for tumors.
18  That's the leading age for bone tumors in adolescence.
19  If it's older patients, we may be looking for arthrosis,
20  because you're not going to get an arthritic shoulder in
21  an 18-year-old but you can see them in a 50-, 60-year
22  old. If there's -- There are occasions where the
23  shoulder will come out of the socket, we'll want to make
24  sure it's back in the socket. So that's mostly it, I

Page 50

1  suppose.
2    Q. In Mr. Hemphill's case, what was the purpose
3  of ordering the X-rays?
4    A. Well, I think for a mature adult one would be
5  looking for signs of arthritis of the glenohumeral
6  joint. There's another joint in the shoulder, the AC
7  joint, but it turns out that radiographic evidence of
8  arthrosis for that joint doesn't predict pain or
9  treatment, but -- so arthritis of what's called the
10  glenohumeral joint, which is the main shoulder joint.
11  One could be looking for tumor, they're unusual but they
12  occur, so if you get an X-ray and it's clean, the
13  patient doesn't have a tumor, you can kind of eliminate
14  that. Arthritis of the joint, in someone like him
15  that's mostly it, his shoulder isn't dislocated and his
16  symptoms are not sufficiently severe, I think where you
17  would be worried about that advance case of full
18  thickness rotator cuff tear where the ball comes out of
19  the socket a little, so mostly those two things I would
20  say.
21    Q. So it seems like it's mostly arthritis then?
22    A. Yeah, I don't know. It depends what you mean
23  by mostly.
24    Q. Well --

Page 51

1    A. If you miss a tumor, somebody could die.
2  They're not going to die if you miss arthritis.
3    Q. So the two main reasons are arthritis and
4  tumor then in Mr. Hemphill's case because he did have a
5  separated shoulder?
6    A. Dislocated shoulder.
7    Q. Dislocated shoulder?
8    A. Correct.
9    Q. And arthritis accumulates over a long period
10  of time, correct?
11    A. Right.
12    Q. So if you have an X-ray in year one, then you
13  have another X-ray eight months later, would you expect
14  a significant difference between those two X-rays if
15  you're just looking for arthritis or a tumor?
16    A. In general, no.
17    Q. In the practice of orthopedic medicine, what
18  is the purpose of an MRI?
19    A. Again, these are blanket questions you ask and
20  there aren't blanket answers. They're -- And every
21  patient is different and in every case -- You know, I
22  can give you some common scenarios, but in every case
23  with every assessment the purpose for getting an MRI
24  would be because you have, you know, a diagnostic

Page 52

1  question about which you feel sufficiently unsure that
2  you want information and the possible results of which
3  would potentially significantly alter treatment.
4    Q. Doctor, I just want to go back real quick. So
5  regarding the X-rays, and you indicated that you
6  wouldn't expect much difference between an X-ray in year
7  one and year -- eight months later, then what would have
8  been the purpose for Mr. Hemphill's second X-rays?
9    A. I mean I said in general. It could be that
10  there -- It could be that there was some arthritis that
11  was progressing a little, perhaps the patient thought
12  that on clinical grounds, it looked like it had
13  progressed, so I mean certainly things can progress in
14  that period of time. Or -- You know, there are cases
15  where a tumor is missed on an early film because it was
16  so early that you couldn't see it and you suspect it so
17  you get one -- get one later.
18    Q. Were there any notes that you saw in review of
19  medical records that any of the doctors or medical staff
20  suspected that Mr. Hemphill had a tumor?
21    A. No.
22    Q. Doctor, if in a private setting if a patient
23  come to you complaining of shoulder pain and you perform
24  an X-ray and you don't determine the source of that pain

13 (Pages 49 to 52)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

| Page 53 |
|---|

1    through the X-ray, would you recommend then conducting
2    an MRI?
3        A.   Well, I'd say a couple of things in regard to
4    that.  If I see a patient and they come to me and I do a
5    history and physical and I get an X-ray and I don't know
6    what's wrong and I requested an MRI, it will be turned
7    down by the insurance company.  The insurance company
8    will say, No, Doctor, I'm sorry, and they won't do it.
9    And I reached them on the phone earlier today and they
10   will make me -- you know, take time, give the patient
11   drugs, and then sometimes they still won't do it and so
12   then I just -- I was just on the phone earlier today and
13   I had to sit on the phone with another doctor and
14   justify why I want the MRI.  And if I think they need
15   it, I'll do what it takes to get it.
16       Q.   Do you think that the patient would need it
17   after conducting an X-ray and you still couldn't
18   determine the source of the pain and the patient
19   continued to be in pain?
20       MR. MARUNA:  Objection --
21   BY THE WITNESS:
22       A.   (Inaudible.)
23       MR. MARUNA:  -- foundation -- Yeah.
24       COURT REPORTER:  I'm sorry, what was your answer?

---

| Page 54 |
|---|

1        THE WITNESS:  I said I did not understand your
2    question, could you please rephrase it?
3    BY MR. McCLAIN:
4        Q.   Yes.  So if a patient complains of shoulder
5    pain and they have an X-ray and you can't determine the
6    source of the pain from that X-ray, you would want to
7    have an MRI, correct?
8        A.   No.  The source of the pain usually -- You
9    see, there are a number of things that go wrong with
10   shoulders, and in every case the diagnostic algorithm
11   differs, so on average the history and the physical are
12   far more useful than the X-ray, and in many cases, it's
13   a combination of things.  If I see somebody with a stiff
14   shoulder, it could -- there's two things that can cause
15   it; arthritis or frozen shoulder.  So I can
16   differentiate those by getting an X-ray because if the
17   X-ray does not show arthrosis, I know it's a frozen
18   shoulder.  But is -- But for most of the things that I
19   see, could be -- Because I get MRIs in only a small
20   percentage of the patients that I see.  I tend to get a
21   lot of X-rays, I just tend to be kind of nervous of
22   missing tumors, because even though they're rare, I've
23   seen a few, you know, and -- But most of the time it's
24   based on a combination of the history and the physical,

---

| Page 55 |
|---|

1    but not only that but the patient's course.  So the
2    history and physical, come up with a provisional
3    diagnosis, probably with an X-ray, and then embark on a
4    treatment course and see how the patient responds, and
5    then all of that is fluid, and if I go through all that
6    and then I need an MRI because I'm not clear, and then
7    there are other things too; response to injections.
8    Sometimes injections can be diagnostic with lidocaine,
9    can be therapeutic with cortisone, depending on the
10   patient's response.  So putting all that together, if --
11   if I'm doing all this and am unsatisfied and think my
12   diag -- Like I said, if I think my diagnosis might be
13   amiss or I'm not sure and I think that, you know, that
14   getting the MRI would alter my treatment -- I see people
15   in their 80s who I think probably have full thickness
16   rotator cuff tears but I don't know for sure, and I
17   treat them but I don't get MRIs because they're, in my
18   world, not surgical candidates.  So I would only get the
19   MRI if I was planning to do surgery.  And an 85-year-old
20   with a sore shoulder, you know, I don't think is an
21   appropriate surgical candidate.  So even then I don't
22   always get them, but if I've gone through this process,
23   and it's different for every patient, it's different for
24   every diagnosis, they're not where I want them to be,

---

| Page 56 |
|---|

1    then I'll get -- and including, of course, you know,
2    responsive treatment, that kind of thing, and I think
3    that the results of the MRI -- In fact, it's
4    interesting, the insurance companies now -- So in
5    addition to me having to get on the phone with doctors,
6    they have these sheets that our staff will fill out, and
7    one of the questions that they will ask is would the
8    patient be a candidate for surgery, and if the staff or
9    myself answers no, they'll turn it down based on that.
10   Because they're saying, Well, Doctor, it's fine that you
11   don't know but we don't care so much that you don't
12   know, we want to know that knowing would affect your
13   treatment in a meaningful way.  So it's all of this
14   together.
15       Q.   Doctor, how do you determine that your
16   treatment plan is effective?
17       A.   Well, there are subjective and objective
18   factors.  So if there is a frozen shoulder where they
19   can't move their shoulder, we can objectively look at
20   passive range of motion.  If it's as with Mr. Hemphill
21   where it's mostly pain, then, you know, kind of the
22   obvious thing is is the patient feeling better.
23       Q.   And how do you determine if the patient is
24   feeling better?

---

14  (Pages 53 to 56)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 57

1    A. It's a combination, a lot of it's subjective,
2    some of it's kind of quasi objective, so, you know,
3    we'll say to the patient, are you feeling better, ask
4    the patient to move their arm and actually I'll ask the
5    patient to lift their arm and go through a few maneuvers
6    and most of us in this business kind of look at the
7    patient's face and try to see if they're wincing, you
8    know, so it makes the subjective quasi objective. There
9    might be a bit -- Well, you know, with a young athlete
10   and they're here with their parents and we find out that
11   they're pitching nine innings of baseball, you know,
12   well, they're probably not feeling too bad kind of
13   thing, you know, so functional things, mostly just
14   asking the person but other things too.
15       Q. Do you schedule routine follow-ups with the
16   patients?
17       MR. MARUNA: Objection, form, vague. Over the
18   objection...
19   BY THE WITNESS:
20       A. I mean I do if there is a reason to, I don't
21   drag people down here for nothing, but...
22       Q. To determine if the course of treatment is
23   working, do you want to see the patients on a follow-up
24   to determine if your treatment is working?

Page 58

1        A. Well --
2        MR. MARUNA: Objection, form, hypothetical,
3    incomplete. Over the objection...
4    BY THE WITNESS:
5        A. There's one of two ways to do it. One is you
6    can ask the patient to come back, another is you can say
7    to the patient, particularly if you think it's not real
8    serious, you would expect them to be better, you can
9    say, you know, If you do this, I expect you're probably
10   going to get better, I cannot be sure, if you're not,
11   give me a call, so I'm kind of not wasting everybody's
12   time.
13       Q. And you indicated that Dr. Obaisi's care of
14   Mr. Hemphill was within the standard of care, correct?
15       A. Yes.
16       Q. And when you refer to the standard of care,
17   what are you referring to?
18       MR. MARUNA: Objection, asked and answered. Over
19   the objection, Doctor...
20   BY THE WITNESS:
21       A. With all due respect, I mean I thought I was
22   being too verbose, but did we not have a long discussion
23   about this? I'm not trying to be smart but you asked me
24   this and I went on at some length.

Page 59

1        Q. So what standard of care were you applying
2    when you determined Dr. Obaisi met the standard of care?
3        MR. MARUNA: Objection, form of the question,
4    vague, assumes a fact not in evidence, asked and
5    answered. Over the objections, Doctor, you can answer
6    or seek clarification.
7    BY THE WITNESS:
8        A. Yeah, I mean that's a good point. So a
9    standard of -- Appropriate standard of care for a
10   nonorthopedic medical doctor I would say.
11       Q. And that's what you applied for Dr. Obaisi?
12       A. Yes.
13       Q. Do you know if Dr. Obaisi was an orthopedic
14   doctor?
15       A. It is my understanding that he was trained as
16   a general surgeon.
17       Q. Have you ever interviewed Dr. Obaisi?
18       A. No.
19       Q. Did you look at any of his medical notes in
20   this case?
21       A. Yes.
22       Q. And which notes were those?
23       A. I don't remember, I looked at a ton of
24   records. I looked at all the notes that I was given

Page 60

1    where he had seen the patient which I... So...
2        Q. And those are the documents you identified in
3    your report?
4        A. That's correct.
5        Q. There's no other documents, correct?
6        A. No, no.
7        Q. Did you ever talk to Dr. Obaisi's assistant?
8        MR. MARUNA: Can you specify? Well, actually you
9    can probably answer to short circuit --
10   BY THE WITNESS:
11       A. The answer would be no.
12       Q. Have you spoken with any of the parties in
13   this case?
14       A. No.
15       Q. Within your report in opinion 1 you indicate
16   that "Dr. Obaisi utilized a logical progression of
17   care." Can you explain what you mean by "logical
18   progression of care"?
19       A. Well, he began with activity modification, so
20   he -- Activity modification, medicines, injections, and
21   one should progress in a step wise fashion which he did.
22       Q. What do you mean by "activity modifications"?
23       A. Avoiding activities that aggravate rotator
24   cuff tendinitis.

15 (Pages 57 to 60)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 61

1      Q.   And you indicated that Mr. Hemphill progressed
2   as he should, what do you mean by that?
3      A.   I didn't say that. I said that Dr. Obaisi
4   progressed as he should have.
5      Q.   I'm sorry, I misheard you, Doctor.
6      A.   Sorry.
7      Q.   So you indicated Dr. Obaisi progressed as he
8   should in providing his care to Mr. Hemphill; is that
9   correct?
10     A.   Yeah, in response to your question, your query
11  about the logical -- logical progression.
12     Q.   So he progressed as how you would expect a
13  doctor in his position to progress?
14     A.   Yes.
15     Q.   And Mr. Hemphill first complained of shoulder
16  pain in February 2013, correct?
17     A.   I'd have to go back and check but I'll take
18  your word for it.
19     Q.   Well, is that your understanding?
20     A.   I'd have to go back and check, if that's what
21  I wrote it is. I don't remember the date just sitting
22  here, but let me look at my report. Is it in there
23  someplace or should I just forge through it until I find
24  it?

Page 62

1      MR. MARUNA:  I don't think the dates are in the
2   report. Do you want -- I've got records if you'd like.
3      THE WITNESS:  Yeah, I can look at the records if
4   you want.
5      MR. McCLAIN:  Yeah.
6      THE WITNESS:  Do you want to do that?
7      MR. McCLAIN:  I got it.
8      MR. MARUNA:  Okay.
9   BY MR. McCLAIN:
10     Q.   Do you recall what Mr. Hemphill was originally
11  diagnosed with?
12     A.   Well, I know the impingement syndrome, maybe
13  that wasn't the first thing they said.
14     Q.   He was diagnosed with probable bursitis. Do
15  you recall reviewing that?
16     A.   Do I recall seeing that? Not necessarily, but
17  as I mentioned a while ago, those are -- Bursitis,
18  impingement syndrome and rotator cuff tendonitis are
19  synonymous terms.
20     Q.   And his initial treatment involved various
21  nonsteroidal anti-inflammatory drugs, correct?
22     A.   Right, yes.
23     Q.   Do you recall the first time Mr. Hemphill saw
24  Dr. Obaisi?

Page 63

1      A.   I mean I'm not going to be able to answer your
2   questions, counselor, about dates without looking if
3   they're not in here (indicating).
4      Q.   Doctor, I'm going to hand you a series of
5   documents Bates labeled IDOC 67 through 69. We're going
6   to mark these as Exhibit 3. Doctor, this is an Offender
7   Outpatient Progress Note, correct?
8      A.   Yes.
9      Q.   And it's dated April 19, 2013, correct?
10     A.   Yes.
11     Q.   And it is a medical -- It is an M.D. note,
12  correct?
13     A.   Well, yeah, yes, it is. It says M.D. note at
14  the top, right.
15     Q.   And this is from Dr. Davis, correct?
16     A.   Is that what the signature at the bottom says?
17     Q.   Do you believe it's the signature at the
18  bottom from Dr. Davis?
19     A.   Counsel, I was asking you. You asked me if I
20  think it's Dr. Davis, and I would only know if it was
21  either provided to me with records that were labeled
22  Dr. Davis, which I don't have here, or if I could read
23  the signature at the bottom, which I can't, so I was
24  asking you if you can help me out.

Page 64

1      Q.   Well, this is a medical note from a medical
2   doctor from April 19, 2013, correct?
3      A.   Yes.
4      Q.   And if you look in the top half of the
5   subjective/objective assessment column, it indicates
6   that the patient is presenting with shoulder pain,
7   correct?
8      A.   Yes.
9      Q.   And the objective portion indicates that he
10  was tender over his AC joint and there's pain, correct?
11     A.   Right.
12     Q.   And the doctor who conducted this examination
13  developed a treatment plan, correct?
14     A.   Yes.
15     Q.   And part of that treatment plan was describing
16  NSAIDs, correct?
17     A.   Yes.
18     Q.   Then this doctor also scheduled Mr. Hemphill
19  to see Dr. Obaisi on April 23rd for an injection,
20  correct?
21     A.   Well, that's what he wrote, but that wouldn't
22  be what would happen. What the doctor would be able to
23  do would be to schedule the patient for a consultation
24  with the other doctor. He wouldn't be scheduling him

16  (Pages 61 to 64)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 65

1   for an injection unless he were sending him to, for
2   example, a radiologist for guided injection but he
3   didn't. You know, it looks like he's suggesting that
4   but what he's scheduling is a consultation.
5       Q. Consultation with Dr. Obaisi for an injection
6   in the right AC joint?
7       A. No, sir. I think I just explained why that's
8   incorrect. You cannot schedule a patient to see another
9   medical doctor for a procedure, and I just gave you a
10  case where you could if you wanted to send them to an
11  imaging person to do something for you. But it is
12  inappropriate to schedule -- Maybe "inappropriate" is
13  not the right word. It is impossible to schedule a
14  patient to see another medical director for an
15  injection. He -- It says to schedule with Dr. -- I
16  don't even know who wrote that, but it says for
17  injections for the right AC, but that note is incorrect.
18  You cannot schedule -- You can't schedule a medical
19  doctor to do a procedure. Medical doctors have
20  independent judgment. So maybe the nurse or somebody
21  who wrote this and thought it was that or maybe if this
22  is Dr. Davis, you never really told me, but if it is
23  Dr. Davis or whoever it was, maybe they could sort of be
24  suggesting that the person do it or maybe he could have

---

Page 66

1   told the patient, I think you should have one, the
2   doctor can do it, but -- And I don't mean to be
3   splitting hairs but I think it's important, but you can
4   schedule the consultation but you can't really schedule
5   a procedure.
6       Q. So if you were in Dr. Obaisi's shoes and you
7   were scheduled to see him on October 23rd and you looked
8   back at this M.D. note that indicates schedule with
9   Dr. Prodromos for April 23rd for injection right AC
10  joint, how would you interpret that note?
11      A. Well, note, how would I interpret the
12  substance of the note? I would -- As I said, I would
13  interpret it that this other doctor -- who, by the way,
14  is subordinate in terms of the medical hierarchy there,
15  and is subordinate in terms of training. Because if
16  this is Dr. Davis, Dr. Davis is a primary care doctor,
17  Dr. Obaisi is the surgeon. So it would be as if a
18  primary care doctor -- If there was a note that says
19  scheduled to see Dr. Prodromos for an AC joint
20  injection, I would perform an evaluation and then carry
21  out treatment as I saw fit. I would think that if
22  indeed somebody scheduled this and said if Dr. Obaisi
23  looked on his schedule and saw a patient X referred
24  by -- Mr. Hemphill, sorry, referred by Dr. Davis for an

---

Page 67

1   injection, I would think that that was an inappropriate
2   listing of the appointment.
3       Q. Would you consider that the patient might need
4   the injection because of this note?
5       A. No.
6       Q. You would totally disregard this note?
7       A. No. I would view what the doctor said. For
8   example, this doctor said that the patient is tender
9   over the AC joint, right, so I would examine, I'm sure
10  Dr. Obaisi examined the AC joint. But I would take it
11  for what it's worth. Number one, the AC joint is pretty
12  difficult to palpate. It depends on the person. I
13  teach doctors how to do this and depending on who it is,
14  some of them can't even find the AC joint. And -- So
15  there are people that come in and are said to have a
16  tender AC joint and they don't because the prior doctor
17  didn't know how to find it. On the other hand, it could
18  be that the AC joint was tender then and isn't tender
19  now. So it would heighten my, you know, looking at it
20  to try to see but you have to take all that into
21  account.
22      Q. Okay. And, Doctor, Mr. Hemphill did not see
23  Dr. Obaisi on April 23rd, did he? Flip to the next
24  page.

---

Page 68

1       A. Correct.
2       Q. And the reason was because there was no
3   provider, correct?
4       A. Right.
5       Q. And he was rescheduled for April 28th,
6   correct?
7       A. Yes.
8       Q. Do you see a note here that says he was
9   scheduled -- he saw Dr. Obaisi on April 28th?
10      A. No.
11      Q. In fact, if we flip down, the time he actually
12  saw Dr. Obaisi was not until June 6th, 2013, correct?
13      A. Right.
14      Q. And in between there on Ap -- excuse me, on
15  May 31st, Mr. Hemphill saw another medical provider and
16  then complained of shoulder pain, correct?
17      A. Right.
18      Q. So it was more than six months -- excuse me,
19  six weeks after his first referral to Dr. Obaisi that he
20  actually saw Dr. Obaisi; is that correct?
21      A. Yes.
22      Q. And on June 6th, Dr. Obaisi indicates that
23  Mr. Hemphill has chronic pain in the right shoulder; is
24  that correct?

---

17 (Pages 65 to 68)

LEXITAS 312-236-6936

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 69

1    A.  Yes.
2    Q.  What does chronic pain mean?
3    A.  It's a matter of definition and it differs by
4   diagnosis and it differs among providers.  So depending
5   upon what the problem is, in a general way it would
6   usually mean a few months.
7    Q.  A few months of continuous pain?
8    A.  Well, you can have chronic continuous, you can
9   have chronic relapsing and remitting, but the presence
10  of pain for, you know, some significant period of time
11  during an interval, often it can be used, it can be
12  etiologically related to causation related, so you're a
13  little more likely to call it chronic.  So less likely
14  to be acute if you have an acute traumatic episode,
15  you'll be likely to call that acute as opposed to
16  something that kind of comes on its own.
17   Q.  And Dr. Obaisi did not give Mr. Hemphill an
18  injection on June 6th, did he?
19   A.  No.
20   Q.  And he indicates that Mr. Hemphill has range
21  of motion full but painful; is that correct?
22   A.  Yes.
23   Q.  If you --
24   A.  Oh, by the way --

---

Page 70

1    Q.  Go ahead, Doctor.
2    A.  -- just to be clear, he says -- the first word
3   before range of motion is abduction.  And I tell you
4   this because the range of motion of the shoulder, there
5   is different planes in which you can do the range of
6   motion, so abduction, which is straight out to the side,
7   tends to be -- it's a more sensitive sign.  It's -- You
8   can have less pathology and have more pain if it's
9   abduction, as opposed to the other thing that's in
10  contradistinction, too often forward flexion in front of
11  you.  So...
12   Q.  And Dr. Obaisi here, part of his plan is for
13  an X-ray of the right shoulder, correct?
14   A.  Yes.
15   Q.  And he says follow-up in one week, correct?
16   A.  Yes.
17   Q.  But Dr. Obaisi did not see Mr. Hemphill one
18  week later, did he?
19   A.  Well, let's see, one week -- No, he did not
20  see him on the 13th.
21   Q.  He saw him on June 26, correct?
22   A.  Right.
23   Q.  And Mr. Hemphill complained again on June 26th
24  of shoulder pain, correct?

---

Page 71

1    A.  Right.
2    Q.  And Mr. Hemphill complains that the Naprosyn
3   did not help, correct?
4    A.  Right.
5    Q.  And Dr. Obaisi prescribed Mobic; is that
6   correct?
7    A.  Yes.
8    Q.  Does this note indicate that Dr. Obaisi
9   scheduled a follow-up appointment for Mr. Hemphill?
10   A.  No.
11   Q.  Would it be difficult for Dr. Obaisi to
12  determine if the new Mobic medication was working
13  without a follow-up appointment?
14   A.  Well, you know, as I said a little while ago,
15  one can reasonably tell the patient, say, Look, I think
16  this is going to help, if it doesn't, let me know.
17  Particularly if it's not thought to be a serious
18  problem.
19   Q.  Doctor, in your report you indicate that "When
20  this was not sufficient to relieve Mr. Hemphill's
21  complaints of shoulder pain, Dr. Obaisi progressed to an
22  injection."  That's in the middle of the first paragraph
23  under opinion 1.  Do you see that portion of your
24  report?

---

Page 72

1    A.  Yes.
2    Q.  What would have been the determining factor
3   for Dr. Obaisi if Mr. Hemphill's treatment was not
4   sufficient?
5    A.  Well, you know, the main thing would be how
6   the patient felt; however, that would be tempered a
7   little by what the patient was doing.  His diagnosis is
8   heavily, predominantly dependent on how the arm was
9   used.  So I don't know exactly what he was thinking but
10  people -- The pills are not curative, so one can
11  progress to an injection if the pills haven't worked and
12  if the patient hasn't been engaging in activities that
13  might aggravate the shoulder.
14   Q.  And what injection are you referring to when
15  you indicate he progressed to a subacromial cortizoic --
16  corticosteroid injection?  Is that the injection that
17  was given on July 31st?
18   A.  You know, again, I don't have these dates
19  memorized, if you want to show me a note, I'll be happy
20  to tell you.
21   Q.  Well, it's in your report so I'm just trying
22  to determine, you know --
23   A.  Right, but I did not put --
24   Q.  -- when you write it in the report?

---

18 (Pages 69 to 72)

LEXITAS 312-236-6936

Electronically signed by Carrie Brown (101-369-569-5178)                                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 73

1    A.   Right, but I did not put exact dates in here.
2    As you know, as I mentioned before, I don't have this
3    record memorized, so if you like to show me the note
4    that's the subject of your query, I'll be happy to
5    answer your question, or I can look through records, I
6    suppose, and try to find it if you would prefer.
7    Q.   I'm just -- I am going to show you records,
8    I'm just trying to progress through your report.  So
9    just, you know, grammatically looking at this sentence,
10   it says that Dr. Obaisi progressed to a shoulder
11   acromial -- or subacromial injection, so I would presume
12   that you're referring to his first injection on July
13   31st.
14   A.   Well, again, you can certainly presume that it
15   was the first one because he progressed from pills to an
16   injection.  And as far as presuming the date, if you've
17   got the records in front of you and that was the first
18   one, then that's a good presumption too.  But as I said,
19   I don't -- I do not have the dates of every visit down
20   here nor do I have them memorized.
21   Q.   Doctor, I'm handing you documents that are
22   Bates labeled IDOC70, 73, 74 and 75, we're going to mark
23   it as Exhibit 4.  If you look at IDOC70, there's a
24   notation there from Dr. Obaisi dated July 31, 2013.

Page 74

1    Within that notation it indicates that Dr. Obaisi gave
2    an injection to the right shoulder; is that correct?
3    A.   Yes.
4    Q.   So does this document refresh your
5    recollection of the injection you were referring to in
6    your report?
7    A.   Yes.  So, counsel, this isn't a matter of
8    refreshing my recollection, I never had these things
9    memorized, but I'm happy to interpret the document for
10   you.  So does it -- So as far as the chronology, I
11   cannot speak to that, you have the records and I don't.
12   But this does confirm that this is a subacromial
13   injection; whether it's the first one or not, you would
14   have to tell me, I couldn't tell you unless you'd like
15   me to go through all the records.
16   Q.   Well, do you recall this being the first one?
17   A.   I -- Counselor --
18   MR. MARUNA:  Objection, asked and answered.
19   BY THE WITNESS:
20   A.   -- I went through hundreds of pages of
21   records, I don't recall dates of them.  I did not think
22   and do not think that, you know, memorizing dates of
23   these things matters, and I look at a lot of records, so
24   I don't -- You know, I don't -- My memory is not

Page 75

1    refreshed by looking at writing on a piece of paper.  I
2    see, you know, better than a hundred patients a week and
3    I'm looking at records all day long, so I can -- I can
4    tell you that this does look like a subacromial space
5    injection but I don't have a memory that lasted in my
6    brain very long of the date of this to be refreshed.
7    Q.   Okay.  In your report you indicate "The
8    patient by his own admission improved following this
9    injection for six months, such that he requested more
10   injections."  Do you see that portion of your report,
11   Doctor?
12   A.   Yes.
13   Q.   So are you -- Is this the injection you're
14   referring to in your report that provided -- it helped
15   Mr. Hemphill improve for six months?
16   A.   So I just got through telling you that I don't
17   have dates, so if this is the first one, then probably
18   it is.  This is July 31st.  You know, if we had one in
19   May, then that would have been it.  I can't answer that
20   for you.  I tried to explain this.  If that's the first
21   one, then yes.
22       So my -- my bill would have been three times
23   bigger if I'd gone through this and documented
24   everything with dates, right?

Page 76

1    Q.   I'm just trying to stay consistent with your
2    report, Doctor.
3        So if you flip to IDOC73 please, the first
4    note there is dated August 31, 2013, correct?
5    A.   Yes.
6    Q.   And within this note Mr. Hemphill complains of
7    shoulder pain, correct?
8    A.   Well, let me ask you:  Under S... NC, no
9    complaints?  I'm not sure.
10   Q.   Well --
11   A.   So --
12   MR. MARUNA:  Hold on, the doctor is answering.
13   BY THE WITNESS:
14   A.   So I -- So all I'm really saying is he
15   certainly had pain during some part of the exam, it's
16   not clear to me whether it was pain at rest or pain with
17   motion, that's all, because I can't read the objective.
18   But, yeah, he had some pain, either at rest or with
19   motion during the exam.
20   Q.   And, Doctor, if you just progress down that
21   same page to September 9, 2013, there's an RN note
22   indicating for Mr. Hemphill that he needs to see the
23   medical director, "I have to have my steroid injection,"
24   do you see that?

19  (Pages 73 to 76)

LEXITAS 312-236-6936

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 77

1      A.  Yes.
2      Q.  And there is pain complained of in his right
3   shoulder during this examination, correct?
4      A.  Yes, but, but -- Can I say again here?
5      Q.  Of course, Doctor.
6      A.  This is very interesting.  Pain is a
7   subjective complaint.  In both of these notes, 8/31 and
8   9/9, pain is listed under O, right, which is objective.
9   So in general you don't put pain under the objective,
10   unless it's pain in response to some maneuver.  Do you
11   know what I mean?
12      Q.  Understood.  So he did suffer pain in his
13   right shoulder on both of these dates, correct?
14      MR. MARUNA:  Objection, form, "suffer."
15   BY THE WITNESS:
16      A.  Yes.
17      Q.  Doctor, if you please flip to IDOC74, which is
18   the next page, there's another entry for September 11,
19   2013, and within there there's also a notation, "Pain in
20   right shoulder," correct?
21      A.  Right.
22      Q.  And if we continue down that page to October
23   22, 2013, there's also a note there that Mr. Hemphill
24   has pain in his right shoulder, correct?

Page 78

1      MR. MARUNA:  Objection, foundation, as to the
2   brand.  Over the objection, Doctor...
3   BY THE WITNESS:
4      A.  Yeah, that's interesting too because the prior
5   one that you reference, the September 11th one, the pain
6   is, again, in the objective, but on 10/22, it says -- it
7   looks like it's in the subjective, although they don't
8   have an S, but it says right shoulder pain...
9      Q.  So, Doctor --
10      MR. MARUNA:  Hold on, he's still answering.
11      MR. McCLAIN:  He was not answering.
12      THE WITNESS:  Yeah, I was.  Sorry.  Sorry, I'll try
13   to talk faster.
14   BY THE WITNESS:
15      A.  It says right shoulder pain came back.  Just
16   to point out, apparently he had a pain-free interval.
17      Q.  Okay.  But as we just went through, he had
18   pain on August 31st, September 9th, September 11th,
19   correct?
20      A.  Yeah.
21      Q.  Okay.  So, Doctor, going back to your report
22   where it indicates that the injection helped
23   Mr. Hemphill for six months, that really wouldn't be an
24   accurate statement, would it?

Page 79

1      A.  Yeah, so it looks like it should have been
2   more like three months.
3      Q.  Three months?
4      A.  I don't know, in July --
5      Q.  He was given the injection on July 31st and he
6   next had pain on August 31 so it would be about a month.
7      A.  Well, I've already told you, all of these
8   pains that are objective, I -- unless this person
9   doesn't know how to write a note, I think it's an RN,
10   these are pains that when you move the shoulder around
11   you get pain.  All right.  If you do that to my
12   shoulder, it hurts, okay?  And he doesn't write until
13   10/23 that his pain came back.  And I don't even know if
14   then what the context of it is.
15      Q.  And you can't tell from this note --
16      A.  Well, I can tell that the other three don't
17   look like it's pain at rest, which is what we're usually
18   talking about, right?  So it's objective, objective,
19   objective every time, it's not mentioned in subjective.
20   So that -- You know, maybe the writer doesn't know what
21   they're doing, but if there were rest pain, it should
22   not be in the objective.  And then 10/22, sort of
23   conspicuously it looks like it did, and then the other
24   thing that isn't down there is there's helped.  Okay, so

Page 80

1   helped, which is what...  Hold on a second.  See,
2   there's mitigation of pain and there's elimination of
3   pain, and so, you know, there isn't enough here to
4   know -- You don't really expect it to be eliminated, you
5   know?  You expect it to be mitigated.  So with what he's
6   got, the pain, unless you're doing offending activities,
7   it just shouldn't come back, and I can't speak for
8   Dr. Obaisi but I can speak for myself and for any good
9   practitioner if you think that a patient's pain is
10   coming back because in this case they're using it more
11   than they should, you'd maybe be a little less likely to
12   go ahead with another injection.
13      Having said all that, I think that three
14   months instead of six months, you know, maybe it's more
15   appropriate, maybe I should have written three instead
16   of six.
17      Q.  Doctor, if you were treating Mr. Hemphill say
18   on November 1, 2013, and you were going back to look at
19   his medical history, would you want more detail in these
20   notes so you could determine proper course of action?
21      MR. MARUNA:  Objection, foundation, calls for --
22   BY THE WITNESS:
23      A.  November 21st.
24      MR. MARUNA:  -- speculation.  Over the objection,

20  (Pages 77 to 80)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 81

1  Doctor...
2  BY THE WITNESS:
3      A.  So I'm not -- So we were just talking about...
4  We were talking about October 22nd...
5      Q.  Right.  And if you were to view these notes
6  treating Mr. Hemphill on say November 1st, 2013, which
7  is about a week after the last note, would you want more
8  complete notes to be able to provide proper care to
9  Mr. Hemphill?
10     MR. MARUNA:  Foundation, form, speculation, assumes
11 facts not in evidence, incomplete hypothetical.  Over
12 the objections...
13 BY THE WITNESS:
14     A.  Sorry.  So you're talking about a hypothetical
15 provider who saw the patient on November 1st?
16     Q.  Yes.  And yourself, you would be that
17 hypothetical provider.
18     A.  I would want to take a good history when I saw
19 the patient on that day.  If you're asking does the
20 parsimony of the notes or are the notes unduly
21 parsimonious, not really.  I mean I think the notes are
22 pretty clear.
23     Q.  Well, you indicated you couldn't really
24 determine why the pain was labeled in the objective

Page 82

1  portion of several of the notes.
2      A.  No, I determined that it was labeled that way
3  because he wasn't having pain at rest.
4      Q.  So is your assumption that the viewing medical
5  provider was manipulating his shoulder somehow to cause
6  that pain; is that correct?
7      A.  Yeah.  As they should have.
8      Q.  So, Doctor, at this point on October 22, 2013,
9  Mr. Hemphill has received NSAID treatments for over
10 seven months and one steroid injection, and he's
11 continued to complain of pain during the seven months,
12 would this raise a condition in a reasonable doctor's
13 mind that the course of treatment wasn't working?
14     A.  Well, it depends how you define treatment.  It
15 would raise a reasonable doubt in my mind that the
16 patient was doing something to aggravate the problem.
17 Because unless I thought clinically the patient had a
18 full thickness rotator cuff tear, which I would not
19 have, and which they did not and which was also
20 certainly proven to be the case, then I would conclude
21 that the patient's recurrent pain was based on how the
22 patient was using the shoulder, and that's true in just
23 about every case.
24     Q.  Was there any indication in the notes that you

Page 83

1  reviewed that to this seven-month period Mr. Hemphill
2  was doing something to aggravate the pain?
3      A.  It wouldn't matter what was in the notes, and
4  it wouldn't really matter what the patient said.  What
5  would matter is what I know about the pathology, and
6  rotator cuff tendinitis, even mild partial tears, simply
7  don't hurt, ever, unless you're doing offending
8  activities.  And, in fact -- We're good, sorry.
9      MR. MARUNA:  No, no.  I want you --
10 BY MR. McCLAIN:
11     Q.  Continue your answer, Doctor.
12     A.  All right.  And, in fact, jump ahead, these
13 doctors I think bend over backwards maybe to a fault to
14 try to get him out of his pain in a way that I wouldn't
15 have, because, you know, corticosteroid injections are
16 kind of more advanced form of treatment, but they're not
17 without their own risks, same with the drugs.  And the
18 treatment for this problem is -- And it is probably the
19 commonest problem that I treat and have been treating
20 for 30 years, it is always, always caused by how you use
21 the shoulder.  And when it hurts after treatment, it
22 gets it to quiet down, it is always because the
23 shoulder's being used in a way that it doesn't tolerate.
24 And usual disconnect is with someone who say is an

Page 84

1  electrician and they have to lift their arms over their
2  head and it hurts, and say, you know, if you're doing
3  it, it's going to hurt, there's really nothing I can do
4  about it.  So I would conclude -- and this is nothing
5  against Mr. Hemphill, you know, but that -- that --
6  so -- What can I say?  They were really trying to help,
7  that's why I wrote compassion in here, because they're
8  giving him drugs and they're giving him shots and
9  they're really trying to help the guy, but -- So when
10 you say not working, I don't know, I think it did work,
11 I think -- I think it quieted down his pain and then I
12 think the rest was up to him.
13     Q.  So to this point in October 2013 you think the
14 treatment was working properly?
15     MR. MARUNA:  Objection, form of the question,
16 "properly."  Over that...
17 BY THE WITNESS:
18     A.  I think the treatment worked as expected.
19     Q.  And what was the expectation for this
20 treatment?
21     A.  Corticosteroid injections, drugs will quiet
22 pain, corticosteroid injections will quiet pain for a
23 limited period of time.  And if a person persists in
24 activities that aggravate the affected part, it comes

21 (Pages 81 to 84)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 85

1   back.  And actually three months is kind of a reasonable
2   time frame for that.
3       Q.  But he suffered pain a month later, correct?
4       A.  No.  As best I can tell, he suffered pain
5   presumably through a provocative part of the exam, which
6   was objective.  So if I see a shoulder patient a month
7   later, I say how are you feeling and they answer.  And
8   had he answered that he was having pain, it should have
9   been put down in the note, in the subjective note, and
10  it was not.  And then I'll take their arm and I'll lift
11  it up and I'll move it back and forth, and then, you
12  know, you'll just want to see how slow they are.  That's
13  called a Hawkins test.  It has various names.  And then
14  generally they'll say they hurt and they'll make a note
15  of it, and I think that's what was going on here.
16      Q.  But that's not listed in the medical notes, is
17  it?
18      A.  Well --
19      MR. MARUNA:  Objection, foundation.
20  BY THE WITNESS:
21      A.  I mean it's in the objective part of it, so
22  presumably they did something or they shouldn't have
23  been putting it there.  And by virtue of the fact that
24  it was three notes, I think, where it's in the objective

Page 86

1   and then one is in the subjective, and when it's in the
2   subjective is when the patient says that the pain came
3   back.  The fact that he said it came back kind of
4   implies that it was gone.  And the fact that in the
5   subjective part of their notes they don't list it
6   implies that it was gone.  And the fact that it was in
7   the objective indicates that it -- I mean could it have
8   been flushed out more, could they have said pain with
9   the Hawkins test?  I suppose, but...
10      Q.  Doctor, on September 9th, 2013, going back to
11  IDOC73, in the subjective portion it says, "Nurse, I
12  need to see medical doctor, I have to have my steroid
13  injection."  If the steroid injection from July 31st was
14  working, why would Mr. Hemphill want to get another
15  steroid injection?
16      A.  Well, I don't know this for sure but maybe he
17  was lifting weights and had pain.  And by the way,
18  patients all the time have expectations, they not only
19  want us to make them feel better, they want us to make
20  them feel better without -- And I understand how
21  patients feel, I do, but they want us to make them feel
22  better without their having to make compromises to their
23  activity.
24      Q.  So based on this note, it would indicate that

Page 87

1   he is, in fact, in pain on September 9th because he's
2   asking for another steroid injection?
3       MR. MARUNA:  Objection, foundation.  Over the
4   objection, Doctor...
5   BY THE WITNESS:
6       A.  So putting all these together, I try to answer
7   the best I could, that if he got better, which I think
8   he did from the steroid injection for a few months which
9   is what they usually do, but if he went out and lifted
10  weights or did things with overhead activities and had
11  pain, then a patient will often say, "Well, yeah, it
12  feels better but when I do this, which I really like
13  doing, it hurts; Doctor, help me," and so...  But, you
14  know, at that point you have choices to make.
15      Q.  But there was nothing in the notes that
16  indicated that's actually, in fact, what happened, that
17  Mr. Hemphill was going out and lifting weights?
18      A.  No, but putting it in the context of the other
19  notes when there was no subjective pain reported and
20  when there apparently was pain with maneuver of it, that
21  would be the conclusions that I would draw based on the
22  totality of that interval of time and plus, plus based
23  on the disease.  Actually corticosteroid injections
24  usually aren't even necessary.  They seem to be very

Page 88

1   responsive to him.  They gave him one drug, they gave
2   him another drug, they gave him an injection.  That's
3   quicker than probably I would have been, and I think
4   it's because they were really trying to help him.
5       Q.  Doctor, do you know when the second steroid
6   injection that Mr. Hemphill received was?
7       A.  No.
8       Q.  Doctor, I'm going to hand you what's going to
9   be Exhibit 5, it's Bates labeled HEM27 through 29.
10  Doctor, if you look at the first page there, it's HEM27,
11  the note indicates -- and this is from Carl Hemphill --
12  "I received a cortisone shot on October 30, 2013;" is
13  that correct?
14      A.  Yes.
15      Q.  And the date of this Offender Sick
16  Call/Medical Services Request is December 30, 2013,
17  correct?
18      A.  Yes.
19      Q.  And Mr. Hemphill is requesting to have another
20  cortisone shot, correct?
21      A.  Well, I don't know.  I have to read this.
22      MR. MARUNA:  Let the doctor read it, yeah.
23  BY THE WITNESS:
24      A.  I'm sorry, "I received a cortisone shot on

22  (Pages 85 to 88)

Electronically signed by Carrie Brown (101-369-569-5178)          4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 89

1    October 30th and" -- What kind of shot? What's the next
2    word, do you know? Something shot. I don't know. Oh,
3    "And the shot only lasted for 60 days and" -- Wow.
4    "And" something -- Oh, "and December 30th," is that what
5    it says, "2013?" I don't know. "Makes" -- Counsel,
6    feel free to help me out.
7        Q. Sure.
8        A. "Makes that" --
9        Q. "Makes that" --
10       A. You've probably gone over this, maybe you can
11   help me interpret this, I'm having a little trouble
12   reading this writing.
13       Q. "I'm asking to be scheduled for a cortisone
14   shot by medical director S. Obaisi."
15       A. And --
16       Q. "I'm" --
17       A. Go ahead. Apparently he's sent out for --
18       Q. -- "sent out for an MRI on my right shoulder.
19   My right shoulder feels like it's on fire and my
20   shoulder goes numb when I'm sleeping, writing, etc.,
21   etc. I need an MRI real bad on my right shoulder."
22       A. Got it.
23       Q. So this note indicates that Mr. Hemphill
24   received a cortisone shot on October 30, 2013, correct?

Page 90

1        A. Yes.
2        Q. And on December 30, 2013, he's complaining
3    that his shoulder is on fire, correct?
4        A. Right.
5        Q. And he asks to have an MRI, correct?
6        A. Right.
7        Q. If you...
8        A. Excuse me. Do you want some coffee?
9             (A short break was had.)
10   BY MR. McCLAIN:
11       Q. Doctor, can you please flip to the next page,
12   the Bates label is HEM28?
13       MR. MARUNA: In Exhibit 5.
14       THE WITNESS: Are you done with this (indicating)?
15       MR. MARUNA: Yep.
16   BY MR. McCLAIN:
17       Q. Oh, this is your copy (indicating).
18       A. Thanks.
19       Q. Doctor, this is an Offender Sick Call/Medical
20   Services Request dated January 21, 2014, correct?
21       A. Yes.
22       Q. And it's from inmate Carl Hemphill, correct?
23       A. Yeah, yes.
24       Q. And within this request Mr. Hemphill indicates

Page 91

1    "I'm putting a" -- "I'm putting in a new pass for a
2    cortisone shot on December 30th. Medical Director
3    Obaisi informed me to ask to be rescheduled for another
4    cortisone shot in my right shoulder." Is that correct?
5        MR. MARUNA: Correct that that's what the document
6    says, counsel, or that the fact itself is correct?
7    BY THE WITNESS:
8        A. "About right shoulder, has been in pain since
9    the cortisone shot stopped working"... I -- What's
10   the... The second line, second line, I lost you. After
11   "stopping working" in the middle of the second line, can
12   you help me out at the end like you were doing, counsel?
13   That was very helpful. I just can't read that. I can't
14   read the end of the second line, maybe you can.
15       Q. Oh. "Informed me to ask to be rescheduled for
16   another cortisone shot."
17       A. "This will be third request" -- "This is my
18   third request for my right shoulder" --
19       COURT REPORTER: Wait, wait. Slow down when you
20   read.
21       MR. MARUNA: Yeah, slow down.
22   BY MR. McCLAIN:
23       Q. Doctor, maybe read it to yourself so the court
24   reporter doesn't have to type.

Page 92

1        A. Well, I have to read it to you so you can
2    follow me, anything that I type. All right, I'll --
3    Anything that I say. Okay, I'll go slow. "This will be
4    my third request about my right shoulder. It's been in
5    pain since the cortisone shot stopped working."
6    Counsel, that's where I can't read it too well. Can you
7    help me? That's at the end of the second line under
8    "Briefly state your request," after "Stopped working."
9    Do you see what that says?
10   BY MR. McCLAIN:
11       Q. Doctor, you're looking at HEM29.
12       MR. MARUNA: We're on 28, Doctor.
13   BY MR. McCLAIN:
14       Q. We're on 28, if you flip that over.
15       A. Sorry, that's the problem.
16       Q. They're double-sided.
17       A. Got it. Okay, I see. Okay. So let's see.
18   So, Miss Court Reporter, I'm going to read out loud.
19   I'll try to go slow and I'll see if I can follow this.
20       "I'm putting in a new pass for cortisone
21   shot," something, "a medical slip on December 30th.
22   Medical Director Obaisi informed me to ask to be
23   rescheduled for a -- another newer" something "cortisone
24   shot in my right shoulder. Also, I'm still requesting

23  (Pages 89 to 92)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 93

1　to have a MRI on my right shoulder. It's been almost
2　one month since my last medical services request."
3　Okay.
4　　　Q.　So within this request Mr. Hemphill is
5　indicating that he wants another cortisone shot,
6　correct?
7　　　A.　Yes.
8　　　Q.　And that he wants an MRI, correct?
9　　　A.　Correct.
10　　　Q.　And, Doctor, if you flip to HEM29, this is an
11　Offender Sick Call/Medical Services Request dated
12　January 31, 2014, correct?
13　　　A.　Yes.
14　　　Q.　And this is also made by Mr. Hemphill,
15　correct?
16　　　A.　Yes.
17　　　Q.　And within this request Mr. Hemphill's
18　requesting a cortisone shot, correct?
19　　　A.　I'm not seeing that. So I'm going to start
20　reading this again, okay, and maybe you can help me,
21　counselor. "This will be my third request about my
22　right shoulder. It's been in pain since the cortisone
23　shot stopped working," something... "June," what does
24　it say?

---

Page 94

1　　　Q.　"I've put in two cortisone" -- or "two other
2　slips since December 30, 2013, and January 21, 2014, and
3　haven't received any response to my call for some
4　medical. My right shoulder"...
5　　　A.　"Feels like it's on fire. I still would like
6　to have a MRI done of my right shoulder."
7　　　Q.　Correct. So on January 31, 2014, Mr. Hemphill
8　complained of --
9　　　A.　Right.
10　　　Q.　-- right shoulder pain?
11　　　A.　Right.
12　　　Q.　So at this point he, Mr. Hemphill, has been
13　complaining of shoulder pain for about a year, correct?
14　His first complaint was in February 2013.
15　　　A.　Right.
16　　　Q.　And during this approximate one year period
17　he'd been given treatment with NSAIDs and two cortisone
18　injections, correct?
19　　　A.　Right.
20　　　Q.　Would a reasonable doctor conclude that after
21　one year of treatment with no improvement in the pain
22　the treatment plan was not working?
23　　　MR. MARUNA: Objection, foundation,
24　mischaracterizes his prior testimony. Over the

---

Page 95

1　objection...
2　BY THE WITNESS:
3　　　A.　I think a reasonable doctor would conclude
4　that he's been appropriately treated, he responded to
5　the subacromial injections which indicates that that's
6　where the problem was. So the pathology has been
7　identified, he was treated appropriately with basically
8　everything that you can do. So I think it worked. One
9　can only conclude, and I would conclude from this, that
10　there is simply a disconnect between what the patient is
11　asking the shoulder to do and what the shoulder will
12　tolerate. And the only answer for that is to down
13　regulate your activities to what the shoulder will
14　tolerate, which I would conclude irrespective of what
15　the patient told me, and it has nothing to do with him
16　being an inmate, by the way. I'm in the situation in my
17　office with noninmates that -- that the patient was
18　simply doing things that the shoulder didn't tolerate
19　and the only way to remedy that is to stop doing them
20　and then the pain has to go away.
21　　　Q.　Is that always the case, Doctor, that --
22　　　A.　It's always the case.
23　　　Q.　-- pain always goes away?
24　　　A.　Always the case. Let me say it again, always

---

Page 96

1　the case. Physical structures do not hurt if they're
2　not stressed. If you have a tumor, it will hurt through
3　that. If you have an infection, it will hurt at rest.
4　Okay? If you have a pinched nerve, it will hurt through
5　rest. But he's only demonstrated by the fact that he
6　responded to the treatment that was given that he
7　doesn't have those problems, that he has impingement or
8　rotator cuff tendinitis or bursitis. It is a physical
9　structure, it's a tendon. Those structures simply do
10　not hurt ever. Did I say ever? Ever. Unless they're
11　stressed. If you don't stress them, they don't hurt.
12　Period.
13　　　Q.　Was Mr. Hemphill's pain reoccurring at this
14　point?
15　　　A.　Yes.
16　　　Q.　And is reoccurrence of pain an indication that
17　treatment was not effective?
18　　　A.　No. Treatment was effective. It's
19　indicative, as I just got through saying but I'll say it
20　again, that he was placing demands on the shoulder that
21　exceeded the shoulder's capacity to execute them. And
22　patients often don't want to accept this, and I
23　understand it, I do. They want to do things and their
24　body won't let them and it's our job to say you have to

---

24 (Pages 93 to 96)

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 97

1  not do things that hurt. And if you do that, I promise
2  you will not have pain, ever. There is no other
3  conclusion. And, in fact, you can get down a very
4  slippery slope because if a patient is saying, "Doctor,
5  treat me, treat me, treat me," I mean that's kind of
6  what's behind the opioid epidemic, isn't it? Is that
7  doctors want to help their patients and they kind of
8  give in and give them drugs that they shouldn't, or they
9  give them shots that they shouldn't or they give them
10  surgery that they shouldn't. And there comes a point
11  when you have to say to the patient this is what you
12  have, the treatment has helped you, you will not have
13  pain if you keep your elbows down, what you usually have
14  to do. I tell people this all day long, every day.
15  Okay? Your pain will go away and it does, but not all
16  patients are willing to accept that. And I know a case
17  like that, there's really nothing else you can do. And if
18  you persist in treating people and get pushed into
19  overtreating, you can hurt people with the treatment.
20       Q. So, Doctor, what facts are you relying on to
21  conclude that the treatment was effective?
22       A. The fact that he got relief from the
23  subacromial injections.
24       Q. And when did he get that relief?

Page 98

1       A. Well, we just looked at these records. He had
2  the one and he got better and then he said the pain came
3  back. It can't come back if it didn't go away to begin
4  with. And he said multiple times that it came back.
5  And it was a couple of months, that's what they do.
6  They quiet for, you know, a few months and then it comes
7  back.
8       Q. The records indicate that it was about a
9  month.
10       A. Fine. Even if it was a week, it shows that
11  you're in the right -- First of all, there's nothing
12  else really that this can be, and it's proven to be than
13  what it is, right, you know? The only other thing it
14  could have been, except these doctors were very astute,
15  it could have been a full thickness rotator cuff tear,
16  and that would require surgery and that can hurt at
17  night and at rest. But they deduced in the clinical
18  exam that it wasn't and it wasn't proven surgically to
19  not be. But except for that, it isn't anything else, it
20  can't be anything else. And when you have physical
21  structures like that, they just do not hurt, cannot hurt
22  unless you stress them. It's kind of the nature of the
23  beast.
24       Q. So you're assuming that Mr. Hemphill was

Page 99

1  engaging in an activity that was continuing to stress
2  his shoulder --
3       A. Yes.
4       Q. -- is that correct?
5       A. Yes. Nothing against Mr. Hemphill, a lot of
6  my patients do it too.
7       Q. Doctor, how long do you expect a cortisone
8  shot to be effective in relieving the pain?
9       A. Six weeks to a few months, something like
10  that, although the more you do the less effective they
11  tend to be.
12       Q. You mean the more you give -- The more times
13  you give an injection, the less effective it becomes?
14       A. Yes.
15       Q. Doctor, you briefly touched on this but in
16  your report you indicated Dr. Obaisi showed compassion
17  for Mr. Hemphill issuing a front cuff permit and a low
18  bunk permit. What do you mean by issuing -- showing
19  compassion?
20       A. Well, I think part of the tenor of this is
21  that the medical providers were callous and were not
22  attentive to the complaints of the patient, and it seems
23  to me they did everything pretty much they could do.
24  You know, they were doing these things so he wouldn't

Page 100

1  have to use his arm so much, and they were giving him
2  shots and they were giving him pills, so that to me is
3  indicating that they were very compassionate, maybe to a
4  fault, you know, maybe worried so much about him, like
5  with all the shots, that they just kept really trying to
6  help him when at some point they should have maybe
7  said -- taken a little harder line stand. But while
8  they're being compassionate, it looks as though they're
9  being characterized as being callous, so that's why I
10  said that.
11       Q. When you indicate they're doing these things
12  so he wouldn't have to use his arms, are you referring
13  to the front cuff permit and the low bunk permit?
14       A. Right. Yeah, because if you -- When you bring
15  your arms behind -- Remember I said before, if your
16  arm's in front of you, it hurts less then if it's out to
17  the side or behind you. So if he was cuffed behind him,
18  it would hurt more. And then the bunk -- Actually I
19  don't think climbing up to the bunk would have been all
20  that bad, but it might have bothered him some to lift
21  his arms to climb, you know, so -- I don't know exactly
22  what they can do in prison, but those two acts seem to
23  me to have been acts of trying to help him.
24       Q. And you testified before that you've never

25 (Pages 97 to 100)

Electronically signed by Carrie Brown (101-369-569-5178)                4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 101

1    worked in a prison or a correctional facility so you're
2    not familiar with the daily activities of an inmate,
3    correct?
4        A.  That's right.
5        Q.  Do you think the lower bunk permit and front
6    cuff permit were medically necessary?
7        A.  Necessary?  I think they were -- They appear
8    to be things that the medical staff was trying to do to
9    make the patient more comfortable.
10       Q.  If you were treating this patient, would you
11   have issued front cuff permits and low bunk permits?
12       MR. MARUNA:  Foundation.  Over the objection,
13   Doctor, if you can answer that.
14   BY THE WITNESS:
15       A.  So, you know, I'm not in the prison -- As I
16   said, I don't -- As best I understand this, and maybe I
17   don't understand it right, so if I'm making a mistake,
18   forgive me.  But my interpretation of this is that
19   cuffed in the front as opposed to cuff in the back, so,
20   yeah, that seems like an appropriate thing to do unless
21   there was some other reason not to do it.  Maybe it's a
22   security risk to do it or something, I don't know, I'm
23   not there.  But as best I can tell, I think so.  And the
24   climbing of the bunk, I don't know.  Generally climbing

Page 102

1    up to things doesn't hurt the shoulder so much as
2    pushing them.  But, yeah, it seems like it was probably
3    a harmless thing to do and I'm just inferring that the
4    patient -- So from what little I know, it looks to me
5    like it's something that he wanted and they did it to
6    try to make him comfortable.
7        Q.  Doctor, I'm handing you what's going to be
8    Exhibit 6, it's IDOC83.  And, Doctor, this is an
9    Offender Outpatient Progress Note dated May 1, 2014,
10   correct?
11       A.  Right.
12       Q.  What does the O portion of this note indicate?
13       A.  Right shoulder abduct...  Something.  Do you
14   know what that last word is?
15       Q.  Movement?
16       A.  Right shoulder abduct movement...  Hmm.  Let
17   me read the first part and maybe that will help me with
18   the last part.
19       Q.  Take your time.
20       A.  "After steroid injection"...  See, and he says
21   here too, and you asked me before how do I know that it
22   went away, this should be the patient's words.  He says
23   "After steroid injection last October, right shoulder
24   pain resolved.  Asked for injection today because pain

Page 103

1    started to come back last few weeks."  Oh, "Right
2    shoulder abduct"...  I don't know.  I'm not sure what
3    they're saying, but -- I don't know.  I can't read it.
4    Probably they're saying that when they did it, it hurt
5    but I can't read it.
6        Q.  Doctor, does it look like "Right shoulder
7    abduct movement"?
8        A.  No.  Maybe it is, but I see a dot before the
9    last thing and there's no -- like over an "I," I don't
10   know.  It could be.  Maybe you're better at this.  It
11   doesn't look like it to me but maybe it is.
12       Q.  So you wouldn't be able to tell what sort of
13   examination they performed on Mr. Hemphill on this date,
14   right, because you can't read the note?
15       A.  Well, they abducted his shoulder, so right
16   shoulder abduction something.
17       Q.  Do you know from this note whether the
18   movement was normal or limited?
19       A.  Pretty much.  So they said right shoulder
20   impingement syndrome, so impingement syndrome or
21   tendinitis or bursitis, as I mentioned, they're
22   synonymous, do not result in limited motion.  So if
23   there had been limited motion, which you can get for
24   example with a frozen shoulder, then the diagnosis ought

Page 104

1    not to have been impingement syndrome.  So I'm assuming
2    he had good motion and pain with abduction somehow.
3        Q.  But it's not listed in this report whether it
4    was normal or limited, correct?
5        A.  The range of motion?
6        Q.  The abduction movement, whether that was
7    limited or normal?
8        MR. MARUNA:  Objection, foundation.  It says
9    "movement," but over the objection, Doctor, you can
10   answer.
11   BY THE WITNESS:
12       A.  So one puts positive findings in notes.  So if
13   he had -- So I assume it was normal because if he had a
14   decreased range -- So abduction is often a test, or
15   at least in some people's -- stands for impingement.
16   The thought is if the arm goes sideways, which is
17   abduction, that you jam the acromion into the tendon,
18   which is part of what people who believe in impingement
19   think happens.  So if he had a decreased range of
20   motion, he would have put ROM, decreased range of
21   motion, and he didn't.
22       So I -- And since all these other notes they
23   were saying -- I don't know, so -- So I assume that he
24   had pain with abduction, although I can't read that last

26  (Pages 101 to 104)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

| Page 105 | Page 107 |
|---|---|

**Page 105**

1   word, and I assume he did not have a limited range of

2   motion, because if he did, that would have been a

3   pertinent finding and there really aren't that many

4   findings in impingement syndrome to begin with. So if

5   it were there, you would have put ROM decreased, and --

6   and, furthermore, you would have modified the diagnosis

7   too, I think, so I -- I mean I think the motion was

8   probably okay.

9      Q.   Doctor, you just in your testimony indicated

10   people who believe in impingement, what do you mean by

11   that?

12      A.   The doctor who created this was a very famous,

13   very smart doctor, Charles Neer, he was chairman of

14   Columbia back in the '60s and '70s. He had apotheosized

15   that the supraspinatus tendon gets damaged, because

16   everybody knows that it does, it's really, really

17   common, that it gets damaged because the acromion, this

18   bone in the side of the shoulder, impinges on the tendon

19   and causes damage to it. So this was a thought -- This

20   was a theory that was popular, he was an influential

21   guy, and it's spawned people shaving down the acromion,

22   and then there were studies all through the '90s seeming

23   to indicate that if the acromion had a certain shape,

24   you got rotator cuff problems. But then when these

**Page 106**

1   studies were repeated, that connection pretty much went

2   away and people kind of stopped doing acromioplasties,

3   the acromion having been thought to be the impinging

4   entity, pretty much stopped doing them to the point

5   where insurance companies don't really pay for them, and

6   furthermore, there were other facts like, for example,

7   the rotator cuff almost always tears from underneath

8   where the acromion is on top. So it was not a real

9   consistent theory to begin with, and it had its apex

10   late '80s, actually when I was training it was pretty

11   popular, and then in the '90s and then people kind of

12   got away from it. Having said that, there are people

13   out there that who still, you know, shave acromions.

14   It's not -- It's not -- It's not exactly known for sure,

15   I don't think it is, what causes the problem. I think

16   most people don't think it is anymore but some people

17   do, so that's why I said for those who believe in it.

18      Q.   Do you believe in it, Doctor?

19      A.   No.

20      Q.   So you don't believe in shoulder impingement

21   syndrome?

22      A.   I don't believe -- I don't believe that

23   acromial impingement, which is what shoulder impingement

24   is short for, you say impingement syndrome, what that

**Page 107**

1   bespeaks is a condition in which the acromion pushes on

2   the rotator cuff and impinges on or pinches it over this

3   thing called the greater tuberosity and causes damage to

4   the tendon. I don't think that's how it occurs. I mean

5   I'm not a hundred percent sure that I'm right about

6   that, but I don't think that that's how it occurs. And

7   I would say at this point in time most shoulder

8   specialists like me don't think that that's how it

9   occurs, but some do, it's just not totally subtle. But

10   I recognize the terminology, and when I see impingement

11   syndrome or I see bursitis or I see rotator cuff

12   tendinitis, I know what people are talking about, the

13   clinical syndrome where you have pain that comes from

14   the rotator cuff, that much is clear.

15      Q.   And so what do you believe is the cause then?

16      A.   I believe that the -- So the rotator cuff

17   is -- Tendons are cables and they're loaded in tension,

18   and any cable that's loaded in tension over time will

19   fray, whether it's an elevator cable or a fan belt on

20   your car. And as you get older, the blood supply gets a

21   little worse, tendons have a bad blood supply anyway, so

22   I believe it is strictly a cable that's failing in

23   tension.

24      Q.   Doctor, I'm handing you Exhibit 7, IDOC95 and

**Page 108**

1   IDOC223. Doctor, this is another Offender Outpatient

2   Progress Note, correct?

3      A.   Yes.

4      Q.   And it's dated November 21st -- excuse me,

5   November 12, 2014, correct?

6      A.   Right, yes.

7      Q.   And in the first half of the note it indicates

8   "Pain right shoulder no better times two years." Do you

9   see that?

10      A.   Yes.

11      Q.   So if a patient of yours complains with

12   shoulder pain for two years, would you continue to

13   prescribe NSAIDs or would that be an indication that

14   it's time to revise the treatment plan?

15      MR. MARUNA: Objection, foundation.

16   BY THE WITNESS:

17      A.   So that's -- I don't know if controversial is

18   the right word, but there are different schools of

19   thought amongst people like me. I personally would not,

20   probably a majority of my colleagues would. So there

21   are people that prescribe these things and keep people

22   on them and believe that it quiets inflammation that's

23   beneficial. I think past the point it's not, but

24   that's -- people differ.

27 (Pages 105 to 108)

Electronically signed by Carrie Brown (101-369-569-5178)          4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

| Page 109 | Page 111 |
|---|---|

**Page 109**

1    Q.  So what would you do then?
2    A.  What would I do?
3    Q.  Yes.
4    A.  I would have a long talk with the patient
5  about what activities they're doing with the arm, and I
6  will tell the patient much as I did you, that if you
7  keep your elbows down, it will go away.
8    Q.  Would you continue to prescribe the NSAIDs?
9    A.  No.
10    Q.  What would you do in terms of a treatment plan
11  going forward?
12    A.  I would tell the patient you've had -- Is it
13  two cortisone shots at this point? -- however many
14  cortisone shots you've had.  I would say you've had two
15  cortisone shots, you've had these, told they quieted
16  down, it keeps coming back, but if you keep your elbow
17  down and you use appropriate mechanics, your pain will
18  go away.
19    Q.  And --
20    A.  And I would talk to the patient at length, and
21  that's what I do.
22    Q.  Would you take any other steps to try and
23  figure out the source of the pain?
24    A.  You mean like get an MRI?  No, because -- The

**Page 110**

1  only other thing you could do would be to get an MRI.
2  The only way that I would do that is if I thought he had
3  a full thickness tear, which there is no evidence that
4  he does and which he, you know, turned out not to have.
5    Q.  How do you know that the patient would not
6  have a full thickness tear?
7    MR. MARUNA:  How does he know now or at the time?
8    BY THE WITNESS:
9    A.  It's a combination of his age, his
10  occupational history, his symptom complex and the exam.
11  I mean it's possible.  And maybe you could get one and
12  if he turns out to have one, you know, I mean this is a
13  judgment call.  But based on all this, I think he
14  didn't.  I kind of defer to them, they were around him
15  more, and, you know -- and he didn't.  And if he had
16  gotten an MRI, it would have shown that he didn't, so I
17  think it's kind of moot anyway.
18    Q.  Well, Doctor, you previously testified that
19  you can't determine from an examination whether a
20  patient had a full thickness tear?
21    A.  No, I didn't say that.  I said that with --
22  that the diagnosis is based -- You asked me about
23  accuracy.  You can never be a hundred percent accurate.
24  And if you think there's a two percent chance -- Like I

**Page 111**

1  said, I can get an MRI on every patient who comes into
2  the office, except they have to pay for them, you know.
3  So you -- What I did say was that the diagnosis -- I
4  said you couldn't find it from an X-ray, but you get
5  a -- you get a good idea from the history and the
6  physical and the fact that the X-ray is normal.
7    And how old is he?  What's the date of birth?
8    Q.  Doctor, I'm the one asking questions today.  I
9  can't answer --
10    A.  Well, I'm trying to answer your question, so
11  if you help me out there, I can -- I can elaborate on my
12  answer, but that's okay.
13    Q.  Doctor, part of your conclusion that
14  Dr. Obaisi's treatment met the standard of care, you
15  make reference to the fact that Dr. Obaisi referred him
16  to the University of Illinois to be evaluated by an
17  orthopedic surgeon.  Do you recall that portion of your
18  report?
19    A.  Yes, yes.
20    Q.  Do you recall when Dr. Obaisi referred
21  Mr. Hemphill to an orthopedic surgeon?
22    A.  The date, no, counsel.
23    Q.  Doctor, I'm handing you what's going to be
24  Exhibit 8 and it's a series of documents, it's IDOC1 and

**Page 112**

1  2, Wexford 4, 3, 5, 10 and 9.  Doctor, if you would,
2  please flip to the second page, Bates labeled IDOC2.
3  Let me know when you're there.
4    A.  You told me I could embellish upon prior
5  answers, can I?  Or did you change your mind?  Will that
6  still be okay?
7    Q.  You can, Doctor, but I'm asking you a separate
8  question at this point, so please turn to page --
9    A.  Before I lose my train of thought, can I
10  please embellish, counselor, so I don't forget?
11    Q.  Go ahead.
12    A.  Is that okay?
13    Q.  That's fine.
14    A.  All right.  So his date of birth listed here
15  is 1978, I'd sort of forgotten, so in 2014 that would
16  make him 36 years old, right?  All right.  So the reason
17  I said this was I recall that he was kind of young, I
18  didn't recall his exact date of birth.  So you also just
19  don't see full thickness rotator cuff tears in
20  36-year-olds, you just don't.  I've been doing this for
21  decades and decades.  I saw one guy who was hit by a
22  train who had only looked like 20.  So part of answering
23  your question about how do I know?  You know, if you
24  were 60, it would be different, but at his age and with

Electronically signed by Carrie Brown (101-369-569-5178)                                4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 113

1    everything else, that's another part of how I know it.
2    Thank you for allowing me to answering.
3        Q.  You're welcome.
4        A.  Can you tell me the other question and I'll
5    try to answer?
6        Q.  Yes.  Please flip to page -- it's Bates
7    labeled IDOC2, it's the second page there.
8        A.  Okay.
9        Q.  And, Doctor, this is a Medical Special
10   Services Referral and Report, correct?
11       A.  Yes.
12       Q.  And it's for Carl Hemphill, correct?
13       A.  Yes.
14       Q.  And Dr. Obaisi is referring Mr. Hemphill to an
15   ortho, correct?
16       A.  Yes.
17       Q.  And it's dated June 4, 2015, correct?
18       A.  Yes.
19       Q.  And within the notes Dr. Obaisi indicates
20   "Chronic pain right shoulder, has had four steroid
21   injections and couple courses PT," do you see that?
22       A.  Yeah, so -- And the last thing is PT and not
23   patient, huh?  Must be.  Yeah, okay, yep.
24       Q.  Did you see anywhere in the records of

---

Page 114

1    Mr. Hemphill actually receiving physical therapy?
2        A.  No.
3        Q.  So this referral would not be accurate then,
4    correct?
5        MR. MARUNA:  Objection, form.
6    BY THE WITNESS:
7        A.  Yeah, by the way, it says -- You know, they
8    were talking about abduction before, it says abduction
9    pain so that kind of clarifies that.  But, yeah, I
10   think -- I think you're correct that it's incorrect.
11       Q.  Would Mr. Hemphill have benefitted from
12   physical therapy?
13       A.  I don't think so.
14       Q.  Why not?
15       A.  So one of the goals of physical therapy, what
16   you're doing in physical therapy for this problem is
17   usually rotator cuff strengthening and his rotator cuff
18   was already inflamed -- And by the way, I see lots of
19   people that are damaged by PT.  The reason to do PT
20   usually is to get people more functional so they can do
21   jobs.  Furthermore, he ultimately had a distal
22   clavicectomy, so that would indicate, although the
23   records aren't real clear, that the surgeon who did it
24   felt that he had AC joint inflammation, and physical

---

Page 115

1    therapy for AC joint inflammation makes it worse.  But
2    in his case I think he was doing too much and doing more
3    strengthening I think would have been likely to be
4    counterproductive.  It's actually also a little sort of
5    risky if you give people anti-inflammatory pills, which
6    are also strong painkillers, and you give people
7    cortisone, which is for the period that works a strong
8    painkiller, if you give people things like that and you
9    send them to physical therapy, you kind of allowed them
10   to damage themselves more than they otherwise would have
11   had they not had those things.  So I make it a point to
12   not do that.
13       Q.  So should Mr. Hemphill not have been referred
14   to physical therapy?
15       A.  He should have been referred to ortho.
16       Q.  Should he have --
17       A.  You asked me if it would be likely to help?  I
18   don't think it would have been likely to help.  Could he
19   have been referred?  Yeah, I mean it's a judgment call,
20   a lot of people would have.  But as to whether I think
21   it would have helped, I don't think it would have.  I
22   don't think it was wrong to do it.
23       Q.  And you're referring to physical therapy,
24   correct?

---

Page 116

1        A.  Right.  The ortho is appropriate, you know,
2    but the patient's obviously not happy so take it up to
3    the next level.
4        Q.  Doctor, can you please flip to -- it's Wex --
5    actually -- excuse me, it's the first page, it's IDOC1?
6    And this is a document from Wexford Health Sources,
7    Incorporated, and it's from Utilization Management to
8    Site Medical Director and HSA, correct?
9        A.  Yes.
10       Q.  And this document is dated June 10, 2015,
11   correct?
12       A.  Yes.
13       Q.  And it indicates that "June 9, '15, receive
14   request for ortho evaluation at UIC."  Do you see that
15   portion?
16       A.  Yes.
17       Q.  So this form indicates that on June 10, 2015,
18   Wexford Health Utilization Management approved the
19   referral of Dr. Obaisi to an orthopedist, correct?
20       MR. MARUNA:  Foundation, it's June 10th.  The
21   record speaks for itself on that, comment section.
22   BY THE WITNESS:
23       A.  I guess.  I mean you're asking about the
24   clerical aspect, I'll take your word for it.  I'm not

---

29 (Pages 113 to 116)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 117

1   sure I understand their procedures but it says approved,
2   right?
3       Q.  It says "services approved," correct?
4       A.  It looks like it, yeah.
5       Q.  Doctor, do you know when Mr. Hemphill
6   ultimately saw an orthopedist?
7       A.  Not without checking the medical record.
8       Q.  If you flip to Wexford 3 please?
9       A.  That's the same document, Wexford?
10      Q.  Yes.
11          MR. MARUNA:  Yes, this one right here (indicating).
12  BY MR. McCLAIN:
13      Q.  It looks like that (indicating).
14      A.  Yes.
15      Q.  And, Doctor, this is an authorization comment
16  dated April 26, 2016, correct?
17      A.  Yes.
18      Q.  And it indicates "Orthopedic eval right
19  shoulder, April 26, 2016," correct?
20      A.  Yes.
21      Q.  So Dr. Obaisi originally referred Mr. Hemphill
22  to see an orthopedist on June 4, 2015, but he did not
23  see an orthopedist until April 26, 2016, correct?
24      A.  Yes.

Page 118

1       Q.  So that's about 11 months delay, correct?
2       A.  Right.
3       Q.  In your opinion, does an 11-month delay of a
4   referral meet the standard of care?
5           MR. MARUNA:  Objection, foundation, "delay."  Over
6   the objection...
7   BY THE WITNESS:
8       A.  Well, I'll tell you, to answer that question,
9   you have to answer whether the orthopedic referral was a
10  useful thing to begin with.  I will tell you that in
11  clinical practice many generalists avoid sending people
12  to specialist surgeons because they perceive that the
13  specialist surgeons are going to operate on the people
14  whether they need it or not.  So if you're -- If you got
15  something, you know, if you have a tumor, if you have an
16  infection, if you've got something like that, then,
17  yeah, this would be inappropriate.  But if you got
18  something that probably didn't really need the
19  orthopedic referral to begin with and it has a
20  reasonable chance of resulting in an operation that
21  might not be necessary, then I don't think that's a bad
22  thing.
23      Q.  So, Doctor, did you see anywhere in the
24  records that Mr. Hemphill was not scheduled because

Page 119

1   someone made a medical determination that it was not
2   appropriate for him to have this orthopedic evaluation?
3       A.  No.
4       Q.  So your testimony is not really applicable to
5   this case because there's no indication that there was a
6   determination that he didn't need that ortho evaluation?
7       A.  No, it --
8           MR. MARUNA:  Objection, argumentative, foundation.
9   BY THE WITNESS:
10      A.  It is applicable because you asked me about
11  the standard of care.  What I'm saying is that for a
12  patient to not see a specialist that they really didn't
13  need to see to begin with in which might result in an
14  unnecessary operation, I don't think -- I think that the
15  standard of care would not have been met if he really
16  needed to see an orthopedist but he really didn't and,
17  you know, you can kind of argue.  So -- So whether they
18  intended it or not, I don't think the standard of care
19  was violated because there was a delay for the reasons
20  that I just said.
21      Q.  And Wexford Health approved this referral on
22  June 10th, correct?
23      A.  Yes.
24          MR. MARUNA:  Foundation.

Page 120

1   BY MR. McCLAIN:
2       Q.  So it took them 11 months to actually schedule
3   him despite their approval, correct?
4           MR. MARUNA:  Objection, foundation.
5   BY THE WITNESS:
6       A.  Let me say this also:  I have no doubt -- And
7   I can't prove this, but I have no doubt that if he had a
8   real problem, really need a referral, it wouldn't have
9   gone this long.  I think if he had a tumor, I think if
10  he had an infection, I think if he had a fracture, I
11  think they would have gotten him in.
12      Q.  That's total speculation though, correct,
13  Doctor?
14      A.  I don't know if it's total speculation.  I
15  mean I -- I -- I don't -- I would -- If there were
16  people that really needed specialists and they weren't
17  getting in, I think it would be all over the front page
18  of the papers, so I don't -- It's not total speculation,
19  no.
20      Q.  And you never interviewed Dr. Obaisi, correct?
21      A.  No.
22      Q.  You never interviewed any of the defendants in
23  this case, correct?
24      A.  No.

30 (Pages 117 to 120)

Electronically signed by Carrie Brown (101-369-569-5178)                4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 121

1    Q.  So you wouldn't know their state of mind when
2  making these medical determinations, correct?
3    A.  No, I would know the state of mind, and I know
4  that you push harder if you think somebody really needs
5  to get in.  And everything that I've seen I think they
6  seem very competent practitioners.  And I have 100
7  percent certainty that if this patient -- Well, even if
8  only for their own self-preservation, okay, if you're a
9  primary care doctor and you've got a patient with a
10  tumor, you think you're going to sit back and wait 10
11  months to get in, right, you know, let the patient die
12  or something?  No.  So...
13    Q.  Are you done?
14    A.  Yes.
15    Q.  I just want to make sure that you're done, I
16  don't want to cut you off.
17    A.  Thank you.  I appreciate your courtesy.
18    Q.  Would you admit that there are doctors who
19  perform bad medical services in the community?
20    MR. MARUNA:  Objection, form of the question,
21  foundation, vague, incomplete hypothetical, calls for
22  speculation.  Over the objection...
23  BY THE WITNESS:
24    A.  Wow, I don't know.

Page 122

1    Q.  I'm sorry, I didn't hear your answer?
2    A.  I don't know if I know.  I mean are you saying
3  are there substandard doctors?  I suppose there's
4  substandard everything.  Do I see -- So how would I
5  answer your question?  Would I tell you I've seen people
6  coming in that have had -- What do you mean by bad?
7  Like wrongly performed surgery?  I'm not sure I
8  understand what you mean by bad.
9    Q.  Are there doctors that provide poor medical
10  care?
11    MR. MARUNA:  Same objections.
12  BY THE WITNESS:
13    A.  I'm sure there are.
14    Q.  Doctor, can you please flip to Wexford 5?  It
15  also looks like this (indicating).
16    A.  Okay.
17    Q.  Doctor, this is another authorization note and
18  this one's dated January 4, 2016, correct?
19    A.  So does this say 4 or 5 at the bottom?  You
20  said 5, right?
21    Q.  Correct.
22    A.  January 4th, I see January...
23    MR. MARUNA:  It's kind of -- It's on the date right
24  above...

Page 123

1  BY MR. McCLAIN:
2    Q.  Doctor, that's where the date is (indicating).
3    A.  At the bottom there.  January 14, 2016, is
4  that what you said?
5    Q.  Correct.
6    A.  Yes.
7    Q.  And within the notes it says "UIC has not been
8  scheduled yet," correct?
9    A.  Yes.
10    MR. MARUNA:  Objection, foundation.  That's not
11  what it says.  Over the objection...
12  BY MR. McCLAIN:
13    Q.  The note said "UIC has not yet scheduled,"
14  correct?
15    A.  Yes.
16    Q.  So this note would indicate that on January
17  14, 2016, Mr. Hemphill has not been scheduled for his
18  orthopedic evaluation, correct?
19    A.  Right.
20    Q.  Doctor, can you please flip to Wexford 10?
21  That's dated April 15, 2016.
22    A.  Right.
23    Q.  And this is another authorization note and
24  it's dated April 15, 2016, correct?

Page 124

1    A.  Yes.
2    Q.  And it indicates "Patient recently transferred
3  from Stateville to Hill CC," correct?
4    A.  Right.
5    Q.  "Patient was unable to go to UIC appointment
6  on April 15, 2016, as site was not aware of appointment
7  until April 14, 2016," correct?
8    A.  Right.
9    Q.  So this would indicate that Mr. Hemphill had a
10  scheduled orthopedic appointment but he missed it,
11  correct?
12    A.  I think so.
13    Q.  And that's because the site was unaware of the
14  appointment until one day before the scheduled
15  appointment, correct?
16    A.  I guess.  They knew before that, right?  But
17  that was not enough time apparently, huh?
18    Q.  And, Doctor, can you please flip back to
19  Wexford 9 and that one is dated April 20, 2016?
20    A.  Yes.
21    Q.  And this is another authorization note and if
22  you follow along with me, the second to last sentence
23  indicates "Patient missed his appointment at UIC ortho
24  on April 15, 2016, because Hill was given too late of

31 (Pages 121 to 124)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 125

1    notice and transportation/security was not feasible."
2    Did I read that correctly?
3        A.  I think so.
4        Q.  So this indicates that Mr. Hemphill missed his
5    appointment on April 15, 2016, because transportation
6    and security were not scheduled, correct?
7        MR. MARUNA:  Objection, foundation.  It says "was
8    not feasible."
9    BY THE WITNESS:
10       A.  Right, was not feasible.
11       Q.  Right.  So he was not able to attend his
12   appointment, correct?
13       A.  Correct.
14       Q.  Doctor, I want to refer you back to your
15   report in the portion where you discuss LaTonya
16   Williams' treatment, and within there you indicate "She
17   referred him to medical director due to chronicity of
18   the problem and his continued pain despite the treatment
19   she was authorized to describe -- prescribe."
20       A.  Refer...  Right.
21       Q.  What chronic problem are you referring to?
22       A.  His -- Pick one, subacromial bursitis,
23   impingement syndrome, rotator cuff tendonitis.
24       Q.  Are you referring to all of those?

Page 126

1        A.  They're all the same, and multiple
2    designations have been used in this report and plus
3    I've -- So they called it -- Here they called it
4    subacromial bursitis and impingement syndrome and I
5    called it rotator cuff tendinitis, so I was using all
6    three so that the record would be clear.
7        Q.  And what qualifies that as chronic?
8        A.  That they continued for a while.
9        Q.  What's the difference between chronic and
10   acute?
11       A.  Acute is shorter duration.
12       Q.  If a condition is chronic, does that affect
13   how you treat the condition versus it being an acute
14   condition?
15       A.  Depends.
16       Q.  In this instance if it was just acute?
17       A.  I don't -- I don't know.  It's -- Treatment is
18   pretty similar, really, if you got -- It might affect
19   the chronology of the escalation of your treatment, when
20   you went from activity modification to NSAIDs to steroid
21   injections.
22       Q.  Doctor, in your opinion you state several
23   times that Dr. Obaisi correctly made the diagnosis that
24   Mr. Hemphill did not have a torn rotator cuff, do you

Page 127

1    see that?
2        A.  Right.
3        Q.  But you previously testified that the only way
4    to know for sure is with an MRI, correct?
5        MR. MARUNA:  Objection, foundation,
6    mischaracterizes his testimony.
7    BY THE WITNESS:
8        A.  So, look, I said a couple times here that
9    nothing is this -- in medicine is a hundred percent.  I
10   mean MRIs aren't a hundred percent, there are false
11   positives and false negatives.  But with a 36-year old,
12   whatever he was, 34 -- 36-year old at presentation,
13   36-year old with this history and this physical, it's
14   pretty sure that he doesn't have a full thickness MRI.
15       Q.  But the best way to determine that, as you
16   testified, would be through an MRI?
17       A.  No.  And best -- Best is a relative term.  In
18   medicine we're obligated to not get, you know, the most
19   elaborate test on every patient.  Best is, you know, on
20   a risk benefit basis and a security of diagnosis basis
21   to do what you need to do to come to the diagnosis and
22   they did.  An MRI was not necessary.  Their judgment was
23   vindicated because the only reason to get it is if you
24   were worried about a full thickness rotator cuff tear

Page 128

1    which he did not have, so they did the right thing.
2    They did the -- To use your word, counselor, they did
3    the best thing.  Could they have increased their
4    diagnostic accuracy from 98 percent to 99 percent with
5    an MRI?  Maybe, but you don't do things in medicine to
6    get an extra one percent of certainty when you're
7    already very certain.
8        Q.  Doctor, you indicated that they were
9    vindicated, what do you mean by that?
10       A.  They're vindicated in that he thought it was
11   bursitis and he thought it was impingement syndrome or
12   tendinitis and it was.  And he provided very
13   compassionate care, he really tried to help this guy, he
14   did more than I would have done because he was
15   concerned, no doubt because the patient was coming to
16   him in pain, and he's a compassionate person.  I don't
17   know why else he would have done all -- I don't know why
18   he would have given four shots instead of the one and
19   two.  I wouldn't have given him four.  And I don't why
20   he would have persisted with the meds.  I think it's
21   because he's a compassionate person.  I'm being very
22   serious about this, honestly, you know.  And -- And --
23   And -- So because he didn't think he had a more serious
24   problem, and I think he was a little afraid to send him

32  (Pages 125 to 128)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 129

1  to -- This I am speculating -- but I think that -- So
2  I'll say that he was vindicated because he thought it
3  was tendinitis and that's what it turned out to be, so
4  he was right all along, and I think his hand was forced
5  because the patient complained so much and lots of
6  patients complain, okay, you know, and then he wound up
7  going to an orthopedist and getting an operation and he
8  never did have a full thickness tear.
9      Q.  Doctor, have you ever experienced personally
10  subacromial bursitis?
11     A.  Yes.
12     Q.  And did it cause you pain?
13     A.  Yes.
14     Q.  And in your report you indicate "Mr. Hemphill
15  had a minor overuse problem in his shoulder, subacromial
16  bursitis, this problem never produces more than mild
17  discomfort unless the patient engages in excessive
18  activity."
19     MR. MARUNA:  You want to direct the doctor where
20  that is in the report, counselor?
21  BY MR. McCLAIN:
22     Q.  Yes, Doctor, it's in your opinion 2.
23     A.  Yes.
24     Q.  It is the first two sentences.

---

Page 130

1      A.  Yes.
2      Q.  Have you in your 30 years of experience ever
3  seen a patient with more than mild pain as a result of
4  subacromial bursitis?
5      A.  So, counselor, you have to qualify it as I did
6  in my sentence.  And I have had it, by the way, since I
7  was a teenager, it's related to weight lifting, and it
8  absolutely in all my patients and just can't be any
9  other way.  You know, if you beat it up it hurts and if
10  you leave it alone it doesn't hurt.  And mine doesn't
11  hurt because I don't beat it up.  And if I do beat it
12  up, it hurts.  And I have -- And that is just simple
13  biology, you know.  Unless you got a disease, a
14  neurologic disease or something like complex regional
15  pain syndrome or reflex sympathetic dystrophy, you know,
16  things -- We don't -- We just don't hurt for no reason.
17  So it's that -- it's just -- it's just how we're wired,
18  it's how we're put together.
19     Q.  So have you ever seen a patient that has had
20  more than mild discomfort that was not engaging in
21  excessive activity?
22     A.  No.
23     Q.  In your entire 30 years of practice?
24     A.  In my entire 64 years of life, no.  And you

---

Page 131

1  know -- No.  I mean they get it from that and they stop
2  doing it and they get better.  Does it go a hundred
3  percent away?  No.  It's just -- It's always activity
4  dependent, always.
5      Q.  So if Mr. Hemphill refrained from using his
6  shoulder and the pain continued, what would you have
7  done in that circumstance?
8      A.  So if I see somebody who I make a clinical
9  diagnosis and they refrain and the pain continues, I do
10  a -- I do a diagnostic subacromial lidocaine injection.
11  Now when he did this, he did lidocaine plus cortisone,
12  okay?
13     Q.  You're referring to Dr. Obaisi?
14     A.  I am, I am.  So that shot serves two purposes;
15  the lidocaine is diagnostic so then the patient's pain
16  gets better for a little bit, and then the cortisone is
17  therapeutic, and the cortisone is also a little
18  diagnostic because when it goes away for a while it kind
19  of confirms the diagnosis.  So if the patient isn't
20  getting better and they're swearing up and down they're
21  not doing anything like that, then I'll do that
22  injection and I'll see.  And I'll do maybe one cortisone
23  shot.  I don't even do more than one, but I'll maybe do
24  one.  I usually don't even do one, okay?  And then --

---

Page 132

1  And so I'll do that to kind of nail down the diagnosis.
2  And if they're 60, I'll get an MRI.  And if they're
3  young, you know, I won't or -- You know, once in a while
4  I'll wind up getting an MRI just because the patient
5  wants it, you know what I mean?  I know it's not
6  medically necessary but the patient is complaining and
7  like he was complaining, right?  Not medically
8  necessary, once in a while I'll do that.
9      And then -- So you're asking me really what
10  other treatment will I do?  I tell them activity
11  modification and I'll tell them it will go away, it has
12  to go away, it can't hurt if you don't use it, it just
13  can't.  Unless -- Or I'll see maybe they've got a
14  pinched nerve in their neck which can mimic this.  And
15  if they have signs of that on the exam, maybe I'll get
16  an MRI of their neck.  He didn't, by the way.  Or if
17  they don't respond to the injection.  If the injection
18  does not produce temporary relief, that's an indication
19  that you're in the wrong place, that's my algorithm,
20  okay?  So if that doesn't happen or if they've got signs
21  that it could be cervical radiculitis, or on a rare
22  occasion, thoracic outlet syndrome.  What else?  You
23  know, tumor, I've already gotten the X-ray.  I'll say,
24  Gees, could I be missing something?  And if I'm not,

---

33 (Pages 129 to 132)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 133

1 then I'll just say, Look, this gets better, and if I
2 treat you more aggressively, I'm just going to hurt you.
3 And I'll tell them, Look, I can stick a scope in your
4 shoulder and I can shave something down but there's no
5 evidence that it does any good. And any operation
6 there's complications, and that's what I do, and this
7 happens.
8     Q. Okay. So just moving through the progression
9 of your treatment, they refrain from engaging in
10 excessive activity, they still had pain, you provided
11 them the one cortisone shot, they are still refraining
12 from excessive activity, and they continue to have pain,
13 what is the next step --
14     A. No.
15     Q. -- in your treatment?
16     A. No, no, no. No, the pain doesn't come back
17 unless they engage in excessive activity.
18     Q. There's no other reason the pain would come
19 back?
20     A. Absolutely.
21     Q. In every single scenario?
22     A. Hundred percent. History of mankind. Unless,
23 unless you're missing the diagnosis. So I'll look extra
24 hard and see, you know, if they have numb fingers or

Page 135

1 that, and we're talking impingement syndrome here, we're
2 not -- You know, I mean we're talking about a sore
3 tendon. Oh, my goodness, do you know what I mean?
4 We're not -- We're not talking any kind of major
5 pathology.
6     Q. And so in this scenario that we've just been
7 discussing, you said it must be that diagnosis, you're
8 referring to impingement syndrome; is that correct?
9     A. Slash rotator cuff tendinitis slash bursitis,
10 yes.
11     Q. And you refer to those always the same?
12     A. They're synonymous terms, right, yes.
13     Q. Okay. Doctor, I want to direct you to the
14 second paragraph of opinion 2. And in the first
15 sentence you indicate "There was no need for an
16 orthopedic consultation in these cases because surgery
17 was not indicated and injections were already
18 performed." Do you see that portion in your report?
19     A. Yes.
20     Q. Can you elaborate on what you mean by "Surgery
21 was not indicated"?
22     MR. MARUNA: Do you need a break?
23     COURT REPORTER: Yes, I do.
24     MR. McCLAIN: We can take a break.

Page 134

1 something, or if I have some reason to think it's from
2 their neck, you know, or something else like that. But
3 if I'm pretty sure that that's the diagnosis and I've
4 nailed it down with the injection, and -- You know, I'll
5 have to order an MRI just to prove to the patient, then,
6 no, it's -- I mean I don't know how else to describe it
7 to. You know, physical structures don't hurt unless
8 they're physically stressed or unless there's some other
9 diagnosis. And everybody gets in trouble in medicine
10 and read the papers, doctors get in trouble -- See,
11 doctors do things for patients to make the patients
12 happy when maybe it's not in the patient's best
13 interest. And you -- And they get overtreated, they get
14 put on opiates. Because you can do that, right? Or you
15 put them on chronic drugs, and then patients will want
16 stronger drugs or they'll buy themselves an operation
17 they didn't need, and that happens, you get pushed into
18 it. You know, they say, Doc, you know, you got to look
19 in with a scope, whatever. And I say, Look, I'm really
20 sorry. It can get hard sometimes, you know. And when
21 you're in private practice, you can maybe lose a patient
22 or two here or there, but I don't lose too many
23 patients, you know. And it's -- But overtreatment
24 happens when, you know, when you give in to things like

Page 136

1     MR. MARUNA: We've been going -- Yeah.
2         (A short break was had.)
3 BY MR. McCLAIN:
4     Q. Doctor, I want to direct you to the second
5 paragraph in opinion 2. And the first sentence you
6 indicate "There was no need for orthopedic consultation
7 in these cases because surgery was not indicated and
8 injections were already performed." What do you mean
9 when you indicate "surgery was not indicated"?
10     A. There's no surgery that helps this problem.
11 There's really no other -- You know, the other part to
12 this is there is really no other treatment that you can
13 do after you do what they did for this problem.
14     Q. And you also indicate that referral from
15 consultation -- excuse me, referral to orthopedic was
16 not indicated as well?
17     A. Not medically indicated. I think, again, he's
18 compassionate, he knows the patient's unhappy and
19 probably the patient is questioning him because he's a
20 general surgeon, he wants to see an orthopedist, so I
21 think he did it for the psychology of the patient, which
22 is valid. But on medical grounds, there's nothing that
23 an orthopedic surgeon can do for this that hasn't
24 already been done.

34 (Pages 133 to 136)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 137

1    Q.  And is it your opinion that during the
2    treatment of Mr. Hemphill by Wexford the case never
3    indicated for an MRI?
4        MR. MARUNA:  Objection, foundation --
5    BY THE WITNESS:
6        A.  That's correct.
7        MR. MARUNA:  -- treatment by Wexford.
8    BY THE WITNESS:
9        A.  But you mean Dr. Obaisi and those --
10       Q.  Yeah.
11       A.  Right, that it is my opinion.
12       Q.  And can you please elaborate on why you think
13   that it was not indicated?
14       A.  Well, I've gone over this in detail but I'm
15   happy to do it again.  Because the only thing that you
16   can be looking to find on an MRI that you -- would
17   affect your treatment would be a full thickness rotator
18   cuff tear.  And in this patient the chances of that are
19   pretty close to zero.
20       Q.  So is that based on hindsight a little bit --
21       A.  No.
22       Q.  -- because there was an MRI and that MRI --
23       A.  No.  No, as I said, it vindicates it, but, no.
24   He's a 36-year old guy without the things that go along

Page 138

1    with full thickness rotator cuff tear, you just don't
2    see it.
3        Q.  So is it your opinion that Dr. Obaisi was
4    never medically obligated to refer Mr. Hemphill to an
5    orthopedist?
6        A.  Medically?
7        Q.  Yes.
8        A.  No.  I think it's correct, I think medically
9    there was no reason to.  Yeah, I don't know, you know,
10   system wise it may well be that -- You know, so if a
11   patient is unhappy, are you obligated to refer him to
12   somebody else with perhaps greater expertise?  I mean I
13   think -- I think that's valid, I think that's good.  I
14   think poor Mr. Hemphill is unhappy here and probably
15   doubting Dr. Obaisi and so you send him to an
16   orthopedist, I think that's valid, but medically,
17   orthopedically, no.
18       Q.  And is it also your opinion that Dr. Obaisi
19   was never medically obligated to refer Mr. Hemphill for
20   an MRI?
21       A.  Right.  Was an MRI indicated?  No.
22       Q.  Mr. Hemphill did have an MRI though, correct?
23       A.  Right.
24       Q.  And the orthopedist reviewed that MRI and

Page 139

1    determined surgery was necessary, correct?
2        A.  Yeah, necessary is kind of a funny word.  It
3    certainly wasn't necessary, but you can get into
4    situations where -- So this is all speculation if I were
5    to say medically necessary, so I'll speculate, if you
6    don't want me to, I'll stop.  But if you get a patient
7    where you don't really think needs surgery but the
8    patient is very unhappy, and I get this, and they say,
9    Hey, Doc, take a look in there, there's got to be
10   something, whatever, and maybe just let yourself get
11   pushed into it, that's what I kind of expect happened
12   here.
13       Q.  So you believe that this orthopedist was
14   pushed into scheduling the surgery for Mr. Hemphill?
15       A.  That's what I -- I can't prove it but that's
16   what I think.
17       Q.  And that's just based on speculation though,
18   correct?
19       A.  It is speculation.
20       Q.  And you never interviewed the orthopedist who
21   conducted the surgery?
22       A.  No.
23       Q.  And you indicated "Mr. Hemphill had a negative
24   X-ray which is the only imaging required for this

Page 140

1    condition," can you please elaborate on that a little
2    bit?
3        A.  Yeah.  I went through this as well, that I
4    would get the X-ray.  Basically in his case I'd be
5    getting it to look for a tumor.  I told you before that
6    we look for arthritis and you can have -- I just saw a
7    guy in his late 30s, was a big heavy weight lifter who
8    got a little arthritis, so you could possibly get it for
9    that but there's -- that's why you -- You're not going
10   to see anything else.
11       Q.  Did the X-rays here indicate that there was
12   arthritis?
13       A.  No.
14       Q.  Doctor, I'm going to pass you Exhibit 9 which
15   is the final exhibit.  It is IDOC217 and 218.  And this
16   is an operative report from Dr. Schierer, correct?
17       A.  Yes.
18       Q.  And Dr. Schierer is the orthopedic surgeon who
19   performed the surgery on Mr. Hemphill, correct?
20       A.  Right.
21       Q.  Turning to the first page, IDOC217, the
22   preoperative diagnosis was chronic impingement syndrome,
23   right shoulder syndrome, and degenerative arthritis
24   right acromioclavicular joint, correct?

35 (Pages 137 to 140)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 141

1     A.   Now you added one, you said shoulder syndrome,
2  it's not there, but otherwise right.
3     Q.   Thank you, Doctor.  And the postoperative
4  diagnosis was identical to the preoperative diagnosis,
5  correct?
6     A.   Right.
7     Q.   Doctor, in about two-thirds of the way down in
8  the indications for operation there's a note there from
9  Dr. Schierer indicating severe degenerative arthritis in
10  the AC joint --
11     A.   Right.
12     Q.   -- do you see that?
13     A.   Yes.
14     Q.   What causes that?
15     A.   It's caused basically by wear and tear.  You
16  should know though that it bears no -- Unlike the
17  glenohumeral joint, which is the main shoulder joint, it
18  bears no relation to clinical symptoms.
19     Q.   Meaning?
20     A.   Meaning that you can have horrific endstage
21  bone on bone, huge osteophyte arthrosis of the AC joint
22  and it -- and you can -- you can take a hundred people
23  with continuum with the worse arthritis you've ever seen
24  and no arthritis you've ever seen and then take the ones

Page 142

1  that have inflammation and pain in that joint and they
2  don't correlate.  So imaging of that joint doesn't
3  matter, it's kind of an unusual joint in that respect
4  but it doesn't matter.  The arthritis that he didn't
5  have was of the glenohumeral joint, that does matter.
6  The glenohumeral joint is the main shoulder joint, the
7  AC joint is a little accessory joint.
8     Q.   And, Doctor, after reviewing the MRI
9  Dr. Schierer determined that he was going to proceed
10  with surgery, correct?
11     A.   Right.
12     Q.   If you had viewed these MRI results, would you
13  have proceeded with surgery?
14     A.   No, not unless -- No, I definitely wouldn't
15  have.  If -- Based on the MRI, absolutely not.  Yeah,
16  right, because clinically the AC joint findings mean
17  nothing and the findings that would matter for
18  indicating surgery would be the MRI findings and I
19  wouldn't have.
20     Q.   In the indications for operation, it indicates
21  MRI scan show partial tearing, tendinosis and
22  impingement of rotator cuff with no complete rotator
23  cuff tear noted, and the operation note indicate that no
24  complete rotator cuff tears were noted, correct?

Page 143

1     A.   Right.
2     Q.   So would that indicate that there was a
3  partial tear in the rotator cuff?
4     A.   No, not even that.  Because if he had had a
5  partial tear, the surgeon almost certainly would have
6  debrided it, done something to it and he didn't.  You
7  see, it's kind of -- it's an arcane form that I
8  mentioned a long time ago here today, but all MR -- MRIs
9  are binary, they're either black or white, they're high
10  signal or low signal.  So when somebody says "tear,"
11  that's a subjective interpretation on the part of the
12  radiologist and the surgeon.  And often things are
13  called "tears" because it makes surgery more -- sort of
14  more palatable.  So if it's discontinuous then at the
15  tear -- if it's not discontinuous, you really can't tell
16  between just degeneration of the tendon or actual
17  tearing.  I just did a case last week where I did a
18  distal clavicectomy because of the clinical syndrome,
19  and while I was in there I looked at the rotator cuff
20  and the MRI said partial tear and it wasn't, it was
21  pristine, it was normal.  So had he had structural
22  partial tearing -- I mean he seems like he's fairly
23  aggressive and I don't mean that in a bad way, you know,
24  but he would have shaved it down, debrided.  I don't

Page 144

1  know if that necessarily helps but that's -- I'm sure he
2  would have done that, I would have even done that, you
3  know, but he didn't.
4     Q.   And what specifically did Dr. Schierer do
5  during the surgery?
6     A.   He shaved down the end of the collarbone, and
7  that's a treatment for AC joint inflammation.  The fact
8  that there was arthritis in the X-ray means nothing,
9  it's a clinical diagnosis when you kind of press on the
10  joint and it hurts, and that doesn't appear to have been
11  the patient's problem because the patient never had an
12  injection in the AC joint and the patient got better
13  from the injection, and past that first note from
14  Dr. Davis, I think it was, nobody ever mentioned the AC
15  joint again, you know.  But if I had seen that -- If the
16  patient had that clinically, I would have injected the
17  joint, if the injection failed, I would have operated.
18  I would not have gone directly to surgery.  That -- Am I
19  talking too fast?
20     COURT REPORTER:  Yeah, you are.
21  BY THE WITNESS:
22     A.   So that's for the AC joint.  For the rotator
23  cuff, there really isn't the surgical procedure that
24  helps that, he did an acromioplasty and -- As I

36 (Pages 141 to 144)

Electronically signed by Carrie Brown (101-369-569-5178)                          4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

---

Page 145

1  mentioned to you, doctors used to believe in it and some
2  doctors still do, and he's not outside of the standard
3  of care for doing it, but -- but acromioplasty for
4  rotator cuff inflammation is basically not believed in
5  by most shoulder specialists, so I would not have done
6  it. I wouldn't -- I wouldn't have -- I wouldn't have
7  scoped it to begin with. He's not wrong for doing it,
8  you know, but I wouldn't have.
9      Q.  That's where reasonable medical minds differ,
10 correct?
11     A.  Yes.
12     MR. McCLAIN:  I have no further questions at this
13 point, Doctor.  Thank you for your time.
14     THE WITNESS:  Thank you.
15     MR. MARUNA:  Just a second, let me go over my notes
16 here.  Let's mark this as 10.  It's going to be IDOC64.
17 I'll show you a copy of it.
18             CROSS-EXAMINATION
19 BY MR. MARUNA:
20     Q.  Doctor, I'm showing you what we're going to
21 mark as 10, it's IDOC64, it's a note from April 11,
22 2013, and I want to discuss with you:  The note here in
23 the subjective portion, does that indicate that the
24 patient was weight lifting and dropped a weight on his

---

Page 146

1  hand?
2      A.  "Patient did a follow-up on right hand injury,
3  dropped weight," oh, by weight lifting weight, I guess
4  so.  Probably.
5      Q.  And we discussed earlier way back several
6  hours ago at the beginning of your deposition the
7  plaintiff first made complaints of shoulder-related pain
8  back in February 2013, this note would be after that
9  date given that's it's in April, correct?
10     A.  Right.
11     Q.  And you discussed earlier that in your
12 experience oftentimes when the patients are having pain
13 of this type of injury, it's because they're exerting
14 the joint; if you don't exert the joint, there would be
15 no pain, correct?
16     A.  Exactly.
17     Q.  And is this some evidence in front of you the
18 patient was continuing to exert the joint which could
19 have caused pain, correct?
20     MR. McCLAIN:  Objection, form, foundation, calls
21 for speculation.
22 BY THE WITNESS:
23     A.  Yeah, I mean it depends what they were doing,
24 but weight lifting is probably the most effective way to

---

Page 147

1  make it -- to make rotator cuff tendinitis hurt.
2          (Brief pause.)
3  BY MR. MARUNA:
4      Q.  I'm sorry, Doctor, I was going through my
5  notes crossing out what we touched on.  Let's take a
6  look back at Exhibit No. 8.  It's the one that's got
7  these (indicating).
8      A.  Okay.
9      Q.  I want to direct you to Wexford 0005, it's the
10 note dated 2016, 1/14, beginning "UIC has not yet
11 scheduled."
12     A.  Yes.
13     Q.  So this was the note that counsel asked you
14 about earlier.  I want to be clear here, this is --
15 Well, the note's referencing the orthopedic consultation
16 at UIC, correct?
17     A.  Right.
18     Q.  This note says "UIC has not yet scheduled the
19 appointment," correct?
20     A.  Right.
21     Q.  It doesn't say Dr. Obaisi hadn't scheduled the
22 appointment, correct?
23     A.  That's correct.
24     Q.  It doesn't say LaTonya Williams hasn't

---

Page 148

1  scheduled the appointment, correct?
2      A.  That's correct.
3      Q.  It doesn't say that Dr. Davis hasn't scheduled
4  the appointment, correct?
5      A.  That's correct.
6      Q.  It doesn't say that Wexford hasn't scheduled
7  the appointment yet, correct?
8      A.  That's correct.
9      Q.  I want to direct you to Exhibit 2, which was
10 your report.  I direct you to the opinion 2 statements.
11     A.  Okay.
12     Q.  So it's going to be the last paragraph of
13 opinion 2.
14     A.  Uh-huh.
15     Q.  The opinion here is "If this patient had been
16 referred to me, I would have recommended only
17 conservative treatment; i.e., pain medication, activity
18 modification, and injections," correct?
19     A.  Right.
20     Q.  "I would not have recommended surgery,"
21 correct?
22     A.  Right.
23     Q.  "Nor would I have recommended an MRI,"
24 correct?

---

37 (Pages 145 to 148)

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

| Page 149 | Page 151 |
|---|---|

**Page 149**

1    A.  Right.

2    Q.  "An MRI would only be useful if surgery was

3  indicated," correct?

4    A.  Right.

5    Q.  "However, as I have opined, surgery was not

6  indicated for this patient," correct?

7    A.  Right.

8    Q.  "Each surgeon has his or her own tolerance for

9  surgery," correct?

10    A.  Right.

11    Q.  "Reasonable medical minds, including

12  reasonable surgical minds, may differ," correct?

13    A.  Right.

14    Q.  "In this case, had the patient presented to me

15  for orthopedic consultation, I would not have" -- "I

16  would have recommended only treatment quite similar to

17  that provided to this patient; i.e., conservative

18  management," correct?

19    A.  Right.

20    Q.  "Thus any claim that orthopedic consultation

21  or an MRI was delayed is false because consultation and

22  additional imaging beyond the X-ray was not medically

23  indicated for this patient," correct?

24    A.  Yes.

**Page 150**

1    Q.  Doctor, regarding Dr. Obaisi's care and

2  treatment of this patient, you're a board-certified

3  orthopedic surgeon, correct?

4    A.  Yes.

5    Q.  You've been treating this type of injury for

6  the better part of 30 years, correct?

7    A.  Yep, yes.

8    Q.  To a reasonable degree of medical certainty,

9  do you support the care provided by Dr. Obaisi to this

10  patient?

11    A.  Yes.

12    Q.  Doctor, same question as to Dr. Davis.  Do you

13  support the care provided by Dr. Davis to this patient?

14    A.  Yes.

15    Q.  And same question as to LaTonya Williams.

16  Doctor, do you support the care provided by

17  Miss Williams to this patient, correct?

18    A.  Yes.

19    Q.  All those opinions are to a reasonable degree

20  of medical certainty, correct?

21    A.  Yes.

22    Q.  The basis is your education, training, and

23  decades of experience as a board-certified orthopedic

24  surgeon, correct?

**Page 151**

1    A.  Yes.

2  MR. MARUNA:  Nothing further.

3  MR. McCLAIN:  I have just one follow-up.  Could I

4  get Exhibit 10?

5  MR. MARUNA:  Here you go.  (Document tendered.)

6       REDIRECT EXAMINATION

7  BY MR. McCLAIN:

8    Q.  Doctor, I'm going to hand you Exhibit 10 so

9  you can refer to it during my questioning.  That

10  document does not indicate specifically what

11  Mr. Hemphill was doing when he dropped the weight on his

12  hand, correct?

13    A.  Correct.

14    Q.  So there's no way to determine if he was, in

15  fact, weight lifting, correct?

16  MR. MARUNA:  Objection, foundation.

17  BY THE WITNESS:

18    A.  Right, or what he was doing if he was weight

19  lifting, right.

20    Q.  And even if he was weight lifting, there's no

21  indication as specifically what type of exercise he was

22  doing, correct?

23    A.  Right.

24    Q.  For all we know, he could have been doing leg

**Page 152**

1  lifts or some sort of lower body exercise, correct?

2    A.  Right.

3  MR. McCLAIN:  No further questions, Doctor.

4  MR. MARUNA:  I've got one more based on that,

5  counsel, and then we'll get you out of here, Doctor.

6       RECROSS-EXAMINATION

7  BY MR. MARUNA:

8    Q.  This will be 11.  Doctor, showing you what's

9  going to be marked as 11.  Counsel. (Document tendered.)

10  I'm going to probably, just to speed this up, come over

11  here, Doctor, if you don't mind.

12    A.  Sure.

13    Q.  Doctor, can I direct you to paragraph -- And

14  I'll represent to you this is the sworn deposition of

15  the plaintiff which was made under oath, I'm going to

16  direct you to page 35, line 12. I want you just to read

17  from 12 to 24 on that page.

18    A.  Question --

19    Q.  You don't have to read it out loud, you can

20  just read it to yourself.

21    A.  (Witness viewing document.)

22    Q.  Doctor, based on your review of Mr. Hemphill's

23  testimony, did he indicate that he was lifting weights

24  when he had the injury in April of 2014 to his hand?

38  (Pages 149 to 152)

Electronically signed by Carrie Brown (101-369-569-5178)    4cb0fd90-42a0-4a56-8797-f455a0bd7c68

Hemphill v. Wexford Health Sources, Inc.
Chadwick C Prodromos, M.D. - 12/20/2018

Page 153

1    A.  Yes, and he said his shoulder failed.
2    Q.  That was my next question.
3    A.  I'm sorry, but yes.
4    Q.  Did Mr. Hemphill indicate that his shoulder
5    failed while he was lifting that weight, correct?
6    A.  Yes.
7    Q.  Reasonable to assume he was doing a
8    weight-lifting exercise that involved his shoulder if
9    the shoulder failed?
10    MR. McCLAIN:  Objection, calls for speculation,
11    form, foundation.
12    BY THE WITNESS:
13    A.  Well, you know, even as counsel said, if he
14    was doing leg lifts or something, the shoulder wouldn't
15    fail unless -- You know, so maybe he was doing bench
16    presses which is a real shoulder kind of exercise or
17    maybe he was taking something to put on his leg, but
18    either way he must have been lifting in a way that the
19    shoulder didn't like.
20    Q.  And that would be consistent with your
21    testimony earlier today that when the patient with this
22    injury, in your experience, decades of experience, the
23    pain is caused because the patient is continuing to
24    exert the joint space, correct?

Page 154

1    MR. McCLAIN:  Objection, form, foundation, calls
2    for speculation.
3    BY THE WITNESS:
4    A.  Yes.
5    MR. MARUNA:  Nothing further, Doctor.
6    MR. McCLAIN:  Signature?
7    MR. MARUNA:  Doctor, you're going to waive, right?
8    THE WITNESS:  Yes.
9    (Witness excused.)
10    (Dr. Prodromos Deposition Exhibits
11    Nos. 3 through 11 marked as
12    requested.)
13    (WHEREUPON, the deposition concluded
14    at 7:23 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 155

1    UNITED STATES OF AMERICA      )
     NORTHERN DISTRICT OF ILLINOIS )
2    EASTERN DIVISION          ) SS.
     STATE OF ILLINOIS         )
3    COUNTY OF COOK            )
4
5        I, Carrie L. Brown, Certified Shorthand
6    Reporter and Registered Professional Reporter, do hereby
7    certify that CHADWICK C. PRODROMOS, M.D., was first duly
8    sworn by me to testify the whole truth and that the
9    above deposition was reported stenographically by me and
10    reduced to typewriting under my personal direction.
11        I further certify that the said deposition was
12    taken at the time and place specified and that the
13    taking of said deposition commenced on the 20th day of
14    December, A.D., 2018, at 4:07 p.m.
15        I further certify that I am not a relative or
16    employee or attorney or counsel of any of the parties,
17    nor a relative or employee of such attorney or counsel,
18    nor financially interested directly or indirectly in
19    this action.
20
21
22
23
24

Page 156

1        In witness whereof, I have hereunto set my
2    hand at Chicago, Illinois, this 9th day of January,
3    A.D., 2019.
4
5
6
7
8
9
10    CARRIE L. BROWN, CSR, RPR
11    180 North LaSalle Street
      Suite 2800
12    Chicago, Illinois  60601
      Phone:  (312) 236-6936
13
      CSR No.  084.004516
14
15
16
17
18
19
20
21
22
23
24

Electronically signed by Carrie Brown (101-369-569-5178)                    4cb0fd90-42a0-4a56-8797-f455a0bd7c68