040372/19344/MHW/JFM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARL HEMPHILL, <br><br> Plaintiff, <br><br> v. <br><br> WEXFORD HEALTH SOURCES, INC.; et al., <br><br> Defendants. | Case Number 15-cv-4968 <br><br> Judge Sharon Johnson Coleman |

### THE WEXFORD DEFENDANTS MEMORANDUM OF LAW IN SUPPORT OF THEIR FED. R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, P.A., and ANN DAVIS, M.D., by and through their attorneys, Matthew H. Weller and James F. Maruna, of CASSIDAY SCHADE LLP, and for their Memorandum of Law in Support of their Motion for Summary Judgment, state as follows:

### INTRODUCTION

Plaintiff, CARL HEMPHILL, filed a complaint against WEXFORD HEALTH SOURCES, INC. and three (3) of his former medical providers, related to, *inter alia*, a claim that Wexford and the medical providers violated his constitutional rights based on their medical care and treatment of his shoulder. His claim lacks any merit. Plaintiff had shoulder impingement and arthritis. *See* The Wexford Defendants' L.R. 56.1 Statement of Facts ("SOF"), ¶ 24. Most patients with impingement syndrome receive conservative treatment and improve. (SOF at ¶ 25). Some patients may benefit from surgery, but even after surgery, some patients still report pain. (SOF at ¶ 31).

Here, in a span of three (3) years, Wexford and its medical providers took this patient through a logical course of treatment. First, they tried conservative treatment with pain medications and lifestyle modifications. When Plaintiff still reported pain, they escalated the treatment to invasive corticosteroid injections - which Plaintiff admitted provided him with months of relief. When the Plaintiff still reported pain after receiving injections, they approved him for consultation with an orthopedic surgeon. When the orthopedic surgeon recommended an MRI of the shoulder, Wexford approved it immediately and the Plaintiff received it within weeks. When the orthopedic surgeon reviewed the MRI and recommended surgery, Wexford approved it and the Plaintiff received it within weeks.

Deliberate indifference is a high burden to clear. Plaintiff must prove that no reasonable medical doctor would have acted as these physicians did in treating his condition. Plaintiff cannot carry his burden in this case. After all, Dr. Chad Prodromos, the only orthopedic surgeon deposed in this case, testified that he reviewed the medical records, and if this patient had presented to him for orthopedic consultation, he would not have recommended surgery or an MRI. (SOF at ¶¶ 75-78). Instead, he would have recommended only conservative treatment that he called "quite similar" to the treatment provided to the Plaintiff by the Wexford Defendants. (SOF at ¶ 76). Because surgery and an MRI were never mandatory - per the only orthopedic surgeon deposed in this case - any claims by Plaintiff of "delayed treatment" necessarily fail.

Simply, Plaintiff could not even prove a claim of medical negligence with this evidence - let alone ever satisfy the much higher burden of constitutional deliberate indifference. Accordingly, the Wexford Defendants are entitled to judgment as a matter of law. Therefore, this Court should grant summary judgment to the Wexford Defendants.

## II.  MATERIAL FACTS

The Wexford Defendants incorporate their Statement of Undisputed Facts Pursuant to Local Rule 56.1 and accompanying exhibits, filed concurrently with their Motion for Summary Judgment and supporting Memorandum of Law.

## III.  ARGUMENT

### A.  Venue and Jurisdiction are Proper

The Defendants have consented to this Court's jurisdiction and venue by admission in answer to Plaintiff's Second Amended Complaint.  (SOF at ¶ 1).

### B.  The Court Should Bar Plaintiff's Expert, Dr. Hellerstein, Because He Worked for Wexford in Another Case Where He Received Confidential Information

As an initial matter, the Court should bar Plaintiff's expert Dr. Hellerstein.  In his disclosures, Dr. Hellerstein was forced to admit that he previously was retained by Wexford to review and opine on an IDOC case pending in the Southern District of Illinois.  (SOF at ¶ 9).

A district court has the "inherent power to disqualify expert witnesses where or when it is necessary to protect the integrity of the adversary process, and/or to promote public confidence in the legal system." *Rosenthal Collins Group, LLC v. Trading Techs. Int'l, Inc.*, No. 05-C-4088, 2008 U.S. Dist. LEXIS 73897, * 3, 2008 WL 4542948 (N.D. Ill. Aug. 15, 2008).  "This is especially true where the basis for disqualification is the expert's past relationship with an adversary in litigation." *Id.*  Courts apply a two-part test.  First, the Court asks whether the party seeking disqualification acted reasonably in assuming that a confidential relationship existed and second, whether confidential information was exchanged requiring disqualification of the expert. *Id.* at 4.  "If both questions are answered in the affirmative, disqualification is warranted." *Id.*

Here, a few years ago, Wexford, through its attorneys, retained Dr. Hellerstein to work as an expert witness in a lawsuit involving a claim made by an IDOC inmate.  (SOF at ¶ 9).  It was

3

completely reasonable for Wexford to assume that a confidential relationship existed with Dr. Hellerstein - or at least that their retained expert would not pop up in another IDOC case a few years later on the other side of the "v." line.  Second, Dr. Hellerstein admitted that Wexford's confidential information was provided to him in document form in that prior lawsuit.  (SOF at ¶ 9).  Dr. Hellerstein also admitted that he frequently spoke with Wexford's attorneys in the prior case.  He could not remember how many times he spoke with Wexford's attorneys in that prior case, but testified that it was more than five (5) times.  (SOF at ¶ 9).  Moreover, because Dr. Hellerstein testified both at deposition and at trial on Wexford's behalf, Dr. Hellerstein met with and participated in "preparation sessions" with Wexford's attorneys prior to giving any testimony.  (SOF at ¶ 9).  Certainly, proprietary testimony and litigation strategies gleaned from Wexford's prior litigation experience (and/or its attorneys' prior experience) were revealed and discussed with Dr. Hellerstein during these preparation sessions with Wexford's attorneys.

Now Dr. Hellerstein has switched sides and, unless barred, can make use of any and all of that knowledge that he gained in confidence against Wexford.  This is a clear conflict and completely unfair to Wexford.  Accordingly, the Court should bar Dr. Hellerstein.

**C.     Summary Judgment is Proper in this Matter**

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Though facts must be viewed in the light most favorable to the non-moving party at the summary judgment stage, this rule only applies if there is a "genuine" dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

4

**D.     Plaintiff Has Not Established the Elements of Deliberate Indifference**

      1.     *Plaintiff must establish all three elements of deliberate indifference to prevail*

The uncontroverted factual record establishes that Plaintiff has unequivocally failed to create any issue of material fact to defeat the Wexford Defendants' Motion for Summary Judgment. In order to prevail on a Section 1983 claim, the Plaintiff must show that every single one of the individual Wexford Defendant acted with deliberate indifference to his serious medical need or condition. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The burden of proof rests on the Plaintiff. *Id.*

The United States Supreme Court has articulated a three-part test for proving deliberate indifference. The Plaintiff must prove: (1) the existence of an objective, serious medical need; (2) that the defendant was subjectively aware of a specific, serious medical need or risk; and (3) that the defendant demonstrated a culpable mental state by deliberately ignoring the plaintiff's alleged need or risk. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

In other words, the Plaintiff must establish that every single one of the individual Wexford Defendants actually knew (independently and subjectively) that the Plaintiff needed treatment for a serious medical need or risk but nevertheless <u>purposely and deliberately withheld such treatment</u>. *See Sellers*, 41 F.3d at 1102 (emphasis added). Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even tortious recklessness is not enough. *Id*. Unsuccessful medical treatment, neglect, nor medical malpractice is sufficient to support a claim for deliberate indifference. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

2.    *The Plaintiff did not suffer from an objectively serious medical condition*

In order to defeat this Motion, Plaintiff must first prove the existence of an objective, serious medical need. *Estelle,* 429 U.S. at 107; *Sellers,* 41 F.3d at 1102; *Vance,* 97 F.3d at 991. A serious medical need is an objective, life-threatening situation, or a risk of needless pain or lingering disability that went untreated, which would have been so obvious that even a lay person would perceive the need for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991). As the Seventh Circuit has held, not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (explaining that "minor aches and pains" do not rise to the level of a serious medical condition).

Here, the Plaintiff admitted that his pain was "on and off." *See* (SOF at ¶ 55) (Plaintiff telling Dr. Obaisi on June 4, 2015 that his pain was "on and off for two years"). Likewise, during this time period he was still working a prison job at Stateville's kitchen performing multiple activities and lifting weights in the prison yard, demonstrating that the "pain" was not impeding his functional abilities. (SOF at ¶ 37; 57). Additionally, from a biomechancial perspective, the Plaintiff's condition, impingement syndrome, causes no pain when the arm is at rest, it only causes pain when certain arm movements are attempted that overstress the joint. (SOF at ¶ 26; 28). Impingement syndrome does not cause "around the clock" pain. (SOF at ¶ 26). Nor can it disturb sleep. (SOF at ¶ 26).

As Dr. Prodromos, the orthopedic surgeon, testified, if a patient with impingement syndrome simply stops lifting his arm directly overhead, the pain will always go away "period."

6

(SOF at ¶ 28).  Simply, there is no evidence that this Plaintiff was in the sort of excruciating, severe, activity-altering pain, necessary to constitute an objectively serious medical need.

    3. *The Wexford Defendants lacked subjective notice of a serious medical need*

  The Wexford Defendants lacked subjective notice of an excessive risk to the Plaintiff's health.  The second element of a deliberate indifference claim – subjective notice – requires that "[a] plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm."  *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016).  For the Plaintiff's claim to succeed, he must establish that every single one of the individual Wexford Defendants knew that the treatment that they provided to the Plaintiff was ineffective; and yet, continued pursuing that course of treatment knowing that doing so would actually harm the Plaintiff.  *See Petties*, 836 F.3d at 728.  Plaintiff's claim fails.

  First, Plaintiff actually told these providers that their medical treatment (pain medication and injections) provided him with pain relief - sometimes for months at a time.  (SOF at ¶ 46; 49-51).  As Dr. Prodromos, the orthopedic surgeon, explained, the Plaintiff's positive response to the corticosteroid injection was particularly revealing in this case. (SOF at ¶ 30).  The injection consists of two medications.  The second medication, lidocaine, is diagnostic.  (SOF at ¶ 30). Lidocaine is diagnostic because if the injection relieves the patient's pain, then it confirms to the clinician that he has identified the correct pathology of the patient's pain - in this case, shoulder impingement syndrome.  (SOF at ¶ 30).  Thus, the Plaintiff's report to the clinicians that the injections relieved his pain provided the clinicians with notice that they were pursuing the right treatment option.  (SOF at ¶ 30).

  Deliberate indifference requires that Plaintiff come forward with evidence that each Wexford Defendant knew that the treatment that they were providing was ineffective and

7

harmful, and yet the provider continued giving that ineffective harmful treatment. *Petties*, 836 F.3d at 728. He can never carry that burden because, quite the opposite situation existed here, the evidence showed that the providers received information directly from the Plaintiff that their treatment relieved his pain complaints. (SOF at (SOF at ¶ 46; 49-51). Therefore, Plaintiff's deliberate indifference claim fails as a matter of law.

        4.        <u>*No Wexford Defendant displayed the required culpability because their treatment of the Plaintiff complied with the applicable standard of care*</u>

The Plaintiff's deliberate indifference claim against the Wexford Defendants fails because the undisputed facts show that all Wexford Defendants complied with all applicable community standards of medical care in treating the Plaintiff. The third element of a deliberate indifference claim is that the defendant demonstrated a culpable mental state by deliberately ignoring the plaintiff's alleged need or risk. *Estelle,* 429 U.S. at 107. In order to infer the required culpability for the serious claim of deliberate indifference based on a medical professional's care, the medical professional's decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

A medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). Mere disagreement with a doctor's medical judgment does not amount to deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Questions of whether certain forms of treatment are warranted are a "classic example of a matter for medical judgment". *Estate of Cole ex rel. Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). The Eighth Amendment does not entitle an inmate to demand specific care or the best care possible. *Forbes*, 112 F. 3d at 267.

With respect to the culpable state of mind requirement, gross negligence is not enough; the conduct must be reckless in the criminal sense. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). As the Seventh Circuit recently noted in an *en banc* decision, "Even objective recklessness - failing to act in the face of an unjustifiably high risk that is so obvious that it should be known - is insufficient to make out a claim." *Petties,* 836 F.3d at 728.

Initially, no reasonable fact-finder can hear about the totality of treatment and then find that the treatment was cruel and unusual. Plaintiff first complained of shoulder pain in January-February 2013. (SOF at ¶¶ 32-34). The majority of patients with shoulder pain require only conservative treatment and no surgery. (SOF at ¶ 25). Per Dr. Prodromos, the orthopedic surgeon, treatment of shoulder impingement pain follows a logical progression of care. (SOF at ¶ 29). Treatment starts with NSAID medication, ice and/or therapy. (*Id.*) If conservative treatment with medications does not resolve the pain, you can elevate treatment to a more invasive procedure like corticosteroid injections into the shoulder. (SOF at ¶ 30). Eventually, if the patient still reports pain after a series of injections, you can consider surgery; however, surgery is not a universal "cure all" for impingement syndrome, and some patients still report pain even after receiving surgery. (SOF at ¶ 31).

Here, Plaintiff claimed that he developed the pain out of the blue on January 1, 2013. (SOF at ¶ 32). On February 1, 2013, he started on pain medications. (SOF at ¶ 34). When he claimed that the pain medications were not working, PA Williams doubled the pain medication dosage and added a new medication, a topical anesthetic. (SOF at ¶ 36). When Plaintiff complained that the higher dosage and analgesic balm were not enough; Dr. Davis switched the Plaintiff to a new medication, Naproxen. (SOF at ¶ 38). When Plaintiff complained that the Naproxen was not helping, Dr. Obaisi switched the Plaintiff to another medication, Mobic. (SOF

9

at ¶ 39). When Plaintiff complained that the Mobic was not working, Dr. Obaisi provided the Plaintiff with a corticosteroid injection into his shoulder. (SOF at ¶ 41).

Dr. Obaisi continued providing the Plaintiff with corticosteroid injections and pain medications, which Plaintiff admitted provided pain relief for months at a time. (SOF at ¶ 43; 46; 50; 51; 54-55). In June of 2015, when Plaintiff reported that his pain was "on and off" for two (2) years, Dr. Obaisi referred the Plaintiff for orthopedic consultation which Wexford approved. (SOF at ¶¶ 55-56). The IDOC transferred the Plaintiff downstate to Hill Correctional Center, so he missed his scheduled UIC appointment, but Wexford secured approval for the Plaintiff to consult with a local orthopedic surgeon in Galesburg, IL; and Wexford approved not only the MRI requested by the surgeon but also an invasive surgical procedure. (SOF at ¶¶ 64-66). Despite receiving surgery, Plaintiff was still reporting at the time of his deposition, that he had "4 out of 10" pain. (SOF at ¶ 67). Even when Plaintiff was told that some patients with shoulder impingement will have chronic lifelong pain even after surgery, Plaintiff advised that he would never accept anything less than zero pain. (SOF at ¶ 68).

Simply, the evidence confirms that the Wexford Defendants correctly diagnosed the Plaintiff's pain pathology as shoulder impingement and then initiated and followed a logical, progressive plan of treatment starting with conservative treatment and ending with surgery. This treatment is the standard of care it is not deliberate indifference.

Second, the Plaintiff can only prevail on his culpability showing by demonstrating to the Court that no other "minimally competent medical professional would have responded under these circumstances." *Sain*, 512 F.3d at 894-95. Worded another way, under the case law, if the Wexford Defendants can show that even one minimally competent physician would have treated the Plaintiff's pain complaints like they did, then the Plaintiff's deliberate indifference claim fails

10

as a matter of law. The Wexford Defendants can point to several physicians. First, Dr. Funk, Dr. Obaisi, Dr. Davis, and PA Williams, all supported the totality of the medical care provided to this Plaintiff. (SOF at ¶ 71). Second, Dr. Tubbs, an expert in correctional medicine, also supported and approved of the medical care provided by Dr. Obaisi, Dr. Davis, and PA Williams. (SOF at ¶ 73).

Dr. Prodromos, the only orthopedic surgeon deposed in this case, testified that he has been treating shoulder impingement for the better part of thirty (30) years and he fully supported the medical care of Dr. Obaisi, Dr. Davis, and PA Williams. (SOF at ¶ 78). Dr. Prodromos testified that if this patient had been sent to him for orthopedic consultation, instead of to the orthopedic surgeon in Galesburg, IL, **Dr. Prodromos would not have recommended surgery or an MRI.** (SOF at ¶ 75). In fact, Dr. Prodromos opined that if this patient presented to Dr. Prodromos as a private patient in his office, **Dr. Prodromos would have recommended only conservative treatment "quite similar" to what the Wexford Defendants provided in this case - pain medication, activity modification, and injections.** (SOF at ¶ 76). Plaintiff's claim fails if even one doctor supports the Wexford Defendants' care. Here, six (6) doctors support their care - including a certified correctional health care provider and an orthopedic surgeon.

Finally, the fact pattern in this case is almost verbatim the same fact pattern in a case decided in Wexford's favor earlier this month. In *Booker v. Wexford Health Sources, Inc.*, the plaintiff-inmate sued Wexford and Dr. Obaisi for treatment of his left shoulder pain over the course of three (3) years. No. 16-CV-10440, 2019 U.S. Dist. LEXIS 24841, * 17-19, 2019 WL 652160 (N.D. Ill. Feb. 15, 2019). The Court found no deliberate indifference on Plaintiff's claim that he should not have had to wait three (3) years for an MRI of his shoulder. *Id.*

11

The Court noted that Dr. Obaisi and other medical professionals employed a "conservative but progressive course of treatment." *Id.* at 17. Initially, they prescribed medicine and counseled the inmate to avoid activities that could exacerbate the shoulder. *Id.* When that treatment proved insufficient to resolve the pain, the Wexford providers switched up the pain medications by taking the inmate's preferences into account. *Id.* at 18. Dr. Obaisi then administered three steroid injections to the inmate's shoulder "which at least initially appeared to be effective." *Id.* The Wexford providers also recommended physical therapy. *Id.*

The Court found that no reasonable fact finder could hear that record and then find that the inmate was treated with deliberate indifference to the medical needs of his shoulder. *Id.* at 19. Just like *Booker*, no jury can hear about Plaintiff Hemphill's totality of care for his shoulder and then find that the Wexford Defendants' medical treatment was deliberately indifferent.

5. *Plaintiff lacks verifying medical evidence*

The Plaintiff lacks verifying medical evidence that the alleged "inadequate" or "delayed" medical treatment actually caused him harm. First, without verifying medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of his medical treatment is insufficient to raise a genuine issue of material fact. *Walker v. Zunker*, 30 Fed. App'x. 625, 628 (7th Cir. 2002). Plaintiff's "inadequate treatment" argument is, *inter alia*, the Wexford Defendants conservative treatment approach was inadequate and, instead, they should have jumped right to an MRI and surgery in 2013. The problem with Plaintiff's argument is that surgery did not cure his pain - in fact, he still was reporting pain at "4 out of 10" well after surgery. (SOF at ¶ 67). Accordingly, Plaintiff cannot prove that the Wexford Defendant's medical treatment decisions (as opposed to the underlying medical condition) caused his pain.

12

Second, the Plaintiff produced no verifying medical testimony establishing his claims that any alleged delayed medical treatment detrimentally caused him harm. *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996) ("an inmate who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Padilla v. Bailey*, No. 09-C-8068, 2011 U.S. Dist. LEXIS 80945, * 17-18, 2011 WL 3045991 (N.D. Ill. July 25, 2011) ("[B]ecause [the plaintiff] did not introduce verifying medical evidence that shows his condition worsened because of the delay, his deliberate indifference claim fails) (internal quotations omitted); *Richey v. Obaisi*, No. 14-C-9399, 2018 U.S. Dist. LEXIS 187851, * 16 (N.D. Ill. Nov. 2, 2018) (noting that "[w]ithout such evidence, the required element of causation is lacking.").

As noted, only one orthopedic surgeon provided testimony in this case - Dr. Prodromos. Dr. Prodromos was adamant that if the Plaintiff had presented to his office for orthopedic consultation, he would not have recommended surgery or an MRI for the Plaintiff. Thus, Dr. Prodromos opined that any claim by Plaintiff that an MRI or surgery was delayed (or should have occurred faster) is false because neither surgery nor an MRI was ever indicated for this patient. (SOF at ¶ 77). Plaintiff lacks verifying medical evidence supporting his claim.

**E.     The Plaintiff has Failed to Prove his Claim Against Wexford Health Sources, Inc.**

The Plaintiff has failed to prove his claim against Wexford Health Sources, Inc. Private corporations acting under color of state law, like municipalities, may be held liable for injuries resulting from unconstitutional policies or practices. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). In order to recover against a corporate defendant under § 1983, a plaintiff must show that an

13

unconstitutional policy or widespread practice exists, and second, that deliberate indifference occurred because of that unconstitutional policy or widespread practice. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986).

First, the Plaintiff makes the frequent *Monell* allegation that Wexford maintains a policy or widespread practice to deny and delay necessary medical treatment. [Dkt. # 33, ¶ 50, 104]. Despite litigating this case for years, Plaintiff still cannot point this Court to a single policy supporting his claim. Absent clear evidence of an unconstitutional policy, the Court should not take the Plaintiff's word and assume that one exists. In *Montague v. Wexford Health Sources, Inc.*, the Seventh Circuit affirmed the District Court's grant of summary judgment to Wexford when an inmate claimed that Wexford maintained an unconstitutional policy or widespread practice, but could produce no evidence of either. 615 F. App'x. 378, 379 (7th Cir. 2015). The Seventh Circuit noted that a policy to deny necessary medical treatment in order to save costs made no sense because Wexford would end up spending more money in the long-term either through expensive medical treatment or litigation. *Id.*

Here, the Plaintiff has no evidence of an unconstitutional policy that Wexford denies or delays necessary medical treatment to save costs, or for any reason. In fact, quite the opposite, - Wexford approved all recommendations for this patient made by his treating medical providers: orthopedic consultation; an MRI; and surgery. (SOF at ¶ 56; 64-66). As Dr. Tubbs, a Certified Correctional Health Care Provider who treats 100 inmates per week in jails and drafts medical policies for correctional settings testified, Wexford and Wexford's medical policies and procedures did not prevent or obstruct the quality or quantity of medical care provided to the Plaintiff. (SOF at ¶ 74).

14

Second, the Plaintiff has produced no evidence of how other inmates were treated in order to support a "widespread practice" showing. In order to claim a "widespread practice", a prisoner needs evidence of how other inmates were treated in order to show that his treatment was not a "random event" but truly the result of a corporate policy. *Grieveson v. Anderson,* 538 F.3d 763, 774 (7th Cir. 2008). Conclusory, factually unsupported allegations about the experience of other inmates are not a sufficient basis to prove *Monell* liability against Wexford. *Haywood v. Wexford Health Sources, Inc.,* No. 16-cv-3566, 2017 U.S. Dist. LEXIS 28416, * 11 (N.D. Ill. Mar. 1, 2017). Here, the Plaintiff has no evidence of how other inmates were treated. Thus, he cannot proceed on a "widespread practice" theory.

Finally, it bears noting that even if the Plaintiff had met his threshold burden of proof in establishing an unconstitutional policy or widespread practice of Wexford, he still fails the second hurdle of his *Monell* claim - that deliberate indifference actually occurred because of that policy or widespread practice. *Pembaur*, 475 U.S. at 479-80. In order to meet the second prong of a *Monell* claim, the Plaintiff must show that the unconstitutional policy was the "direct cause" or "moving force" behind the alleged deliberate indifference to his serious medical needs. *See Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010). As noted above, no individual provider displayed deliberate indifference.

### F. The Plaintiff's claim for punitive damages fails

Finally, punitive damages may be awarded under 42 U.S.C. § 1983 only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Schaub v. VonWald*, 638 F.3d 905, 922-23 (8th Cir. 2011). Here, all providers testified that they never intended to cause the Plaintiff any harm, and only desired the best possible medical outcome for the Plaintiff.

15

(SOF at ¶ 70). Therefore, even if a question of fact exists, Plaintiff's punitive damages should be dismissed.

## **CONCLUSION**

WHEREFORE, Defendants, WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, P.A., and ANN DAVIS, M.D., pray that this Honorable Court enter an Order granting Summary Judgment in their favor, dismissing the case with prejudice against Plaintiff, awarding fees and costs for having to defend this meritless claim that was pursued maliciously based on the lack of evidence, and for any other relief deemed just.

Respectfully submitted,

WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, and ANN DAVIS, M.D.

By: /s/ James F. Maruna
Matthew H. Weller / ARDC No. 6278685
James F. Maruna / ARDC No. 6313433
CASSIDAY SCHADE, LLP
222 W Adams Street, # 2900
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 - Fax
mweller@cassiday.com
jmaruna@cassiday.com

*Counsel for Defendants,* WEXFORD HEALTH SOURCES, INC., GHALIA OBAISI, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), LATONYA WILLIAMS, and ANN DAVIS, M.D.

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2019, I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ James F. Maruna

9080524 JMARUNA;JMARUNA