**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARL HEMPHILL,<br><br>  Plaintiff,<br><br>  vs.<br><br>WEXFORD HEALTH SOURCES, INC.,<br>SALEH OBAISI, ANN HUNDLY DAVIS,<br>LATONYA WILLIAMS, LOUIS SHICKER,<br>MICHAEL LEMKE, DORRETTA O'BRIEN,<br><br>  Defendant. | No. 15 CV 4968<br><br>Honorable Sharon Johnson Coleman<br>Magistrate Judge Mary M. Rowland |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

NOW COMES Plaintiff Carl Hemphill by his court-appointed attorneys, Foley & Lardner LLP, for his L.R. 56.1 Statement of Material Facts in Support of his Response to Wexford Defendants' Motion for Summary Judgment and the Defendants Michael Lemke, Doretta O'Brien, and Louis Shicker's Motion for Summary Judgment, states as follows:

**EXHIBIT LIST**

**Exhibit A**: Dr. Hellerstein Report
**Exhibit B**: Deposition of Dr. Ann Davis
**Exhibit C**: Deposition of Dr. Saleh Obaisi
**Exhibit D**: Deposition of Dr. Kennon Tubbs
**Exhibit E**: Deposition of Michael Lemke
**Exhibit F**: Deposition of Dr. Chadwick Prodromos
**Exhibit G**: Deposition of LaTonya Williams
**Exhibit H**: Deposition of Dr. Arthur Funk
**Exhibit I**: Deposition of Louis Shicker
**Exhibit J**: Deposition of Dorretta O'Brien
**Exhibit K**: Deposition of Carl Hemphill
**Exhibit L**: Deposition of Dr. Hellerstein

1. Plaintiff's expert Dr. David Hellerstein received his bachelor's degree from Harvard College, a PhD from Stanford University, and his MD from University of California, San Diego. He currently serves the Inspector General for the State of California to monitor the quality of care for California's prison system. **Ex. A**, p. 2. As a consultant to the Inspector General, the state of California and a federal receivership appointed over the California Department of Corrections relies on Dr. Hellerstein's opinion in terms of monitoring and evaluating the quality of care. (Ex. L, 30:19-31:14) Dr. Hellerstein has served as an expert witness in correctional healthcare in numerous prisoner's rights cases. He previously served as the Chief Medical Director Medical and Public Health Programs, Division of Correctional Health Care Services, California Department of Corrections and Rehabilitation. He led the team that developed, piloted, and implemented a computer-based Inmate Patient Scheduling, Tracking, and Quality Monitoring System that was subsequently used throughout the California Prison system. It is Dr. Hellerstein's opinion, as an expert in correctional medicine, that the health care provided to Plaintiff for his shoulder while incarcerated at Stateville Correctional Center fell below the standard of care. **Ex. A**, p. 3.

2. When Plaintiff was first incarcerated he was not informed of how IDOC policies and procedures worked. (Ex. K, 18:20-22).

3. On April 19, 2013, Plaintiff presented to Dr. Ann Davis with shoulder pain. Dr. Davis found Plaintiff had tenderness over his right acromioclavicular joint and pain with external and internal rotation of the shoulder. (Ex. B, 35:21-25). Dr. Davis prescribed Plaintiff a stronger anti-inflammatory medicine than what he was currently receiving and scheduled him with Dr. Obaisi for an injection on right AC joint for April 23, 2013. (Ex. B, 38:17-25; Ex. C, 50:21-51:9).

4. Plaintiff was not seen on April 23, 2013 due to "no provider" and he was rescheduled for April 28, 2013. There is no notation in Plaintiff's medical file indicating he was seen on April 28, 2013 and the next entry for a medical visit is dated May 31, 2013 with a medical technician and at which Plaintiff complained he cannot sleep because of the pain in this shoulder. The medical technician scheduled Plaintiff to see a doctor on June 4, 2013, this did not occur. (Ex. C, 51:18-53:18; Ex. D. 45:17-23)

5. In June 2013, a Wexford nurse informed Plaintiff he needed an MRI on his shoulder in order to diagnose the problems and figure out a proper treatment plan. (Ex. K, 38:6-13.).

6. On June 6, 2013, Dr. Obaisi saw Plaintiff, scheduled an x-ray of Plaintiff's right shoulder, and scheduled a one-week follow up. The one week follow up did not occur. (Ex. D, 45:23-46:12). Dr. Obaisi did not next see Plaintiff until June 26, 2013. At this examination Plaintiff complained of shoulder pain and stated his current medication was not helping, and Dr. Obaisi ordered a 90-day supply of a

2

different non-steroidal anti-inflammatory (NSAID) with no scheduled follow up. (Ex C., 63:6-24; Ex. D, 46:22-47:2).

7.      At this point, there is an emerging pattern of delayed and failed follow up appointments. (Ex. A, p. 4). In the correctional setting it is incumbent on the institution to have a process in place to ensure that cancelled or rescheduled appointments take place to maintain good medical care, however, due to the many cancelled and rescheduled appointments in early 2013, this process failed Plaintiff. (Ex. A., p. 4).

8.      On July 24, 2013, Plaintiff wrote a letter to Utilization Management of Wexford Health Resources in which Plaintiff requested copies of Wexfords medical policies and procedures for inmates with medical issues and to go to U of I for an MRI or surgery on his shoulder. This is no apparent response to this record. (Ex. A, p. 5)

9.      On July 28, 2013, Plaintiff filed a Medical Treatment Grievance in which Plaintiff complains of chronic shoulder pain and requests to have an MRI, plus surgery, and a consult with a doctor at UIC or U of I. (Ex. E, 55:18-21). This grievance was not addressed by a grievance officer until October 22, 2014 and was signed off by the chief administrative officer on October 24, 2014. (Ex. E, 57:6-11; Ex. A, p. 5). Michael Lemke, the former warden for Stateville stated that taking more than a year to respond to a grievance is "a bit long." (Ex. E, 60:23-61:6).

10.     In Dr. Hellerstein's expert opinion, the grievance process at Stateville Correctional Center was defective. Health care problems are usually time critical and patients likely suffer harm if issues are not addressed timely. No grievance process involving management of an ongoing medical condition should be allowed to take over a year to adjudicate (Ex. A, p. 6). The grievance process as Stateville did not provide for adequate review of medical care. The process left inmates (and Plaintiff) with legitimate concerns over medical care with no recourse. The Illinois Department of Corrections/Stateville Correctional Center's grievance process denied Mr. Hemphill access to the health care to which he was constitutionally entitled. (Ex. A, p. 6).

11.     It is the standard of care that requests for medical services and grievances be included in a patient's medical services chart. (Ex. L, 76:2-15).

12.     Even though Plaintiff received a cortisone shot on July 31, 2013, he continued to have pain in his right shoulder and complained of that pain on August 31, 2013, September 9, 2013, and September 11, 2013 to nurses at Stateville. (Ex. F, 78:17-20). In fact, Plaintiff testified his shoulder pain got worse at this injection. (Ex. K, 56:7-11)

13.     At this time, Plaintiff had carried a diagnosis of should impingement syndrome for over six months without significant improvement. The standard of care

3

required Dr. Obaisi and Plaintiff's medical providers to order an MRI to look for other causes of Plaintiff's symptoms or to refer him to an orthopedist. (Ex. A, p. 7)

14.     On October 11, 2013, Plaintiff filed another grievance complaining of shoulder pain and requesting consultation with an outside university affiliate. This grievance was reviewed on October 17, 2014 and contained virtually an identical response to Plaintiff's July 28, 2013 grievance. (Ex. A., p. 7).

15.     On December 30, 2013, Plaintiff submitted an Offender Sick Call/Medical Services Request in which he requested to be sent out of an MRI and complained that his shoulder felt like it's "on fire". (Ex. F, 88:15-18; 90:2-4). Likewise, Plaintiff submitted another Offender Sick Call/Medical Services Request dated January 31, 2014 complaining of right shoulder pain and stating he had not received a response to his request for medical treatment. (Ex. F, 94:1-11)

16.     On February 7, 2014, Louis Shicker emailed Dr. Obaisi asking for a synopsis of Plaintiff's care, especially related to shoulder pain. (Ex. D, 55:21-25). Dr. Obaisi responded on February 11, 2014 that the cortisone injection given on July 31, 2013 gave relief until October 30, 2013 and that Dr. Obaisi has not heard from him since. (Ex. A, p. 7). Dr. Obaisi admitted he did not review any of Plaintiff's medical records before responding. (Ex. C, 145:15-24). Dr. Tubbs testified that he "certainly would have reviewed a medical record before sending a reply." (Ex. D, 58:1-6). Dr. Obaisi's response was inaccurate and misleading. (Ex. A, pp. 7-8)

17.     On February 13, 2014, Plaintiff was seen by a nurse and reported pain of 8 out of 10. (Ex. C, 81:9-82:3).

18.     On March 5, 2014, Plaintiff was scheduled to see the medical director, Dr. Obaisi, but this appointment was rescheduled to April 4, 2014 due to "no provider." Plaintiff's April 4, 2014 was again rescheduled to May 1, 2014 because "no provider available. In the interim, Plaintiff filed a two medical health service requests dated March 17, 2014 and April 25, 2014 requesting to see Dr. Obaisi, to have a cortisone shot, and to have an MRI. (Ex. D, 107:1-108:4). Plaintiff was also consistently in pain from his last injection until May 1, 2014. (Ex K, 64:17-14).

19.     Plaintiff was not seen at scheduled appointments on September 26, 2014, October 9, 2014, October 11, 2014, October 15, 2014. (Ex. A, p. 9).

20.     A doctor can provide access to care that a nurse cannot as a result, there are situations where it is inappropriate to see a nurse and instead a doctor is needed because a doctor can provide greater access to care. (Ex. L, 81:18-82:6). It is entirely reasonable for a patient to wait to see a doctor rather than see a nurse because a doctor can provide greater access to care. *Id.*

4

21.     On November 12, 2014, Plaintiff saw Dr. Obaisi and Dr. Obaisi noted that Plaintiff had pain in his right shoulder that was "no better x 2 years" (meaning the pain had not resolved after two years). (Ex. C, 97:5-17).  Dr. Obaisi order two more months of anti-inflammatories (naproxen), a drug Plaintiff has previously been prescribed and which did not previously alleviate Plaintiff's pain. (Ex. C, 97:18-98:8.)  This was a missed opportunity.  Dr. Obaisi should have referred Plaintiff for an MRI or to an outside specialist after three to six months of conservative therapy but here, Dr. Obaisi acknowledges Plaintiff was "no better" after two years but Dr. Obaisi continued to prescribe the same treatment. (Ex. A, p. 10)

22.     On February 11, 2015, Plaintiff saw PA Williams who referred Plaintiff to Dr. Obaisi because PA Williams believe Plaintiff's condition was chronic and her "hands were tied" so she wanted Dr. Obaisi to reassess Plaintiff.  (Ex. G, 52:23-54:15).  On March 4, 2015, Dr. Obaisi saw Plaintiff and Plaintiff again complained for shoulder pain.  (Ex. C, 99:8-13).  Dr. Obaisi again prescribed the same medicine he prescribed in November 2014 despite Plaintiff continuing to complain of shoulder pain.  (Ex. C, 100:3-12).

23.     On April 15, 2015, Plaintiff saw a nurse and complained of pain in his right shoulder that radiated down the right side of his back.  (Ex. C, 101:20-23)

24.     On June 4, 2015, Dr. Obaisi referred Plaintiff for an outside orthopedic evaluation.  Dr. Obaisi's request was approved on June 9, 2015.  (Ex. A, p. 10.)  Plaintiff continued to make complaints of shoulder pains after he was referred to see an outside specialist, including but not limited to in September 2015, November 2015, January 2016, and February 2016. (Ex. G, 111:16-24, 112:13-17; 113:6-16; 115:3-6; Ex. C, 121:19-23).

25.     On January 14, 2016, Wexford commented that Plaintiff's university appointment still had not been scheduled for his outside consultation and Plaintiff was scheduled to been seen by a local provider on April 15, 2016 (*Id.*).  Plaintiff missed his April 15, 2016 appointment because notice and transportation/security was not feasible (Ex. A, p. 10; Ex. H, 68:11-69:2).

26.     More than three years after Plaintiff first presented with shoulder pain, he ultimately had an MRI in May 2016 and an orthopedist proceed with surgery on Plaintiff. (Ex. A, p. 11).  The orthopedist made a preoperative diagnosis of chronic impingement syndrome and degenerative arthritis right acromioclavicular joint. The preoperative and postoperative diagnosis from the orthopedist that performed surgery on Plaintiff's right shoulder was identical.  (Ex. F, 140:21-141:6)

27.     Dr. Obaisi exhibited deliberate indifference for Plaintiff's medical condition and for treatment of inmates generally.

    a.   In response to questioning about Plaintiff's description of his pain as 8 out of 10, Dr. Obaisi replied "Eight to 10. Eight to 10, yeah. He should be on gurney, according to the pain-level scale." (Ex. C, 82:2-4)

    b.   In response to whether it was reasonable for it to take over two years for Plaintiff to get secondary treatment Dr. Obaisi replied "For impingement syndrome, the answer is yes…because impingement syndrome, this is the way it's created. It's just—nothing threatening anybody life. It's not threatening the muscle strength or the joint.  You can wait and treat conservatively as long as you want…."  (Ex. C, 138:3-21)

    c.   In response to questioning about whether Dr. Obaisi believed Plaintiff's complaint to a nurse that Plaintiff was in pain, Dr. Obaisi replied "That is a lie. I don't care what he tell the nurse. It's what he tell me." (Ex. C, 144:17-145:10).

    d.   In response to questioning about Plaintiff's grievances, Dr. Obaisi responded, "No, I did not see the grievances. The grievances are a mode for Mr. Hemphill and all of them to file lawsuit. I say that at the beginning. That's the way they are -- they are in business. I sell medicine. You sell law. He sell pain. I have -- every single inmate here have a lawsuit. Some of them have three, four, five lawsuits. Is that something reasonable? Unreasonable." (Ex. C, 149:2-11).

28.    For the period of 2013 to 2015, nursing staffing was difficult at times and the IDOC was trying to "revamp their sick call process as well". (Ex. I, 18:14-19:4). The IDOC was attempting to revamp the sick call process because it found that "there [were] often delays" in healthcare personnel reviewing and responding to sick call requests. (Ex. I, 19:22-20:17) There were also gaps in the staffing levels Wexford was required to maintain pursuant to its contract, including in nursing, medical staff, mid levels and medical director and this caused problems in people having to work overtime, lower staffing capabilities and could have caused problems in getting to see patients during sick call. (Ex. I, 19:5-21).

29.    The IDOC was aware of delays in responding to sick call requests. (Ex. I, 19:22-20:17)

30.    The IDOC also had problems with coordinating and scheduling outside provider appointments with the University of Illinois and there were "long delays in getting people in to see their consults." (Ex. I, 22:1-21).  Further, trying to schedule inmates within a reasonable time was difficult so patients (inmates) would not see their consultants "for a while." (Ex. I, 22:22-23:10).

31.    It was a coordinated effort between Wexford and the IDOC to ensure inmates would be able to see their medical consultants within a reasonable time period. (Ex. I, 24:15-19).  It was the warden's responsibility to ensure an inmate was

safely transferred to and from his medical consultant appoint. (Ex. E, 19:16-20:7).

32.    IDOC had an expectation that medical consultations would be carried quickly and this expectation was conveyed from IDOC to Wexford. (Ex. I, 26:10-13; 27:5-7).

33.    It was Michael Lemke's responsibility, as warden for Stateville, to ensure the contract between IDOC and Wexford for medical treatment was properly honored. (Ex. E, 19:16-20:7). Likewise, Dorretta O'Brien as assistant warden has similar responsibilities including ensuring inmates had access to the medical professionals and that they were seen as needed by the medical professionals. (Ex. E, 82:12-83:10).

34.    The IDOC conducted periodic audits of Wexford to ensure was providing adequate medical treatment and to ensure Wexford was following policies and procedures. (Ex. E, 22:18-23:10; Ex. J, 9:22-11:4).

35.    The grievance process at Stateville was inadequate. (Ex. A, p.12). Stateville's responses to Plaintiff's grievances were unduly delayed. The grievance process at Stateville failed Plaintiff. (Ex. A, p. 12).


Dated: April 19, 2019

                              Respectfully submitted,

                              FOLEY & LARDNER, LLP

                              By: /s/ Andrew T. McClain
                              One of the Attorneys for Plaintiff, CARL HEMPHILL

                              David B. Goroff
                              Andrew T. McClain
                              FOLEY & LARDNER LLP
                              321 North Clark Street, Suite 2800
                              Chicago, Illinois 60654-5313
                              (312) 832-4500
                              (312) 832-4700 (facsimile)
                              dgoroff@foley.com
                              amcclain@foley.com

## **CERTIFICATE OF SERVICE**

I, Andrew T. McClain, an attorney, certify I electronically filed the foregoing document with the clerk of court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ *Andrew T. McClain*

4844-3761-4740.1