UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL HEMPHILL, | ) |
| | ) Case No. 15-cv-4968 |
| Plaintiff, | ) |
| | ) Judge Sharon Johnson Coleman |
| v. | ) |
| | ) |
| GHALIA OBAISI, Independent Executor | ) |
| Estate of Saleh Obaisi, LATONYA WILLIAMS, | ) |
| ANN DAVIS, WEXFORD HEALTH SOURCES, | ) |
| INC., MICHAEL LEMKE, DORETTA | ) |
| O'BRIEN, and LOUIS SHICKER, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carl Hemphill filed his second amended complaint [33] asserting claims against Wexford Health Sources, Inc., Ghalia Obaisi, as the Independent Executor of the Estate of Saleh Obaisi, M.D. (deceased), Latonya Williams, P.A., and Ann Davis, M.D., (the "Wexford Defendants") and against Defendants Michael Lemke, Doretta O'Brien, and Louis Shicker (the "State Defendants"), alleging that they violated his Eighth Amendment rights because they acted with deliberate indifference to his serious medical needs by denying or delaying medical treatment while he was incarcerated. Hemphill also alleges that Wexford Health's policies caused his constitutional injury. The Wexford Defendants and the State Defendants have filed parallel motions for summary judgment. For the following reasons, the Wexford Defendants' motion for summary judgment [145] and the State Defendants' motion for summary judgment [151] are both granted.

**Rule 56.1 Statement and Expert Objections**

The Wexford Defendants contend that portions of Hemphill's Rule 56.1(b)(3)(B) Response to the Wexford Defendants' Rule 56.1 Statement does not comply with Local Rule 56.1(b) because Hemphill did not respond with "specific references" to the record that demonstrate a factual

1

dispute. L.R. 56.1(b)(3)(B); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). This Court deems admitted those paragraphs that Hemphill does not expressly admit to. Further, Hemphill fails to dispute with citations to relevant and admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record). Thus, the following paragraphs of the Wexford Defendants' Rule 56.1 Statement are deemed admitted: 28, 57, 62, 65, and 79.[1]

The Wexford Defendants also contend that the Court should disqualify Hemphill's medical expert witness Dr. David Hellerstein because he has a conflict of interest. It is within this Court's discretion "to disqualify expert witnesses where or when it is necessary to protect the integrity of the adversary process, and/or to promote public confidence in the legal system." *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*, No. 05 C 4088, 2008 WL 4542948, at *1 (N.D. Ill. Aug. 15, 2008) (Moran, J.). First the court asks "whether the party seeking disqualification acted reasonably in assuming that a confidential relationship existed and, second, whether confidential information was exchanged requiring disqualification of the expert." *Id.* If either question is answered in the negative, then disqualification is not merited. *Id.* Disqualification of expert witnesses is "a drastic measure which courts should hesitate to impose except when absolutely necessary." *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, No. 08 C 1083, 2009 WL 249386, at *1 (N.D. Ill. Feb. 2, 2009) (Dow, J.). As the party seeking disqualification, the Wexford Defendants, bear the burden of demonstrating a conflict. *Id.*

Here, Wexford Health retained Dr. Hellerstein as an expert witness a few years ago in a lawsuit involving a claim made by an Illinois Department of Correction ("IDOC") inmate through

---

[1] The Court also notes that the Wexford Defendants' object to Hemphill's response to the Wexford Defendants' Rule 56.1 Statement paragraph 68 and that Hemphill objects to the form of the question used in the underlying deposition testimony. The Court denies both objections and does not rely on this non-material fact.

2

which Dr. Hellerstein was exposed to Wexford Health's confidential information. Hemphill asserts that disqualification would be inappropriate because there is no overlap in the parties, the medical condition, the correctional facility, or the attorneys that represented Wexford Health in either case. The mere fact that Dr. Hellerstein performed work for Wexford Health previously and was exposed to confidential information as a result is not a sufficient basis to warrant disqualification. Such a conflict of interest standard would effectively prohibit experts, such as Dr. Hellerstein, from testifying as an expert in their field of expertise once they have been exposed to confidential information from one client. The Wexford Defendants cite no controlling precedent to support such a standard. Further, the Wexford Defendants have not presented any evidence or argument that there is overlap between the technical subject matter of the litigations. The vast differences between the prior Wexford Health matter for which Dr. Hellerstein testified at trial and this matter indicate that the expert does not have a conflict of interest in the present matter. Thus, the Court denies the Wexford Defendants' request that the Court disqualify Dr. Hellerstein.

**Background**

*Medical Treatment*

Hemphill is an inmate incarcerated with IDOC, who previously was housed at Stateville Correctional Center. Wexford Health, a private corporation contracted by IDOC, provided medical services to Stateville inmates during the time periods relevant to this dispute. Dr. Obaisi, who was employed by Wexford Health, served as the Medical Director for Stateville from 2012 until his death in 2017. Williams has been employed as the physician's assistant at Stateville since 2002. Dr. Davis worked as a staff physician at Stateville from April 2013 to April 2014. Lemke, a non-medical professional, served as the Warden of Stateville from December 2012 to December 2013. Lemke relied on medical providers to determine medical treatment plans. O'Brien is a former Assistant

3

Warden of Programs at Stateville, who retired in December 2013. Dr. Shicker was the Medical Director for IDOC from November 2009 to June 2016.

Hemphill began to experience right shoulder pain on January 1, 2013, and eventually was diagnosed with shoulder impingement and arthritis. In February 2013, Hemphill was given a prescription for Tylenol and was scheduled to see a clinician. A few weeks later, Hemphill saw Williams, a physician's assistant. Hemphill reported that he was still experiencing pain, so Williams increased his prescription. Dr. Davis treated Hemphill in clinic in April 2013 for a hand injury; Hemphill made no mention of shoulder pain during that visit. Dr. Davis saw Hemphill again a few weeks later. During that visit, Hemphill complained of having ongoing shoulder pain for the two months, so Dr. Davis switched Hemphill's his medication to Naproxen.

In June 2013, Hemphill received an X-ray, which revealed no abnormalities. Hemphill saw Dr. Obaisi in clinic later the same month and told Dr. Obaisi that his medication was not helping. Dr. Obaisi switched his medication from Naproxen to Mobic. In July 2013, Hemphill saw a nurse, whom he told his medications still were not helping. The nurse performed an examination on Hemphill and found that he had no signs or symptoms consistent with distress. The same day, Dr. Obaisi provided Hemphill with a medical permit for a bottom bunk in the cell house and requested that IDOC cuff Hemphill at the waist rather than behind his back. Both of these actions intended to provide relief for Hemphill's pain.

Hemphill was scheduled for a steroid injection in September 2013, which was rescheduled due to a lockdown and administered in October 2013. In February 2014, Hemphill told the nurse that his steroid injections helped for about 60 days and that his Naproxen prescription helped him a little. During an appointment in May 2014, Hemphill told Dr. Obaisi that the pain had come back in the last few weeks. Hemphill further testified in his deposition that the injection had not helped much, but the pain medication had been providing some relief for his shoulder pain. Dr. Obaisi

4

provided Hemphill with another injection, which relieved Hemphill's pain for around 40 days. In November 2014, Dr. Obaisi treated Hemphill in clinic again; during that appointment, Dr. Obaisi diagnosed Hemphill with chronic tendonitis, ordered an X-ray, and issued a prescription for Naproxen. The X-ray results were negative.

Williams diagnosed Hemphill with chronic pain in his right shoulder in February 2015. Dr. Obaisi evaluated Hemphill again in March 2015, and Hemphill told Dr. Obaisi that his pain was "on and off." Dr. Obaisi renewed the Naproxen prescription for ninety days. Hemphill saw Dr. Obaisi again in June 2015 and told Dr. Obaisi that his pain continued. Dr. Obaisi made a referral for an offsite consultation with UIC's orthopedic service, which Wexford Health approved. In the interim, Williams evaluated Hemphill and ordered another X-ray in January 2016, which again returned negative findings.

Hemphill was transferred from Stateville to another correctional center in March 2016, which caused Hemphill to miss his referral for the UIC consultation. In April 2016, Hemphill saw a local orthopedic surgeon near his new correctional center, who scheduled an MRI that revealed a partial tear of Hemphill's rotator cuff. Wexford Health approved the orthopedic surgeon's recommendation for surgery, which Hemphill received in June 2016. Hemphill testified that the surgery reduced his pain level from 10 out of 10 to 4 out of 10.

*Grievances*

On July 28, 2013, Hemphill filed a grievance regarding his medical treatment and requesting an MRI for his shoulder, surgery, and a consultation with a specialist. During Lemke's time as Warden, his designees would review and respond to grievances and letters. Lemke testified that he did not recall personally reviewing Hemphill's grievance, and that his signature on the grievance was added by a Stateville employee. On October 11, 2013, Hemphill submitted another grievance regarding his medical treatment, again requesting a consultation from a specialist regarding his

5

shoulder pain. Lemke did not sign the second grievance and testified that he did not recall reviewing that grievance either. On December 9, 2013, Hemphill wrote a letter addressed to Lemke requesting an MRI and a consultation from another doctor. Letters received by the Warden's Office typically are stamped when received. However, the letter dated December 9 had no stamp on it, and Lemke did not recall seeing the letter.

The Grievance Office received the first grievance on August 16, 2013; the office sent an initial response confirming receipt on August 30, 2013, and a full response from the Grievance Office on October 24, 2014, ten months after Lemke left office. Based on a licensed practical nurse's review, the grievance officer recommended no action because Hemphill appeared to be receiving appropriate medical care at that time. The Grievance Office received the second grievance on October 15, 2013. The office sent an initial response five days later and a full response the next year, also after Lemke had left his position. Lemke testified that the individuals who received the grievance would not have had the authority to issue an MRI. Rather, medical treatment is dictated and performed by medical professionals and grievance officers have to rely on their opinions. Hemphill admitted that he did not have an in person conversation with Lemke.

On December 9, 2013, Hemphill wrote a letter addressed to O'Brien requesting an MRI and a medical consultation. Hemphill stated in his letter that he had spoken in person with O'Brien. O'Brien, however, did not recall having a conversation with Hemphill and denied having seen the letter addressed to her. O'Brien testified that she was not working at Stateville during the entire month of December 2013 and that generally letters addressed to her would be handled by her secretary, who would refer the matter to a healthcare administrator or grievance officer for follow-up. O'Brien did not have the authority to order an MRI or send anyone to outside treatment. She also testified that if she had talked to Hemphill regarding his situation, she would have referred him to a medical provider.

Around that time, Hemphill also wrote a letter to the Governor's office regarding what he viewed as inadequate medical treatment and requesting an MRI. After seeking insight from Dr. Obaisi, Dr. Shicker replied to Hemphill's letter on February 25, 2014, informing Hemphill that the decision for an MRI was a clinical one, that Dr. Obaisi had been watching his case and treating him symptomatically, and that should things change clinically Dr. Obaisi may adjust his treatment plan. Dr. Shicker testified that he relied on Dr. Obaisi's report and did not see red flags in Hemphill's case. Hemphill confirmed that he had never met nor received medical treatment from Dr. Shicker.

During his deposition, Dr. Shicker further testified regarding staffing at the correctional centers that IDOC serviced. Specifically, he testified that there were gaps in the staffing levels and that IDOC was attempting to revamp the sick call process because "there [were] often delays." (Dkt. 159-9, Ex. I at 7.) He also testified that IDOC was aware of the delays.

**Legal Standard**

Summary judgment is proper when the pleadings, the discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual dispute exists when there is enough evidence that a reasonable jury could find in favor of the nonmoving party. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Discussion**

To succeed on a claim for deliberate indifference, Hemphill must demonstrate that he had an objectively serious medical need and that the Wexford Defendants and the State Defendants were aware of and refused to take reasonable steps to address it. *Dobbey v. Mitchell-Lawshea*, 806 F.3d

7

938, 940 (7th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 101, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). As to medical professionals, deliberate indifference will only be inferred if a physician's treatment decision is such a departure from accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). When determining whether deliberate indifference can be inferred from a physician's treatment decision, courts focus on what the physician knew at the time of treatment. *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008). Nonmedical personnel, on the other hand, are generally entitled to rely on the judgment of jail health professionals, *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010), and will not be found to be deliberately indifferent unless they have reason to believe that medical personnel are mistreating or not treating a prisoner. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

As to whether Hemphill's pain constitutes an objectively serious medical need, the evidence clearly demonstrates that his shoulder condition constituted a serious medical condition that required medical treatment. *See Hotchkiss v. David*, 713 F. App'x 501, 504 (7th Cir. 2017); *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). Therefore, the only issue to resolve on the motions for summary judgment is whether Dr. Obaisi, Dr. Davis, Williams, Lemke, O'Brien, Shicker, and Wexford Health were deliberately indifferent.

*The State Defendants*

The State Defendants argue that the undisputed evidence demonstrates that the State Defendants were not personally involved in Hemphill's medical care and that they were not deliberately indifferent to his medical needs, as required for liability under section 1983. Hemphill responds that disputed material facts and a lack of timely and proper medical care prevent granting summary judgment for the State Defendants.

8

To prevail on a claim against a warden, Hemphill must show that the warden was personally involved with his medical care independent of the grievance process or that the warden was deliberately indifferent to Hemphill's need for and access to medical care. *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012). The undisputed evidence shows that Lemke and O'Brien's only involvement in Hemphill's case was related to the grievance process. Hemphill does not point to any evidence that Lemke or O'Brien were personally involved in his medical treatment or any alleged delay. Indeed, Lemke's undisputed testimony supports that Lemke and O'Brien did not have the authority to make or evaluate any medical decision. Rather, the Warden Office and Grievance Office must refer grievances concerning medical treatments to medical professionals and rely on their judgments. Hemphill's two grievances were referred to, and reviewed by, licensed practical nurses. Grievance officers subsequently relied on their opinions and decided that no additional action was required regarding to ensure Hemphill received access to medical care.

While Lemke and O'Brien had a duty to ensure that inmates have access to medical treatment, access is not the issue here; Hemphill received medical care throughout the time period at issue. Hemphill's claim is based on the Wexford Health doctors' delay in ordering an MRI or consultation with a specialist. Because there is no genuine issue of material fact as to Lemke and O'Brien's personal involvement, Lemke and O'Brien could not be deliberately indifferent to Hemphill's care. Thus, the Court grants the State Defendants' motion for summary judgment as to Lemke and O'Brien.

On the other hand, Dr. Shicker was involved in evaluating Hemphill's medical care. Although the undisputed evidence shows that Dr. Shicker did not personally treat Hemphill, Dr. Shicker received Hemphill's letter to the Governor's office, reviewed a report from Dr. Obaisi on Hemphill's medical condition, and exercised medical judgment when he approved of Dr. Obaisi's

9

care plan. As a result, there is sufficient evidence for a jury to find that Dr. Shicker participated in the alleged constitutional deprivation.

Next, Hemphill must demonstrate that Dr. Shicker was deliberately indifferent regarding Hemphill's medical care. Hemphill argues that Dr. Shicker failed to further investigate after he obtained Hemphill's medical records from Dr. Obaisi. Deliberate indifference describes a state of mind more blameworthy than negligence. *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy this subjective component, the prison official must know of and disregard an excessive risk to inmate health. *Hayes*, 546 F.3d at 522.

Hemphill argues that Dr. Shicker became aware of his serious medical condition when Dr. Shicker reviewed his letter to the Governor. Dr. Shicker, however, testified that as the medical director of IDOC, he relied on Wexford Health's medical director Dr. Obaisi to provide information regarding Hemphill's care. And, the medical record that Dr. Shicker reviewed showed that Hemphill received treatment in which his doctors continued to try different medications and options when Hemphill's pain continued. A prison official will be liable when the treatment an inmate receives is so plainly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition. *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Id.* at 653. Although Hemphill contends that a lack of timely medical care was deliberately indifferent, the undisputed facts indicate the Dr. Shicker confirmed that Hemphill was receiving ongoing medical treatment. The Court finds this undisputed evolving care plan does not constitute deliberate indifference and also grants summary judgment in favor of Dr. Shicker.

The State Defendants also raise qualified immunity as an alternative argument for the first time on reply. However, it is well established that arguments raised for the first time in a reply brief

10

are waived. *United States v. Wescott*, 576 F.3d 347, 354 (7th Cir. 2009). The Court will not consider this issue of qualified immunity.

<u>*The Wexford Defendants*</u>

The Wexford Defendants contend that they lacked subjective notice of a serious medical need, that the Wexford Defendants treated Hemphill with the applicable standard of care, and that Hemphill lacks verifying medical evidence. Hemphill's primary argument is that the Wexford Defendants were deliberately indifferent because they delayed Hemphill's medical care, especially an MRI, referral to a specialist, and shoulder surgery. The Seventh Circuit has explained that delay is not always significant and "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); *see also Walker*, 233 F.3d at 501. Hemphill must provide medical evidence that the actual delay in his treatment caused him harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

Hemphill has demonstrated that each of the Wexford Defendants was aware of Hemphill's shoulder pain through their treatment of Hemphill; but this alone is not evidence that they disregarded a substantial risk of harm to Hemphill. Hemphill contends that the Wexford Defendants were medically indifferent by allowing a pattern of cancelled and rescheduled appointments. A prison official, however, cannot be held liable for a job that is not his own. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. … [P]eople who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen."). The evidence does not show that the Dr. Obaisi, Dr. Davis, or Williams were responsible for rescheduling appointments, and therefore, they cannot be held responsible for any related delays.

11

Hemphill further contends that the Wexford Defendants are not entitled to summary judgment because there are still outstanding issues of material fact related to whether Dr. Obaisi, Dr. Davis, and Williams departed from accepted medical standards. As support for this contention, Hemphill relies on Dr. Hellerstein's expert report. An expert report will not create a genuine issue of material fact if it does not provide the basis for its conclusions. *See Shaw v. Wexford Health Sources, Inc.*, No. 17-2848, 2019 WL 4127344, at *2 (7th Cir. Aug. 29, 2019). Dr. Hellerstein's report lists only three articles that are not attached to his report and are not discussed therein. (Dkt. 159-1 at 3.)

The evidence shows that Hemphill began receiving treatment for his shoulder pain as soon as he complained about his pain. Dr. Obaisi diagnosed Hemphill with chronic tendonitis and Williams later diagnosed him with chronic pain. As his treatment progressed, Hemphill was also diagnosed with shoulder impingement and arthritis. Dr. Hellerstein writes that the "standard of care required Dr. Obaisi to order an MRI to look for other causes of Mr. Hemphill's symptoms, or to refer him to an orthopedist" (Dkt. 159-1 at 7) and "[p]ersistent should pain with limited range of motion calls for MRI or specialty referral after three to six months of conservative treatment," (*id.* at 10), but does not indicate whether that "standard of care" is based on the articles he reviewed or any other source.

Dr. Hellerstein himself recognizes that "[m]ost Shoulder Impingement Syndrome patients get better with rest and rehabilitation, including … oral anti-inflammatory agents." (Dkt. 159-1 at 2.) That is precisely the course of treatment that the Wexford Defendants sought to exhaust before turning to the more aggressive steps of prescribing an MRI and consultation with a specialist. The record shows that the Wexford Defendants altered the course of their treatment throughout the time they treated Hemphill, using a conservative but progressive care plan. Without more, Dr. Hellerstein's report fails to show *how* or *why* the Wexford Defendant's diagnoses and ongoing and evolving treatment of Hemphill's shoulder were a departure from accepted medical professional

12

standards. Thus, any conclusions found in Dr. Hellerstein's report that would preclude summary judgment are unsupported, and therefore, do not create an issue of material fact.

Moreover, Hemphill has not offered "verifying medial evidence" that any delay in his medical treatment (rather than his underlying medical condition) caused some degree of harm. *See Williams*, 491 F.3d at 715. Hemphill points to *McGowan v. Hulick*, 612 F.3d 636 (7th Cir. 2010) as an example of a case where the plaintiff set forth a plausible set of facts for deliberate indifference based on delay of treatment. However, *McGowan* was decided at the motion to dismiss juncture, while this case is subject to the heightened summary judgment standard.

Similarly, this case is distinct from *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005). In *Greeno*, the plaintiff's situation progressively worsened with the plaintiff experiencing severe heartburn and vomiting and no relief from the medication that his doctors prescribed to him. *Id.* at 649–50. Here, in contrast, Hemphill affirmatively told the Wexford Defendants on numerous occasions that the medication and steroid shots relieved his pain for a period of time. All Hemphill has achieved is to register disagreement with the Wexford Defendants' medical judgment. That is insufficient to prove deliberate indifference. *Berry*, 604 F.3d at 441. A reasonable jury could not find that the Wexford Defendants' progressive care plan for Hemphill was deliberately indifferent under the law where Hemphill himself informed the Wexford Defendants that he experienced partial relief from the treatment.

Finally, Hemphill contends that Wexford Health, in conjunction with IDOC, had knowledge of and perpetuated a practice and policy of understaffing. The Wexford Defendants respond that Wexford Health cannot be held liable because Hemphill seeks to hold Wexford Health and IDOC jointly and severally liable and because after providing the initial authorization Wexford Health had no role in the process of scheduling or arranging transportation for appointments. To recover on a deliberate indifference claim against a corporate entity under *Monell v. Dep't of Soc. Servs. of City of New*

13

*York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a plaintiff must allege that his constitutional injury was caused by a corporate policy, custom, or practice. *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

To establish a widespread practice or policy, Hemphill must provide competent evidence that a policy of understaffing was "the *moving* force behind the constitutional violation before [the Court] can impose liability under *Monell*." *Id.* at 306 (reversing liability of Wexford Health related to an alleged policy of understaffing). Hemphill again points to authority at the motion to dismiss juncture, which has no bearing on the type of evidence necessary to refute a defendants' motion for summary judgment. Here, the evidence does not establish that understaffing was relevant to the medical treatment used by the Wexford Defendants. Moreover, Hemphill has not presented a causal link between any understaffing and an alleged failure to provide adequate medical care. Based upon this record, the Court finds there is not sufficient evidence for a reasonable jury to find Wexford Health deliberately indifferent and grants the Wexford Defendants' motion for summary judgment on the *Monell* claim.

Finally, the Court does not award punitive damages because "reckless or callous indifference" does not exist where there is no underlying liability for the Wexford Defendants or the State Defendants. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007).

**Conclusion**

For the foregoing reasons, the Court grants the Wexford Defendants' motion for summary judgment [145] and the State Defendants' motion for summary judgment [151].

IT IS SO ORDERED.

Date: 9/12/2019    Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge